# EXHIBIT 2A



**KENTUCKY COURT OF JUSTICE**

24-CI-01033

### GUPTA, PRAGYA B. ET AL VS. KENTUCKY BOARD OF MEDICAL LICENSU

**FRANKLIN CIRCUIT COURT**

Filed on **10/16/2024** as **CONSTITUTIONAL CHALLENGE** with **HON. THOMAS DAWSON WINGATE**

**\*\*\*\* NOT AN OFFICIAL COURT RECORD \*\*\*\***

| **Case Memo** | **24-CI-01033** |
|---|---|

*12-19-25 OPINION AFFIRMING FCC BYSCOA;;;;;;;*

| **Parties** | **24-CI-01033** |
|---|---|

as **PLAINTIFF / PETITIONER**

**GUPTA, PRAGYA B.** as **PLAINTIFF / PETITIONER**

**KENTUCKY BOARD OF MEDICAL LICENSURE** as **DEFENDANT / RESPONDENT**

**Address**

HON. RUSSELL T. COLEMAN
700 CAPITOL AVE, SUITE 118
FRANKFORT KY 40601

**Summons**

**CIVIL SUMMONS** issued on **10/16/2024** served / recalled on **10/24/2024** by way of **CERTIFIED MAIL**
*9208190194038383321992; Successful;*

**KENTUCKY BOARD OF MEDICAL LICENSURE** as **DEFENDANT / RESPONDENT**

**Address**

MICHAEL S. RODMAN, EXECUTIVE DIRECTOR
310 WHITTINGTON PARKWAY, SUITE 1B
LOUISVILLE KY 40222

**Summons**

**CIVIL SUMMONS** issued on **10/16/2024** served / recalled on **10/24/2024** by way of **CERTIFIED MAIL**
*9208190194038383322012; Successful;*

**KENTUCKY BOARD OF MEDICAL LICENSURE** as **DEFENDANT / RESPONDENT**

**Address**

LEANNE DIAKOV, GENERAL COUNSEL
310 WHITTINGTON PARKWAY, SUITE 1B
LOUISVILLE KY 40222

**Summons**

**CIVIL SUMMONS** issued on **10/16/2024** served / recalled on **10/24/2024** by way of **CERTIFIED MAIL**
*9208190194038383322043; Successful;*

**RODMAN, MICHAEL S.** as **DEFENDANT / RESPONDENT**

**Address**

KENTUCKY BOARD OF MEDICAL LICENSURE
310 WHITTINGTON, PARKWAY, SUITE 1B
LOUISVILLE KY 40222

**Summons**

**CIVIL SUMMONS** issued on **10/16/2024** served / recalled on **10/24/2024** by way of **CERTIFIED MAIL**
*9208190194038383322050; Successful;*

**TAYLOR, KRISTIN ANN** as **DEFENDANT / RESPONDENT**

**Address**

PO BOX 172
ALEXANDRIA KY 41001

**Summons**

> **CIVIL SUMMONS** issued on **03/27/2026** by way of **CERTIFIED MAIL**
> *9236090194038364006173;*

---

**THORNBURY, WILLIAM C.** as **DEFENDANT / RESPONDENT**

**Address**

> KENTUCKY BOARD OF MEDICAL LICENSURE
> 310 WHITTINGTON, PARKWAY, SUITE 1B
> LOUISVILLE KY 40222

**Summons**

> **CIVIL SUMMONS** issued on **10/16/2024** served / recalled on **10/22/2024** by way of **CERTIFIED MAIL**
> *11/13/24 - RCVD CERT MAIL PACKAGE RETURNED UNDELIVERABLE; 9208190194038383322098; Successful;*

---

**TONEY, DALE E.** as **DEFENDANT / RESPONDENT**

**Address**

> KENTUCKY BOARD OF MEDICAL LICENSURE
> 310 WHITTINGTON, PARKWAY, SUITE 1B
> LOUISVILLE KY 40222

**Summons**

> **CIVIL SUMMONS** issued on **10/16/2024** served / recalled on **10/22/2024** by way of **CERTIFIED MAIL**
> *11/13/24 - RCVD CERT MAIL PACKAGE RETURNED UNDELIVERED; 9208190194038383322135; Successful;*

---

**COLEMAN, RUSSELL T.** as **ATTORNEY GENERAL**

**Address**

> OFFICE OF THE ATTORNEY GENERAL
> 700 CAPITAL AVE., SUITE 118
> FRANKFORT KY 40601

**Summons**

> **CIVIL SUMMONS** issued on **10/16/2024** served / recalled on **10/24/2024** by way of **CERTIFIED MAIL**
> *9208190194038383322159; Successful;*

---

**DOMENE, DAVID** as **ATTORNEY FOR DEFENDANT**

**Address**

> BLACKBURN DOMENE BURCHETT PLLC
> 614 W. MAIN ST. SUITE 3000
> LOUISVILLE KY 40202

---

**HINKLE, LISA ENGLISH** as **ATTORNEY FOR PLAINTIFF**

**Address**

> MCBRAYER PLLC
> 201 EAST MAIN STREET, SUITE 900
> LEXINGTON KY 40507

---

**KING, NICOLE** as **ATTORNEY FOR DEFENDANT**

**Address**

> KENTUCKY BOARD OF MEDICAL LICENSURE
> 310 WHITTINGTON PKWY
> LOUISVILLE KY 40222

**Summons**

> **CIVIL SUMMONS** issued on **03/27/2026** by way of **CERTIFIED MAIL**
> *9236090194038364005985;*

---

**KING, NICOLE** as **ATTORNEY FOR DEFENDANT**

**Address**

> KENTUCKY BOARD OF MEDICAL LICENSURE

310 WHITTINGTON PKWY

LOUISVILLE KY 40222

| Summons |
| --- |
| **CIVIL SUMMONS** issued on **03/27/2026** by way of **CERTIFIED MAIL** *9236090194038364006036;* |

**MICHAEL, VALERIE** as **ATTORNEY FOR PLAINTIFF**

| Address |
| --- |
| MCBRAYER 201 E MAIN ST, SUITE 900 LEXINGTON KY 40507 |

**RUTLEDGE, CHARLES** as **ATTORNEY FOR DEFENDANT**

| Address |
| --- |
| BLACKBURN DOMENE & BURCHETT, PLLC 614 WEST MAIN STREET, SUITE 3000 LOUISVILLE KY 40202 |

| Documents | 24-CI-01033 |
| --- | --- |

**COMPLAINT / PETITION** filed on **10/16/2024**
*COMPLAINT;*

**EXHIBIT** filed on **10/16/2024**
*EXHIBIT 1 - GRIEVANCE;*

**EXHIBIT** filed on **10/16/2024**
*EXHIBIT 2 - KENTON CIRCUIT COMPLAINT;*

**EXHIBIT** filed on **10/16/2024**
*EXHIBIT 3 - GUPTA RESPONSE, 05.09. 2023;*

**EXHIBIT** filed on **10/16/2024**
*EXHIBIT 4 - AGREED ORDER;*

**EXHIBIT** filed on **10/16/2024**
*EXHIBIT 5 - AMENDED AGREED ORDER;*

**EXHIBIT** filed on **10/16/2024**
*EXHIBIT 6 - 2023 ANNUAL KBML REPORT;*

**EXHIBIT** filed on **10/16/2024**
*EXHIBIT 7 - TRANSCRIPT;*

**EXHIBIT** filed on **10/16/2024**
*EXHIBIT 8 - MOTION TO VACATE OR AMEND;*

**EXHIBIT** filed on **10/16/2024**
*EXHIBIT 9 - LTR FROM KBML;*

**EXHIBIT** filed on **10/16/2024**
*EXHIBIT 10 - KBML'S CONSULTANT FINDINGS;*

**MISCELLANEOUS** filed on **11/07/2024**
*INDEX TO DOCUMENTS- KENTUCKY BOARD OF MEDICAL LICENSURE V. PRAGYA B. GUPTA, M.D. AGENCY CASE NO. 2106 VOLUME 1 OF 1 PERSONAL INFORMATION IN THE DOCUMENTS LISTED BELOW HAVE BEEN REDACTED. ;*

**MEMORANDUM** filed on **11/07/2024**
*PANEL MEMORANDUM ; MEMORANDUM TO PANEL B FROM JON MARSHALL, MEDICAL INVESTIGATOR, WITH EXHIBTS 1-5 ATTACHED PAGES. 001-221 EXHIBT 1- GRIEVANCE PAGES. 004-006 EXHIBT- 2- DR. GUPTA'S RESPONSE (...)*

**SEALED DOCUMENT** filed on **11/07/2024**
*RE: PRAGYA B. GUPTA MD. CASE 2106 SEALED RECORDS PAGES 035-058 MEDICAL RECORDS (DOCUMENTS SEALED IN MANILLA FOLDER);*

**SEALED DOCUMENT** filed on **11/07/2024**
*RE: PRAGYA B. GUPTA MD. CASE 2106 SEALED RECORDS PAGES 153-164 MEDICAL RECORDS (DOCUMENTS SEALED IN MANILLA FOLDER);*

**SEALED DOCUMENT** filed on **11/07/2024**
*RE: PRAGYA B. GUPTA MD. CASE 2106 SEALED RECORDS PAGES 166-175 MEDICAL RECORDS (DOCUMENTS SEALED IN MANILLA FOLDER);*

**SEALED DOCUMENT** filed on **11/07/2024**
*RE: PRAGYA B. GUPTA MD. CASE 2106 SEALED RECORDS PAGES 204-207 MEDICAL RECORDS (DOCUMENTS SEALED IN MANILLA FOLDER);*

**MISCELLANEOUS** filed on **11/07/2024**
*CD-ROM - PRESENTATION OF GUPTA TO PANEL B PAGE. 233;*

**ANSWER** filed on **11/08/2024**
*ANSWER;*

**NOTICE - OTHER** filed on **11/08/2024**
*NOTICE - MOTION TO DISMISS - ORDER;*

**TENDERED DOCUMENT** filed on **11/08/2024**
*PROPOSED / TENDERED ORDER;*

**RE-NOTICE OF HEARING** filed on **11/12/2024**
*RE-NOTICE;*

**RESPONSE** filed on **11/27/2024**
*PETITIONERS RESPONSE TO MOTION TO DISMISS;*

**REPLY** filed on **01/10/2025**
*REPLY AND NOTICE ON MTD;*

**ORDER DENYING** entered on **01/22/2025**
*24-CI-1033.PDFNOE ES : KING, NICOLE, HINKLE, LISA ENGLISH, MICHAEL, VALERIE;*

**TENDERED DOCUMENT** filed on **02/03/2025**
*PROPOSED / TENDERED ORDER;*

**NOTICE OF SUBMISSION** filed on **02/12/2025**
*AOC-280;*

**ORDER DENYING** entered on **02/14/2025**
*24-CI-1033.PDFNOE ES : KING, NICOLE, HINKLE, LISA ENGLISH, MICHAEL, VALERIE;*

**EXHIBIT** filed on **08/20/2025**
*AMENDED COMPLAINT;*

**RESPONSE** filed on **08/25/2025**
*RESP TO GUPTA REQ TO AMEND;*

**ENTRY OF APPEARANCE** filed on **03/09/2026**
*ENTRY OF APPEARANCE;*

**TENDERED DOCUMENT** filed on **03/09/2026**
*PROPOSED / TENDERED ORDER;*

**NOTICE - OTHER** filed on **03/10/2026**
*NOTICE OF SERVICE OF COMBINED DISCOVERY REQUESTS;*

**AMENDED COMPLAINT** filed on **03/19/2026**
*FIRST AMENDED COMPLAINT;*

**TENDERED DOCUMENT** filed on **03/19/2026**
*ORDER GRANTING MOTION TO FILE AMENDED COMPLAINT;*

**AMENDED COMPLAINT** filed on **03/27/2026**
*AMENDED COMPLAINT;*

**ORDER TO FILE AMENDED COMPLAINT** entered on **03/27/2026**
*24-CI-1033 AMENDED COMPLAINT.PDFNOE ES : DOMENE, DAVID, KING, NICOLE, RUTLEDGE, CHARLES, HINKLE, LISA ENGLISH, MICHAEL, VALERIE|;*

**EXHIBIT** filed on **03/27/2026**
*EXHIBIT;*

**EXHIBIT** filed on **03/27/2026**
*ORIGINAL COMPLAINT;*

| Events | 24-CI-01033 |
|---|---|

**MOTION HOUR** scheduled for **03/16/2026 09:00 AM** in room **E** with **HON. THOMAS DAWSON WINGATE**

> **Motions**
> • **MOTION - OTHER** filed on **03/09/2026** by **AD**

**MOTION HOUR** scheduled for **08/27/2025 09:00 AM** in room **E** with **HON. THOMAS DAWSON WINGATE**

| Motions |
| --- |
| • **MOTION TO AMEND** filed on **08/20/2025** by **AP** |

**MOTION HOUR** scheduled for **02/12/2025 09:00 AM** in room **E** with **HON. THOMAS DAWSON WINGATE**

| Motions |
| --- |
| • **MOTION - OTHER** filed on **02/10/2025** by **AP**<br>• **MOTION - OTHER** filed on **02/07/2025** by **AP**<br>• **MOTION TO RECONSIDER** filed on **02/03/2025** by **AD** |

**MOTION HOUR** scheduled for **01/15/2025 09:00 AM** in room **E** with **HON. THOMAS DAWSON WINGATE**

**MOTION HOUR** scheduled for **12/02/2024 09:00 AM** in room **E** with **HON. THOMAS DAWSON WINGATE**

| Images | 24-CI-01033 |
| --- | --- |

**COMPLAINT / PETITION** filed on **10/16/2024**  *Page(s): 26*

**EXHIBIT** filed on **10/16/2024**  *Page(s): 3*

**EXHIBIT** filed on **10/16/2024**  *Page(s): 7*

**EXHIBIT** filed on **10/16/2024**  *Page(s): 5*

**EXHIBIT** filed on **10/16/2024**  *Page(s): 9*

**EXHIBIT** filed on **10/16/2024**  *Page(s): 12*

**EXHIBIT** filed on **10/16/2024**  *Page(s): 1*

**EXHIBIT** filed on **10/16/2024**  *Page(s): 132*

**EXHIBIT** filed on **10/16/2024**  *Page(s): 198*

**EXHIBIT** filed on **10/16/2024**  *Page(s): 2*

**EXHIBIT** filed on **10/16/2024**  *Page(s): 8*

**SUMMONS** filed on **10/16/2024**  *Page(s): 1*

**SUMMONS** filed on **10/16/2024**  *Page(s): 1*

**SUMMONS** filed on **10/16/2024**  *Page(s): 1*

**SUMMONS** filed on **10/16/2024**  *Page(s): 1*

**SUMMONS** filed on **10/16/2024**  *Page(s): 1*

**SUMMONS** filed on **10/16/2024**  *Page(s): 1*

**SUMMONS** filed on **10/16/2024**  *Page(s): 1*

**COURTESY FINANCIAL TRANSACTION REPORT** filed on **10/16/2024**  *Page(s): 1*

**SUMMONS - RETURN OF SERVICE** filed on **10/30/2024**  *Page(s): 2*

**SUMMONS - RETURN OF SERVICE** filed on **10/30/2024**  *Page(s): 2*

**SUMMONS - RETURN OF SERVICE** filed on **10/30/2024**  *Page(s): 2*

**SUMMONS - RETURN OF SERVICE** filed on **10/30/2024**  *Page(s): 2*

**SUMMONS - RETURN OF SERVICE** filed on **10/30/2024**  *Page(s): 2*

**SUMMONS - RETURN OF SERVICE** filed on **10/30/2024**  *Page(s): 2*

**SUMMONS - RETURN OF SERVICE** filed on **10/30/2024**  *Page(s): 2*

**EXHIBIT** filed on **11/07/2024**  *Page(s): 3*

**MEMORANDUM** filed on **11/07/2024**  *Page(s): 3*

| |
|---|
| **MEMORANDUM** filed on **11/07/2024**   *Page(s): 3* |
| **MEMORANDUM** filed on **11/07/2024**   *Page(s): 154* |
| **MEMORANDUM** filed on **11/07/2024**   *Page(s): 66* |
| **MISCELLANEOUS** filed on **11/07/2024**   *Page(s): 3* |
| **ANSWER** filed on **11/08/2024**   *Page(s): 8* |
| **MOTION TO DISMISS** filed on **11/08/2024**   *Page(s): 30* |
| **TENDERED DOCUMENT** filed on **11/08/2024**   *Page(s): 2* |
| **NOTICE - OTHER** filed on **11/08/2024**   *Page(s): 2* |
| **RE-NOTICE OF HEARING** filed on **11/12/2024**   *Page(s): 2* |
| **RESPONSE** filed on **11/27/2024**   *Page(s): 17* |
| **REPLY** filed on **01/10/2025**   *Page(s): 6* |
| **ORDER DENYING** filed on **01/22/2025**   *Page(s): 3* |
| **MOTION TO RECONSIDER** filed on **02/03/2025**   *Page(s): 3* |
| **TENDERED DOCUMENT** filed on **02/03/2025**   *Page(s): 2* |
| **MOTION - OTHER** filed on **02/07/2025**   *Page(s): 2* |
| **MOTION - OTHER** filed on **02/10/2025**   *Page(s): 4* |
| **NOTICE OF SUBMISSION** filed on **02/12/2025**   *Page(s): 2* |
| **ORDER DENYING** filed on **02/14/2025**   *Page(s): 3* |
| **EXHIBIT** filed on **08/20/2025**   *Page(s): 25* |
| **MOTION TO AMEND** filed on **08/20/2025**   *Page(s): 4* |
| **RESPONSE** filed on **08/25/2025**   *Page(s): 3* |
| **MOTION - OTHER** filed on **03/09/2026**   *Page(s): 3* |
| **ENTRY OF APPEARANCE** filed on **03/09/2026**   *Page(s): 2* |
| **TENDERED DOCUMENT** filed on **03/09/2026**   *Page(s): 2* |
| **NOTICE - OTHER** filed on **03/10/2026**   *Page(s): 2* |
| **TENDERED DOCUMENT** filed on **03/19/2026**   *Page(s): 1* |
| **AMENDED COMPLAINT** filed on **03/19/2026**   *Page(s): 25* |
| **EXHIBIT** filed on **03/27/2026**   *Page(s): 26* |
| **EXHIBIT** filed on **03/27/2026**   *Page(s): 1* |
| **SUMMONS** filed on **03/27/2026**   *Page(s): 1* |
| **SUMMONS** filed on **03/27/2026**   *Page(s): 1* |
| **SUMMONS** filed on **03/27/2026**   *Page(s): 1* |
| **AMENDED COMPLAINT** filed on **03/27/2026**   *Page(s): 25* |
| **ORDER TO FILE AMENDED COMPLAINT** filed on **03/27/2026**   *Page(s): 1* |
| **COURTESY FINANCIAL TRANSACTION REPORT** filed on **03/27/2026**   *Page(s): 1* |
| **RECEIPT** filed on **03/30/2026**   *Page(s): 0* |

**\*\*\*\* End of Case Number : 24-CI-01033 \*\*\*\***

Filed          24-CI-01033   10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

06/06/2025 03:03:10

S031245

**COMMONWEALTH OF KENTUCKY**
**FRANKLIN CIRCUIT COURT**
**CASE NO. _____**
**DIVISION ___**


**PRAGYA B. GUPTA, M.D.**                                                    **PETITIONER**


## VERIFIED COMPLAINT AND PETITION FOR DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

**KENTUCKY BOARD OF MEDICAL LICENSURE**
an agency of the Commonwealth of Kentucky, and          **RESPONDENTS**

      Serve:      Hon. Russell T. Coleman
                  Office of the Attorney General
                  700 Capitol Ave., Suite 118
                  Frankfort, Kentucky 40601

      Serve:      Michael S. Rodman
                  Executive Director
                  Kentucky Board of Medical Licensure
                  310 Whittington Parkway
                  Suite 1B
                  Louisville, KY 40222

      Serve:      Leanne Diakov, Esq.
                  General Counsel
                  Kentucky Board of Medical Licensure
                  310 Whittington Parkway
                  Suite 1B
                  Louisville, KY 40222

and

**MICHAEL S. RODMAN., in his official capacity**
**as Executive Director of the Kentucky**
**Board of Medical Licensure**

      Serve:      Michael S. Rodman
                  Executive Director
                  Kentucky Board of Medical Licensure
                  310 Whittington Parkway
                  Suite 1B
                  Louisville, KY 40222

and

1

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000001 of 000026

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM

06/06/2025 03:03:10

**WILLIAM C. THORNBURY, M.D.** in his official capacity
as President of and member of the Kentucky Board of
Medical Licensure

S031245

        Serve:       William C. Thornbury, M.D.
                      President
                      Kentucky Board of Medical Licensure
                      310 Whittington Parkway
                      Suite 1B
                      Louisville, KY 40222

and

**DALE E. TONEY, M.D.,** in his official capacity
as Chair of Inquiry Panel B and member of the
Kentucky Board of Medical Licensure

        Serve:       Dale E. Toney, M.D.
                      Chairman, Panel B
                      Kentucky Board of Medical Licensure
                      310 Whittington Parkway
                      Suite 1B
                      Louisville, KY 40222

********

Comes the Plaintiff, Pragya B. Gupta, M.D., by counsel, pursuant to Kentucky Revised Statute ("**KRS**") 311.593, 13B.140, 418.040, *et seq.*, and Kentucky Rules of Civil Procedure ("**CR**") 57 and 65, and hereby files this Verified Complaint and Petition for Declaratory Judgment and Permanent Injunction. In support thereof, Dr. Gupta further states as follows:

**INTRODUCTION**

The Plaintiff, Dr. Gupta, seeks (1) Entry of an Order declaring the acts of the Kentucky Board of Medical Licensure ("**KBML**") to be unconstitutional and in violation of both his state and federal constitutional rights; (2) Entry of an Order declaring 201 KAR 9:082 to be an unconstitutional delegation of power to discipline physicians to the General Counsel through

2

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000002 of 000026

Filed                24-CI-01033   10/16/2024            Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
06/06/2025 03:03:10
PM
S031245

informal proceedings; (3) Entry of an Order declaring the actions of the Executive Director of the Kentucky Board of Medical Licensure's failure to present a Motion to Amend or Vacate the Amended Agreed Order an unconstitutional usurpation of the statutory authority of the KBML and a violation of Plaintiff's rights; (4) Entry of an Order declaring the entire proceedings against Dr. Gupta to be in violation of the right to fundamentally fair proceedings due to bias, conflict of interest inter alia; (5) Entry of an Order that the Agreed Order and Amended Agreed Order are substantively unconscionable and unfair and therefore null and void as against public policy; (6) Judgment in Plaintiff's favor as a result of the violation of his constitutional rights under state and federal law; and (7) Permanent injunctive relief preventing the enforcement of the unconstitutional Amended Agreed Order.

## THE PARTIES

1. Pragya B. Gupta M.D. (**Dr. Gupta**) is a physician licensed to practice medicine in Kentucky by the KBML. Dr. Gupta currently resides at 931 Tucana Drive, San Marcos, California 92078, but maintains an active medical license in Kentucky. Dr. Gupta practices in the specialty of interventional pain medicine and has maintained an unrestricted medical license in the Commonwealth for more than twenty-five years until June of 2023 when he executed an Agreed Order with the KBML.

2. The Kentucky Board of Medical Licensure ("**Board**" or "**KBML**") is a statutorily created agency of the Commonwealth of Kentucky whose principal office is located at 310 Whittington Parkway, Suite 1B, Louisville, Jefferson County, Kentucky 40222. Michael S. Rodman is the Executive Director of the KBML. He is statutorily charged to administer the Kentucky Medical Practice Act and is responsible for the regulation of all medical and osteopathic licensure functions within the Commonwealth of Kentucky including the licensure and discipline of

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000003 of 000026

Filed                24-CI-01033   10/16/2024            Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT 06/06/2025 03:03:10 PM S031245

physicians duly authorized to practice medicine in Kentucky.

3. Dale E. Toney, M.D. serves as Secretary of the KBML, serves as Chair of Inquiry Panel B, and serves as a board member of the KBML; he is served in his official capacity. At all times relevant to this case, Respondent Dale E. Toney, M.D. was acting under color of state law and the actions of the Respondent KBML and Respondent Dale E. Toney, M.D. constitute "state action" within the meaning of the Fourteenth Amendment to the United States Constitution. Service of process shall be made by serving Dale E. Toney, M.D., Chair, Panel B Kentucky Board of Medical Licensure, 310 Whittington Parkway, Suite 1B, Louisville, Kentucky 40222.

4. William C. Thornbury, M.D. serves as the President of the KBML and is served in his official capacity. At all times relevant to this case, Respondent William C. Thornbury, M.D. was acting under color of state law and the actions of the Respondent KBML and Respondent William C. Thornbury, M.D. constitute "state action" within the meaning of the Fourteenth Amendment to the United States Constitution. Service of process shall be made by serving William C. Thornbury, M.D., President, Kentucky Board of Medical Licensure, 310 Whittington Parkway, Suite 1B, Louisville, Kentucky 40222.

5. Defendant Michael S. Rodman is the Executive Director of the KBML and he is served in his official capacity. At all times relevant to this case, Respondent Michael S. Rodman was acting under color of state law and the actions of both the Respondent KBML and Respondent Michael S. Rodman constitute "state action" within the meaning of the Fourteenth Amendment to the United States Constitution. Service of process shall be made by serving Michael S. Rodman, Executive Director, Kentucky Board of Medical Licensure, 310 Whittington Parkway, Suite 1B, Louisville, Kentucky 40222.

6. Russell T. Coleman, Esq., Attorney General of the Commonwealth of Kentucky, serves as the

4

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000004 of 000026

Filed

DOCUMENT

PM

NOT ORIGINAL

06/06/2025 03:03:10

S031245

agent for service of process of the KBML pursuant to CR 4.04; to provide notice, pursuant to CR 24.03 of challenge to the Constitutionality of the regulations specified herein; and also as the legal advisor of all state offices, departments, and agencies pursuant to KRS 15.020. Attorney General Russell T. Coleman Esq. is served with this action for notice purposes only and served with summons and a copy of this Verified Complaint pursuant to CR 4.04(6).

## JURISDICTION & VENUE

7. Dr. Gupta adopts and reiterates each and every allegation set forth above as if fully set forth and restated herein.

8. This Court has jurisdiction over this action pursuant to Sections 109 and 112 of the Kentucky Constitution and KRS 23A.010.

9. Plaintiffs' claims for declaratory and injunctive relief are authorized by KRS 418.040, KRS 418.045, CR 57, CR 65.01, and the general legal and equitable powers of this Court.

10. Venue is appropriate in this Court pursuant to KRS 452.005 because this is a civil action that challenges the constitutionality of a Kentucky administrative regulation and that seeks declaratory and injunctive relief against individual state officials in their official capacities, and Plaintiff is a resident of the State of California.

11. Accordingly, and pursuant to KRS 452.005 (2)(b), because Dr. Gupta is not a resident of Kentucky, the proper venue for this action is Franklin Circuit Court.

12. Pursuant to KRS 418.075(1) and KRS 452.005(3), notice of this action challenging the constitutionality of enactments of the General Assembly is being provided to the Attorney General, by serving copies of the Complaint upon him.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000005 of 000026

5

Filed                24-CI-01033    10/16/2024              Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT 06/06/2025 03:03:10 PM S031245

## STATEMENT OF FACTS

13. Dr. Gupta practices interventional pain medicine and is a pain medicine physician who, prior to the events detailed in this Verified Complaint and Petition, practiced medicine in Northern Kentucky operating a private practice that provided pain treatment, interventions, and an alternative to long-term pain treatment with opioid medication for patients. Dr. Gupta has practiced medicine for over twenty-five years, has maintained active medical staff membership with St. Elizabeth Medical Center in good standing, and has treated thousands of patients. In addition, Dr. Gupta has been active in the research of new medications and interventions and has participated in forty-one clinical trials to develop newer opioid-sparing treatment options for patients and treatment options for patients with substance use disorders. Dr. Gupta is certified as a Diplomate of the American Board of Pain Medicine; is certified in Pain Medicine as a subspecialty; is certified as a Diplomate of the American Board of Anesthesiology; is certified as a Principal Investigator for the Academy of Clinical Research Professionals; has been named a Fellow of the Academy of Physicians in Clinical Research; and has published extensively in peer recognized medical journals.

14. On January 6, 2023, Wendy Fillhardt ("**Grievant**") filed a grievance with the Board alleging several complaints about the care she received from Dr. Gupta. **Exhibit 1 (KBML Grievance)**. While the Grievant made many different allegations, the primary basis of her complaint was that her IV treatment was administered by Dr. Gupta's unlicensed staff, that her privacy was violated because staff was in the procedure room when she was partially clothed, and that she was overmedicated.

15. On April 11, 2023, Ms. Fillhardt filed a medical malpractice action against Dr. Gupta in Kenton Circuit Court, 23-CI-00644. In this action, the Grievant was represented by Kristin Turner,

6

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000006 of 000026

Filed                24-CI-01033   10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
06/06/2025 03:03:10
PM
S031245

Esq., who then also served as a member of the KBML. **Exhibit 2 (Kenton Circuit Complaint).**

16. Ms. Turner served as a board member of the KBML from 2018 until October 2023.

17. In her KBML Grievance, Ms. Fillhardt alleged that Dr. Gupta allowed his medical assistant, D.J. Thomas, to place and insert her IV line and administer anesthesia. The Grievance and the lawsuit filed against Dr. Gupta contained essentially the same claims in almost identical language.[1] At the time the Grievant filed her complaint with the KBML, she was assisted by Kristin Turner, Esq., who was an active member of the KBML as the Grievant admitted in her deposition on May 29, 2024. While Ms. Turner's participation as counsel to the Grievant in her malpractice lawsuit was known when the complaint was filed, it was not known until the Grievant was deposed in 2024 that Ms. Turner also assisted the Grievant with her Grievance to the KBML on January 6, 2023. Ms. Turner stood to gain financially if the KBML took disciplinary action against Dr. Gupta as any disciplinary action against Dr. Gupta had the potential to favorably affect the outcome of the malpractice lawsuit.

18. The Grievant, Wendy Fillhardt, is Kristin Turner, Esq.'s aunt by marriage.

19. Based on an open records request, Ms. Turner did not disclose to the Board her representation of Ms. Fillhardt in filing the Grievance, did not disclose her representation of Ms. Fillhardt in the malpractice action, did not disclose her familial relationship with Ms. Fillhardt, and did not disclose any conflict of interest to the KBML.

20. The KBML should have become aware of this conflict of interest on May 9, 2023, when Dr. Gupta's then-counsel responded to the January 6, 2023 Grievance. In this response, Dr. Gupta requested that Ms. Turner recuse herself from the proceedings. **Exhibit 3 (May 9, 2023**

---

[1] Both Ms. Fillhardt's KBML Grievance and her Kenton Circuit Complaint misspell the word "prescribe" or "prescribed" as "proscribe" or "proscribed."

7

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000007 of 000026

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
06/06/2025 03:03:10
PM
S031245

**Response)**.

21. The KBML, however, never addressed or acknowledged the conflict, creating a perpetuating impropriety that still exists. In fact, knowledge that a fellow board member had filed a malpractice lawsuit on behalf of the Grievant under the same set of facts reported to the KBML had the potential to affect the decision-making of the KBML panel evaluating the Grievant's claims. This nondisclosure had the further potential as to whether the Board would take disciplinary action, which ultimately manifested in disproportionate and unfair disciplinary action against Dr. Gupta in the June 2023 Agreed Order and in the August 2023 Amended Agreed Order as well as the Executive Director's refusal to present material and new evidence that the allegations of the Grievant were false for reconsideration to the Board.

22. Based on the Grievant's allegations and an expert review that concluded that Dr. Gupta allowed his staff to practice medicine without a license, Dr. Gupta was offered one chance to avoid the issuance of a KBML disciplinary complaint and an emergency restriction on his medical license by entering into an Agreed Order with the Board in June of 2023. To avoid restriction of his medical license on an emergency basis, which could have prevented his practice of medicine indefinitely, Dr. Gupta accepted an Agreed Order on June 1, 2023, proffered by KBML counsel. The June 2023 Agreed Order limited the scope of Dr. Gupta's medical practice and required that Dr. Gupta practice at a location approved by the KBML and not in an independent setting. **Exhibit 4 (June 1, 2023 Agreed Order)**. The supporting facts recited in the Agreed Order included a finding that Dr. Gupta allowed D.J. Thomas to engage in the unlicensed practice of medicine when he inserted an IV for the Grievant.

23. During the summer of 2023, Dr. Gupta petitioned the KBML to allow him to practice under supervision consistent with the June 2023 Agreed Order. On August 8, 2023, Dr. Gupta and

8

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000008 of 000026

Filed                                                                                                Kathryn Marshall, Franklin Circuit Clerk

24-CI-01033   10/16/2024

NOT ORIGINAL
DOCUMENT
06/06/2025 03:03:10
PM                                                                                                  S031245

the KBML entered into an Amended Agreed Order ("**the Order**" or "**Order**"), which is still in place as of the filing of this action. The Amended Agreed Order approved Dr. Gupta to practice at the Pain Management Center of Paducah, Pain Management Center of Hopkinsville, and the Pain Management of America Surgery Center under the supervision of Lax Manchikanti, M.D. **Exhibit 5 (August 8, 2023 Amended Agreed Order)**.

24. The Amended Agreed Order, however, not only authorized his practice under Dr. Manchikanti's supervision as required by the June 2023 Agreed Order, but also included a new provision that indefinitely limited his ability to ever petition the KBML to approve his ability to practice medicine independently. The Order included this new provision:

> "3. As an express condition for the entry of this Amended Agreed Order, each party understands and agrees that **the Board will never consider any petition for termination or modification the terms of the agreement in any way that would allow the licensee to practice in an independent setting in the Commonwealth of Kentucky. Any communication by the licensee and/or his agents to the Board attempting to revive this matter or modify or terminate the terms set forth in this Amended Agreed Order will be returned without being provided or forwarded to any Board member**."

> **Exhibit 5 (emphasis added)**.

25. The additional sanction contained in the Amended Agreed Order appears to have resulted from the unilateral action of the KBML's Counsel as the Order was negotiated solely by the Board's Counsel and signed by Dr. Toney, Panel B Chair pursuant to 201 KAR 9:082 and never presented for approval to the KBML Panel overseeing Dr. Gupta's discipline.

26. A condition of the Order is that Dr. Gupta may never reopen the matter, and if he did so, it would violate the terms of the order and provide a legal basis for additional disciplinary actions. Such restrictions are unprecedented and constitute a new and additional disciplinary sanction.

27. The restrictions of the Order are unconscionable as it leaves Dr. Gupta with no course to redress an action, even where the underlying factual allegation is later contradicted by the Grievant's

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000009 of 000026

9

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
06/06/2025 03:03:10
PM
S031245

own sworn testimony and proven to be false.

28. The conditions placed on Dr. Gupta are not proportional to other disciplined medical physicians who faced similar grievances. Other physicians have not been placed under indefinite restrictions without the ability to seek modification of their Agreements with the KBML. Further, even physicians who are convicted of felonies, for example, have the ability to petition the Board for reinstatement and do so with successful results. In 2023, only *one* physician, Dr. Gupta, was subject to an order of indefinite suspension. **Exhibit 6 (KBML 2023 Annual Report).**

29. While pursuing her malpractice claim, Ms. Fillhardt sat for a deposition in her malpractice suit against Dr. Gupta on May 29, 2024.

30. In her deposition testimony, Ms. Fillhardt directly contradicts the following statement she made in her January 6, 2023 KBML grievance:

> "[o]n multiple occasions, [D.J. Thomas] was the individual who administered the anesthesia I was given for a procedure. He would ask Dr. Gupta how much to administer and then measure out and give the dose by iv [sic]...I also feel that he should have never been allowed to give me an IV or administer any medications."

**Exhibit 1.**

31. This January 6, 2023 statement was false.

32. Contrary to her statements in her Grievance, Ms. Fillhardt testified during her deposition under oath that Mr. Thomas never placed her IV. Regarding Mr. Thomas, Ms. Fillhardt testified, "[b]ut he sedated me with anesthesia in a syringe. Acted as a legal professional in scrubs." **Exhibit 7, Page 50.**

33. Ms. Fillhardt further testified regarding her IV experience and sedation during procedures with Dr. Gupta. When asked who set her IV, she testified as follows, "[w]ho -- it was an African American woman I recall."

10

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000010 of 000026

Filed          24-CI-01033    10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
06/06/2025 03:03:10 PM

S031245

34. D.J. Thomas is a Caucasian man.

35. Ms. Fillhardt further testified that "the lady" set her first IV and there was a "Mexican boy" at the last procedure. **Exhibit 7, Pages 64-65**.

36. Upon questioning, Grievant testified that only "the lady" or the "Mexican boy" placed her IV for each of the two procedures.

37. Later in the deposition, Grievant acknowledged that she testified to the Board that D.J. Thomas placed her IV.

38. Grievant was asked if D.J. Thomas started the IV and she replied "[n]o." **Exhibit 7, Pages 81-82**.

39. The question of whether Dr. Gupta allowed D.J. Thomas to place Ms. Fillhardt's IV was central to the original KBML grievance and the only fact that supported the conclusion that Dr. Gupta had allowed his staff to engage in the unauthorized practice of medicine and thus precipitating the extreme and harsh discipline and sanctions included in the Order. This representation was also considered by the KBML's consultant who changed his evaluation of Dr. Gupta's practice when he concluded that Dr. Gupta allowed his staff to engage in the unlicensed practice of medicine.

40. Ms. Fillhardt's deposition testimony directly refutes the basis of the Grievance, rendering the findings of fact in the Agreed Order and Amended Agreed Order false. Ms. Fillhardt's sworn and contradictory testimony in her recent deposition constitutes new and material evidence that directly contradicts the findings relied upon by the KBML Panel when making its decision about disciplinary action and provides good cause for reconsideration and dissolution of the Amended Agreed Order. In addition, these statements also directly impact the conclusions of the KBML's expert consultant that Dr. Gupta allowed Mr. Thomas to engage in the

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000011 of 000026

11

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

06/06/2025 03:03:10

S031245

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000012 of 000026

unauthorized practice of medicine. Thus, Dr. Gupta filed a Motion to Vacate or Amend Amended Agreed Order on August 15, 2024. **Exhibit 8 (Motion to Vacate or Amend Amended Agreed Order)**.

41. On August 20, 2024, only five days after the Motion to Vacate or Amend Amended Agreed Order was filed, the Board, via its Executive Director and Respondent in this action, Michael S. Rodman, responded to this new evidence by sending Dr. Gupta a letter rejecting his request and refusing to examine this new evidence himself or present it to the Board. **Exhibit 9 (August 20, 2024 KBML Letter)**.

42. In the letter, Executive Director Rodman references the provision quoted in Paragraph 24 of this Complaint and states that, "[t]he current motion is interpreted as a request to vacate or amend Dr. Gupta's agreement with the Board in such a manner as would allow him to practice in an independent setting in the Commonwealth of Kentucky. Per Paragraph No. 3, p. 11, of the Amended Agreed Order, Dr. Gupta's request to revive this matter or modify the existing terms is being returned."

43. Thus, Dr. Gupta's request for reconsideration based upon new and material evidence directly related to the basis of the Agreed Order and Amended Agreed Order was returned to him and never presented to the KBML for a substantive decision. Because this information includes a direct refutation of her statements in the Grievance as well as a crucial finding of the expert who reviewed the medical records, this refusal to review the information results in an egregious violation of Dr. Gupta's rights to due process of law and continues to deprive him of the ability to gainfully and fully practice his profession.

44. Despite this new exculpatory evidence, the KBML and Executive Director, without proper review, decided to unilaterally hold Dr. Gupta to the Amended Agreed Order in perpetuity

12

NOT ORIGINAL DOCUMENT

06/06/2025 03:03:10 PM

S031245

with no means of redress or revision.

45. This is a violation of Dr. Gupta's due process rights, is arbitrary and capricious, and violates both state and federal constitutional guarantees.

46. Defendants' actions have resulted and will continue to result in Dr. Gupta suffering irreparable harm for which there is no adequate remedy at law.

## CAUSES OF ACTION

## COUNT I

## KRISTIN TURNER'S CONFLICT OF INTEREST RENDERS THE KBML PROCEEDINGS FUNDAMENTALLY UNFAIR, ARBITRARY, AND CAPRICIOUS; VIOLATES FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS OF LAW; AND THEREFORE TAINTS THE ENTIRE PROCEEDINGS.

47. Dr. Gupta adopts and reiterates each and every allegation set forth above as if fully set forth and restated herein.

48. Kristin Turner Esq. served as a member of the KBML from the Fall of 2018 until October 2023, when her replacement as consumer representative was appointed to succeed her.

49. Ms. Turner represented and counseled Ms. Fillhardt when filing her January 6, 2023 grievance against Dr. Gupta as admitted by Fillhardt in her later deposition testimony and as publicly set forth in malpractice pleadings filed on April 11, 2023 in Kenton Circuit Court signed by Ms. Turner as counsel. **Exhibit 2**.

50. It appears that Ms. Turner provided information elicited from the KBML's investigation, which was not publicly available, to Ms. Fillhardt to use for her benefit in her malpractice case against Dr. Gupta.

51. A sitting board member's representation of a grievant before the KBML is improper and a direct conflict of interest wherein the outcome of the disciplinary proceedings has the ability to financially benefit both Ms. Turner and Ms. Fillhardt.

13

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000013 of 000026

Filed

24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

06/06/2025 03:03:10

S031245

52. Even if not directly involved in the decision-making concerning Dr. Gupta, Ms. Turner's representation of the Grievant influenced the decision-making of the other KBML members, the KBML's investigation of Dr. Gupta, its resolution of the case, and its choice of discipline and sanctions.

53. The KBML's imposition of an additional sanction precluding Dr. Gupta from ever practicing in an independent setting or being able to terminate or modify the Amended Agreed Order is egregious and constitutes unequal treatment of Dr. Gupta when compared with other physicians who have been disciplined. **Exhibit 6**.

54. By imposing an additional sanction in the Amended Agreed Order in August 2023 that forever precludes subsequent review or revision of the disciplinary sanctions levied against Dr. Gupta, the KBML has effectively assured that the conflict of interest created by Ms. Turner's representation of the Grievant will never be resolved despite the prejudice, harm, and damage experienced by Dr. Gupta as a result of this egregious violation of his due process rights. This conflict of interest renders the entire disciplinary proceedings fundamentally unfair and violates Dr. Gupta's constitutional rights and thus must be found null and void.

55. Dr. Gupta's "agreement" to the Agreed Orders was impaired and uninformed as he did so without knowledge that Ms. Turner counseled and represented the Grievant when the grievance was filed with the KBML.

56. Kristin Turner never disclosed her familial relationship with the Grievant, that she counseled Grievant in filing her Grievance, or that she represented Grievant in the malpractice suit to the KBML.

57. Kristin Turner's representation of the Grievant before the KBML and in the Kenton Circuit malpractice case while serving as a member of the KBML constitutes a conflict of interest and

14

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000014 of 000026

Filed                                    Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

06/06/2025 03:03:10

S031245

renders the administrative proceedings against Dr. Gupta fundamentally unfair, arbitrary, and capricious; violates Dr. Gupta's federal and state constitutional rights to due process of law; and therefore, taints the entire proceedings.

## COUNT II:

## DECLARATORY JUDGMENT ACTION THAT 201 KAR 9:082 IS UNCONSTITUTIONAL.

58. Dr. Gupta adopts and reiterates each and every allegation set forth above as if fully set forth and restated herein.

59. The KBML's restriction of Dr. Gupta's ability to practice medicine, as evidenced by the Board's refusal to even discuss amending the terms of the Amended Agreed Order, constitutes arbitrary and capricious state agency action that is in violation of Sections 2 and 14 of the Kentucky Constitution and the Fifth and Fourteenth Amendments to the United States Constitution's guarantee of due process of law.

60. The Constitution of the Commonwealth of Kentucky, Section 2, states:

**Section 2. Absolute and arbitrary power denied.**

Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority.

61. The Constitution of the Commonwealth of Kentucky, Section 14, states:

**Section 14. right of judicial remedy for injury – Speedy trial.**

All courts shall be open, and every person for injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay.

62. In his August 20, 2024 Motion to Vacate or Amend Amended Agreed Order, Dr. Gupta presented new evidence that directly contradicted the evidence that the KBML's Consultant found "most concerning" which was a fundamental basis of the stipulated findings of fact in

15

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000015 of 000026

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
06/06/2025 03:03:10 PM
S031245

the Amended Agreed Order as well as the Agreed Order. **Exhibit 10 (KBML's Consultant Findings)**.

63. KRS 311.591(3) requires that "each grievance shall be investigated as necessary."

64. The KBML's Amended Agreed Order entered into on August 7, 2023, wherein the Board resolved to "never consider any petition for termination or modification of the terms of the agreement" was an arbitrary and capricious exercise of power in violation of Section 2 of the Kentucky Constitution because it has prevented the KBML from receiving exculpatory information necessary for a complete investigation into this matter as required by KRS 311.591(3).

65. Executive Director Rodman's refusal to present Dr. Gupta's Motion to Vacate or Amend, indicating that the KBML would not receive this information and returning the Motion to Dr. Gupta, has deprived and will continue to deprive Dr. Gupta of his due process right to be heard and to a fundamentally fair administrative adjudication of the Grievance. **Exhibit 9**.

66. KRS 311.565(c) gives the Board sole authority to limit or restrict licenses issued by the Board. This provision also gives the Board sole authority to place licensees on probation or to issue reprimand.

67. The Board is statutorily required to be composed of sixteen members of various requirements, none of which are KBML staff members. KRS 311.530.

68. The Board is authorized to enact reasonable administrative regulations pursuant to KRS 311.565(a).

69. Pursuant to this rulemaking authority, the Board promulgated and enacted 201 KAR 9:082, regarding informal KBML proceedings.

> Section 1. Commencement of Informal Proceedings. At any time after the authorized issuance of a complaint or the issuance of a show cause order, the

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000016 of 000026

16

Filed        24-CI-01033   10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
06/06/2025 03:03:10
PM

S031245

responding physician may seek an informal dispensation of any matter upon signing a waiver that states that the physician waives his or her right to raise any constitutional, statutory or common law objection should the board reject the informal proposal or if informal proceedings are curtailed by the general counsel. The general counsel shall have complete discretion to negotiate with the responding physician concerning stipulations of fact, conclusions of law and proposed discipline. The general counsel shall also have discretion to reject any or all offers of informal dispensation and may commence informal proceedings on his or her own initiative.

Section 2. Presentation of Proposal to Board. Whenever the general counsel believes that an appropriate informal dispensation has been negotiated, he or she shall cause to be presented to the board the responding physician's signed waiver and stipulations of fact, conclusions of law and a proposed order of informal dispensation signed by the responding physician and the general counsel. The documents shall include a line for the signature of an officer of the board and shall become effective upon being accepted by the board, signed by an officer and filed of record.

70. KRS 311.565(c) gives *the Board*, sole authority to reprimand or place licensees on probation. The KBML general counsel is not a member of the Board and has no statutory authority to initiate, conduct, or curtail informal proceedings. Furthermore, the general counsel has *no* legal discretion, let alone "complete discretion" as worded in the regulation, to negotiate with a physician concerning resolution of proposed discipline. The general counsel also has no legal discretion to reject any or all offers of informal dispensation or to commence *any* proceedings on his or her own initiative. That authority rests solely with the Board itself, making Section 1 contrary to law and unenforceable.

71. Likewise, the general counsel has no legal authority to make any independent determination that an appropriate informal dispensation has been negotiated. This is an illegal delegation of the Board's legal authority to the general counsel.

72. By denying Dr. Gupta an opportunity to reopen this informal resolution resulting in the Amended Agreed Order at issue, and by circumventing the legal authority of the Board by preventing Dr. Gupta's Motion to Vacate or Amend Amended Agreed Order from being seen

17

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000017 of 000026

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
06/06/2025 03:03:10 PM
S031245

by duly appointed members of the KBML, KBML staff acted arbitrarily and in violation of Dr. Gupta's right to due process of law as guaranteed by the Constitution of the Commonwealth of Kentucky, Sections 2 and 14. Dr. Gupta's property rights in his medical license have been abridged without due process of law in an arbitrary and capricious action by the KBML acting under an unconstitutional regulation, 201 KAR 9:082.

73. Moreover, KBML general counsel as a member of the Kentucky Bar Association has an ethical duty to communicate information to her client. Pursuant to Kentucky Rule of Professional Conduct SCR 3.130(1.4), counsel does not have the authority to control the information that is presented to her client by unilaterally deciding not to communicate the information and make an independent decision without consultation and final authority from her client.

74. Mr. Rodman's and the KBML's decision to deny Dr. Gupta *any* opportunity to ever reassess the terms of his medical license is arbitrary and capricious, constitutes an abuse of discretion, and is clearly erroneous in violation of Section 2 of the Kentucky Constitution.

75. The Constitution of the United States of America, Amendment V states:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

76. The Constitution of the United States of America, Amendment XIV, Section 1 states:

> All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law.

77. As a result of the KBML's application of an unconstitutional regulation, Dr. Gupta has suffered

18

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000018 of 000026

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

06/06/2025 03:03:10

S031245

an egregious lack of due process concerning his medical license.

78. By promulgating 201 KAR 9:082, the Board has unlawfully delegated its statutory duties and function to the general counsel and deprived Dr. Gupta of liberty and property without due process of law and equal protection of the laws.

79. 201 KAR 9:2082 is fundamentally flawed in that it creates a procedure not authorized by statute and delegates a function exclusively granted to the Board (the power to probate licenses or other disciplinary functions) in KRS 311.565 to the general counsel.

80. By signing the first Agreed Order and subsequent Amended Agreed Order (resulting from an informal proceeding) restricting Dr. Gupta's practice on behalf of the Board, Dale E. Toney, M.D., in his official capacity, and the KBML denied Dr. Gupta's right to due process of law as guaranteed by Sections 2 and 14 of the Kentucky Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. Moreover, it appears that the Amended Agreed Order has not been reviewed or accepted by the Board, as required by statute, but only by the Chair of Panel B, Respondent Toney.

81. 201 KAR 9:082 is invalid in its entirety under the Kentucky Constitution and the United States Constitution and must be ruled null and void.

82. The Amended Agreed Order entered by the KBML constitutes a taking of Dr. Gupta's property rights by the state without compensation or due process of law and must be ruled null and void.

83. Defendant Rodman acted outside the scope of his authority as KBML Executive Director and usurped the decision-making authority of the KBML when he refused to present Dr. Gupta's August 20, 2024 Motion to Vacate or Amend Amended Agreed Order (**Exhibits 8, 9**) to the KBML. The Executive Director and General Counsel of the KBML have no statutory authority to withhold legal requests regarding Board decisions or agreements from the Board itself.

19

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000019 of 000026

Filed    24-CI-01033    10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
06/06/2025 03:03:10
PM
S031245

84. By acting outside the scope of his regulatory authority, Michael S. Rodman, under color of state authority, deprived Dr. Gupta of liberty and property without due process of law and equal protection of the laws by refusing to present to the Board the new and material information discovered in Ms. Fillhardt's deposition.

## COUNT III

### VIOLATION OF DR. GUPTA'S FOURTEENTH AMENDMENT RIGHTS CONSTITUTES THE DEPRIVATION OF RIGHTS, PRIVILEGES, AND IMMUNITIES SECURED BY THE UNITED STATES CONSTITUTION.

85. Dr. Gupta adopts and reiterates each and every allegation set forth above as if fully set forth and restated herein.

86. Defendants, in their official capacity, were acting under the color of state law in their capacities as employees of the Kentucky Board of Medical Licensure, and their acts or omissions were conducted within the scope of these official duties or employment with the KBML.

87. Defendants, acting under the color of law, deprived the Plaintiff of his substantial rights secured by the United States Constitution and other laws, along with his constitutional rights guaranteed by the Fourteenth Amendment to the United States Constitution.

88. The Fourteenth Amendment to the United States Constitution established the Plaintiff's right to equal protection and due process of law.

89. The Fourteenth Amendment is made applicable to the Commonwealth through 42 U.S.C. § 1983.

90. Defendants violated Plaintiff's Fourteenth Amendment right to procedural due process. Defendants' actions deprived Plaintiff of a protected property and liberty interest as it placed unnecessary and unreasonable restrictions on his medical license and impaired his career, reputation, and livelihood

20

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000020 of 000026

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
06/06/2025 03:03:10 PM
S031245

91. Defendants violated Plaintiff's Fourteenth Amendment right to procedural due process by failing to provide a hearing by a neutral decision maker. Ms. Turner, through her role as panel member for the Board, both authored and brought forward a grievance based on factual inaccuracies and falsehoods that were central to the Board's original finding as well as that of its expert consultant. Ms. Turner's actions caused the Grievance to not be decided by an impartial decisionmaker, violating Plaintiff's procedural due process rights.

92. Defendants violated Plaintiff's Fourteenth Amendment procedural due process rights by refusing to provide notice or an opportunity to be heard on Plaintiff's Motion to Vacate or Amend Amended Agreed Order. **Exhibits 8, 9**. Refusing to provide a hearing when the underlying evidence supporting the original Grievance, subsequent Agreed Order, and subsequent Amended Agreed Order was false violated the due process requirements of a hearing as it interfered with and impaired Dr. Gupta's property and liberty interests in his career, reputation, and livelihood, as described above.

93. An actual and immediate controversy exists between Dr. Gupta and Defendants with respect to Defendants' failure to afford Dr. Gupta due process.

94. Dr. Gupta faces a real and immediate threat of irreparable harm as a result of Defendants' violation of his due process rights.

95. As a result of Defendants' infringement, Plaintiff has suffered and continues to suffer irreparable harms, including harms to his ability to practice medicine, financial security, and access to the full constellation of benefits conferred by the state upon others.

96. The acts or omissions of Defendants as described herein intentionally deprived Plaintiff of his constitutional rights and caused him other damages.

21

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000021 of 000026

NOT ORIGINAL
DOCUMENT
06/06/2025 03:03:10
PM
S031245

## COUNT IV

## THE AMENDED AGREED ORDER AS A CONTRACT IS VOID AS AGAINST PUBLIC POLICY AND NOT ENFORCEABLE.

97. Dr. Gupta adopts and reiterates each and every allegation set forth above as if fully set forth and restated herein.

98. The June 2023 Agreed Order and the August 8, 2023 Amended Agreed Order are essentially contracts between the parties, substantively unconscionable, and should not be enforced.

99. Specifically, the unconscionable provision of the Amended Agreed Order is:

"3. As an express condition for the entry of this Amended Agreed Order, each party understands and agrees that the Board will never consider any petition for termination or modification the terms of the agreement in any way that would allow the licensee to practice in an independent setting in the Commonwealth of Kentucky. Any communication by the licensee and/or his agents to the Board attempting to revive this matter or modify or terminate the terms set forth in this Amended Agreed Order will be returned without being provided or forwarded to any Board member." **Exhibit 5**.

100. Because of the KBML's extraordinary power and the fact that he was faced with the possibility of a complete revocation of his medical license, Dr. Gupta was in a position of lesser bargaining power.

101. This provision is also unconscionable because it is impractical and impossible to enforce. Not only does it give KBML staff members unlawfully delegated power, but there are instances where any agreement may need to be modified in the future, particularly when the facts the agreement is based upon are false.

102. This condition that Board staff members would review any pleading to modify the Order and choose to return any such request to the sender without bringing it to the Board's attention goes far beyond the authority of KBML staff members. It is the Board that makes decisions regarding physician discipline – not KBML staff.

22

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000022 of 000026

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
06/06/2025 03:03:10
PM
S031245

103. The June 2023 Agreed Order was entered into by Dr. Gupta without the awareness that the Grievant was represented by a KBML board member when making the Grievance. Thus, its proffer was fundamentally unfair and unconscionable as the conflict of interest was not disclosed to Dr. Gupta. The concealment of this fact of representation and conflict of interest was intentional and caused Dr. Gupta to accept an Agreed Order that he otherwise would not have.

104. Substantive unconscionability "refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent." *Conseco,* 47 S.W.3d 325, 343 n. 22 (Ky. Ct. App. 2001). As for substantive unconscionability, courts consider "the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Jenkins,* 400 F.3d 868, 876 (11th Cir. 2005).

105. These unconscionable terms are weighted so heavily in favor of the KBML as to be unconscionable as a public policy matter and should not be enforced. Accordingly, the Agreed Order and the Amended Agreed Order should be vacated or modified.

## COUNT V:
### THE AGREED ORDER AND AMENDED AGREED ORDER SHOULD BE PERMANTENTALY ENJOINED FROM ENFORCEMENT

106. Dr. Gupta adopts and reiterates each and every allegation set forth above as it fully set forth and restated herein.

107. CR 65 provides that a party may seek injunctive relief in the form of a permanent injunction when a movant's rights are being or will be violated by an adverse party and the movant will suffer immediate and irreparable injury, loss or damage.

23

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000023 of 000026

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT

06/06/2025 03:03:10 PM

S031245

108. The KBML has an obligation to investigate grievances fully and fairly, which necessarily requires it to have access to evidence.

109. By returning the Motion to Vacate to Dr. Gupta rather than presenting it to KBML Panel B, Michael S. Rodman has prevented the Board from considering new, exculpatory evidence that directly contradicts the fundamental basis of the stipulated facts in the Amended Agreed Order.

110. The failure of the Board to consider this new evidence has significant consequences for Dr. Gupta and the property interest he has in his medical license.

111. Dr. Gupta seeks a permanent injunction preventing the KBML from enforcing the Agreed Order or Amended Agreed Order as both were entered in violation of the constitutional rights secured to Dr. Gupta by the Kentucky and United States Constitutions.

## PRAYER FOR RELIEF

**WHEREFORE,** Pragya B. Gupta, M.D. respectfully demands:

1. Declaration that the Agreed Order and Amended Agreed Order subject to this action are null and void.

2. Declaratory judgment in his favor enjoining immediately the Kentucky Board of Medical Licensure from enforcing the Agreed Order or Amended Agreed Order.

3. Declaratory judgment in his favor that 201 KAR 9:082, as written and interpreted by the KBML is unconstitutional violates right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Sections 2 and 14 of the Kentucky Constitution.

4. A Writ of Mandamus against Michael S. Rodman and the KBML, ordering Rodman to present the Moton to Vacate or Amend Amended Agreed Order to the KBML and ordering the KBML

24

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000024 of 000026

Filed
DOCUMENT
PM

NOT ORIGINAL
06/06/2025 03:03:10
S031245

to consider the Motion or in the alternative, an Order requiring consideration of Dr. Gupta's investigation by a fair and impartial board or disciplinary panel.

5. For an award in favor of Plaintiff and against Defendants of compensatory damages, in an amount to be calculated in accordance with applicable law.

6. For Judgment awarding Plaintiff its costs incurred in this matter, including its reasonable attorney fees.

7. For any and all other relief, both legal and equitable, to which Plaintiff may appear herein entitled.

Respectfully submitted,

Lisa English Hinkle, Esq. | KBA No. 33210
Ed Monarch, Esq. | KBA No. 84898
Valerie Michael, Esq. | KBA No. 98958
Katy Harvey, Esq. | KBA No. 100441
MCBRAYER PLLC
201 East Main Street, Suite 900
Lexington, Kentucky 40507
Email: lhinkle@mcbrayerfirm.com
        emonarch@mcbrayerfirm.com
        vmichael@mcbrayerfirm.com
        kharvey@mcbrayerfirm.com
*Counsel for Plaintiff*

25

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000025 of 000026

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
06/06/2025 03:03:10
PM
S031245

## VERIFICATION

I, Pragya B. Gupta, M.D., verify that I have read the foregoing Complaint and believe it to be true and accurate to the best of my knowledge and belief.

_____
Pragya B. Gupta, M.D.

## ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _San Diego_ )

On _10/15/2024_ before me, _Nicholas Pedersen, Notary Public_
(date)                    (insert name and title of the officer)

personally appeared PRAGYA B. GUPTA, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

26

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000026 of 000026

NOT ORIGINAL DOCUMENT

My name is Wendy Fillhardt. I was under the care of Dr. Pragya Gupta from January 25, 2021, until April 2022. During this time, I believe there were several issues with my care that were a violation of standard medical practice and standard of care. Not all issues are directly with Dr. Gupta however he is not proper managing his staff or hiring properly trained individuals.  I will detail each issue individually below:

1.  Donald Jay Thomas "DJ" was introduced to me as the office manager for the office. However, throughout my time under Dr. Gupta's care he was an active participant in my care. I was very uncomfortable with him being in my treatment room while I was wearing a gown and not fully clothed given that he has no medical certification. On multiple occasions, he was the individual who administered the anesthesia I was given for a procedure. He would ask Dr. Gupta how much to administer and then measure out and give the doses by iv. I have experienced trauma in my life and have a PTSD diagnosis. I believe that having someone in the room who was not an authorized medical professional has led to further trauma for me. I also feel that he should have never been allowed to give me an IV or administer any medications.

2.  In September 2021, I was given my first injection of cyanocobalamin injection. I was supposed to have a second injection 30 days from the first as I understand the protocol to be. At the second injection date, Dr. Gupta took one look at me and was immediately concerned. I had let DJ and others in the office know that I did not feel right, and I had swelling. Dr. Gupta immediately knew that this was an allergic reaction. I instead was given a different injection.

3.  I was told during my injection procedures that I was a "VIP" patient and that I would receive good stuff. I took this to mean that I was given more anesthesia than other patients. I expected to be in a twilight type feeling while injections were being given. However, I was completely knocked out and I do not believe that was appropriate for this type of injection. On one occasion, I had issues coming out of the anesthesia in the office.

4.  Autumn Thomas is the wife of DJ Thomas and the clerk/billing assistant at the office. To my understanding she has had no medical training or certification, but she conducted medical functions such as taking vitals. She was also the individual that would handle send proscriptions to the pharmacy. However, I do not believe that proper protocols were followed in proscribing as I had to different issues that I believe are very important to mention.

    a.  I was proscribed Savella. Dr. Gupta had advised that this medication was one that needed to be stepped up to a higher dosage. I was only advised to take one a day and was supposed to receive a lower milligram capsule for so many days the pickup a higher milligram. The proscription was incorrectly placed by Autumn, my dosage stated two pills per day and I was started on a 25 mg which I was supposed to start on 12.5. At one point, the system as you can see in my medical records had me proscribed a 25 MG and a 50 mg to both take twice a day. I never took these together or in the incorrectly proscribed manner. However, I did have side effects from taking the 25 mg to begin and Dr. Gupta was very upset over what had occurred. However, he did not take any responsibility for it and put it off on an individual in his office who should not be writing prescriptions. This causes me to have concerns that he does not fill out his own prescription orders or at the least he doesn't pay attention to what he signs.

    b.  On several occasions, proscriptions from other doctors were ordered to be refilled by Dr. Gupta's office. My understanding from what I was told was that this was Autumn incorrectly refilling medications. My other doctors Dr. Kinney were very concerned

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000001 of 000003

NOT

ORIGINAL DOCUMENT

01/05/2026

04:05:39 PM

when this occurred. I not understanding the system do not understand how this occurred, but my doctors were very concerned because the milligrams had been changed for my Topamax by Dr. Gupta's office, but Dr. Gupta was not the proscribing doctor on that medication.

85787

WENDY FILLHARDT
Dated: 01/06/2023

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000002 of 000003

ORIGINAL DOCUMENT

04:05:39 PM

NOT

01/05/2026

## Kentucky Board of Medical Licensure
### Hurstbourne Office Park
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
Telephone: 502/429-7150
Fax: 502/429-7158
Website: www.kbml.ky.gov

**RECEIVED**

JAN 0 9 2023

**K.B.M.L.**

## Waiver of Privilege
## Agreement to Release Records

Upon receipt of a photostatic or other copy hereof, you are authorized to release to the representative of the Kentucky Board of Medical Licensure for inspection and copying all records in your possession pertaining to me, to discuss with them fully any information you may have about me, and to furnish them a full report concerning me.

This authorization includes medical records, including all hospital records, psychiatric and psychological records, records of physicians and other medical personnel, records of drug abuse, records of alcohol abuse, prescriptions and drug records, and any and all records relating to my physical and mental condition.

**Prohibition of Rediscloure:** This information has been disclosed in compliance with Federal Regulations (42 CFR Part2) which prohibits further disclosure of this information except with specific written consent of the person to whom it pertains. A general authorization for the release of medical or other information, if held by another party, is not sufficient for this purpose. Federal Regulations state that any person who violates any provision of this law shall be fined not more than $500, in the case of a first offense, and not more than $5,000 in the case of each subsequent offense.

### For Purposes Of Identification:

1. Patient's Full Name: _Wendy M Fillhardt_
2. Date of Birth: _07/20/1975_
3. Last 4 Digits of Social Security Number: _2564_

Date: _01/06/2023_   Signature: _W____

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000003 of 000003

NOT ORIGINAL
DOCUMENT
PM

Filed

**COMMONWEALTH OF KENTUCKY**
**KENTON CIRCUIT COURT**
**DIVISION** ___
**NO. 23-CI-**_____

**WENDY FILLHARDT**                                           **PLAINTIFF**
1178 Edgewater Way,
Alexandria, KY 41001

**vs.**

**ADVANCED PAIN TREATMENT CENTER, PLLC**            **DEFENDANTS**
162 Barnwood Drive
Edgewood, KY 41017

**DR. PRAGYA B. GUPTA, MD**
2689 Mary Jane Ct
Lakeside Park, KY 41017

**DONALD J. THOMAS**
8426 St. Louis Blvd
Union, KY 41091

**TO THE CLERK, SERVE THE ABOVE CAPTIONED DEFENDANTS AND:**

**DR. PRAGYA B GUPTA**
AS REGISTERED AGENT OF SERVICE FOR
Advanced Pain Treatment Center, PLLC
162 Barnwood Drive, Edgewood, KY 41017

---

**COMPLAINT WITH JURY DEMAND**

---

**FACTUAL BACKGROUND, JURISDICTION, AND VENUE**

1. Jurisdiction is proper in this Court pursuant to KRS § 23A.010.

2. Venue is proper in this Court pursuant to KRS § 452.450.

Filed                                                                                                   NOT ORIGINAL
DOCUMENT
PM

3. Plaintiff Wendy Fillhardt is a Kentucky resident who resides at 1178 Edgewater Way, Alexandria, KY 41001.

4. Defendant Advanced Pain Treatment Center, a PLLC existing under the laws of the Commonwealth of Kentucky, operates a treatment center in Edgewood, Kenton County, Kentucky. This center accepts persons from the general public as patients.

5. Defendant Dr. Pragya B. Gupta, MD is a Doctor of Medicine licensed to practice in Kentucky and practicing in Kenton County, Kentucky.

6. Defendant Donald Jay Thomas at the time of the allegations alleged herein was an employee of Advanced Pain Treatment Center, PLLC in Edgewood, Kentucky. It is also believed that Donald Jay Thomas had or has ownership interest in Advanced Pain Treatment Center, PLLC.

7. Defendant Dr. Pragya B. Gupta, MD is the owner and operator of Advanced Pain Treatment Center, PLLC. He is also the registered agent of service.

8. Plaintiff Wendy Fillhardt sought care at Advanced Pain Treatment Center, PLLC for pain management and treatment for chronic conditions. She was under the care of Dr. Gupta from January 25, 2021, until April 30, 2022.

**NEGLIGENCE DUE TO MEDICAL MALPRACTICE**

9. The Plaintiffs incorporate by reference, as if fully set out, paragraphs 1 through 8 and further allege the following.

10. Defendant Dr. Guypta and his staff treated Plaintiff Wendy Fillhardt at Advanced Pain Treatment Center, PLLC in Edgewood, Kentucky.

11. Defendant Dr Guypta had undertaken a duty to provide proper care to Plaintiff Wendy

NOT ORIGINAL

Fillhardt, with a level of care, skill, and treatment that is recognized as acceptable and appropriate by reasonably prudent similar health care providers and nationally set standards of care.

12. Defendant Advanced Pain Treatment Center, PLLC is vicariously liable for the acts of their nursing staff and medical doctors in the course of their employment at their location in Edgewood conducting treatment of Plaintiff Wendy Fillhardt.

13. Defendants Advanced Pain Treatment Center, PLLC, Dr. Guypta, breached their duty owed to Plaintiff Wendy Fillhardt by the following acts or instances where there was a negligent act or failure to act:

a. By negligently and carelessly proscribing medication and injections in a way that injured the Plaintiffs health and could have caused severe injury or death.

b. By negligently and carelessly allowing Donald Jay Thomas to preform duties that he had no certification or license to be doing.

c. By negligently and carelessly allowing Donald Jay Thomas to administer anesthesia despite him not having a license or certification to do so.

d. By negligently and carelessly during a simple injection giving anesthesia to Plaintiff in unnecessary amounts that she did not request because she was a "VIP", which resulted in Plaintiff having an incident in which she had trouble coming out of anesthesia.

e. By negligently and carelessly overdosing anesthesia in a doctor's office procedure.

f. By negligently and carelessly allowing a non-medically certified employee Donald Jay Thomas to be in the room during procedures in which Plaintiff Wendy Fillhardt was unclothed in a hospital gown. Plaintiff suffers from PTSD and suffered mental harm because of Dr Gupta's lack of proper medical practice and

NOT ORIGINAL DOCUMENT

00/05/2026 04:06:30 PM

85087

care.

g.  By negligently and carelessly allowing support staff to refill prescriptions without doctor approval when they were not licensed or certified to do so, resulting in Plaintiffs prescriptions to be incorrect which Dr. Gupta stated to Plaintiff could have caused serious harm. Plaintiff did suffer health concerns due to incorrect doses being given allegedly by medical staff member Autumn Thomas. Additionally, causing confusion when prescriptions were refilled in different amounts by Autumn Thomas acting for Dr. Gupta for prescriptions that were not proscribed by Dr. Gupta's office but a different medical care provider of the Plaintiff's.

h.  By negligently and carelessly failing to diagnose Plaintiff's allergic rection to a cyanocobalamin injection.

i.  By negligently administering a drug trial and improper billing associated with such.

j.  By negligently billing insurance for prescriptions that were not needed and visits that did not happen.

14. As a direct and proximate result of the defendant's negligence, Plaintiff Wendy Fillhardt sustained complications to her health as well as psychological trauma. The Plaintiff's damages are in excess of the statutory minimum.

## BATTERY AND ASSAULT

15. The Plaintiffs incorporated by reference, as if fully set out, paragraphs 1 through 29 and further allege that:

16. Defendant Donald Jay Thomas committed acts that constitute battery and assault against Plaintiff Wendy Fillhardt.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000004 of 000007

Filed 24-CI-01633 12/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

00/03/2026 04:06:30

17. Defendants Advanced Pain Treatment Center, PLLC and Dr. Gupta are vicariously liable for the acts of their employee that were done by their direction and under their supervision.

18. On multiple occasions, Donald Jay Thomas gave anesthesia, iv's, injections and other shots and medications that he does not have the certification, license, or training to give.

19. Defendant Donald Jay Thomas intentionally caused harmful or offensive contact to Plaintiff Wendy Fillhardt by injecting her with unnecessary anesthesia without the proper training, license, or certification. Plaintiff was told by Donald Jay Thomas that she was a VIP and that they would take care of her. Plaintiff was then given more anesthesia than is needed for a simple injection. Plaintiff had a bad reaction and had trouble coming out of anesthesia.

20. Plaintiff Wendy Fillhardt was then put in constant fear of what Donald Jay Thomas was actually giving her and if he knew proper dosages or if the contact she was subjected to with him would lead to harm or physical injury for her.

21. Plaintiff Wendy Fillhardt has PTSD and suffers from severe pain associated with medical conditions. Plaintiff has childhood trauma that causes her to be nervous and apprehensive around men. Defendant Donald Jay Thomas was permitted to perform medical functions and be present during medical procedures despite his lack of training, license or certification to do so. Plaintiff was during all procedures apprehensive of contact with Defendant Donald Jay Thomas that caused her to be fearful and trigger her PTSD. During the procedures, she was clothed in a robe and did not desire anyone other than medical professionals to attend to her care and be in her room.

Presiding Judge: HON. THOMAS DAMRON WINGATE (648243)

EXH : 000005 of 000007

Filed 24-CI-01633 12/16/2024 Kathryn Marshall, Franklin Circuit Clerk

24-CI-00044 09/19/2023 John D. Middleton, Kenton Circuit Clerk

**WHEREFORE**, the Plaintiffs demand:

1. Judgment against Advanced Pain Treatment Center, against Dr. Pragya B. Gupta, against Donald Jay Thomas, or against all of the Defendants, in an amount in excess of the minimum dollar amount necessary to establish the jurisdiction of this Court;

2. Post judgment interest at the legal rate; and

4. All other proper relief that the Plaintiffs may be entitled to.

Respectfully Submitted,

*Kristin Turner*

KRISTIN A. TURNER, KBA # 97939
Attorney for Plaintiff
P. O. Box 172
Alexandria, Kentucky 41001
Ph. (859) 353-3130
Fax: (855) 343-3572
Email: Kristin@kturnerlegal.com

**JURY DEMAND**

Pursuant to CR 38.02, Plaintiff's request trial by jury on all triable issues.

*Kristin Turner*

Kristin A. Turner (97939)

6

Filed                 24-CI-01033   12/16/2024                 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
00/05/2025 04:06:36 PM
85087

## VERIFICATION

Plaintiff Wendy Fillhardt states that she has read the foregoing Complaint and the statements contained herein are true.

*Wendy Fillhardt*
WENDY FILLHARDT

**COMMONWEALTH OF KENTUCKY**
**COUNTY OF CAMPBELL**

SUBSCRIBED AND SWORN to before me, a Notary Public, by WENDY FILLHARDT as her free and voluntary act and deed on this the _10_ day of April 2023.

Christy Adams Kynp43428
Notary Public

My Commission Expires: 1/23/26

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)
EXH : 000007 of 000007

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

PM

01/05/2026 04:08:02

85787

# LEWIS BRISBOIS

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Judd R. Uhl
250 East Fifth Street, Suite 2000
Cincinnati, Ohio 45202
Judd.Uhl@lewisbrisbois.com
Direct: 513.808.9913

May 9, 2023

Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222

Re: Supplemental Response to Grievance Against Pragya Gupta, MD

To the Kentucky Board of Medical Licensure:

On behalf of Pragya Gupta, MD, the undersigned hereby submits this Supplemental Response to the Grievance filed by former patient, Wendy Fillhardt. Ms. Fillhardt's Grievance raised four specific issues that will each be addressed individually below:

I.   As this Board is undoubtedly aware, there is no statute or regulation in Kentucky which directly governs the practice of medical assistants. Rather, the delegation of tasks to unlicensed persons being supervised by a physician is a common law authority extended to physicians licensed in this State. This Board has indirect control over medical assistants by virtue of its control over licensed physicians who supervise and delegate tasks to them. While certification programs for medical assistants exist, certification or licensure is not a requirement in Kentucky. For purposes of this Supplemental Response, it must be noted that this Board has never issued an Opinion wherein a medical assistant was specifically precluded from serving as a qualified practitioner participating in a procedure involving moderate sedation/analgesia, nor has this Board defined what would constitute an "other qualified practitioner" as set forth in the published Board Opinion dated June 16, 2011, and updated March 15, 2018.

The Grievance submitted by Ms. Fillhardt expressed concern over Donald Jay Thomas' lack of medical certification and his participation in Ms. Fillhardt's care over the course of her treatment with Dr. Gupta. However, from the face of the Grievance, it is unequivocal that Dr. Gupta was directly supervising Mr. Thomas in every aspect of the tasks delegated to him by Dr. Gupta in accordance with the "Policies and Procedures for Sedation" at Advanced Pain and Treatment Center, effective December 2018. (*See* "Policies and Procedures for Sedation" attached hereto as Appendix A).

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000001 of 000005

ARIZONA • CALIFORNIA • COLORADO • CONNECTICUT • DELAWARE • FLORIDA • GEORGIA • ILLINOIS • INDIANA • KANSAS • KENTUCKY • LOUISIANA

MARYLAND •MASSACHUSETTS • MINNESOTA • MISSISSIPPI • MISSOURI • NEVADA • NEW JERSEY • NEW MEXICO • NEW YORK • NORTH CAROLINA

OHIO • OREGON • PENNSYLVANIA • RHODE ISLAND • TENNESSEE • TEXAS • UTAH • VIRGINIA • WASHINGTON • WASHINGTON D.C. • WEST VIRGINIA

94656438.1

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:08:02

85787

Kentucky Board of Medical Licensure
May 8, 2023
Page 2

Moreover, Ms. Fillhardt executed six (6) separate informed consents to treatment, each of which explicitly include the following provisions:

6.   I am aware that in the practice of medicine, other unexpected risks or complications not discussed may occur. I also understand that during proposed procedure(s), unforeseen conditions may be revealed requiring the performance of additional procedures, and I authorize such procedures to be performed. I further acknowledge that no guarantees or promises have been made to me concerning the results of any procedures. I hereby voluntarily give my authorization and consent to Dr. Pragya B. Gupta, and his delegated associates to perform and/or assist in the proposed procedure described above.

7.   I hereby authorize and consent to the taking of photographs or films during the procedure and their use for teaching or research purposes.

(*See* Consents to Procedures attached hereto as Appendix B, emphasis in original).

In addition to executing the six consent forms allowing the participation of delegated associates, including Mr. Thomas, during the procedures, Ms. Fillhardt also consented to the procedures themselves to be used as instructional tools. (*See* Appendix B). Ms. Fillhardt was given the opportunity to ask questions about the procedures and certified that she read and fully understood the contents of the consent form and that the disclosures had in fact been made. (*Id.*). In accordance with the consent form executed by Ms. Fillhardt, Mr. Thomas participated in five (5) of the six procedures Dr. Gupta performed on Ms. Fillhardt, all of which utilized moderate sedation/analgesia. (*See* Conscious Sedation Flow Sheet attached hereto as Appendix C).

Ms. Fillhardt also consented to participate in an observational study conducted by Eli Lilly and Co. as part of the Preventive Treatment of Migraine: Outcomes for Patients in Real-World Healthcare Systems ("TRIUMPH"). (*See* Consent to Release Information and HIPAA Authorizations attached hereto as Appendix D). Ms. Fillhardt initially reviewed and executed her Consent to Release as part of this observational study, which did not constitute experimental treatment or alter the scope/plan of treatment for Ms. Fillhardt in any way, in an electronic format that Ms. Fillhardt examined for more than twenty (20) minutes on January 25, 2021, based upon the metadata/audit trail that was maintained as part of her enrollment in the study. (*See* Appendix D). Ms. Fillhardt subsequently executed a hard copy of a Consent and Release on November 24, 2021, which was also kept as part of Dr. Gupta's records. (*See* Appendix D). Accordingly, evidence exists supporting the conclusion that Ms. Fillhardt is the type of patient who reads documents prior to signing and there is no indication that she failed to read or was not afforded the opportunity to read the consents attached hereto as Appendix B. (*See* Appendix D).

LEWIS BRISBOIS BISGAARD & SMITH LLP

www.lewisbrisbois.com

94656438.1

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000002 of 000005

**Filed** 24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:08:02
PM

85787

Kentucky Board of Medical Licensure
May 8, 2023
Page 3

As Dr. Gupta noted in his February 13, 2023 Response, Mr. Thomas has been with Dr. Gupta's practice since 2002 and Dr. Gupta has trained him for the past twenty (20) years. This long-standing history puts Dr. Gupta in a unique position to assess Mr. Thomas' abilities with respect to performing appropriately delegated patient care. Mr. Thomas' participation in Ms. Fillhardt's care was always directly supervised by Dr. Gupta and the inclusion of Mr. Thomas in these and similar procedures over the past twenty years has allowed Dr. Gupta to operate a safe and efficient practice in accordance with Kentucky law. Notably, Dr. Gupta cannot recall a single adverse event or serious adverse event where Mr. Thomas was involved in patient care. It is the teaching and research purposes Ms. Fillhardt and other similarly situated patients consented to which has allowed Mr. Thomas to participate in treatments/procedures to better assist Dr. Gupta and his patients.

As noted above, there is no statute or regulation that prohibits Dr. Gupta from training Mr. Thomas or including him in procedures, under direct supervision by Dr. Gupta, where the patient consents to his involvement and where moderate sedation/analgesia is used. Further, there is no pre-existing Opinion from this Board that provides a bright-line rule for the use/inclusion of medical assistants in this State in procedures involving moderate sedation/analgesia. Using Dr. Gupta as an example and punishing him for conduct that is not otherwise prohibited by law or the guidance of this Board would be unduly prejudicial and unconstitutional.

In the event that this Board would like to directly control the activities of medical assistants in Kentucky, proposing statutory legislation on this subject or issuing a prospective administrative regulation on this topic under KRS 311.565(1)(i) are more appropriate vehicles than retrospective punishment of Dr. Gupta when there has been no violation of Kentucky law or breach of the applicable standard of care. Similarly, if this Board would like to prohibit medical assistants from serving as a "qualified practitioner" in procedures where moderate sedation/analgesia is used, a clarifying Opinion on this topic would be more equitable than the issuance of a complaint or other punitive action under KRS 311.591(c) or (d).

II.    Ms. Fillhardt's next complaint pertains to the alleged injection of cyanocobalamin in Dr. Gupta's office. Specifically, Ms. Fillhardt claims that the second injection of the medication caused an allergic reaction, but she does not assert or describe any issue with the first injection of the medication. Notably, Dr. Gupta denies that cyanocobalamin was ever administered in his office; rather, the medication is simply listed as one of Ms. Fillhardt's medications.

III.   Ms. Fillhardt's assumption that her alleged designation as a "VIP" inferred that she would be given more anesthesia than other patients is inconsistent with the Conscious Sedation Flow Sheets and the acceptable norms of the practice of medicine. (*See* Appendix C). Further, Ms. Fillhardt's allegations that she "expected to be in a twilight type feeling while injections were being given" is unfounded and unsupported. Similarly, Ms. Fillhardt's contention that she "had issues coming out of anesthesia" is inconsistent with the nursing notes included in the Conscious Sedation Flow Sheets. (*See* Appendix C). To the extent that the document

LEWIS BRISBOIS BISGAARD & SMITH LLP

www.lewisbrisbois.com

**Filed**         24-CI-01033 10/16/2024                    **Kathryn Marshall, Franklin Circuit Clerk**

94656438.1

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000003 of 000005

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:08:02

85787

Kentucky Board of Medical Licensure
May 8, 2023
Page 4

has not been filled out, Dr. Gupta represented to this Board that all employees have been re-educated to fill out forms in their entirety.

In the event that Ms. Fillhardt had post-procedure issues, Dr. Gupta provided her with post-procedure instructions which included directions to report to a hospital or emergency room should certain complications arise. (*See* Post-Discharge Instructions attached hereto as Appendix E). At each procedure, Ms. Fillhardt was accompanied by her husband and/or her daughter, Brittany Morris, a medical assistant previously employed at Dr. Gupta's office. Ms. Fillhardt walked out of the office, without assistance, awake and alert after each procedure .

IV.      The last of Ms. Fillhardt's concerns in her Grievance pertain to Autumn Thomas' involvement in Ms. Fillhardt's prescriptions. With respect to the designation of Ms. Thomas as a medical assistant, Dr. Gupta relies on his response as set forth in Part (I) above.

Any involvement by Ms. Thomas in providing medication to Ms. Fillhardt would have been solely at the delegation by Dr. Gupta and under his direct supervision. This is not the situation where the Board previously issued an Opinion that prohibits medical assistants or nurses from prescribing or refilling medication consistent with a previously established protocol created by a physician. Rather, Dr. Gupta prescribed the medication for Ms. Fillhardt and Ms. Thomas did not participate in the unlicensed practice of medicine. Specifically, at no time did Ms. Thomas undertake any tasks which required the exercise of independent professional judgment or the making of clinical assessments, evaluations, or interpretations.

For these reasons, Dr. Gupta requests that this Board conclude that there is no evidence of any medical malpractice act by Dr. Gupta and that no further action is necessary pursuant to KRS 311.591(3)(a) or, in the alternative, that there is insufficient evidence of a violation to warrant the issuance of a complaint pursuant to KRS 311.591(3)(b). To the extent that this Board has already concluded that some type of action or complaint may be necessary consistent with KRS 311.591(3)(c) or (d), Dr. Gupta requests that this Board reconsider the same in light of the reasons provided herein, including the supportive documentation attached in the Appendices.

In addition to this letter serving as a direct reply to Ms. Fillhardt's allegations, Dr. Gupta also requests that Board Member Kristin A. Turner, counsel for Ms. Fillhardt in her civil suit, recuse herself from the Board's ultimate determination on the issuance of a complaint because her conflicting interest tarnishes the "independent" nature of the Board, despite the explicit language used in KRS 311.530(1) to create this Board, and Ms. Turner is "financially interested" in the regulation of Dr. Gupta's practice herein, contrary to the express provisions of KRS 311.530(3)(c). Any inquiry into the appropriateness of Dr. Gupta's practice under KRS 311.591 by Board Member Turner pertaining to the grievance filed by her client, who she represents in civil litigation pending against Dr. Gupta, would create an appearance of impropriety that KRS 311.591(5) attempts to prevent. Additionally, any final order issued against Dr. Gupta would be subject to judicial review under KRS 311.593 and KRS 311.555.

LEWIS BRISBOIS BISGAARD & SMITH LLP

www.lewisbrisbois.com

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

94656438.1

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000004 of 000005

NOT ORIGINAL

DOCUMENT

01/05/2026 04:08:02

PM

85787

Kentucky Board of Medical Licensure
May 8, 2023
Page 5

Should this Board have any additional questions or concerns related to Dr. Gupta or his care of Ms. Fillhardt, please do not hesitate to contact me.

Very truly yours,

/s/ Judd R. Uhl

Judd R. Uhl of
LEWIS BRISBOIS BISGAARD & SMITH LLP

JRU

LEWIS BRISBOIS BISGAARD & SMITH LLP

www.lewisbrisbois.com

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000005 of 000005

**ORIGINAL DOCUMENT**

04:09:50 PM

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

FILED OF RECORD

JUN - 1 2023  01/05/2026

K.B.M.L. 85787

## COMMONWEALTH OF KENTUCKY
## BOARD OF MEDICAL LICENSURE
### CASE NO. 2106

IN RE: THE LICENSE TO PRACTICE MEDICINE IN THE COMMONWEALTH OF KENTUCKY HELD BY PRAGYA B. GUPTA, M.D., LICENSE NO. 34920, 162 BARNWOOD DRIVE, EDGEWOOD, KENTUCKY 41017

### <u>AGREED ORDER</u>

Come now the Kentucky Board of Medical Licensure (hereafter "the Board"), acting by and through its Inquiry Panel B, and Pragya B. Gupta, M.D. (hereafter "the licensee"), and, based upon their mutual desire to fully and finally resolve the pending investigation without an evidentiary hearing, hereby ENTER INTO the following **AGREED ORDER**:

### <u>STIPULATIONS OF FACT</u>

The parties stipulate the following facts, which serve as the factual bases for this Agreed Order:

1.  At all relevant times, Pragya B. Gupta, M.D., was licensed by the Board to practice medicine within the Commonwealth of Kentucky.

2.  The licensee's medical specialty is Interventional Pain Management.

3.  In January 2023, the Board received a complaint from one of the licensee's patients alleging violations of the standard medical practice and standard of care and causing her trauma. Specifically, the grievant detailed the following issues:

    *   Donald Jay Thomas "DJ" was introduced to me as the office manager. However, throughout my time under the licensee's care he was an active participant in my care. I was very uncomfortable with Mr. Thomas being in my treatment room while I was wearing a gown and not fully clothed given that he has no medical certification. On multiple occasions, he was the individual who administered the anesthesia[.] He would ask Dr. Gupta how much to administer and then measure out and give the doses by iv. [...]

    *   In September 2021, I was given my first injection of cyanocobalamin [.] I was supposed to have a second injection 30 days from the first as I understand the protocol to be. At the second injection date, Dr. Gupta took

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000001 of 000009

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:09:50 PM

NOT

01/05/2026

85787

one look at me and was immediately concerned. I had let DJ and others in the office know that I did not feel right, and I had swelling. Dr. Gupta immediately knew that this was an allergic reaction. I instead was given a different injection.

- I was told during my injection procedures that I was a "VIP" patient and that I would receive good stuff. I took this to mean that I was given more anesthesia than other patients. I expected to be in a twilight type feeling while injections were being given. However, I was completely knocked out and I do not believe that was appropriate for this type of injection. On one occasion, I had issues coming out of the anesthesia in the office.

- Autumn Thomas is the wife of DJ Thomas and the clerk/billing assistant at the office. To my understanding she has had no medical training or certification, but she conducted medical functions such as taking vitals. She was also the individual that would handle sending proscriptions [*sic*] to the pharmacy. However, I do not believe that proper protocols were followed in proscribing [*sic*] as I had two different issues that I believe are very important to mention.

  a. I was proscribed [*sic*] Savella. Dr. Gupta had advised that this medication was one that needed to be stepped up to a higher dosage. I was only advised to take one a day and was supposed to receive a lower milligram capsule for so many days then pickup a higher milligram. The proscription [*sic*] was incorrectly placed by Autumn, my dosage stated two pills per day and I was started on a 25 mg which I was supposed to start on 12.5. At one point, the system as you can see in my medical records had me proscribed [*sic*] a 25 MG and a 50 mg to both take twice a day. I never took these together or in the incorrectly proscribed [*sic*] manner. However, I did have side effects from taking the 25 mg to begin [...] This causes me to have concerns that he does not fill out his own prescription orders or at the least he doesn't pay attention to what he signs.

  b. On several occasions, proscriptions [*sic*] from other doctors were ordered to be refilled by Dr. Gupta's office. My understanding from what I was told was that this was Autumn incorrectly refilling medications. My other doctors [...] were very concerned when this occurred. [...]

4. On or about February 12, 2023, the licensee responded to the grievant's complaint.

He discussed her history, diagnoses and treatment. He also included his chronology

of her care and his *curriculum vitae*. Specifically, he stated, in part:

2

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000002 of 000009

320 of 526

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:09:50 PM

NOT

01/05/2026

85787

- Donnie J Thomas (DJ) is a trained medical assistant. I have trained him since 2002. In my long career, I had not had a single adverse event or serious adverse event where he was involved. I have trained him not only to perform routine Medical Assistant Jobs, but he is also a Clinical Coordinator for my ongoing clinical research work (GCP certified). [...] DJ is trained to perform more than one job. Multitasking is required to work in a solo practitioner's office. DJ helps me in the procedure room. He positions patients, attaches them to the monitors per ASA guidelines, and moves the Fluoroscope per my instruction. At times DJ administers a small dose of sedation on my request. [...] DJ was not the only person present at the time of infusion, as other MAs were there, particularly her daughter, on the day of the first infusion. I have checked her multiple times during the infusion to monitor EKG tracing and the depth of her sedation. She received good care. She was covered appropriately with blankets. There was no trigger for reactivating PTSD.

- In September, there were three encounters. [...] I don't recall the swelling at all. It was not life-threatening and without any residual problems. She is probably referring to swelling from IV fluid extravasation, which is not an allergic reaction. The patient was never administered Cyanocobalamin in my clinic.

- No, I don't recall calling any patient a VIP, although I consider all patients VIPs and treat them accordingly. Most of the time, her daughter Brittany Morris was present during transportation of her to and from the procedure room. She needed 5mg of midazolam for the procedure as she was extremely nervous. Without sedation, I could not have performed the procedure as she would not cooperate.

- Ms. Autumn Thomas is also a MA whom I have trained since 2013. Autumn Thomas occasionally helped us in the recovery unit by relieving Medical Assistants for lunch breaks when we were short-staffed during the COVID infection. Autumn Thomas is responsible for discharging patients, reviewing discharge instructions, and ensuring that patients are appropriately scheduled for post-procedure follow-up. She also helps me with billing work. In the recovery area, she would typically watch those patients who are getting ready to be discharged. All patients in the recovery area are attached to the automated monitors. She is also responsible for following all my orders, such as lab work and imaging requests.

  [...]

- The allegations that I don't take care of my prescription are inaccurate. I am meticulous and ensure that my staff follows my instruction correctly. I verify and cross-verify that the prescriptions are correctly sent by checking the logs frequently. Autumn helps me ensure that the refills are sent in a timely fashion. I enter the prescription under the appropriate diagnosis, and then she transmits the Rx electronically, which I monitor directly.

3

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000003 of 000009

321 of 526

Filed          24-CI-01033   10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:09:50 PM

NOT

01/05/2026

85787

- No, I don't refill other physicians' prescriptions unless the patient specifically requests me to do that to save time and a visit. […]

5. On or about March 21, 2023, a Board consultant completed a review of the grievant's medical records and found that the licensee's diagnosis and treatment were below the minimum standards of acceptable and prevailing medical practice. The Board consultant's specific diagnostic concerns were that:

- Dr. Gupta performed three cervical transforaminal epidurals without documenting the specific history and findings indicating the need for these injections […]

- The cervical MRI showed "C4-C5 small central disc protrusion mildly compressing the thecal sac. No spinal cord or nerve root compression."

The Board consultant's specific treatment concerns were that:

- The three transforaminal cervical epidurals performed were not indicated as described under the diagnosis. In addition, after each transforaminal epidural injection there is no mention of the patient's response to the previous epidural procedure. Only after three epidurals does Dr. Gupta describe the response to the three procedures.

- The epidurals and facet injection's were performed under moderate sedation. The operating physician, Dr. Gupta cannot also serve as the anesthesia monitor. It is standard of care that the anesthesia monitor must be at least an RN. In all of the procedures his trained assistant, DJ Thomas, served as anesthesia monitor. In addition, the sedation monitoring records are incomplete and one is missing.

- There is evidence in the medical record that the grievant was over-medicated. […] After starting these medications, on follow-ups Dr. Gupta does not address the partial response to these medications. On 6/15/2021 Dr. Gupta's interim history states "Today patient exhibited some speech difficulty and complained of weakness in right upper extremity and lower extremity." The medical record does not show any new physical exam, just a repeat of the previous exams. Dr. Gupta does not comment on these serious new complaints and he continues her treatment plan. On 7/13/2021 the patient presented with new complaints of having an "an attack of generalized numbness and fatigue-like symptoms." The patient complained of intermittent incontinence, in addition to the previous complaints […] Over the next eight months all of her complaints continued.

- […] Based on the list of medications and known drug interactions some of these serious symptoms, were more likely than not related to over-medication

4

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000004 of 000009

Filed          24-CI-01033   10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:09:50 PM

NOT

01/05/2026

85787

6. On or about April 4, 2023, the licensee responded to the Board consultant's report and included a detailed explanation of his treatment and reasoning for the care he provided to the grievant. He also included significant references to literature and his clinic's policies and procedures. Specifically, he explained:

- The decision to perform three cervical transforaminal injections was based on my clinical examination of the patient, my experience, and my knowledge. I examined the patient before every procedure in the procedure room. There is a record of pre-procedure VAS on each occasion. [...] This patient had complete pain relief after the third injection.

- I use sedation for anxiolysis and amnesia only. I titrate the medicine so that they are fully responsive and comfortable with minimal anxiety and can tolerate unpleasant sensations of the procedure. All patients are monitored as per ASA protocol. BP, HR, and Pulse oximetry are performed continuously in the procedure room. Patients are evaluated pre-procedure and post-procedure, and the vitals are recorded. We have followed the guidelines outlined in KBML (https://kbml.ky.gov/board/Documents/Board%20Opinion%20Office%20Based%20Surgery.pdf) (revised 2018) regarding the requirement for the safe conduct of mild sedation. In this document[,] requirement of a trained person is mentioned. All procedure personnel is ACLS trained and have been trained to assist me in the procedure room properly.

- The procedure room has all the equipment for resuscitation, including an AED, laryngoscope (3 sizes Miller and McIntosh), suction machine, ambu-bag, and oxygen cylinder. All recovery bays are fully equipped with monitors for monitoring vitals as per ASA protocol. All equipment undergoes preventative maintenance. [...]

- The MA normally positions the fluoroscope and monitors the patient. I operate the fluoroscope and constantly communicate with the patient. I am a board-certified anesthesiologist and a pain specialist. I administer 0.5mg of Versed in the procedure room and titrate the medicine slowly while my assistant and I monitor the vitals. Most of the time, the completion of the procedure takes 30 - 35 minutes (for ESI or Facet joint block), which includes an examination of the patient pre and post-procedure in the room and recovery area.

  [...]

- The patient was an extremely difficult patient to manage. I spent anywhere from 1 – 2 hours with her each visit and could not document everything that transpired during the visit. I treated her with FDA-approved combination medicine for fibromyalgia as she failed all other treatments, but she did not

5

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000005 of 000009

323 of 526

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:09:50 PM

NOT

01/05/2026

85787

respond. Insomnia is a known problem associated with fibromyalgia, which I treated with Lunesta. I can assure you that she did not experience any side effects from the medicine that I prescribed. [...]

7. On or about April 26, 2023, after considering the licensee's response to his report and again reviewing the records, the Board consultant changed his conclusions as follows:

- [The grievant] had a total of five procedures where she was administered intravenous sedation with midazolam 5 mg. This dosage is documented in the medical record and acknowledged by Dr. Gupta in his response to the grievance (answer number 3). Dr. Gupta's patient encounters list the billing codes used for each visit. In all instances where midazolam sedation was administered the billing was listed as moderate sedation. Dr. Gupta has indicated in his response to my report that he was using mild sedation (answer 2).

- Dr. Gupta states that [the grievant's] intravenous line infiltrated after one of her cervical epidurals in September 2021 without residual problems. He also says he has educated his staff to properly fill out anesthesia monitoring forms. I have previously stated that the guidelines for intravenous sedation require that a registered nurse be present as the anesthesia monitor to administer the sedation and, if necessary, start intravenous lines. I have included in this report the latest guidelines for conscious sedation.

- Most concerning to me is the recent information I have received regarding Donnie J. Thomas. The grievant has stated that Mr. Thomas started at least one of her intravenous lines and had administered intravenous sedation to her. Further review of Dr. Gupta's response (answer#1) to her grievance reveals by his own admission that he allows Mr. Thomas to administer intravenous midazolam.

  My conclusion is Donnie J. Thomas is practicing medicine without a license. This represents an immediate threat to the safety and health of the citizens of Kentucky.

8. The licensee, with counsel, was present at the Panel meeting on May 18, 2023. Leading up to the meeting, he provided more literature to the Panel and provided pictures of his facility to the Panel during the meeting. At the Panel meeting, he explained that he trains all his staff. He considers Mr. Thomas a Medical Assistant because of that training and because he assists him with procedures, including

6

324 of 526

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000006 of 000009

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:09:50 PM

NOT

01/05/2026

85787

pushing medications. The licensee conceded that Mr. Thomas has no certification. However, Mr. Thomas has worked with the licensee on and off for twenty years, most recently starting in 2016. During the meeting, the licensee stated that he has twelve staff members, including one Nurse Practitioner, two receptionists, two clinical coordinators, one dietitian, one exercise therapist, one discharge employee and two temporary workers for additional help. Two people are in the procedure room, but none are a Physician Assistant, Registered Nurse or certified Medical Assistant. It is during post-op that a certified Medical Assistant sees patients. He informed the Board that he has plans to move to California and had been offered a job there in October. He has transferred all his patients to another physician, and May 18, 2023 was his last day – he would perform no further procedures in Kentucky.

9. The licensee agreed to enter into this Agreed Order, in lieu of the issuance of a Complaint and Emergency Order of Suspension.

## STIPULATED CONCLUSIONS OF LAW

The parties stipulate the following Conclusions of Law, which serve as the legal bases for this Agreed Order:

1. The licensee's medical license is subject to regulation and discipline by the Board.

2. Based upon the Stipulations of Fact, the licensee engaged in conduct which violates the provisions of KRS 311.595(9) [as illustrated by KRS 311.597(4)]. Accordingly, there are legal grounds for the parties to enter into this Agreed Order.

3. Pursuant to KRS 311.591(6) and 201 KAR 9:082, the parties may fully and finally resolve this matter without an evidentiary hearing by entering into an informal resolution such as this Agreed Order.

7

325 of 526

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000007 of 000009

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:09:50 PM

NOT

01/05/2026

85787

## AGREED ORDER

Based upon the foregoing Stipulations of Fact and Stipulated Conclusions of Law, and, based upon their mutual desire to resolve the pending matter without an evidentiary hearing, the parties hereby ENTER INTO the following **AGREED ORDER**:

1. The license to practice medicine within the Commonwealth of Kentucky held by Pragya B. Gupta, M.D., is RESTRICTED/LIMITED FOR AN INDEFINITE PERIOD OF TIME, effective immediately upon the filing of this Agreed Order.

2. During the effective period of this Agreed Order, the licensee's medical license SHALL BE SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:

    a. The licensee SHALL NOT perform any act which would constitute the practice of medicine, as that term is defined or contemplated by KRS 311.840, et seq., in the Commonwealth of Kentucky, unless and until the Panel or its Chair has approved, in writing, the practice location at which he will practice as a physician. The decision whether to approve a particular practice location lies in the sole discretion of the Panel or its Chair. In determining whether to approve a practice location, the Panel or its Chair will particularly consider whether there will be appropriate oversight by a person(s) or entity that is not the licensee. In approving such practice location, the Panel or its Chair may include specific conditions/restrictions to ensure patient safety;

    b. Pursuant to KRS 311.565(1)(v), the licensee SHALL REIMBURSE the Board's costs of $2,625.00 within six (6) months from entry of this Agreed Order; and

    c. The licensee SHALL NOT violate any provision of KRS 311.595 and/or 311.597.

3. The licensee expressly agrees that if he should violate any term or condition of this Agreed Order, the licensee's practice will constitute an immediate danger to the public health, safety, or welfare, as provided in KRS 311.592 and 13B.125. The parties further agree that if the Board should receive information that the licensee has violated any term or condition of this Agreed Order, the Panel Chair is authorized by law to enter an Emergency Order of Suspension or Restriction

8

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000008 of 000009

326 of 526

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

**Filed** 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:09:50 PM

NOT

01/05/2026

85787

immediately upon a finding of probable cause that a violation has occurred, after an *ex parte* presentation of the relevant facts by the Board's General Counsel or Assistant General Counsel. If the Panel Chair should issue such an Emergency Order, the parties agree and stipulate that a violation of any term or condition of this Agreed Order would render the licensee's practice an immediate danger to the health, welfare and safety of patients and the general public, pursuant to KRS 311.592 and 13B.125; accordingly, the only relevant question for any emergency hearing conducted pursuant to KRS 13B.125 would be whether the licensee violated a term or condition of this Agreed Order.

4. The licensee understands and agrees that any violation of the terms of this Agreed Order would provide a legal basis for additional disciplinary action, pursuant to KRS 311.595(13), and may provide a legal basis for criminal prosecution.

SO AGREED on this 27th day of May, 2023.

FOR THE LICENSEE:

_____
PRAGYA B. GUPTA, M.D.

_____
JUDD R. UHL
COUNSEL FOR THE LICENSEE

FOR THE BOARD:

_____
DALE E. TONEY, M.D.
CHAIR, INQUIRY PANEL B

_____
NICOLE A. KING
Assistant General Counsel
Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
(502) 429-7150

9

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000009 of 000009

327 of 526

**Filed**   24-CI-01033   10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:13:18 PM

FILED OF RECORD
NOT
AUG - 8 2023
01/05/2026

K.B.M.L.
85787

## COMMONWEALTH OF KENTUCKY
## BOARD OF MEDICAL LICENSURE
## CASE NO. 2106

IN RE: THE LICENSE TO PRACTICE MEDICINE IN THE COMMONWEALTH OF KENTUCKY HELD BY PRAGYA B. GUPTA, M.D., LICENSE NO. 34920, 162 BARNWOOD DRIVE, EDGEWOOD, KENTUCKY 41017

### AMENDED AGREED ORDER

Come now the Kentucky Board of Medical Licensure (hereafter "the Board"), acting by and through the Chair of its Inquiry Panel B, and Pragya B. Gupta, M.D. (hereafter "the licensee"), and, based upon their mutual desire to fully and finally resolve the pending investigation without an evidentiary hearing, hereby ENTER INTO the following **AMENDED AGREED ORDER:**

### STIPULATIONS OF FACT

The parties stipulate the following facts, which serve as the factual bases for this Amended Agreed Order:

1. At all relevant times, Pragya B. Gupta, M.D., was licensed by the Board to practice medicine within the Commonwealth of Kentucky.

2. The licensee's medical specialty is Interventional Pain Management.

3. In January 2023, the Board received a complaint from one of the licensee's patients alleging violations of the standard medical practice and standard of care and causing her trauma. Specifically, the grievant detailed the following issues:

   - Donald Jay Thomas "DJ" was introduced to me as the office manager. However, throughout my time under the licensee's care he was an active participant in my care. I was very uncomfortable with Mr. Thomas being in my treatment room while I was wearing a gown and not fully clothed given that he has no medical certification. On multiple occasions, he was the individual who administered the anesthesia[.] He would ask Dr. Gupta how much to administer and then measure out and give the doses by iv. […]

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000001 of 000012

Filed                    24-CI-01033 10/16/2024           Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:13:18 PM

NOT

01/05/2026

85787

- In September 2021, I was given my first injection of cyanocobalamin [.] I was supposed to have a second injection 30 days from the first as I understand the protocol to be. At the second injection date, Dr. Gupta took one look at me and was immediately concerned. I had let DJ and others in the office know that I did not feel right, and I had swelling. Dr. Gupta immediately knew that this was an allergic reaction. I instead was given a different injection.

- I was told during my injection procedures that I was a "VIP" patient and that I would receive good stuff. I took this to mean that I was given more anesthesia than other patients. I expected to be in a twilight type feeling while injections were being given. However, I was completely knocked out and I do not believe that was appropriate for this type of injection. On one occasion, I had issues coming out of the anesthesia in the office.

- Autumn Thomas is the wife of DJ Thomas and the clerk/billing assistant at the office. To my understanding she has had no medical training or certification, but she conducted medical functions such as taking vitals. She was also the individual that would handle sending proscriptions [sic] to the pharmacy. However, I do not believe that proper protocols were followed in proscribing [sic] as I had two different issues that I believe are very important to mention.

    a. I was proscribed [sic] Savella. Dr. Gupta had advised that this medication was one that needed to be stepped up to a higher dosage. I was only advised to take one a day and was supposed to receive a lower milligram capsule for so many days then pickup a higher milligram. The proscription [sic] was incorrectly placed by Autumn, my dosage stated two pills per day and I was started on a 25 mg which I was supposed to start on 12.5. At one point, the system as you can see in my medical records had me proscribed [sic] a 25 MG and a 50 mg to both take twice a day. I never took these together or in the incorrectly proscribed [sic] manner. However, I did have side effects from taking the 25 mg to begin [...] This causes me to have concerns that he does not fill out his own prescription orders or at the least he doesn't pay attention to what he signs.

    b. On several occasions, proscriptions [sic] from other doctors were ordered to be refilled by Dr. Gupta's office. My understanding from what I was told was that this was Autumn incorrectly refilling medications. My other doctors [...] were very concerned when this occurred. [...]

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000002 of 000012

2

Filed          24-CI-01033   10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:13:18 PM

NOT

01/05/2026

85787

4. On or about February 12, 2023, the licensee responded to the grievant's complaint. He discussed her history, diagnoses, and treatment. He also included his chronology of her care and his *curriculum vitae.* Specifically, he stated, in part:

- Donnie J Thomas (DJ) is a trained medical assistant. I have trained him since 2002. In my long career, I had not had a single adverse event or serious adverse event where he was involved. I have trained him not only to perform routine Medical Assistant Jobs, but he is also a Clinical Coordinator for my ongoing clinical research work (GCP certified). […] DJ is trained to perform more than one job. Multitasking is required to work in a solo practitioner's office. DJ helps me in the procedure room. He positions patients, attaches them to the monitors per ASA guidelines, and moves the Fluoroscope per my instruction. At times DJ administers a small dose of sedation on my request. […] DJ was not the only person present at the time of infusion, as other MAs were there, particularly her daughter, on the day of the first infusion. I have checked her multiple times during the infusion to monitor EKG tracing and the depth of her sedation. She received good care. She was covered appropriately with blankets. There was no trigger for reactivating PTSD.

- In September, there were three encounters. […] I don't recall the swelling at all. It was not life-threatening and without any residual problems. She is probably referring to swelling from IV fluid extravasation, which is not an allergic reaction. The patient was never administered Cyanocobalamin in my clinic.

- No, I don't recall calling any patient a VIP, although I consider all patients VIPs and treat them accordingly. Most of the time, her daughter Brittany Morris was present during transportation of her to and from the procedure room. She needed 5mg of midazolam for the procedure as she was extremely nervous. Without sedation, I could not have performed the procedure as she would not cooperate.

- Ms. Autumn Thomas is also a MA whom I have trained since 2013. Autumn Thomas occasionally helped us in the recovery unit by relieving Medical Assistants for lunch breaks when we were short-staffed during the COVID infection. Autumn Thomas is responsible for discharging patients, reviewing discharge instructions, and ensuring that patients are appropriately scheduled for post-procedure follow-up. She also helps me with billing work. In the recovery area, she would typically watch those patients who are getting ready to be discharged. All patients in the recovery area are attached to the automated monitors. She is also responsible for following all my orders, such as lab work and imaging requests.

    […]

3

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000003 of 000012

Filed          24-CI-01033   10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:13:18 PM

NOT

01/05/2026

85787

- The allegations that I don't take care of my prescription are inaccurate. I am meticulous and ensure that my staff follows my instruction correctly. I verify and cross-verify that the prescriptions are correctly sent by checking the logs frequently. Autumn helps me ensure that the refills are sent in a timely fashion. I enter the prescription under the appropriate diagnosis, and then she transmits the Rx electronically, which I monitor directly.

- No, I don't refill other physicians' prescriptions unless the patient specifically requests me to do that to save time and a visit. [...]

5. On or about March 21, 2023, a Board consultant completed a review of the grievant's medical records and found that the licensee's diagnosis and treatment were below the minimum standards of acceptable and prevailing medical practice.

The Board consultant's specific diagnostic concerns were that:

- Dr. Gupta performed three cervical transforaminal epidurals without documenting the specific history and findings indicating the need for these injections [...]

- The cervical MRI showed "C4-C5 small central disc protrusion mildly compressing the thecal sac. No spinal cord or nerve root compression."

The Board consultant's specific treatment concerns were that:

- The three transforaminal cervical epidurals performed were not indicated as described under the diagnosis. In addition, after each transforaminal epidural injection there is no mention of the patient's response to the previous epidural procedure. Only after three epidurals does Dr. Gupta describe the response to the three procedures.

- The epidurals and facet injection's were performed under moderate sedation. The operating physician, Dr. Gupta cannot also serve as the anesthesia monitor. It is standard of care that the anesthesia monitor must be at least an RN. In all of the procedures his trained assistant, DJ Thomas, served as anesthesia monitor. In addition, the sedation monitoring records are incomplete and one is missing.

- There is evidence in the medical record that the grievant was over-medicated. [...] After starting these medications, on follow-ups Dr. Gupta does not address the partial response to these medications. On 6/15/2021 Dr. Gupta's interim history states "Today patient exhibited some speech difficulty and complained of weakness in right upper extremity and lower extremity." The medical record does not show any new physical exam, just a repeat of the previous exams. Dr. Gupta does not comment on these serious new complaints and he continues her treatment plan. On 7/13/2021 the patient presented with new complaints of having an "an attack of

4

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000004 of 000012

Filed                24-CI-01033    10/16/2024                Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:13:18 PM

generalized numbness and fatigue-like symptoms." The patient complained of intermittent incontinence, in addition to the previous complaints […] Over the next eight months all of her complaints continued.

- […] Based on the list of medications and known drug interactions some of these serious symptoms, were more likely than not related to over-medication.

6. On or about April 4, 2023, the licensee responded to the Board consultant's report and included a detailed explanation of his treatment and reasoning for the care he provided to the grievant. He also included significant references to literature and his clinic's policies and procedures. Specifically, he explained:

- The decision to perform three cervical transforaminal injections was based on my clinical examination of the patient, my experience, and my knowledge. I examined the patient before every procedure in the procedure room. There is a record of pre-procedure VAS on each occasion. […] This patient had complete pain relief after the third injection.

- I use sedation for anxiolysis and amnesia only. I titrate the medicine so that they are fully responsive and comfortable with minimal anxiety and can tolerate unpleasant sensations of the procedure. All patients are monitored as per ASA protocol. BP, HR, and Pulse oximetry are performed continuously in the procedure room. Patients are evaluated pre-procedure and post-procedure, and the vitals are recorded. We have followed the guidelines outlined in KBML (https://kbml.ky.gov/board/Documents/Board%20Opinion%20Office%20Based%20Surgery.pdf) (revised 2018) regarding the requirement for the safe conduct of mild sedation. In this document[,] requirement of a trained person is mentioned. All procedure personnel is ACLS trained and have been trained to assist me in the procedure room properly.

- The procedure room has all the equipment for resuscitation, including an AED, laryngoscope (3 sizes Miller and McIntosh), suction machine, ambu-bag, and oxygen cylinder. All recovery bays are fully equipped with monitors for monitoring vitals as per ASA protocol. All equipment undergoes preventative maintenance. […]

- The MA normally positions the fluoroscope and monitors the patient. I operate the fluoroscope and constantly communicate with the patient. I am a board-certified anesthesiologist and a pain specialist. I administer 0.5mg of Versed in the procedure room and titrate the medicine slowly while my assistant and I monitor the vitals. Most of the time, the completion of the procedure takes 30 - 35 minutes (for ESI or Facet joint block), which

5

Filed                24-CI-01033 10/16/2024                Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000005 of 000012

Filed        24-CI-01033    10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT

ORIGINAL DOCUMENT

04:13:18 PM

01/05/2026

85787

includes an examination of the patient pre and post-procedure in the room and recovery area.

[…]

- The patient was an extremely difficult patient to manage. I spent anywhere from 1 – 2 hours with her each visit and could not document everything that transpired during the visit. I treated her with FDA-approved combination medicine for fibromyalgia as she failed all other treatments, but she did not respond. Insomnia is a known problem associated with fibromyalgia, which I treated with Lunesta. I can assure you that she did not experience any side effects from the medicine that I prescribed. […]

7. On or about April 26, 2023, after considering the licensee's response to his report and again reviewing the records, the Board consultant changed his conclusions as follows:

- [The grievant] had a total of five procedures where she was administered intravenous sedation with midazolam 5 mg. This dosage is documented in the medical record and acknowledged by Dr. Gupta in his response to the grievance (answer number 3). Dr. Gupta's patient encounters list the billing codes used for each visit. In all instances where midazolam sedation was administered the billing was listed as moderate sedation. Dr. Gupta has indicated in his response to my report that he was using mild sedation (answer 2).

- Dr. Gupta states that [the grievant's] intravenous line infiltrated after one of her cervical epidurals in September 2021 without residual problems. He also says he has educated his staff to properly fill out anesthesia monitoring forms. I have previously stated that the guidelines for intravenous sedation require that a registered nurse be present as the anesthesia monitor to administer the sedation and, if necessary, start intravenous lines. I have included in this report the latest guidelines for conscious sedation.

- Most concerning to me is the recent information I have received regarding Donnie J. Thomas. The grievant has stated that Mr. Thomas started at least one of her intravenous lines and had administered intravenous sedation to her. Further review of Dr. Gupta's response (answer#1) to her grievance reveals by his own admission that he allows Mr. Thomas to administer intravenous midazolam.

  My conclusion is Donnie J. Thomas is practicing medicine without a license. This represents an immediate threat to the safety and health of the citizens of Kentucky.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000006 of 000012

6

Filed          24-CI-01033  10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:13:18 PM

NOT

01/05/2026

85787

8. The licensee, with counsel, was present at the Panel meeting on May 18, 2023. Leading up to the meeting, he provided more literature to the Panel and provided pictures of his facility to the Panel during the meeting. At the Panel meeting, he explained that he trains all his staff. He considers Mr. Thomas a Medical Assistant because of that training and because he assists him with procedures, including pushing medications. The licensee conceded that Mr. Thomas has no certification. However, Mr. Thomas has worked with the licensee on and off for twenty years, most recently starting in 2016. During the meeting, the licensee stated that he has twelve staff members, including one Nurse Practitioner, two receptionists, two clinical coordinators, one dietitian, one exercise therapist, one discharge employee and two temporary workers for additional help. Two people are in the procedure room, but none are a Physician Assistant, Registered Nurse or certified Medical Assistant. It is during post-op that a certified Medical Assistant sees patients. He informed the Board that he has plans to move to California and had been offered a job there in October. He has transferred all his patients to another physician, and May 18, 2023 was his last day – he would perform no further procedures in Kentucky.

9. The Panel gave strong consideration to the licensee's representations that he had effectively closed his solo practice, having transferred all of his patients and ceased performing procedures in Kentucky in anticipation of his move to California. Although the licensee desired to maintain a Kentucky license, Panel members felt that the issues raised in the investigation were not such that they could be corrected by remedial education and monitoring and that he should not practice in an independent setting in Kentucky. The Panel and the licensee agreed to enter into an

7

Filed          24-CI-01033  10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000007 of 000012

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:13:18 PM

NOT

01/05/2026

85787

Agreed Order, in lieu of the issuance of a Complaint and Emergency Order of Restriction.

10. The Agreed Order, filed of record on June 1, 2023, required that the licensee's medical license SHALL BE SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:

a. The licensee SHALL NOT perform any act which would constitute the practice of medicine, as that term is defined or contemplated by KRS 311.840, et seq., in the Commonwealth of Kentucky, unless and until the Panel or its Chair has approved, in writing, the practice location at which he will practice as a physician. The decision whether to approve a particular practice location lies in the sole discretion of the Panel or its Chair. In determining whether to approve a practice location, the Panel or its Chair will particularly consider whether there will be appropriate oversight by a person(s) or entity that is not the licensee. In approving such practice location, the Panel or its Chair may include specific conditions/restrictions to ensure patient safety;

b. Pursuant to KRS 311.565(1)(v), the licensee SHALL REIMBURSE the Board's costs of $2,625.00 within six (6) months from entry of this Amended Agreed Order; and

c. The licensee SHALL NOT violate any provision of KRS 311.595 and/or 311.597.

11. On or about June 12, 2023, the licensee reimbursed the Board for costs in the amount of $2,625.00.

12. On or about June 30, 2023, the licensee, through his counsel, advised the Board that his opportunity in California was withdrawn. Therefore, he requested approval to practice in Kentucky with Dr. Laxmaiah Manchikanti at Pain Management Centers of America, P.S.C. If approved, the licensee stated that he would be practicing in the Paducah and Hopkinsville locations.

13. Attached to the licensee's request was a letter from Dr. Laxmaiah Manchikanti explaining:

8

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000008 of 000012

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

[M]y plan would be to gradually integrate [Dr. Gupta] into our practice. This will provide him with an opportunity to become knowledgeable of our practice processes, procedures, and expectations. Initially, Dr. Gupta will shadow me in the clinic and surgery center in Paducah, Kentucky. After familiarizing himself with our processes, I will then observe his patient encounters in the clinic and procedures in the surgery center. When my expectations are met, Dr. Gupta will then transition to having his own schedule of clinic patients in the Paducah and Hopkinsville offices. He will also be scheduled time in the Paducah surgery center for procedures. I will note that sometimes I am present in the Hopkinsville office and there is an APRN onsite in addition to the physician and other qualified staff. Of course, I would be available for consultation with Dr. Gupta as needed.

14. The Panel and the licensee now enter into this Amended Agreed Order to approve the licensee's location to practice medicine under Dr. Laxmaiah Manchikanti at Pain Management Centers of America, P.S.C. in the Paducah and Hopkinsville locations pursuant to the terms and conditions of this Amended Agreed Order.

## STIPULATED CONCLUSIONS OF LAW

The parties stipulate the following Conclusions of Law, which serve as the legal bases for this Amended Agreed Order:

1. The licensee's medical license is subject to regulation and discipline by the Board.

2. Based upon the Stipulations of Fact, the licensee engaged in conduct which violates the provisions of KRS 311.595(9) [as illustrated by KRS 311.597(4)]. Accordingly, there are legal grounds for the parties to enter into this Amended Agreed Order.

3. Pursuant to KRS 311.591(6) and 201 KAR 9:082, the parties may fully and finally resolve this matter without an evidentiary hearing by entering into an informal resolution such as this Amended Agreed Order.

9

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000009 of 000012

Filed            24-CI-01033  10/16/2024         Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:13:18 PM

NOT

01/05/2026

85787

## AMENDED AGREED ORDER

Based upon the foregoing Stipulations of Fact and Stipulated Conclusions of Law, and, based upon their mutual desire to resolve the pending matter without an evidentiary hearing, the parties hereby ENTER INTO the following **AMENDED AGREED ORDER:**

1. The license to practice medicine within the Commonwealth of Kentucky held by Pragya B. Gupta, M.D., is RESTRICTED/LIMITED FOR AN INDEFINITE PERIOD OF TIME, effective immediately upon the filing of this Amended Agreed Order.

2. During the effective period of this Amended Agreed Order, the licensee's medical license SHALL BE SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:

   a. The licensee SHALL NOT perform any act which would constitute the practice of medicine, as that term is defined or contemplated by KRS 311.840, et seq., in the Commonwealth of Kentucky, unless and until the Panel or its Chair has approved, in writing, the practice location at which he will practice as a physician. The decision whether to approve a particular practice location lies in the sole discretion of the Panel or its Chair. In determining whether to approve a practice location, the Panel or its Chair will particularly consider whether there will be appropriate oversight by a person(s) or entity that is not the licensee;

      i. Once approved, the licensee SHALL NOT change practice locations without first obtaining written approval by the Panel or its Chair for such change. The parties agree that the Panel or its Chair may require additional conditions and/or restrictions as a condition of it granting approval for a new practice location;

      ii. The licensee is approved to practice medicine at the following locations of Pain Management Centers of America, P.S.C.:

         1. **Pain Management Center | Paducah, KY**
            67 Lakeview Drive
            Paducah, Kentucky 42001

         2. **Pain Management of America Surgery Center**
            2831 Lone Oak Road
            Paducah, Kentucky 42003

10

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000010 of 000012

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:13:18 PM

NOT

01/05/2026

85787

### 3. Pain Management Center | Hopkinsville, KY
### 112 Keeton Drive
### Hopkinsville, Kentucky 42240

b. The licensee understands that his practice of medicine at Pain Management Centers of America, P.S.C. may be subject to review by the Board at is discretion including but not limited to requesting reviews from Dr. Manchikanti relevant to whether the licensee's practice of medicine meets acceptable and prevailing medical practices in the Commonwealth of Kentucky; and

c. The licensee SHALL NOT violate any provision of KRS 311.595 and/or 311.597.

3. As an express condition for the entry of this Amended Agreed Order, each party understands and agrees that the Board will never consider any petition for termination or modification the terms of the agreement in any way that would allow the licensee to practice in an independent setting in the Commonwealth of Kentucky. Any communication by the licensee and/or his agents to the Board attempting to revive this matter or modify or terminate the terms set forth in this Amended Agreed Order will be returned without being provided or forwarded to any Board member.

4. The licensee expressly agrees that if he should violate any term or condition of this Amended Agreed Order, the licensee's practice will constitute an immediate danger to the public health, safety, or welfare, as provided in KRS 311.592 and 13B.125. The parties further agree that if the Board should receive information that the licensee has violated any term or condition of this Amended Agreed Order, the Panel Chair is authorized by law to enter an Emergency Order of Suspension or Restriction immediately upon a finding of probable cause that a violation has occurred, after an *ex parte* presentation of the relevant facts by the Board's General Counsel or Assistant General Counsel. If the Panel Chair should issue such an

11

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000011 of 000012

ORIGINAL DOCUMENT

Emergency Order, the parties agree and stipulate that a violation of any term or condition of this Amended Agreed Order would render the licensee's practice an immediate danger to the health, welfare and safety of patients and the general public, pursuant to KRS 311.592 and 13B.125; accordingly, the only relevant question for any emergency hearing conducted pursuant to KRS 13B.125 would be whether the licensee violated a term or condition of this Amended Agreed Order.

5. The licensee understands and agrees that any violation of the terms of this Amended Agreed Order would provide a legal basis for additional disciplinary action, pursuant to KRS 311.595(13), and may provide a legal basis for criminal prosecution.

SO AGREED on this 7th day of ___Aug___, 2023.

FOR THE LICENSEE:

_____
PRAGYA B. GUPTA, M.D.

_____
L. CHAD ELDER
COUNSEL FOR THE LICENSEE

FOR THE BOARD:

_____
DALE E. TONEY, M.D.
CHAIR, INQUIRY PANEL B

_____
NICOLE A. KING
Assistant General Counsel
Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
(502) 429-7150

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000012 of 000012

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:15:00

85787

# Kentucky Board of Medical Licensure
## Administrative Report
## Fiscal Year 2023

**Disposition of Grievances and Disciplinary Actions Taken:**

| | |
|---|---|
| Grievances Opened | 278 |
| Total Cases to Panel | 280 |
| Cases Investigated to Panel | 98 |
| Investigations Pending | 51 |
| Malpractice Cases Reviewed | 74 |
| Disciplinary Proceedings Authorized | 87 |

**Disciplinary Action Taken**

| | |
|---|---|
| Complaints Issued | 15 |
| Emergency Orders of Suspension | 13 |
| Emergency Orders of Restriction | 3 |
| Orders Denying License | 2 |
| Final Orders | 0 |
| Orders of Probation | 0 |
| Orders of Reprimand | 0 |
| Orders of Restriction | 2 |
| Orders of Revocation | 2 |
| Orders of Suspension | 0 |
| Agreed Orders | 38 |
| Agreed Orders of Indefinite Restriction | 1 |
| Agreed Orders of Surrender | 6 |
| Agreed Orders of Probation | 0 |
| Agreed Orders of Revocation | 1 |
| Agreed Orders of Suspension | 0 |
| Agreed Orders of Fine | 4 |
| Agreed Orders of Retirement | 0 |
| Interim Agreed Orders | 7 |
| Orders Amended | 14 |
| Letters of Agreement | 13 |
| Letters of Admonishment | 6 |
| Letters of Concern | 22 |

Filed          24-CI-01033   10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

**NOT ORIGINAL**

01/05/2026 04:15:40

COMMONWEALTH OF KENTUCKY
KENTON CIRCUIT COURT
DIVISION III
CIVIL ACTION NO. 23-CI-00644

85787

WENDY FILLHARDT                )   DEPOSITION TAKEN ON
                               )   BEHALF OF DEFENDANTS
                               )      BY:   NOTICE
            PLAINTIFF          )
                               )
                               )
VS:                            )
                               )
                               )
ADVANCED PAIN TREATMENT        )
CENTER, PLLC; PRAGYA B.        )
GUPTA, M.D.; AND DONALD J.     )
THOMAS                         )
                               )   WITNESS:
                               )
            DEFENDANTS         )   WENDY FILLHARDT


                    *  *  *  *  *  *  *  *


          The deposition of WENDY FILLHARDT was taken

before Lisa E. Hoinke, Court Reporter and Notary Public

in and for the State of Kentucky at Large, at the

offices of Gray Law, PLLC located at 10200 Forest Green

Blvd., Suite 112, Louisville, Kentucky, 40223 on May

29, 2024, commencing at the approximate hour of 10:35

a.m.  Said deposition was taken pursuant to Notice,

heretofore filed, for the purpose of discovery on

behalf of the Defendants in the above-captioned action,

and all other purposes as permitted by the Kentucky

Rules of Civil Procedure.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

*Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)*

EXH : 000001 of 000132

Filed    24-CI-01033    10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

APPEARANCES:

        Hon. Justin T. Baxter
        ROBINSON & WEBER, PSC
        101 Prosperous Place, Suite 100
        Lexington, KY 40509

        COUNSEL FOR THE DEFENDANTS,
        ADVANCED PAIN TREATMENT CENTER, PLLC;
        PRAGYA B. GUPTA, M.D.;
        AND DONALD J. THOMAS

        Hon. David B. Gray
        GRAY LAW, PLLC
        10200 Forest Green Blvd., Suite 112
        Louisville, KY 40223
and,
        Hon. TJ Smith
        T.J. SMITH ATTORNEY AT LAW
        600 West Main Street, Suite 200
        Louisville, KY 40202

        CO-COUNSEL FOR THE PLAINTIFF,
        WENDY FILLHARDT

ALSO PRESENT:

        John Sowards, Videographer
        sowardsjohn5@gmail.com

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    2

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000002 of 000132

Filed    24-CI-01033    10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

I N D E X

01/05/2026 04:15:40

85787

                                                                        PAGE

WITNESS: WENDY FILLHARDT

DIRECT EXAMINATION
        By Mr. Baxter     ....................   5-131

REPORTER'S CERTIFICATE    ....................    132

E X H I B I T   I N D E X

| Number | Description | Page |
|---|---|---|
| (Defendants':) | | |
| Exhibit 1 | Answers to Interrogatories | 14 |
| Exhibit 2 | APTC Patient Registration 1/15/21 | 44 |
| Exhibit 3 | APTC Medical Record DOS: 4/15/21 | 51 |
| Exhibit 4 | APTC Medical Record DOS: 3/25/21 | 51 |
| Exhibit 5 | Complaint | 84 |
| Exhibit 6 | Discovery responses | 97 |
| Exhibit 7 | St. Elizabeth Healthcare Records | 116 |

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    3

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000003 of 000132

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

VIDEOGRAPHER:     We're now on the video record.

Today's date is May 29, 2024, and

the time is 10:35 a.m.  My name is

John Sowards, today's videographer.

And we are located at the offices of

Gray Law, 10200 Forest Green Blvd.,

Suite 112, Louisville, Kentucky, for

the deposition of Wendy Fillhardt,

pursuant to Notice in the Kenton

Circuit Court, Division II, Civil

Action No. 23-CI-644, styled Wendy

Fillhardt, Plaintiff, versus

Advanced Pain Treatment Center,

PLLC, et al., Defendants.  Court

reporter is Lisa Hoinke.  And I'd

ask counsel to please introduce

themselves and state who they

represent.

MR. GRAY:     Yes, I'm David Gray, along with TJ

Smith.  We represent the Plaintiff,

Wendy Fillhardt.

MR. BAXTER:     I'm Justin Baxter for all named

Defendants.

VIDEOGRAPHER:     Okay, thank you.  The court reporter

will now swear in the witness.

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:15:40

85787

COURT REPORTER:     Raise your right hand, please.

MR. GRAY:     Raise your right hand.

COURT REPORTER:     Ma'am, do you swear or affirm the testimony you are about to give will be the truth, the whole truth and nothing but the truth?

WITNESS:     Yes.

COURT REPORTER:     Thank you.

<u>DIRECT EXAMINATION</u>

<u>By Mr. Baxter:</u>

MR. BAXTER:     Hi, Ms. Fillhardt.  My name is Justin Baxter.  I represent Advanced Pain Treatment Center, D.J. Thomas and Dr. Gupta.  Because Advanced Pain Treatment Center is a little cumbersome, sometimes I might refer to it as Advanced Pain or maybe it's acronym, APTC, and I'll try to, hopefully, get that correct.

Q     First, have you ever taken a deposition before?

A     I don't remember.

Q     Okay, all right.  And I'm sure your attorney went over some kind of like a bit of how this works and the ground rules.  I'm just

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*     5

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000005 of 000132

Filed     24-CI-01033 10/16/2024     Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

going to go over a little bit as kind of my intro every single time. So I'm sure your attorney has gone over it already, but this is -- it's kind of a weird format. It's like a conversation, but where everything is recorded, it's got some kind of specific rules, one being that we don't need to talk over one another. I'll try my best to do that and I'm sure you'll do the same. We might end up doing that anyway. Another is to answer verbally. A lot of times in conversations we tend to kind of nod our heads, and that doesn't translate to -- to written form of the record. So I may do that; you may do that. No worries, I just wanted to let you kind of know those. The most important rule, though, is that if I ask a question and you don't understand it, I want you to let me know that because then that way we have an understanding and a clean record. So feel free, if you don't understand anything that I'm asking, to let me know that and I'll clarify it, but if you answer, I'll -- I'll assume that you understood; is that fair?

A    Yes.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                     6

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:15:40
PM
85787

Q   All right.  Start with kind of some -- some -- some soft balls.  Where -- where were you born?

A   Kentucky.

Q   Kentucky.  And this case is filed in Kenton County.  Are you a native of Kenton County?

A   I don't remember.

Q   Okay.  Where do you currently reside?

A   Campbell.

Q   Campbell County.  Is it Campbell County or like Campbell, a town?

A   Campbell, Kentucky.

Q   And what is your address?

A   The full address?

Q   Yes, ma'am.

A   970 Darlington Creek Drive, Alexandria, Kentucky, 41001.

Q   Another thing I should have went over in kind of the beginning, this isn't a marathon, so anytime you want to take a break, you let me and your counsel know.  I might ask you to finish whatever question's pending, but this isn't -- I understand it's uncomfortable, and I don't aim to make it more uncomfortable. So if there's any time you need a break -- or

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          7

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000007 of 000132

Filed   24-CI-01033  10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

**NOT ORIGINAL**

we've already -- I've already spoken to your counsel off record that if -- if you need to tap out for today, we can rearrange that.  So I just want to let you know that so you feel a little more comfortable going forward in this.  Who all presently resides with you at the Darlington Creek address?

A   My husband and my dog, Rocky.

Q   What kind of dog is Rocky?

A   Bichon.

Q   Bichon.  Is that a big dog?

A   No, it's little --

Q   Oh, little one --

A   -- little.

Q   How long have you lived at that Darlington address?

A   Not long.

Q   Have you lived there more than a year?

A   I don't remember.

Q   Okay.  Where did you live prior to the Darlington Creek address?

A   Edgewater.

Q   And is that the name of the town or the -- or --

A   No, the street.

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000008 of 000132

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:15:40
PM
85787

Q    Edgewater.  Is that also in Alexandria?

A    Yes.

Q    And did you live there for more than five years?

A    No.

Q    No.  About how long did you live in that -- at that address?

A    One year.

Q    And was it the same other people at -- or other people and animals?

A    Yes.

Q    Prior to the Edgewater address, where did you reside?

A    Baneberry.

Q    Is that also in Alexandria?

A    Yes.

Q    And approximately how long were you at that address?

A    Not long.

Q    More than a year?

A    Less.

Q    This would put us at about 2021.  Were you residing at the Baneberry address when you were being treated at Advanced Pain Treatment Center?

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000009 of 000132

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                9

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
01/05/2026 04:15:40
85787

A    I don't remember.

Q    Okay.  I saw from the discovery answers that you -- you graduated from Campbell County High in 1994; is that correct?

A    I don't remember.  I went to Campbell County High School.

Q    Just not sure --

A    Yes.

Q    -- of the year of graduation?

A    Yes.

Q    Okay.

A    Correct.

Q    Any post-high school education?

A    Yes.

Q    Where -- where did you attend post -- post-high school education?

A    Certified rehab tech.

Q    And did you take classes --

A    Yes.

Q    -- for a certified rehab --

A    Yes.

Q    -- tech?  Where were those classes at?

A    Lakeside Vocational.

Q    And where is that located?

A    Northern Kentucky.

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000010 of 000132

Filed       24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

01/05/2026 04:15:40
PM

85787

Q       Do you know whether or not they have more than one location?

A       I don't know.

Q       Did you receive a certificate?

A       Yes.

Q       Any additional post-high school education other than the certified rehab technician certification?

A       Yes.

Q       Where else did you attend?

A       Sun Behavioral.

Q       When did you receive the certificate as a certified rehab tech?

A       I don't remember.

Q       And I -- I'm somewhat familiar with Sun Behavioral as a -- like a facility.  Does it also have like a education department within that facility?

A       Yes, sir.

Q       And was it associated with your employment at Sun Behavioral?

A       Yes.

Q       Are there -- is that kind of educational department, is it just for folks that work at Sun Behavioral or are there other folks that

Filed       24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000011 of 000132

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

Q    take classes from other -- that might go to other facilities?

A    Correct.

Q    Is that --

A    Explain -- explain yourself.

Q    Sure.  So was the Sun Behavioral education, was that limited to just folks that you would then later work with?

A    No.  Their employees.  I was trained through them.

Q    I gotcha.

A    They give certi -- certification through them.

Q    So after receiving that certificate as a rehab tech, then there was additional certifications that you received --

A    Yes.

Q    -- through Sun?  Do you have any children?

A    Yes.

Q    What are their names?

A    Brittany Garrett.

Q    And does she reside in Alexandria?

A    Yes.

Q    Is Brittany married?

A    Yes.

Q    To whom?

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                12

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000012 of 000132

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:15:40
PM
85787

A        I don't remember.

Q        And does she have any children?

A        I don't remember.

Q        Do you have any other children other than Brittany Garrett?

A        Yes, a son.

Q        And what's his name?

A        Brandon.

Q        What's -- what's Brandon's last name?

A        Morris.

Q        And where does he reside?

A        Independence.

Q        Is Bra -- excuse me, is Brandon married?

A        I don't remember.

Q        Does Brandon have any children?

A        No.

Q        You're presently married to Dave Fillhardt, correct?

A        Correct.

Q        What year were you all married?

A        2015.

Q        2015.  Let me do this, might save us.

MR. GRAY:         Your answers say 2014.

WITNESS:          '14.

MR. GRAY:         '14, is that right?

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          13

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000013 of 000132

Filed        24-CI-01033  10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000014 of 000132

WITNESS:            I was going to look at my arm.

MR. GRAY:           Is that -- is that where you put your answers in high school, write them on your arm?

WITNESS:            No, our wedding vows is there.

MR. GRAY:           I know; I'm just kidding with you. I'm just trying to help.

WITNESS:            Yeah.

MR. GRAY:           That's a question --

WITNESS:            Yeah.

MR. GRAY:           -- you don't want wrong on the record.

WITNESS:            Yeah.

MR. BAXTER:         That's why I didn't ask the anniversary --

WITNESS:            Sorry.

MR. BAXTER:         -- I didn't want to --

MR. GRAY:           Right, right.

MR. BAXTER:         -- I didn't want to --

MR. SMITH:          Don't -- don't push it, Justin.

WITNESS:            Sorry.

(REPORTER MARKS A COPY OF THE ANSWERS TO INTERROGATORIES AS EXHIBIT 1 FOR THE PURPOSE OF IDENTIFICATION, AND THE SAME IS ATTACHED HERETO AND FILED HEREWITH.)

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                14

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
01/05/2026 04:15:40
85787

DOCUMENT

PM

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000015 of 000132

Q Here, let's -- I think this might make it a bit easier. I'm going to introduce what will be marked as Exhibit 1. It's your Answers to Interrogatories.

A I don't have my glasses, so it's not going to help.

Q Okay.

A So I can't see.

MR. SMITH: Are they in your car or --

WITNESS: Yes.

MR. SMITH: Okay. You --

WITNESS: Will you ask Dave --

MR. SMITH: -- you work with Justin right now, and I'll go get with Dave --

WITNESS: Yeah.

MR. SMITH: -- and get your glasses.

MR. BAXTER: Okay.

WITNESS: Thank you.

Q All right. The reason I was going to introduce these and -- and kind of use them was maybe to kind of help the timeline a bit.

MR. GRAY: Do you use readers or do you --

WITNESS: Yeah, they work. Thank you.

Q So on -- on page 2 of what I've marked as Exhibit 1, it -- it kind of lists your -- your

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:15:40

85787

marital history. Does -- does that appear accurate to you?

A    Correct.

Q    And let me preface this question because it's kind of strange. I'm going to ask if you have any like family members in Kenton County. The reason is because if this is seated for a jury, you know, you don't want -- we don't want your brother or first cousin and vice versa. You wouldn't want any of my client's relations on the jury. Do you have any extended family in Kenton County?

A    Yes.

Q    Is it a lot or is it just kind of a handful of folks?

A    Handful.

Q    Okay. What -- what are their names?

MR. GRAY:    Yes, tell him.

A    Wanda Zumwalt.

MR. GRAY:    How do you spell that?

WITNESS:    Z-U-M-W-A-L-T.

MR. GRAY:    Thank you. Go ahead.

A    Jeff Zumwalt, Laura Zumwalt, Chris Allender, Jill Allender.

Q    All right, thank you.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*     16

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000016 of 000132

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:15:40
85787

A You're welcome.

Q And the -- the treatment at -- at issue at Advanced Pain Treatment Center, just to kind of help with the timeline, was, I have from January 25, 2021 to April 2022. In January of 2021, were you employed anywhere?

(WITNESS REVIEWS DOCUMENT)

MR. GRAY: Keep flipping. Come in. This is your work history. Thank you, sir; you're a good assistant.

A Yes.

Q And are -- you're looking at interrogatories on page 3?

MR. GRAY: Her answer to number 5, Justin.

A Yes.

MR. GRAY: You want to switch with TJ?

WITNESS: Yes, you can have them.

MR. GRAY: You can --

WITNESS: Thank you, TJ.

MR. GRAY: -- put your pretty ones on.

WITNESS: Thank you.

Q Was that employment at Tyson?

A Yes. Tyson Medical Department.

Q And what was your -- what was your job there?

A I was assistant to the medical director, her

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com* 17

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000017 of 000132

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

assistant.

Q    And this -- this answer to interrogatory indicates that you were first employed there in 2020.  Do you have an approximation of about when in 2020 you were employed at Tyson?

A    I don't remember.

Q    Do you recall when you ceased employment at Tyson?

A    I don't remember.

Q    And is it Tyson like associated with the food company --

A    Hot dog factory.

Q    I'm sorry?

A    The hot dog factory.

Q    Oh, gotcha.  So you all would provide, I guess, care to any, I guess, injuries that would happen at Tyson?

A    Correct.

Q    Are you still employed at Tyson?

A    No.

Q    Were you -- were you still employed at Tyson in April of 2022 when -- kind of the end of the care at issue?

A    No.

Q    Do you think that you were employed at Tyson

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000018 of 000132

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:15:40

85787

Q   for the entirety of 2021?

A   I don't remember.

Q   Your answers to interrogatories indicate that the -- the job prior to that was at Active Day CNA -- or was at Active Day as a CNA preceptor.  What did your job duties entail at Active Day?

A   Shadow, shadow CNAs.

Q   And when you say, shadow CNAs, what do you mean by that?

A   In-home CNA.

Q   So you were paired with another CNA and provide at-home health --

A   Yes.

Q   -- with Active Day?

A   Make sure they're doing the right training as a preceptor.

Q   So was the -- the medical care kind of limited to more physical therapy style --

A   Correct.

Q   -- home care?  Any -- any medications that were dispensed or distributed as far as that job?

A   No.

Q   Going back to Tyson, were you a salary or

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000019 of 000132

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    19

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:15:40

85787

hourly employee?

A    Hourly.

Q    And do you recall how much you were making an hour?

A    I don't remember.

Q    Were you typically working full time hours at Tyson?

A    Yes.

Q    It list Active Day employment from -- from 2019 to 2020.  Do you recall any -- any kind of further pinpointing of that date.  Can you tell me when in 2019?

A    Can you repeat it?

Q    Sure.  Do you recall when in 2019 you started at Active Day?

A    I don't remember.

Q    Were -- at Active Day were you an hourly employee or salary?

A    Hourly.

Q    Do you recall what you were making an hour at Active Day?

A    I don't remember.

Q    And did you keep full-time hours there?

A    Yes.

Q    Moving to your -- your kind of next in reverse

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000020 of 000132

NOT ORIGINAL

chronology order, what -- at Sun Behavioral were -- you were a mental health tech from 2018 to 2019?

A    Yes.

Q    And what were your kind of roles and responsibilities as a mental health tech?

A    A rehab tech for the unit for the littles.

Q    So you say, for the littles, I'm guessing for the pediatric patients there?

A    Correct.  And assist on the other units when short staffed.

Q    And when you were brought in to assist in those other units, what were kind of the tasks and --

MR. BAXTER:        I'm so sorry.  Let me re-start that.

Q    When you were asked to assist in those other units, what -- what work would you typically be doing?

A    I don't remember exactly.

Q    Were you an hourly or salary employee at Sun Behavioral?

A    Hourly.

Q    Do you happen to recall what your hourly rate --

A    No.

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed            24-CI-01033 10/16/2024            Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

Q        And did you keep full-time hours as there -- as well there?

A        Yes.

Q        Moving next in -- in what's identified in the discovery answers, Campbell County Detention Center.  It lists that you were a commissary clerk; was -- is that correct?

A        Correct.

Q        And what did that job entail?

A        I oversee'd the inmates' comm -- commissary accounts.

Q        I'm sorry, I want to jump back a little before you're too far into this one.  What was the -- the reason for leaving Tyson?

A        I don't remember.

Q        What was the reason for leaving Active Day?

A        I don't remember exactly.

Q        Well, and I hate to press, but when you're saying you don't remember exactly, are there any details you remember for the -- for the reason for leaving --

A        No.

Q        -- Active Day?  Were you terminated from Active Day?

A        No.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                     22

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000022 of 000132

Filed                 24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Q     Were you terminated from Tyson?

A     No.

Q     Is -- what was the reason that you left Sun
Behavioral?

A     I don't remember.

Q     And the same question, were -- were you
terminated from Sun --

A     No.

Q     -- Behavioral?  At Campbell Detention Center,
were you an hourly employee or salary --
salary?

A     Hourly.

Q     Do you recall your hourly rate?

A     No.

Q     Did you keep full-time hours at Campbell
County?

A     Yes.

Q     What was your reason for leaving, if you
recall?

A     I don't remember.

Q     And the same question, were you terminated
from Campbell County?

A     No.

Q     Without going back through that employment
history, did you ever suffer a work accident?

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    23

Filed                 24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:15:40

85787

A       I don't remember.

Q       I -- I don't think I brought the record here with me, so please feel free to correct me if this is incorrect, but I believe I saw in -- in some employment records you may have previously worked at a pain clinic.  Did -- did I recall that correctly?

MR. GRAY:       Did you ever work in a --

WITNESS:        Yes.

MR. GRAY:       -- pain clinic?

WITNESS:        Yes.

MR. GRAY:       Okay.

Q       What was the name of that pain clinic?

A       It was before.

MR. GRAY:       Before what?

WITNESS:        Before --

MR. GRAY:       It was before St. Elizabeth --

WITNESS:        Uh-huh (AFFIRMATIVE).

MR. GRAY:       -- Rehab?

WITNESS:        Yes.

MR. GRAY:       It was before --

WITNESS:        Yes.

MR. GRAY:       -- 2010?

WITNESS:        Yes.

MR. GRAY:       What was the name of that clinic?

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*        24

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000024 of 000132

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:15:40

85787

WITNESS:   Advanced.  It was a gen -- a general -- a generally pain on Lexington Road, Lexington.  I -- I --

MR. GRAY:   Take your time.

WITNESS:   It's on Lexington.  I know the doctor.

MR. GRAY:   What's the doctor's name?

WITNESS:   Dr. Azat.

MR. GRAY:   How do you spell that?

WITNESS:   A-Z-A-T.

MR. GRAY:   Azat?

WITNESS:   Yes, something like that.

MR. GRAY:   On Lexington Road?

WITNESS:   Yes.  It got shut down.  I wasn't there when it happened.

Q   Do you -- do you know what it got -- was shut down for?

A   No.  I wasn't working.

Q   Were you made aware later after you left employment?

A   Yes.

Q   What was the reason you -- as you understood, that it was shut down?

A   I don't recall.

Q   This lists St. Elizabeth rehab technician from

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000025 of 000132

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    25

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

2010 to 2016, I believe in kind of your testimony earlier, you said that that employment predates 2010, correct?

MR. GRAY: At the pain clinic.

Q At the pain clinic, yes.

MR. GRAY: Right.

A Correct.

MR. BAXTER: Thank you.

Q Do you recall about what years you were employed at with Dr. Azat?

A No.

Q You said Lexington Road, is that -- was that in Lexington, Kentucky?

A Yes.

Q Okay. How long did you -- did -- did you commute from Northern Kentucky to Lexington, Kentucky?

A Yes.

Q Over the course of this, if -- if I ask anything that references, you know, if I -- if I ask have you had any discussions, and the only discussion that you have had is with your attorney, I -- I -- I don't want you telling me any of that information. I'm not entitled to know that. So I want to preface that and

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000026 of 000132

Filed  24-CI-01033 10/16/2024  Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

kind of the rest of these questions.  But, so other than counsel, have you had any discussions with anyone to prepare for this deposition?

A    I don't recall.

Q    What, if anything, did you review in order to prepare for this deposition?

MR. GRAY:       Do you understand the question?

What did you review to prepare for -- you looked -- you looked at these, right?

A    With my attorney.

Q    Okay.  Outside of the kind of the medical care and relationship you had with the Defendants as your medical providers, do you have any social relationships with any of the named Defendants?

A    I don't know.

Q    So kind of in other words, did you -- did you know D.J. Thomas socially prior to being treated at Advanced --

A    No.

Q    -- Pain?  Okay.  Did know Dr. Gupta socially?

A    No.

Q    Okay.  What about Autumn Thomas?

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    27

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000027 of 000132

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

A     No.

Q     All right.  Well, before closing kind of the employment stuff.  Are -- it's my understanding that you -- you are not presently employed, correct?

A     No.

Q     And that you presently receive disability, correct?

A     Correct.

Q     When was the disa -- when did you first apply for disability?

A     I don't recall.

Q     Was it prior to January of 2021?

A     I done it after I went to the doctor.  I don't recall the year.

Q     After you went to Advanced Pain?

A     Correct.

Q     Did you only apply once for disability?

A     Correct.

Q     What was kind of the -- the reason that you were determined to be disabled?

A     I don't know.

Q     Have you applied for disability prior to receiving care at Advanced Pain?

A     Explain.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          28

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000028 of 000132

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
01/05/2026 04:15:40 PM
85787

Q So if I'm understanding your testimony correctly, you were -- you -- you were granted disability while you were being -- while you were receiving treatment from Advanced Pain, correct?

MR. GRAY: When it was approved, were you still treating with Dr. Gupta? Was it --

WITNESS: Yes.

MR. GRAY: Okay.

WITNESS: He told me I would never work again. I would be disabled.

Q Was that application made prior to your initial presentation to Dr. Gupta?

A I applied for disability when I started seeing Dr. Gupta.

Q Okay, that answers it.

A He's the one who told me I would never work again. I would be disabled.

Q And what reason did he provide for --

A He never would give me a reason and told me I would never work again.

Q And what context did this conversation occur?

A What do you mean?

Q How did this conversation arise? Were you

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000029 of 000132

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com* 29

Filed          24-CI-01033   10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
01/05/2026 04:15:40
85787

DOCUMENT

PM

applying for disability and requesting his assistance?

A     No.  I went to him for help for my pain.

Q     I understand.  And the -- the con -- you testified today conversation where he -- where Dr. Gupta said that you would never work again, and I'm just curious kind of how that conversation came up with Dr. Gupta?

A     I asked if I could go back to work.  He said, I would never be able to go back to work again.

Q     And it's your testimony that he never elaborated on that, never gave --

A     No.

Q     -- a reason?  Did -- did you ask?

A     Every time.

Q     Do you know the -- like, the terms of the disability, what is incoming each month?

MR. GRAY:          How much?  That's the question, how much?

MR. BAXTER:        Yes.

A     Little over 1,000 because insurance is taken out.

MR. BAXTER:        I don't know how long we've been going.  Are you good?  Do you want

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    30

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000030 of 000132

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
01/05/2026 04:15:40
85787

to take a break or --

MR. SMITH:        I'm good.

MR. GRAY:        She's good.

Q        The next kind of set of questions I'm going to ask you is, is the time period prior to your initial presentation.  So before January of 2021.  In your discovery answers, as it concerns pre-existing pain and injuries, you identified back pain related to arthritis.  Do you know about when that you started experiencing back pain?

A        I don't recall.

Q        Prior to your treatment at the Defendants, were you diagnosed with arthritis?

A        Explain what --

Q        Sure.  Were -- were you seeing any medical provider for arthritis prior to the Defendants?

A        I had back -- I had back pain, but I -- in the past I was being treated for PTSD, anxiety disorder.

Q        Okay.  Was Advanced Pain the first medical provider that you went to for back pain?

A        Yes.

Q        Okay.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    31

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000031 of 000132

Filed

24-CI-01033 10/16/2024

Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:15:40

85787

A    Correct.

Q    And I know you testified that you don't recall when you started experiencing back pain, was it years before your first presentation to Advanced Pain?

A    What?

Q    The -- the back pain that you sought care at Advanced treatment, had that been persisting for longer than a year?

A    Yes.

Q    Had it been persisting for multiple years?

A    Yes.

Q    Was your back pain, did it manifest after like a particular injury or movement?

A    Not that I recall.

Q    It -- was it more kind of slow build to back pain that you ultimately needed to seek treatment for?

A    I don't know.

Q    Would you be able to recall what you would rate your pain out of 10 prior to seeking care at Advanced Treatment?

A    An 8.

Q    And where was that back pain coming from in relation to your -- your actual back?

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000032 of 000132

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          32

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
01/05/2026 04:15:40
85787

DOCUMENT

PM

A        All over.

Q        And would anything exacerbate that pain?

A        I don't know.

Q        Prior to seeking treatment at Advanced Pain, was there anything that you would do or take that would relieve that pain?

A        I don't recall.

Q        And just to clear up, there were no other providers that you saw for back pain prior to Advanced Pain?

A        I don't recall.

Q        Were you taking any medication for the back pain prior to Advanced Pain Treatment Center?

A        No.

Q        Did you -- did you ever seek PT services related to the back pain prior to Advanced Pain?

A        Not that I recall.

Q        And you mentioned a moment ago a history of anxiety and PTSD.  Prior to Advanced Pain Treatment Center, how -- out of a scale of 10, how would have rate -- how would you rate your anxiety?

A        I had it under control.

Q        Prior to Advanced Pain Treatment Center, what,

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000033 of 000132

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

Q   if anything, would kind of exacerbate or raise that level of anxiety?

A   Explain yourself.

Q   So for me, personally, my anxiety is kind of elevated whenever I have a lot of work or I can't get home that often.  Was there anything along the -- along those lines --

A   If I didn't get to run five miles a day.  I used to run five miles a day, every day.  I can't do that now.

MR. GRAY:   Was your question before she saw Dr. Gupta?

MR. BAXTER:   Yes.

MR. GRAY:   Do you understand the question?  He asked you about your anxiety before Dr. -- you saw Dr. Gupta.  Your testimony was you had it under control.

WITNESS:   Uh-huh (AFFIRMATIVE).

MR. GRAY:   He then asked you prior to seeing Dr. Gupta, what were the things that would cause your anxiety to increase, before seeing Dr. Gupta?

WITNESS:   I don't understand.

MR. BAXTER:   It's all right.  We can move from

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*   34

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000034 of 000132

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:15:40

85787

DOCUMENT

PM

there.

Q I think within -- to kind of help you out a little bit. I think within our records, we had a Dr. Zieba --

A Yes.

Q -- that you were treating for anxiety.

A Yes.

Q And I think the University of Cincinnati Stress Center.

A Yes.

Q Were there any other providers that you were receiving treatment for related to anxiety, other than --

A Therapy.

Q Therapy. And where -- who was your therapist?

A No, I was seeing therapy. That's what I'm saying, therapy.

Q Okay. Where were you seeing therapy --

A No, therapy. That's what I'm telling you, therapy. I was doing therapy.

Q Right, I hear you. And was that with Dr. Zieba?

A Yes.

Q Okay. But nobody else other than --

A No.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com* 35

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000035 of 000132

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
01/05/2026 04:15:40
85787

DOCUMENT

PM

Q       -- Dr. Zieba?  Gotcha.  Prior to Advanced Pain, were you taking any medications for your anxiety?

A       Yes.

Q       And what were those medications?

A       Pro -- Pro -- Prosolan, Pro -- Prosolan.

MR. GRAY:          Prazosin.

A       Prazosin, Topamax.

Q       Oh, is it --

A       It's the --

Q       Is there a list?  I apologize.

A       Yes.

MR. GRAY:          She's on page 8 --

A       Yes.

MR. GRAY:          -- Justin.

Q       In -- in preparing for this, I must have --

A       Yes.

Q       -- not --

A       It's --

A       -- reviewed this.

A       -- the ones at the top.

Q       Okay.  If you could then just review those and tell me if there are any additional medications that you can recall?

A       Not that I recall.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          36

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000036 of 000132

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

Q    Okay.  Concerning your PTSD, prior to Advanced Treatment Center, and it may be difficult to numerically categorize, but if you were -- if you were asked to kind of rate out of 10, what would you rate your PTSD prior to Advanced Pain Treatment Center?

A    Two.  Prior to going to Pain --

Q    Yes, ma'am.

A    Two.

MR. GRAY:    Yes, that -- that was the question.

Q    And we already identified the UC Stress Center.  Was there anybody else that you were seeking medical care related to your PTSD?

A    Not that I recall.

Q    Prior to Advanced Pain Treatment Center, did you -- had you been diagnosed with anything else?

A    Explain.

Q    I guess prior to January 2021, had you -- had you been diagnosed with fibromyalgia prior to January 2021?

A    Can you repeat that?

Q    Sure.  Let me -- let me do it a different way.  Have you ever been diagnosed with fibromyalgia?

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*    37

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000037 of 000132

Filed                24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

PM

01/05/2026 04:15:40

85787

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000038 of 000132

A        Yes.

Q        And --

A        Dr. Gupta did.

Q        Are you currently seeking any care related to fibromyalgia?

A        Yes.

Q        And who is that?

A        Dr. Chang.

MR. GRAY:        Is that C-H-A-N-G?

WITNESS:        Yes, I believe so.

Q        What are your symptoms of fibromyalgia?

A        I'm no doctor so, my body just hurts, everything.

Q        Is it more kind of muscle pain, joint pain, all the above?

A        My whole body.

Q        Have you ever been diagnosed with restless leg syndrome?

A        I don't know.

Q        Same question for -- for a clear record, have you ever been diagnosed with aphasia?

A        What?

Q        Aphasia.

A        I don't know.

Q        If you don't know, fair enough to say you're

Filed                24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

01/05/2026 04:15:40

85787

not aware of any diagnosis.  Have you ever been diagnosed with -- with arthritis?

A    Yes.

Q    And does it -- is it a -- is it rheumatoid arthritis?

A    I don't know.

Q    From review of the records, I think your rheumatologist identified an autoimmune disease.  Do you recall when you were diagnosed with that?

A    I don't recall; there's so much.

Q    When you were diagnosed with that autoimmune disease by the rheumatologist, was there any conversation as to when it would have manifested?

A    I don't recall.

Q    Have you ever been diagnosed with conversion disorder?

A    Yes.

Q    What is your understanding of your conversion disorder diagnosis?

A    I don't know.

WITNESS:        Can we take a break?

MR. BAXTER:        Sure, absolutely.

MR. GRAY:        Sure.  Don't forget to take your

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000039 of 000132

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed                    24-CI-01033 10/16/2024         Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

microphone off.

VIDEOGRAPHER:      The time's 11:28.

(OFF THE RECORD)

VIDEOGRAPHER:       We're now back on the record; it's 11:38.

Q        In my review of the records, and I think it's Dr. Zieba's records, there's an indication that you were may -- maybe treated for your PTSD at a place in Tennessee; do you recall that?

A        Yes.

Q        Do you recall the name of that?

A        I don't.

MR. GRAY:        If you remember later, will you let me know?

WITNESS:        Yes.

MR. GRAY:        Thanks.

MR. BAXTER:        Thank you.

Q        Prior to Advanced Pain Treatment Center, had you ever been in a car crash?

MR. GRAY:        Car wreck.  Before you went to see -- ever see Gupta, were ever you in a car wreck?

WITNESS:        Not that I recall.

Q        And we already talked about work-related

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    40

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000040 of 000132

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:15:40

85787

DOCUMENT

PM

injuries.  Any injuries kind of working or doing something around the home?

A    Around the home?

Q    Yeah, just -- I guess, let me ask it a different way.  Have you ever injured yourself kind of out and about or just at home?

MR. BAXTER:    And,  sorry, that's really broad.  Let me try that again.

Q    Did you ever -- in either working around the home, running errands, ever do anything to injure or strain your back?

A    Not that I recall.

Q    Overall, how would you describe kind of your -- your physical condition prior to your first day at Advanced Pain?

A    Explain yourself.

Q    Well, clearly, your back hurt prior to going to Advanced Pain, correct?

A    Correct.

Q    Was that pain stopping you from being able to do any of the things that you wanted to do at home?

A    How was I functioning, is that what you're asking?

Q    Absolutely.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000041 of 000132

NOT ORIGINAL

A    I was working full time; I was normal. I wasn't disabled before I went there.

Q    Were you referred to Advanced Pain Treatment Center, like by another physician?

A    No.

Q    What initially led you to Advanced Pain?

A    My daughter worked there.

Q    And what -- what was Brittany's position at Advanced Pain?

A    CMA.

Q    When you would go to appointments with Dr. Gupta would anyone else attend with you

A    My husband.

Q    And did he attend each appointment?

A    I don't recall.

Q    Would Brittany also attend those appointments?

A    No.

Q    When the -- the procedures, the facet blocks, the injections, when those would occur, would Brittany go into that room with you?

A    No.

Q    Okay.  Would your husband attend in those rooms --

A    Yes.

Q    Do you think that he was there for every

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000042 of 000132

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
01/05/2026 04:15:40
85787

DOCUMENT

PM

single one of the injections?

A    I don't know.  Can you -- can you rephra -- can you re -- readdress that question, please?

Q    Sure.  When you -- so just to kind of let you know what I mean by injections, records indicate that you received facet blocks.

A    Fa -- what do you mean fa --

Q    It -- it's what they're called.  That's okay. Let me try this differently.  When -- sometimes when you would see Dr. Gupta, it would be just a regular visit where they would check up on kind of your condition, correct?

A    Correct.

Q    And sometimes you would then be given an additional treatment --

A    That they give my neck.

Q    Correct.  When those would occur, was your husband always present?

A    Correct.

Q    Okay.

A    The important visits, correct.

Q    Thank you.

A    You're welcome.

MR. SMITH:       That's the way you do it, help him --

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000043 of 000132

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          43

NOT ORIGINAL

MR. BAXTER: I was -- yeah, I -- I

MR. SMITH: -- help -- help him give you a good question that you can answer.

MR. BAXTER: -- I need as much help --

MR. SMITH: Help him -- help him and he'll help you, okay.

MR. BAXTER: -- I need as much help as -- as -- as the rest of us in these....

(REPORTER MARKS A COPY OF THE ADVANCED PAIN TREATMENT CENTER PATIENT REGISTRATION, JANUARY 15, 2021, AS EXHIBIT 2 FOR THE PURPOSE OF IDENTIFICATION, AND THE SAME IS ATTACHED HERETO AND FILED HEREWITH.)

Q I'm going to hand you what we will mark as Defendant's Exhibit 2. And I'll -- I'll represent to you this is the kind of initial paperwork from Advanced Pain Treatment Center. Does this look like your handwriting?

A Yes.

Q And then if you will turn -- let's see, it should have been page number one, two, three -- the fifth page, the background questionnaire. It's got the drawing of a man to kind of mark where the pain was.

MR. GRAY: There you go.

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000044 of 000132

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM

01/05/2026 04:15:40

85787

Q        And so within --

A        No, this is not my handwriting.

Q        Correct.  The -- the front page that we discussed was, but this portion right here, other than -- is the top, where it lists your name, is that your handwriting?

A        No -- yes, that is, but that's not.

Q        And then the rest was -- looks like probably filled out by Dr. -- presumably Dr. Gupta?

A        Yes, that is.

Q        Do you recall making the markings on the -- the picture of the man at --

A        No --

Q        -- the --

A        -- I do not.

Q        Okay.  Does this -- in reviewing this chart which kind of -- which marks where the pain was reported, does that -- does that kind of jive with your memory as to where you were experiencing pain when you initially presented -- when you first went to Dr. Gupta?

A        No.

Q        And how -- how does it differ from your recollection?

A        It was just my back.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*        45

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000045 of 000132

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

Q     It was just your back.  So the portions marking pain in the -- looks to me the right arm and right leg, you think is incorrect?

A     Uh-huh (AFFIRMATIVE).  It's over.

Q     It also seems to indicate like a headache pain.

A     Uh-huh (AFFIRMATIVE).

Q     Were you experiencing headaches when you were first -- when you first went to Dr. Gupta?

A     I was already being treated.

MR. GRAY:        For headaches?

WITNESS:        Uh-huh (AFFIRMATIVE).

MR. GRAY:        Is that --

WITNESS:        Correct.

MR. GRAY:        -- is that a yes?

WITNESS:        Yes.

MR. GRAY:        Lisa needs yeses.

WITNESS:        Yes.

MR. GRAY:        Okay.

Q     I'm going to direct you to -- without page numbers it's difficult.  It is the -- it's the fourth to last page.  It looks like this (INDICATING).  Yeah, yes.  Is this your handwriting?

A     Yes.

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000046 of 000132

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:15:40
PM
85787

Q    And do you see on the kind of lower third of the page where there's a section for employment status?

A    Yes.

Q    And where it says current occupation, it says, currently not working.  Is that your handwriting?

A    Yes.

Q    And with the benefit of -- of seeing this document, do -- does that change your previous testimony that you were working full time at the -- when you first went to Dr. Gupta?

A    I don't understand what you're saying.

Q    Now, having the benefit of seeing this document that you filled out on January 15, 2021, does that maybe correct the timeline for your employment in your testimony?

A    I disagree with this date.

Q    You think that the -- so you disagree with the date at the bottom --

A    Yes.

Q    -- of the page?

A    Correct.

Q    Does it -- does it not look like your handwriting?

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000047 of 000132

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          47

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT

01/05/2026 04:15:40 PM

85787

A        No.

Q        When do you think that this document -- that you filled out this document?

A        I don't know.

WITNESS:        Can we speak?

MR. GRAY:        You and I?

WITNESS:        Yes.

MR. GRAY:        Yes.

MR. BAXTER:        Sure.

MR. GRAY:        Let's go off the record.  Take the mic off; let's step outside.

VIDEOGRAPHER:        We're off the record.

        (OFF THE RECORD)

VIDEOGRAPHER:        We're now back on the record.  The time is 11:53.

Q        Based on Dr. Gupta's assessment, is it your understanding that he recommended some form of injection?

A        Yes.

Q        And setting aside the involvement of -- of D.J. Thomas, which I'm -- I -- we'll -- we will discuss at length.  I don't want to ignore.  I know that there are -- are complaints there.  But is it your -- is it your contention that you did not consent to

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000048 of 000132

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

those injections at all or that you did not consent to the involvement of D.J. Thomas?

MR. GRAY: Let me OBJECT for the record. She's not a medical expert, but you're entitled to hear what her lay opinion is about her care. Do you understand the question or have I screwed it up now? I'm good at that. You want to do it again?

Q Sure. Did -- did you agree to the injections but not the involve --

A I did not agree to Mr. Thomas sedating me and acting as a anesthesiologist. I trusted Dr. Gupta --

Q And -- and --

A -- to perform faithful care on me and he broke that trust.

Q And I -- I understand that --

A And when I told D.J. no, he didn't listen. And when he said I -- I will be a VIP patient. All patients should be VIP.

Q Is it possible that he said that to all patients?

A He said it behind closed doors. I'm not saying that he didn't. But aren't all

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000049 of 000132

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

patients VIP.  But he sedated me with anesthesia in a syringe.  Acted as a legal professional in scrubs.

Q      And we're -- we will -- I will make sure to discuss this at length.  But what my question is, if we were to remove D.J.'s involvement or if D.J. were a -- a different person, a registered nurse, were you in agreement with the injections --

A      No.

Q      -- that were recommended?  So you -- you did not agree to any of the injections from Dr. Gupta at all, regard -- regardless of D.J. Thomas' involvement?

MR. GRAY:          Do you understand the question?

WITNESS:          No.

Q      So I understand that your testimony earlier is that you -- you don't recall that the term facet block is a type of injection for pain management.  That was -- I'll represent to you that was the first set of injections that were performed.  When they were recommended, did you agree to them?

A      Not that I recall.

MR. BAXTER:        I'm going to introduce Exhibit 3.  I

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000050 of 000132

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:15:40

85787

went out of order.  Let's -- we'll keep this as Exhibit 3.  I went out of order on my dates.  And I'll introduce Exhibit 4.  We might need it; we may not, but we've already got a sticker.

(REPORTER MARKS A COPY OF THE ADVANCED PAIN TREATMENT CENTER MEDICAL RECORD, APRIL 15, 2021, AS EXHIBIT 3 FOR THE PURPOSE OF IDENTIFICATION, AND THE SAME IS ATTACHED HERETO AND FILED HEREWITH.)

(REPORTER MARKS A COPY OF THE ADVANCED PAIN TREATMENT CENTER MEDICAL RECORD, MARCH 25, 2021, AS EXHIBIT 4 FOR THE PURPOSE OF IDENTIFICATION, AND THE SAME IS ATTACHED HERETO AND FILED HEREWITH.)

(WITNESS REVIEWS DOCUMENT)

A       Huh-uh (NEGATIVE).  Huh-uh (NEGATIVE).

Q       So I'll represent to you that this is the --

MR. GRAY:       We're on Exhibit 4?

MR. BAXTER:     Yes.

MR. GRAY:       Okay.  Look at this.

MR. BAXTER:     Yeah, I -- I grabbed the wrong one for Exhibit 3.

Q       This is the -- the office note for the first

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000051 of 000132

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:15:40

85787

injective therapy that you received from the Defendants.

MR. GRAY:   Don't look at 3.  Look at 4.  He's on 4.

WITNESS:   Okay.

MR. GRAY:   All right.

Q   On the last page, the last two pages.  I'm sorry, I'm being so confusing.  The second to last page of this document which for the video record appears like this (INDICATING).  Is that your signature at the bottom of the page?

A   Absolutely not.

Q   Do you recall discussions with Dr. Gupta about the injective therapy that he had recommended?

A   I did recall.

Q   And what do you recall about those discussions?

A   That I was not a candidate.

Q   You're not a candidate for --

A   The injections.

Q   In that discussion, what was -- what do you recall then kind of being the plan for your treatment?

A   Ketamine.

Q   Did you agree to a Ketamine infusion?

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*   52

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000052 of 000132

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:15:40

85787

A    Yes.

Q    Was it your understanding that sedation was going to be used?

A    There was no talk about it.

Q    What do you recall from the discussion about the process of the Ketamine infusion with Dr. -- with Dr. Gupta?

A    He did not explain it.  He screamed most of the time.

Q    This episode of screaming, was that prior to the first Ketamine infusion?

A    Yes.

Q    Did it make you feel -- make you feel uncomfortable?

A    Yes.

Q    Did it make you weary to continue treatment?

A    Yes.

Q    Why did you then continue treatment?

A    I had nobody else.

Q    Did you attempt to seek care from any other pain management physicians?

A    Yes.

Q    Which pain management physicians did you seek care from after this episode where --

A    I don't remember.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000053 of 000132

Filed

24-CI-01033 10/16/2024

Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

MR. GRAY:            Make sure he finishes his question, okay?

WITNESS:            Uh-huh (AFFIRMATIVE).

MR. GRAY:            You're doing great, but make sure he finishes, okay.

Q    What was the -- what stopped you from being able to see those pain management physicians?

A    What do you mean?

Q    What was the reason that you did not follow through seeing those other pain management physicians?

A    Follow through like why?

Q    From what I understand your testimony to be is that prior to the first Ketamine infusion there is an episode where Dr. Gupta raised his voice and made you feel uncomfortable and made you weary of continuing treatment, correct?

A    Correct.

Q    And that prompted you to try to seek other pain management physicians' care, correct?

A    Correct.

Q    You cannot recall who those physicians were, but you ultimately did not receive care from those physicians?

Filed            24-CI-01033 10/16/2024            Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000054 of 000132

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:15:40

85787

A    Correct.

Q    Was an appointment made with anybody?

A    Correct.

Q    Did you attend that initial appointment?

A    Correct.

Q    Was it with just one other pain management physician?

A    I don't recall.

Q    Do you -- do you recall who the pain management physician was that you went to seek a second opinion from?

MR. GRAY:    Do you remember?

A    Yes.

Q    What was that physician's name?

A    Dr. Klickovich.  I was referred to him.

Q    Who were you referred to Dr. Klickovich by?

A    From my rheumatoid arthritis doctor.

Q    And you attended the initial appointment with Dr. Klickovich?

A    Correct.

Q    Did anyone else attend that appointment with you?

A    Yes.

Q    Who?

A    My husband.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*    55

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000055 of 000132

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:15:40
PM
85787

Q      And what was the reason provided that Dr. Klickovich could not continue treatment?

A      Could not help me.  Certified me a letter, UPS.

Q      I'm sorry, I don't understand.  Certified -- what do you mean by the certified letter?

A      That he could not provide me service.

Q      And this was after the initial appointment?

A      Correct.

Q      Did he -- prior to sending that certified letter, did he make any plans or recommendations about the treatment?

A      Not that I recall.

Q      Did you voice your concerns with Dr. Gupta to Dr. Klickovich?

A      He asked detail.  Whole conversation was about what went wrong.

Q      And what did you -- when you say what went wrong, what are you referring to?

A      What to make my care better.

Q      And so you had a conversation with Dr. Klickovich about how your care could be improved from what Dr. Gupta was providing, correct?

A      Correct.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000056 of 000132

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                     56

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT 01/05/2026 04:15:40 PM 85787

Q   And did Dr. Klickovich voice any criticisms of the care that Dr. Gupta had provided?

A   He said nothing.

Q   I apologize.  I kind of lost my train of thought here for a moment.  Your testimony was that you did recall a conversation with Dr. Gupta about the Ketamine infusions?

A   Correct.

Q   And that you -- you ultimately were in agreement to proceed with the Ketamine infusion?

A   Correct.

Q   And I think this might be where my confusion is, but you don't recall any conversation about the use of any sedation?

A   No.

Q   Okay.

A   Not by D.J.

Q   But sedation, in general?

A   I knew there would be -- if any procedures were performed by Dr. Gupta, yes, but not by D.J. Thomas, who's not certified to do anything.

Q   No, I -- I understand.  And we'll -- I promise we will get to those -- that part of the

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    57

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000057 of 000132

NOT ORIGINAL

litigation, but just so I make sure I have a clean record and understand what you're saying, you knew and agreed to sedation for any of the procedures performed by Dr. Gupta, just not performed by D.J.?

A     Any -- any procedures performed by Dr. Gupta, but not by D.J. Thomas.

Q     Okay.  Staying focused on the Ketamine infusion, walk me through what you recall about that procedure, just kind of frame by frame as if we're watching a -- the movie of it.

A     Explain.

Q     So represent, based on Exhibit 4, in our medical records, that on April 15, 2021, you underwent your first Ketamine infusion with Dr. Gupta.  Had you had a Ketamine infusion anywhere else prior to that first Ketamine infusion?

A     No.

Q     If you could, just -- just tell me the story of that Ketamine infusion, what you recall from the moment you were brought back at Advanced Pain to the moment that you left Advanced Pain.

A          Do you mean like when I left, went home?

MR. GRAY:          No.  He's asking you to tell -- tell him what you remember about the procedure itself; when you were brought in, what they did, how they did it, what you -- just what you remember; who was there, who did what.

A          Gupta came out and screamed that it was going too fast because it went like in 30 -- like 20 minutes or something, that it was going too fast.  And it was done in a certain amount of time, and it wasn't supposed to be done.  There was no hallucinations.  I wasn't like monitored properly.

Q          You said --

A          It was done IV-wise.

Q          You said no hallu -- hallucinations.  I guess I'm just -- I'm just confused by that, what you mean --

A          Like I didn't go like in twilight --

Q          Oh, okay.

A          -- if that's what you're asking.

Q          No, ma'am.  I -- I was just clarifying what you said.  So starting with the -- who all was

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          59

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:15:40

85787

Q    present for that Ketamine infusion?

A    D.J.

Q    Was Dave?

A    Yes.

Q    Was Brittany?

A    She was, but she did nothing on -- on me.

Q    Were there any other medical providers within that room?

A    No.  Dr. Gupta was running back and forth and D.J. in his little blue scrubs.

Q    Who set your IV?

A    Who -- it was an African American woman I recall.

Q    But --

A    I mean --

Q    -- guessing it's a nurse --

A    Yes.

Q    -- or -- or PA?

A    Yes.  Because I'm a hard stick.

Q    No, I understand.  Did they -- after the IV was set, what occurred next?

A    The infusion.

Q    Was there any sedation for this procedure that you recall?

A    Are you asking -- okay, are you asking how the

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          60

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000060 of 000132

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:15:40

85787

infusion got started?  Is -- is --

Q    I'm really --

A    -- is that how you're asking, how the Ketamine got started?

Q    No, ma'am.  I'm really just asking kind of step by step what you recall of just that Ketamine infusion.  So we've got the IV set by --

A    Because it all started in the operating room, and Gupta brought me out of the operating room because I had a side effect to the back, and he didn't answer the phone, because my whole right side swelled, and when he realized I had a side effect he said, oh, no, we can't do this no more.  Why didn't anybody call me?

Q    Is -- is it your testimony that Dr. Gupta was not in the room for the Ketamine infusion?

A    Okay.  So they were going to do another procedure on my back, but he asked how it went, and when he was aware that we were trying to get a hold of him by phone because my whole right side swelled and nobody answered that number to call, he said, no, we can't do this procedure.  We're going to go this way to the Ketamine.  So he brought me

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000061 of 000132

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*         61

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
01/05/2026 04:15:40
85787

DOCUMENT

PM

out of the operating room and him and D.J.

started -- that's when D.J. done the Ketamine,

was doing the Ketamine.

Q    So the -- the procedures that you -- you had

before the Ketamine infusion, you had a

reaction to it to where your right side

swelled?

A    Yeah, I swelled -- yes.  This whole right side

leg swelled.  And he called it something.

Q    Did you -- did you take anything -- any

medications to -- in order to reduce the

swelling?

A    No.  I was on -- on the couch.

Q    I -- I understand that you called Advanced

Pain.  Did you --

A    Called whatever number was on the paper and

nobody answered.

Q    Did you reach out to any other medical

providers to make an appointment anywhere for

the right-sided swelling?

A    No, because the number said contact Gupta

on-call person.

Q    Other than the right-sided swelling, was there

any other complications with that, that first

procedure that was performed by Gupta?

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000062 of 000132

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

PM

01/05/2026 04:15:40

85787

A    Not that I recall.

Q    How long did that right-sided swelling last?

A    I don't remember.

Q    That initial procedure, did it also -- going back to the initial procedure, do you recall any discussions prior to the procedure itself where -- where it was explained to you?

A    He done whatever he wanted to do.  Gupta done whatever Gupta wanted to do.

Q    Did he explain to you the procedure that they were going to do?  Going back to that initial procedure where you would experience right-sided swelling, do you recall any discussions with Gupta prior to the procedure?

A    To the first procedure?

Q    Yes.

A    What I went there for, we would talk about.

Q    And he -- so he discussed what would happen with that first procedure.  Did you agree to that first procedure?

A    Yes.

Q    Was it -- and -- and -- do you recall receiving sedation for that first procedure?

A    D.J. Thomas sedated me.

Q    And --

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000063 of 000132

NOT ORIGINAL

A    He would ask Dr. Gupta how much sedation to -- to give me.

Q    And once he asked, presumably then he would go draw the --

A    Yes.

Q    -- medication?

A    Out of the little container and put it in the needle and do it.

Q    And then would --

A    They're supposed to be twilight.

Q    Would Dr. Gupta check the amount?

A    No.  He would tell him how much.

Q    And how was the sedation administered by D.J.?

A    Needle, out of a bottle.  He took it out of the cabinet.

Q    Was it through an IV?

A    Yes.

Q    Who set the -- who set your first IV, if you recall?

A    The -- a lady because I'm a hard stick.

Q    During each of those was it the same lady that --

A    I don't honestly recall.

Q    Okay.  Let me -- and this is one of those weird deposition rules where you've just got

01/05/2026 04:15:40

85787

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000064 of 000132

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

to read out the whole one before you respond.

But what I was going to ask is if you recall whether it was the same lady that set your IV for all the procedures at Dr. Gupta's office?

A No. There was a -- I will correct that. There was a Mexican boy at the last procedure. I do not recall his name.

Q So either the -- the African-American lady --

A Yes.

Q -- or -- or the Mexican man --

A Yes.

Q -- were -- those were the two medical providers that set your IV --

A Yes.

Q -- each time?

A Yes.

Q Okay. How long after that first procedure did that right-sided swelling start?

A I don't recall.

Q Was -- do you recall if it was the same day?

A Within.

Q Going back to the Ketamine infusion, somebody -- kind of walking through the procedure still. After the IV was set, was sedation administered during that infusion, if

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    65

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000065 of 000132

NOT ORIGINAL

01/05/2026 04:15:40

85787

Q    you recall?

A    Ketamine?

Q    Prior to the Ketamine infusion was there sedation involved in that procedure?

A    Not with the Ketamine, no.

Q    Okay.  What then would next happen after the IV was set, if you recall, during that Ketamine infusion?

A    I don't recall.

Q    Okay.

A    So much happened.

Q    Did you experience any complications --

MR. BAXTER:        Let me strike that.

Q    After the Ketamine infusion, did you have any problems?

A    When?

Q    So this would be the second -- the second procedure performed by Dr. Gupta was the Ketamine infusion.  Did you -- do you recall experiencing any problems like right-sided swelling or any other complications after the Ketamine infusion?

A    With what?

MR. GRAY:        Related to the Ketamine infusion, did you ever have any bad results or

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000066 of 000132

DOCUMENT

PM

Filed            24-CI-01033 10/16/2024           Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

complications?

WITNESS:          From the Ketamine?

MR. GRAY:          Yes.

WITNESS:           No.

Q        All right.  It's my understanding that beginning then in May of 2021, you participated in exercise therapy -- therapy at Advanced Pain Treatment Center.  Do you recall that?

A        He pushed for me to go to therapy there, Dr. Gupta.

Q        Was that your first experience with any PT or exercise therapy, other than obviously your -- your background?

A        To go to Dr. Gupta's physical therapy?

Q        No.  Let me rephrase it.  Have you ever been a patient in -- in any -- for any PT prior to Advanced Pain?

A        No.

Q        Okay.

A        Not that I recall.  Can I add to the record?

Q        Sure.

A        That he wanted me to be a patient at the psych -- psychiatrist there and the nutritionist, knowing I already had a psychiatrist.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    67

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000067 of 000132

NOT ORIGINAL

01/05/2026 04:15:40

85787

Q    And after that conversation, did you -- did you decline to see both?

A    Yes.

Q    All right.

A    And the physical therapist.  So going to his physical therapist, there was like four or five other patients in there at the same time, and with me having high anxiety, that just made it worse.

Q    But -- so it was your understanding that you were able to decline certain services that were recommended by Advanced Pain and Dr. Gupta?

A    But he kept on yelling at me for not going.

Q    After the exercise therapy, do you recall another type of procedure being recommended by Dr. Gupta?

A    Not that I recall.

Q    Okay.  Is it your recollection that the Ketamine infusion was the last procedure that Dr. Gupta performed on you?

A    I don't recall.

Q    When were you first made aware of D.J. Thomas' licensure status?

A    When the Medical Board let us know.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                 68

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000068 of 000132

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:15:40
85787

Q      It's my understanding that you were the grievant in that Kentucky Board of Medical Licensure; is that correct?

A      Correct.

Q      So how did you learn prior to filing that grievance about D.J. Thomas' licensure status?

MR. GRAY:          OBJECT to form.

MR. SMITH:         You can go on and answer.

MR. GRAY:          You can answer, I'm sorry.  Do you understand the question?  Have I screwed it up again?  Before you filed your grievance with the Medical Licensure Board, how did you become aware that D.J. did not hold a certification?

WITNESS:           I don't know.

Q      Do you recall who told you about D.J.'s medical license -- or status as a medical assistant?

A      The Medical Board.

Q      When you filed that grievance were you represented by an attorney?

A      Correct.

Q      What was the name of that attorney?

A      Kristin Turner.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          69

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000069 of 000132

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:15:40 PM
85787

Q    It is my understanding that Kristin Turner was also a member of the Kentucky Board of Medical Licensure; is that your -- do you share that understanding?

A    I don't recall.

Q    Prior to the Kentucky Board of Medical Licensure grievance did you have a prior relationship with Kristin Turner?

MR. GRAY:    Let me OBJECT to relevance; go ahead.  You can tell him.

A    Yes.

Q    What -- what was the relationship?

A    Niece.

Q    And I should have asked this earlier.  Do you have any siblings?

A    Yes, half.

Q    Obvious.  It'd be hard to have a niece without a sibling.  I'm sorry, what was the name of the sibling?

A    Half, but I'm not involved with them.

Q    Oh, Heide is the last name?

A    No.  Half.

MR. GRAY:    Half siblings.

A    But I'm not involved with them.

Q    Oh, I'm sorry.  And what -- do they live in

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000070 of 000132

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:15:40

85787

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000071 of 000132

Kenton County?

A      Yes.

Q      Okay.  And kind of for the same jury purposes --

A      Chris Allender.

Q      Okay.  So you've already identified --

A      Yes.

Q      -- them earlier?

A      Uh-huh (AFFIRMATIVE).

Q      So who is -- is Ms. Turner --

A      Dave's -- Dave's niece.

Q      So your prior testimony was that you were made aware of the medical -- that D.J. was a medical assistant by the Kentucky Board of Medical Licensure.  The grievance states -- states that D.J. is a medical assistant and that he -- that that's the gravamen of your -- your complaint.

MR. BAXTER:      Sorry, I completely lost my train of thought.

MR. GRAY:       Is that a question?

MR. BAXTER:      No.

MR. GRAY:       Why don't you start --

MR. BAXTER:      Stream of --

MR. GRAY:       -- over?

Filed            24-CI-01033 10/16/2024            Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
01/05/2026 04:15:40
85787

DOCUMENT

PM

MR. BAXTER:          -- stream of consciousness.

MR. GRAY:          And why don't you take gravamen out

of your next question.

Q       What was the substance of your grievance, if

you recall?

MR. GRAY:          I'll OBJECT that this document

speaks for itself, but do you

remember, what was your complaint

to the Medical Licensure Board,

Wendy?

A       That I was given sedation by an unprofessional

person who sedated me and Dr. Gupta allowed

it, and I trusted him.  He touched my

backside.  He wouldn't listen.  He

administered drugs to me in the office,

including IV sedation.  And Kentucky Board

License found that D.J. was practicing

medication without a license.

Q       Was -- was your daughter, Brittany, aware of

D.J.'s status as a medical assistant?

A       Not until at the end, until this was found.

Q       Other than the grievance filed, did you have

any other interactions with the Kentucky Board

of Medical Licensure?

A       No.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000072 of 000132

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          72

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:15:40

85787

Q        Did -- I'll confess to you, I don't know the full process they have.  So there were no interviews?

A        Explain.

Q        Well, did the -- after you filed your grievance, were you called in for any interviews in front of any Board members?

A        No.

Q        Okay.  Other than the grievance, do you recall providing any other statements, like written?

A        Explain.

Q        Other than the initial document that laid out your complaints to the Board, did you have to prepare any other written statement, affidavit, anything along those lines?

A        Not that I recall.

Q        After you filed the -- the grievance, did you -- did you discuss your complaints about Dr. Gupta and the practice with any other medical providers?

A        Yes.

Q        And who would that be?

A        I don't recall.

MR. BAXTER:        I -- I'm not going to mark this, but I want to provide it so then that

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                73

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000073 of 000132

Filed  24-CI-01033 10/16/2024  Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:15:40 PM
85787

way we're all reading from the same page of the hymnal.  I -- not to forecast too much of our legal concerns, but I think there are -- well, I don't want -- concern about waiver of any privilege that might attach the Kentucky Board of Medical Licensure documentations -- documentation.

Q  This is the Amended Agreed Order that Dr. Gupta and the practice entered with the Kentucky Board of Medical Licensure. Beginning on the third paragraph on this first page, it details the grievance that was filed. The first paragraph lists that you were uncomfortable with Mr. Thomas being in the room.  I guess I'm just curious why that would be at the outset, prior to learning that he was a medical assistant?

A  Explain yourself.

Q  It states in the -- under the bullet point in the second sentence, I was very uncomfortable with Mr. Thomas being in my treatment room while I was wearing a gown and not fully clothed, given that he has no medical

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000074 of 000132

Filed  24-CI-01033 10/16/2024  Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

certification.  Well, let me ask this, did --
after you learned that D.J. was a medical
assistant, did you return for treatment at
Advanced Pain?

A    Once I learned he wasn't a medical assistant?

Q    Well, he is a medical assistant.

A    He is not a medical assistant.  He is nothing.
The Kentucky -- he is nothing.  The Kentucky
Board found him to be nothing.  He has no
license, bottom line.  He should have never
touched me.  He should have never done no
procedures on me.  He has no license.

Q    Is -- is it your testimony that he performed
the procedures or just administered the
sedation?

A    He per -- he performed procedures.  He done
X-rays too.

Q    So the -- the first procedure where you had
the right-sided --

A    Right here, the gown.  When I say the gown,
that was the X-ray room that we were in.  It
should have never happened.  He should have
never touched me in that room.  Dr. Gupta knew
I was raped before and he allowed it.  It
should have never happened.

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000075 of 000132

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

PM

01/05/2026 04:15:40

85787

MR. BAXTER: Counsel, do we want to take five?

MR. GRAY: You want to take a break? Let's take a break. Go off.

VIDEOGRAPHER: It's 11:35; we're off the record.

(OFF THE RECORD)

VIDEOGRAPHER: We're now back on the record. It's 12:46.

Q Going back to this document, the -- the Amended Agreed Order that reflects the grievance. Were you uncomfortable with D.J. Thomas being present in the procedure room prior to learning that he was just a medical assistant?

MR. GRAY: Let me OBJECT to form. We don't need to argue about semantics, medical assistant, but -- I don't know, that's where we kind of got confused last time, but I'll just OBJECT to his characterization as a certified medical assistant. I don't know if that's even what you meant, but maybe you can try it a different way.

MR. BAXTER: Why don't we go off the record for a minute.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000076 of 000132

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

(OFF THE RECORD)

VIDEOGRAPHER:   We're now back on the record; it's 12:50.

MR. GRAY:   We just had an off-the -record discussion about the terminology or the semantics of calling D.J. a medical assistant.  We've agreed to not call him a certified medical assistant, but for our purposes today, we've agreed to call him a medical assistant.

MR. BAXTER:   Yeah, and we all reserve our further arguments and kind of --

MR. GRAY:   Abso --

MR. BAXTER:   -- yeah.

MR. GRAY:   Absolutely.

MR. BAXTER:   Gotcha.

MR. GRAY:   Thank you.

Q   Prior to learning that D.J. Thomas was just a medical assistant, do you have -- did you have any con -- did you still feel uncomfortable with him in the room?

A   I felt uncomfortable having them both and not having a female in the room, yes.  There was never a female present in the room with them.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*   77

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000077 of 000132

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

Q    What about the -- the African-American woman who set the IV, would she remain in the room?

A    No.  When we were behind closed doors, there was never a female.  For the record, I'm very up front about my PTSD and the rape from a child with all of my doctors.

Q    I'm sorry, just making sure I didn't have followup.  I -- it's weird where it's not a form to be able to acknowledge what you said, but I don't want to just sit there and let it --

A    So if it is a male that -- that I have to see, for instance, there was always a female that is present.  I just want you to be aware of that.

Q    Was -- was that part of your grievance to the KBML, or is that kind of -- you're just giving me that information so I kind of have a better understanding?

A    So you'll have a better understanding.

Q    On the next -- on page 2 of that Agreed Order, the -- the bullet, it talks about you're given your first injection of something we're probably all going to struggle to pronounce, cyanocobalamin, and -- and that's also listed

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*    78

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000078 of 000132

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:15:40
85787

in your Complaint, that you were given that injection even though you were allergic. Is that still your understanding as you sit here today?

MR. GRAY:          OBJECT to form. She wasn't allergic to -- it's B12, right, Wendy?

WITNESS:          Uh-huh (AFFIRMATIVE).

MR. GRAY:          It's B12. She's not allergic to B12. She had an allergic reaction. I think it's two different things.

Q     Is that your testimony that you're not allergic to B12 injections, but you had an allergic reaction to an injection of B12 at Dr. Gupta's office?

A     Correct.

Q     And it's your testimony today that the B12 injection was provided by Dr. Gupta at Advanced Pain?

A     Correct.

Q     As I understand it, they did not have in stock B12 at any given time, and it's not listed within the medical records. Is it possible that you might be equating the B12 injection to Dr. Gupta when it was performed by another provider?

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000079 of 000132

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:15:40

85787

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000080 of 000132

A    Not that I recall.

Q    The next portion of this grievance refers to what I'll -- I'll refer to as like the VIP conversation.  Do you recall whether -- was this -- did this conversation occur prior to the first procedure?

A    The -- the VIP was in the procedure room.  He looked at me and said, you'll be VIP when he got ready to sedate me.  And I was knocked out.

Q    It then says, I took this to mean that I was given more anesthesia than other patients.  Is it possible that this -- that his reference to VIP was also made to other patients?  Did you have any -- I guess, let me re-ask that.  Did you have any discussion with any other patients?

A    I did not talk to any other patients.  I did not remember moving from the stretcher to the other bed, then from that bed over into the -- the little waiting area.

Q    Is it -- is it your testimony that you lost consciousness after the Versed was -- sorry, is it your testimony that you lost consciousness after the sedation was

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:15:40 PM

85787

DOCUMENT

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000081 of 000132

administered?

A    You could say that, if I don't remember anything. It wasn't twilight.

Q    Did you inform the Kentucky Board of Medical Licensure that D.J. Thomas set one of your IV lines?

A    Correct.

Q    And earlier, I understand your testimony to be that all IV lines were set by either an African-American woman or a Mexican man. So was that representation to the Kentucky Board of Medical Licensure untrue?

A    Are you saying set by the, or give the injections?

Q    Placed the IV, like insert --

A    Oh --

Q    -- the IV?

A    -- he inserted into my IV.

Q    Correct. But he didn't start the initial IV, correct?

A    He injected into my IV.

Q    Correct.

MR. GRAY:    You're -- you're not communicating.
He's asking you if -- if you told the Board of Medical Licensure that

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*    81

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

D.J. put in your IV --

A       No.

MR. GRAY:          -- placed your IV?

A       He injected into the IV.

Q       So any statement that -- to the Board that D.J. set the IV would be incorrect?

A       I don't know.

Q       Returning back to the VIP conversation, was anyone else present when the VIP language was used?

A       Gupta was.  Me and Gupta and D.J. was behind closed doors.

Q       Was this in the procedure room?

A       Yes.

Q       Was Dave also present?

A       Of course not.  He was getting ready to do the procedure.  He was standing over beside Dr. Gupta.

Q       Dave was?

A       No, D.J.

Q       I -- I thought your testimony earlier was that Dave was present for the procedures?

A       He's not allowed to be in there, in the procedure room.

Q       Okay.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          82

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000082 of 000132

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
01/05/2026 04:15:40
85787

A    It was D.J. and Dr. Gupta and me.  They roll you in the procedure room.

Q    Okay, I understand now.  Since we're having kind of some difficulty in -- in me understanding the testimony, I want to return back to the procedures themselves.  We talked about the first procedure where there was -- you experienced right-sided swelling.  The next was the Ketamine infusion.  Do you recall receiving, and I know this is medical terminology, but cervical epidural steroid injections at Dr. Gupta's office?

MR. GRAY:    Injections in your neck.

A    Yes, back here (INDICATING).

Q    Do you recall the conversation -- do you recall having a conversation with Dr. Gupta about that procedure before it occurred?

A    Yes.  He had to do a couple procedures.

Q    Did you feel like he answered all the questions that you had about that procedure?

A    I don't recall.

Q    All right.  Did -- did you ultimately agree to those -- those procedures -- those procedures, but the -- the -- the cervical --

A    Yes.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*    83

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000083 of 000132

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

Q        -- epidural steroid injections?

MR. BAXTER:        Okay.  We're going to move on to the Complaint which we'll mark as Exhibit 5.

(REPORTER MARKS A COPY OF THE COMPLAINT AS EXHIBIT 5 FOR THE PURPOSE OF IDENTIFICATION, AND THE SAME IS ATTACHED HERETO AND FILED HEREWITH.)

Q        I want to ask you some questions to kind of clarify the meaning in some of these paragraphs on page 3 under -- it's paragraph 13, and then I'm going to ask you some questions about those subparagraphs.  The first one being 13(e) which says, by negligently and carelessly overdosing anesthesia in a doctor's office procedure.  Was it more than one occasion that you contend you overdosed on the anesthesia?

MR. GRAY:        Let me state an OBJECTION on the record.  This is a Complaint written by a lawyer, but I'll allow her to answer.

A        I was given anesthesia by D.J. Thomas, who was not certified to do any medical treatment on me, and he sedated me, and Dr. Gupta allowed

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    84

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000084 of 000132

Filed                24-CI-01033 10/16/2024           Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:15:40
PM
85787

it, and I trusted him.

Q   Moving to paragraph 13(g), it's on the next page, and it -- it describes situations where prescriptions were refilled incorrectly.  Did you, ultimately, take those prescriptions or did you discover that they were incorrect prior to ingesting?

A   Can you rephrase that?

Q   Sure.  Paragraph 13(g) describes issues that occurred where your prescriptions were refilled incorrectly by the Defendants.  Did you take those medications that were ordered incorrectly?

A   So my prescriptions -- I have prescriptions by other doctors, by another doctor.  So D.J.'s wife orders the prescriptions, and she was calling in my other medicine from my psychiatrist.  So it was like double prescriptions being called in.

Q   Okay.

A   So my husband was thinking I was taking both medication and I wasn't.  So it was causing arguments, big time.

Q   What was that medication?

A   The Topamax.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    85

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000085 of 000132

Filed                24-CI-01033 10/16/2024           Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL
01/05/2026 04:15:40
85787

Q        Topamax.  And --

A        She was just ordering all my medications and she didn't have the right to do that.

Q        Other than kind of the marital conflict, did -- did it cause any additional harm?  Did you take the medication and, you know, take too much other -- or otherwise get sick from it?

A        I don't know what all medications were taken to be truthful.

Q        Okay.

A        There was so much medication given to me.

Q        By Dr. Gupta or by other providers as well?

A        Dr. Gupta.  I was on so much medication.  I was lucky to be able to tie my shoe.

MR. GRAY:        Justin, if you'll give me some latitude.  There's a couple of issues that she's brought up that you need to know about.  Was there any issues with the prescribing of Savella, that --

WITNESS:        Yes.

MR. GRAY:        -- you recall?  Would you please explain that?

WITNESS:        So he -- Dr. Gupta prescribed

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000086 of 000132

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          86

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:15:40
85787

Savella, and it was supposed to be started at a low dose, but Autumn, D.J.'s wife, called it in at a high dose and my blood pressure bottomed. So I was trying to get a hold of Dr. Gupta to see what was going on and the messages wasn't getting to Dr. Gupta. When it finally got to Dr. Gupta, he went off in his office, said, what are you trying to do, kill my patient? So I had to start the prescription all back over again because you've got to go in slow increments with this medication.

Q And what is Savella prescribed for?

A You tell me. I have no idea.

Q Is it your contention that you should not have been prescribed Savella?

A Justin, I don't know.

Q Has any medical provider ever told you that the Savella prescription was incorrect?

A Justin, I do not know.

Q I mean --

A Yes, the medicine -- I was supposed to start

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000087 of 000132

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:15:40 PM
85787

the low dose and go so many days, but Autumn, D.J.'s wife, who orders Dr. Gupta's prescriptions, called it in to the pharmacy wrong.  She called it in at the high dose.  So she overdosed me.  She called it in backwards.  And my blood pressure was bottoming.  I even called the pharmacy, was like, is there a conflict here; do you know?  And he said, you need to call your doctor.  So the message wasn't getting to Dr. Gupta.  Then finally when contact was made to Dr. -- he goes, are you trying to kill my patient?

Q    And that contact, was that -- so you called --

A    Me.  I finally made con -- I had to go in to his office.

Q    So you called Dr. Gupta.  You were unable to get a hold of him, and then you went to the office?

A    Correct.

Q    Was it on one of the days where you had an appointment or did you just go to discuss --

A    Showed up.

Q    Okay.  And was anyone else present with you?

A    My husband.  I even took pictures of my hand because they were turning blue.

Lisa E. Hoinke, Court Reporter
HoinkeReporting@gmail.com                88

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

Q        Do you still have those pictures?

A        Probably not because my phone got destroyed.

Q        When did your phone get destroyed?

A        A year ago because the kids -- my grandkids dropped it.

Q        Do you still have the same phone number that you did at the same time --

A        I --

Q        -- at the time you --

A        I don't recall.

Q        Do you -- you don't recall whether --

A        I --

Q        -- your phone number has ever changed?

A        It probably has.

MR. SMITH:        It has.  Dave called me with a new phone number within the last six months.

MR. BAXTER:        Well, I mean, that could be all of us.

MR. GRAY:        If we have any pictures -- if you have any pictures --

WITNESS:        I can provide them.

MR. GRAY:        Please do.

WITNESS:        Yes.

Q        Okay.  Do you still presently take Savella?

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000089 of 000132

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

A    No.

Q    Do you take any medication for your fibromyalgia?

A    Yes.

Q    What medication do you take?

A    Cymbalta and Gabapentin and Hydrocodone.

Q    Paragraph 13(I) on the same document says, negligently administering a drug trial and improper billing associated with such.  Is -- is the drug trial you're referring to Emgality?

A    Yes.  I was asked to go into this drug trial by Dr. Gupta, the Emgality, which I was already on Emgality by my neurologist who was giving it to me.  And so I explained that to him, but he said, oh, no, try this for the trial.  And then the one lady -- I can't think of her name -- came and said, you'll get these gift cards every three months, $25 or $50 gift cards.  I never saw any gift cards.  So I was supposed to come in once a month to get the Emgality.  So she would call me to say, okay, it's time for your Emgality.  Well, when I missed, because she quit calling me, that's when he flipped out in the office and kicked

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL
01/05/2026 04:15:40

85787

the garbage can all the way down the frigging hallway and started screaming at her and screaming at me.

Q    Was this in -- in his office?

A    Correct.

Q    And do you know the name of that other employee?

A    No, I do not.

Q    Could you describe her for me?

A    Blonde hair, long.  And when we would go to the pharmacy to get our medicine, Emgality would be there, and it's like seven hundred and some dollars because it's a syringe that you stick in your stomach.

Q    The -- the female employee with long blonde hair, was she heavy set or skinny?

A    Medium.  She was his assistant.

Q    About how tall would you estimate her?

A    About your height.  Holly is her name.

Q    Holly, thank you.  So prior to the drug trial, you were already taking Emgality?

A    Yes.

Q    Was it -- in the drug trial, do you know whether it was a different, like a different dosage?

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*    91

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000091 of 000132

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:15:40
PM
85787

A     Not that I know of.  I was just told Emgality.

Q     Okay.  The second kind of part of this portion of the Complaint is the improper billing associated with it.  Is it your contention you were over billed for participation in the drug trial?

A     Okay, Just -- can I say something, Justin?

Q     Sure.

A     So this Emgality, by the way, was being treated for my headaches.  I was already being treated for my headaches by my psychiatrist.  I was already on medication for my headaches.  So adding more medication was -- was just bad.

Q     So during your participation in the drug trial, is it -- were you taking two doses of Emgality then?

A     Yes, because I was getting Emgality from my neurologist, and I was getting headache medicine for my migraines from my psychiatrist.  So Dr. Gupta's going to have more headache medicine.  So why add more medication?  I was there to get treated for my back, not for my headaches, or to find out what was going on with the pain.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000092 of 000132

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:15:40
85787

Q    Where would you typically -- so was the Emgality provided by Advanced Pain or would you have to go to a pharmacy to get it filled?

A    I would get -- she would come in with the syringe and give it.  But when we would go to the -- get my medicine, when Autumn would call in all my medicine, Emgality would be there and we would have to tell the pharmacy, no, that's not supposed to be there.  And it went on for several times.

Q    But, ultimately, you would tell the pharmacy, no, we don't need any Emgality and you wouldn't receive any from the pharmacy?

A    No.  No, Justin.  Because I didn't have seven hundred-some dollars to pay.  That's a lot of money.

Q    I agree.  The last of this kind of subpart is -- is 13(j) negligently billing insurance for prescriptions that were not needed and visits that did not happen.  What were the prescriptions that were not needed?

A    My headache medicine.

Q    So that would be the Emgality?

A    Topamax, because my psychiatrist was already ordering my Topamax.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000093 of 000132

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          93

NOT ORIGINAL

Q    How did you learn that you -- that insurance was billed for visits that did not occur?

A    Well, I check my billing statements.  I keep track of all my billing statements.  So every time I would call they would charge my insurance, because I would have to call to say, hey, why isn't my prescriptions at the pharmacy because he was having -- sending your prescriptions over.  It would be a week later before my prescriptions would be there, so I would be out of my medicine.  So you go a week late without your medication, three days late, four days.  So I'm arguing with the pharmacy, like are you all the ones holding my medicine up?  And they're like no.  And they're showing me a printout like, this is when it came.  So every time I would call, they would bill the insurance.

Q    Do you -- setting -- kind of splitting the -- the claims in the Complaint from the medical negligence, just kind of outright errors in how they --

MR. BAXTER:         Sorry I'm not going to get there.  You just want to strike that one.

Q    Has any medical provider ever told you that

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000094 of 000132

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

Q    any of the procedures performed by Dr. Gupta were done incorrectly?

A    Nobody says anything.  Except the Kentucky Board found that they were unnecessary.

Q    And a bit of a delicate subject, but you had referenced, and it's in the discovery responses as well, about an incident where you were in the gown and D.J. -- I believe it was D.J., but maybe it was Dr. Gupta, correct me if I'm wrong, either touched the gown or the backside.  If you could, just kind of describe that incident.

A    We were in the X-ray room and the gown, he touched the back and I said, don't touch me. He said, I can do whatever.  And I said, don't touch me.  He was doing the X-ray.  He was acting as an X-ray tech.  He took the X-rays.

Q    So the X-ray room, is that different than the procedure room?

A    Yes.

Q    Were you taken to this X-ray room before procedures?

A    No.  He just done that one X-ray.

Q    What was the X-ray on?

A    My back.  The back and the front.  I'm

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000095 of 000132

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*    95

Filed       24-CI-01033 10/16/2024       Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:15:40

85787

DOCUMENT

PM

assuming the front and the back.  I don't know, it's been so long.

Q   Aside from the sedation, what was D.J. Thomas' involvement in the proce -- the -- the procedures, as you recall?

A   Everything.

Q   Did he -- after the sedation for instance and the epidural injections, did Dr. Gupta then perform the actual procedure and D.J. just administered the IV sedation?

A   I have no idea.  I was sedated.

Q   Did you lose consciousness each time?

A   Yes.  It was only me and D.J. and Dr. Gupta behind that closed door.  Nobody else was behind that closed door.  If they're saying somebody else was behind that closed door, they're lying.  Or they came in after I was knocked out.

Q   Do you know what the sedation drug was?

A   No, I do not.  I just know he got it out of the cabinet over to the left as you come into the door, and he had his needle and he asked Dr. Gupta how much to give me, and Dr. Gupta told him.  Dr. Gupta was over at the computer, still charting on the other patient with his

Lisa E. Hoinke, Court Reporter
HoinkeReporting@gmail.com                96

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000096 of 000132

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

back turned.  Dr. Gupta would wear his little X-ray lab coat.

Q    In your discovery responses --

MR. BAXTER:    Mark this as Exhibit 6.  These are the supplemental.

(REPORTER MARKS A COPY OF THE DISCOVERY RESPONSES AS EXHIBIT 6 FOR THE PURPOSE OF IDENTIFICATION, AND THE SAME IS ATTACHED HERETO AND FILED HEREWITH.)

MR. GRAY:    Here, give me this one.

Q    In response to number 7, that second bullet point says that Dr. Gupta performed three cervical epidurals unnecessarily.  Do you have any understanding as the basis for that conclusion?

A    Ex -- explain again.

Q    And with the understanding that this -- these documents are prepared a lot of times by and with lawyers, I just am curious whether you have any independent understanding of whether like those -- those epidurals were performed unnecessarily?

A    The Board of License said that they were unnecessarily needed.  And I trusted Dr. Gupta to perform the care that I needed by him, and

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000097 of 000132

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

he failed me. And that he wouldn't do a job to harm me.

Q This also mentions that one of the epidurals had a complication. What -- what was that complication?

A I swelled.

Q Was there a second occasion where you experienced right-sided swelling?

A Yes.

Q Other than the two episodes of right-sided swelling, were there any other problems that you had after the -- after the procedures?

A When I had the swelling of the one in the back, I swelled that I know.

Q The last bullet in this Exhibit 6, page 2, that first kind of set of questions and responses says, Plaintiff was forced to visit the emergency room with medication toxicity issues that threatened her life. Where did you present to the emergency room?

A Fort Thomas. That's when the Savella.

Q Have you ever seen any medical records from that presentation?

A What?

Q Have you ever seen any medical records related

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com* 98

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000098 of 000132

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

to that presenta -- you went to --

MR. BAXTER:      Or sorry, let me rephrase it.

Q      Have you ever seen your St. Thom -- or your -- can't get through it now.  Have you ever seen the medical records associated with that ER presentation?

A      I've been hospitalized.

Q      There's another bullet, it's the third from the bottom, says, Autumn Thomas, as an employee of Defendant(s), failed to timely call in refills of Plaintiff's medication thus forcing her into opioid withdrawals.  What opioid was prescribed by Dr. Gupta?

A      It was the -- I'm not sure of which medication, but she was in charge of calling in all my medication.

Q      Have you ever experienced opioid withdrawals?

A      Yes.

Q      And was that related to prescriptions that Dr. Gupta was responsible for?

A      Yes.

Q      What opioid was that?

A      All my medication that was ever called in was late.

Q      With the understanding that your medication

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000099 of 000132

Filed      24-CI-01033 10/16/2024      Kathryn Marshall, Franklin Circuit Clerk

Filed    24-CI-01033    10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

was called -- called -- called in late, this response specifically refers to an opioid withdrawal, and I'm just curious whether or not you know what opioid was ever prescribed by Dr. Gupta?

A    I'm not sure which one he considers opiates because I'm supposed to be drug tested regular when I go there and I was drug tested one time.

Q    Is it possible that opioid withdrawals is a misunderstanding and it was just -- it was problems with a different medication that wasn't an opioid?

A    Correct.

Q    When you presented to the ER for the Savella issue, what treatment did you receive at St. Thomas?

A    I don't recall.

Q    Do you recall any discussions with any of the providers at St. Thomas about the dosage of Savella?

A    Not there.  From the pharmacy, I do.  How it was supposed to be prescribed.

Q    So --

A    Because it was written how it was supposed to

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000100 of 000132

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
01/05/2026 04:15:40
85787

be prescribed on the prescription.

Q    When you presented to St. Thomas at that --

A    Yeah.

Q    -- at the time you presented, did you know that Savella was the issue?

A    No.

Q    What did you -- what were your complaints when you presented to St. Thomas?

A    Blood pressure low.  But the Savella was called in backwards.

Q    And did you -- do you recall any conversations with any medical providers that explained your blood pressure dropped because of the Savella?

A    Yes.  The pharmacy person when I called to see if there was a re -- could be a reaction to the medication.

Q    And would this have been after you got home from St. Thomas?

A    No, before.  Autumn called in the Savella wrong.  She called it in backwards.  Dr. Gupta wrote a prescription.  Autumn called it in wrong.

Q    And -- and so you took the Savella and then you started experiencing --

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000101 of 000132

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed                24-CI-01033 10/16/2024                Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
01/05/2026 04:15:40
85787

A       Yes, the side effects.

Q       What were the side effects?

A       My blood pressure bottomed, almost killed me.

Q       And then after your blood pressure bottomed -- how do you check your blood pressure, do you use a cuff; do you have a --

A       Yes.

Q       Does that -- do you record that in any way?

A       Write it down.  Do I have record of it?  No.

Q       So after you blood pressure drops, what is your next -- what do you do next?

A       Tried to reach Dr. Gupta and could not reach him.

Q       And then next you go to St. Thomas?

A       I don't remember.

Q       What pharmacist or -- or what pharmacy did you call?

A       Walgreens, Newport.

Q       Within the same document marked as Exhibit 6, on page 3, within this, you indicate that you tried to seek other pain management specialists that refused to treat you; is that accurate?

A       Correct.

Q       And it says, specifically, Plaintiff met --

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    102

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000102 of 000132

Filed

DOCUMENT

PM

24-CI-01033 10/16/2024

Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
01/05/2026 04:15:40

85787

met with Quintorich, Q-U-I-N-T-O-R-I-C-H, M.D., a pain management specialist that refused to treat Plaintiff after consultation. Where is Dr. Quintorich's office?

MR. GRAY:          Where is his office?

WITNESS:           Who is that?  I have no idea who that person is.  I've never seen that person.

MR. GRAY:          Who was the doctor that you --

WITNESS:           That's the one who sent me the letter, that is Dr. Gupta's friend.

MR. GRAY:          Klickovich.  We already talked about him.

WITNESS:           Yes.  That's the only one.  I've never seen this person.

MR. GRAY:          So you think Quintorich should be Klickovich?  All right.

MR. SMITH:         That would probably be this lawyer's error.

MR. GRAY:          I was getting ready to pin it on TJ, but -- if he wasn't here, I definitely was going to pin it on him.

MR. SMITH:         That would -- that would be this lawyer's error.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          103

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000103 of 000132

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:15:40

85787

DOCUMENT

PM

MR. GRAY:            So --

MR. BAXTER:         Fair enough.  That's -- that's fine. I understand.

MR. GRAY:           -- Quintorich/Klickovich, close enough.

Q      Okay.  From what I understand about your earlier testimony, that presentation to Dr. Klickovich occurred after the Ketamine infusion, correct?

A      Yes.

Q      Okay.  Have you tried to seek pain management care at any time from any other provider after Advanced Pain?

A      Yes.

Q      Where?

A      UC Pain Management finally accepted me.

Q      Have you had an appointment with UC Pain Management?

A      Yes.  I'm seen there now.

Q      When did you start treating at UC Pain Management?

A      A few months ago.

Q      Have they recommended any treatment?

A      Yes, water aerobics, water therapy.

Q      Have they -- have they recommended Ketamine

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000104 of 000132

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:15:40

85787

DOCUMENT

PM

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000105 of 000132

infusions?

A          No.

Q          Have you sought out Ketamine infusion since Advanced Pain Treatment?

A          Sought out Ketamine?

Q          Like as treatment, not as --

MR. GRAY:          Have you gone anywhere asking for Ketamine treatment?

WITNESS:          I've had it.  The ambulance had to give it to me when they came and picked me up.

Q          When was that?

A          Several months ago.  They thought I had a stroke.  Nowhere around here offers the Ketamine.

Q          Do you feel like the Ketamine improved your back pain?

A          Yes.  The Ketamine that I had, and what they're saying the Ketamine that Dr. Gupta give me was not.  Whatever Dr. Gupta give me, I do not know because the Ketamine that the ambulance people gave me was Ketamine.

Q          So is it your testimony that you don't think that you received Ketamine from Dr. --

A          No, I do not.  Do I believe he gave me

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

Ketamine?  No, I do not.

COURT REPORTER:     You want to finish your question?

MR. BAXTER:         I'm sorry?

COURT REPORTER:     You said, is it your testimony that you don't think -- you want to finish the question?

MR. BAXTER:         Okay, yeah.

Q       Is it your testimony that you don't -- that you don't believe you received Ketamine from Dr. Gupta?

A       No, I do not.

Q       What evidence do you have to support that claim?

A       Because of the effects that I had from the Ketamine that I had from the Ketamine that I had on the last infusion, the side effects.

Q       Where did you receive a Ketamine infusion since Advanced Pain Treatment?

A       When the ambulance came and picked me up at my home.

Q       Okay.  So that -- was that an injection of Ketamine?

A       Injection.

Q       And -- and you're -- you're comparing the injection of the Ketamine to the Ketamine

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                 106

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000106 of 000132

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:15:40 PM
85787

infusion that was performed at Advanced Pain?

A    It was the same way as it was performed at Advanced Pain Clinic that you're talking about, that D.J. and Dr. Gupta provided.  It was done the exact same way, but the ambulance people strapped me down and monitored, but D.J. and Dr. Gupta did not.  I was laid on a gurney straight.  Did I hallucinate?  No, I did not at Pain Management.

Q    I want to parse out a little bit of testimony, you -- you talked about the monitoring, and you talked about the strapping down.  Is it also your testimony that they did not monitor your vital signs at Advanced Pain Treatment Center?

A    There was a vital machine there, yes, but the side effects to Ketamine was completely different.  Do I feel that I had Ketamine that they're saying at Dr. Gupta's?  No, I do not compared to what I had in the squad.

Q    Have you ever discussed that concern with any medical provider?

A    Yes, I have.

Q    And who would that be?

A    With my therapist.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000107 of 000132

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:15:40

85787

Q        Is that Dr. Zieba?

A        Vickie Kennedy, my counselor.

Q        And is Ms. Kennedy part of a larger like group, like what's the name of her office?

(PAUSE)

Q        That's -- we can -- I can always confer back with counsel, if we need to further identify.

A        What's -- she's public.  Newport.

MR. SMITH:        Her office is in Newport?

WITNESS:        I call it the poor.

Q        Your answers to interrogatories indicate that your -- your back is worse than when you first began treatment at Advanced Pain Treatment Center.  Could you describe how it -- it's worse today than it was in -- in January of 2021?

A        I was able to run before, walk more, lay longer.  It feels like I'm being hit with a baseball bat regular.

Q        And at UC Pain Center, have they given you any explanation as to what the source of your pain is?

A        Just medication.

MR. GRAY:        What's the source of your pain?

WITNESS:        Said monitoring -- well,

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000108 of 000132

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:15:40

85787

DOCUMENT

PM

fibromyalgia, but monitoring -- possibly monitoring for MS.  And that's been the first time that we've heard that.

Q    Was that recently?

A    Yes, because of my eyesight and falling and everything else.  And this is the same stuff that had been reported the whole time going to Dr. Gupta's.

Q    You had issues with your eyesight and falling prior to your presentation with Dr. Gupta, though, correct?

A    No.  It had been getting worse.

Q    It -- it had -- is your testimony that it had been getting worse, but that you did have issues with your eyesight and falling prior to Dr. Gupta?

A    What do you mean?

Q    So you said that you did not have those problems, but it also sounded like you were saying that it had gotten worse.  So did you have problems with your eyesight and falling prior to your presentation to Dr. Gupta?

A    I wasn't falling, falling.  I started falling, like my whole right side started giving out

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*    109

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000109 of 000132

NOT ORIGINAL

and my eyesight started going bad once he started me on all that medication. And I started telling him and he just started adding more.

Q Did -- did you seek treatment from Dr. Zieba related to the issues of falling and eyesight prior to your presentation to Advanced Pain Treatment?

A Absolutely not.

Q If those records were to indicate otherwise, would you say that Dr. Zieba's records were incorrect?

A Yes, I would. I know what I seen Dr. Zieba for and I would be very open about it.

Q I want to move forward in time to the interview that you did with LINK nky and just curious how that came about?

A They asked for an interview.

Q Did you or any of your family members reach out to them first or did they contact you first?

A They contact.

Q In that interview, in the raw interview, it mentions that you called a friend who is a medic after one of the injections. Who was

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000110 of 000132

01/05/2026 04:15:40

85787

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
01/05/2026 04:15:40
85787

DOCUMENT

PM

that individual?

A     I do not know.  I was not the one who called.

Q     Who was the person who called?

A     My husband.

Q     This is a little off topic, but within that interview there's -- there's kind of mention of the vehicles of my clients and -- and kind of where they frequent.  Are you aware of any surveillance efforts on any of my clients?

A     What?  Rephrase that.  What?

Q     Sure.  In the -- in the LINK nk -- in -- in that interview --

MR. GRAY:          I second the motion.

Q     In that interview there's some pretty detailed descriptions of my -- one of the vehicles of my clients and also kind of mentions where they frequent.  Have you, Dave, any of your representatives, engaged in any surveillance efforts of my clients?

A     Negative.

Q     Okay.

A     That's a no.

MR. GRAY:          We understand; that's good.

Q     Within that interview you also say that Dr. Gupta intentionally hurt you and I --

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000111 of 000132

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          111

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:15:40 PM
85787

Q    I -- I was just curious kind of what you meant by that?

A    He knew that D.J. Thomas was not certified to do any procedures, and I trusted Dr. Gupta in good faith to perform what he told me he would do.

Q    How do you know --

A    He lied.

Q    Sorry.  How do you know that Dr. Gupta knew that D.J. was not allowed to assist in the way he did?

A    He's practiced with him for how long?  He should know every one of his employees if they're certified or not.  That's his responsibility.

Q    And I -- I don't disagree with you.  But do you have any information that would lead -- that would -- that would show that Dr. Gupta knew that D.J. should not be participating in that way, but disregarded that?

A    That's his responsibility to know what certifications his employees have.  That's -- that's his responsibility.

Q    I understand and I don't disagree.  But what your testimony is is that Dr. Gupta, not

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                112

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000112 of 000132

Filed                24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

should have known, but Dr. Gupta knew, and I'm curious what information you have about Dr. Gupta's specific knowledge?

A       That is Dr. Gupta's responsibility as a doctor, to know when he hires his employees. He takes an oath to provide care for patients, and I was his patient, and he failed.

Q       Has the regulation that governs sedation in those procedures ever been explained to you?

A       What do you mean?

Q       So the -- the regulation that the KBML order addresses, and D.J.'s involvement, the regulation that it allegedly violated, have you -- have you ever read that regulation?

A       The Kentucky Board said D.J. Thomas has no license.

MR. GRAY:          The question is, have you ever read the regulation that regulates the giving of sedation?  Have you ever read that regulation?

WITNESS:          You have to have a license.

MR. GRAY:          Have you ever read the --

WITNESS:          No.

MR. GRAY:          -- regulation?  Okay.

WITNESS:          No.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000113 of 000132

Filed                24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
01/05/2026 04:15:40
85787

MR. GRAY:    Okay, that was his question.

WITNESS:    No.

MR. GRAY:    That was just that simple.  Okay.

Q    We talked about the back pain.  Are there additional back pain since Advanced Pain Treatment Center?  Are there any additional injuries that you attribute to the care provided by the Defendants?

A    I hurt every day.  I'm not the same person now that I was.  My whole life has been torn apart.

Q    And the pain that you experience every day, do you attribute that to the care that Defendants provided?

A    Yes, I do.

Q    And if you could kind of explain to me a little further why that is.

A    I trusted Dr. Gupta.  I went there trusting Dr. Gupta.  I'm not a person to just go to doctors, and I don't like taking a lot of medication.  So I trusted him to go there thinking he could help me and he failed.  And knowing my situation I was already facing.

Q    I guess I'm struggling to understand how that correlates --

NOT ORIGINAL DOCUMENT

01/05/2026 04:15:40 PM

85787

A    He should have been more communicating with my psychiatrist too, instead of wanting me to go on board with all his partners in his facility and giving all the medication, and I wouldn't have been having psych -- breakdowns and stuff and ended up being hospitalized in psych because of the epidurals and all that.

Q    When were you hospitalized due to the epidural in psych?

A    I don't recall.  It's embarrassing.

Q    Had you ever been hospitalized for psychiatric issues prior to the treatment that was provided by Defendants?

A    No.  I have not had a history of this length of my health ever until seeing Dr. Gupta.

MR. BAXTER:        Let's take a break.  I'll get organized, and we should be near the end.

MR. GRAY:        Okay.

VIDEOGRAPHER:        The time is 1:50, and we're off the record.

(OFF THE RECORD)

VIDEOGRAPHER:        We're back on the record; it's 1:58.

Q    In January of 2021, were you admitted to the Lindner Center of Hope?

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000115 of 000132

Filed  24-CI-01033 10/16/2024  Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

A    Yes.

Q    And what was that admission for, as best you understand it?

A    I don't recall.

Q    Was it for psychiatric treatment?

A    I don't recall.

MR. BAXTER:       What I am up to?

COURT REPORTER:    This will be 7.

MR. BAXTER:       Seven.

(REPORTER MARKS A COPY OF THE ST. ELIZABETH HEALTHCARE RECORDS AS EXHIBIT 7 FOR THE PURPOSE OF IDENTIFICATION, AND THE SAME IS ATTACHED HERETO AND FILED HEREWITH.)

Q    I'm going to hand you Exhibit 7. And because there's only 18 pages, this is the entirety of the St. Elizabeth Healthcare specific to SEP Behavioral Health. On, what is marked at the bottom, page 5, there's a 9/15/2021 visit. And the last two sentences states, she claims she was healthy up until the time she was working at Campbell County Detention Center. Things just went downhill, losing sunglasses, losing purse, little things, forgetting things. She hasn't worked for about a year now. I couldn't even focus computer -

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000116 of 000132

Filed      24-CI-01033 10/16/2024      Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

aggravating.  Now, I just get aggravated cooking - burning things - not normal.  I'm curious what -- if you agree with this statement today?

A    I don't recall.

Q    This also states that you hadn't been working for about a year now, which would kind of further indicate that at the time you initially presented to Advanced Pain you were not working.  Does that further clarify your understanding as to your employment status when you first sought treatment?

A    I don't recall.

Q    All right.  Last question I'll ask about this document concerns page 14.  Do you recall being treated by, I believe it's Dr. Davis, Dr. James Davis at SEP Behavioral Health?

A    Yes.

Q    This note details that he met with both you and your husband and that, second sentence, I advised them that I believe the patient is showing signs and symptoms of a pretty classic conversion reaction and the good news, then, is that I don't believe she has a neurological disease causing her problems.  I discussed the

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000117 of 000132

Filed            24-CI-01033 10/16/2024            Kathryn Marshall, Franklin Circuit Clerk

Filed

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:15:40

85787

24-CI-01033 10/16/2024         Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000118 of 000132

nature of somataform disorders with her, emphasizing how psychic stress is, quote, converted into somatic symptoms as a means of distracting these patients from painful emotional -- emotions and memories.

Therefore, the treatment for conversion symptoms is not medication or medical procedures, but rather psychotherapy which helps the patient acknowledge, identify and cope with the emotional pain in their life.

Do you recall having this conversation with Dr. Davis?

A    I don't remember.

Q    Are you still currently seeking treatment for any conversion disorder?

A    Yes.

Q    Who are you currently seeking treatment for conversion disorder?

A    I'm in therapy.

Q    What is your understanding of conversion disorder?

A    It's therapy.  I see a neurologist.

Q    After learning that D.J. was out of -- practicing outside the scope of his ability, did -- who did you speak to in terms of

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    118

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:15:40

85787

medical providers about any of the issues it caused?

A    I don't recall.

Q    Is it -- is it possible you didn't speak to any medical provider about the issues that arose after learning about D.J. Thomas?

A    I don't recall.

Q    Your discovery responses indicate previous contact with the Commonwealth's Attorney. When was the last time you had any contact with the Commonwealth's Attorney about the allegations in this case?

A    I don't recall.

Q    Do you have any understanding of the Commonwealth Attorney's position as involves Dr. Gupta and D.J. Thomas?

A    Explain.

Q    So you filed a complaint, for lack of a better word, to the Commonwealth's Attorney concerning Dr. Gupta and D.J. Thomas, correct?

A    Correct.

Q    Have you had any discussions, after filing that kind of initial documentation, with anyone at the Commonwealth Attorney's Office?

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000119 of 000132

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*            119

NOT ORIGINAL

MR. GRAY:          Did you have an interview with them?

WITNESS:          Yes.

Q        When would you estimate that that occurred?

A        A year ago.

Q        Since that interview, have you had any contact with the Commonwealth Attorney's Office related to this?

A        Not that I recall.

Q        Okay.  Did they ever provide any explanation to you about any decision they've made concerning Dr. Gupta and --

A        Not that I recall.

Q        Earlier you -- you mentioned that you're -- you were a runner prior to Advanced Pain Treatment Center's care.  Would you regularly participate in races?

A        The walks and races.

Q        What were some of the ones you enjoyed before the Defendants --

A        The Turkey, the holiday races, and walking my dog regular.

Q        Do you use any kind of like mileage tracker when you were running?

A        No.  I was very active.

Lisa E. Hoinke, Court Reporter
HoinkeReporting@gmail.com          120

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:15:40
85787

Q       Did you have any -- do you have any gym memberships currently?

A       Planet.

Q       Oh, Planet Fitness?

A       Yes.

MR. GRAY:            It's purple, you know.

MR. BAXTER:          Yeah.  They have goofy commercials.

Q       We've -- we've discussed at length the allegations in the Complaint and the injuries that you've -- that arose, that you've alleged.  Have -- to the best of your knowledge now, have you -- have you detailed all the complaints that you have about my clients?

A       I know my life won't be back to where it was.

Q       What do you mean by that?

A       Back to normal.  But I was working full time and to see where I'm at now and to hear Dr. Gupta say to me, you'll never work again, that's very discouraging to go to a doctor and to be told that.  I went there to be able to be normal, and to feel that I'm not normal now, it's not fair.  And to be treated how I was treated is unacceptable.  They get to enjoy their life every day.

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000121 of 000132

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

01/05/2026 04:15:40

85787

PM

Q      How -- how do you differentiate pain that you experience on a daily basis, as related to your fibromyalgia or conversion disorder, with the allegations that you've asserted in this litigation?

A      I can't even describe to you the pain between any of it, from my body to any of it.  My body is in pain.  My back.

Q      And I -- I -- I don't know if we've nailed this down --

A      I used to be able to go on vacations.  I can't even hardly ride in the car without aching.

Q      The -- the back pain that has gotten worse, what is your allegation that caused that?

MR. BAXTER:       Sorry, let me rephrase that.

Q      How did the care that my clients provide further injure your back?

A      I don't know what he give me in my back.  Was it something wrong?  Did he do something wrong?  Did he puncture something?  I don't know.  I'm not a doctor.  I -- I was sedated. I can't tell you what he done in that room. All I know was my back is messed up.

Q      What leads you to believe that there may have

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                122

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000122 of 000132

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:15:40

85787

been a puncture?

A    I'm saying my back is messed up.  It wasn't like this.  I was hurting, but not in this much pain.

Q    And -- and --

A    I can't even go and do a lot of stuff.

Q    And what I'm asking is what -- what part of the care that my clients provided do you correlate to that pain?

A    Dr. Gupta provided a care that he would give and they both, him and D.J., worked as a team.

Q    Okay.  And I understand that there are issues related to the sedation and D.J.'s involvement, that -- that exacerbated PTSD and anxiety, but when it comes to the back pain, are you alleging that any of the care that was provided was provided incorrectly?

A    Something had to go wrong because, I mean, I used to be able to ride in the car for long periods of time.  Now, it hurts.  Pain shoots up.  My leg goes numb.  My arm goes numb.  My fingers go numb.

Q    When did that start to --

A    After.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*    123

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000123 of 000132

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
01/05/2026 04:15:40
85787

DOCUMENT

PM

Q   Was it after any particular procedure?

A   After I went and seen him, that I can remember. Then the anxiety. I used to be functional. Now, my anxiety is through the roof. Then you don't even want to throw on sex. My family life, my husband's life, everything's destroyed.

Q   Is it your contention that the care provided by Defendants has destroyed --

A   Everything.

Q   -- your marriage?

A   And my children. My children don't know how to deal with me. I don't know how to deal with myself because I trusted them. I trusted Dr. Gupta. The bottom line is I trusted him. He failed me as a patient.

Q   And other than the sedation, injection of the sedation to the IV, how did they fail you?

A   As a human being, as a patient. He knew what I had wrong with me. He knew I was a complicated case. If he couldn't treat me, he shouldn't took me on. He took me on. Just like my doctor now, he knows I have a lot of issues. It's right in his chart.

Q   I understand.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    124

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000124 of 000132

DOCUMENT

PM

NOT ORIGINAL
01/05/2026 04:15:40

85787

A    And Dr. Gupta knew I had anxiety; I had PTSD. He knew.  He chose to take me on.

Q    Okay.

A    He was a trial-study doctor.  Okay.  He used me.  That's what I feel like, a used person. Just use her.  Do her as a test trial.  That's what I feel like.

Q    Is it your contention you did not agree to the trial?

A    No.  You just don't use -- that's what I feel like.  I'm -- I'm being used.  Nothing can replace what's been done to me, nothing.

Q    And, again, other than the sedation being provided by a medical assistant, what are your --

A    All of it.

Q    What does that mean?

A    Integrity, everything, embarrassment.

Q    How did they embarrass you?

A    How did they -- how dare you sit there and ask how did they embarrass me?

Q    Then explain it to me.

A    I -- I go to the ER, they think I'm drug seeking.

Q    And -- and how is that related --

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    125

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000125 of 000132

Filed 24-CI-01033 10/16/2024  Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:15:40
PM
85787

A        Look at all the medicine on my chart.

Q        And how is that related to Dr. Gupta --

A        Look, I wasn't on all that damn medicine before I went there, no.  Pull the list, no.  Look at the medicine list.  You put Dr. Gupta's and my regular.  I go to the ER, I'm put to the back of the line because they think I'm drug seeking.

Q        What medications --

A        That's sad.

Q        What medications did he prescribe that you no longer take?

         (WITNESS REVIEWS DOCUMENTS)

MR. GRAY:          Need that?

WITNESS:          Yeah.

MR. GRAY:          Page eight.

A        Page eight.  And I have to go through this every time I go to the doctor because there's a whole list on my chart.  It's humiliating.  I'm on hydro -- hydroxychlo -- whatever you want to call -- pain patch.  Then you add that, but you go to the middle --

Q        I don't see a pain patch on this.

A        The pain patch is off.  Did not get put on.

Q        Okay.  What else is not on here after --

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000126 of 000132

Filed            24-CI-01033 10/16/2024            Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:15:40

85787

A        The Hydrocodone.

Q        You take Hydrocodone now?

A        Yeah, from Dr. Chang, who has to see me by Wendy Morris.  They put me under the -- my middle name because of this lawsuit.  That's embarrassing.  Because no other doctor would see me because of this lawsuit being filed.

Q        Who has told you that?

A        They don't say anything.  They decline to take my case.

Q        So Savella is listed here three times as a medication you're no longer taking.  You testified earlier that you are taking medication for fibromyalgia, correct?

A        Cymbalta.

Q        Cymbalta is also not listed on this bottom one.

A        Not Cym -- I'm taking the ones at the bottom. Sorry.  The pain patch isn't listed and the Hydrocodone.

MR. BAXTER:        So this may be all the questions I have.  I have a question for counsel we can do off record.

MR. GRAY:        Okay.

VIDEOGRAPHER:        2:18, and we're off the record.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000127 of 000132

Filed            24-CI-01033 10/16/2024            Kathryn Marshall, Franklin Circuit Clerk

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:15:40

85787

(OFF THE RECORD)

VIDEOGRAPHER:    2:20, we're back on the record.

Q    Ms. Fillhardt, would you agree with me that you have sought treatment related to concerns about your husband's infidelity over the years?

A    Can you explain?

Q    Did you -- have you frequently told Dr. Zieba, for instance, that you have concerns about your husband's potential infidelity?

A    That's my personal life.

MR. GRAY:    Do you recall making those complaints --

WITNESS:    Yes.

MR. GRAY:    -- to Dr. Zieba?

WITNESS:    Yes.

Q    And those complaints would have predated any treatment by Advanced Pain Treatment Center, correct?  You had -- you had those concerns in January of 2021 and before?

A    Yes.

Q    You continued to seek treatment --

A    Yes.

Q    -- for the same concerns?

A    Yes.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*    128

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000128 of 000132

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:15:40
85787

Q   In 2019 was there an event that led to an increase in your anxiety related to the loss of an extramarital partner?

A   But it has -- yes, but nothing to do with this.

Q   How long would you estimate that it kind of took to get over that?

A   Can you explain?

Q   Sure.  How -- how long did that raise your anxiety?

A   I was in therapy.  It was....

MR. GRAY:        How long was that the topic in therapy, three months, six months, nine months?

WITNESS:         Couple months.

MR. GRAY:        Okay.

A   Wait, back this up.  Do you mean a marital affair; is that what you're saying?

Q   Yes.

A   No, it was not an affair.  We were friends. There was a group of us.

Q   So if in a medical record that refers to --

A   It -- it's wrong.  We were friends.  I have never had an affair on my husband.

Q   Okay.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000129 of 000132

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

PM

01/05/2026 04:15:40

85787

A    Point blank.

Q    The famil -- the other familia issues with your -- what are those with your daughter, that -- that Defendants care has -- has caused?

A    What?

Q    You said that it has created issues with your children.  What issues has it created with your daughter?

A    It's not with my children.  My children has a hard time understanding my issues.

Q    Okay, okay.  We've identified the -- the back -- final question.  The --

A    The fact that D.J. done what D.J. done to me, does not have anything to do with my children or my personal life or what Dr. Gupta done to me.

Q    I -- I understand, to the extent it might be necessary -- that wasn't what I meant.  What I meant -- I thought that your testimony was that it created issues with your family, and so that was what I was asking about with the children portion.  We discussed worsened back pain, exacerbation of anxiety, exacerbation of PTSD.  Are there any other injuries that you

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*    130

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000130 of 000132

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:15:40

85787

associate with the Defendant's care?

MR. GRAY:            I think we've done a good, don't you?

WITNESS:            Yes.

MR. BAXTER:         Okay.  And it's not a final lap, so if there's anything additional, just let -- notify your counsel and we'll go from there.  I -- I appreciate your time.  I know it's not a comfortable position.

MR. GRAY:            No questions.  Thank you.  We're done.

VIDEOGRAPHER:       The deposition is concluded.  The time is 2:24, and we're off the record.

                    * * * * * * * * * *

        WHEREUPON, the deposition of WENDY FILLHARDT was concluded at 2:24 p.m.

                    * * * * * * * * * *

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    131

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000131 of 000132

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL
01/05/2026 04:15:40

85787

STATE OF KENTUCKY     )
                      )
COUNTY OF FAYETTE     )

     I, LISA E. HOINKE, the undersigned Notary Public in and for the State of Kentucky at Large, certify that the facts stated in said caption hereto are true; that at the time and place stated in said caption the witness named in the caption hereto personally appeared before me, and after being by me duly sworn, was examined by counsel for the parties; that said testimony was taken down in stenotype by me and the foregoing is a true record of the testimony given by said witness.

     No party to said action nor counsel for said parties requested in writing that said deposition be signed by the testifying witness.

     My commission expires:  June 18, 2027.

     IN TESTIMONY WHEREOF, I have hereunder set my hand and seal of office on this the 2nd day of July, 2024.

                */s/ Lisa E.* Hoinke
                LISA E. HOINKE
                NOTARY PUBLIC, ID KYNP72022
                STATE-AT-LARGE, KENTUCKY

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          132

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000132 of 000132

NOT ORIGINAL

01/05/2026 04:16:24

DOCUMENT

PM

EXH : 000001 of 000198

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)



LISA ENGLISH HINKLE
lhinkle@mcbrayerfirm.com

201 EAST MAIN STREET, SUITE 900
LEXINGTON, KY 40507
859.231.8780 EXT. 1256
FAX: 859.281.6480

August 15, 2024

**VIA EMAIL & OVERNIGHT FEDEX TO:**

Michael Rodman, Executive Director
Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
mike.rodman@ky.gov

Leanne Diakov General Counsel
Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
leanne.diakov@ky.gov

Nicole A. King, Assistant General Counsel
Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
Nicolea.king@ky.gov

**IN RE: KBML Case No. 2106 - Pragya B. Gupta, M.D.**

Dear Mr. Rodman, Ms. Diakov, and Ms. King:

Enclosed please find Motion to Vacate or Amend Amended Agreed Order entered in Pragya B. Gupta, M.D.'s disciplinary case number 2106 to be filed and provided to the Kentucky Board of Medical Licensure. This motion contains documentation sufficient to justify the requested relief. Upon request, we will be happy to provide additional documentation regarding the statements of the Grievant. We request that review of the Motion be expedited and presented to the KBML at its September meeting. Counsel and Dr. Gupta will be present to answer any questions.

Please feel free to contact me if you have any questions or need any additional information.

Sincerely,

LISA ENGLISH HINKLE

VALERIE MICHAEL

LEH/lkt
Enclosure

Law Offices: Lexington | Louisville

Government Affairs: Frankfort | Washington, D.C.

mcbrayerfirm.com

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:16:24

85787

COMMONWEALTH OF KENTUCKY
BOARD OF MEDICAL LICENSURE
CASE NO. 2106

IN RE:    LICENSE TO PRACTICE MEDICINE IN THE COMMONWEALTH OF KENTUCKY HELD BY PRAGYA B. GUPTA, M.D., LICENSE NO. 34920, 162 BARNWOOD DRIVE, EDGEWOOD, KENTUCKY 41017

## MOTION TO VACATE OR AMEND AMENDED AGREED ORDER

\* \* \* \* \* \* \* \* \* \* \*

Comes Pragya B. Gupta, M.D., by and through counsel, and respectfully moves the Kentucky Board of Medical Licensure ("**Board**" or "**KBML**") to vacate or amend the Amended Agreed Order ("**Order**") (**Exhibit 1**) dated August 8, 2023. The Order is an amendment to the Agreed Order dated June 1, 2023 (**Exhibit 2**). The cumulative effect of various new developments surrounding the procedural background of the underlying complaint serves to taint the entire proceeding under which the Order was entered into and thus good cause exists to reopen the matter.

First, the primary fact upon which the parties relied in assenting to the agreed order was in fact, false. In section 1 of her grievance, Wendy Fillhardt claimed that "[o]n multiple occasions, [DJ Thomas] was the individual who administered the anesthesia I was given for a procedure. He would ask Dr. Gupta how much to administer and then measure out and give the dose by iv [sic]...I also feel that he should have never been allowed to give me an IV or administer any medications." **Exhibit 3**. Ms. Fillhardt later testified during a deposition that DJ Thomas never placed her IV. Second, Kristin Turner's involvement and nondisclosure as Ms. Fillhardt's counsel for both the grievance and Kenton Circuit complaint while an active KBML member raise significant questions as to whether her conduct tainted the proceedings to the

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000002 of 000198

1

Filed

DOCUMENT

PM

24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:16:24

85787

extent that the matter should be reopened. Third, certain terms of the Order itself are substantively unconscionable and should not be enforced.

### I.    Contrary to the Findings in the Agreed Orders, DJ Thomas Never Placed or Inserted Ms. Fillhardt's IV.

On May 29, 2024, Ms. Fillhardt sat for a deposition in her malpractice suit against Dr. Gupta. In that deposition, she contradicts the following statement from her KBML grievance, "[o]n multiple occasions, [DJ Thomas] was the individual who administered the anesthesia I was given for a procedure. He would ask Dr. Gupta how much to administer and then measure out and give the dose by iv [sic]...I also feel that he should have never been allowed to give me an IV or administer any medications." **Exhibit 3**. Ms. Fillhardt later testified during a deposition that Mr. Thomas never placed her IV. Regarding Mr. Thomas, Ms. Fillhardt testified, "But he sedated me with anesthesia in a syringe. Acted as a legal professional in scrubs." **Exhibit 4, Page 50.** Ms. Fillhardt further testified regarding her IV and sedation during procedures with Dr. Gupta. When asked who set her IV, she testified as follows, "[w]ho -- it was an African American woman I recall." Ms. Fillhardt then apparently had some swelling to the right side of her body as a reaction to treatment. She said Dr. Gupta brought her out of the operating room and Dr. Gupta and Mr. Thomas administered Ketamine testifying, "...that's when D.J. done the Ketamine, was doing the Ketamine." **Exhibit 4, Page 62.**

Ms. Fillhardt further testified that "the lady" set her first IV and there was a "Mexican boy" at the last procedure. **Exhibit 4, Pages 64-65.** Counsel questioned her further to clarify that only "the lady" or the "Mexican boy" placed her IV for each of the two procedures, which Ms. Fillhardt testified to in the affirmative. Later in the deposition, Ms. Fillhardt was again questioned about whether she testified to the Board that DJ Thomas placed her IV, to which she

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000003 of 000198

2

Filed    24-CI-01033  10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT

01/05/2026 04:16:24 PM

85787

answered in the affirmative, that she did tell that to the Board. What the deposition testimony actually elicited was that Mr. Thomas inserted medication into an IV already placed by another staff member, transcribed as follows,

> 'Attorney: "Did you inform the Kentucky Board of Medical Licensure that D.J. Thomas set one of your IV lines?"
>
> Fillhardt: "Correct."
>
> Attorney: "And earlier, I understand your testimony to be that all IV lines were set by either an African-American woman or a Mexican man. So was that representation to the Kentucky Board of Medical Licensure untrue?"
>
> Fillhardt: "Are you saying set by the, or give the injections?"
>
> Attorney: "Placed the IV, like insert –"
>
> Fillhardt: "Oh –"
>
> Attorney: "-- the IV?"
>
> Fillhardt: "-- he inserted into my IV."
>
> Attorney: "Correct. But he didn't start the initial IV, correct?"
>
> Fillhardt: "He injected into my IV."
>
> Attorney: "Correct."'

Ms. Fillhardt's attorney told her that she wasn't communicating well. To clarify, she was asked if D.J. Thomas started the IV and she replied "No." **Exhibit 4, Pages 81-28**. The question of whether Dr. Gupta allowed DJ Thomas to place Ms. Fillhardt's IV was central to the original KBML grievance and the fact upon which the investigation relied most heavily, resulting in the terms of the Order. Ms. Fillhardt's sworn testimony in her recent deposition directly contradicts her KBML grievance. Given Ms. Fillhardt's sworn testimony in her recent deposition, the Order must be vacated or amended because the basic underlying fact (that DJ Thomas inserted her IV

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000004 of 000198

3

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

line) is now directly contradicted by the grievant. At most, Mr. Thomas administered medication ordered by Dr. Gupta to Ms. Fillhardt.

## II. DJ Thomas Did Not Engage in the Unauthorized Practice of Medicine.

The administration of medication into Ms. Fillhardt's IV, while under supervision of Dr. Gupta, did not constitute the unauthorized practice of medicine as alleged by the Board's consultant – rather the administration of medication into an IV is an example of the delegation of a *nursing* task. A Kentucky Board of Nursing ("**KBN**") advisory opinion addresses this issue and states that the administration of medicine is the practice of nursing. **Exhibit 5, Page 6**. The opinion goes on to state that a nurse can delegate certain components of the administration of medication to medical assistants if the task consists of the following:

(1) frequently occurs in the routine care of a stable client or group of clients;
(2) are performed according to an established sequence of steps;
(3) involve no modification in client care;
(4) may be performed with a predictable outcome; and
(5) does not inherently involve ongoing assessment, interpretation, or decision-making.

The KBN Decision Tree for Delegation to Unlicensed Assistive Personnel (UAP) is also available on page 13 of the advisory opinion. In this case, Dr. Gupta was providing direct supervision of DJ Thomas (note from the KBML pleadings it is undisputed that Dr. Gupta was in the procedure room any time Mr. Thomas performed any delegated task) and all of the factors were met. Mr. Thomas worked as a medical assistant for Dr. Gupta for over 11 years. In her deposition, Ms. Fillhardt eventually testified that one of two nurses set her IV lines.

201 KAR 20:400 (2) (1) allows that "[a] registered nurse or a licensed practical nurse may delegate a task to an unlicensed person in accordance with this section and Sections 3, 4, and 5 of this administrative regulation." **Exhibit 6**. The regulation further details the manner and levels of supervision required for delegation of nursing tasks. Given that Mr. Thomas had years

4

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000005 of 000198

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

of experience at Dr. Gupta's practice and given that he was always supervised by Dr. Gupta, any delegation of a nursing task, such as administering a routine medication into an already placed IV, is permissible within the scope of KBN regulations. Given the contradictory testimony, relief, in the form of vacating or amending the terms of the Order, is now warranted.

### III.    Kristin Turner's Actions Constitute Deception Sufficient to Vacate or Amend the Order.

The second area of recently discovered information affecting these proceedings is the result of Ms. Fillhardt's niece-by-marriage, Kristin Turner, Esq., and her involvement with every facet of this matter. Turner is an attorney licensed in Kentucky and was a consumer member of the KBML from Fall 2018 until Summer 2023, serving on Panel A (timeframe established from publicly available quarterly KBML newsletters). On January 6, 2023, Ms. Fillhardt filed her grievance with the Board. On April 11, 2023, Ms. Fillhardt, through counsel, filed her Complaint alleging malpractice by Dr. Gupta in Kenton Circuit Court (23-CI-644). **Exhibit 7**. Ms. Fillhardt's counsel in this Complaint was the very same Kristin Turner.

Notably in her recent deposition, Ms. Fillhardt testified, when asked when she was first made aware of Mr. Thomas' licensure status, that it was "[w]hen the Medical Board let us know." **Exhibit 4, Page 68**. However, in her January 6, 2023 KBML grievance, Ms. Fillhardt wrote regarding Mr. Thomas in section 1, "I was very uncomfortable with him being in my treatment room while was wearing a gown and not fully clothed given that he has no medical certification." **Exhibit 3**. It is difficult to imagine why Ms. Fillhardt would write in January of 2023 that Mr. Thomas "has no medical certification" when she later testified that she did not become aware of that fact until the "Medical Board let us know." The Board could not have let

5

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000006 of 000198

Filed

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

85787

24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Ms. Fillhardt know about anything prior to the filing of her grievance through any routine means – no grievance had yet been filed.

Ms. Fillhardt was also asked in her deposition whether an attorney represented her when she filed her grievance. The following exchange occurred as she answered the question,

'Fillhardt: "Correct."

Attorney: "What was the name of that attorney?"

Fillhardt: "Kristin Turner."'

Attorney: "It is my understanding that Kristin Turner was also a member of the Kentucky Board of Medical Licensure; is that your -- do you share that understanding?"

Fillhardt: "I don't recall."

Attorney: "Prior to the Kentucky Board of Medical Licensure grievance did you have a prior relationship with Kristin Turner?"

Objection.

Fillhardt: "Niece."'

After some further clarification, Ms. Fillhardt testified that Kristin Turner is her husband's niece. **Exhibit 4, Pages 69-71**. Ms. Fillhardt confirmed, while under oath, that Kristin Turner is her niece-by-marriage and that Ms. Turner represented her when she filed her KBML grievance. Public records confirm that Kristin Turner was Ms. Fillhardt's attorney who filed her medical malpractice complaint against Dr. Gupta. Curiously, Ms. Fillhardt's KBML grievance and her Kenton Circuit Complaint contain remarkably similar language, including the misspelling of "proscribe/proscribing" instead of prescribe or prescribing.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000007 of 000198

6

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Public records also confirm that Kristin Turner was a sitting KBML member until *after* Dr. Gupta entered into the first agreed order resolving the grievance in June of 2023. What public records do not confirm, however, is whether Ms. Turner ever disclosed this blatant conflict of interest to the Board. Undersigned counsel obtained, through open records requests, copies of Board minutes from November 2022 through October 2023 – Ms. Turner never disclosed her conflict of interest to the Board. **Exhibit 6**. Furthermore, the Board became aware of this conflict at least by May 9, 2023 when Dr. Gupta's counsel responded to the grievance. **Exhibit 7, Page 4**. In that response, Dr. Gupta requested that Ms. Turner recuse herself from the proceedings. Board Panel B adjudicated Dr. Gupta's matter and assented to the Order, while Ms. Turner was a member of Panel A. However, a certain level of impropriety still exists here to such an extent that the Order should be reopened and if not vacated entirely, amended.

As discussed previously in this motion, Ms. Fillhardt testified in her deposition that she did not become aware of DJ Thomas' lack of medical certification until the Board informed her. **Exhibit 1**. In fact, during Ms. Turner's counseling of the grievant, we have reason to believe that Ms. Turner may have provided information to Ms. Fillhardt that may have led to Ms. Fillhardt's conclusion that Mr. Thomas had no medical certification. Yet in her January 2023 grievance, written while represented by Ms. Turner (as Ms. Fillhardt testified to in her deposition), Ms. Fillhardt complained that DJ Thomas "has no medical certification" when she later testified that she did not become aware of that fact until the "Medical Board let us know." It appears, from the very language of her grievance, that Ms. Fillhardt was provided with information regarding the subject of her grievance that she only received because she was represented by an attorney who was also a KBML member.

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000008 of 000198

Filed
DOCUMENT
PM

NOT ORIGINAL

01/05/2026 04:16:24

85787

## IV. The Terms of the Order are Substantively Unconscionable and Should Not Be Enforced.

Several provisions of the Order are substantively unconscionable, specifically:

"3. As an express condition for the entry of this Amended Agreed Order, each party understands and agrees that the Board will never consider any petition for termination or modification the terms of the agreement in any way that would allow the licensee to practice in an independent setting in the Commonwealth of Kentucky. Any communication by the licensee and/or his agents to the Board attempting to revive this matter or modify or terminate the terms set forth in this Amended Agreed Order will be returned without being provided or forwarded to any Board member.

4. The licensee expressly agrees that if he should violate any term or condition of this Amended Agreed Order, the licensee's practice will constitute an immediate danger to the public health, safety, or welfare, as provided in KRS 311.592 and 13 B .125. The parties further agree that if the Board should receive information that the licensee has violated any term or condition of this Amended Agreed Order, the Panel Chair is authorized by law to enter an Emergency Order of Suspension or Restriction immediately upon a finding of probable cause that a violation has occurred, after an *ex parte* presentation of the relevant facts by the Board's General Counsel or Assistant General Counsel. If the Panel Chair should issue such an Emergency Order, the parties agree and stipulate that a violation of any term or condition of this Amended Agreed Order would render the licensee's practice an immediate danger to the health, welfare and safety of patients and the general public, pursuant to KRS 311.592 and 13B.125; accordingly, the only relevant question for any emergency hearing conducted pursuant to KRS 13B.125 would be whether the licensee violated a term or condition of this Amended Agreed Order.

5. The licensee understands and agrees that any violation of the terms of this Amended Agreed Order would provide a legal basis for additional disciplinary action, pursuant to KRS 311.595( 13), and may provide a legal basis for criminal prosecution." **(Exhibit 1, pages 11-12).**

Substantive unconscionability "refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent." *Conseco,* 47 S.W.3d 325, 343 n. 22 (Ky. Ct. App. 2001). As for substantive unconscionability, courts consider "the commercial reasonableness of the contract terms, the purpose and effect of the

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000009 of 000198

8

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

terms, the allocation of the risks between the parties, and similar public policy concerns." *Jenkins,* 400 F.3d 868, 876 (11th Cir. 2005).

Kentucky courts have most frequently considered contract unconscionability in the context of reviewing arbitration agreements. However, the Order which is the subject of this Motion should be analyzed under the same framework. Each of the factors outlined by the court in *Jenkins* causes the Order to be unconscionable and thus unenforceable.

First, the commercial reasonableness of the contract terms are unconscionable. The term that the Board will never consider any petition to terminate or modify the terms of the agreement and that any communication attempting to revive the matter will be returned without being addressed by the Board is unreasonable (condition 3). There are many reasons why a licensee would seek to modify the terms of an agreed order. In fact, in this very matter Dr. Gupta and the Board modified the original agreed order in June of 2023, entering into the Amended Agreed Order in August of 2023. The Order's condition that Board staff members would review any pleading to modify the Order and choose to return any such request to the sender without bringing it to the Board's attention goes far beyond the authority of KBML staff members. It is the Board that makes decisions regarding physician discipline – not KBML staff.

Second, the purpose and effect of the terms are written such that Dr. Gupta could face additional disciplinary action for exercising his substantive due process right to reopen a matter relating to his medical license. The Sixth Circuit has recognized that physicians have a property interest in retaining their medical privileges. *See Benjamin v. Brachman*, 246 F. App'x 905, 914 (6th Cir. 2007) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). By making it a condition of the Amended Agreed Order that Dr. Gupta may *never* reopen the matter, if he still

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000010 of 000198

9

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:16:24
85787

chooses to do so, he would violate the further condition that any violation of the terms of the Order would provide a legal basis for additional disciplinary action (conditions 4, 5).

Third, the allocation of risk between the parties speaks for itself – Dr. Gupta bears all risk in the enforcement of these unconscionable terms. It is his medical license at stake and according to the current terms; by even requesting a revisiting of those terms, he could face additional disciplinary action. These unconscionable terms are weighted so heavily in favor of the KBML as to be unconscionable as a public policy matter and should not be enforced. Accordingly, the Amended Agreed Order should be vacated or modified.

## V.     Conclusion.

The KBML should vacate or modify the terms of Dr. Gupta's Amended Agreed Order for three reasons. First, the primary fact upon which the parties relied in assenting to the agreed order was in fact, false. DJ Thomas did not place Ms. Fillhardt's IV line; she testified that in fact, two separate nurses did. Second, Kristin Turner's involvement and nondisclosure as Ms. Fillhardt's counsel for both the grievance and Kenton Circuit complaint while a sitting KBML member raise significant questions as to whether her conduct tainted the proceedings to the extent that the matter should be reopened. Third, certain terms of the Order itself are substantively unconscionable and should not be enforced.

WHEREFORE, Pragya B. Gupta, M.D., hereby respectfully requests that this Motion be granted and the hearing of this Motion be considered at the next Panel Meeting, to reopen this matter, and to vacate or amend the terms of the Amended Agreed Order. Additionally, Dr. Gupta requests to supplement the record with additional information and evidence as it becomes available.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000011 of 000198

NOT ORIGINAL

01/05/2026 04:16:24 PM

Respectfully:

MCBRAYER PLLC

_____
Lisa English Hinkle, Esq., KBA #33210

_____
Valerie Michael, Esq., KBA #98958
201 East Main Street, Suite 900
Lexington, Kentucky 40507
lhinkle@mcbrayerfirm.com
vmichael@mcbrayerfirm.com
**COUNSEL FOR PETITIONER**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via electronic mail and FedEx to the following on this the 15th day of August, 2024.

Mr. Michael Rodman, Executive Director
Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
mike.rodman@ky.gov

Ms. Leanne Diakov, General Counsel
Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
leann.diakov@ky.gov

Ms. Nicole King, Assistant General Counsel
Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
nicolea.king@ky.gov

_____
LISA ENGLISH HINKLE

11

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

85787

# EXHIBIT 1

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000013 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM

FILED OF RECORD

01/05/2026 04:16:24

AUG - 8 2023

85787

K.B.M.L.

COMMONWEALTH OF KENTUCKY
BOARD OF MEDICAL LICENSURE
CASE NO. 2106

IN RE: THE LICENSE TO PRACTICE MEDICINE IN THE COMMONWEALTH OF
KENTUCKY HELD BY PRAGYA B. GUPTA, M.D., LICENSE NO. 34920, 162
BARNWOOD DRIVE, EDGEWOOD, KENTUCKY 41017

## AMENDED AGREED ORDER

Come now the Kentucky Board of Medical Licensure (hereafter "the Board"), acting

by and through the Chair of its Inquiry Panel B, and Pragya B. Gupta, M.D. (hereafter "the

licensee"), and, based upon their mutual desire to fully and finally resolve the pending

investigation without an evidentiary hearing, hereby ENTER INTO the following

**AMENDED AGREED ORDER**:

## STIPULATIONS OF FACT

The parties stipulate the following facts, which serve as the factual bases for this

Amended Agreed Order:

1. At all relevant times, Pragya B. Gupta, M.D., was licensed by the Board to practice

   medicine within the Commonwealth of Kentucky.

2. The licensee's medical specialty is Interventional Pain Management.

3. In January 2023, the Board received a complaint from one of the licensee's patients

   alleging violations of the standard medical practice and standard of care and

   causing her trauma. Specifically, the grievant detailed the following issues:

   - Donald Jay Thomas "DJ" was introduced to me as the office manager.
     However, throughout my time under the licensee's care he was an active
     participant in my care. I was very uncomfortable with Mr. Thomas being in
     my treatment room while I was wearing a gown and not fully clothed given
     that he has no medical certification. On multiple occasions, he was the
     individual who administered the anesthesia[.] He would ask Dr. Gupta how
     much to administer and then measure out and give the doses by iv. [...]

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000014 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT 01/05/2026 04:16:24 PM

85787

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000015 of 000198

- In September 2021, I was given my first injection of cyanocobalamin [.] I was supposed to have a second injection 30 days from the first as I understand the protocol to be. At the second injection date, Dr. Gupta took one look at me and was immediately concerned. I had let DJ and others in the office know that I did not feel right, and I had swelling. Dr. Gupta immediately knew that this was an allergic reaction. I instead was given a different injection.

- I was told during my injection procedures that I was a "VIP" patient and that I would receive good stuff. I took this to mean that I was given more anesthesia than other patients. I expected to be in a twilight type feeling while injections were being given. However, I was completely knocked out and I do not believe that was appropriate for this type of injection. On one occasion, I had issues coming out of the anesthesia in the office.

- Autumn Thomas is the wife of DJ Thomas and the clerk/billing assistant at the office. To my understanding she has had no medical training or certification, but she conducted medical functions such as taking vitals. She was also the individual that would handle sending proscriptions [sic] to the pharmacy. However, I do not believe that proper protocols were followed in proscribing [sic] as I had two different issues that I believe are very important to mention.

  a. I was proscribed [sic] Savella. Dr. Gupta had advised that this medication was one that needed to be stepped up to a higher dosage. I was only advised to take one a day and was supposed to receive a lower milligram capsule for so many days then pickup a higher milligram. The proscription [sic] was incorrectly placed by Autumn, my dosage stated two pills per day and I was started on a 25 mg which I was supposed to start on 12.5. At one point, the system as you can see in my medical records had me proscribed [sic] a 25 MG and a 50 mg to both take twice a day. I never took these together or in the incorrectly proscribed [sic] manner. However, I did have side effects from taking the 25 mg to begin [...] This causes me to have concerns that he does not fill out his own prescription orders or at the least he doesn't pay attention to what he signs.

  b. On several occasions, proscriptions [sic] from other doctors were ordered to be refilled by Dr. Gupta's office. My understanding from what I was told was that this was Autumn incorrectly refilling medications. My other doctors [...] were very concerned when this occurred. [...]

2

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

4.  On or about February 12, 2023, the licensee responded to the grievant's complaint.

He discussed her history, diagnoses, and treatment. He also included his chronology

of her care and his *curriculum vitae*. Specifically, he stated, in part:

- Donnie J Thomas (DJ) is a trained medical assistant. I have trained him since 2002. In my long career, I had not had a single adverse event or serious adverse event where he was involved. I have trained him not only to perform routine Medical Assistant Jobs, but he is also a Clinical Coordinator for my ongoing clinical research work (GCP certified). […] DJ is trained to perform more than one job. Multitasking is required to work in a solo practitioner's office. DJ helps me in the procedure room. He positions patients, attaches them to the monitors per ASA guidelines, and moves the Fluoroscope per my instruction. At times DJ administers a small dose of sedation on my request. […] DJ was not the only person present at the time of infusion, as other MAs were there, particularly her daughter, on the day of the first infusion. I have checked her multiple times during the infusion to monitor EKG tracing and the depth of her sedation. She received good care. She was covered appropriately with blankets. There was no trigger for reactivating PTSD.

- In September, there were three encounters. […] I don't recall the swelling at all. It was not life-threatening and without any residual problems. She is probably referring to swelling from IV fluid extravasation, which is not an allergic reaction. The patient was never administered Cyanocobalamin in my clinic.

- No, I don't recall calling any patient a VIP, although I consider all patients VIPs and treat them accordingly. Most of the time, her daughter Brittany Morris was present during transportation of her to and from the procedure room. She needed 5mg of midazolam for the procedure as she was extremely nervous. Without sedation, I could not have performed the procedure as she would not cooperate.

- Ms. Autumn Thomas is also a MA whom I have trained since 2013. Autumn Thomas occasionally helped us in the recovery unit by relieving Medical Assistants for lunch breaks when we were short-staffed during the COVID infection. Autumn Thomas is responsible for discharging patients, reviewing discharge instructions, and ensuring that patients are appropriately scheduled for post-procedure follow-up. She also helps me with billing work. In the recovery area, she would typically watch those patients who are getting ready to be discharged. All patients in the recovery area are attached to the automated monitors. She is also responsible for following all my orders, such as lab work and imaging requests.

    […]

3

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000016 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
01/05/2026 04:16:24 PM

- The allegations that I don't take care of my prescription are inaccurate. I am meticulous and ensure that my staff follows my instruction correctly. I verify and cross-verify that the prescriptions are correctly sent by checking the logs frequently. Autumn helps me ensure that the refills are sent in a timely fashion. I enter the prescription under the appropriate diagnosis, and then she transmits the Rx electronically, which I monitor directly.

- No, 1 don't refill other physicians' prescriptions unless the patient specifically requests me to do that to save time and a visit. [...]

5. On or about March 21, 2023, a Board consultant completed a review of the grievant's medical records and found that the licensee's diagnosis and treatment were below the minimum standards of acceptable and prevailing medical practice.

The Board consultant's specific diagnostic concerns were that:

- Dr. Gupta performed three cervical transforaminal epidurals without documenting the specific history and findings indicating the need for these injections [...]

- The cervical MRI showed "C4-C5 small central disc protrusion mildly compressing the thecal sac. No spinal cord or nerve root compression."

The Board consultant's specific treatment concerns were that:

- The three transforaminal cervical epidurals performed were not indicated as described under the diagnosis. In addition, after each transforaminal epidural injection there is no mention of the patient's response to the previous epidural procedure. Only after three epidurals does Dr. Gupta describe the response to the three procedures.

- The epidurals and facet injection's were performed under moderate sedation. The operating physician, Dr. Gupta cannot also serve as the anesthesia monitor. It is standard of care that the anesthesia monitor must be at least an RN. In all of the procedures his trained assistant, DJ Thomas, served as anesthesia monitor. In addition, the sedation monitoring records are incomplete and one is missing.

- There is evidence in the medical record that the grievant was over-medicated. [...] After starting these medications, on follow-ups Dr. Gupta does not address the partial response to these medications. On 6/15/2021 Dr. Gupta's interim history states "Today patient exhibited some speech difficulty and complained of weakness in right upper extremity and lower extremity." The medical record does not show any new physical exam, just a repeat of the previous exams. Dr. Gupta does not comment on these serious new complaints and he continues her treatment plan. On 7/13/2021 the patient presented with new complaints of having an "an attack of

4

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000017 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

generalized numbness and fatigue-like symptoms." The patient complained of intermittent incontinence, in addition to the previous complaints [...] Over the next eight months all of her complaints continued.

- [...] Based on the list of medications and known drug interactions some of these serious symptoms, were more likely than not related to over-medication.

6.  On or about April 4, 2023, the licensee responded to the Board consultant's report and included a detailed explanation of his treatment and reasoning for the care he provided to the grievant. He also included significant references to literature and his clinic's policies and procedures. Specifically, he explained:

    - The decision to perform three cervical transforaminal injections was based on my clinical examination of the patient, my experience, and my knowledge. I examined the patient before every procedure in the procedure room. There is a record of pre-procedure VAS on each occasion. [...] This patient had complete pain relief after the third injection.

    - I use sedation for anxiolysis and amnesia only. I titrate the medicine so that they are fully responsive and comfortable with minimal anxiety and can tolerate unpleasant sensations of the procedure. All patients are monitored as per ASA protocol. BP, HR, and Pulse oximetry are performed continuously in the procedure room. Patients are evaluated pre-procedure and post-procedure, and the vitals are recorded. We have followed the guidelines outlined in KBML (https://kbml.ky.gov/board/Documents/Board%20Opinion%20Office%20Based%20Surgery.pdf) (revised 2018) regarding the requirement for the safe conduct of mild sedation. In this document[,] requirement of a trained person is mentioned. All procedure personnel is ACLS trained and have been trained to assist me in the procedure room properly.

    - The procedure room has all the equipment for resuscitation, including an AED, laryngoscope (3 sizes Miller and McIntosh), suction machine, ambu-bag, and oxygen cylinder. All recovery bays are fully equipped with monitors for monitoring vitals as per ASA protocol. All equipment undergoes preventative maintenance. [...]

    - The MA normally positions the fluoroscope and monitors the patient. I operate the fluoroscope and constantly communicate with the patient. I am a board-certified anesthesiologist and a pain specialist. I administer 0.5mg of Versed in the procedure room and titrate the medicine slowly while my assistant and I monitor the vitals. Most of the time, the completion of the procedure takes 30 - 35 minutes (for ESI or Facet joint block), which

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000018 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Filed                24-CI-01033   10/16/2024              Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:16:24

includes an examination of the patient pre and post-procedure in the room and recovery area.

[…]

- The patient was an extremely difficult patient to manage. I spent anywhere from 1 – 2 hours with her each visit and could not document everything that transpired during the visit. I treated her with FDA-approved combination medicine for fibromyalgia as she failed all other treatments, but she did not respond. Insomnia is a known problem associated with fibromyalgia, which I treated with Lunesta. I can assure you that she did not experience any side effects from the medicine that I prescribed. […]

7. On or about April 26, 2023, after considering the licensee's response to his report and again reviewing the records, the Board consultant changed his conclusions as follows:

- [The grievant] had a total of five procedures where she was administered intravenous sedation with midazolam 5 mg. This dosage is documented in the medical record and acknowledged by Dr. Gupta in his response to the grievance (answer number 3). Dr. Gupta's patient encounters list the billing codes used for each visit. In all instances where midazolam sedation was administered the billing was listed as moderate sedation. Dr. Gupta has indicated in his response to my report that he was using mild sedation (answer 2).

- Dr. Gupta states that [the grievant's] intravenous line infiltrated after one of her cervical epidurals in September 2021 without residual problems. He also says he has educated his staff to properly fill out anesthesia monitoring forms. I have previously stated that the guidelines for intravenous sedation require that a registered nurse be present as the anesthesia monitor to administer the sedation and, if necessary, start intravenous lines. I have included in this report the latest guidelines for conscious sedation.

- Most concerning to me is the recent information I have received regarding Donnie J. Thomas. The grievant has stated that Mr. Thomas started at least one of her intravenous lines and had administered intravenous sedation to her. Further review of Dr. Gupta's response (answer#1) to her grievance reveals by his own admission that he allows Mr. Thomas to administer intravenous midazolam.

  My conclusion is Donnie J. Thomas is practicing medicine without a license. This represents an immediate threat to the safety and health of the citizens of Kentucky.

6

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000019 of 000198

Filed

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

8. The licensee, with counsel, was present at the Panel meeting on May 18, 2023. Leading up to the meeting, he provided more literature to the Panel and provided pictures of his facility to the Panel during the meeting. At the Panel meeting, he explained that he trains all his staff. He considers Mr. Thomas a Medical Assistant because of that training and because he assists him with procedures, including pushing medications. The licensee conceded that Mr. Thomas has no certification. However, Mr. Thomas has worked with the licensee on and off for twenty years, most recently starting in 2016. During the meeting, the licensee stated that he has twelve staff members, including one Nurse Practitioner, two receptionists, two clinical coordinators, one dietitian, one exercise therapist, one discharge employee and two temporary workers for additional help. Two people are in the procedure room, but none are a Physician Assistant, Registered Nurse or certified Medical Assistant. It is during post-op that a certified Medical Assistant sees patients. He informed the Board that he has plans to move to California and had been offered a job there in October. He has transferred all his patients to another physician, and May 18, 2023 was his last day – he would perform no further procedures in Kentucky.

9. The Panel gave strong consideration to the licensee's representations that he had effectively closed his solo practice, having transferred all of his patients and ceased performing procedures in Kentucky in anticipation of his move to California. Although the licensee desired to maintain a Kentucky license, Panel members felt that the issues raised in the investigation were not such that they could be corrected by remedial education and monitoring and that he should not practice in an independent setting in Kentucky. The Panel and the licensee agreed to enter into an

7

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000020 of 000198

NOT ORIGINAL
DOCUMENT

01/05/2026 04:16:24
PM

Agreed Order, in lieu of the issuance of a Complaint and Emergency Order of
Restriction.

10. The Agreed Order, filed of record on June 1, 2023, required that the licensee's
medical license SHALL BE SUBJECT TO THE FOLLOWING TERMS AND
CONDITIONS:

   a. The licensee SHALL NOT perform any act which would constitute the practice of medicine, as that term is defined or contemplated by KRS 311.840, et seq., in the Commonwealth of Kentucky, unless and until the Panel or its Chair has approved, in writing, the practice location at which he will practice as a physician. The decision whether to approve a particular practice location lies in the sole discretion of the Panel or its Chair. In determining whether to approve a practice location, the Panel or its Chair will particularly consider whether there will be appropriate oversight by a person(s) or entity that is not the licensee. In approving such practice location, the Panel or its Chair may include specific conditions/restrictions to ensure patient safety;

   b. Pursuant to KRS 311.565(1)(v), the licensee SHALL REIMBURSE the Board's costs of $2,625.00 within six (6) months from entry of this Amended Agreed Order; and

   c. The licensee SHALL NOT violate any provision of KRS 311.595 and/or 311.597.

11. On or about June 12, 2023, the licensee reimbursed the Board for costs in the
amount of $2,625.00.

12. On or about June 30, 2023, the licensee, through his counsel, advised the Board that
his opportunity in California was withdrawn. Therefore, he requested approval to
practice in Kentucky with Dr. Laxmaiah Manchikanti at Pain Management Centers
of America, P.S.C. If approved, the licensee stated that he would be practicing in
the Paducah and Hopkinsville locations.

13. Attached to the licensee's request was a letter from Dr. Laxmaiah Manchikanti
explaining:

8

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000021 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

85787

[M]y plan would be to gradually integrate [Dr. Gupta] into our practice. This will provide him with an opportunity to become knowledgeable of our practice processes, procedures, and expectations. Initially, Dr. Gupta will shadow me in the clinic and surgery center in Paducah, Kentucky. After familiarizing himself with our processes, I will then observe his patient encounters in the clinic and procedures in the surgery center. When my expectations are met, Dr. Gupta will then transition to having his own schedule of clinic patients in the Paducah and Hopkinsville offices. He will also be scheduled time in the Paducah surgery center for procedures. I will note that sometimes I am present in the Hopkinsville office and there is an APRN onsite in addition to the physician and other qualified staff. Of course, I would be available for consultation with Dr. Gupta as needed.

14. The Panel and the licensee now enter into this Amended Agreed Order to approve the licensee's location to practice medicine under Dr. Laxmaiah Manchikanti at Pain Management Centers of America, P.S.C. in the Paducah and Hopkinsville locations pursuant to the terms and conditions of this Amended Agreed Order.

## STIPULATED CONCLUSIONS OF LAW

The parties stipulate the following Conclusions of Law, which serve as the legal bases for this Amended Agreed Order:

1. The licensee's medical license is subject to regulation and discipline by the Board.

2. Based upon the Stipulations of Fact, the licensee engaged in conduct which violates the provisions of KRS 311.595(9) [as illustrated by KRS 311.597(4)]. Accordingly, there are legal grounds for the parties to enter into this Amended Agreed Order.

3. Pursuant to KRS 311.591(6) and 201 KAR 9:082, the parties may fully and finally resolve this matter without an evidentiary hearing by entering into an informal resolution such as this Amended Agreed Order.

9

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000022 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
01/05/2026 04:16:24 PM

85787

## AMENDED AGREED ORDER

Based upon the foregoing Stipulations of Fact and Stipulated Conclusions of Law, and, based upon their mutual desire to resolve the pending matter without an evidentiary hearing, the parties hereby ENTER INTO the following **AMENDED AGREED ORDER:**

1. The license to practice medicine within the Commonwealth of Kentucky held by Pragya B. Gupta, M.D., is RESTRICTED/LIMITED FOR AN INDEFINITE PERIOD OF TIME, effective immediately upon the filing of this Amended Agreed Order.

2. During the effective period of this Amended Agreed Order, the licensee's medical license SHALL BE SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:

   a. The licensee SHALL NOT perform any act which would constitute the practice of medicine, as that term is defined or contemplated by KRS 311.840, et seq., in the Commonwealth of Kentucky, unless and until the Panel or its Chair has approved, in writing, the practice location at which he will practice as a physician. The decision whether to approve a particular practice location lies in the sole discretion of the Panel or its Chair. In determining whether to approve a practice location, the Panel or its Chair will particularly consider whether there will be appropriate oversight by a person(s) or entity that is not the licensee;

      i. Once approved, the licensee SHALL NOT change practice locations without first obtaining written approval by the Panel or its Chair for such change. The parties agree that the Panel or its Chair may require additional conditions and/or restrictions as a condition of it granting approval for a new practice location;

      ii. The licensee is approved to practice medicine at the following locations of Pain Management Centers of America, P.S.C.:

         1. **Pain Management Center | Paducah, KY**
            67 Lakeview Drive
            Paducah, Kentucky 42001

         2. **Pain Management of America Surgery Center**
            2831 Lone Oak Road
            Paducah, Kentucky 42003

10

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000023 of 000198

Filed            24-CI-01033 10/16/2024            Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

85787

**3. Pain Management Center | Hopkinsville, KY**
**112 Keeton Drive**
**Hopkinsville, Kentucky 42240**

   b. The licensee understands that his practice of medicine at Pain Management Centers of America, P.S.C. may be subject to review by the Board at is discretion including but not limited to requesting reviews from Dr. Manchikanti relevant to whether the licensee's practice of medicine meets acceptable and prevailing medical practices in the Commonwealth of Kentucky; and

   c. The licensee SHALL NOT violate any provision of KRS 311.595 and/or 311.597.

3. As an express condition for the entry of this Amended Agreed Order, each party understands and agrees that the Board will never consider any petition for termination or modification the terms of the agreement in any way that would allow the licensee to practice in an independent setting in the Commonwealth of Kentucky. Any communication by the licensee and/or his agents to the Board attempting to revive this matter or modify or terminate the terms set forth in this Amended Agreed Order will be returned without being provided or forwarded to any Board member.

4. The licensee expressly agrees that if he should violate any term or condition of this Amended Agreed Order, the licensee's practice will constitute an immediate danger to the public health, safety, or welfare, as provided in KRS 311.592 and 13B.125. The parties further agree that if the Board should receive information that the licensee has violated any term or condition of this Amended Agreed Order, the Panel Chair is authorized by law to enter an Emergency Order of Suspension or Restriction immediately upon a finding of probable cause that a violation has occurred, after an *ex parte* presentation of the relevant facts by the Board's General Counsel or Assistant General Counsel. If the Panel Chair should issue such an

11

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000024 of 000198

NOT ORIGINAL

01/05/2026 04:16:24

Emergency Order, the parties agree and stipulate that a violation of any term or condition of this Amended Agreed Order would render the licensee's practice an immediate danger to the health, welfare and safety of patients and the general public, pursuant to KRS 311.592 and 13B.125; accordingly, the only relevant question for any emergency hearing conducted pursuant to KRS 13B.125 would be whether the licensee violated a term or condition of this Amended Agreed Order.

5. The licensee understands and agrees that any violation of the terms of this Amended Agreed Order would provide a legal basis for additional disciplinary action, pursuant to KRS 311.595(13), and may provide a legal basis for criminal prosecution.

SO AGREED on this 7th day of _____Aug_____, 2023.

FOR THE LICENSEE:

_____
PRAGYA B. GUPTA, M.D.

_____
L. CHAD ELDER
COUNSEL FOR THE LICENSEE

FOR THE BOARD:

_____
DALE E. TONEY, M.D.
CHAIR, INQUIRY PANEL B

_____
NICOLE A. KING
Assistant General Counsel
Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
(502) 429-7150

12

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

85787

# EXHIBIT 2

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000026 of 000198

Filed                24-CI-01033 10/16/2024              Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

FILED OF RECORD

JUN - 1 2023

85787

K.B.M.L

COMMONWEALTH OF KENTUCKY
BOARD OF MEDICAL LICENSURE
CASE NO. 2106

IN RE: THE LICENSE TO PRACTICE MEDICINE IN THE COMMONWEALTH OF
KENTUCKY HELD BY PRAGYA B. GUPTA, M.D., LICENSE NO. 34920, 162
BARNWOOD DRIVE, EDGEWOOD, KENTUCKY 41017

### AGREED ORDER

Come now the Kentucky Board of Medical Licensure (hereafter "the Board"), acting

by and through its Inquiry Panel B, and Pragya B. Gupta, M.D. (hereafter "the licensee"),

and, based upon their mutual desire to fully and finally resolve the pending investigation

without an evidentiary hearing, hereby ENTER INTO the following AGREED ORDER:

### STIPULATIONS OF FACT

The parties stipulate the following facts, which serve as the factual bases for this

Agreed Order:

1. At all relevant times, Pragya B. Gupta, M.D., was licensed by the Board to practice

   medicine within the Commonwealth of Kentucky.

2. The licensee's medical specialty is Interventional Pain Management.

3. In January 2023, the Board received a complaint from one of the licensee's patients

   alleging violations of the standard medical practice and standard of care and

   causing her trauma. Specifically, the grievant detailed the following issues:

   - Donald Jay Thomas "DJ" was introduced to me as the office manager.
     However, throughout my time under the licensee's care he was an active
     participant in my care. I was very uncomfortable with Mr. Thomas being in
     my treatment room while I was wearing a gown and not fully clothed given
     that he has no medical certification. On multiple occasions, he was the
     individual who administered the anesthesia[.] He would ask Dr. Gupta how
     much to administer and then measure out and give the doses by iv. [...]

   - In September 2021, I was given my first injection of cyanocobalamin [.] I
     was supposed to have a second injection 30 days from the first as I
     understand the protocol to be. At the second injection date, Dr. Gupta took

Filed                24-CI-01033 10/16/2024              Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000027 of 000198

Filed

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

one look at me and was immediately concerned. I had let DJ and others in the office know that I did not feel right, and I had swelling. Dr. Gupta immediately knew that this was an allergic reaction. I instead was given a different injection.

- I was told during my injection procedures that I was a "VIP" patient and that I would receive good stuff. I took this to mean that I was given more anesthesia than other patients. I expected to be in a twilight type feeling while injections were being given. However, I was completely knocked out and I do not believe that was appropriate for this type of injection. On one occasion, I had issues coming out of the anesthesia in the office.

- Autumn Thomas is the wife of DJ Thomas and the clerk/billing assistant at the office. To my understanding she has had no medical training or certification, but she conducted medical functions such as taking vitals. She was also the individual that would handle sending proscriptions [sic] to the pharmacy. However, I do not believe that proper protocols were followed in proscribing [sic] as I had two different issues that I believe are very important to mention.

  a. I was proscribed [sic] Savella. Dr. Gupta had advised that this medication was one that needed to be stepped up to a higher dosage. I was only advised to take one a day and was supposed to receive a lower milligram capsule for so many days then pickup a higher milligram. The proscription [sic] was incorrectly placed by Autumn, my dosage stated two pills per day and I was started on a 25 mg which I was supposed to start on 12.5. At one point, the system as you can see in my medical records had me proscribed [sic] a 25 MG and a 50 mg to both take twice a day. I never took these together or in the incorrectly proscribed [sic] manner. However, I did have side effects from taking the 25 mg to begin [...] This causes me to have concerns that he does not fill out his own prescription orders or at the least he doesn't pay attention to what he signs.

  b. On several occasions, proscriptions [sic] from other doctors were ordered to be refilled by Dr. Gupta's office. My understanding from what I was told was that this was Autumn incorrectly refilling medications. My other doctors [...] were very concerned when this occurred. [...]

4. On or about February 12, 2023, the licensee responded to the grievant's complaint. He discussed her history, diagnoses and treatment. He also included his chronology of her care and his *curriculum vitae*. Specifically, he stated, in part:

2

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

320 of 526

EXH : 000028 of 000198

Filed          24-CI-01033  10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT

01/05/2026 04:16:24 PM

- Donnie J Thomas (DJ) is a trained medical assistant. I have trained him since 2002. In my long career, I had not had a single adverse event or serious adverse event where he was involved. I have trained him not only to perform routine Medical Assistant Jobs, but he is also a Clinical Coordinator for my ongoing clinical research work (GCP certified). [...] DJ is trained to perform more than one job. Multitasking is required to work in a solo practitioner's office. DJ helps me in the procedure room. He positions patients, attaches them to the monitors per ASA guidelines, and moves the Fluoroscope per my instruction. At times DJ administers a small dose of sedation on my request. [...] DJ was not the only person present at the time of infusion, as other MAs were there, particularly her daughter, on the day of the first infusion. I have checked her multiple times during the infusion to monitor EKG tracing and the depth of her sedation. She received good care. She was covered appropriately with blankets. There was no trigger for reactivating PTSD.

- In September, there were three encounters. [...] I don't recall the swelling at all. It was not life-threatening and without any residual problems. She is probably referring to swelling from IV fluid extravasation, which is not an allergic reaction. The patient was never administered Cyanocobalamin in my clinic.

- No, I don't recall calling any patient a VIP, although I consider all patients VIPs and treat them accordingly. Most of the time, her daughter Brittany Morris was present during transportation of her to and from the procedure room. She needed 5mg of midazolam for the procedure as she was extremely nervous. Without sedation, I could not have performed the procedure as she would not cooperate.

- Ms. Autumn Thomas is also a MA whom I have trained since 2013. Autumn Thomas occasionally helped us in the recovery unit by relieving Medical Assistants for lunch breaks when we were short-staffed during the COVID infection. Autumn Thomas is responsible for discharging patients, reviewing discharge instructions, and ensuring that patients are appropriately scheduled for post-procedure follow-up. She also helps me with billing work. In the recovery area, she would typically watch those patients who are getting ready to be discharged. All patients in the recovery area are attached to the automated monitors. She is also responsible for following all my orders, such as lab work and imaging requests.

[...]

- The allegations that I don't take care of my prescription are inaccurate. I am meticulous and ensure that my staff follows my instruction correctly. I verify and cross-verify that the prescriptions are correctly sent by checking the logs frequently. Autumn helps me ensure that the refills are sent in a timely fashion. I enter the prescription under the appropriate diagnosis, and then she transmits the Rx electronically, which I monitor directly.

3

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000029 of 000198

Filed                    24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

01/05/2026 04:16:24
PM

85787

- No, I don't refill other physicians' prescriptions unless the patient specifically requests me to do that to save time and a visit. [...]

5. On or about March 21, 2023, a Board consultant completed a review of the grievant's medical records and found that the licensee's diagnosis and treatment were below the minimum standards of acceptable and prevailing medical practice.

The Board consultant's specific diagnostic concerns were that:

- Dr. Gupta performed three cervical transforaminal epidurals without documenting the specific history and findings indicating the need for these injections [...]

- The cervical MRI showed "C4-C5 small central disc protrusion mildly compressing the thecal sac. No spinal cord or nerve root compression."

The Board consultant's specific treatment concerns were that:

- The three transforaminal cervical epidurals performed were not indicated as described under the diagnosis. In addition, after each transforaminal epidural injection there is no mention of the patient's response to the previous epidural procedure. Only after three epidurals does Dr. Gupta describe the response to the three procedures.

- The epidurals and facet injection's were performed under moderate sedation. The operating physician, Dr. Gupta cannot also serve as the anesthesia monitor. It is standard of care that the anesthesia monitor must be at least an RN. In all of the procedures his trained assistant, DJ Thomas, served as anesthesia monitor. In addition, the sedation monitoring records are incomplete and one is missing.

- There is evidence in the medical record that the grievant was over-medicated. [...] After starting these medications, on follow-ups Dr. Gupta does not address the partial response to these medications. On 6/15/2021 Dr. Gupta's interim history states "Today patient exhibited some speech difficulty and complained of weakness in right upper extremity and lower extremity." The medical record does not show any new physical exam, just a repeat of the previous exams. Dr. Gupta does not comment on these serious new complaints and he continues her treatment plan. On 7/13/2021 the patient presented with new complaints of having an "an attack of generalized numbness and fatigue-like symptoms." The patient complained of intermittent incontinence, in addition to the previous complaints (...) Over the next eight months all of her complaints continued.

- [...] Based on the list of medications and known drug interactions some of these serious symptoms, were more likely than not related to over-medication

4

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000030 of 000198

Filed                    24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

6. On or about April 4, 2023, the licensee responded to the Board consultant's report and included a detailed explanation of his treatment and reasoning for the care he provided to the grievant. He also included significant references to literature and his clinic's policies and procedures. Specifically, he explained:

- The decision to perform three cervical transforaminal injections was based on my clinical examination of the patient, my experience, and my knowledge. I examined the patient before every procedure in the procedure room. There is a record of pre-procedure VAS on each occasion. [...] This patient had complete pain relief after the third injection.

- I use sedation for anxiolysis and amnesia only. I titrate the medicine so that they are fully responsive and comfortable with minimal anxiety and can tolerate unpleasant sensations of the procedure. All patients are monitored as per ASA protocol. BP, HR, and Pulse oximetry are performed continuously in the procedure room. Patients are evaluated pre-procedure and post-procedure, and the vitals are recorded. We have followed the guidelines outlined in KBML (https://kbml.ky.gov/board/Documents/Board%20Opinion%20Office%20Based%20Surgery.pdf) (revised 2018) regarding the requirement for the safe conduct of mild sedation. In this document[,] requirement of a trained person is mentioned. All procedure personnel is ACLS trained and have been trained to assist me in the procedure room properly.

- The procedure room has all the equipment for resuscitation, including an AED, laryngoscope (3 sizes Miller and McIntosh), suction machine, ambu-bag, and oxygen cylinder. All recovery bays are fully equipped with monitors for monitoring vitals as per ASA protocol. All equipment undergoes preventative maintenance. [...]

- The MA normally positions the fluoroscope and monitors the patient. I operate the fluoroscope and constantly communicate with the patient. I am a board-certified anesthesiologist and a pain specialist. I administer 0.5mg of Versed in the procedure room and titrate the medicine slowly while my assistant and I monitor the vitals. Most of the time, the completion of the procedure takes 30 - 35 minutes (for ESI or Facet joint block), which includes an examination of the patient pre and post-procedure in the room and recovery area.

  [...]

- The patient was an extremely difficult patient to manage. I spent anywhere from 1 – 2 hours with her each visit and could not document everything that transpired during the visit. I treated her with FDA-approved combination medicine for fibromyalgia as she failed all other treatments, but she did not

5

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000031 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:16:24

respond. Insomnia is a known problem associated with fibromyalgia, which 85787 I treated with Lunesta. I can assure you that she did not experience any side effects from the medicine that I prescribed. [...]

7. On or about April 26, 2023, after considering the licensee's response to his report and again reviewing the records, the Board consultant changed his conclusions as follows:

- [The grievant] had a total of five procedures where she was administered intravenous sedation with midazolam 5 mg. This dosage is documented in the medical record and acknowledged by Dr. Gupta in his response to the grievance (answer number 3). Dr. Gupta's patient encounters list the billing codes used for each visit. In all instances where midazolam sedation was administered the billing was listed as moderate sedation. Dr. Gupta has indicated in his response to my report that he was using mild sedation (answer 2).

- Dr. Gupta states that [the grievant's] intravenous line infiltrated after one of her cervical epidurals in September 2021 without residual problems. He also says he has educated his staff to properly fill out anesthesia monitoring forms. I have previously stated that the guidelines for intravenous sedation require that a registered nurse be present as the anesthesia monitor to administer the sedation and, if necessary, start intravenous lines. I have included in this report the latest guidelines for conscious sedation.

- Most concerning to me is the recent information I have received regarding Donnie J. Thomas. The grievant has stated that Mr. Thomas started at least one of her intravenous lines and had administered intravenous sedation to her. Further review of Dr. Gupta's response (answer#1) to her grievance reveals by his own admission that he allows Mr. Thomas to administer intravenous midazolam.

  My conclusion is Donnie J. Thomas is practicing medicine without a license. This represents an immediate threat to the safety and health of the citizens of Kentucky.

8. The licensee, with counsel, was present at the Panel meeting on May 18, 2023. Leading up to the meeting, he provided more literature to the Panel and provided pictures of his facility to the Panel during the meeting. At the Panel meeting, he explained that he trains all his staff. He considers Mr. Thomas a Medical Assistant because of that training and because he assists him with procedures, including

6

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000032 of 000198

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:16:24

pushing medications. The licensee conceded that Mr. Thomas has no certification. However, Mr. Thomas has worked with the licensee on and off for twenty years, most recently starting in 2016. During the meeting, the licensee stated that he has twelve staff members, including one Nurse Practitioner, two receptionists, two clinical coordinators, one dietitian, one exercise therapist, one discharge employee and two temporary workers for additional help. Two people are in the procedure room, but none are a Physician Assistant, Registered Nurse or certified Medical Assistant. It is during post-op that a certified Medical Assistant sees patients. He informed the Board that he has plans to move to California and had been offered a job there in October. He has transferred all his patients to another physician, and May 18, 2023 was his last day – he would perform no further procedures in Kentucky.

9. The licensee agreed to enter into this Agreed Order, in lieu of the issuance of a Complaint and Emergency Order of Suspension.

### STIPULATED CONCLUSIONS OF LAW

The parties stipulate the following Conclusions of Law, which serve as the legal bases for this Agreed Order:

1. The licensee's medical license is subject to regulation and discipline by the Board.

2. Based upon the Stipulations of Fact, the licensee engaged in conduct which violates the provisions of KRS 311.595(9) [as illustrated by KRS 311.597(4)]. Accordingly, there are legal grounds for the parties to enter into this Agreed Order.

3. Pursuant to KRS 311.591(6) and 201 KAR 9:082, the parties may fully and finally resolve this matter without an evidentiary hearing by entering into an informal resolution such as this Agreed Order.

7

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000033 of 000198

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:16:24

## AGREED ORDER

85787

Based upon the foregoing Stipulations of Fact and Stipulated Conclusions of Law, and, based upon their mutual desire to resolve the pending matter without an evidentiary hearing, the parties hereby ENTER INTO the following **AGREED ORDER**:

1. The license to practice medicine within the Commonwealth of Kentucky held by Pragya B. Gupta, M.D., is RESTRICTED/LIMITED FOR AN INDEFINITE PERIOD OF TIME, effective immediately upon the filing of this Agreed Order.

2. During the effective period of this Agreed Order, the licensee's medical license SHALL BE SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:

   a. The licensee SHALL NOT perform any act which would constitute the practice of medicine, as that term is defined or contemplated by KRS 311.840, et seq., in the Commonwealth of Kentucky, unless and until the Panel or its Chair has approved, in writing, the practice location at which he will practice as a physician. The decision whether to approve a particular practice location lies in the sole discretion of the Panel or its Chair. In determining whether to approve a practice location, the Panel or its Chair will particularly consider whether there will be appropriate oversight by a person(s) or entity that is not the licensee. In approving such practice location, the Panel or its Chair may include specific conditions/restrictions to ensure patient safety;

   b. Pursuant to KRS 311.565(1)(v), the licensee SHALL REIMBURSE the Board's costs of $2,625.00 within six (6) months from entry of this Agreed Order; and

   c. The licensee SHALL NOT violate any provision of KRS 311.595 and/or 311.597.

3. The licensee expressly agrees that if he should violate any term or condition of this Agreed Order, the licensee's practice will constitute an immediate danger to the public health, safety, or welfare, as provided in KRS 311.592 and 13B.125. The parties further agree that if the Board should receive information that the licensee has violated any term or condition of this Agreed Order, the Panel Chair is authorized by law to enter an Emergency Order of Suspension or Restriction

8

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000034 of 000198

Filed   24-CI-01033   10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

immediately upon a finding of probable cause that a violation has occurred, after 85787 an *ex parte* presentation of the relevant facts by the Board's General Counsel or Assistant General Counsel. If the Panel Chair should issue such an Emergency Order, the parties agree and stipulate that a violation of any term or condition of this Agreed Order would render the licensee's practice an immediate danger to the health, welfare and safety of patients and the general public, pursuant to KRS 311.592 and 13B.125; accordingly, the only relevant question for any emergency hearing conducted pursuant to KRS 13B.125 would be whether the licensee violated a term or condition of this Agreed Order.

4. The licensee understands and agrees that any violation of the terms of this Agreed Order would provide a legal basis for additional disciplinary action, pursuant to KRS 311.595(13), and may provide a legal basis for criminal prosecution.

SO AGREED on this 27th day of May, 2023.

FOR THE LICENSEE:

_____
PRAGYA B. GUPTA, M.D.

_____
JUDD R. UHL
COUNSEL FOR THE LICENSEE

FOR THE BOARD:

_____
DALE E. TONEY, M.D.
CHAIR, INQUIRY PANEL B

_____
NICOLE A. KING
Assistant General Counsel
Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
(502) 429-7150

9

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000035 of 000198

327 of 526

NOT ORIGINAL

01/05/2026 04:16:24

85787

# EXHIBIT 3

Filed 24-CI-01033 10/16/2024 DOCUMENT PM Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000036 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

My name is Wendy Fillhardt. I was under the care of Dr. Pragya Gupta from January 25, 2021, until April 2022. During this time, I believe there were several issues with my care that were a violation of standard medical practice and standard of care. Not all issues are directly with Dr. Gupta however he is not proper managing his staff or hiring properly trained individuals.  I will detail each issue individually below:

1. Donald Jay Thomas "DJ" was introduced to me as the office manager for the office. However, throughout my time under Dr. Gupta's care he was an active participant in my care. I was very uncomfortable with him being in my treatment room while I was wearing a gown and not fully clothed given that he has no medical certification. On multiple occasions, he was the individual who administered the anesthesia I was given for a procedure. He would ask Dr. Gupta how much to administer and then measure out and give the doses by iv. I have experienced trauma in my life and have a PTSD diagnosis. I believe that having someone in the room who was not an authorized medical professional has led to further trauma for me. I also feel that he should have never been allowed to give me an IV or administer any medications.

2. In September 2021, I was given my first injection of cyanocobalamin injection. I was supposed to have a second injection 30 days from the first as I understand the protocol to be. At the second injection date, Dr. Gupta took one look at me and was immediately concerned. I had let DJ and others in the office know that I did not feel right, and I had swelling. Dr. Gupta immediately knew that this was an allergic reaction. I instead was given a different injection.

3. I was told during my injection procedures that I was a "VIP" patient and that I would receive good stuff. I took this to mean that I was given more anesthesia than other patients. I expected to be in a twilight type feeling while injections were being given. However, I was completely knocked out and I do not believe that was appropriate for this type of injection. On one occasion, I had issues coming out of the anesthesia in the office.

4. Autumn Thomas is the wife of DJ Thomas and the clerk/billing assistant at the office. To my understanding she has had no medical training or certification, but she conducted medical functions such as taking vitals. She was also the individual that would handle send proscriptions to the pharmacy. However, I do not believe that proper protocols were followed in proscribing as I had to different issues that I believe are very important to mention.
    a. I was proscribed Savella. Dr. Gupta had advised that this medication was one that needed to be stepped up to a higher dosage. I was only advised to take one a day and was supposed to receive a lower milligram capsule for so many days the pickup a higher milligram. The proscription was incorrectly placed by Autumn, my dosage stated two pills per day and I was started on a 25 mg which I was supposed to start on 12.5. At one point, the system as you can see in my medical records had me proscribed a 25 MG and a 50 mg to both take twice a day. I never took these together or in the incorrectly proscribed manner. However, I did have side effects from taking the 25 mg to begin and Dr. Gupta was very upset over what had occurred. However, he did not take any responsibility for it and put it off on an individual in his office who should not be writing prescriptions. This causes me to have concerns that he does not fill out his own prescription orders or at the least he doesn't pay attention to what he signs.
    b. On several occasions, proscriptions from other doctors were ordered to be refilled by Dr. Gupta's office. My understanding from what I was told was that this was Autumn incorrectly refilling medications. My other doctors Dr. Kinney were very concerned

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000037 of 000198

Filed

24-CI-01033 10/16/2024

Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

when this occurred. I not understanding the system do not understand how this 85787 occurred, but my doctors were very concerned because the milligrams had been changed for my Topamax by Dr. Gupta's office, but Dr. Gupta was not the proscribing doctor on that medication.

WENDY FILLHARDT
Dated: _01/04/2023_

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000038 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

## Kentucky Board of Medical Licensure
### Hurstbourne Office Park
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
Telephone: 502/429-7150
Fax: 502/429-7158
Website: www.kbml.ky.gov

85787

**RECEIVED**

JAN 0 9 2023

### Waiver of Privilege
### Agreement to Release Records

K.B.M.L.

Upon receipt of a photostatic or other copy hereof, you are authorized to release to the representative of the Kentucky Board of Medical Licensure for inspection and copying all records in your possession pertaining to me, to discuss with them fully any information you may have about me, and to furnish them a full report concerning me.

This authorization includes medical records, including all hospital records, psychiatric and psychological records, records of physicians and other medical personnel, records of drug abuse, records of alcohol abuse, prescriptions and drug records, and any and all records relating to my physical and mental condition.

**Prohibition of Redisclosure:** This information has been disclosed in compliance with Federal Regulations (42 CFR Part2) which prohibits further disclosure of this information except with specific written consent of the person to whom it pertains. A general authorization for the release of medical or other information, if held by another party, is not sufficient for this purpose. Federal Regulations state that any person who violates any provision of this law shall be fined not more than $500, in the case of a first offense, and not more than $5,000 in the case of each subsequent offense.

### For Purposes Of Identification:

1. Patient's Full Name: _Wendy M Fillhardt_
2. Date of Birth: _07/20/1975_
3. Last 4 Digits of Social Security Number: _2564_

Date: _01/06/2023_   Signature: _W_____

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000039 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

# EXHIBIT 4

85787

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000040 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

COMMONWEALTH OF KENTUCKY
KENTON CIRCUIT COURT
DIVISION III
CIVIL ACTION NO. 23-CI-00644

85787

WENDY FILLHARDT                    )    DEPOSITION TAKEN ON
                                   )    BEHALF OF DEFENDANTS
                                   )         BY:  NOTICE
          PLAINTIFF                )    _____
                                   )
                                   )
VS:                                )
                                   )
                                   )
ADVANCED PAIN TREATMENT            )
CENTER, PLLC; PRAGYA B.            )
GUPTA, M.D.; AND DONALD J.         )
THOMAS                             )
                                   )    WITNESS:
                                   )
          DEFENDANTS               )    WENDY FILLHARDT

*  *  *  *  *  *  *  *

The deposition of WENDY FILLHARDT was taken before Lisa E. Hoinke, Court Reporter and Notary Public in and for the State of Kentucky at Large, at the offices of Gray Law, PLLC located at 10200 Forest Green Blvd., Suite 112, Louisville, Kentucky, 40223 on May 29, 2024, commencing at the approximate hour of 10:35 a.m.  Said deposition was taken pursuant to Notice, heretofore filed, for the purpose of discovery on behalf of the Defendants in the above-captioned action, and all other purposes as permitted by the Kentucky Rules of Civil Procedure.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000041 of 000198

NOT ORIGINAL

01/05/2026 04:16:24

APPEARANCES:

85787

        Hon. Justin T. Baxter
        ROBINSON & WEBER, PSC
        101 Prosperous Place, Suite 100
        Lexington, KY 40509

        COUNSEL FOR THE DEFENDANTS,
        ADVANCED PAIN TREATMENT CENTER, PLLC;
        PRAGYA B. GUPTA, M.D.;
        AND DONALD J. THOMAS


        Hon. David B. Gray
        GRAY LAW, PLLC
        10200 Forest Green Blvd., Suite 112
        Louisville, KY 40223
and,
        Hon. TJ Smith
        T.J. SMITH ATTORNEY AT LAW
        600 West Main Street, Suite 200
        Louisville, KY 40202

        CO-COUNSEL FOR THE PLAINTIFF,
        WENDY FILLHARDT


ALSO PRESENT:

        John Sowards, Videographer
        sowardsjohn5@gmail.com

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000042 of 000198

NOT ORIGINAL

DOCUMENT

PM

Filed            24-CI-01033 10/16/2024            Kathryn Marshall, Franklin Circuit Clerk

01/05/2026 04:16:24

85787

I N D E X

PAGE

WITNESS: WENDY FILLHARDT

DIRECT EXAMINATION
        By Mr. Baxter      .....................   5-131

REPORTER'S CERTIFICATE     .....................    132

E X H I B I T   I N D E X

| Number | Description | Page |
|---|---|---|
| (Defendants':) | | |
| Exhibit 1 | Answers to Interrogatories | 14 |
| Exhibit 2 | APTC Patient Registration 1/15/21 | 44 |
| Exhibit 3 | APTC Medical Record DOS: 4/15/21 | 51 |
| Exhibit 4 | APTC Medical Record DOS: 3/25/21 | 51 |
| Exhibit 5 | Complaint | 84 |
| Exhibit 6 | Discovery responses | 97 |
| Exhibit 7 | St. Elizabeth Healthcare Records | 116 |

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                3

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000043 of 000198

Filed            24-CI-01033 10/16/2024            Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

VIDEOGRAPHER:   We're now on the video record. Today's date is May 29, 2024, and the time is 10:35 a.m.  My name is John Sowards, today's videographer. And we are located at the offices of Gray Law, 10200 Forest Green Blvd., Suite 112, Louisville, Kentucky, for the deposition of Wendy Fillhardt, pursuant to Notice in the Kenton Circuit Court, Division II, Civil Action No. 23-CI-644, styled Wendy Fillhardt, Plaintiff, versus Advanced Pain Treatment Center, PLLC, et al., Defendants.  Court reporter is Lisa Hoinke.  And I'd ask counsel to please introduce themselves and state who they represent.

MR. GRAY:   Yes, I'm David Gray, along with TJ Smith.  We represent the Plaintiff, Wendy Fillhardt.

MR. BAXTER:   I'm Justin Baxter for all named Defendants.

VIDEOGRAPHER:   Okay, thank you.  The court reporter will now swear in the witness.

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

COURT REPORTER:    Raise your right hand, please.

MR. GRAY:    Raise your right hand.

85787

COURT REPORTER:    Ma'am, do you swear or affirm the testimony you are about to give will be the truth, the whole truth and nothing but the truth?

WITNESS:    Yes.

COURT REPORTER:    Thank you.

DIRECT EXAMINATION

By Mr. Baxter:

MR. BAXTER:    Hi, Ms. Fillhardt.  My name is Justin Baxter.  I represent Advanced Pain Treatment Center, D.J. Thomas and Dr. Gupta.  Because Advanced Pain Treatment Center is a little cumbersome, sometimes I might refer to it as Advanced Pain or maybe it's acronym, APTC, and I'll try to, hopefully, get that correct.

Q    First, have you ever taken a deposition before?

A    I don't remember.

Q    Okay, all right.  And I'm sure your attorney went over some kind of like a bit of how this works and the ground rules.  I'm just

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*    5

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000045 of 000198

Filed          24-CI-01033  10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

going to go over a little bit as kind of my intro every single time.  So I'm sure your attorney has gone over it already, but this is -- it's kind of a weird format.  It's like a conversation, but where everything is recorded, it's got some kind of specific rules, one being that we don't need to talk over one another.  I'll try my best to do that and I'm sure you'll do the same.  We might end up doing that anyway.  Another is to answer verbally.  A lot of times in conversations we tend to kind of nod our heads, and that doesn't translate to -- to written form of the record.  So I may do that; you may do that.  No worries, I just wanted to let you kind of know those.  The most important rule, though, is that if I ask a question and you don't understand it, I want you to let me know that because then that way we have an understanding and a clean record.  So feel free, if you don't understand anything that I'm asking, to let me know that and I'll clarify it, but if you answer, I'll -- I'll assume that you understood; is that fair?

A    Yes.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                6

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000046 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

Q       All right.  Start with kind of some -- some -- some soft balls.  Where -- where were you born?

A       Kentucky.

Q       Kentucky.  And this case is filed in Kenton County.  Are you a native of Kenton County?

A       I don't remember.

Q       Okay.  Where do you currently reside?

A       Campbell.

Q       Campbell County.  Is it Campbell County or like Campbell, a town?

A       Campbell, Kentucky.

Q       And what is your address?

A       The full address?

Q       Yes, ma'am.

A       970 Darlington Creek Drive, Alexandria, Kentucky, 41001.

Q       Another thing I should have went over in kind of the beginning, this isn't a marathon, so anytime you want to take a break, you let me and your counsel know.  I might ask you to finish whatever question's pending, but this isn't -- I understand it's uncomfortable, and I don't aim to make it more uncomfortable. So if there's any time you need a break -- or

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000047 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

we've already -- I've already spoken to your counsel off record that if -- if you need to tap out for today, we can rearrange that.  So I just want to let you know that so you feel a little more comfortable going forward in this. Who all presently resides with you at the Darlington Creek address?

A    My husband and my dog, Rocky.

Q    What kind of dog is Rocky?

A    Bichon.

Q    Bichon.  Is that a big dog?

A    No, it's little --

Q    Oh, little one --

A    -- little.

Q    How long have you lived at that Darlington address?

A    Not long.

Q    Have you lived there more than a year?

A    I don't remember.

Q    Okay.  Where did you live prior to the Darlington Creek address?

A    Edgewater.

Q    And is that the name of the town or the -- or --

A    No, the street.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000048 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

PM

01/05/2026 04:16:24

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Q    Edgewater.  Is that also in Alexandria?

A    Yes.

Q    And did you live there for more than five years?

A    No.

Q    No.  About how long did you live in that -- at that address?

A    One year.

Q    And was it the same other people at -- or other people and animals?

A    Yes.

Q    Prior to the Edgewater address, where did you reside?

A    Baneberry.

Q    Is that also in Alexandria?

A    Yes.

Q    And approximately how long were you at that address?

A    Not long.

Q    More than a year?

A    Less.

Q    This would put us at about 2021.  Were you residing at the Baneberry address when you were being treated at Advanced Pain Treatment Center?

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    9

85787

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000049 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

85787

A    I don't remember.

Q    Okay.  I saw from the discovery answers that you -- you graduated from Campbell County High in 1994; is that correct?

A    I don't remember.  I went to Campbell County High School.

Q    Just not sure --

A    Yes.

Q    -- of the year of graduation?

A    Yes.

Q    Okay.

A    Correct.

Q    Any post-high school education?

A    Yes.

Q    Where -- where did you attend post -- post-high school education?

A    Certified rehab tech.

Q    And did you take classes --

A    Yes.

Q    -- for a certified rehab --

A    Yes.

Q    -- tech?  Where were those classes at?

A    Lakeside Vocational.

Q    And where is that located?

A    Northern Kentucky.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    10

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000050 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:16:24

85787

Q    Do you know whether or not they have more than one location?

A    I don't know.

Q    Did you receive a certificate?

A    Yes.

Q    Any additional post-high school education other than the certified rehab technician certification?

A    Yes.

Q    Where else did you attend?

A    Sun Behavioral.

Q    When did you receive the certificate as a certified rehab tech?

A    I don't remember.

Q    And I -- I'm somewhat familiar with Sun Behavioral as a -- like a facility.  Does it also have like a education department within that facility?

A    Yes, sir.

Q    And was it associated with your employment at Sun Behavioral?

A    Yes.

Q    Are there -- is that kind of educational department, is it just for folks that work at Sun Behavioral or are there other folks that

Lisa E. Hoinke, Court Reporter
HoinkeReporting@gmail.com                11

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000051 of 000198

NOT ORIGINAL

take classes from other -- that might go to other facilities?

A    Correct.

Q    Is that --

A    Explain -- explain yourself.

Q    Sure.  So was the Sun Behavioral education, was that limited to just folks that you would then later work with?

A    No.  Their employees.  I was trained through them.

Q    I gotcha.

A    They give certi -- certification through them.

Q    So after receiving that certificate as a rehab tech, then there was additional certifications that you received --

A    Yes.

Q    -- through Sun?  Do you have any children?

A    Yes.

Q    What are their names?

A    Brittany Garrett.

Q    And does she reside in Alexandria?

A    Yes.

Q    Is Brittany married?

A    Yes.

Q    To whom?

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000052 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

A       I don't remember.

Q       And does she have any children?

A       I don't remember.

Q       Do you have any other children other than Brittany Garrett?

A       Yes, a son.

Q       And what's his name?

A       Brandon.

Q       What's -- what's Brandon's last name?

A       Morris.

Q       And where does he reside?

A       Independence.

Q       Is Bra -- excuse me, is Brandon married?

A       I don't remember.

Q       Does Brandon have any children?

A       No.

Q       You're presently married to Dave Fillhardt, correct?

A       Correct.

Q       What year were you all married?

A       2015.

Q       2015.  Let me do this, might save us.

MR. GRAY:        Your answers say 2014.

WITNESS:         '14.

MR. GRAY:        '14, is that right?

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          13

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000053 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT 01/05/2026 04:16:24 PM 85787

WITNESS:            I was going to look at my arm.

MR. GRAY:           Is that -- is that where you put your answers in high school, write them on your arm?

WITNESS:            No, our wedding vows is there.

MR. GRAY:           I know; I'm just kidding with you. I'm just trying to help.

WITNESS:            Yeah.

MR. GRAY:           That's a question --

WITNESS:            Yeah.

MR. GRAY:           -- you don't want wrong on the record.

WITNESS:            Yeah.

MR. BAXTER:         That's why I didn't ask the anniversary --

WITNESS:            Sorry.

MR. BAXTER:         -- I didn't want to --

MR. GRAY:           Right, right.

MR. BAXTER:         -- I didn't want to --

MR. SMITH:          Don't -- don't push it, Justin.

WITNESS:            Sorry.

         (REPORTER MARKS A COPY OF THE ANSWERS TO INTERROGATORIES AS EXHIBIT 1 FOR THE PURPOSE OF IDENTIFICATION, AND THE SAME IS ATTACHED HERETO AND FILED HEREWITH.)

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    14

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000054 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
01/05/2026 04:16:24 PM
85787

Q      Here, let's -- I think this might make it a bit easier.  I'm going to introduce what will be marked as Exhibit 1.  It's your Answers to Interrogatories.

A      I don't have my glasses, so it's not going to help.

Q      Okay.

A      So I can't see.

MR. SMITH:      Are they in your car or --

WITNESS:      Yes.

MR. SMITH:      Okay.  You --

WITNESS:      Will you ask Dave --

MR. SMITH:      -- you work with Justin right now, and I'll go get with Dave --

WITNESS:      Yeah.

MR. SMITH:      -- and get your glasses.

MR. BAXTER:      Okay.

WITNESS:      Thank you.

Q      All right.  The reason I was going to introduce these and -- and kind of use them was maybe to kind of help the timeline a bit.

MR. GRAY:      Do you use readers or do you --

WITNESS:      Yeah, they work.  Thank you.

Q      So on -- on page 2 of what I've marked as Exhibit 1, it -- it kind of lists your -- your

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000055 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

marital history.  Does -- does that appear accurate to you?

A    Correct.

Q    And let me preface this question because it's kind of strange.  I'm going to ask if you have any like family members in Kenton County.  The reason is because if this is seated for a jury, you know, you don't want -- we don't want your brother or first cousin and vice versa.  You wouldn't want any of my client's relations on the jury.  Do you have any extended family in Kenton County?

A    Yes.

Q    Is it a lot or is it just kind of a handful of folks?

A    Handful.

Q    Okay.  What -- what are their names?

MR. GRAY:        Yes, tell him.

A    Wanda Zumwalt.

MR. GRAY:        How do you spell that?

WITNESS:        Z-U-M-W-A-L-T.

MR. GRAY:        Thank you.  Go ahead.

A    Jeff Zumwalt, Laura Zumwalt, Chris Allender, Jill Allender.

Q    All right, thank you.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000056 of 000198

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
01/05/2026 04:16:24 PM
85787

A        You're welcome.

Q        And the -- the treatment at -- at issue at Advanced Pain Treatment Center, just to kind of help with the timeline, was, I have from January 25, 2021 to April 2022.  In January of 2021, were you employed anywhere?

(WITNESS REVIEWS DOCUMENT)

MR. GRAY:        Keep flipping.  Come in.  This is your work history.  Thank you, sir; you're a good assistant.

A        Yes.

Q        And are -- you're looking at interrogatories on page 3?

MR. GRAY:        Her answer to number 5, Justin.

A        Yes.

MR. GRAY:        You want to switch with TJ?

WITNESS:        Yes, you can have them.

MR. GRAY:        You can --

WITNESS:        Thank you, TJ.

MR. GRAY:        -- put your pretty ones on.

WITNESS:        Thank you.

Q        Was that employment at Tyson?

A        Yes.  Tyson Medical Department.

Q        And what was your -- what was your job there?

A        I was assistant to the medical director, her

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000057 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033  10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
01/05/2026 04:16:24 PM
85787

assistant.

Q    And this -- this answer to interrogatory indicates that you were first employed there in 2020.  Do you have an approximation of about when in 2020 you were employed at Tyson?

A    I don't remember.

Q    Do you recall when you ceased employment at Tyson?

A    I don't remember.

Q    And is it Tyson like associated with the food company --

A    Hot dog factory.

Q    I'm sorry?

A    The hot dog factory.

Q    Oh, gotcha.  So you all would provide, I guess, care to any, I guess, injuries that would happen at Tyson?

A    Correct.

Q    Are you still employed at Tyson?

A    No.

Q    Were you -- were you still employed at Tyson in April of 2022 when -- kind of the end of the care at issue?

A    No.

Q    Do you think that you were employed at Tyson

Lisa E. Hoinke, Court Reporter
HoinkeReporting@gmail.com                    18

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000058 of 000198

Filed   24-CI-01033   10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

85787

Q   for the entirety of 2021?

A   I don't remember.

Q   Your answers to interrogatories indicate that the -- the job prior to that was at Active Day CNA -- or was at Active Day as a CNA preceptor.  What did your job duties entail at Active Day?

A   Shadow, shadow CNAs.

Q   And when you say, shadow CNAs, what do you mean by that?

A   In-home CNA.

Q   So you were paired with another CNA and provide at-home health --

A   Yes.

Q   -- with Active Day?

A   Make sure they're doing the right training as a preceptor.

Q   So was the -- the medical care kind of limited to more physical therapy style --

A   Correct.

Q   -- home care?  Any -- any medications that were dispensed or distributed as far as that job?

A   No.

Q   Going back to Tyson, were you a salary or

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000059 of 000198

Filed   24-CI-01033   10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

85787

hourly employee?

A    Hourly.

Q    And do you recall how much you were making an hour?

A    I don't remember.

Q    Were you typically working full time hours at Tyson?

A    Yes.

Q    It list Active Day employment from -- from 2019 to 2020.  Do you recall any -- any kind of further pinpointing of that date.  Can you tell me when in 2019?

A    Can you repeat it?

Q    Sure.  Do you recall when in 2019 you started at Active Day?

A    I don't remember.

Q    Were -- at Active Day were you an hourly employee or salary?

A    Hourly.

Q    Do you recall what you were making an hour at Active Day?

A    I don't remember.

Q    And did you keep full-time hours there?

A    Yes.

Q    Moving to your -- your kind of next in reverse

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000060 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

chronology order, what -- at Sun Behavioral were -- you were a mental health tech from 2018 to 2019?

A    Yes.

Q    And what were your kind of roles and responsibilities as a mental health tech?

A    A rehab tech for the unit for the littles.

Q    So you say, for the littles, I'm guessing for the pediatric patients there?

A    Correct.  And assist on the other units when short staffed.

Q    And when you were brought in to assist in those other units, what were kind of the tasks and --

MR. BAXTER:    I'm so sorry.  Let me re-start that.

Q    When you were asked to assist in those other units, what -- what work would you typically be doing?

A    I don't remember exactly.

Q    Were you an hourly or salary employee at Sun Behavioral?

A    Hourly.

Q    Do you happen to recall what your hourly rate --

A    No.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000061 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

Q     And did you keep full-time hours as there -- as well there?

A     Yes.

Q     Moving next in -- in what's identified in the discovery answers, Campbell County Detention Center.  It lists that you were a commissary clerk; was -- is that correct?

A     Correct.

Q     And what did that job entail?

A     I oversee'd the inmates' comm -- commissary accounts.

Q     I'm sorry, I want to jump back a little before you're too far into this one.  What was the -- the reason for leaving Tyson?

A     I don't remember.

Q     What was the reason for leaving Active Day?

A     I don't remember exactly.

Q     Well, and I hate to press, but when you're saying you don't remember exactly, are there any details you remember for the -- for the reason for leaving --

A     No.

Q     -- Active Day?  Were you terminated from Active Day?

A     No.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000062 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033   10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

Q   Were you terminated from Tyson?

A   No.

Q   Is -- what was the reason that you left Sun Behavioral?

A   I don't remember.

Q   And the same question, were -- were you terminated from Sun --

A   No.

Q   -- Behavioral?  At Campbell Detention Center, were you an hourly employee or salary -- salary?

A   Hourly.

Q   Do you recall your hourly rate?

A   No.

Q   Did you keep full-time hours at Campbell County?

A   Yes.

Q   What was your reason for leaving, if you recall?

A   I don't remember.

Q   And the same question, were you terminated from Campbell County?

A   No.

Q   Without going back through that employment history, did you ever suffer a work accident?

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                23

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000063 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

A        I don't remember.

Q        I -- I don't think I brought the record here with me, so please feel free to correct me if this is incorrect, but I believe I saw in -- in some employment records you may have previously worked at a pain clinic.  Did -- did I recall that correctly?

MR. GRAY:        Did you ever work in a --

WITNESS:        Yes.

MR. GRAY:        -- pain clinic?

WITNESS:        Yes.

MR. GRAY:        Okay.

Q        What was the name of that pain clinic?

A        It was before.

MR. GRAY:        Before what?

WITNESS:        Before --

MR. GRAY:        It was before St. Elizabeth --

WITNESS:        Uh-huh (AFFIRMATIVE).

MR. GRAY:        -- Rehab?

WITNESS:        Yes.

MR. GRAY:        It was before --

WITNESS:        Yes.

MR. GRAY:        -- 2010?

WITNESS:        Yes.

MR. GRAY:        What was the name of that clinic?

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000064 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

WITNESS: Advanced. It was a gen -- a general -- a generally pain on Lexington Road, Lexington. I -- I --

MR. GRAY: Take your time.

WITNESS: It's on Lexington. I know the doctor.

MR. GRAY: What's the doctor's name?

WITNESS: Dr. Azat.

MR. GRAY: How do you spell that?

WITNESS: A-Z-A-T.

MR. GRAY: Azat?

WITNESS: Yes, something like that.

MR. GRAY: On Lexington Road?

WITNESS: Yes. It got shut down. I wasn't there when it happened.

Q Do you -- do you know what it got -- was shut down for?

A No. I wasn't working.

Q Were you made aware later after you left employment?

A Yes.

Q What was the reason you -- as you understood, that it was shut down?

A I don't recall.

Q This lists St. Elizabeth rehab technician from

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000065 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Filed                24-CI-01033  10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

01/05/2026 04:16:24
PM

85787

2010 to 2016, I believe in kind of your testimony earlier, you said that that employment predates 2010, correct?

MR. GRAY:          At the pain clinic.

Q         At the pain clinic, yes.

MR. GRAY:          Right.

A         Correct.

MR. BAXTER:        Thank you.

Q         Do you recall about what years you were employed at with Dr. Azat?

A         No.

Q         You said Lexington Road, is that -- was that in Lexington, Kentucky?

A         Yes.

Q         Okay.  How long did you -- did -- did you commute from Northern Kentucky to Lexington, Kentucky?

A         Yes.

Q         Over the course of this, if -- if I ask anything that references, you know, if I -- if I ask have you had any discussions, and the only discussion that you have had is with your attorney, I -- I -- I don't want you telling me any of that information.  I'm not entitled to know that.  So I want to preface that and

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000066 of 000198

Filed                24-CI-01033  10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
01/05/2026 04:16:24 PM

kind of the rest of these questions. But, so other than counsel, have you had any discussions with anyone to prepare for this deposition?

A     I don't recall.

Q     What, if anything, did you review in order to prepare for this deposition?

MR. GRAY:     Do you understand the question? What did you review to prepare for -- you looked -- you looked at these, right?

A     With my attorney.

Q     Okay. Outside of the kind of the medical care and relationship you had with the Defendants as your medical providers, do you have any social relationships with any of the named Defendants?

A     I don't know.

Q     So kind of in other words, did you -- did you know D.J. Thomas socially prior to being treated at Advanced --

A     No.

Q     -- Pain? Okay. Did know Dr. Gupta socially?

A     No.

Q     Okay. What about Autumn Thomas?

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000067 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

85787

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

85787

A       No.

Q       All right.  Well, before closing kind of the employment stuff.  Are -- it's my understanding that you -- you are not presently employed, correct?

A       No.

Q       And that you presently receive disability, correct?

A       Correct.

Q       When was the disa -- when did you first apply for disability?

A       I don't recall.

Q       Was it prior to January of 2021?

A       I done it after I went to the doctor.  I don't recall the year.

Q       After you went to Advanced Pain?

A       Correct.

Q       Did you only apply once for disability?

A       Correct.

Q       What was kind of the -- the reason that you were determined to be disabled?

A       I don't know.

Q       Have you applied for disability prior to receiving care at Advanced Pain?

A       Explain.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                28

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000068 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

85787

Q       So if I'm understanding your testimony correctly, you were -- you -- you were granted disability while you were being -- while you were receiving treatment from Advanced Pain, correct?

MR. GRAY:       When it was approved, were you still treating with Dr. Gupta?  Was it --

WITNESS:        Yes.

MR. GRAY:       Okay.

WITNESS:        He told me I would never work again.  I would be disabled.

Q       Was that application made prior to your initial presentation to Dr. Gupta?

A       I applied for disability when I started seeing Dr. Gupta.

Q       Okay, that answers it.

A       He's the one who told me I would never work again.  I would be disabled.

Q       And what reason did he provide for --

A       He never would give me a reason and told me I would never work again.

Q       And what context did this conversation occur?

A       What do you mean?

Q       How did this conversation arise?  Were you

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                                    29

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000069 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

Q    applying for disability and requesting his assistance?

85787

A    No.  I went to him for help for my pain.

Q    I understand.  And the -- the con -- you testified today conversation where he -- where Dr. Gupta said that you would never work again, and I'm just curious kind of how that conversation came up with Dr. Gupta?

A    I asked if I could go back to work.  He said, I would never be able to go back to work again.

Q    And it's your testimony that he never elaborated on that, never gave --

A    No.

Q    -- a reason?  Did -- did you ask?

A    Every time.

Q    Do you know the -- like, the terms of the disability, what is incoming each month?

MR. GRAY:        How much?  That's the question, how much?

MR. BAXTER:      Yes.

A    Little over 1,000 because insurance is taken out.

MR. BAXTER:      I don't know how long we've been going.  Are you good?  Do you want

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000070 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024                    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

to take a break or --

MR. SMITH:        I'm good.

MR. GRAY:         She's good.

Q    The next kind of set of questions I'm going to ask you is, is the time period prior to your initial presentation.  So before January of 2021.  In your discovery answers, as it concerns pre-existing pain and injuries, you identified back pain related to arthritis.  Do you know about when that you started experiencing back pain?

A    I don't recall.

Q    Prior to your treatment at the Defendants, were you diagnosed with arthritis?

A    Explain what --

Q    Sure.  Were -- were you seeing any medical provider for arthritis prior to the Defendants?

A    I had back -- I had back pain, but I -- in the past I was being treated for PTSD, anxiety disorder.

Q    Okay.  Was Advanced Pain the first medical provider that you went to for back pain?

A    Yes.

Q    Okay.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000071 of 000198

Filed          24-CI-01033 10/16/2024                    Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

A    Correct.

Q    And I know you testified that you don't recall when you started experiencing back pain, was it years before your first presentation to Advanced Pain?

A    What?

Q    The -- the back pain that you sought care at Advanced treatment, had that been persisting for longer than a year?

A    Yes.

Q    Had it been persisting for multiple years?

A    Yes.

Q    Was your back pain, did it manifest after like a particular injury or movement?

A    Not that I recall.

Q    It -- was it more kind of slow build to back pain that you ultimately needed to seek treatment for?

A    I don't know.

Q    Would you be able to recall what you would rate your pain out of 10 prior to seeking care at Advanced Treatment?

A    An 8.

Q    And where was that back pain coming from in relation to your -- your actual back?

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000072 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
01/05/2026 04:16:24 PM
85787

A      All over.

Q      And would anything exacerbate that pain?

A      I don't know.

Q      Prior to seeking treatment at Advanced Pain, was there anything that you would do or take that would relieve that pain?

A      I don't recall.

Q      And just to clear up, there were no other providers that you saw for back pain prior to Advanced Pain?

A      I don't recall.

Q      Were you taking any medication for the back pain prior to Advanced Pain Treatment Center?

A      No.

Q      Did you -- did you ever seek PT services related to the back pain prior to Advanced Pain?

A      Not that I recall.

Q      And you mentioned a moment ago a history of anxiety and PTSD. Prior to Advanced Pain Treatment Center, how -- out of a scale of 10, how would have rate -- how would you rate your anxiety?

A      I had it under control.

Q      Prior to Advanced Pain Treatment Center, what,

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    33

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000073 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT

01/05/2026 04:16:24 PM

85787

if anything, would kind of exacerbate or raise that level of anxiety?

A    Explain yourself.

Q    So for me, personally, my anxiety is kind of elevated whenever I have a lot of work or I can't get home that often.  Was there anything along the -- along those lines --

A    If I didn't get to run five miles a day.  I used to run five miles a day, every day.  I can't do that now.

MR. GRAY:    Was your question before she saw Dr. Gupta?

MR. BAXTER:    Yes.

MR. GRAY:    Do you understand the question?  He asked you about your anxiety before Dr. -- you saw Dr. Gupta.  Your testimony was you had it under control.

WITNESS:    Uh-huh (AFFIRMATIVE).

MR. GRAY:    He then asked you prior to seeing Dr. Gupta, what were the things that would cause your anxiety to increase, before seeing Dr. Gupta?

WITNESS:    I don't understand.

MR. BAXTER:    It's all right.  We can move from

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    34

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000074 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed            24-CI-01033 10/16/2024            Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

there.

Q    I think within -- to kind of help you out a little bit.  I think within our records, we had a Dr. Zieba --

A    Yes.

Q    -- that you were treating for anxiety.

A    Yes.

Q    And I think the University of Cincinnati Stress Center.

A    Yes.

Q    Were there any other providers that you were receiving treatment for related to anxiety, other than --

A    Therapy.

Q    Therapy.  And where -- who was your therapist?

A    No, I was seeing therapy.  That's what I'm saying, therapy.

Q    Okay.  Where were you seeing therapy --

A    No, therapy.  That's what I'm telling you, therapy.  I was doing therapy.

Q    Right, I hear you.  And was that with Dr. Zieba?

A    Yes.

Q    Okay.  But nobody else other than --

A    No.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000075 of 000198

Filed    24-CI-01033   10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

Q    -- Dr. Zieba?  Gotcha.  Prior to Advanced Pain, were you taking any medications for your anxiety?

A    Yes.

Q    And what were those medications?

A    Pro -- Pro -- Prosolan, Pro -- Prosolan.

MR. GRAY:    Prazosin.

A    Prazosin, Topamax.

Q    Oh, is it --

A    It's the --

Q    Is there a list?  I apologize.

A    Yes.

MR. GRAY:    She's on page 8 --

A    Yes.

MR. GRAY:    -- Justin.

Q    In -- in preparing for this, I must have --

A    Yes.

Q    -- not --

A    It's --

A    -- reviewed this.

A    -- the ones at the top.

Q    Okay.  If you could then just review those and tell me if there are any additional medications that you can recall?

A    Not that I recall.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000076 of 000198

Filed    24-CI-01033   10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

PM

01/05/2026 04:16:24

85787

Q    Okay. Concerning your PTSD, prior to Advanced Treatment Center, and it may be difficult to numerically categorize, but if you were -- if you were asked to kind of rate out of 10, what would you rate your PTSD prior to Advanced Pain Treatment Center?

A    Two. Prior to going to Pain --

Q    Yes, ma'am.

A    Two.

MR. GRAY:    Yes, that -- that was the question.

Q    And we already identified the UC Stress Center. Was there anybody else that you were seeking medical care related to your PTSD?

A    Not that I recall.

Q    Prior to Advanced Pain Treatment Center, did you -- had you been diagnosed with anything else?

A    Explain.

Q    I guess prior to January 2021, had you -- had you been diagnosed with fibromyalgia prior to January 2021?

A    Can you repeat that?

Q    Sure. Let me -- let me do it a different way. Have you ever been diagnosed with fibromyalgia?

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000077 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:16:24
85787

A    Yes.

Q    And --

A    Dr. Gupta did.

Q    Are you currently seeking any care related to fibromyalgia?

A    Yes.

Q    And who is that?

A    Dr. Chang.

MR. GRAY:    Is that C-H-A-N-G?

WITNESS:    Yes, I believe so.

Q    What are your symptoms of fibromyalgia?

A    I'm no doctor so, my body just hurts, everything.

Q    Is it more kind of muscle pain, joint pain, all the above?

A    My whole body.

Q    Have you ever been diagnosed with restless leg syndrome?

A    I don't know.

Q    Same question for -- for a clear record, have you ever been diagnosed with aphasia?

A    What?

Q    Aphasia.

A    I don't know.

Q    If you don't know, fair enough to say you're

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*    38

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000078 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
01/05/2026 04:16:24 PM

85787

not aware of any diagnosis.  Have you ever been diagnosed with -- with arthritis?

A      Yes.

Q      And does it -- is it a -- is it rheumatoid arthritis?

A      I don't know.

Q      From review of the records, I think your rheumatologist identified an autoimmune disease.  Do you recall when you were diagnosed with that?

A      I don't recall; there's so much.

Q      When you were diagnosed with that autoimmune disease by the rheumatologist, was there any conversation as to when it would have manifested?

A      I don't recall.

Q      Have you ever been diagnosed with conversion disorder?

A      Yes.

Q      What is your understanding of your conversion disorder diagnosis?

A      I don't know.

WITNESS:            Can we take a break?

MR. BAXTER:         Sure, absolutely.

MR. GRAY:           Sure.  Don't forget to take your

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*            39

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000079 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

85787

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000080 of 000198

microphone off.

VIDEOGRAPHER:          The time's 11:28.

(OFF THE RECORD)

VIDEOGRAPHER:          We're now back on the record; it's 11:38.

Q          In my review of the records, and I think it's Dr. Zieba's records, there's an indication that you were may -- maybe treated for your PTSD at a place in Tennessee; do you recall that?

A          Yes.

Q          Do you recall the name of that?

A          I don't.

MR. GRAY:          If you remember later, will you let me know?

WITNESS:          Yes.

MR. GRAY:          Thanks.

MR. BAXTER:          Thank you.

Q          Prior to Advanced Pain Treatment Center, had you ever been in a car crash?

MR. GRAY:          Car wreck.  Before you went to see -- ever see Gupta, were ever you in a car wreck?

WITNESS:          Not that I recall.

Q          And we already talked about work-related

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          40

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:16:24
85787

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

injuries.  Any injuries kind of working or doing something around the home?

A   Around the home?

Q   Yeah, just -- I guess, let me ask it a different way.  Have you ever injured yourself kind of out and about or just at home?

MR. BAXTER:   And, sorry, that's really broad.  Let me try that again.

Q   Did you ever -- in either working around the home, running errands, ever do anything to injure or strain your back?

A   Not that I recall.

Q   Overall, how would you describe kind of your -- your physical condition prior to your first day at Advanced Pain?

A   Explain yourself.

Q   Well, clearly, your back hurt prior to going to Advanced Pain, correct?

A   Correct.

Q   Was that pain stopping you from being able to do any of the things that you wanted to do at home?

A   How was I functioning, is that what you're asking?

Q   Absolutely.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000081 of 000198

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

85787

A    I was working full time; I was normal.  I wasn't disabled before I went there.

Q    Were you referred to Advanced Pain Treatment Center, like by another physician?

A    No.

Q    What initially led you to Advanced Pain?

A    My daughter worked there.

Q    And what -- what was Brittany's position at Advanced Pain?

A    CMA.

Q    When you would go to appointments with Dr. Gupta would anyone else attend with you

A    My husband.

Q    And did he attend each appointment?

A    I don't recall.

Q    Would Brittany also attend those appointments?

A    No.

Q    When the -- the procedures, the facet blocks, the injections, when those would occur, would Brittany go into that room with you?

A    No.

Q    Okay.  Would your husband attend in those rooms --

A    Yes.

Q    Do you think that he was there for every

Lisa E. Hoinke, Court Reporter
HoinkeReporting@gmail.com        42

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000082 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
01/05/2026 04:16:24 PM
85787

single one of the injections?

A    I don't know.  Can you -- can you rephrase -- can you re -- readdress that question, please?

Q    Sure.  When you -- so just to kind of let you know what I mean by injections, records indicate that you received facet blocks.

A    Fa -- what do you mean fa --

Q    It -- it's what they're called.  That's okay. Let me try this differently.  When -- sometimes when you would see Dr. Gupta, it would be just a regular visit where they would check up on kind of your condition, correct?

A    Correct.

Q    And sometimes you would then be given an additional treatment --

A    That they give my neck.

Q    Correct.  When those would occur, was your husband always present?

A    Correct.

Q    Okay.

A    The important visits, correct.

Q    Thank you.

A    You're welcome.

MR. SMITH:    That's the way you do it, help him --

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000083 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

MR. BAXTER:          I was -- yeah, I -- I

MR. SMITH:          -- help -- help him give you a good question that you can answer.

MR. BAXTER:          -- I need as much help --

MR. SMITH:          Help him -- help him and he'll help you, okay.

MR. BAXTER:          -- I need as much help as -- as -- as the rest of us in these....

(REPORTER MARKS A COPY OF THE ADVANCED PAIN TREATMENT CENTER PATIENT REGISTRATION, JANUARY 15, 2021, AS EXHIBIT 2 FOR THE PURPOSE OF IDENTIFICATION, AND THE SAME IS ATTACHED HERETO AND FILED HEREWITH.)

Q          I'm going to hand you what we will mark as Defendant's Exhibit 2.  And I'll -- I'll represent to you this is the kind of initial paperwork from Advanced Pain Treatment Center. Does this look like your handwriting?

A          Yes.

Q          And then if you will turn -- let's see, it should have been page number one, two, three -- the fifth page, the background questionnaire.  It's got the drawing of a man to kind of mark where the pain was.

MR. GRAY:          There you go.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000084 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033   10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

85787

Q       And so within --

A       No, this is not my handwriting.

Q       Correct.  The -- the front page that we discussed was, but this portion right here, other than -- is the top, where it lists your name, is that your handwriting?

A       No -- yes, that is, but that's not.

Q       And then the rest was -- looks like probably filled out by Dr. -- presumably Dr. Gupta?

A       Yes, that is.

Q       Do you recall making the markings on the -- the picture of the man at --

A       No --

Q       -- the --

A       -- I do not.

Q       Okay.  Does this -- in reviewing this chart which kind of -- which marks where the pain was reported, does that -- does that kind of jive with your memory as to where you were experiencing pain when you initially presented -- when you first went to Dr. Gupta?

A       No.

Q       And how -- how does it differ from your recollection?

A       It was just my back.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000085 of 000198

Filed          24-CI-01033   10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

Q     It was just your back.  So the portions marking pain in the -- looks to me the right arm and right leg, you think is incorrect?

A     Uh-huh (AFFIRMATIVE).  It's over.

Q     It also seems to indicate like a headache pain.

A     Uh-huh (AFFIRMATIVE).

Q     Were you experiencing headaches when you were first -- when you first went to Dr. Gupta?

A     I was already being treated.

MR. GRAY:     For headaches?

WITNESS:     Uh-huh (AFFIRMATIVE).

MR. GRAY:     Is that --

WITNESS:     Correct.

MR. GRAY:     -- is that a yes?

WITNESS:     Yes.

MR. GRAY:     Lisa needs yeses.

WITNESS:     Yes.

MR. GRAY:     Okay.

Q     I'm going to direct you to -- without page numbers it's difficult.  It is the -- it's the fourth to last page.  It looks like this (INDICATING).  Yeah, yes.  Is this your handwriting?

A     Yes.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000086 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

Q   And do you see on the kind of lower third of the page where there's a section for employment status?

A   Yes.

Q   And where it says current occupation, it says, currently not working.  Is that your handwriting?

A   Yes.

Q   And with the benefit of -- of seeing this document, do -- does that change your previous testimony that you were working full time at the -- when you first went to Dr. Gupta?

A   I don't understand what you're saying.

Q   Now, having the benefit of seeing this document that you filled out on January 15, 2021, does that maybe correct the timeline for your employment in your testimony?

A   I disagree with this date.

Q   You think that the -- so you disagree with the date at the bottom --

A   Yes.

Q   -- of the page?

A   Correct.

Q   Does it -- does it not look like your handwriting?

85787

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000087 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed                    24-CI-01033 10/16/2024              Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

01/05/2026 04:16:24
PM

85787

A       No.

Q       When do you think that this document -- that you filled out this document?

A       I don't know.

WITNESS:        Can we speak?

MR. GRAY:       You and I?

WITNESS:        Yes.

MR. GRAY:       Yes.

MR. BAXTER:     Sure.

MR. GRAY:       Let's go off the record.  Take the mic off; let's step outside.

VIDEOGRAPHER:   We're off the record.

        (OFF THE RECORD)

VIDEOGRAPHER:   We're now back on the record.  The time is 11:53.

Q       Based on Dr. Gupta's assessment, is it your understanding that he recommended some form of injection?

A       Yes.

Q       And setting aside the involvement of -- of D.J. Thomas, which I'm -- I -- we'll -- we will discuss at length.  I don't want to ignore.  I know that there are -- are complaints there.  But is it your -- is it your contention that you did not consent to

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000088 of 000198

Filed                    24-CI-01033 10/16/2024              Kathryn Marshall, Franklin Circuit Clerk

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

those injections at all or that you did not consent to the involvement of D.J. Thomas?

MR. GRAY:        Let me OBJECT for the record.  She's not a medical expert, but you're entitled to hear what her lay opinion is about her care.  Do you understand the question or have I screwed it up now?  I'm good at that.  You want to do it again?

Q    Sure.  Did -- did you agree to the injections but not the involve --

A    I did not agree to Mr. Thomas sedating me and acting as a anesthesiologist.  I trusted Dr. Gupta --

Q    And -- and --

A    -- to perform faithful care on me and he broke that trust.

Q    And I -- I understand that --

A    And when I told D.J. no, he didn't listen.  And when he said I -- I will be a VIP patient.  All patients should be VIP.

Q    Is it possible that he said that to all patients?

A    He said it behind closed doors.  I'm not saying that he didn't.  But aren't all

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000089 of 000198

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

patients VIP. But he sedated me with anesthesia in a syringe. Acted as a legal professional in scrubs.

Q   And we're -- we will -- I will make sure to discuss this at length. But what my question is, if we were to remove D.J.'s involvement or if D.J. were a -- a different person, a registered nurse, were you in agreement with the injections --

A   No.

Q   -- that were recommended? So you -- you did not agree to any of the injections from Dr. Gupta at all, regard -- regardless of D.J. Thomas' involvement?

MR. GRAY:   Do you understand the question?

WITNESS:   No.

Q   So I understand that your testimony earlier is that you -- you don't recall that the term facet block is a type of injection for pain management. That was -- I'll represent to you that was the first set of injections that were performed. When they were recommended, did you agree to them?

A   Not that I recall.

MR. BAXTER:   I'm going to introduce Exhibit 3. I

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000090 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

went out of order.  Let's -- we'll keep this as Exhibit 3.  I went out of order on my dates.  And I'll introduce Exhibit 4.  We might need it; we may not, but we've already got a sticker.

(REPORTER MARKS A COPY OF THE ADVANCED PAIN TREATMENT CENTER MEDICAL RECORD, APRIL 15, 2021, AS EXHIBIT 3 FOR THE PURPOSE OF IDENTIFICATION, AND THE SAME IS ATTACHED HERETO AND FILED HEREWITH.)

(REPORTER MARKS A COPY OF THE ADVANCED PAIN TREATMENT CENTER MEDICAL RECORD, MARCH 25, 2021, AS EXHIBIT 4 FOR THE PURPOSE OF IDENTIFICATION, AND THE SAME IS ATTACHED HERETO AND FILED HEREWITH.)

(WITNESS REVIEWS DOCUMENT)

A    Huh-uh (NEGATIVE).  Huh-uh (NEGATIVE).

Q    So I'll represent to you that this is the --

MR. GRAY:    We're on Exhibit 4?

MR. BAXTER:    Yes.

MR. GRAY:    Okay.  Look at this.

MR. BAXTER:    Yeah, I -- I grabbed the wrong one for Exhibit 3.

Q    This is the -- the office note for the first

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000091 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

PM

01/05/2026 04:16:24

85787

injective therapy that you received from the Defendants.

MR. GRAY:   Don't look at 3.  Look at 4.  He's on 4.

WITNESS:   Okay.

MR. GRAY:   All right.

Q   On the last page, the last two pages.  I'm sorry, I'm being so confusing.  The second to last page of this document which for the video record appears like this (INDICATING).  Is that your signature at the bottom of the page?

A   Absolutely not.

Q   Do you recall discussions with Dr. Gupta about the injective therapy that he had recommended?

A   I did recall.

Q   And what do you recall about those discussions?

A   That I was not a candidate.

Q   You're not a candidate for --

A   The injections.

Q   In that discussion, what was -- what do you recall then kind of being the plan for your treatment?

A   Ketamine.

Q   Did you agree to a Ketamine infusion?

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000092 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT 01/05/2026 04:16:24 PM

A        Yes.

Q        Was it your understanding that sedation was going to be used?

A        There was no talk about it.

Q        What do you recall from the discussion about the process of the Ketamine infusion with Dr. -- with Dr. Gupta?

A        He did not explain it.  He screamed most of the time.

Q        This episode of screaming, was that prior to the first Ketamine infusion?

A        Yes.

Q        Did it make you feel -- make you feel uncomfortable?

A        Yes.

Q        Did it make you weary to continue treatment?

A        Yes.

Q        Why did you then continue treatment?

A        I had nobody else.

Q        Did you attempt to seek care from any other pain management physicians?

A        Yes.

Q        Which pain management physicians did you seek care from after this episode where --

A        I don't remember.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*        53

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000093 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:16:24

85787

MR. GRAY: Make sure he finishes his question, okay?

WITNESS: Uh-huh (AFFIRMATIVE).

MR. GRAY: You're doing great, but make sure he finishes, okay.

Q What was the -- what stopped you from being able to see those pain management physicians?

A What do you mean?

Q What was the reason that you did not follow through seeing those other pain management physicians?

A Follow through like why?

Q From what I understand your testimony to be is that prior to the first Ketamine infusion there is an episode where Dr. Gupta raised his voice and made you feel uncomfortable and made you weary of continuing treatment, correct?

A Correct.

Q And that prompted you to try to seek other pain management physicians' care, correct?

A Correct.

Q You cannot recall who those physicians were, but you ultimately did not receive care from those physicians?

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000094 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

PM

01/05/2026 04:16:24

A    Correct.

Q    Was an appointment made with anybody?    85787

A    Correct.

Q    Did you attend that initial appointment?

A    Correct.

Q    Was it with just one other pain management physician?

A    I don't recall.

Q    Do you -- do you recall who the pain management physician was that you went to seek a second opinion from?

MR. GRAY:          Do you remember?

A    Yes.

Q    What was that physician's name?

A    Dr. Klickovich.  I was referred to him.

Q    Who were you referred to Dr. Klickovich by?

A    From my rheumatoid arthritis doctor.

Q    And you attended the initial appointment with Dr. Klickovich?

A    Correct.

Q    Did anyone else attend that appointment with you?

A    Yes.

Q    Who?

A    My husband.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000095 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
65/87

Q    And what was the reason provided that Dr. Klickovich could not continue treatment?

A    Could not help me.  Certified me a letter, UPS.

Q    I'm sorry, I don't understand.  Certified -- what do you mean by the certified letter?

A    That he could not provide me service.

Q    And this was after the initial appointment?

A    Correct.

Q    Did he -- prior to sending that certified letter, did he make any plans or recommendations about the treatment?

A    Not that I recall.

Q    Did you voice your concerns with Dr. Gupta to Dr. Klickovich?

A    He asked detail.  Whole conversation was about what went wrong.

Q    And what did you -- when you say what went wrong, what are you referring to?

A    What to make my care better.

Q    And so you had a conversation with Dr. Klickovich about how your care could be improved from what Dr. Gupta was providing, correct?

A    Correct.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000096 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

85787

Q    And did Dr. Klickovich voice any criticisms of the care that Dr. Gupta had provided?

A    He said nothing.

Q    I apologize.  I kind of lost my train of thought here for a moment.  Your testimony was that you did recall a conversation with Dr. Gupta about the Ketamine infusions?

A    Correct.

Q    And that you -- you ultimately were in agreement to proceed with the Ketamine infusion?

A    Correct.

Q    And I think this might be where my confusion is, but you don't recall any conversation about the use of any sedation?

A    No.

Q    Okay.

A    Not by D.J.

Q    But sedation, in general?

A    I knew there would be -- if any procedures were performed by Dr. Gupta, yes, but not by D.J. Thomas, who's not certified to do anything.

Q    No, I -- I understand.  And we'll -- I promise we will get to those -- that part of the

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    57

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000097 of 000198

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

01/05/2026 04:16:24
PM
85787

litigation, but just so I make sure I have a clean record and understand what you're saying, you knew and agreed to sedation for any of the procedures performed by Dr. Gupta, just not performed by D.J.?

A     Any -- any procedures performed by Dr. Gupta, but not by D.J. Thomas.

Q     Okay.  Staying focused on the Ketamine infusion, walk me through what you recall about that procedure, just kind of frame by frame as if we're watching a -- the movie of it.

A     Explain.

Q     So represent, based on Exhibit 4, in our medical records, that on April 15, 2021, you underwent your first Ketamine infusion with Dr. Gupta.  Had you had a Ketamine infusion anywhere else prior to that first Ketamine infusion?

A     No.

Q     If you could, just -- just tell me the story of that Ketamine infusion, what you recall from the moment you were brought back at Advanced Pain to the moment that you left Advanced Pain.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000098 of 000198

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

01/05/2026 04:16:24
PM

A        Do you mean like when I left, went home?

MR. GRAY:           No.  He's asking you to tell — to tell him what you remember about the procedure itself; when you were brought in, what they did, how they did it, what you -- just what you remember; who was there, who did what.

A        Gupta came out and screamed that it was going too fast because it went like in 30 -- like 20 minutes or something, that it was going too fast.  And it was done in a certain amount of time, and it wasn't supposed to be done.  There was no hallucinations.  I wasn't like monitored properly.

Q        You said --

A        It was done IV-wise.

Q        You said no hallu -- hallucinations.  I guess I'm just -- I'm just confused by that, what you mean --

A        Like I didn't go like in twilight --

Q        Oh, okay.

A        -- if that's what you're asking.

Q        No, ma'am.  I -- I was just clarifying what you said.  So starting with the -- who all was

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                59

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000099 of 000198

Filed   24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

01/05/2026 04:16:24

PM

present for that Ketamine infusion?

85787

A    D.J.

Q    Was Dave?

A    Yes.

Q    Was Brittany?

A    She was, but she did nothing on -- on me.

Q    Were there any other medical providers within that room?

A    No.  Dr. Gupta was running back and forth and D.J. in his little blue scrubs.

Q    Who set your IV?

A    Who -- it was an African American woman I recall.

Q    But --

A    I mean --

Q    -- guessing it's a nurse --

A    Yes.

Q    -- or -- or PA?

A    Yes.  Because I'm a hard stick.

Q    No, I understand.  Did they -- after the IV was set, what occurred next?

A    The infusion.

Q    Was there any sedation for this procedure that you recall?

A    Are you asking -- okay, are you asking how the

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    60

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000100 of 000198

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:16:24
85787

Q    infusion got started?  Is -- is -- I'm really --

A    -- is that how you're asking, how the Ketamine got started?

Q    No, ma'am.  I'm really just asking kind of step by step what you recall of just that Ketamine infusion.  So we've got the IV set by --

A    Because it all started in the operating room, and Gupta brought me out of the operating room because I had a side effect to the back, and he didn't answer the phone, because my whole right side swelled, and when he realized I had a side effect he said, oh, no, we can't do this no more.  Why didn't anybody call me?

Q    Is -- is it your testimony that Dr. Gupta was not in the room for the Ketamine infusion?

A    Okay.  So they were going to do another procedure on my back, but he asked how it went, and when he was aware that we were trying to get a hold of him by phone because my whole right side swelled and nobody answered that number to call, he said, no, we can't do this procedure.  We're going to go this way to the Ketamine.  So he brought me

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000101 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

PM          01/05/2026 04:16:24

out of the operating room and him and D.J. started -- that's when D.J. done the Ketamine, was doing the Ketamine.

Q    So the -- the procedures that you -- you had before the Ketamine infusion, you had a reaction to it to where your right side swelled?

A    Yeah, I swelled -- yes.  This whole right side leg swelled.  And he called it something.

Q    Did you -- did you take anything -- any medications to -- in order to reduce the swelling?

A    No.  I was on -- on the couch.

Q    I -- I understand that you called Advanced Pain.  Did you --

A    Called whatever number was on the paper and nobody answered.

Q    Did you reach out to any other medical providers to make an appointment anywhere for the right-sided swelling?

A    No, because the number said contact Gupta on-call person.

Q    Other than the right-sided swelling, was there any other complications with that, that first procedure that was performed by Gupta?

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    62

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000102 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

PM

01/05/2026 04:16:24

85787

A        Not that I recall.

Q        How long did that right-sided swelling last?

A        I don't remember.

Q        That initial procedure, did it also -- going back to the initial procedure, do you recall any discussions prior to the procedure itself where -- where it was explained to you?

A        He done whatever he wanted to do.  Gupta done whatever Gupta wanted to do.

Q        Did he explain to you the procedure that they were going to do?  Going back to that initial procedure where you would experience right-sided swelling, do you recall any discussions with Gupta prior to the procedure?

A        To the first procedure?

Q        Yes.

A        What I went there for, we would talk about.

Q        And he -- so he discussed what would happen with that first procedure.  Did you agree to that first procedure?

A        Yes.

Q        Was it -- and -- and -- do you recall receiving sedation for that first procedure?

A        D.J. Thomas sedated me.

Q        And --

Lisa E. Hoinke, Court Reporter
HoinkeReporting@gmail.com                    63

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000103 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT

01/05/2026 04:16:24 PM

85787

A   He would ask Dr. Gupta how much sedation to -- to give me.

Q   And once he asked, presumably then he would go draw the --

A   Yes.

Q   -- medication?

A   Out of the little container and put it in the needle and do it.

Q   And then would --

A   They're supposed to be twilight.

Q   Would Dr. Gupta check the amount?

A   No.  He would tell him how much.

Q   And how was the sedation administered by D.J.?

A   Needle, out of a bottle.  He took it out of the cabinet.

Q   Was it through an IV?

A   Yes.

Q   Who set the -- who set your first IV, if you recall?

A   The -- a lady because I'm a hard stick.

Q   During each of those was it the same lady that --

A   I don't honestly recall.

Q   Okay.  Let me -- and this is one of those weird deposition rules where you've just got

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    64

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000104 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

to read out the whole one before you respond. But what I was going to ask is if you recall whether it was the same lady that set your IV for all the procedures at Dr. Gupta's office?

A    No.  There was a -- I will correct that. There was a Mexican boy at the last procedure. I do not recall his name.

Q    So either the -- the African-American lady --

A    Yes.

Q    -- or -- or the Mexican man --

A    Yes.

Q    -- were -- those were the two medical providers that set your IV --

A    Yes.

Q    -- each time?

A    Yes.

Q    Okay.  How long after that first procedure did that right-sided swelling start?

A    I don't recall.

Q    Was -- do you recall if it was the same day?

A    Within.

Q    Going back to the Ketamine infusion, somebody -- kind of walking through the procedure still.  After the IV was set, was sedation administered during that infusion, if

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          65

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000105 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
01/05/2026 04:16:24 PM
85787

you recall?

A     Ketamine?

Q     Prior to the Ketamine infusion was there sedation involved in that procedure?

A     Not with the Ketamine, no.

Q     Okay.  What then would next happen after the IV was set, if you recall, during that Ketamine infusion?

A     I don't recall.

Q     Okay.

A     So much happened.

Q     Did you experience any complications --

MR. BAXTER:     Let me strike that.

Q     After the Ketamine infusion, did you have any problems?

A     When?

Q     So this would be the second -- the second procedure performed by Dr. Gupta was the Ketamine infusion.  Did you -- do you recall experiencing any problems like right-sided swelling or any other complications after the Ketamine infusion?

A     With what?

MR. GRAY:     Related to the Ketamine infusion, did you ever have any bad results or

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000106 of 000198

Filed     24-CI-01033 10/16/2024     Kathryn Marshall, Franklin Circuit Clerk

Case: 3:26-cv-00024-GFVT Doc #: 1-2 Filed: 03/30/26 Page: 309 of 662 - Page ID#: 370

NOT ORIGINAL DOCUMENT
01/05/2026 04:16:24 PM
85787

complications?

WITNESS:        From the Ketamine?

MR. GRAY:        Yes.

WITNESS:        No.

Q        All right.  It's my understanding that beginning then in May of 2021, you participated in exercise therapy -- therapy at Advanced Pain Treatment Center.  Do you recall that?

A        He pushed for me to go to therapy there, Dr. Gupta.

Q        Was that your first experience with any PT or exercise therapy, other than obviously your -- your background?

A        To go to Dr. Gupta's physical therapy?

Q        No.  Let me rephrase it.  Have you ever been a patient in -- in any -- for any PT prior to Advanced Pain?

A        No.

Q        Okay.

A        Not that I recall.  Can I add to the record?

Q        Sure.

A        That he wanted me to be a patient at the psych -- psychiatrist there and the nutritionist, knowing I already had a psychiatrist.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*        67

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)
EXH : 000107 of 000198

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

PM                                                                            01/05/2026 04:16:24

85787

Q        And after that conversation, did you -- did you decline to see both?

A        Yes.

Q        All right.

A        And the physical therapist.  So going to his physical therapist, there was like four or five other patients in there at the same time, and with me having high anxiety, that just made it worse.

Q        But -- so it was your understanding that you were able to decline certain services that were recommended by Advanced Pain and Dr. Gupta?

A        But he kept on yelling at me for not going.

Q        After the exercise therapy, do you recall another type of procedure being recommended by Dr. Gupta?

A        Not that I recall.

Q        Okay.  Is it your recollection that the Ketamine infusion was the last procedure that Dr. Gupta performed on you?

A        I don't recall.

Q        When were you first made aware of D.J. Thomas' licensure status?

A        When the Medical Board let us know.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000108 of 000198

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

85787

Q    It's my understanding that you were the grievant in that Kentucky Board of Medical Licensure; is that correct?

A    Correct.

Q    So how did you learn prior to filing that grievance about D.J. Thomas' licensure status?

MR. GRAY:    OBJECT to form.

MR. SMITH:    You can go on and answer.

MR. GRAY:    You can answer, I'm sorry.  Do you understand the question?  Have I screwed it up again?  Before you filed your grievance with the Medical Licensure Board, how did you become aware that D.J. did not hold a certification?

WITNESS:    I don't know.

Q    Do you recall who told you about D.J.'s medical license -- or status as a medical assistant?

A    The Medical Board.

Q    When you filed that grievance were you represented by an attorney?

A    Correct.

Q    What was the name of that attorney?

A    Kristin Turner.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000109 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
01/05/2026 04:16:24 PM

Q       It is my understanding that Kristin Turner was also a member of the Kentucky Board of Medical Licensure; is that your -- do you share that understanding?

A       I don't recall.

Q       Prior to the Kentucky Board of Medical Licensure grievance did you have a prior relationship with Kristin Turner?

MR. GRAY:       Let me OBJECT to relevance; go ahead.  You can tell him.

A       Yes.

Q       What -- what was the relationship?

A       Niece.

Q       And I should have asked this earlier.  Do you have any siblings?

A       Yes, half.

Q       Obvious.  It'd be hard to have a niece without a sibling.  I'm sorry, what was the name of the sibling?

A       Half, but I'm not involved with them.

Q       Oh, Heide is the last name?

A       No.  Half.

MR. GRAY:       Half siblings.

A       But I'm not involved with them.

Q       Oh, I'm sorry.  And what -- do they live in

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000110 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM

01/05/2026 04:16:24

85787

Kenton County?

A    Yes.

Q    Okay.  And kind of for the same jury purposes --

A    Chris Allender.

Q    Okay.  So you've already identified --

A    Yes.

Q    -- them earlier?

A    Uh-huh (AFFIRMATIVE).

Q    So who is -- is Ms. Turner --

A    Dave's -- Dave's niece.

Q    So your prior testimony was that you were made aware of the medical -- that D.J. was a medical assistant by the Kentucky Board of Medical Licensure.  The grievance states -- states that D.J. is a medical assistant and that he -- that that's the gravamen of your -- your complaint.

MR. BAXTER:    Sorry, I completely lost my train of thought.

MR. GRAY:    Is that a question?

MR. BAXTER:    No.

MR. GRAY:    Why don't you start --

MR. BAXTER:    Stream of --

MR. GRAY:    -- over?

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000111 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

MR. BAXTER:        -- stream of consciousness.

MR. GRAY:          And why don't you take gravamen out

of your next question.

Q        What was the substance of your grievance, if

you recall?

MR. GRAY:          I'll OBJECT that this document

speaks for itself, but do you

remember, what was your complaint

to the Medical Licensure Board,

Wendy?

A        That I was given sedation by an unprofessional

person who sedated me and Dr. Gupta allowed

it, and I trusted him.  He touched my

backside.  He wouldn't listen.  He

administered drugs to me in the office,

including IV sedation.  And Kentucky Board

License found that D.J. was practicing

medication without a license.

Q        Was -- was your daughter, Brittany, aware of

D.J.'s status as a medical assistant?

A        Not until at the end, until this was found.

Q        Other than the grievance filed, did you have

any other interactions with the Kentucky Board

of Medical Licensure?

A        No.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    72

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000112 of 000198

Filed   24-CI-01033   10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

85787

Q     Did -- I'll confess to you, I don't know the full process they have.  So there were no interviews?

A     Explain.

Q     Well, did the -- after you filed your grievance, were you called in for any interviews in front of any Board members?

A     No.

Q     Okay.  Other than the grievance, do you recall providing any other statements, like written?

A     Explain.

Q     Other than the initial document that laid out your complaints to the Board, did you have to prepare any other written statement, affidavit, anything along those lines?

A     Not that I recall.

Q     After you filed the -- the grievance, did you -- did you discuss your complaints about Dr. Gupta and the practice with any other medical providers?

A     Yes.

Q     And who would that be?

A     I don't recall.

MR. BAXTER:      I -- I'm not going to mark this, but I want to provide it so then that

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    73

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000113 of 000198

Filed   24-CI-01033   10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed  24-CI-01033  10/16/2024  Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

way we're all reading from the same page of the hymnal.  I -- not to forecast too much of our legal concerns, but I think there are -- well, I don't want -- concern about waiver of any privilege that might attach the Kentucky Board of Medical Licensure documentations -- documentation.

Q    This is the Amended Agreed Order that Dr. Gupta and the practice entered with the Kentucky Board of Medical Licensure. Beginning on the third paragraph on this first page, it details the grievance that was filed. The first paragraph lists that you were uncomfortable with Mr. Thomas being in the room.  I guess I'm just curious why that would be at the outset, prior to learning that he was a medical assistant?

A    Explain yourself.

Q    It states in the -- under the bullet point in the second sentence, I was very uncomfortable with Mr. Thomas being in my treatment room while I was wearing a gown and not fully clothed, given that he has no medical

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000114 of 000198

Filed  24-CI-01033  10/16/2024  Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

certification.  Well, let me ask this, did --
after you learned that D.J. was a medical
assistant, did you return for treatment at
Advanced Pain?

A     Once I learned he wasn't a medical assistant?

Q     Well, he is a medical assistant.

A     He is not a medical assistant.  He is nothing.
The Kentucky -- he is nothing.  The Kentucky
Board found him to be nothing.  He has no
license, bottom line.  He should have never
touched me.  He should have never done no
procedures on me.  He has no license.

Q     Is -- is it your testimony that he performed
the procedures or just administered the
sedation?

A     He per -- he performed procedures.  He done
X-rays too.

Q     So the -- the first procedure where you had
the right-sided --

A     Right here, the gown.  When I say the gown,
that was the X-ray room that we were in.  It
should have never happened.  He should have
never touched me in that room.  Dr. Gupta knew
I was raped before and he allowed it.  It
should have never happened.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000115 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

MR. BAXTER:          Counsel, do we want to take five?

MR. GRAY:            You want to take a break?  Let's

take a break.  Go off.

VIDEOGRAPHER:        It's 11:35; we're off the record.

(OFF THE RECORD)

VIDEOGRAPHER:        We're now back on the record.  It's

12:46.

Q      Going back to this document, the -- the

Amended Agreed Order that reflects the

grievance.  Were you uncomfortable with D.J.

Thomas being present in the procedure room

prior to learning that he was just a medical

assistant?

MR. GRAY:            Let me OBJECT to form.  We don't

need to argue about semantics,

medical assistant, but -- I don't

know, that's where we kind of got

confused last time, but I'll just

OBJECT to his characterization as a

certified medical assistant.  I

don't know if that's even what you

meant, but maybe you can try it a

different way.

MR. BAXTER:          Why don't we go off the record for a

minute.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    76

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000116 of 000198

Filed

24-CI-01033 10/16/2024

Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT

01/05/2026 04:16:24 PM

85/87

            (OFF THE RECORD)

VIDEOGRAPHER:        We're now back on the record; it's
                    12:50.

MR. GRAY:            We just had an off-the -record
                    discussion about the terminology or
                    the semantics of calling D.J. a
                    medical assistant.  We've agreed to
                    not call him a certified medical
                    assistant, but for our purposes
                    today, we've agreed to call him a
                    medical assistant.

MR. BAXTER:         Yeah, and we all reserve our further
                    arguments and kind of --

MR. GRAY:           Abso --

MR. BAXTER:         -- yeah.

MR. GRAY:           Absolutely.

MR. BAXTER:         Gotcha.

MR. GRAY:           Thank you.

Q        Prior to learning that D.J. Thomas was just a
         medical assistant, do you have -- did you have
         any con -- did you still feel uncomfortable
         with him in the room?

A        I felt uncomfortable having them both and not
         having a female in the room, yes.  There was
         never a female present in the room with them.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                          77

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000117 of 000198

Filed                  24-CI-01033 10/16/2024                  Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

Q      What about the -- the African-American woman who set the IV, would she remain in the room?

A      No.  When we were behind closed doors, there was never a female.  For the record, I'm very up front about my PTSD and the rape from a child with all of my doctors.

Q      I'm sorry, just making sure I didn't have followup.  I -- it's weird where it's not a form to be able to acknowledge what you said, but I don't want to just sit there and let it --

A      So if it is a male that -- that I have to see, for instance, there was always a female that is present.  I just want you to be aware of that.

Q      Was -- was that part of your grievance to the KBML, or is that kind of -- you're just giving me that information so I kind of have a better understanding?

A      So you'll have a better understanding.

Q      On the next -- on page 2 of that Agreed Order, the -- the bullet, it talks about you're given your first injection of something we're probably all going to struggle to pronounce, cyanocobalamin, and -- and that's also listed

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000118 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

in your Complaint, that you were given that injection even though you were allergic. Is that still your understanding as you sit here today?

MR. GRAY:          OBJECT to form.  She wasn't allergic to -- it's B12, right, Wendy?

WITNESS:          Uh-huh (AFFIRMATIVE).

MR. GRAY:          It's B12.  She's not allergic to B12.  She had an allergic reaction.  I think it's two different things.

Q    Is that your testimony that you're not allergic to B12 injections, but you had an allergic reaction to an injection of B12 at Dr. Gupta's office?

A    Correct.

Q    And it's your testimony today that the B12 injection was provided by Dr. Gupta at Advanced Pain?

A    Correct.

Q    As I understand it, they did not have in stock B12 at any given time, and it's not listed within the medical records.  Is it possible that you might be equating the B12 injection to Dr. Gupta when it was performed by another provider?

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    79

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000119 of 000198

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:16:24
85787

A      Not that I recall.

Q      The next portion of this grievance refers to what I'll -- I'll refer to as like the VIP conversation.  Do you recall whether -- was this -- did this conversation occur prior to the first procedure?

A      The -- the VIP was in the procedure room.  He looked at me and said, you'll be VIP when he got ready to sedate me.  And I was knocked out.

Q      It then says, I took this to mean that I was given more anesthesia than other patients.  Is it possible that this -- that his reference to VIP was also made to other patients?  Did you have any -- I guess, let me re-ask that.  Did you have any discussion with any other patients?

A      I did not talk to any other patients.  I did not remember moving from the stretcher to the other bed, then from that bed over into the -- the little waiting area.

Q      Is it -- is it your testimony that you lost consciousness after the Versed was -- sorry, is it your testimony that you lost consciousness after the sedation was

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000120 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

administered?

A    You could say that, if I don't remember anything.  It wasn't twilight.

Q    Did you inform the Kentucky Board of Medical Licensure that D.J. Thomas set one of your IV lines?

A    Correct.

Q    And earlier, I understand your testimony to be that all IV lines were set by either an African-American woman or a Mexican man.  So was that representation to the Kentucky Board of Medical Licensure untrue?

A    Are you saying set by the, or give the injections?

Q    Placed the IV, like insert --

A    Oh --

Q    -- the IV?

A    -- he inserted into my IV.

Q    Correct.  But he didn't start the initial IV, correct?

A    He injected into my IV.

Q    Correct.

MR. GRAY:    You're -- you're not communicating.  He's asking you if -- if you told the Board of Medical Licensure that

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*    81

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000121 of 000198

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:16:24

85787

D.J. put in your IV --

A       No.

MR. GRAY:       -- placed your IV?

A       He injected into the IV.

Q       So any statement that -- to the Board that D.J. set the IV would be incorrect?

A       I don't know.

Q       Returning back to the VIP conversation, was anyone else present when the VIP language was used?

A       Gupta was.  Me and Gupta and D.J. was behind closed doors.

Q       Was this in the procedure room?

A       Yes.

Q       Was Dave also present?

A       Of course not.  He was getting ready to do the procedure.  He was standing over beside Dr. Gupta.

Q       Dave was?

A       No, D.J.

Q       I -- I thought your testimony earlier was that Dave was present for the procedures?

A       He's not allowed to be in there, in the procedure room.

Q       Okay.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    82

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000122 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT 01/05/2026 04:16:24 PM

85787

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000123 of 000198

A    It was D.J. and Dr. Gupta and me.  They roll you in the procedure room.

Q    Okay, I understand now.  Since we're having kind of some difficulty in -- in me understanding the testimony, I want to return back to the procedures themselves.  We talked about the first procedure where there was -- you experienced right-sided swelling.  The next was the Ketamine infusion.  Do you recall receiving, and I know this is medical terminology, but cervical epidural steroid injections at Dr. Gupta's office?

MR. GRAY:    Injections in your neck.

A    Yes, back here (INDICATING).

Q    Do you recall the conversation -- do you recall having a conversation with Dr. Gupta about that procedure before it occurred?

A    Yes.  He had to do a couple procedures.

Q    Did you feel like he answered all the questions that you had about that procedure?

A    I don't recall.

Q    All right.  Did -- did you ultimately agree to those -- those procedures -- those procedures, but the -- the -- the cervical --

A    Yes.

Filed                    24-CI-01033 10/16/2024                    Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

Q        -- epidural steroid injections?

MR. BAXTER:        Okay.  We're going to move on to the
                   Complaint which we'll mark as
                   Exhibit 5.

        (REPORTER MARKS A COPY OF THE COMPLAINT AS
        EXHIBIT 5 FOR THE PURPOSE OF IDENTIFICATION,
        AND THE SAME IS ATTACHED HERETO AND FILED
        HEREWITH.)

Q        I want to ask you some questions to kind of
         clarify the meaning in some of these
         paragraphs on page 3 under -- it's paragraph
         13, and then I'm going to ask you some
         questions about those subparagraphs.  The
         first one being 13(e) which says, by
         negligently and carelessly overdosing
         anesthesia in a doctor's office procedure.
         Was it more than one occasion that you contend
         you overdosed on the anesthesia?

MR. GRAY:        Let me state an OBJECTION on the
                 record.  This is a Complaint written
                 by a lawyer, but I'll allow her to
                 answer.

A        I was given anesthesia by D.J. Thomas, who was
         not certified to do any medical treatment on
         me, and he sedated me, and Dr. Gupta allowed

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000124 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

it, and I trusted him.

Q   Moving to paragraph 13(g), it's on the next page, and it -- it describes situations where prescriptions were refilled incorrectly.  Did you, ultimately, take those prescriptions or did you discover that they were incorrect prior to ingesting?

A   Can you rephrase that?

Q   Sure.  Paragraph 13(g) describes issues that occurred where your prescriptions were refilled incorrectly by the Defendants.  Did you take those medications that were ordered incorrectly?

A   So my prescriptions -- I have prescriptions by other doctors, by another doctor.  So D.J.'s wife orders the prescriptions, and she was calling in my other medicine from my psychiatrist.  So it was like double prescriptions being called in.

Q   Okay.

A   So my husband was thinking I was taking both medication and I wasn't.  So it was causing arguments, big time.

Q   What was that medication?

A   The Topamax.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    85

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)   EXH : 000125 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:16:24

Q    Topamax.  And --

A    She was just ordering all my medications and she didn't have the right to do that.

Q    Other than kind of the marital conflict, did -- did it cause any additional harm?  Did you take the medication and, you know, take too much other -- or otherwise get sick from it?

A    I don't know what all medications were taken to be truthful.

Q    Okay.

A    There was so much medication given to me.

Q    By Dr. Gupta or by other providers as well?

A    Dr. Gupta.  I was on so much medication.  I was lucky to be able to tie my shoe.

MR. GRAY:    Justin, if you'll give me some latitude.  There's a couple of issues that she's brought up that you need to know about.  Was there any issues with the prescribing of Savella, that --

WITNESS:    Yes.

MR. GRAY:    -- you recall?  Would you please explain that?

WITNESS:    So he -- Dr. Gupta prescribed

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                86

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000126 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

Savella, and it was supposed to be started at a low dose, but Autumn, D.J.'s wife, called it in at a high dose and my blood pressure bottomed. So I was trying to get a hold of Dr. Gupta to see what was going on and the messages wasn't getting to Dr. Gupta. When it finally got to Dr. Gupta, he went off in his office, said, what are you trying to do, kill my patient? So I had to start the prescription all back over again because you've got to go in slow increments with this medication.

Q    And what is Savella prescribed for?

A    You tell me. I have no idea.

Q    Is it your contention that you should not have been prescribed Savella?

A    Justin, I don't know.

Q    Has any medical provider ever told you that the Savella prescription was incorrect?

A    Justin, I do not know.

Q    I mean --

A    Yes, the medicine -- I was supposed to start

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000127 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed  24-CI-01033  10/16/2024  Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:16:24

85787

the low dose and go so many days, but Autumn, D.J.'s wife, who orders Dr. Gupta's prescriptions, called it in to the pharmacy wrong. She called it in at the high dose. So she overdosed me. She called it in backwards. And my blood pressure was bottoming. I even called the pharmacy, was like, is there a conflict here; do you know? And he said, you need to call your doctor. So the message wasn't getting to Dr. Gupta. Then finally when contact was made to Dr. -- he goes, are you trying to kill my patient?

Q  And that contact, was that -- so you called --

A  Me. I finally made con -- I had to go in to his office.

Q  So you called Dr. Gupta. You were unable to get a hold of him, and then you went to the office?

A  Correct.

Q  Was it on one of the days where you had an appointment or did you just go to discuss --

A  Showed up.

Q  Okay. And was anyone else present with you?

A  My husband. I even took pictures of my hand because they were turning blue.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                88

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000128 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
01/05/2026 04:16:24 PM

Q        Do you still have those pictures?

A        Probably not because my phone got destroyed.

Q        When did your phone get destroyed?

A        A year ago because the kids -- my grandkids dropped it.

Q        Do you still have the same phone number that you did at the same time --

A        I --

Q        -- at the time you --

A        I don't recall.

Q        Do you -- you don't recall whether --

A        I --

Q        -- your phone number has ever changed?

A        It probably has.

MR. SMITH:        It has.  Dave called me with a new phone number within the last six months.

MR. BAXTER:        Well, I mean, that could be all of us.

MR. GRAY:        If we have any pictures -- if you have any pictures --

WITNESS:        I can provide them.

MR. GRAY:        Please do.

WITNESS:        Yes.

Q        Okay.  Do you still presently take Savella?

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000129 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

85787

A     No.

Q     Do you take any medication for your fibromyalgia?

A     Yes.

Q     What medication do you take?

A     Cymbalta and Gabapentin and Hydrocodone.

Q     Paragraph 13(I) on the same document says, negligently administering a drug trial and improper billing associated with such.  Is -- is the drug trial you're referring to Emgality?

A     Yes.  I was asked to go into this drug trial by Dr. Gupta, the Emgality, which I was already on Emgality by my neurologist who was giving it to me.  And so I explained that to him, but he said, oh, no, try this for the trial.  And then the one lady -- I can't think of her name -- came and said, you'll get these gift cards every three months, $25 or $50 gift cards.  I never saw any gift cards.  So I was supposed to come in once a month to get the Emgality.  So she would call me to say, okay, it's time for your Emgality.  Well, when I missed, because she quit calling me, that's when he flipped out in the office and kicked

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000130 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

the garbage can all the way down the frigging hallway and started screaming at her and screaming at me.

Q  Was this in -- in his office?

A  Correct.

Q  And do you know the name of that other employee?

A  No, I do not.

Q  Could you describe her for me?

A  Blonde hair, long.  And when we would go to the pharmacy to get our medicine, Emgality would be there, and it's like seven hundred and some dollars because it's a syringe that you stick in your stomach.

Q  The -- the female employee with long blonde hair, was she heavy set or skinny?

A  Medium.  She was his assistant.

Q  About how tall would you estimate her?

A  About your height.  Holly is her name.

Q  Holly, thank you.  So prior to the drug trial, you were already taking Emgality?

A  Yes.

Q  Was it -- in the drug trial, do you know whether it was a different, like a different dosage?

Lisa E. Hoinke, Court Reporter
HoinkeReporting@gmail.com                    91

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000131 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT

01/05/2026 04:16:24 PM

85787

A   Not that I know of.  I was just told Emgality.

Q   Okay.  The second kind of part of this portion of the Complaint is the improper billing associated with it.  Is it your contention you were over billed for participation in the drug trial?

A   Okay, Just -- can I say something, Justin?

Q   Sure.

A   So this Emgality, by the way, was being treated for my headaches.  I was already being treated for my headaches by my psychiatrist.  I was already on medication for my headaches.  So adding more medication was -- was just bad.

Q   So during your participation in the drug trial, is it -- were you taking two doses of Emgality then?

A   Yes, because I was getting Emgality from my neurologist, and I was getting headache medicine for my migraines from my psychiatrist.  So Dr. Gupta's going to have more headache medicine.  So why add more medication?  I was there to get treated for my back, not for my headaches, or to find out what was going on with the pain.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000132 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
01/05/2026 04:16:24 PM
85787

Q    Where would you typically -- so was the Emgality provided by Advanced Pain or would you have to go to a pharmacy to get it filled?

A    I would get -- she would come in with the syringe and give it.  But when we would go to the -- get my medicine, when Autumn would call in all my medicine, Emgality would be there and we would have to tell the pharmacy, no, that's not supposed to be there.  And it went on for several times.

Q    But, ultimately, you would tell the pharmacy, no, we don't need any Emgality and you wouldn't receive any from the pharmacy?

A    No.  No, Justin.  Because I didn't have seven hundred-some dollars to pay.  That's a lot of money.

Q    I agree.  The last of this kind of subpart is -- is 13(j) negligently billing insurance for prescriptions that were not needed and visits that did not happen.  What were the prescriptions that were not needed?

A    My headache medicine.

Q    So that would be the Emgality?

A    Topamax, because my psychiatrist was already ordering my Topamax.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000133 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL
01/05/2026 04:16:24
85787

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000134 of 000198

Q    How did you learn that you -- that insurance was billed for visits that did not occur?

A    Well, I check my billing statements.  I keep track of all my billing statements.  So every time I would call they would charge my insurance, because I would have to call to say, hey, why isn't my prescriptions at the pharmacy because he was having -- sending your prescriptions over.  It would be a week later before my prescriptions would be there, so I would be out of my medicine.  So you go a week late without your medication, three days late, four days.  So I'm arguing with the pharmacy, like are you all the ones holding my medicine up?  And they're like no.  And they're showing me a printout like, this is when it came.  So every time I would call, they would bill the insurance.

Q    Do you -- setting -- kind of splitting the -- the claims in the Complaint from the medical negligence, just kind of outright errors in how they --

MR. BAXTER:    Sorry I'm not going to get there.  You just want to strike that one.

Q    Has any medical provider ever told you that

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT

PM

01/05/2026 04:16:24

85787

any of the procedures performed by Dr. Gupta were done incorrectly?

A    Nobody says anything.  Except the Kentucky Board found that they were unnecessary.

Q    And a bit of a delicate subject, but you had referenced, and it's in the discovery responses as well, about an incident where you were in the gown and D.J. -- I believe it was D.J., but maybe it was Dr. Gupta, correct me if I'm wrong, either touched the gown or the backside.  If you could, just kind of describe that incident.

A    We were in the X-ray room and the gown, he touched the back and I said, don't touch me. He said, I can do whatever.  And I said, don't touch me.  He was doing the X-ray.  He was acting as an X-ray tech.  He took the X-rays.

Q    So the X-ray room, is that different than the procedure room?

A    Yes.

Q    Were you taken to this X-ray room before procedures?

A    No.  He just done that one X-ray.

Q    What was the X-ray on?

A    My back.  The back and the front.  I'm

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000135 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
01/05/2026 04:16:24 PM

85787

assuming the front and the back.  I don't know, it's been so long.

Q   Aside from the sedation, what was D.J. Thomas' involvement in the proce -- the -- the procedures, as you recall?

A   Everything.

Q   Did he -- after the sedation for instance and the epidural injections, did Dr. Gupta then perform the actual procedure and D.J. just administered the IV sedation?

A   I have no idea.  I was sedated.

Q   Did you lose consciousness each time?

A   Yes.  It was only me and D.J. and Dr. Gupta behind that closed door.  Nobody else was behind that closed door.  If they're saying somebody else was behind that closed door, they're lying.  Or they came in after I was knocked out.

Q   Do you know what the sedation drug was?

A   No, I do not.  I just know he got it out of the cabinet over to the left as you come into the door, and he had his needle and he asked Dr. Gupta how much to give me, and Dr. Gupta told him.  Dr. Gupta was over at the computer, still charting on the other patient with his

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                96

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000136 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT

01/05/2026 04:16:24 PM

85787

back turned.  Dr. Gupta would wear his little X-ray lab coat.

Q    In your discovery responses --

MR. BAXTER:    Mark this as Exhibit 6.  These are the supplemental.

(REPORTER MARKS A COPY OF THE DISCOVERY RESPONSES AS EXHIBIT 6 FOR THE PURPOSE OF IDENTIFICATION, AND THE SAME IS ATTACHED HERETO AND FILED HEREWITH.)

MR. GRAY:    Here, give me this one.

Q    In response to number 7, that second bullet point says that Dr. Gupta performed three cervical epidurals unnecessarily.  Do you have any understanding as the basis for that conclusion?

A    Ex -- explain again.

Q    And with the understanding that this -- these documents are prepared a lot of times by and with lawyers, I just am curious whether you have any independent understanding of whether like those -- those epidurals were performed unnecessarily?

A    The Board of License said that they were unnecessarily needed.  And I trusted Dr. Gupta to perform the care that I needed by him, and

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000137 of 000198

Filed  24-CI-01033 10/16/2024  Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

he failed me.  And that he wouldn't do a job to harm me.

Q  This also mentions that one of the epidurals had a complication.  What -- what was that complication?

A  I swelled.

Q  Was there a second occasion where you experienced right-sided swelling?

A  Yes.

Q  Other than the two episodes of right-sided swelling, were there any other problems that you had after the -- after the procedures?

A  When I had the swelling of the one in the back, I swelled that I know.

Q  The last bullet in this Exhibit 6, page 2, that first kind of set of questions and responses says, Plaintiff was forced to visit the emergency room with medication toxicity issues that threatened her life.  Where did you present to the emergency room?

A  Fort Thomas.  That's when the Savella.

Q  Have you ever seen any medical records from that presentation?

A  What?

Q  Have you ever seen any medical records related

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000138 of 000198

Filed  24-CI-01033 10/16/2024  Kathryn Marshall, Franklin Circuit Clerk

85787

to that presenta -- you went to --

MR. BAXTER: Or sorry, let me rephrase it.

Q Have you ever seen your St. Thom -- or your --
can't get through it now. Have you ever seen
the medical records associated with that ER
presentation?

A I've been hospitalized.

Q There's another bullet, it's the third from
the bottom, says, Autumn Thomas, as an
employee of Defendant(s), failed to timely
call in refills of Plaintiff's medication thus
forcing her into opioid withdrawals. What
opioid was prescribed by Dr. Gupta?

A It was the -- I'm not sure of which
medication, but she was in charge of calling
in all my medication.

Q Have you ever experienced opioid withdrawals?

A Yes.

Q And was that related to prescriptions that
Dr. Gupta was responsible for?

A Yes.

Q What opioid was that?

A All my medication that was ever called in was
late.

Q With the understanding that your medication

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    99

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000139 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

was called -- called -- called in late, this response specifically refers to an opioid withdrawal, and I'm just curious whether or not you know what opioid was ever prescribed by Dr. Gupta?

A    I'm not sure which one he considers opiates because I'm supposed to be drug tested regular when I go there and I was drug tested one time.

Q    Is it possible that opioid withdrawals is a misunderstanding and it was just -- it was problems with a different medication that wasn't an opioid?

A    Correct.

Q    When you presented to the ER for the Savella issue, what treatment did you receive at St. Thomas?

A    I don't recall.

Q    Do you recall any discussions with any of the providers at St. Thomas about the dosage of Savella?

A    Not there.  From the pharmacy, I do.  How it was supposed to be prescribed.

Q    So --

A    Because it was written how it was supposed to

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*          100

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000140 of 000198

Filed                24-CI-01033 10/16/2024                Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

01/05/2026 04:16:24

PM

85787

be prescribed on the prescription.

Q    When you presented to St. Thomas at that --

A    Yeah.

Q    -- at the time you presented, did you know that Savella was the issue?

A    No.

Q    What did you -- what were your complaints when you presented to St. Thomas?

A    Blood pressure low.  But the Savella was called in backwards.

Q    And did you -- do you recall any conversations with any medical providers that explained your blood pressure dropped because of the Savella?

A    Yes.  The pharmacy person when I called to see if there was a re -- could be a reaction to the medication.

Q    And would this have been after you got home from St. Thomas?

A    No, before.  Autumn called in the Savella wrong.  She called it in backwards.  Dr. Gupta wrote a prescription.  Autumn called it in wrong.

Q    And -- and so you took the Savella and then you started experiencing --

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                               101

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000141 of 000198

Filed         24-CI-01033 10/16/2024         Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

01/05/2026 04:16:24
PM

85787

A    Yes, the side effects.

Q    What were the side effects?

A    My blood pressure bottomed, almost killed me.

Q    And then after your blood pressure bottomed -- how do you check your blood pressure, do you use a cuff; do you have a --

A    Yes.

Q    Does that -- do you record that in any way?

A    Write it down.  Do I have record of it?  No.

Q    So after you blood pressure drops, what is your next -- what do you do next?

A    Tried to reach Dr. Gupta and could not reach him.

Q    And then next you go to St. Thomas?

A    I don't remember.

Q    What pharmacist or -- or what pharmacy did you call?

A    Walgreens, Newport.

Q    Within the same document marked as Exhibit 6, on page 3, within this, you indicate that you tried to seek other pain management specialists that refused to treat you; is that accurate?

A    Correct.

Q    And it says, specifically, Plaintiff met --

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    102

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000142 of 000198

Filed         24-CI-01033 10/16/2024         Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

met with Quintorich, Q-U-I-N-T-O-R-I-C-H, M.D., a pain management specialist that refused to treat Plaintiff after consultation. Where is Dr. Quintorich's office?

MR. GRAY:          Where is his office?

WITNESS:           Who is that?  I have no idea who that person is.  I've never seen that person.

MR. GRAY:          Who was the doctor that you --

WITNESS:           That's the one who sent me the letter, that is Dr. Gupta's friend.

MR. GRAY:          Klickovich.  We already talked about him.

WITNESS:           Yes.  That's the only one.  I've never seen this person.

MR. GRAY:          So you think Quintorich should be Klickovich?  All right.

MR. SMITH:         That would probably be this lawyer's error.

MR. GRAY:          I was getting ready to pin it on TJ, but -- if he wasn't here, I definitely was going to pin it on him.

MR. SMITH:         That would -- that would be this lawyer's error.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    103

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000143 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

MR. GRAY:          So --

MR. BAXTER:          Fair enough.  That's -- that's fine.  I understand.

MR. GRAY:          -- Quintorich/Klickovich, close enough.

Q          Okay.  From what I understand about your earlier testimony, that presentation to Dr. Klickovich occurred after the Ketamine infusion, correct?

A          Yes.

Q          Okay.  Have you tried to seek pain management care at any time from any other provider after Advanced Pain?

A          Yes.

Q          Where?

A          UC Pain Management finally accepted me.

Q          Have you had an appointment with UC Pain Management?

A          Yes.  I'm seen there now.

Q          When did you start treating at UC Pain Management?

A          A few months ago.

Q          Have they recommended any treatment?

A          Yes, water aerobics, water therapy.

Q          Have they -- have they recommended Ketamine

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    104

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000144 of 000198

Filed

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

85787

infusions?

A       No.

Q       Have you sought out Ketamine infusion since Advanced Pain Treatment?

A       Sought out Ketamine?

Q       Like as treatment, not as --

MR. GRAY:       Have you gone anywhere asking for Ketamine treatment?

WITNESS:       I've had it.  The ambulance had to give it to me when they came and picked me up.

Q       When was that?

A       Several months ago.  They thought I had a stroke.  Nowhere around here offers the Ketamine.

Q       Do you feel like the Ketamine improved your back pain?

A       Yes.  The Ketamine that I had, and what they're saying the Ketamine that Dr. Gupta give me was not.  Whatever Dr. Gupta give me, I do not know because the Ketamine that the ambulance people gave me was Ketamine.

Q       So is it your testimony that you don't think that you received Ketamine from Dr. --

A       No, I do not.  Do I believe he gave me

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    105

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000145 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM

01/05/2026 04:16:24

85/87

Ketamine?  No, I do not.

COURT REPORTER:     You want to finish your question?

MR. BAXTER:         I'm sorry?

COURT REPORTER:     You said, is it your testimony that you don't think -- you want to finish the question?

MR. BAXTER:         Okay, yeah.

Q     Is it your testimony that you don't -- that you don't believe you received Ketamine from Dr. Gupta?

A     No, I do not.

Q     What evidence do you have to support that claim?

A     Because of the effects that I had from the Ketamine that I had from the Ketamine that I had on the last infusion, the side effects.

Q     Where did you receive a Ketamine infusion since Advanced Pain Treatment?

A     When the ambulance came and picked me up at my home.

Q     Okay.  So that -- was that an injection of Ketamine?

A     Injection.

Q     And -- and you're -- you're comparing the injection of the Ketamine to the Ketamine

Lisa E. Hoinke, Court Reporter
HoinkeReporting@gmail.com                    106

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000146 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:16:24
85787

infusion that was performed at Advanced Pain?

A    It was the same way as it was performed at Advanced Pain Clinic that you're talking about, that D.J. and Dr. Gupta provided. It was done the exact same way, but the ambulance people strapped me down and monitored, but D.J. and Dr. Gupta did not. I was laid on a gurney straight. Did I hallucinate? No, I did not at Pain Management.

Q    I want to parse out a little bit of testimony, you -- you talked about the monitoring, and you talked about the strapping down. Is it also your testimony that they did not monitor your vital signs at Advanced Pain Treatment Center?

A    There was a vital machine there, yes, but the side effects to Ketamine was completely different. Do I feel that I had Ketamine that they're saying at Dr. Gupta's? No, I do not compared to what I had in the squad.

Q    Have you ever discussed that concern with any medical provider?

A    Yes, I have.

Q    And who would that be?

A    With my therapist.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000147 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

Q    Is that Dr. Zieba?

A    Vickie Kennedy, my counselor.

Q    And is Ms. Kennedy part of a larger like group, like what's the name of her office?

(PAUSE)

Q    That's -- we can -- I can always confer back with counsel, if we need to further identify.

A    What's -- she's public.  Newport.

MR. SMITH:    Her office is in Newport?

WITNESS:    I call it the poor.

Q    Your answers to interrogatories indicate that your -- your back is worse than when you first began treatment at Advanced Pain Treatment Center.  Could you describe how it -- it's worse today than it was in -- in January of 2021?

A    I was able to run before, walk more, lay longer.  It feels like I'm being hit with a baseball bat regular.

Q    And at UC Pain Center, have they given you any explanation as to what the source of your pain is?

A    Just medication.

MR. GRAY:    What's the source of your pain?

WITNESS:    Said monitoring -- well,

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000148 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

85787

fibromyalgia, but monitoring --
possibly monitoring for MS.  And
that's been the first time that
we've heard that.

Q    Was that recently?

A    Yes, because of my eyesight and falling and
everything else.  And this is the same stuff
that had been reported the whole time going to
Dr. Gupta's.

Q    You had issues with your eyesight and falling
prior to your presentation with Dr. Gupta,
though, correct?

A    No.  It had been getting worse.

Q    It -- it had -- is your testimony that it had
been getting worse, but that you did have
issues with your eyesight and falling prior to
Dr. Gupta?

A    What do you mean?

Q    So you said that you did not have those
problems, but it also sounded like you were
saying that it had gotten worse.  So did you
have problems with your eyesight and falling
prior to your presentation to Dr. Gupta?

A    I wasn't falling, falling.  I started falling,
like my whole right side started giving out

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000149 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

and my eyesight started going bad once he started me on all that medication. And I started telling him and he just started adding more.

Q     Did -- did you seek treatment from Dr. Zieba related to the issues of falling and eyesight prior to your presentation to Advanced Pain Treatment?

A     Absolutely not.

Q     If those records were to indicate otherwise, would you say that Dr. Zieba's records were incorrect?

A     Yes, I would. I know what I seen Dr. Zieba for and I would be very open about it.

Q     I want to move forward in time to the interview that you did with LINK nky and just curious how that came about?

A     They asked for an interview.

Q     Did you or any of your family members reach out to them first or did they contact you first?

A     They contact.

Q     In that interview, in the raw interview, it mentions that you called a friend who is a medic after one of the injections. Who was

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000150 of 000198

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:16:24

that individual?

A     I do not know.  I was not the one who called.

Q     Who was the person who called?

A     My husband.

Q     This is a little off topic, but within that interview there's -- there's kind of mention of the vehicles of my clients and -- and kind of where they frequent.  Are you aware of any surveillance efforts on any of my clients?

A     What?  Rephrase that.  What?

Q     Sure.  In the -- in the LINK nk -- in -- in that interview --

MR. GRAY:          I second the motion.

Q     In that interview there's some pretty detailed descriptions of my -- one of the vehicles of my clients and also kind of mentions where they frequent.  Have you, Dave, any of your representatives, engaged in any surveillance efforts of my clients?

A     Negative.

Q     Okay.

A     That's a no.

MR. GRAY:          We understand; that's good.

Q     Within that interview you also say that Dr. Gupta intentionally hurt you and I --

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000151 of 000198

NOT ORIGINAL DOCUMENT

01/05/2026 04:16:24 PM

Q  I -- I was just curious kind of what you meant by that?

A  He knew that D.J. Thomas was not certified to do any procedures, and I trusted Dr. Gupta in good faith to perform what he told me he would do.

Q  How do you know --

A  He lied.

Q  Sorry.  How do you know that Dr. Gupta knew that D.J. was not allowed to assist in the way he did?

A  He's practiced with him for how long?  He should know every one of his employees if they're certified or not.  That's his responsibility.

Q  And I -- I don't disagree with you.  But do you have any information that would lead -- that would -- that would show that Dr. Gupta knew that D.J. should not be participating in that way, but disregarded that?

A  That's his responsibility to know what certifications his employees have.  That's -- that's his responsibility.

Q  I understand and I don't disagree.  But what your testimony is is that Dr. Gupta, not

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000152 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

should have known, but Dr. Gupta knew, and I'm curious what information you have about Dr. Gupta's specific knowledge?

A    That is Dr. Gupta's responsibility as a doctor, to know when he hires his employees. He takes an oath to provide care for patients, and I was his patient, and he failed.

Q    Has the regulation that governs sedation in those procedures ever been explained to you?

A    What do you mean?

Q    So the -- the regulation that the KBML order addresses, and D.J.'s involvement, the regulation that it allegedly violated, have you -- have you ever read that regulation?

A    The Kentucky Board said D.J. Thomas has no license.

MR. GRAY:          The question is, have you ever read the regulation that regulates the giving of sedation?  Have you ever read that regulation?

WITNESS:          You have to have a license.

MR. GRAY:          Have you ever read the --

WITNESS:          No.

MR. GRAY:          -- regulation?  Okay.

WITNESS:          No.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000153 of 000198

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT

01/05/2026 04:16:24 PM

85787

MR. GRAY:          Okay, that was his question.

WITNESS:          No.

MR. GRAY:          That was just that simple.  Okay.

Q     We talked about the back pain.  Are there additional back pain since Advanced Pain Treatment Center?  Are there any additional injuries that you attribute to the care provided by the Defendants?

A     I hurt every day.  I'm not the same person now that I was.  My whole life has been torn apart.

Q     And the pain that you experience every day, do you attribute that to the care that Defendants provided?

A     Yes, I do.

Q     And if you could kind of explain to me a little further why that is.

A     I trusted Dr. Gupta.  I went there trusting Dr. Gupta.  I'm not a person to just go to doctors, and I don't like taking a lot of medication.  So I trusted him to go there thinking he could help me and he failed.  And knowing my situation I was already facing.

Q     I guess I'm struggling to understand how that correlates --

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    114

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000154 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

A    He should have been more communicating with my psychiatrist too, instead of wanting me to go on board with all his partners in his facility and giving all the medication, and I wouldn't have been having psych -- breakdowns and stuff and ended up being hospitalized in psych because of the epidurals and all that.

Q    When were you hospitalized due to the epidural in psych?

A    I don't recall.  It's embarrassing.

Q    Had you ever been hospitalized for psychiatric issues prior to the treatment that was provided by Defendants?

A    No.  I have not had a history of this length of my health ever until seeing Dr. Gupta.

MR. BAXTER:    Let's take a break.  I'll get organized, and we should be near the end.

MR. GRAY:    Okay.

VIDEOGRAPHER:    The time is 1:50, and we're off the record.

          (OFF THE RECORD)

VIDEOGRAPHER:    We're back on the record; it's 1:58.

Q    In January of 2021, were you admitted to the Lindner Center of Hope?

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000155 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033  10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85/87

A       Yes.

Q       And what was that admission for, as best you understand it?

A       I don't recall.

Q       Was it for psychiatric treatment?

A       I don't recall.

MR. BAXTER:       What I am up to?

COURT REPORTER:    This will be 7.

MR. BAXTER:       Seven.

        (REPORTER MARKS A COPY OF THE ST. ELIZABETH HEALTHCARE RECORDS AS EXHIBIT 7 FOR THE PURPOSE OF IDENTIFICATION, AND THE SAME IS ATTACHED HERETO AND FILED HEREWITH.)

Q       I'm going to hand you Exhibit 7.  And because there's only 18 pages, this is the entirety of the St. Elizabeth Healthcare specific to SEP Behavioral Health.  On, what is marked at the bottom, page 5, there's a 9/15/2021 visit. And the last two sentences states, she claims she was healthy up until the time she was working at Campbell County Detention Center. Things just went downhill, losing sunglasses, losing purse, little things, forgetting things.  She hasn't worked for about a year now.  I couldn't even focus computer –

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    116

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000156 of 000198

Filed          24-CI-01033  10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:16:24
85787

aggravating.  Now, I just get aggravated cooking - burning things - not normal.  I'm curious what -- if you agree with this statement today?

A   I don't recall.

Q   This also states that you hadn't been working for about a year now, which would kind of further indicate that at the time you initially presented to Advanced Pain you were not working.  Does that further clarify your understanding as to your employment status when you first sought treatment?

A   I don't recall.

Q   All right.  Last question I'll ask about this document concerns page 14.  Do you recall being treated by, I believe it's Dr. Davis, Dr. James Davis at SEP Behavioral Health?

A   Yes.

Q   This note details that he met with both you and your husband and that, second sentence, I advised them that I believe the patient is showing signs and symptoms of a pretty classic conversion reaction and the good news, then, is that I don't believe she has a neurological disease causing her problems.  I discussed the

Lisa E. Hoinke, Court Reporter
HoinkeReporting@gmail.com                    117

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000157 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:16:24
85787

nature of somataform disorders with her, emphasizing how psychic stress is, quote, converted into somatic symptoms as a means of distracting these patients from painful emotional -- emotions and memories. Therefore, the treatment for conversion symptoms is not medication or medical procedures, but rather psychotherapy which helps the patient acknowledge, identify and cope with the emotional pain in their life. Do you recall having this conversation with Dr. Davis?

A   I don't remember.

Q   Are you still currently seeking treatment for any conversion disorder?

A   Yes.

Q   Who are you currently seeking treatment for conversion disorder?

A   I'm in therapy.

Q   What is your understanding of conversion disorder?

A   It's therapy.  I see a neurologist.

Q   After learning that D.J. was out of -- practicing outside the scope of his ability, did -- who did you speak to in terms of

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    118

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000158 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT

01/05/2026 04:16:24 PM

85787

medical providers about any of the issues it caused?

A   I don't recall.

Q   Is it -- is it possible you didn't speak to any medical provider about the issues that arose after learning about D.J. Thomas?

A   I don't recall.

Q   Your discovery responses indicate previous contact with the Commonwealth's Attorney. When was the last time you had any contact with the Commonwealth's Attorney about the allegations in this case?

A   I don't recall.

Q   Do you have any understanding of the Commonwealth Attorney's position as involves Dr. Gupta and D.J. Thomas?

A   Explain.

Q   So you filed a complaint, for lack of a better word, to the Commonwealth's Attorney concerning Dr. Gupta and D.J. Thomas, correct?

A   Correct.

Q   Have you had any discussions, after filing that kind of initial documentation, with anyone at the Commonwealth Attorney's Office?

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    119

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000159 of 000198

Filed            24-CI-01033 10/16/2024            Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:16:24

85787

MR. GRAY: Did you have an interview with them?

WITNESS: Yes.

Q When would you estimate that that occurred?

A A year ago.

Q Since that interview, have you had any contact with the Commonwealth Attorney's Office related to this?

A Not that I recall.

Q Okay. Did they ever provide any explanation to you about any decision they've made concerning Dr. Gupta and --

A Not that I recall.

Q Earlier you -- you mentioned that you're -- you were a runner prior to Advanced Pain Treatment Center's care. Would you regularly participate in races?

A The walks and races.

Q What were some of the ones you enjoyed before the Defendants --

A The Turkey, the holiday races, and walking my dog regular.

Q Do you use any kind of like mileage tracker when you were running?

A No. I was very active.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000160 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

85787

Q    Did you have any -- do you have any gym memberships currently?

A    Planet.

Q    Oh, Planet Fitness?

A    Yes.

MR. GRAY:    It's purple, you know.

MR. BAXTER:    Yeah. They have goofy commercials.

Q    We've -- we've discussed at length the allegations in the Complaint and the injuries that you've -- that arose, that you've alleged. Have -- to the best of your knowledge now, have you -- have you detailed all the complaints that you have about my clients?

A    I know my life won't be back to where it was.

Q    What do you mean by that?

A    Back to normal. But I was working full time and to see where I'm at now and to hear Dr. Gupta say to me, you'll never work again, that's very discouraging to go to a doctor and to be told that. I went there to be able to be normal, and to feel that I'm not normal now, it's not fair. And to be treated how I was treated is unacceptable. They get to enjoy their life every day.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000161 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

Q    How -- how do you differentiate pain that you experience on a daily basis, as related to your fibromyalgia or conversion disorder, with the allegations that you've asserted in this litigation?

A    I can't even describe to you the pain between any of it, from my body to any of it.  My body is in pain.  My back.

Q    And I -- I -- I don't know if we've nailed this down --

A    I used to be able to go on vacations.  I can't even hardly ride in the car without aching.

Q    The -- the back pain that has gotten worse, what is your allegation that caused that?

MR. BAXTER:    Sorry, let me rephrase that.

Q    How did the care that my clients provide further injure your back?

A    I don't know what he give me in my back.  Was it something wrong?  Did he do something wrong?  Did he puncture something?  I don't know.  I'm not a doctor.  I -- I was sedated. I can't tell you what he done in that room. All I know was my back is messed up.

Q    What leads you to believe that there may have

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    122

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000162 of 000198

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:16:24

been a puncture?

A    I'm saying my back is messed up. It wasn't like this. I was hurting, but not in this much pain.

Q    And -- and --

A    I can't even go and do a lot of stuff.

Q    And what I'm asking is what -- what part of the care that my clients provided do you correlate to that pain?

A    Dr. Gupta provided a care that he would give and they both, him and D.J., worked as a team.

Q    Okay. And I understand that there are issues related to the sedation and D.J.'s involvement, that -- that exacerbated PTSD and anxiety, but when it comes to the back pain, are you alleging that any of the care that was provided was provided incorrectly?

A    Something had to go wrong because, I mean, I used to be able to ride in the car for long periods of time. Now, it hurts. Pain shoots up. My leg goes numb. My arm goes numb. My fingers go numb.

Q    When did that start to --

A    After.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                      123

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

PM

01/05/2026 04:16:24

Q     Was it after any particular procedure?

A     After I went and seen him, that I can 85787
remember.  Then the anxiety.  I used to be
functional.  Now, my anxiety is through the
roof.  Then you don't even want to throw on
sex.  My family life, my husband's life,
everything's destroyed.

Q     Is it your contention that the care provided
by Defendants has destroyed --

A     Everything.

Q     -- your marriage?

A     And my children.  My children don't know how
to deal with me.  I don't know how to deal
with myself because I trusted them.  I trusted
Dr. Gupta.  The bottom line is I trusted him.
He failed me as a patient.

Q     And other than the sedation, injection of the
sedation to the IV, how did they fail you?

A     As a human being, as a patient.  He knew what
I had wrong with me.  He knew I was a
complicated case.  If he couldn't treat me, he
shouldn't took me on.  He took me on.  Just
like my doctor now, he knows I have a lot of
issues.  It's right in his chart.

Q     I understand.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    124

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000164 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:16:24

85787

A   And Dr. Gupta knew I had anxiety; I had PTSD. He knew. He chose to take me on.

Q   Okay.

A   He was a trial-study doctor. Okay. He used me. That's what I feel like, a used person. Just use her. Do her as a test trial. That's what I feel like.

Q   Is it your contention you did not agree to the trial?

A   No. You just don't use -- that's what I feel like. I'm -- I'm being used. Nothing can replace what's been done to me, nothing.

Q   And, again, other than the sedation being provided by a medical assistant, what are your --

A   All of it.

Q   What does that mean?

A   Integrity, everything, embarrassment.

Q   How did they embarrass you?

A   How did they -- how dare you sit there and ask how did they embarrass me?

Q   Then explain it to me.

A   I -- I go to the ER, they think I'm drug seeking.

Q   And -- and how is that related --

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000165 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

A   Look at all the medicine on my chart.

Q   And how is that related to Dr. Gupta -- 85787

A   Look, I wasn't on all that damn medicine before I went there, no.  Pull the list, no. Look at the medicine list.  You put Dr. Gupta's and my regular.  I go to the ER, I'm put to the back of the line because they think I'm drug seeking.

Q   What medications --

A   That's sad.

Q   What medications did he prescribe that you no longer take?

(WITNESS REVIEWS DOCUMENTS)

MR. GRAY:        Need that?

WITNESS:         Yeah.

MR. GRAY:        Page eight.

A   Page eight.  And I have to go through this every time I go to the doctor because there's a whole list on my chart.  It's humiliating. I'm on hydro -- hydroxychlo -- whatever you want to call -- pain patch.  Then you add that, but you go to the middle --

Q   I don't see a pain patch on this.

A   The pain patch is off.  Did not get put on.

Q   Okay.  What else is not on here after --

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000166 of 000198

Filed     24-CI-01033 10/16/2024     Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:16:24

85787

A       The Hydrocodone.

Q       You take Hydrocodone now?

A       Yeah, from Dr. Chang, who has to see me by Wendy Morris. They put me under the -- my middle name because of this lawsuit. That's embarrassing. Because no other doctor would see me because of this lawsuit being filed.

Q       Who has told you that?

A       They don't say anything. They decline to take my case.

Q       So Savella is listed here three times as a medication you're no longer taking. You testified earlier that you are taking medication for fibromyalgia, correct?

A       Cymbalta.

Q       Cymbalta is also not listed on this bottom one.

A       Not Cym -- I'm taking the ones at the bottom. Sorry. The pain patch isn't listed and the Hydrocodone.

MR. BAXTER:       So this may be all the questions I have. I have a question for counsel we can do off record.

MR. GRAY:       Okay.

VIDEOGRAPHER:       2:18, and we're off the record.

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                    127

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000167 of 000198

NOT ORIGINAL DOCUMENT

01/05/2026 04:16:24 PM

(OFF THE RECORD)

VIDEOGRAPHER: 2:20, we're back on the record.

Q  Ms. Fillhardt, would you agree with me that you have sought treatment related to concerns about your husband's infidelity over the years?

A  Can you explain?

Q  Did you -- have you frequently told Dr. Zieba, for instance, that you have concerns about your husband's potential infidelity?

A  That's my personal life.

MR. GRAY: Do you recall making those complaints --

WITNESS: Yes.

MR. GRAY: -- to Dr. Zieba?

WITNESS: Yes.

Q  And those complaints would have predated any treatment by Advanced Pain Treatment Center, correct?  You had -- you had those concerns in January of 2021 and before?

A  Yes.

Q  You continued to seek treatment --

A  Yes.

Q  -- for the same concerns?

A  Yes.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000168 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

Q    In 2019 was there an event that led to an increase in your anxiety related to the loss of an extramarital partner?

A    But it has -- yes, but nothing to do with this.

Q    How long would you estimate that it kind of took to get over that?

A    Can you explain?

Q    Sure.  How -- how long did that raise your anxiety?

A    I was in therapy.  It was....

MR. GRAY:    How long was that the topic in therapy, three months, six months, nine months?

WITNESS:    Couple months.

MR. GRAY:    Okay.

A    Wait, back this up.  Do you mean a marital affair; is that what you're saying?

Q    Yes.

A    No, it was not an affair.  We were friends. There was a group of us.

Q    So if in a medical record that refers to --

A    It -- it's wrong.  We were friends.  I have never had an affair on my husband.

Q    Okay.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000169 of 000198

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
PM
01/05/2026 04:16:24
85787

A     Point blank.

Q     The famil -- the other familia issues with your -- what are those with your daughter, that -- that Defendants care has -- has caused?

A     What?

Q     You said that it has created issues with your children.  What issues has it created with your daughter?

A     It's not with my children.  My children has a hard time understanding my issues.

Q     Okay, okay.  We've identified the -- the back -- final question.  The --

A     The fact that D.J. done what D.J. done to me, does not have anything to do with my children or my personal life or what Dr. Gupta done to me.

Q     I -- I understand, to the extent it might be necessary -- that wasn't what I meant.  What I meant -- I thought that your testimony was that it created issues with your family, and so that was what I was asking about with the children portion.  We discussed worsened back pain, exacerbation of anxiety, exacerbation of PTSD.  Are there any other injuries that you

Lisa E. Hoinke, Court Reporter
HoinkeReporting@gmail.com                    130

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000170 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT

01/05/2026 04:16:24 PM

85787

associate with the Defendant's care?

MR. GRAY:          I think we've done a good, don't you?

WITNESS:           Yes.

MR. BAXTER:        Okay.  And it's not a final lap, so if there's anything additional, just let -- notify your counsel and we'll go from there.  I -- I appreciate your time.  I know it's not a comfortable position.

MR. GRAY:          No questions.  Thank you.  We're done.

VIDEOGRAPHER:      The deposition is concluded.  The time is 2:24, and we're off the record.

                   * * * * * * * * *

     WHEREUPON, the deposition of WENDY FILLHARDT was concluded at 2:24 p.m.

                   * * * * * * * * *

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000171 of 000198

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

Filed                24-CI-01033    10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:16:24

STATE OF KENTUCKY    )
                     )
COUNTY OF FAYETTE    )                              85787

     I, LISA E. HOINKE, the undersigned Notary Public in and for the State of Kentucky at Large, certify that the facts stated in said caption hereto are true; that at the time and place stated in said caption the witness named in the caption hereto personally appeared before me, and after being by me duly sworn, was examined by counsel for the parties; that said testimony was taken down in stenotype by me and the foregoing is a true record of the testimony given by said witness.

     No party to said action nor counsel for said parties requested in writing that said deposition be signed by the testifying witness.

     My commission expires:  June 18, 2027.

     IN TESTIMONY WHEREOF, I have hereunder set my hand and seal of office on this the 2nd day of July, 2024.

                   /s/ Lisa E. Hoinke
                   LISA E. HOINKE
                   NOTARY PUBLIC, ID KYNP72022
                   STATE-AT-LARGE, KENTUCKY

*Lisa E. Hoinke, Court Reporter*
*HoinkeReporting@gmail.com*                              132

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000172 of 000198

Filed                24-CI-01033    10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033   10/16/2024                    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:16:24

85787

# EXHIBIT 5

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000173 of 000198

Case: 3:26-cv-00024-GFVT   Doc #: 1-2   Filed: 03/30/26   Page: 376 of 662 - Page ID#: 437

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

DOCUMENT

PM

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

AOS #15 Supervision and Delegation
*Revised 4/2023*



**KENTUCKY BOARD OF NURSING**
312 Whittington Parkway, Suite 300
Louisville, Kentucky 40222-5172
http://kbn.ky.gov

## ADVISORY OPINION STATEMENT

### Role of Nurses in the Supervision and Delegation of Nursing Tasks to Unlicensed Personnel

| | |
|---|---|
| The Kentucky Board of Nursing is authorized by Kentucky Revised Statutes (KRS) Chapter 314 to regulate nurses, nursing education and practice, promulgate regulations and to issue advisory opinions on nursing practice, in order to assure that safe and effective nursing care is provided by nurses to the citizens of the Commonwealth.<br><br>The Kentucky Board of Nursing issues advisory opinions as to what constitutes safe nursing practice. As such, an opinion is not a regulation of the Board and does not have the force and effect of law. It is issued as a guideline to licensees who wish to engage in safe nursing practice. | **Opinion:**<br>Roles of Nurses in the Supervision and Delegation of Nursing Tasks to Unlicensed Personnel<br><br>**Approved Date:** 6/1987<br>**Revised:** 1/1988; 2/1991; 1/1993; 12/1993; 4/2001; 10/2002; 6/2003; 2/2012; 4/2014; 10/2014; 12/2018; 10/2019; 4/2023 **Editorial Revisions:** 2/2005; 1/2011;<br>1/2012; 5/2012; 4/2018; 6/2018 **Reviewed:** 1/2012; 9/2012; 4/2014 |

**Accountability and Responsibility of Nurses**

In accordance with KRS 314.021(2), nurses are responsible and accountable for making decisions that are based upon the individuals' educational preparation and current clinical competence in nursing, and requires licensees to practice nursing with reasonable skill and safety. Nursing practice should be consistent with the *Kentucky Nursing Laws*, established standards of practice, and be evidence based.

**Rationale for Advisory Opinion**

The Board has receives numerous inquiries related to the role of nurses in delegation. These inquiries span healthcare settings including facilities, schools, community settings, and others. The Board has issued the following advisory opinion statement as a resource for nurses making delegation decisions.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000174 of 000198

Filed        24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

Page 2 of 14

85787

## Advisory Opinion

"When certain aspects of nursing care need to be delegated beyond the traditional role and assignment of a care provider, it is imperative that the delegation process and the state nurse practice act (NPA) be clearly understood so that it is safely and effectively carried out." (National Council State Boards of Nursing, 2016).

"Only a licensed nurse can delegate…. Because they are responsible, they need to provide direction, determine who is going to carry out the delegated responsibility, and assist or perform the responsibility him/herself, if he or she deems that appropriate under the given circumstances." (NCSBN and ANA Joint Position Statement, 2019).

In accordance with KRS 314.021(2), nurses are held responsible and accountable for their decisions regarding the supervision and delegation of nursing acts to unlicensed personnel who provide nursing assistance, based upon the nurse's educational preparation and current clinical competence in nursing.

## Unlicensed Personnel

201 KAR 20:400 Section 1(14) defines an "unlicensed person" as "an individual, other than a nurse, the client, or the client's family, legal guardian, or delegatee, who functions in an assistant or subordinate role to the nurse." Unlicensed personnel are trained to perform specific health care related job duties and include but are not limited to certified nursing assistants, medical assistants, home health aides, dialysis technicians, and medication aides/technicians. A medication aide/technician is defined as an individual who receives training preparing for a role in administering topical and oral medications and who works under the supervision of a licensed nurse.

Unlicensed Assistive Personnel (UAP) are "any assistive personnel trained to function in a supportive role, regardless of title, to who a nursing responsibility may be delegated. This includes but is not limited to certified nursing assistants or aides (CNAs), patient care technicians, CMS, certified medication aides, and home health aides…." (NCSBN and ANA Joint Position Statement, 2019).

In the utilization of unlicensed personnel to provide nursing assistance, nurses should follow written approved policies and procedures of the health care facility/agency which are consistent with KRS Chapter 314.

It is inappropriate for an unlicensed person to delegate nursing tasks to other unlicensed persons.

## Delegation

"Delegation is allowing a delegatee to perform a specific nursing activity, skill, or procedure that is beyond the delegatee's traditional role and not routinely performed…." (National Council State Boards of Nursing, 2016).

The nurse (RN/LPN/APRN) has the overall responsibility and accountability for assessing the capabilities of the unlicensed assistive personnel (UAP) to include validation of their qualifications, knowledge, and competence in skills in carrying out any technical role. In

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000175 of 000198

Filed
24-CI-01033   10/16/2024
Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

addition, the nurse is responsible for providing the UAP with ongoing supervision, teaching, and evaluation (201 KAR 20:400).

Assessment, communication, supervision, and evaluation are essential elements in the delegation process. These elements should be utilized throughout the delegation process to ensure patient safety.

"Provide clear instructions and desired outcomes when delegating tasks.." (Potter, et al., 2019)

### NCSBN provided the following Five Rights of Delegation (2019).

- Right task: The activity falls within the delegatee's job description or is included as part of the established written policies and procedures for the nursing practice setting….

- Right circumstance: The health condition of the patient must be stable. If the patient's condition changes, the delegatee must communicate this to the licensed nurse, and the licensed nurse must reassess the situation and the appropriateness of the delegation.

- Right person: The licensed nurse along with the employer and the delegatee is responsible for ensuring that the delegatee possesses the appropriate skills and knowledge to perform the activity.

- Right directions and communication: Each delegation situation should be specific to the patient, the licensed nurse and the delegatee. The licensed nurse is expected to communicate specific instructions for the delegated activity to the delegatee; the delegatee, as part of the two-way communication, should ask any clarifying questions…. The delegatee must understand the terms of the delegation and must agree to accept the delegated activity. The licensed nurse should ensure that the delegatee understands that she or he cannot make any decisions or modifications in carrying out the activity without first consulting the licensed nurse.

- Right supervision and evaluation: The licensed nurse is responsible for monitoring the delegated activity, following up with the delegatee at the completion of the activity, and evaluating patient outcomes. The delegatee is responsible for communicating patient information to the licensed nurse during the delegated situation.

### Delegated Nursing Tasks

Unlicensed personnel who provide assistance to nurses may contribute to the implementation of the plan of nursing care in situations where the delegation of the task does not jeopardize the client welfare.

Some tasks may be included within job descriptions of unlicensed assistive personnel.

Such tasks may include, but are not limited to:

a) Collection, documentation, and reporting of data (e.g., vital signs, oxygen saturation using pulse oximeter equipment, height, weight, intake and output, and blood glucose testing when sample is obtained from a capillary site).

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000176 of 000198

NOT ORIGINAL DOCUMENT
01/05/2026 04:16:24 PM

85787

b) Assisting patients to perform self-care tasks, including assistance with a patient's self-administered medication.

c) Performing tasks of a routine nature that do not require ongoing nursing assessment and nursing judgment. For example, simple non-sterile dressing changes, external care to urinary catheters enema administration when not contraindicated by patient's skin integrity and condition, bowel and bladder program care including intermittent urinary catheterization and digital rectal stimulation, and colostomy appliance changes on mature stoma sites with sustained skin integrity.

d) Selected ambulation, positioning, turning, activities of daily living, or exercise programs.

e) Providing and maintaining a safe, comfortable environment.

f) Selected nutritional activities, such as feeding and meal preparation. This may include the administration of feedings or medications as outlined below via a gastrostomy tube when the tube is in a mature stoma site with sustained skin integrity, and when it is delegated by and performed under the supervision of a nurse.

g) Socialization activities.

h) Transportation of client.

## Nurse as Educator of Unlicensed Personnel

A registered nurse is an appropriate licensed health care professional to participate in the instruction, training, and education of unlicensed personnel. The licensed practical nurse may participate in the instruction, training and education of unlicensed personnel under the direction of a registered nurse, physician, dentist, or advanced practice registered nurse (except as limited in KRS 156.502, Health services in school setting – Designated provider – Liability protection, for licensed practical nurses in school settings).

Delegation does not occur when:

- A nurse only participates in the education of the unlicensed person and is not a participant in the ongoing assessment and implementation of direct care for the client and is not making decisions about delegation pursuant to 201 KAR 20:400 at the time the unlicensed person is providing the care; or
- During non-routine encounters between the nurse and client if the nurse is not making decisions about delegation pursuant to 201 KAR 20:400; or
- During performance of administrative duties by the nurse in the care setting that are not related to the nurse providing or supervising direct care.

## Licensed Practical Nurse

The licensed practical nurse, practices under the direction of a registered nurse, advanced practice registered nurse, physician, physician assistant, or dentist, and may supervise and

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000177 of 000198

NOT ORIGINAL
DOCUMENT
PM

01/05/2026 04:16:24

delegate nursing tasks to unlicensed persons in accordance with 201 KAR 20:400 as outlined in Section 1, except in a school setting.

Under KRS 156:502 (2) a school employee may be delegated responsibility to perform a health service by a physician, advanced practice registered nurse, or registered nurse. Thus in a school setting, a licensed practical nurse is not authorized to delegate to an unlicensed person.

### Registered Nurse

Based upon the statutes governing registered nursing practice, the focus of registered nursing practice is on the application of substantial specialized knowledge, judgment and nursing skill in the assessment, planning, implementation and evaluation of nursing care. Therefore, the registered nurse is responsible and accountable for:

a) Utilizing nursing judgment and critical thinking in decision-making regarding nursing care, and assuring that care is provided in a safe and competent manner;

b) Utilizing 201 KAR 20:400 Delegation of nursing tasks in determining which nursing acts in the implementation of care can be delegated and to whom.

201 KAR 20:400 Section 2 states in part:

(3) Prior to delegating a nursing task, the nurse shall determine the nursing care needs of the client. The nurse shall retain responsibility and accountability for the nursing care of the client, including nursing assessment, planning, evaluation, and assuring documentation.

(4) The nurse, prior to delegation to an unlicensed person, shall have either instructed the unlicensed person in the delegated task or determined that the unlicensed person is competent to perform the nursing task.

(5) A nursing task shall be delegated directly or indirectly. An indirect delegation shall not alter the responsibility of the nurse for appropriately assigning and supervising an unlicensed person.

c.) Providing supervision of unlicensed personnel who provide assistance to the nurse.

The nurse may wish to utilize the KBN Decision Tree for Delegation of Nursing Tasks to Unlicensed Personnel to determine if the nursing task should be delegated in conjunction with 201 KAR 20:400, Section 3 Criteria for Delegation, which states in part

- A task that a reasonable and prudent nurse would find is within the scope of sound nursing judgment and practice to delegate;
- A task that, in the opinion of the delegating nurse, can be competently and safely performed by the delegatee without compromising the client's welfare;
- The nursing task shall not require the delegatee to exercise independent nursing judgment or intervention; and
- The delegator shall be responsible for assuring that the delegated task is performed in a competent manner by the delegatee.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000178 of 000198

85787

## Exception to this Opinion

The performance of nursing tasks, such as medication administration, without a nursing license, except when included within the scope of practice of another licensed healthcare professional or otherwise permitted by law, would constitute the unlawful practice of nursing (KRS 314.031 and KRS 314.991). There is, however, one significant exception.

Pursuant to 201 KAR 20:400, Section 1(14), when the performance of what would otherwise constitute a nursing task is directed by the client, the client's family, the client's legal guardian or the client/client family/legal guardian's delegatee, the task is not considered to be the practice of nursing, nor delegation by a nurse. This would occur primarily in venues that are the client's home, or home-like residential settings, whether temporary or permanent.

Patient and family education is a part of nursing practice. As a part of preparing a patient for self-care, nurses may teach and supervise the performance of acts by patients and family members who have demonstrated willingness and an ability to perform the acts.

## Supervision

In a supervising capacity, the registered nurse, or licensed practical nurse practicing under the direction, and supervision of a physician, physician assistant, APRN, or RN, should provide clear direction, and assistance to those unlicensed individuals supervised, observe, and monitor the activities of those supervised, and evaluate the effectiveness of tasks performed under supervision.

The nurse should assure that the individual performing the task has the necessary educational preparation and validation of competence in order to perform the act in a safe manner.

201 KAR 20:400 Section 4. Supervision states:

> (1) The nurse shall provide supervision of a delegated nursing task.
> (2) The degree of supervision required shall be determined by the delegator after an evaluation of appropriate factors involved including the following:
>     (a) The stability and acuity of the client's condition;
>     (b) The training and competency of the delegatee;
>     (c) The complexity of the nursing task being delegated; and
> (d) The proximity and availability of the delegator to the delegatee when the nursing task is performed.

## Evaluation and Communication

The licensed nurse is responsible reviewing, evaluating and providing feedback regarding the UAP's performance of the delegated activity. As part of the evaluation process clear communication regarding the delegatee's demonstrated competency, ability to follow directions and the resulting patient outcomes should occur.

## Medication Administration

As stated in KRS 314.011(6)(c) and (10)(c), the administration of medication is the practice of nursing. KRS 314.011(6)(c) concerning registered nursing practice states:

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000179 of 000198

Case: 3:26-cv-00024-GFVT Doc #: 1-2 Filed: 03/30/26 Page: 382 of 662 - Page ID#: 443

NOT ORIGINAL DOCUMENT

01/05/2026 04:16:24 PM

85787

"The administration of medication and treatment as prescribed by a physician, physician assistant, dentist, or advanced registered nurse practitioner and as further authorized or limited by the board, and which are consistent either with American Nurses' Association Scope and Standards of Practice or with standards of practice established by nationally accepted organizations of registered nurses."

It is the opinion of the Board that following assessment of a client, a nurse utilizing 201 KAR 20:400 may delegate components of the administration of medication.

In the administration of medication, tasks may be delegated to a medication aide which:
(1) frequently occur in the routine care of a stable client or group of clients;
(2) are performed according to an established sequence of steps;
(3) involve no modification in client care;
(4) may be performed with a predictable outcome; and
(5) does not inherently involve ongoing assessment, interpretation, or decision-making.

The KBN does not have jurisdiction over medication aides or their training programs. However, the KBN recommends that a medication aide training curriculum include the following topics: medication fundamentals, safety, communication and documentation, medication administration, ethical and legal issues, and a practicum (NCSBN, 2007).

It is the opinion of the Board, that a nurse should not delegate the professional judgement or decision-making responsibility related to the following:

(1) recognizing side effects, toxic effects, and allergic reactions;
(2) recognizing immediate desired effects;
(3) recognizing unusual and unexpected effects;
(4) recognizing changes in client's condition that contraindicates continued administration of the medication; and
(5) anticipating those effects which may rapidly endanger a client's life or well-being (NCBON, 2019).

Should an unexpected or untoward event occur as the result of medication administration, the medication aide would be expected to immediately notify the nurse to assess and intervene as necessary.

### Assistive Living Communities

In Kentucky, KRS 194A.700 defines assistance with self-administration of medications. The statute allows for assistance with self-administering oral medication and application of topical ointments. "Assistance with medication that is prepared or directed by the resident, the resident's designated representative, or a licensed health care professional who is not the owner, manager, or employee of the assisted living community…"(2022).

### Long Term Care

In Kentucky, 902 KAR 20:048 states that unlicensed personnel known as certified medicine aides/technicians, may function by administering oral and topical medication in long-term care facilities only through delegation by and under the supervision of licensed medical or nursing personnel. Unlicensed personnel who administer oral and topical medications must have

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000180 of 000198

000180 of 000198

NOT ORIGINAL DOCUMENT

01/05/2026 04:16:24 PM

successfully completed a state approved training program from a state approved training provider with competency validation/testing through either a state approved or national exam for administration of medication as defined in the administrative regulations issued by the Cabinet for Health and Family Services, Office of the Inspector General.

## School Setting

Unlicensed school personnel were given authority (2014) to administer insulin in school settings under the delegation of a physician, advanced practice registered nurse or registered nurse by KRS 158.838. Unlicensed assistive personnel are required to successfully complete an approved course for administration of insulin and validate competency.

## Dialysis Technicians

Dialysis technicians may administer only those medications listed in 201 KAR 20:478, "Dialysis technician credentialing requirements and training program standards".

## Paramedics

Effective July 15, 2002, KRS 311A.170(5) permits a paramedic to be employed by a hospital to work as a licensed paramedic in the emergency department of the hospital subject to specific conditions. KRS 314.170(5) (b) states: "…A paramedic shall provide patient care services under the orders of a physician, physician assistant, advanced practice registered nurse, or as delegated by a registered nurse…" and as per 201 KAR 20:400.

The Kentucky Board of Nursing issues advisory opinions as to what constitutes safe nursing practice. An opinion is not a regulation of the Board and does not have the force and effect of law. It is issued as a guideline to licensees who wish to engage in safe nursing practice.

---

### Determining Scope of Practice

KRS 314.021(2) holds all nurses individually responsible and accountable for the individual's acts based upon the nurse's education and experience. Each nurse must exercise professional and prudent judgment in determining whether the performance of a given act is within the scope of practice for which the nurse is both licensed and clinically competent to perform In addition to this advisory opinion statement, the Kentucky Board of Nursing has issued Advisory Opinion Statement #41 RN/LPN Scope of Practice Determination Guidelines which contains the KBN Decision-Making Model providing guidance to nurses in determining whether a selected act is within an individual nurse's scope of practice now or in the future. A copy of the KBN RN/LPN Scope of Practice Determination Guidelines may be downloaded from the Board's website.

### Decisions Related to Delegation

A registered nurse who makes decisions related to delegation of tasks is governed by 201 KAR 20:400 Delegation of nursing tasks.

In addition to this advisory opinion the Kentucky Board of Nursing has published the Decision Tree for Delegation to Unlicensed Assistive Personnel which provides guidance to the nurse in determining whether a selected act should be delegated.

In summary, delegation should occur only if, in the professional opinion of the delegating nurse, the act may be competently and safely performed by the person to whom the act is delegated.

---

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000181 of 000198

## Applicable Statutes from the *Kentucky Nursing Law*

85787

**KRS 314.011(2**) defines "delegation" as:

...Directing a competent person to perform a selected nursing activity or task in a selected situation under the nurse's supervision and pursuant to administrative regulations promulgated by the board in accordance with the provisions of KRS Chapter 13A.

**KRS 314.011 (3) defines "nurse"** as:

...A person who is licensed or holds the privilege to practice under the provisions of this chapter as a registered nurse or as a licensed practical nurse.

**KRS 314.011(6) defines "registered nursing practice"** as:

...The performance of acts requiring substantial specialized knowledge, judgment, and nursing skill based upon the principles of psychological, biological, physical, and social sciences in the application of the nursing process in:

a) The care, counsel, and health teaching of the ill, injured, or infirm;
b) The maintenance of health or prevention of illness of others;
c) The administration of medication and treatment as prescribed by physician, physician assistant, dentist, or advanced practice registered nurse and as further authorized or limited by the board, and which are consistent either with American Nurses' Association Scope and Standards of Practice or with standards of practice established by nationally accepted organizations of registered nurses. Components of medication administration include but are not limited to:
   1. Preparing and giving medication in the prescribed dosage, route, and frequency, including dispensing medications only as defined in subsection (17)(b) of this section;
   2. Observing, recording, and reporting desired effects, untoward reactions, and side effects of drug therapy;
   3. Intervening when emergency care is required as a result of drug therapy;
   4. Recognizing accepted prescribing limits and reporting deviations to the prescribing individual;
   5. Recognizing drug incompatibilities and reporting interactions or potential interactions to the prescribing individual; and
   6. Instructing an individual regarding medications;
d) The supervision, teaching of, and delegation to other personnel in the performance of activities relating to nursing care; and
e) The performance of other nursing acts which are authorized or limited by the board, and which are consistent either with American Nurses' Association Standards of Practice or with Standards of Practice established by nationally accepted organizations of registered nurses.

## KRS 314.011(8) defines "advanced practice registered nursing practice" as:

...The performance of additional acts by registered nurses who have gained advanced clinical knowledge and skills through an accredited program that prepares the registered nurse for one (1) of four (4) APRN roles; who are certified by the American Nurses' Association or other nationally established organizations or agencies recognized by the board to certify registered nurses for advanced practice registered nursing as a certified nurse practitioner, certified registered nurse anesthetist, certified nurse midwife, or clinical nurse specialist; and who certified in at least one (1) population focus. The additional acts shall, subject to approval of the board, include but not be limited to prescribing treatment, drugs, devices, and ordering diagnostic tests. Advanced practice registered nurses who engage in these additional acts shall be authorized to issue prescriptions for and dispense nonscheduled legend drugs as defined in KRS 217.905 and to issue prescriptions for but not to dispense Schedules II through V controlled substances described in or as classified pursuant to KRS 218A.020, 218A.060, 218A.080, 218A.100, and 218A.120 under the conditions set forth in KRS 314.042 and regulations promulgated by the Kentucky Board of Nursing on or before August 15, 2006.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000182 of 000198

01/05/2026 04:16:24

85787

**KRS 314.011(10) defines "licensed practical nursing practice" as:**

…The performance of acts requiring knowledge and skill such as are taught or acquired in approved schools for practical nursing in:

a) The observing and caring for the ill, injured, or infirm under the direction of a registered nurse, advanced practice registered nurse, physician assistant, licensed physician, or dentist;
b) The giving of counsel and applying procedures to safeguard life and health, as defined and authorized by the board;
c) The administration of medication or treatment as authorized by a physician, physician assistant, dentist, or advanced practice registered nurse and as further authorized or limited by the board which is consistent with the National Federation of Licensed Practical Nurses or with Standards of Practice established by nationally accepted organizations of licensed practical nurses;
d) Teaching, supervising, and delegating except as limited by the board; and
e) The performance of other nursing acts, which are authorized, or limited by the board and which are consistent with the National Federation of [Licensed] Practical Nurses' Standards of Practice or with Standards of Practice established by nationally accepted organizations of licensed practical nurses.

**KRS 314.031(1**) states: "It shall be unlawful for any person to call or hold herself or himself out as or use the title of nurse or to practice or offer to practice as a nurse unless licensed or privileged under the provisions of this chapter."

**201 KAR 20:400** governs delegation of nursing tasks to unlicensed persons as well as to paramedics in a hospital emergency department.

## Accountability and Responsibility of Nurses

**KRS 314.021(2**) imposes individual responsibility and holds nurses accountable for rendering safe, effective nursing care to clients and for judgments exercised and actions taken in the course of providing care. Acts which are within the permissible scope of practice for a given licensure level may be performed only by those licensees who personally possess the education and skill proficiency to perform those acts in a safe, effective manner.

Nursing practice should be consistent with the *Kentucky Nursing Laws (KRS Chapter 314)*, established standards of practice, and be evidence based.

An advisory opinion is not a regulation of the Board and does not have the force and effect of law. It is issued as a guideline to licensees who wish to engage in safe nursing practice and who wish to minimize the possibility of being subjected to malpractice litigation.

The legal scope of advanced practice registered nursing is defined by a) post-basic education; b) certification as an advanced practice registered nurse; and c) the national nursing organization's published scope and standards of practice.

Attachments: 201 KAR 20:400
KBN Decision Tree for Delegation to Unlicensed Personnel

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000183 of 000198

NOT ORIGINAL DOCUMENT

01/05/2026 04:16:24 PM

Page **11** of **14**

85787

**201 KAR 20:400. Delegation of nursing tasks.**

RELATES TO: KRS 311A.170, 314.011, 314.021(2), 314.091(1)
STATUTORY AUTHORITY: KRS 314.131(1)
NECESSITY, FUNCTION, AND CONFORMITY: KRS 314.131(1) authorizes the board to promulgate administrative regulations necessary to implement KRS Chapter 314. KRS 314.091(1)(d) prohibits a person from negligently or willfully acting in a manner inconsistent with the practice of nursing. This administrative regulation establishes requirements that govern the delegation of a nursing task in a safe, effective manner so as to safeguard the health and welfare of the citizens of the Commonwealth.

Section 1. Definitions. (1) "Board" is defined by KRS 314.011(1).
(2) "Client" means a patient, resident, or consumer of nursing care.
(3) "Competence" means performing an act in a safe, effective manner.
(4) "Delegatee" means a person to whom a task is delegated.
(5) "Delegation" is defined by KRS 314.011(2).
(6) "Delegator" means the nurse delegating a task to another person.
(7) "Direct supervision" means the continuous, direct, onsite supervision by a registered nurse;
(8) "Nurse" is defined by KRS 314.011(3).
(9) "Nurse Extern" means an employee in a healthcare facility who is also actively enrolled as a student in a board-approved prelicensure program of nursing.
(10) "Nursing assistance" is defined by KRS 314.011(13).
(11) "Nursing task" means an act included in the definition of registered nursing practice, advanced practice registered nursing, or licensed practical nursing practice pursuant to KRS 314.011(6), (8), or (10).
(12) "Paramedic" is defined by KRS 311A.010.
(13) "Supervision" means the provision of guidance by a qualified nurse for the accomplishment of a nursing task with periodic observation and evaluation of the performance of the task including validation that the nursing task has been performed according to established standards of practice.
(14) "Unlicensed person" means an individual, other than a nurse, the client, or the client's family, legal guardian, or delegatee, who functions in an assistant or subordinate role to the nurse.

Section 2. Nurse's Responsibility in Delegation. (1) A registered nurse or a licensed practical nurse may delegate a task to an unlicensed person in accordance with this section and Sections 3, 4, and 5 of this administrative regulation.
(2) A registered nurse may delegate a task to a paramedic employed in a hospital emergency department in accordance with KRS 311A.170 and Sections 3 and 4 of this administrative regulation.
(3) Prior to delegating a nursing task, the nurse shall determine the nursing care needs of the client. The nurse shall retain responsibility and accountability for the nursing care of the client, including nursing assessment, planning, evaluation, and assuring documentation.
(4) The nurse, prior to delegation to an unlicensed person, shall have either instructed the unlicensed person in the delegated task or determined that the unlicensed person is competent to perform the nursing task.
(5) A nursing task shall be delegated directly or indirectly. An indirect delegation shall not alter the responsibility of the nurse for appropriately assigning and supervising an unlicensed person.
(6) A nurse who delegates a nursing task in violation of this administrative regulation or participates in the utilization of an unlicensed person in violation of this administrative regulation shall be considered acting in a manner inconsistent with the practice of nursing.

Section 3. Criteria for Delegation. The delegation of a nursing task shall meet the following criteria:
(1) The delegated nursing task shall be a task that a reasonable and prudent nurse would find is within the scope of sound nursing judgment and practice to delegate;
(2) The delegated nursing task shall be a task that, in the opinion of the delegating nurse, may be competently and safely performed by the delegatee without compromising the client's welfare;
(3) The nursing task shall not require the delegatee to exercise independent nursing judgment or intervention; and
(4) The delegator shall be responsible for assuring that the delegated task is performed in a competent manner by the delegatee.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000184 of 000198

NOT ORIGINAL DOCUMENT
01/05/2026 04:16:24 PM

Page 12 of 14

85787

Section 4. Supervision. (1) The nurse shall provide supervision of a delegated nursing task.

(2) The degree of supervision required shall be determined by the delegator after an evaluation of appropriate factors involved including the following:

(a) The stability and acuity of the client's condition;

(b) The training and competency of the delegatee;

(c) The complexity of the nursing task being delegated; and

(d) The proximity and availability of the delegator to the delegatee when the nursing task is performed.

Section 5. Nurse Extern. (1) The nurse extern may perform nursing tasks as delegated under the direct supervision of a registered nurse in accordance with this section. Those tasks may include the administration of medication or other tasks that have been taught in the nurse extern's nursing education program. The nurse extern shall be individually educationally prepared and clinically competent to perform the task. At a minimum, this competency shall be verified by an official letter from the nursing program documenting that the nurse extern has successfully completed the task as a student in the program of nursing. The employer shall independently verify and document the competency of the nurse extern to successfully perform the acts that the nurse extern will perform.

(2) A licensed practical nurse may participate with the registered nurse in providing supervision of a nurse extern enrolled in a practical nurse program of nursing.

(3) The nurse extern may provide nursing assistance that is routinely a part of any nursing assistant's job description.

(4) For a nurse extern enrolled in a practical nurse program of nursing, the administration of medications shall be limited by 201 KAR 20:490.

(5) A nurse extern shall not substitute for licensed nursing staff.

(6) A nurse extern shall not be required to independently assume the role, function, or responsibility of licensed personnel. (19 Ky.R. 1242; eff. 1-27-1993; 25 Ky.R. 2189; 2546; eff. 5-19-1999; 29 Ky.R. 2947; eff. 8-13-2003; TAm eff. 7-15-2010; 44 Ky.R. 1382, 1816; eff. 2-15-2018.)

**References**

National Guidelines for Nursing Delegation. (2016). *Journal of Nursing Regulation*, 7(1), 5–14. https://doi.org/10.1016/S2155-8256(16)31035-3

NCSBN and ANA Joint Position Statement. (2019). *National Guidelines for Nursing Delegation*. https://www.nursingworld.org/~4962ca/globalassets/practiceandpolicy/nursing-excellence/ana-position-statements/nursing-practice/ana-ncsbn-joint-statement-on-delegation.pdf

NCSBN. (2007). Medication assistant-certified (MA-C) model curriculum. Retrieved from https://www.ncsbn.org/public-files/07_Final_MAC.pdf

Potter, P. Perry, A. Sockert, P. & Hall. A. (2019) *Essentials for Nursing Practice*, 9th Edition. Elsevier, p. 231.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000185 of 000198

24-CI-01033 10/16/2024      Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

01/05/2026 04:16:24

PM

## KBN Decision Tree for Delegation to Unlicensed Assistive Personnel (UAP)

85787

Is the task within the scope of practice for a licensed nurse? → **No** → Cannot delegate to UAP

**Yes**

Has there been an assessment of the client's needs? → **No** → RN to complete assessment, then proceed with consideration of delegation.

**Yes**

Is the RN/LPN competent to make delegation decision? Nurse is accountable for the decision to delegate, to assure the delegated task is appropriate and to adhere to the criteria for delegation. → **No** → Do not delegate

**Yes**

Is the task consistent with the criteria for delegation to UAP?

*Must meet all the following criteria:*

- A task that a reasonable and prudent nurse would find is within the scope of sound nursing judgment and practice to delegate.
- A task that, in the opinion of the delegating nurse, can be competently and safely performed by the delegatee without compromising the client's welfare.
- A task shall not require the delegatee to exercise independent nursing judgment or intervention.
- The delegator shall be responsible for assuring that the delegated task is performed in a competent manner by the delegatee.

→ **No** → Do not delegate

**Yes**

The nurse shall provide supervision of a delegated nursing task. The degree of supervision required determined by the delegator after an evaluation including the following:

- The stability and acuity of the client's condition
- The training and competency of the delegatee
- The complexity of the nursing task being delegated

→ **No** → Do not delegate

**Yes**

Proceed with delegation.

The UAP is responsible for accepting only those delegated acts for which they are competent to perform. Only the implementation of a task/activity may be delegated. Assessment, planning, evaluation, and nursing judgment cannot be delegated.

201 KAR 20:400

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000186 of 000198

## Step Two – Communication

Communication must be a two-way process

| The nurse: | The nursing assistive personnel: | Documentation: |
|---|---|---|
| • Assesses the assistant's understanding<br>　○ How the task is to be accomplished<br>　○ When and what information is to be reported, including<br>　　▪ Expected observations to report and record<br>　　▪ Specific client concerns that would require prompt reporting.<br>• Individualizes for the nursing assistive personnel and client situation<br>• Addresses any unique client requirements and characteristics, and clear expectations of:<br>• Assesses the assistant's understanding of expectations, providing clarification if needed.<br>• Communicates his or her willingness and availability to guide and support assistant.<br>• Assures appropriate accountability by verifying that the receiving person accepts the delegation and accompanying responsibility. | • Ask questions regarding the delegation and seek clarification of expectations if needed<br>• Inform the nurse if the assistant has not done a task/function/activity before, or has only done infrequently<br>• Ask for additional training or supervision<br>• Affirm understanding of expectations<br>• Determine the communication method between the nurse and the assistive personnel<br>• Determine the communication and plan of action in emergency situations. | *Timely, complete and accurate documentation of provided care*<br>• Facilitates communication with other members of the healthcare team<br>• Records the nursing care provided. |

## Step Three – Surveillance and Supervision

The purpose of surveillance and monitoring is related to nurse's responsibility for client care within the context of a client population. The nurse supervises the delegation by monitoring the performance of the task or function and assures compliance with standards of practice, policies and procedures. Frequency, level and nature of monitoring vary with needs of client and experience of assistant.

| The nurse considers the: | The nurse determines: | The nurse is responsible for: |
|---|---|---|
| • Client's health care status and stability of condition<br>• Predictability of responses and risks<br>• Setting where care occurs<br>• Availability of resources and support infrastructure.<br>• Complexity of the task being performed. | • The frequency of onsite supervision and assessment based on:<br>　○ Needs of the client<br>　○ Complexity of the delegated function/task/activity<br>　○ Proximity of nurse's location | • Timely intervening and follow-up on problems and concerns. Examples of the need for intervening include:<br>• Alertness to subtle signs and symptoms (which allows nurse and assistant to be proactive, before a client's condition deteriorates significantly).<br>• Awareness of assistant's difficulties in completing delegated activities.<br>• Providing adequate follow-up to problems and/or changing situations is a critical aspect of delegation. |

## Step Four – Evaluation and Feedback

Evaluation is often the forgotten step in delegation.

In considering the effectiveness of delegation, the nurse addresses the following questions:
- Was the delegation successful?
  - Was the task/function/activity performed correctly?
  - Was the client's desired and/or expected outcome achieved?
  - Was the outcome optimal, satisfactory or unsatisfactory?
  - Was communication timely and effective?
  - What went well; what was challenging?
  - Were there any problems or concerns; if so, how were they addressed?
- Is there a better way to meet the client need?
- Is there a need to adjust the overall plan of care, or should this approach be continued?
- Were there any "learning moments" for the assistant and/or the nurse?
- Was appropriate feedback provided to the assistant regarding the performance of the delegation?
- Was the assistant acknowledged for accomplishing the task/activity/function?

Approved: 2009
Revised: 2/2010; 6/2018

*2017 Joint Statement on Delegation, American Nurses Association and National Council of State Boards of Nursing.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000187 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM
85787

# EXHIBIT 6

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000188 of 000198

NOT ORIGINAL DOCUMENT

01/05/2026 04:16:24 PM

85787

## 201 KAR 20:400. Delegation of nursing tasks.

RELATES TO: KRS 311A.170, 314.011, 314.021(2), 314.091(1)
STATUTORY AUTHORITY: KRS 314.131(1)
NECESSITY, FUNCTION, AND CONFORMITY: KRS 314.131(1) authorizes the board to promulgate administrative regulations necessary to implement KRS Chapter 314. KRS 314.091(1)(d) prohibits a person from negligently or willfully acting in a manner inconsistent with the practice of nursing. This administrative regulation establishes requirements that govern the delegation of a nursing task in a safe, effective manner so as to safeguard the health and welfare of the citizens of the Commonwealth.

Section 1. Definitions.
(1) "Board" is defined by KRS 314.011(1).
(2) "Client" means a patient, resident, or consumer of nursing care.
(3) "Competence" means performing an act in a safe, effective manner.
(4) "Delegatee" means a person to whom a task is delegated.
(5) "Delegation" is defined by KRS 314.011(2).
(6) "Delegator" means the nurse delegating a task to another person.
(7) "Direct supervision" means the continuous, direct, onsite supervision by a registered nurse;
(8) "Nurse" is defined by KRS 314.011(3).
(9) "Nurse Extern" means an employee in a healthcare facility who is also actively enrolled as a student in a board-approved prelicensure program of nursing.
(10) "Nursing assistance" is defined by KRS 314.011(13).
(11) "Nursing task" means an act included in the definition of registered nursing practice, advanced practice registered nursing, or licensed practical nursing practice pursuant to KRS 314.011(6), (8), or (10).
(12) "Paramedic" is defined by KRS 311A.010.
(13) "Supervision" means the provision of guidance by a qualified nurse for the accomplishment of a nursing task with periodic observation and evaluation of the performance of the task including validation that the nursing task has been performed according to established standards of practice.
(14) "Unlicensed person" means an individual, other than a nurse, the client, or the client's family, legal guardian, or delegatee, who functions in an assistant or subordinate role to the nurse.

Section 2. Nurse's Responsibility in Delegation.
(1) A registered nurse or a licensed practical nurse may delegate a task to an unlicensed person in accordance with this section and Sections 3, 4, and 5 of this administrative regulation.
(2) A registered nurse may delegate a task to a paramedic employed in a hospital emergency department in accordance with KRS 311A.170 and Sections 3 and 4 of this administrative regulation.
(3) Prior to delegating a nursing task, the nurse shall determine the nursing care needs of the client. The nurse shall retain responsibility and accountability for the nursing care of the client, including nursing assessment, planning, evaluation, and assuring documentation.
(4) The nurse, prior to delegation to an unlicensed person, shall have either instructed the unlicensed person in the delegated task or determined that the unlicensed person is competent to perform the nursing task.
(5) A nursing task shall be delegated directly or indirectly. An indirect delegation shall not alter the responsibility of the nurse for appropriately assigning and supervising an unlicensed person.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000189 of 000198

Filed          24-CI-01033   10/16/2024              Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

(6) A nurse who delegates a nursing task in violation of this administrative regulation or participates in the utilization of an unlicensed person in violation of this administrative regulation shall be considered acting in a manner inconsistent with the practice of nursing.

Section 3. Criteria for Delegation. The delegation of a nursing task shall meet the following criteria:

(1) The delegated nursing task shall be a task that a reasonable and prudent nurse would find is within the scope of sound nursing judgment and practice to delegate;

(2) The delegated nursing task shall be a task that, in the opinion of the delegating nurse, may be competently and safely performed by the delegatee without compromising the client's welfare;

(3) The nursing task shall not require the delegatee to exercise independent nursing judgment or intervention; and

(4) The delegator shall be responsible for assuring that the delegated task is performed in a competent manner by the delegatee.

Section 4. Supervision.

(1) The nurse shall provide supervision of a delegated nursing task.

(2) The degree of supervision required shall be determined by the delegator after an evaluation of appropriate factors involved including the following:

(a) The stability and acuity of the client's condition;

(b) The training and competency of the delegatee;

(c) The complexity of the nursing task being delegated; and

(d) The proximity and availability of the delegator to the delegatee when the nursing task is performed.

Section 5. Nurse Extern.

(1) The nurse extern may perform nursing tasks as delegated under the direct supervision of a registered nurse in accordance with this section. Those tasks may include the administration of medication or other tasks that have been taught in the nurse extern's nursing education program. The nurse extern shall be individually educationally prepared and clinically competent to perform the task. At a minimum, this competency shall be verified by an official letter from the nursing program documenting that the nurse extern has successfully completed the task as a student in the program of nursing. The employer shall independently verify and document the competency of the nurse extern to successfully perform the acts that the nurse extern will perform.

(2) A licensed practical nurse may participate with the registered nurse in providing supervision of a nurse extern enrolled in a practical nurse program of nursing.

(3) The nurse extern may provide nursing assistance that is routinely a part of any nursing assistant's job description.

(4) For a nurse extern enrolled in a practical nurse program of nursing, the administration of medications shall be limited by 201 KAR 20:490.

(5) A nurse extern shall not substitute for licensed nursing staff.

(6) A nurse extern shall not be required to independently assume the role, function, or responsibility of licensed personnel.

(19 Ky.R. 1242; eff. 1-27-1993; 25 Ky.R. 2189; 2546; eff. 5-19-1999; 29 Ky.R. 2947; eff. 8-13-2003; TAm eff. 7-15-2010; 44 Ky.R. 1382, 1816; eff. 2-15-2018.)

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000190 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:16:24
PM

# EXHIBIT 7

85787

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000191 of 000198

Filed                24-CI-01033 10/16/2024                Kathryn Marshall, Franklin Circuit Clerk

Filed                23-CI-00644 04/11/2023                John C. Middleton, Kenton Circuit Clerk

NOT ORIGINAL
NOT ORIGINAL
01/05/2026 04:16:24
10/02/2023 04:22:32
85787
85084

**COMMONWEALTH OF KENTUCKY**
**KENTON CIRCUIT COURT**
**DIVISION ___**
**NO. 23-CI-_____**

| | |
|---|---|
| **WENDY FILLHARDT** | **PLAINTIFF** |
| 1178 Edgewater Way, | |
| Alexandria, KY 41001 | |

**vs.**

| | |
|---|---|
| **ADVANCED PAIN TREATMENT CENTER, PLLC** | **DEFENDANTS** |
| 162 Barnwood Drive | |
| Edgewood, KY 41017 | |

**DR. PRAGYA B. GUPTA, MD**
2689 Mary Jane Ct
Lakeside Park, KY 41017

**DONALD J. THOMAS**
8426 St. Louis Blvd
Union, KY 41091

**TO THE CLERK, SERVE THE ABOVE CAPTIONED DEFENDANTS AND:**

**DR. PRAGYA B GUPTA**
AS REGISTERED AGENT OF SERVICE FOR
Advanced Pain Treatment Center, PLLC
162 Barnwood Drive, Edgewood, KY 41017

---

**COMPLAINT WITH JURY DEMAND**

---

<u>**FACTUAL BACKGROUND, JURISDICTION, AND VENUE**</u>

1. Jurisdiction is proper in this Court pursuant to KRS § 23A.010.

2. Venue is proper in this Court pursuant to KRS § 452.450.

Presiding Judge: HON. MARY K. MOLLOY (616422)

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000001 of 000007

EXH : 000192 of 000198

1

Filed                23-CI-00644 04/11/2023                John C. Middleton, Kenton Circuit Clerk

Filed                24-CI-01033 10/16/2024                Kathryn Marshall, Franklin Circuit Clerk

Filed 23-CI-00644 04/11/2023 John C. Middleton, Kenton Circuit Clerk

NOT ORIGINAL
NOT ORIGINAL
01/05/2026 04:16:24
10/02/2023 04:22:32
85787

3. Plaintiff Wendy Fillhardt is a Kentucky resident who resides at 1178 Edgewater Way, Alexandria, KY 41001.

4. Defendant Advanced Pain Treatment Center, a PLLC existing under the laws of the Commonwealth of Kentucky, operates a treatment center in Edgewood, Kenton County, Kentucky. This center accepts persons from the general public as patients.

5. Defendant Dr. Pragya B. Gupta, MD is a Doctor of Medicine licensed to practice in Kentucky and practicing in Kenton County, Kentucky.

6. Defendant Donald Jay Thomas at the time of the allegations alleged herein was an employee of Advanced Pain Treatment Center, PLLC in Edgewood, Kentucky. It is also believed that Donald Jay Thomas had or has ownership interest in Advanced Pain Treatment Center, PLLC.

7. Defendant Dr. Pragya B. Gupta, MD is the owner and operator of Advanced Pain Treatment Center, PLLC. He is also the registered agent of service.

8. Plaintiff Wendy Fillhardt sought care at Advanced Pain Treatment Center, PLLC for pain management and treatment for chronic conditions. She was under the care of Dr. Gupta from January 25, 2021, until April 30, 2022.

## NEGLIGENCE DUE TO MEDICAL MALPRACTICE

9. The Plaintiffs incorporate by reference, as if fully set out, paragraphs 1 through 8 and further allege the following.

10. Defendant Dr. Guypta and his staff treated Plaintiff Wendy Fillhardt at Advanced Pain Treatment Center, PLLC in Edgewood, Kentucky.

11. Defendant Dr Guypta had undertaken a duty to provide proper care to Plaintiff Wendy

Presiding Judge: HON. MARY K. MOLLOY (616422)
Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000002 of 000007
EXH : 000193 of 000198

NOT ORIGINAL
NOT ORIGINAL
01/05/2026 04:16:24
10/02/2023 04:22:32

Fillhardt, with a level of care, skill, and treatment that is recognized as acceptable and appropriate by reasonably prudent similar health care providers and nationally set standards of care.

12. Defendant Advanced Pain Treatment Center, PLLC is vicariously liable for the acts of their nursing staff and medical doctors in the course of their employment at their location in Edgewood conducting treatment of Plaintiff Wendy Fillhardt.

13. Defendants Advanced Pain Treatment Center, PLLC, Dr. Guypta, breached their duty owed to Plaintiff Wendy Fillhardt by the following acts or instances where there was a negligent act or failure to act:

a. By negligently and carelessly proscribing medication and injections in a way that injured the Plaintiffs health and could have caused severe injury or death.

b. By negligently and carelessly allowing Donald Jay Thomas to preform duties that he had no certification or license to be doing.

c. By negligently and carelessly allowing Donald Jay Thomas to administer anesthesia despite him not having a license or certification to do so.

d. By negligently and carelessly during a simple injection giving anesthesia to Plaintiff in unnecessary amounts that she did not request because she was a "VIP", which resulted in Plaintiff having an incident in which she had trouble coming out of anesthesia.

e. By negligently and carelessly overdosing anesthesia in a doctor's office procedure.

f. By negligently and carelessly allowing a non-medically certified employee Donald Jay Thomas to be in the room during procedures in which Plaintiff Wendy Fillhardt was unclothed in a hospital gown. Plaintiff suffers from PTSD and suffered mental harm because of Dr Gupta's lack of proper medical practice and

Presiding Judge: HON. MARY K. MOLLOY (616422)
Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000003 of 000007
EXH : 000194 of 000198

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

Filed 23-CI-00644 04/11/2023 John C. Middleton, Kenton Circuit Clerk NOT ORIGINAL

NOT ORIGINAL
01/05/2026 04:16:24
10/02/2023 04:22:32
85787
85084

care.

g. By negligently and carelessly allowing support staff to refill prescriptions without doctor approval when they were not licensed or certified to do so, resulting in Plaintiffs prescriptions to be incorrect which Dr. Gupta stated to Plaintiff could have caused serious harm. Plaintiff did suffer health concerns due to incorrect doses being given allegedly by medical staff member Autumn Thomas. Additionally, causing confusion when prescriptions were refilled in different amounts by Autumn Thomas acting for Dr. Gupta for prescriptions that were not proscribed by Dr. Gupta's office but a different medical care provider of the Plaintiff's.

h. By negligently and carelessly failing to diagnose Plaintiff's allergic rection to a cyanocobalamin injection.

i. By negligently administering a drug trial and improper billing associated with such.

j. By negligently billing insurance for prescriptions that were not needed and visits that did not happen.

14. As a direct and proximate result of the defendant's negligence, Plaintiff Wendy Fillhardt sustained complications to her health as well as psychological trauma. The Plaintiff's damages are in excess of the statutory minimum.

**BATTERY AND ASSAULT**

15. The Plaintiffs incorporated by reference, as if fully set out, paragraphs 1 through 29 and further allege that:

16. Defendant Donald Jay Thomas committed acts that constitute battery and assault against Plaintiff Wendy Fillhardt.

Presiding Judge: HON. MARY K. MOLLOY (616422)

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000004 of 000007

EXH : 000195 of 000198

Filed 23-CI-00644 04/11/2023 John C. Middleton, Kenton Circuit Clerk

Filed 24-CI-01033 10/16/2024 Kathryn Marshall, Franklin Circuit Clerk

17. Defendants Advanced Pain Treatment Center, PLLC and Dr. Gupta are vicariously liable for the acts of their employee that were done by their direction and under their supervision.

18. On multiple occasions, Donald Jay Thomas gave anesthesia, iv's, injections and other shots and medications that he does not have the certification, license, or training to give.

19. Defendant Donald Jay Thomas intentionally caused harmful or offensive contact to Plaintiff Wendy Fillhardt by injecting her with unnecessary anesthesia without the proper training, license, or certification. Plaintiff was told by Donald Jay Thomas that she was a VIP and that they would take care of her. Plaintiff was then given more anesthesia than is needed for a simple injection. Plaintiff had a bad reaction and had trouble coming out of anesthesia.

20. Plaintiff Wendy Fillhardt was then put in constant fear of what Donald Jay Thomas was actually giving her and if he knew proper dosages or if the contact she was subjected to with him would lead to harm or physical injury for her.

21. Plaintiff Wendy Fillhardt has PTSD and suffers from severe pain associated with medical conditions. Plaintiff has childhood trauma that causes her to be nervous and apprehensive around men. Defendant Donald Jay Thomas was permitted to perform medical functions and be present during medical procedures despite his lack of training, license or certification to do so. Plaintiff was during all procedures apprehensive of contact with Defendant Donald Jay Thomas that caused her to be fearful and trigger her PTSD. During the procedures, she was clothed in a robe and did not desire anyone other than medical professionals to attend to her care and be in her room.

Presiding Judge: HON. MARY K. MOLLOY (616422)

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000005 of 000007

EXH : 000196 of 000198

**WHEREFORE**, the Plaintiffs demand:

1. Judgment against Advanced Pain Treatment Center, against Dr. Pragya S. Gupta, against Donald Jay Thomas, or against all of the Defendants, in an amount in excess of the minimum dollar amount necessary to establish the jurisdiction of this Court;

2. Post judgment interest at the legal rate; and

4. All other proper relief that the Plaintiffs may be entitled to.


Respectfully Submitted,


*Kristin Turner*
KRISTIN A. TURNER, KBA # 97939
Attorney for Plaintiff
P. O. Box 172
Alexandria, Kentucky 41001
Ph. (859) 353-3130
Fax: (855) 343-3572
Email: Kristin@kturnerlegal.com


## JURY DEMAND

Pursuant to CR 38.02, Plaintiff's request trial by jury on all triable issues.

*Kristin Turner*
Kristin A. Turner (97939)

Filed          23-CI-00644 04/11/2023          John C. Middleton, Kenton Circuit Clerk

## VERIFICATION

Plaintiff Wendy Fillhardt states that she has read the foregoing Complaint and the statements contained herein are true.

*Wendy Fillhardt*
WENDY FILLHARDT

**COMMONWEALTH OF KENTUCKY**
**COUNTY OF CAMPBELL**

 **SUBSCRIBED AND SWORN** to before me, a Notary Public, by **WENDY FILLHARDT** as her free and voluntary act and deed on this the _10_ day of April 2023.

_Christie L. Adams_ KYNP43428
(Notary Public)

My Commission Expires: 1/23/26

Presiding Judge: HON. MARY K. MOLLOY (616422)

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000007 of 000007

EXH : 000198 of 000198

**7**

Filed          23-CI-00644 04/11/2023          John C. Middleton, Kenton Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033    10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Case: 3:26-cv-00024-GFVT    Doc #: 1-2    Filed: 03/30/26    Page: 401 of 662 - Page ID#: 464

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:17:22

85787

# KENTUCKY BOARD OF MEDICAL LICENSURE

**Andy Beshear**
GOVERNOR

Hurstbourne Office Park
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222

www.kbml.ky.gov
(502) 429-7150

August 20, 2024

Certified Mail
Lisa English Hinkle
Valerie Michael
McBrayer PLLC
201 East Main Street, Suite 900
Lexington, Kentucky 40507

Re:    **Pragya B. Gupta, M.D.; License No. 34920;** *Motion to Vacate or Amend Amended Agreed Order*

Dear Ms. Hinkle:

I am in receipt of your motion to vacate or amend the Amended Agreed Order, Case No. 2106, dated August 15, 2024, in which you request that your motion be considered at the next Panel meeting to reopen this matter and to vacate or amend the terms of the Amended Agreed Order.

In June 2023, Dr. Gupta and the Board entered into an Agreed Order to resolve an investigation, in lieu of the issuance of a complaint and an emergency order. The Agreed Order was amended to the current Amended Agreed Order on August 8, 2023, in order to allow Dr. Gupta to practice at three (3) Pain Management Centers of America, P.S.C., locations in Paducah and Hopkinsville.

The current motion is interpreted as a request to vacate or amend Dr. Gupta's agreement with the Board in such a manner as would allow him to practice in an independent setting in the Commonwealth of Kentucky. Per Paragraph No. 3, p. 11, of the Amended Agreed Order, Dr. Gupta's request to revive this matter or modify the existing terms is being returned.

Sincerely,

Michael S. Rodman
Executive Director

Enc.



An Equal Opportunity Employer M/F/D

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000001 of 000002

Filed          24-CI-01033    10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT
01/05/2026 04:17:22
PM

**[ MCBRAYER ]**

LISA ENGLISH HINKLE
lhinkle@mcbrayerfirm.com

201 EAST MAIN STREET, SUITE 900
LEXINGTON, KY 40507
859.231.8780 EXT. 1256
FAX: 859.281.6480

August 15, 2024

RECEIVED
AUG 16 2024
K.B.M.L.

**VIA EMAIL & OVERNIGHT FEDEX TO:**

Michael Rodman, Executive Director
Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
mike.rodman@ky.gov

Leanne Diakov General Counsel
Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
leanne.diakov@ky.gov

Nicole A. King, Assistant General Counsel
Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
Nicolea.king@ky.gov

**IN RE: KBML Case No. 2106 - Pragya B. Gupta, M.D.**

Dear Mr. Rodman, Ms. Diakov, and Ms. King:

Enclosed please find Motion to Vacate or Amend Amended Agreed Order entered in Pragya B. Gupta, M.D.'s disciplinary case number 2106 to be filed and provided to the Kentucky Board of Medical Licensure. This motion contains documentation sufficient to justify the requested relief. Upon request, we will be happy to provide additional documentation regarding the statements of the Grievant. We request that review of the Motion be expedited and presented to the KBML at its September meeting. Counsel and Dr. Gupta will be present to answer any questions.

Please feel free to contact me if you have any questions or need any additional information.

Sincerely,

LISA ENGLISH HINKLE

VALERIE MICHAEL

LEH/lkt
Enclosure

Filed          24-CI-01033 10/16/2024          Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000002 of 000002

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT NOT

04:18:26 PM

# Pain Management Consultants, LLC

1169 Eastern Parkway, Suite 2211 Louisville, KY 40217
Phone (502) 635-2775   Fax (502) 371-0475

Item 9
Jeffrey W. Berg, M.D.
Melissa A. Hoehler, APRN

01/05/2026

85787

To whom it may concern:                                         April 26, 2023

Case #: 15981
Patient Name ▮▮▮▮▮▮

I have been asked to respond to Dr. Gupta's answers to my board consultative report regarding his care of ▮▮▮▮▮▮ The question asked to me by Mr. Jon Marshall was have any of my opinions changed after reviewing Dr.Gupta's responses? I have reviewed ▮▮▮▮▮▮ medical records again and my conclusions have changed for the following reasons.

▮▮▮▮▮▮ had a total of five procedures where she was administered intravenous sedation with midazolam 5 mg. This dosage is documented in the medical record and acknowledged by Dr. Gupta in his response to ▮▮▮▮▮▮ grievance (answer number 3). Dr. Gupta's patient encounters list the billing codes used for each visit. In all instances where midazolam sedation was administered the billing was listed as moderate sedation. Dr. Gupta has indicated in his response to my report that he was using mild sedation (answer 2).

Dr. Gupta states that ▮▮▮▮▮▮ intravenous line infiltrated after one of her cervical epidurals in September 2021 without residual problems. He also says he has educated his staff to properly fill out anesthesia monitoring forms. I have previously stated that the guidelines for intravenous sedation require that a registered nurse be present as the anesthesia monitor to administer the sedation and, if necessary, start intravenous lines. I have included in this report the latest guidelines for conscious sedation.

Most concerning to me is the recent information I have received regarding Donnie J. Thomas. ▮▮▮▮▮▮ has stated that Mr. Thomas started at least one of her intravenous lines and had administered intravenous sedation to her. Further review of Dr. Gupta's response (answer#1) to her grievance reveals by his own admission that he allows Mr. Thomas to administer intravenous midazolam.

My conclusion is Donnie J. Thomas is practicing medicine without a license. This represents an immediate threat to the safety and health of the citizens of Kentucky.

Sincerely,

Jeffrey W. Berg M.D.



EXHIBIT # 5

accredited by the
Joint Commission

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000001 of 000008

411 of 526

NOT ORIGINAL DOCUMENT

04:18:26 PM

Item 9
Page 143

01/05/2026

85787

## KENTUCKY BOARD OF MEDICAL LICENSURE

## EXPERT REVIEW WORKSHEET
(Please type)

Case No. __15981_____    Patient Name ███████████_____

Expert's Name__Jeffrey Berg, MD_____

1.  **Brief description of symptom, dx and course of treatment:** _____

███████ was a ██ year-old female when she presented to Advanced Pain Treatment Center on January 25, 2021. She complained of longstanding migraine headaches without aura. She had been receiving Topamax 300 milligrams QHS for her headaches over the last four years.

The patient also complained of cervical pain that referred to the right suprascapular area. In addition, she complained of bilateral tingling paresthesias and excessive cold sensations in her extremities.

Her past medical history was significant for a history of post-traumatic stress disorder beginning in childhood. She was receiving psychiatric treatment. A complete history and physical evaluation is included in the medical record. The physical exam findings of cervical tenderness were noted, "raising the possibility of facet joint arthropathy". An MRI of the cervical spine from 07/1/2020 was obtained and reviewed showing a central disc protrusion mildly compressing her thecal sac at C4-5.

The medical assessment from her initial visit was migraine headaches without aura, cervicalgia, cervical spondylosis, cervical disc displacement without myelopathy, and idiopathic peripheral neuropathy.

The initial treatment plan included continuing Topamax and starting Emgality injections for her migraine headaches. In addition, laboratory panels for thyroid function, vitamin B12, folate levels, c reactive protein, hepatitis panel, basic metabolic panel, sedimentation rate, and liver function tests were ordered, as well as x-rays of the cervical spine and an MRI of the brain. Opioid risk assessment and opioid consent agreements are included in the initial history and physical.

The patient was scheduled to return for "right C4-5 and C5-6 facet joint blocks to rule out facet joint arthropathy".

The patient returned on 2/25/21 with new complaints of severe lower back and bilateral leg pain. Her other problems were ongoing. A physical exam of the lumbar spine was

EXHIBIT # __3__

349 of 526

EXH : 000002 of 000008

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:18:26 PM

NOT

Item 9
Page 144

01/05/2026

85787

performed "raising the possibility of facet joint arthropathy." The assessments from that encounter were #1 Fibromyalgia #2 intractable migraine without aura #3 lumbosacral spondylosis without myelopathy #4 displacement of lumbar intervertebral disc without myelopathy #5 history of gastric bypass. The treatment plan for her fibromyalgia was to start Lyrica. For the lumbosacral spondylosis without myelopathy and for displacement of lumbar intervertebral disc without myelopathy, the patient was to have an MRI of the lumbar spine and return for facet joint blocks bilaterally at L4-5 and L5-S1 with mild sedation. For her history of gastric bypass, she was to complete previously ordered thyroid panel and to continue B12 injections.

Her next evaluation was on 3/8/21. Dr. Gupta describes ongoing cervical and lumbar symptoms as well as her migraine headaches. She also complained of insomnia. The patient had her MRI of the lumbar spine. The results were reviewed with the patient. However, the MRI results are not in the medical record. The MRI results were provided promptly on request. The results were as follows: disc desiccation, mild bilateral facet arthropathy at L4-5 and L5-S1 with mild bilateral neuro foraminal narrowing at L5-S1. The physical exam findings were unchanged. The treatment plan included starting Lunesta for sleep and follow up appointment for "bilateral L4-5 and L5-S1 facet joint blocks preferably under mild sedation."

On 3/25/21 the patient had L4-5 and L5-S1 bilateral medial branch blocks under fluoroscopic guidance with 5 mg of versed sedation and 500 ml of lactated ringers solution IV. The conscious sedation flow sheet shows only one set of vital signs recorded. The record also indicates that the medical assistant was Mr. Thomas. The record does not indicate who started the intravenous line or who administered the versed sedation. There was no RN present.

The patient's next follow up was on 4/15/21. There is no mention of the previous medial branch blocks or how the patient responded. The stated reason for the appointment was widespread myofascial pain and fibromyalgia. The patient was started on Savella (milnacipran). It was decided to proceed with ketamine 50 mg and versed 5mg infusion intravenously. The listed monitoring assistant was Mr. Thomas. The record shows 3 recorded vital signs over 30 minutes.

The patient returned on 5/18/21, again complaining of widespread myofascial pain. She described some relief with the ketamine infusion but stated her pain had reoccurred as before. The treatment plan was to continue her current medications with the addition of cyclobenzaprine for her lumbar spondylosis.

There were visits on 5/25/21, 6/2/21 and 6/8/21. The first visit involved checking mobility and general strength in upper body. "Finding an exercise selection that was obtainable" was the reason for the two other visits.

There is an evaluation on 6/15/21 for her widespread myofascial pain where the patient was continued on her current medications and no new treatments were performed.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000003 of 000008

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:18:26 PM

Filed  24-CI-01033 10/16/2024  Kathryn Marshall, Franklin Circuit Clerk

However, the record states "Today patient exhibited some speech difficulty and complained of weakness in the right upper extremity and lower extremity".

On 7/13/21, "today patient complained of having an episode of attack of generalized numbness and fugue-like symptoms." The rest of her present illness was unchanged including continued speech difficulty and weakness. Additional labs were ordered for autoimmune disease. She was continued on her current medications. Dr. Gupta noted waiting for follow up with her psychiatrist and neurologist.

The patient was reevaluated on 8/24/21. Her history of present illness is the same as her previous visit, including continued speech difficulty and extremity weakness. The medical record mentions no history or exam findings of specific radicular arm pain, weakness, or focal numbness that would indicate the need for epidural injections. She was scheduled for left C5 and C6 transforaminal epidural injections. For cervical spondylosis she was started on Celebrex and duloxetine. The patient was to continue cyclobenzaprine, Emgality, Topamax, eszopiclone, pregabalin, and milnacipran. These are in addition to her other medications. Triamterene, hydrochlorothiazide, methylphenidate, Seroquel, and prazosin.

The patient returned on 9/1/22, 9/29/22 and 11/24/22. At all three of those visits the patient underwent left cervical C5 and C6 transforaminal epidural injections with 5mg of versed sedation and "500 ml of lactated ringers was administered prophylactically for the procedure". When the patient returned on 9/29/22 and 11/24/22 the second and third epidurals were performed without mention of the previous injection response. The patient record shows Mr. Thomas as the anesthesia monitor. In all of the procedures the duration of the sedation was stated to be greater than 30 minutes, yet there were no more than two recorded vital signs on any of the procedures. On the 11/24/22 procedure there is no anesthesia monitoring record at all.

The next evaluation was on 12/21/22. The history of present illness is identical to the last 6 encounters again without mention of the patient's response to the three transforaminal epidural injections. In addition, the patient is still noted to have speech difficulty and weakness. The patient was continued on all of her current medications.

On 3/14/22 the patient returned for reevaluation and the history of present illness and physical exam are again the same as the previous six visits. At the end of the office note it says "patient denies any radicular pain therefore at this time we will not schedule her for cervical transforaminal epidural injection." The patient was continued on her current medications.

The next follow up was on 4/05/22 where the patient stated that she had recently fallen. An ER visit found no acute injuries. The rest of history and physical exam were unchanged. The plan was to continue her current medications with the addition of lidocaine and diclofenac patches.

Item 9
Page 145

NOT

01/05/2026

85787

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000004 of 000008

Filed                24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:18:26 PM

NOT

Item 9
Page 146

01/05/2026

85787

Her next and last evaluation was on 4-13-22. The reason for the appointment was for repeat ketamine infusion for her widespread pain. The ketamine infusion was done without problems as before.

2. **Can you form an opinion?** Based on your background and experience and review of all information provided you, and assuming that the treatment as documented was provided, can you form an opinion as to whether the care rendered by the care provider, including diagnosis, treatment or record keeping, departed from or failed to conform to the minimal standards of acceptable and prevailing medical practice (in the medical community at large)?

   __X___  Yes, I can form an opinion.

   _____  No, I cannot form an opinion.

   _____  I need more information (specify): _____

   _____

   _____

   _____

3. **What is your opinion?** Please use the definitions below as "guidelines" to be used in defining standard of practice. You are not limited to these guidelines in forming your opinion, but please state your own additional criteria if applicable.

   a. **Diagnosis.** Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable.

      __X___  Below minimum standards

      _____  Within minimum standards

   b. **Treatment.** Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction.

      __X___  Below minimum standards

      _____  Within minimum standards

   c. **Records.**

      Maintenance of records which should contain, at a minimum, the

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000005 of 000008

352 of 526

Filed                24-CI-01033 10/16/2024        Kathryn Marshall, Franklin Circuit Clerk

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:18:26 PM

following: (1) appropriate history and physical and/or mental examination for the patient's chief complaint relevant to the physician's specialty; (2) results of diagnostic tests (when indicated); (3) a working diagnosis; (4) notes on treatment(s) undertaken; (5) a record by date of all prescriptions for drugs, with names of medications, strengths, dosages, quantity, and number of refills; and (6) a record of billings.

_____   Below minimum standards

_X___   Within minimum standards

d. **Overall Opinion.** Based on the foregoing, what is your overall opinion?

_____   Clearly below minimum standards.

_____   Clearly within minimum standards

_X___   Borderline Case

e. **Gross Ignorance, Gross Negligence, Gross Incompetence.** If you found that this physician did not meet the minimum standards of care in treating a patient(s), did you also conclude that any of these departures from the minimum standards of care were so serious that you consider them to exhibit gross ignorance, gross negligence, and/or gross incompetence on the physician's part. If "yes," please identify each of these instances, classify it appropriately and explain your reasoning in reaching that conclusion(s). If "yes," please also indicate whether you found a pattern of gross ignorance, gross negligence and/or gross incompetence in this physician's practice as evidenced by the records reviewed and explain your conclusion(s).

_____

_____

_____

_____

_____

4. **Other questions from the Medical Board (ignore if blank):**

_____

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000006 of 000008

Filed   24-CI-01033 10/16/2024   Kathryn Marshall, Franklin Circuit Clerk

**ORIGINAL DOCUMENT**

04:18:26 PM

**NOT**

Item 9
Page 148

01/05/2026

85787

5. Explain your opinion. If you opined that practice was below minimum standard for any of the above reasons, state the correct minimal standard of practice (NOTE: It is not sufficient to say "I would have...., or I would have not...", you should be able to testify that "the minimal standard of practice in the medical community at large would be to...") Use extra sheets as necessary to explain your opinion and complete this report.

In the course of this review, the concerns with regard to Dr Gupta's diagnosis of ███████ ████████ are

#1 Dr. Gupta performed three cervical transforaminal epidurals without documenting the specific history and physical findings indicating the need for these injections: numbness, weakness, or pain in the radicular distribution to be injected

#2 The cervical MRI showed, "C4-C5 small central disc protrusion mildly compressing the thecal sac. No spinal cord or nerve root compression."

With regard to the treatment of ████████████ there are several issues of concern:

#1 The three transforaminal cervical epidurals performed were not indicated as described under the diagnosis  In addition, after each transforaminal epidural injection there is no mention of the patient's response to the previous epidural procedure. Only after three epidurals does Dr Gupta describe the response to the three procedures

#2 The epidurals and facet injections were performed under moderate sedation. The operating physician, Dr. Gupta, cannot also serve as the anesthesia monitor  It is standard of care that the anesthesia monitor must be at least an RN. In all of the procedures his trained assistant, DJ Thomas, served as anesthesia monitor.  In addition, the sedation monitoring records are incomplete and one is missing.

#3 There is evidence in the medical record that Wendy Fillhardt was over-medicated  In the fifteen months that the patient was under Dr. Gupta's care, the following medications were added to her medical regimen  pregabalin, cyclobenzaprine, milnacipran, eszopiclone, duloxetine, topiramate, celecoxib, galcanezumab, lidocaine patches, and diclofenac patches  These are in addition to the other medicines prescribed by her other providers: methylphenidate, quetiapine, prazosin, and triamterene-hydrochlorothiazide  All of these medications, with exception of diclofenac patches, can have central nervous system side effects.  These medications were added in response to new symptom complaints by ████████████  After starting these medications, on follow-ups Dr Gupta does not address the patient response to these medications. On 6/15/2021 Dr. Gupta's interim history states "Today patient exhibited some speech difficulty and complained of weakness in right upper extremity and lower extremity." The medical

Filed    24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

EXH : 000007 of 000008

**Filed** 24-CI-01033 10/16/2024    Kathryn Marshall, Franklin Circuit Clerk

ORIGINAL DOCUMENT

04:18:26 PM

NOT

Item 9
Page 149

01/05/2026

85787

record does not show any new physical exam, just a repeat of the previous exams. Dr. Gupta does not comment on these serious new complaints and he continues her treatment plan. On 7/13/2021 the patient presented with new complaints of having an "attack of generalized numbness and fugue-like symptoms." The patient complained of intermittent incontinence, in addition to the previous complaints of speech difficulty, right upper and lower extremity weakness. Dr. Gupta notes, "patient awaiting to follow-up with neurologist and psychiatrist." Over the next eight months all of her complaints continued. There is no record of the neurologist findings. At the patient's last evaluation on 4/05/2022, she reported that she recently fell and that an ER visit found no acute processes.

The neurological complaints of ▮▮▮▮▮▮ a ▮▮ ear-old woman, were serious and unexplained. She had MRIs of the brain, lumbar, and cervical spines as well as extensive laboratory examinations. Based on the list of medications and known drug interactions some of these serious symptoms were more likely than not related to over-medication.

The medical record was noted to contain a history and physical, opioid consent agreement, pain disability questionnaire, opioid risk assessment, KASPER reports, and a depression index. The medical records have a missing anesthesia monitoring form and several are incomplete, however the record meets minimal standards.

_____3/11/23_____
Date of Review

_____
Signature of Expert

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000008 of 000008



NOT ORIGINAL
DOCUMENT
01/05/2026 04:20:11 PM
85787

| | | |
|---|---|---|
| AOC-E-105   Sum Code: CI | | Case #: **24-CI-01033** |
| Rev. 9-14 | | Court: **CIRCUIT** |
| Commonwealth of Kentucky | | County: **FRANKLIN** |
| Court of Justice   *Courts.ky.gov* | | |
| CR 4.02; Cr Official Form 1 | **CIVIL SUMMONS** | |

*Plantiff,* **GUPTA, PRAGYA B. ET AL VS. KENTUCKY BOARD OF MEDICAL LICENSU**, *Defendant*

TO: **KENTUCKY BOARD OF MEDICAL LICENSURE**
**HON. RUSSELL T. COLEMAN**
**700 CAPITOL AVE, SUITE 118**
**FRANKFORT, KY 40601**

Email: SERVETHECOMMONWEALTH@KY.GOV

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Kathryn Marshall*

Franklin Circuit Clerk
Date: **10/16/2024**

### Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20 _____

_____
Served By

_____
Title

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

CI : 000001 of 000001

Summons ID: @90005709420
CIRCUIT: 24-CI-01033 Certified Mail
GUPTA, PRAGYA B. ET AL VS. KENTUCKY BOARD OF MEDICAL LICENSU



Page 1 of 1

*eFiled*



| AOC-E-105     Sum Code: CI | | Case #: **24-CI-01033** |
| Rev. 9-14 | **CIVIL SUMMONS** | Court: **CIRCUIT** |
| Commonwealth of Kentucky | | County: **FRANKLIN** |
| Court of Justice    *Courts.ky.gov* | | |
| CR 4.02; Cr Official Form 1 | | |

NOT ORIGINAL
DOCUMENT
01/05/2026 04:24:37
PM
85787

*Plantiff,* **GUPTA, PRAGYA B. ET AL VS. KENTUCKY BOARD OF MEDICAL LICENSU**, *Defendant*

TO: **RUSSELL T. COLEMAN**

**OFFICE OF THE ATTORNEY GENERAL**

**700 CAPITAL AVE., SUITE 118**

**FRANKFORT, KY 40601**

Email: SERVETHECOMMONWEALTH@KY.GOV

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Kathryn Marshall*

Franklin Circuit Clerk
Date: **10/16/2024**

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20 _____

_____
Served By

_____
Title

Summons ID: @90005709426
CIRCUIT: 24-CI-01033 Certified Mail
GUPTA, PRAGYA B. ET AL VS. KENTUCKY BOARD OF MEDICAL LICENSU



Page 1 of 1

eFiled

*Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)*

*CI : 000001 of 000001*



NOT ORIGINAL DOCUMENT
01/05/2026 04:21:37 PM
85787

| AOC-E-105    Sum Code: CI | | Case #: **24-CI-01033** |
| Rev. 9-14 | | Court: **CIRCUIT** |
| Commonwealth of Kentucky | | County: **FRANKLIN** |
| Court of Justice    *Courts.ky.gov* | **CIVIL SUMMONS** | |
| CR 4.02; Cr Official Form 1 | | |

*Plantiff,* **GUPTA, PRAGYA B. ET AL VS. KENTUCKY BOARD OF MEDICAL LICENSU**, *Defendant*

TO: **KENTUCKY BOARD OF MEDICAL LICENSURE**
**LEANNE DIAKOV, GENERAL COUNSEL**
**310 WHITTINGTON PARKWAY, SUITE 1B**
**LOUISVILLE, KY 40222**

Email: LEANNE.DIAKOV@KY.GOV

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Kathryn Marshall*

Franklin Circuit Clerk
Date: **10/16/2024**

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20 _____

_____
Served By

_____
Title

Summons ID: @90005709422
CIRCUIT: 24-CI-01033 Certified Mail
GUPTA, PRAGYA B. ET AL VS. KENTUCKY BOARD OF MEDICAL LICENSU



Page 1 of 1

*eFiled*

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

CI : 000001 of 000001



| | | |
|---|---|---|
| AOC-E-105        Sum Code: CI<br>Rev. 9-14 | | Case #: **24-CI-01033** |
| Commonwealth of Kentucky<br>Court of Justice     *Courts.ky.gov* | | Court: **CIRCUIT** |
| | | County: **FRANKLIN** |
| CR 4.02; Cr Official Form 1 | **CIVIL SUMMONS** | |

DOCUMENT

NOT ORIGINAL

01/05/2026 04:22:13 PM

85787

*Plantiff,* **GUPTA, PRAGYA B. ET AL VS. KENTUCKY BOARD OF MEDICAL LICENSU**, *Defendant*

TO:  **MICHAEL S. RODMAN**

**KENTUCKY BOARD OF MEDICAL LICENSURE**

**310 WHITTINGTON, PARKWAY, SUITE 1B**

**LOUISVILLE, KY 40222**

Email: MIKE.RODMAN@KY.GOV

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Kathryn Marshall*

Franklin Circuit Clerk
Date: **10/16/2024**

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
Served By

_____
Title

Summons ID: @90005709423
CIRCUIT: 24-CI-01033 Certified Mail
GUPTA, PRAGYA B. ET AL VS. KENTUCKY BOARD OF MEDICAL LICENSU



Page 1 of 1

eFiled

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

CI : 000001 of 000001



| | |
|---|---|
| AOC-E-105      Sum Code: CI<br>Rev. 9-14<br><br>Commonwealth of Kentucky<br>Court of Justice      *Courts.ky.gov*<br><br>CR 4.02; Cr Official Form 1 | Case #: **24-CI-01033**<br>Court:  **CIRCUIT**<br>County: **FRANKLIN** |

NOT ORIGINAL
DOCUMENT
01/05/2026 04:20:42
PM
85787

**CIVIL SUMMONS**

---

*Plantiff,* **GUPTA, PRAGYA B. ET AL VS. KENTUCKY BOARD OF MEDICAL LICENSU**, *Defendant*

**TO:    KENTUCKY BOARD OF MEDICAL LICENSURE**
**MICHAEL S. RODMAN, EXECUTIVE DIRECTOR**
**310 WHITTINGTON PARKWAY, SUITE 1B**
**LOUISVILLE, KY 40222**

Email: MIKE.RODMAN@KY.GOV

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Kathryn Marshall*

Franklin Circuit Clerk
Date: **10/16/2024**

---

### Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____          _____
                                                                                            Served By

                                                                                            _____
                                                                                            Title

Summons ID: @90005709421
CIRCUIT: 24-CI-01033 Certified Mail
GUPTA, PRAGYA B. ET AL VS. KENTUCKY BOARD OF MEDICAL LICENSU

Page 1 of 1



eFiled

*Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)*

*CI : 000001 of 000001*



NOT ORIGINAL DOCUMENT
01/05/2026 04:23:39 PM
85787

| AOC-E-105    Sum Code: CI | | Case #: **24-CI-01033** |
| Rev. 9-14 | | Court: **CIRCUIT** |
| Commonwealth of Kentucky | | County: **FRANKLIN** |
| Court of Justice    *Courts.ky.gov* | | |
| CR 4.02; Cr Official Form 1 | **CIVIL SUMMONS** | |

*Plantiff,* **GUPTA, PRAGYA B. ET AL VS. KENTUCKY BOARD OF MEDICAL LICENSU**, *Defendant*

TO:  **WILLIAM C. THORNBURY**
**KENTUCKY BOARD OF MEDICAL LICENSURE**
**310 WHITTINGTON, PARKWAY, SUITE 1B**
**LOUISVILLE, KY 40222**

The Commonwealth of Kentucky to Defendant:

 You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Kathryn Marshall*

Franklin Circuit Clerk
Date: **10/16/2024**

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

 To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
Served By

_____
Title

CI : 000001 of 000001

Summons ID: @90005709424
CIRCUIT: 24-CI-01033 Certified Mail
GUPTA, PRAGYA B. ET AL VS. KENTUCKY BOARD OF MEDICAL LICENSU



Page 1 of 1

*e*Filed



| AOC-E-105    Sum Code: CI<br>Rev. 9-14<br><br>Commonwealth of Kentucky<br>Court of Justice    *Courts.ky.gov*<br><br>CR 4.02; Cr Official Form 1 | **CIVIL SUMMONS** | Case #: **24-CI-01033**<br>Court: **CIRCUIT**<br>County: **FRANKLIN** |

DOCUMENT

PM

NOT ORIGINAL

01/05/2026 04:24:10

85787

*Plantiff,* **GUPTA, PRAGYA B. ET AL VS. KENTUCKY BOARD OF MEDICAL LICENSU**, *Defendant*

TO:  **DALE E. TONEY**
**KENTUCKY BOARD OF MEDICAL LICENSURE**
**310 WHITTINGTON, PARKWAY, SUITE 1B**
**LOUISVILLE, KY 40222**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Kathryn Marshall*

Franklin Circuit Clerk
Date: **10/16/2024**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20 _____

_____
Served By

_____
Title

*Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)*

*CI : 000001 of 000001*

Summons ID: @90005709425
CIRCUIT: 24-CI-01033 Certified Mail
GUPTA, PRAGYA B. ET AL VS. KENTUCKY BOARD OF MEDICAL LICENSU



Page 1 of 1

eFiled

Filed                                                                                          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT

01/05/2026 04:29:27 PM

85787

**UNITED STATES POSTAL SERVICE**

October 30, 2024

The following is in response to your request for proof of delivery on your item with the tracking number: **9208 1901 9403 8383 3221 59**.

| Item Details | |
| --- | --- |
| **Status:** | Delivered, Individual Picked Up at Postal Facility |
| **Status Date / Time:** | October 24, 2024, 7:40 am |
| **Location:** | FRANKFORT, KY 40601 |
| **Postal Product:** | Priority Mail® |
| **Extra Services:** | Certified Mail Restricted Delivery |
| | Return Receipt Electronic |
| | Up to $100 insurance included |
| **Recipient Name:** | COLEMAN RUSSELL T |

| Recipient Signature | |
| --- | --- |
| Signature of Recipient: |  |
| Address of Recipient: | |

Note: Scanned image may reflect a different destination address due to Intended Recipient's delivery instructions on file.

Thank you for selecting the United States Postal Service® for your mailing needs. If you require additional assistance, please contact your local Post Office™ or a Postal representative at 1-800-222-1811.

Sincerely,
United States Postal Service®
475 L'Enfant Plaza SW
Washington, D.C. 20260-0004

This USPS proof of delivery is linked to the customers mail piece information on file as shown below:

COLEMAN, RUSSELL T.
OFFICE OF THE ATTORNEY GENERAL
700 CAPITAL AVE., SUITE 118
FRANKFORT KY 40601

COR : 000001 of 000002

Filed    24-CI-01033    10/30/2024    Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

01/05/2026 04:29:27

85787

DOCUMENT

PM

USPS MAIL PIECE TRACKING NUMBER:  420406019208190194038383322159

MAILING DATE:        10/21/2024
DELIVERED DATE:    10/23/2024
Custom 1: DriverId-9036375
Custom 2: PartyId-59953816
Custom 3: SummonsNum-@90005709426
Custom 4: CentralMailId-187867
Custom 5: Source County-FRANKLIN

MAIL PIECE DELIVERY INFORMATION:

COLEMAN, RUSSELL T.
OFFICE OF THE ATTORNEY GENERAL
700 CAPITAL AVE., SUITE 118
FRANKFORT KY 40601

MAIL PIECE TRACKING EVENTS:

| 10/21/2024 15:44 | PRE-SHIPMENT INFO SENT  USPS AWAITS ITEM | FRANKFORT,KY 40601 |
| 10/21/2024 16:54 | SHIPMENT RECEIVED ACCEPTANCE PENDING | FRANKFORT,KY 40601 |
| 10/21/2024 19:42 | ORIGIN ACCEPTANCE | FRANKFORT,KY 40601 |
| 10/21/2024 20:57 | PROCESSED THROUGH USPS FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/22/2024 00:19 | PROCESSED THROUGH USPS FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/22/2024 02:56 | DEPARTED USPS REGIONAL FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/22/2024 03:00 | DEPARTED USPS REGIONAL FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/22/2024 03:41 | ARRIVE USPS FACILITY | FRANKFORT,KY 40601 |
| 10/22/2024 05:24 | ARRIVAL AT UNIT | FRANKFORT,KY 40601 |
| 10/22/2024 06:10 | OUT FOR DELIVERY | FRANKFORT,KY 40601 |
| 10/22/2024 08:11 | AVAILABLE FOR PICKUP | FRANKFORT,KY 40601 |
| 10/23/2024 04:31 | ARRIVAL AT UNIT | FRANKFORT,KY 40601 |
| 10/23/2024 06:47 | AVAILABLE FOR PICKUP | FRANKFORT,KY 40601 |
| 10/23/2024 07:33 | DELIVERED INDIVIDUAL PICKED UP AT USPS | FRANKFORT,KY 40601 |
| 10/24/2024 05:15 | ARRIVAL AT UNIT | FRANKFORT,KY 40601 |
| 10/24/2024 07:40 | DELIVERED INDIVIDUAL PICKED UP AT USPS | FRANKFORT,KY 40601 |

COR : 000002 of 000002

Filed          24-CI-01033     10/30/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL
DOCUMENT

01/05/2026 04:27:43
PM

85787

**UNITED STATES POSTAL SERVICE**

October 30, 2024

The following is in response to your request for proof of delivery on your item with the tracking number:
**9208 1901 9403 8383 3219 92**.

| Item Details | |
|---|---|
| **Status:** | Delivered, Individual Picked Up at Postal Facility |
| **Status Date / Time:** | October 24, 2024, 7:40 am |
| **Location:** | FRANKFORT, KY 40601 |
| **Postal Product:** | Priority Mail® |
| **Extra Services:** | Certified Mail Restricted Delivery |
| | Return Receipt Electronic |
| | Up to $100 insurance included |
| **Recipient Name:** | KENTUCKY BOARD OF MEDICAL LICENSURE |

| Recipient Signature | |
|---|---|

Signature of Recipient:

Address of Recipient:



Note: Scanned image may reflect a different destination address due to Intended Recipient's delivery instructions on file.

Thank you for selecting the United States Postal Service® for your mailing needs. If you require additional assistance, please contact your local Post Office™ or a Postal representative at 1-800-222-1811.

Sincerely,
United States Postal Service®
475 L'Enfant Plaza SW
Washington, D.C. 20260-0004

This USPS proof of delivery is linked to the customers mail piece information on file
as shown below:

KENTUCKY BOARD OF MEDICAL LICENSURE
HON. RUSSELL T. COLEMAN
700 CAPITOL AVE, SUITE 118
FRANKFORT KY 40601

COR : 000001 of 000002

Filed 24-CI-01033 10/30/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:27:43

85787

USPS MAIL PIECE TRACKING NUMBER: 420406019208190194038383321992

MAILING DATE: 10/21/2024

DELIVERED DATE: 10/23/2024

Custom 1: DriverId-9036375

Custom 2: PartyId-59953810

Custom 3: SummonsNum-@90005709420

Custom 4: CentralMailId-187861

Custom 5: Source County-FRANKLIN

MAIL PIECE DELIVERY INFORMATION:

KENTUCKY BOARD OF MEDICAL LICENSURE
HON. RUSSELL T. COLEMAN
700 CAPITOL AVE, SUITE 118
FRANKFORT KY 40601

MAIL PIECE TRACKING EVENTS:

| Date/Time | Event | Location |
|---|---|---|
| 10/21/2024 15:44 | PRE-SHIPMENT INFO SENT USPS AWAITS ITEM | FRANKFORT,KY 40601 |
| 10/21/2024 16:54 | SHIPMENT RECEIVED ACCEPTANCE PENDING | FRANKFORT,KY 40601 |
| 10/21/2024 19:41 | ORIGIN ACCEPTANCE | FRANKFORT,KY 40601 |
| 10/21/2024 20:56 | PROCESSED THROUGH USPS FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/22/2024 00:19 | PROCESSED THROUGH USPS FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/22/2024 02:56 | DEPARTED USPS REGIONAL FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/22/2024 03:00 | DEPARTED USPS REGIONAL FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/22/2024 03:41 | ARRIVE USPS FACILITY | FRANKFORT,KY 40601 |
| 10/22/2024 05:21 | ARRIVAL AT UNIT | FRANKFORT,KY 40601 |
| 10/22/2024 06:10 | OUT FOR DELIVERY | FRANKFORT,KY 40601 |
| 10/22/2024 08:11 | AVAILABLE FOR PICKUP | FRANKFORT,KY 40601 |
| 10/23/2024 04:31 | ARRIVAL AT UNIT | FRANKFORT,KY 40601 |
| 10/23/2024 06:47 | AVAILABLE FOR PICKUP | FRANKFORT,KY 40601 |
| 10/23/2024 07:33 | DELIVERED INDIVIDUAL PICKED UP AT USPS | FRANKFORT,KY 40601 |
| 10/24/2024 05:14 | ARRIVAL AT UNIT | FRANKFORT,KY 40601 |
| 10/24/2024 07:40 | DELIVERED INDIVIDUAL PICKED UP AT USPS | FRANKFORT,KY 40601 |

COR : 000002 of 000002

Filed 24-CI-01033 10/30/2024 Kathryn Marshall, Franklin Circuit Clerk



| | | |
|---|---|---|
| AOC-E-105    Sum Code: CI<br>Rev. 9-14<br><br>Commonwealth of Kentucky<br>Court of Justice    *Courts.ky.gov*<br><br>CR 4.02; Cr Official Form 1 | **CIVIL SUMMONS** | Case #: **24-CI-01033**<br>Court: **CIRCUIT**<br>County: **FRANKLIN** |

DOCUMENT

PM

NOT ORIGINAL
01/05/2026 04:21:37

85787

*Plantiff,* **GUPTA, PRAGYA B. ET AL VS. KENTUCKY BOARD OF MEDICAL LICENSU**, *Defendant*

TO:  **KENTUCKY BOARD OF MEDICAL LICENSURE**

**LEANNE DIAKOV, GENERAL COUNSEL**

**310 WHITTINGTON PARKWAY, SUITE 1B**

**LOUISVILLE, KY 40222**

Email: LEANNE.DIAKOV@KY.GOV

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Kathryn Marshall*

Franklin Circuit Clerk
Date: **10/16/2024**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____ , 20 _____

_____
Served By

_____
Title

Summons ID: @90005709422
CIRCUIT: 24-CI-01033 Certified Mail
GUPTA, PRAGYA B. ET AL VS. KENTUCKY BOARD OF MEDICAL LICENSU



Page 1 of 1

*eFiled*

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

CI : 000001 of 000001

Filed                24-CI-01033    10/30/2024            Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT

01/05/2026 04:28:20 PM

85787

**UNITED STATES POSTAL SERVICE**

October 30, 2024

The following is in response to your request for proof of delivery on your item with the tracking number: **9208 1901 9403 8383 3220 50**.

| Item Details | |
|---|---|
| **Status:** | Delivered, Left with Individual |
| **Status Date / Time:** | October 24, 2024, 11:34 am |
| **Location:** | LOUISVILLE, KY 40222 |
| **Postal Product:** | Priority Mail® |
| **Extra Services:** | Certified Mail Restricted Delivery |
| | Return Receipt Electronic |
| | Up to $100 insurance included |
| **Recipient Name:** | RODMAN MICHAEL S |

| Recipient Signature | |
|---|---|
| Signature of Recipient: | |
| Address of Recipient: | |

Note: Scanned image may reflect a different destination address due to Intended Recipient's delivery instructions on file.

Thank you for selecting the United States Postal Service® for your mailing needs. If you require additional assistance, please contact your local Post Office™ or a Postal representative at 1-800-222-1811.

Sincerely,
United States Postal Service®
475 L'Enfant Plaza SW
Washington, D.C. 20260-0004

This USPS proof of delivery is linked to the customers mail piece information on file as shown below:

RODMAN, MICHAEL S.
KENTUCKY BOARD OF MEDICAL LICENSURE
310 WHITTINGTON, PARKWAY, SUITE 1B
LOUISVILLE KY 40222

COR : 000001 of 000002

Filed                24-CI-01033    10/30/2024            Kathryn Marshall, Franklin Circuit Clerk

Filed        24-CI-01033   10/30/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:28:20

85787

USPS MAIL PIECE TRACKING NUMBER:  42040222920819019403838383322050
MAILING DATE:        10/21/2024
DELIVERED DATE:   10/22/2024
Custom 1: DriverId-9036375
Custom 2: PartyId-59953813
Custom 3: SummonsNum-@90005709423
Custom 4: CentralMailId-187864
Custom 5: Source County-FRANKLIN


MAIL PIECE DELIVERY INFORMATION:

RODMAN, MICHAEL S.
KENTUCKY BOARD OF MEDICAL LICENSURE
310 WHITTINGTON, PARKWAY, SUITE 1B
LOUISVILLE KY 40222


MAIL PIECE TRACKING EVENTS:

| Date/Time | Event | Location |
|---|---|---|
| 10/21/2024 15:44 | PRE-SHIPMENT INFO SENT  USPS AWAITS ITEM | FRANKFORT,KY 40601 |
| 10/21/2024 16:54 | SHIPMENT RECEIVED ACCEPTANCE PENDING | FRANKFORT,KY 40601 |
| 10/21/2024 19:43 | ORIGIN ACCEPTANCE | FRANKFORT,KY 40601 |
| 10/21/2024 20:58 | PROCESSED THROUGH USPS FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/21/2024 21:49 | DEPARTED USPS REGIONAL FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/21/2024 22:41 | DEPARTED USPS REGIONAL FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/22/2024 00:40 | ARRIVE USPS FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/22/2024 04:08 | PROCESSED THROUGH USPS FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/22/2024 04:57 | DEPARTED USPS REGIONAL FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/22/2024 05:40 | DEPARTED USPS REGIONAL FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/22/2024 06:01 | ARRIVED AT USPS REGIONAL FACILITY | LOUISVILLE,KY 40222 |
| 10/22/2024 07:06 | ARRIVAL AT UNIT | LOUISVILLE,KY 40222 |
| 10/22/2024 07:17 | OUT FOR DELIVERY | LOUISVILLE,KY 40222 |
| 10/22/2024 13:24 | DELIVERED FRONT DESK/RECEPTION/MAIL ROOM | LOUISVILLE,KY 40222 |
| 10/23/2024 01:18 | PROCESSED THROUGH USPS FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/23/2024 05:36 | DEPARTED USPS REGIONAL FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/23/2024 05:54 | DEPARTED USPS REGIONAL FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/23/2024 06:14 | ARRIVED AT USPS REGIONAL FACILITY | LOUISVILLE,KY 40222 |
| 10/23/2024 06:18 | ARRIVE USPS FACILITY | LOUISVILLE,KY 40222 |
| 10/23/2024 06:56 | ARRIVAL AT UNIT | LOUISVILLE,KY 40222 |
| 10/23/2024 11:02 | RESCHEDULED TO NEXT DELIVERY DAY | LOUISVILLE,KY 40222 |
| 10/24/2024 11:34 | DELIVERED LEFT WITH INDIVIDUAL | LOUISVILLE,KY 40222 |

COR : 000002 of 000002

Filed          24-CI-01033    10/30/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT

October 30, 2024

01/05/2026 04:25:46 PM

85787

**UNITED STATES POSTAL SERVICE**

The following is in response to your request for proof of delivery on your item with the tracking number: **9208 1901 9403 8383 3220 12**.

| Item Details | |
|---|---|
| **Status:** | Delivered, Left with Individual |
| **Status Date / Time:** | October 24, 2024, 11:34 am |
| **Location:** | LOUISVILLE, KY 40222 |
| **Postal Product:** | Priority Mail® |
| **Extra Services:** | Certified Mail Restricted Delivery |
| | Return Receipt Electronic |
| | Up to $100 insurance included |
| **Recipient Name:** | KENTUCKY BOARD OF MEDICAL LICENSURE |

**Recipient Signature**

Signature of Recipient:

Address of Recipient:

Note: Scanned image may reflect a different destination address due to Intended Recipient's delivery instructions on file.

Thank you for selecting the United States Postal Service® for your mailing needs. If you require additional assistance, please contact your local Post Office™ or a Postal representative at 1-800-222-1811.

Sincerely,
United States Postal Service®
475 L'Enfant Plaza SW
Washington, D.C. 20260-0004

This USPS proof of delivery is linked to the customers mail piece information on file as shown below:

KENTUCKY BOARD OF MEDICAL LICENSURE
MICHAEL S. RODMAN, EXECUTIVE DIRECTOR
310 WHITTINGTON PARKWAY, SUITE 1B
LOUISVILLE KY 40222

COR : 000001 of 000002

Filed          24-CI-01033    10/30/2024          Kathryn Marshall, Franklin Circuit Clerk

Filed          24-CI-01033     10/30/2024          Kathryn Marshall, Franklin Circuit Clerk

USPS MAIL PIECE TRACKING NUMBER:   420402229208190194038383322012
MAILING DATE:          10/21/2024
DELIVERED DATE:    10/24/2024
Custom 1: DriverId-9036375
Custom 2: PartyId-59953811
Custom 3: SummonsNum-@90005709421
Custom 4: CentralMailId-187862
Custom 5: Source County-FRANKLIN

MAIL PIECE DELIVERY INFORMATION:

KENTUCKY BOARD OF MEDICAL LICENSURE
MICHAEL S. RODMAN, EXECUTIVE DIRECTOR
310 WHITTINGTON PARKWAY, SUITE 1B
LOUISVILLE KY 40222

MAIL PIECE TRACKING EVENTS:

| Date/Time | Event | Location |
|---|---|---|
| 10/21/2024 15:44 | PRE-SHIPMENT INFO SENT  USPS AWAITS ITEM | FRANKFORT,KY 40601 |
| 10/21/2024 16:54 | SHIPMENT RECEIVED ACCEPTANCE PENDING | FRANKFORT,KY 40601 |
| 10/21/2024 19:42 | ORIGIN ACCEPTANCE | FRANKFORT,KY 40601 |
| 10/21/2024 20:57 | PROCESSED THROUGH USPS FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/21/2024 21:49 | DEPARTED USPS REGIONAL FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/21/2024 22:41 | DEPARTED USPS REGIONAL FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/22/2024 00:40 | ARRIVE USPS FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/22/2024 04:09 | PROCESSED THROUGH USPS FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/22/2024 04:57 | DEPARTED USPS REGIONAL FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/22/2024 05:40 | DEPARTED USPS REGIONAL FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/22/2024 06:01 | ARRIVED AT USPS REGIONAL FACILITY | LOUISVILLE,KY 40222 |
| 10/22/2024 07:04 | ARRIVAL AT UNIT | LOUISVILLE,KY 40222 |
| 10/22/2024 07:15 | OUT FOR DELIVERY | LOUISVILLE,KY 40222 |
| 10/23/2024 01:15 | AWAITING DELIVERY SCAN | LOUISVILLE,KY 40222 |
| 10/23/2024 01:19 | PROCESSED THROUGH USPS FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/23/2024 05:36 | DEPARTED USPS REGIONAL FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/23/2024 05:54 | DEPARTED USPS REGIONAL FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/23/2024 06:14 | ARRIVED AT USPS REGIONAL FACILITY | LOUISVILLE,KY 40222 |
| 10/23/2024 06:18 | ARRIVE USPS FACILITY | LOUISVILLE,KY 40222 |
| 10/23/2024 06:45 | ARRIVAL AT UNIT | LOUISVILLE,KY 40222 |
| 10/23/2024 11:02 | RESCHEDULED TO NEXT DELIVERY DAY | LOUISVILLE,KY 40222 |
| 10/24/2024 11:34 | DELIVERED LEFT WITH INDIVIDUAL | LOUISVILLE,KY 40222 |

NOT ORIGINAL

01/05/2026 04:25:46

85787

COR : 000002 of 000002

Filed          24-CI-01033    10/30/2024          Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT

01/05/2026 04:27:06 PM

85787

**UNITED STATES POSTAL SERVICE**

October 30, 2024

The following is in response to your request for proof of delivery on your item with the tracking number: **9208 1901 9403 8383 3220 98**.

## Item Details

| | |
|---|---|
| **Status:** | Delivered, Front Desk/Reception/Mail Room |
| **Status Date / Time:** | October 22, 2024, 1:24 pm |
| **Location:** | LOUISVILLE, KY 40222 |
| **Postal Product:** | Priority Mail® |
| **Extra Services:** | Certified Mail Restricted Delivery |
| | Return Receipt Electronic |
| | Up to $100 insurance included |
| **Recipient Name:** | THORNBURY WILLIAM C |

## Recipient Signature

Signature of Recipient:

Address of Recipient:

Note: Scanned image may reflect a different destination address due to Intended Recipient's delivery instructions on file.

Thank you for selecting the United States Postal Service® for your mailing needs. If you require additional assistance, please contact your local Post Office™ or a Postal representative at 1-800-222-1811.

Sincerely,
United States Postal Service®
475 L'Enfant Plaza SW
Washington, D.C. 20260-0004

This USPS proof of delivery is linked to the customers mail piece information on file as shown below:

THORNBURY, WILLIAM C.
KENTUCKY BOARD OF MEDICAL LICENSURE
310 WHITTINGTON, PARKWAY, SUITE 1B
LOUISVILLE KY 40222

COR : 000001 of 000002

Filed        24-CI-01033    10/30/2024        Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL

DOCUMENT

PM

01/05/2026 04:27:06

85787

USPS MAIL PIECE TRACKING NUMBER:  420402229208190194038383322098

MAILING DATE:        10/21/2024

DELIVERED DATE:    10/22/2024

Custom 1: DriverId-9036375

Custom 2: PartyId-59953814

Custom 3: SummonsNum-@90005709424

Custom 4: CentralMailId-187865

Custom 5: Source County-FRANKLIN

MAIL PIECE DELIVERY INFORMATION:

THORNBURY, WILLIAM C.
KENTUCKY BOARD OF MEDICAL LICENSURE
310 WHITTINGTON, PARKWAY, SUITE 1B
LOUISVILLE KY 40222

MAIL PIECE TRACKING EVENTS:

| Date/Time | Event | Location |
|---|---|---|
| 10/21/2024 15:44 | PRE-SHIPMENT INFO SENT  USPS AWAITS ITEM | FRANKFORT,KY 40601 |
| 10/21/2024 16:54 | SHIPMENT RECEIVED ACCEPTANCE PENDING | FRANKFORT,KY 40601 |
| 10/21/2024 19:41 | ORIGIN ACCEPTANCE | FRANKFORT,KY 40601 |
| 10/21/2024 20:56 | PROCESSED THROUGH USPS FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/21/2024 21:49 | DEPARTED USPS REGIONAL FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/21/2024 22:41 | DEPARTED USPS REGIONAL FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/22/2024 00:40 | ARRIVE USPS FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/22/2024 04:08 | PROCESSED THROUGH USPS FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/22/2024 04:57 | DEPARTED USPS REGIONAL FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/22/2024 05:40 | DEPARTED USPS REGIONAL FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/22/2024 06:01 | ARRIVED AT USPS REGIONAL FACILITY | LOUISVILLE,KY 40222 |
| 10/22/2024 07:02 | ARRIVAL AT UNIT | LOUISVILLE,KY 40222 |
| 10/22/2024 07:13 | OUT FOR DELIVERY | LOUISVILLE,KY 40222 |
| 10/22/2024 13:24 | DELIVERED FRONT DESK/RECEPTION/MAIL ROOM | LOUISVILLE,KY 40222 |
| 10/23/2024 01:17 | PROCESSED THROUGH USPS FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/23/2024 05:36 | DEPARTED USPS REGIONAL FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/23/2024 05:54 | DEPARTED USPS REGIONAL FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/23/2024 06:14 | ARRIVED AT USPS REGIONAL FACILITY | LOUISVILLE,KY 40222 |
| 10/23/2024 06:18 | ARRIVE USPS FACILITY | LOUISVILLE,KY 40222 |
| 10/23/2024 06:46 | ARRIVAL AT UNIT | LOUISVILLE,KY 40222 |
| 10/23/2024 10:58 | NO AUTHORIZED RECIPIENT AVAILABLE | LOUISVILLE,KY 40222 |

Filed        24-CI-01033    10/30/2024        Kathryn Marshall, Franklin Circuit Clerk

Filed 24-CI-01033 10/30/2024 Kathryn Marshall, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
01/05/2026 04:28:59 PM
85787

![United States Postal Service logo]

October 30, 2024

The following is in response to your request for proof of delivery on your item with the tracking number: **9208 1901 9403 8383 3221 35**.

## Item Details

| | |
|---|---|
| **Status:** | Delivered, Front Desk/Reception/Mail Room |
| **Status Date / Time:** | October 22, 2024, 1:24 pm |
| **Location:** | LOUISVILLE, KY 40222 |
| **Postal Product:** | Priority Mail® |
| **Extra Services:** | Certified Mail Restricted Delivery |
| | Return Receipt Electronic |
| | Up to $100 insurance included |
| **Recipient Name:** | TONEY DALE E |

## Recipient Signature

Signature of Recipient: *[handwritten signature: Dusty Hughes]*

Address of Recipient: *BOARD OF MED LICENSURE 310 WHITTINGTON STE 1B*

Note: Scanned image may reflect a different destination address due to Intended Recipient's delivery instructions on file.

Thank you for selecting the United States Postal Service® for your mailing needs. If you require additional assistance, please contact your local Post Office™ or a Postal representative at 1-800-222-1811.

Sincerely,
United States Postal Service®
475 L'Enfant Plaza SW
Washington, D.C. 20260-0004

This USPS proof of delivery is linked to the customers mail piece information on file as shown below:

TONEY, DALE E.
KENTUCKY BOARD OF MEDICAL LICENSURE
310 WHITTINGTON, PARKWAY, SUITE 1B
LOUISVILLE KY 40222

COR : 000001 of 000002

NOT ORIGINAL

01/05/2026 04:28:59

85787

Filed                24-CI-01033        10/30/2024                Kathryn Marshall, Franklin Circuit Clerk

USPS MAIL PIECE TRACKING NUMBER:  420402229208190194038383322135
MAILING DATE:          10/21/2024
DELIVERED DATE:     10/22/2024
Custom 1: DriverId-9036375
Custom 2: PartyId-59953815
Custom 3: SummonsNum-@90005709425
Custom 4: CentralMailId-187866
Custom 5: Source County-FRANKLIN

MAIL PIECE DELIVERY INFORMATION:

TONEY, DALE E.
KENTUCKY BOARD OF MEDICAL LICENSURE
310 WHITTINGTON, PARKWAY, SUITE 1B
LOUISVILLE KY 40222

MAIL PIECE TRACKING EVENTS:

| Date/Time | Event | Location |
|---|---|---|
| 10/21/2024 15:44 | PRE-SHIPMENT INFO SENT  USPS AWAITS ITEM | FRANKFORT,KY 40601 |
| 10/21/2024 16:54 | SHIPMENT RECEIVED ACCEPTANCE PENDING | FRANKFORT,KY 40601 |
| 10/21/2024 19:42 | ORIGIN ACCEPTANCE | FRANKFORT,KY 40601 |
| 10/21/2024 20:57 | PROCESSED THROUGH USPS FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/21/2024 21:49 | DEPARTED USPS REGIONAL FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/21/2024 22:41 | DEPARTED USPS REGIONAL FACILITY | LEXINGTON KY DISTRIBUTION CENTE 40511 |
| 10/22/2024 00:40 | ARRIVE USPS FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/22/2024 04:09 | PROCESSED THROUGH USPS FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/22/2024 04:57 | DEPARTED USPS REGIONAL FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/22/2024 05:40 | DEPARTED USPS REGIONAL FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/22/2024 06:01 | ARRIVED AT USPS REGIONAL FACILITY | LOUISVILLE,KY 40222 |
| 10/22/2024 07:03 | ARRIVAL AT UNIT | LOUISVILLE,KY 40222 |
| 10/22/2024 07:14 | OUT FOR DELIVERY | LOUISVILLE,KY 40222 |
| 10/22/2024 13:24 | DELIVERED FRONT DESK/RECEPTION/MAIL ROOM | LOUISVILLE,KY 40222 |
| 10/23/2024 01:16 | PROCESSED THROUGH USPS FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/23/2024 05:36 | DEPARTED USPS REGIONAL FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/23/2024 05:54 | DEPARTED USPS REGIONAL FACILITY | LOUISVILLE KY DISTRIBUTION CENT 40231 |
| 10/23/2024 06:14 | ARRIVED AT USPS REGIONAL FACILITY | LOUISVILLE,KY 40222 |
| 10/23/2024 06:18 | ARRIVE USPS FACILITY | LOUISVILLE,KY 40222 |
| 10/23/2024 06:51 | ARRIVAL AT UNIT | LOUISVILLE,KY 40222 |
| 10/23/2024 11:01 | NO AUTHORIZED RECIPIENT AVAILABLE | LOUISVILLE,KY 40222 |

COR : 000002 of 000002

NOT ORIGINAL DOCUMENT

03/30/2026 04:18:17 PM

Item 9
Page 125

My name is Wendy Fillhardt. I was under the care of Dr. Pragya Gupta from January 25, 2021, until April 2022. During this time, I believe there were several issues with my care that were a violation of standard medical practice and standard of care. Not all issues are directly with Dr. Gupta however he is not proper managing his staff or hiring properly trained individuals. I will detail each issue individually below:

1. Donald Jay Thomas "DJ" was introduced to me as the office manager for the office. However, throughout my time under Dr. Gupta's care he was an active participant in my care. I was very uncomfortable with him being in my treatment room while I was wearing a gown and not fully clothed given that he has no medical certification. On multiple occasions, he was the individual who administered the anesthesia I was given for a procedure. He would ask Dr. Gupta how much to administer and then measure out and give the doses by iv. I have experienced trauma in my life and have a PTSD diagnosis. I believe that having someone in the room who was not an authorized medical professional has led to further trauma for me. I also feel that he should have never been allowed to give me an IV or administer any medications.

2. In September 2021, I was given my first injection of cyanocobalamin injection. I was supposed to have a second injection 30 days from the first as I understand the protocol to be. At the second injection date, Dr. Gupta took one look at me and was immediately concerned. I had let DJ and others in the office know that I did not feel right, and I had swelling. Dr. Gupta immediately knew that this was an allergic reaction. I instead was given a different injection.

3. I was told during my injection procedures that I was a "VIP" patient and that I would receive good stuff. I took this to mean that I was given more anesthesia than other patients. I expected to be in a twilight type feeling while injections were being given. However, I was completely knocked out and I do not believe that was appropriate for this type of injection. On one occasion, I had issues coming out of the anesthesia in the office.

4. Autumn Thomas is the wife of DJ Thomas and the clerk/billing assistant at the office. To my understanding she has had no medical training or certification, but she conducted medical functions such as taking vitals. She was also the individual that would handle send proscriptions to the pharmacy. However, I do not believe that proper protocols were followed in proscribing as I had to different issues that I believe are very important to mention.

   a. I was proscribed Savella. Dr. Gupta had advised that this medication was one that needed to be stepped up to a higher dosage. I was only advised to take one a day and was supposed to receive a lower milligram capsule for so many days the pickup a higher milligram. The proscription was incorrectly placed by Autumn, my dosage stated two pills per day and I was started on a 25 mg which I was supposed to start on 12.5. At one point, the system as you can see in my medical records had me proscribed a 25 MG and a 50 mg to both take twice a day. I never took these together or in the incorrectly proscribed manner. However, I did have side effects from taking the 25 mg to begin and Dr. Gupta was very upset over what had occurred. However, he did not take any responsibility for it and put it off on an individual in his office who should not be writing prescriptions. This causes me to have concerns that he does not fill out his own prescription orders or at the least he doesn't pay attention to what he signs.

   b. On several occasions, proscriptions from other doctors were ordered to be refilled by Dr. Gupta's office. My understanding from what I was told was that this was Autumn incorrectly refilling medications. My other doctors Dr. Kinney were very concerned



EXHIBIT # 1

004

NOT ORIGINAL
DOCUMENT
Item 9
Page 126
03/30/2026 04:18:17
PM
85787

when this occurred. I not understanding the system do not understand how this occurred, but my doctors were very concerned because the milligrams had been changed for my Topamax by Dr. Gupta's office, but Dr. Gupta was not the proscribing doctor on that medication.

WENDY FILLHARDT
Dated: _01/04/2023_

DOCUMENT ·

PM

NOT ORIGINAL

Item 9
Page 127
03/30/2026 04:18:17

**Kentucky Board of Medical Licensure**
**Hurstbourne Office Park**
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
Telephone: 502/429-7150
Fax: 502/429-7158
Website: www.kbml.ky.gov

85787

**RECEIVED**

JAN 0 9 2023

**Waiver of Privilege**
**Agreement to Release Records**

**K.B.M.L.**

Upon receipt of a photostatic or other copy hereof, you are authorized to release to the representative of the Kentucky Board of Medical Licensure for inspection and copying all records in your possession pertaining to me, to discuss with them fully any information you may have about me, and to furnish them a full report concerning me.

This authorization includes medical records, including all hospital records, psychiatric and psychological records, records of physicians and other medical personnel, records of drug abuse, records of alcohol abuse, prescriptions and drug records, and any and all records relating to my physical and mental condition.

**Prohibition of Redisclosure:** This information has been disclosed in compliance with Federal Regulations (42 CFR Part2) which prohibits further disclosure of this information except with specific written consent of the person to whom it pertains. A general authorization for the release of medical or other information, if held by another party, is not sufficient for this purpose. Federal Regulations state that any person who violates any provision of this law shall be fined not more than $500, in the case of a first offense, and not more than $5,000 in the case of each subsequent offense.

## For Purposes Of Identification:

1. Patient's Full Name: _Wendy M Fillhardt_
2. Date of Birth: ▓▓▓▓▓▓▓▓▓▓▓
3. Last 4 Digits of Social Security Number: ▓▓▓▓▓▓▓

Date: _01/06/2023_    Signature: _[signature]_

006

NOT ORIGINAL
DOCUMENT

PM

Item 9
Page 122
03/30/2026 04:20:50

85787

## Panel Memorandum

To:              Inquiry Panel

From:            Jon Marshall

Reviewed by:     Nicole A. King
                 Assistant General Counsel

Date:            May 1, 2023

RE:              Pragya B. Gupta, M.D.
                 162 Barnwood Drive
                 Edgewood, KY 41017
                 Medical School: Active Physician, 1983
                 Original Licensing State: Massachusetts
                 Date Licensed in KY: 6/17/1999
                 License #: 34920
                 Type: Active Physician
                 Specialty: Interventional Pain Management
                 Grievance Number: 15981
                 Investigation Initiated: 1/10/2023
                 Cost of Consultant: $2,625.00


**Action Requested:** This is a new case involving a grievance against Dr. Gupta concerning poor standard of care.

001

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 123
03/30/2026 04:20:50

85787

RE: Pragya B. Gupta M.D.
Grievance #15981

1. **BASIS FOR INVESTIGATION:** Wendy Fillhardt filed a grievance on Pragya B. Gupta M.D. alleging poor standard of care (Exhibit #1).

2. **INTERVIEW OF GRIEVANT:** An interview was conducted with **Wendy Fillhardt** and she stated substantially as follows: Wendy saw Dr. Gupta from January 2021 to April 2022. She believes there are several things that violate the standard of care in her treatment. She is most upset that "DJ", who is the office manager, has administered anesthesia to her and taken x-rays and he has no medical training. He has been in the room with her while she was only partially clothed. DJ's wife, Autumn, is the office clerk but she takes vital signs and also sends in prescriptions. In September 2021, she received a shot of cyanocobalamin and had a reaction to it. Her husband called Dr. Gupta's office four (4) times but received no response. Dr. Gupta saw her 30 days later and was shocked when he saw her because he had not been notified she had a reaction. Dr. Gupta told her if she entered into a trial for migraines, she would get a gift card. She never got the card. Wendy said DJ did most procedures, but her medical chart lists Dr. Gupta as having done them. Wendy states Autumn would call in a prescription for Emgality and it would be $700, but she received the shot at the office and did not need the prescription. Wendy outlines her concerns in her grievance.

3. **INTERVIEW (S) OF WITNESS (ES):** N/A

4. **MEDICAL RECORDS/EVIDENCE REVIEW:** Medical records on Wendy Fillhardt from Dr. Gupta

5. **LICENSEE'S RESPONSE:** An interview was conducted with **Dr. Gupta** and he stated substantially as follows: Dr. Gupta stated Wendy Fillhardt was an extremely difficult patient who has a significant history of PTSD and is under the care of a psychiatrist. Dr. Gupta asked for time to review her chart and submit a response (Exhibit #2), which he did in a timely manner.

6. **CONSULTANT'S FINDINGS:** Board consultant, **Jeffrey Berg M.D.**, reviewed the material sent to him and submitted a report to the Board (Exhibit #3). During this review, Dr. Berg requested additional information (any current ACLS certificates in the office, copy of infection control and Lumbar MRI report on Wendy Fillhardt).

Dr. Gupta was given a subpoena for these items and he provided them for the consultant to review. BLS certificates for two office personnel were issued the same date Dr. Gupta provided them.

Dr. Berg listed diagnosis and treatment to be below minimum standards, medical records to be within minimum standards, and an overall opinion of a Borderline case. Dr. Berg stated there are several concerns in regard to the treatment provided by Dr. Gupta. The three transforaminal cervical epidurals were not indicated as described under the diagnosis. These epidurals were performed under moderate sedation. The operating physician, Dr. Gupta,

1

002

NOT ORIGINAL DOCUMENT

03/30/2026 04:20:50 PM

Item 9
Page 124

85787

cannot also serve as the anesthesia monitor. It is standard of care that the anesthesia monitor must be at least an RN. In all of the procedures his trained assistant, DJ Thomas, served as anesthesia monitor and there is evidence in the medical record that Wendy Fillhardt was overmedicated.

7. **LICENSEE'S RESPONSE TO CONSULTANT'S FINDINGS: Dr. Gupta** was provided with a redacted copy of the consultant's report and submitted a response to the Board (Exhibit #4). Dr. Gupta explains his treatment of Wendy Fillhardt in a manner to address the concerns listed by the consultant.

8. **CONSULTANT'S FINAL REPORT:** Board consultant, **Jeffrey Berg M.D.**, was provided with Dr. Gupta's response to his report and submitted a final report to the Board (Exhibit #5). Dr. Berg states his original opinion has changed somewhat and he explains his reasons in his final report.

9. **PRIOR BOARD ACTIONS:**
On 4/16/2009, Panel B reviewed a grievance alleging Dr. Gupta prescribed an unapproved drug which caused the patient's death. The Panel also reviewed an investigative report, Dr. Gupta's response and the findings of a Board consultant. After review, it was the consensus of the Panel to have the case reviewed by a Board consultant specializing in Neurosurgery or Orthopedics.

On 10/15/2009, Panel B reviewed the Panel Memo & Exhibits from the 4/16/2009 Panel B meeting. The Panel also reviewed a new investigative report and the findings of a Board consultant. After review, it was the consensus of the Panel to send Dr. Gupta a Letter of Concern along with a copy of the consultant's report.

On 4/21/2016, Panel A reviewed a grievance against Dr. Gupta alleging he provided poor standard of care. The Panel reviewed the grievance and a response from Dr. Gupta. After review, it was the consensus of the Panel that there was no evidence of a violation of the Medical Practice Act and no further action was necessary.

On 2/21/2019, Panel A reviewed a grievance against Dr. Gupta alleging he provided poor standard of care. The Panel reviewed the grievance and a response from Dr. Gupta. After review, it was the consensus of the Panel that there was no evidence of a violation of the Medical Practice Act and no further action was necessary.

10. **EXHIBITS LIST:**
Exhibit #1- Grievance filed by Wendy Fillhardt
Exhibit #2- Dr. Gupta's response to grievance
Exhibit #3- Board consultant's report
Exhibit #4- Dr. Gupta's response to consultant's report
Exhibit #5- Board consultant's final report

NOT ORIGINAL
DOCUMENT

Item 9
Page 122

PM                                                                    03/30/2026 04:21:48

85787

**Panel Memorandum**

To:             Inquiry Panel

From:           Jon Marshall

Reviewed by:    Nicole A. King
                Assistant General Counsel

Date:           May 1, 2023

RE:             Pragya B. Gupta, M.D.
                162 Barnwood Drive
                Edgewood, KY 41017
                Medical School: Active Physician, 1983
                Original Licensing State: Massachusetts
                Date Licensed in KY: 6/17/1999
                License #: 34920
                Type: Active Physician
                Specialty: Interventional Pain Management
                Grievance Number: 15981
                Investigation Initiated: 1/10/2023
                Cost of Consultant: $2,625.00

**Action Requested:** This is a new case involving a grievance against Dr. Gupta concerning poor standard of care.

NOT ORIGINAL
DOCUMENT

PM

Item 9
Page 123
03/30/2026 04:21:48

85787

RE: Pragya B. Gupta M.D.
Grievance #15981

1. **BASIS FOR INVESTIGATION:** Wendy Fillhardt filed a grievance on Pragya B. Gupta
   M.D. alleging poor standard of care (Exhibit #1).

2. **INTERVIEW OF GRIEVANT:** An interview was conducted with **Wendy Fillhardt** and
   she stated substantially as follows: Wendy saw Dr. Gupta from January 2021 to April 2022.
   She believes there are several things that violate the standard of care in her treatment. She is
   most upset that "DJ", who is the office manager, has administered anesthesia to her and taken
   x-rays and he has no medical training. He has been in the room with her while she was only
   partially clothed. DJ's wife, Autumn, is the office clerk but she takes vital signs and also
   sends in prescriptions. In September 2021, she received a shot of cyanocobalamin and had a
   reaction to it. Her husband called Dr. Gupta's office four (4) times but received no response.
   Dr. Gupta saw her 30 days later and was shocked when he saw her because he had not been
   notified she had a reaction. Dr. Gupta told her if she entered into a trial for migraines, she
   would get a gift card. She never got the card. Wendy said DJ did most procedures, but her
   medical chart lists Dr. Gupta as having done them. Wendy states Autumn would call in a
   prescription for Emgality and it would be $700, but she received the shot at the office and did
   not need the prescription. Wendy outlines her concerns in her grievance.

3. **INTERVIEW (S) OF WITNESS (ES):** N/A

4. **MEDICAL RECORDS/EVIDENCE REVIEW:** Medical records on Wendy Fillhardt
   from Dr. Gupta

5. **LICENSEE'S RESPONSE:** An interview was conducted with **Dr. Gupta** and he stated
   substantially as follows: Dr. Gupta stated Wendy Fillhardt was an extremely difficult patient
   who has a significant history of PTSD and is under the care of a psychiatrist. Dr. Gupta
   asked for time to review her chart and submit a response (Exhibit #2), which he did in a
   timely manner.

6. **CONSULTANT'S FINDINGS:** Board consultant, **Jeffrey Berg M.D.**, reviewed the
   material sent to him and submitted a report to the Board (Exhibit #3). During this review,
   Dr. Berg requested additional information (any current ACLS certificates in the office, copy
   of infection control and Lumbar MRI report on Wendy Fillhardt).

   Dr. Gupta was given a subpoena for these items and he provided them for the consultant to
   review. BLS certificates for two office personnel were issued the same date Dr. Gupta
   provided them.

   Dr. Berg listed diagnosis and treatment to be below minimum standards, medical records to
   be within minimum standards, and an overall opinion of a Borderline case. Dr. Berg stated
   there are several concerns in regard to the treatment provided by Dr. Gupta. The three
   transforaminal cervical epidurals were not indicated as described under the diagnosis. These
   epidurals were performed under moderate sedation. The operating physician, Dr. Gupta,

1

002

NOT ORIGINAL

DOCUMENT

PM

Item 9
Page 124
03/30/2026 04:21:48

85787

cannot also serve as the anesthesia monitor. It is standard of care that the anesthesia monitor must be at least an RN. In all of the procedures his trained assistant, DJ Thomas, served as anesthesia monitor and there is evidence in the medical record that Wendy Fillhardt was overmedicated.

7. **LICENSEE'S RESPONSE TO CONSULTANT'S FINDINGS: Dr. Gupta** was provided with a redacted copy of the consultant's report and submitted a response to the Board (Exhibit #4). Dr. Gupta explains his treatment of Wendy Fillhardt in a manner to address the concerns listed by the consultant.

8. **CONSULTANT'S FINAL REPORT:** Board consultant, **Jeffrey Berg M.D.**, was provided with Dr. Gupta's response to his report and submitted a final report to the Board (Exhibit #5). Dr. Berg states his original opinion has changed somewhat and he explains his reasons in his final report.

9. **PRIOR BOARD ACTIONS:**
On 4/16/2009, Panel B reviewed a grievance alleging Dr. Gupta prescribed an unapproved drug which caused the patient's death. The Panel also reviewed an investigative report, Dr. Gupta's response and the findings of a Board consultant. After review, it was the consensus of the Panel to have the case reviewed by a Board consultant specializing in Neurosurgery or Orthopedics.

On 10/15/2009, Panel B reviewed the Panel Memo & Exhibits from the 4/16/2009 Panel B meeting. The Panel also reviewed a new investigative report and the findings of a Board consultant. After review, it was the consensus of the Panel to send Dr. Gupta a Letter of Concern along with a copy of the consultant's report.

On 4/21/2016, Panel A reviewed a grievance against Dr. Gupta alleging he provided poor standard of care. The Panel reviewed the grievance and a response from Dr. Gupta. After review, it was the consensus of the Panel that there was no evidence of a violation of the Medical Practice Act and no further action was necessary.

On 2/21/2019, Panel A reviewed a grievance against Dr. Gupta alleging he provided poor standard of care. The Panel reviewed the grievance and a response from Dr. Gupta. After review, it was the consensus of the Panel that there was no evidence of a violation of the Medical Practice Act and no further action was necessary.

10. **EXHIBITS LIST:**
Exhibit #1- Grievance filed by Wendy Fillhardt
Exhibit #2- Dr. Gupta's response to grievance
Exhibit #3- Board consultant's report
Exhibit #4- Dr. Gupta's response to consultant's report
Exhibit #5- Board consultant's final report

NOT ORIGINAL

DOCUMENT

PM

Item 9
Page 125
03/30/2026 04:22:14

85787

My name is Wendy Fillhardt. I was under the care of Dr. Pragya Gupta from January 25, 2021, until April 2022. During this time, I believe there were several issues with my care that were a violation of standard medical practice and standard of care. Not all issues are directly with Dr. Gupta however he is not proper managing his staff or hiring properly trained individuals.  I will detail each issue individually below:

1. Donald Jay Thomas "DJ" was introduced to me as the office manager for the office. However, throughout my time under Dr. Gupta's care he was an active participant in my care. I was very uncomfortable with him being in my treatment room while I was wearing a gown and not fully clothed given that he has no medical certification. On multiple occasions, he was the individual who administered the anesthesia I was given for a procedure. He would ask Dr. Gupta how much to administer and then measure out and give the doses by iv. I have experienced trauma in my life and have a PTSD diagnosis. I believe that having someone in the room who was not an authorized medical professional has led to further trauma for me. I also feel that he should have never been allowed to give me an IV or administer any medications.

2. In September 2021, I was given my first injection of cyanocobalamin injection. I was supposed to have a second injection 30 days from the first as I understand the protocol to be. At the second injection date, Dr. Gupta took one look at me and was immediately concerned. I had let DJ and others in the office know that I did not feel right, and I had swelling. Dr. Gupta immediately knew that this was an allergic reaction. I instead was given a different injection.

3. I was told during my injection procedures that I was a "VIP" patient and that I would receive good stuff. I took this to mean that I was given more anesthesia than other patients. I expected to be in a twilight type feeling while injections were being given. However, I was completely knocked out and I do not believe that was appropriate for this type of injection. On one occasion, I had issues coming out of the anesthesia in the office.

4. Autumn Thomas is the wife of DJ Thomas and the clerk/billing assistant at the office. To my understanding she has had no medical training or certification, but she conducted medical functions such as taking vitals. She was also the individual that would handle send proscriptions to the pharmacy. However, I do not believe that proper protocols were followed in proscribing as I had to different issues that I believe are very important to mention.
    a. I was proscribed Savella. Dr. Gupta had advised that this medication was one that needed to be stepped up to a higher dosage. I was only advised to take one a day and was supposed to receive a lower milligram capsule for so many days the pickup a higher milligram. The proscription was incorrectly placed by Autumn, my dosage stated two pills per day and I was started on a 25 mg which I was supposed to start on 12.5. At one point, the system as you can see in my medical records had me proscribed a 25 MG and a 50 mg to both take twice a day. I never took these together or in the incorrectly proscribed manner. However, I did have side effects from taking the 25 mg to begin and Dr. Gupta was very upset over what had occurred. However, he did not take any responsibility for it and put it off on an individual in his office who should not be writing prescriptions. This causes me to have concerns that he does not fill out his own prescription orders or at the least he doesn't pay attention to what he signs.
    b. On several occasions, proscriptions from other doctors were ordered to be refilled by Dr. Gupta's office. My understanding from what I was told was that this was Autumn incorrectly refilling medications. My other doctors Dr. Kinney were very concerned



EXHIBIT # ____1____

NOT ORIGINAL

DOCUMENT .

PM

Item 9
Page 126
03/30/2026 04:22:14

when this occurred. I not understanding the system do not understand how this 85787 occurred, but my doctors were very concerned because the milligrams had been changed for my Topamax by Dr. Gupta's office, but Dr. Gupta was not the proscribing doctor on that medication.

WENDY FILLHARDT
Dated: __01/06/2023__

005

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 127

03/30/2026 04:22:14

85787

## Kentucky Board of Medical Licensure
### Hurstbourne Office Park
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
Telephone: 502/429-7150
Fax: 502/429-7158
Website: www.kbml.ky.gov

**RECEIVED**

JAN 0 9 2023

## Waiver of Privilege
## Agreement to Release Records

**K.B.M.L.**

Upon receipt of a photostatic or other copy hereof, you are authorized to release to the representative of the Kentucky Board of Medical Licensure for inspection and copying all records in your possession pertaining to me, to discuss with them fully any information you may have about me, and to furnish them a full report concerning me.

This authorization includes medical records, including all hospital records, psychiatric and psychological records, records of physicians and other medical personnel, records of drug abuse, records of alcohol abuse, prescriptions and drug records, and any and all records relating to my physical and mental condition.

**Prohibition of Redisclosure:** This information has been disclosed in compliance with Federal Regulations (42 CFR Part2) which prohibits further disclosure of this information except with specific written consent of the person to whom it pertains. A general authorization for the release of medical or other information, if held by another party, is not sufficient for this purpose. Federal Regulations state that any person who violates any provision of this law shall be fined not more than $500, in the case of a first offense, and not more than $5,000 in the case of each subsequent offense.

## For Purposes Of Identification:

1. Patient's Full Name: _Wendy M Fillhardt_
2. Date of Birth: ██████████
3. Last 4 Digits of Social Security Number: ████████

Date: _01/06/2023_    Signature: _[signature]_

006

NOT ORIGINAL
DOCUMENT

PM

Item 9
Page 128
03/30/2026 04:22:14

85787

To

Mr. Jonathan T. Marshall
Medical Investigator
Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1 B
Louisville, KY 40222

Date: February 12, 2023

Ref: Wendy Fillhardt ███████. Responses to her grievances filed with the state of Kentucky
Medical Board. The patient was treated from Jan 25, 2021 - 4/5/2022.

Dear Mr. Marshall,

Wendy Fillhardt a 47-year-old female patient, was seen in my clinic for Migraine, Cervicalgia
with cervical discogenic pain with intermittent cervical radicular pain, peripheral neuropathy,
myofascial with intermittent radicular pain, and myofascial pain (>5 diagnoses)[4]. She also
presented with a significant history of PTSD and is under psychiatric care. She was first seen on
January 25, 2021. She was seen upon request of her daughter Brittany Morris who was working
as a Medical Assistant in my clinic.

Clinically she had finding suggestive of Cervical spondylosis, cervical radicular pain, lumbar
spondylosis (facet arthropathy) causing low back pain, Generalized myofascial pain with
widespread allodynia to deep palpation, peripheral neuropathy, and moderate depression with
anxiety disorder. She was also diagnosed with intractable migraine.

Past medical and surgical history includes PTSD, depression, Gastric bypass surgery,
abdominoplasty, Breast augmentation, partial hysterectomy, and oophorectomy.

At my clinic, she underwent a diagnostic bilateral L4-5 and L5-S1 facet joint block, which was
negative, and a series of three cervical transforaminal injections (9/1/21, 9/29/21, & 11/24/21)
for cervical radicular pain for left UE radicular pain. The cervical transforaminal injection
resolved upper extremity radicular pain.
For widespread myofascial pain with allodynia, she was treated with a small dose of IV
Ketamine (50mg) under mild sedation, mainly for treating central sensitization of pain, which
was manifested by widespread allodynia and myofascial pain. She received treatment on
4/15/2021 and 4/13/2022. She had some improvement after the infusions, only for a brief period.
None of the treatments caused any adverse events or serious adverse events.
During the treatment, I noticed that the scores of PHQ 9 abruptly increased (probably secondary
to underlying psychiatric or psychological conditions). She also complained of weakness in her
legs (non-specific) and h/o urinary incontinence (intermittent), for which I advised her to see a
neurologist. She was also under the care of a psychiatrist.

She was treated with Lyrica and Savella for Myofascial syndrome, Topamax and Emgality for
Migraine (emgality was administered free of cost through our phase 4 TRIUMPH clinical trial

Page 1 of 6

EXHIBIT # 2

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 129
03/30/2026 04:22:14

for migraine headache), Celebrex for facet arthritis, and Duloxetine for pain and depression per PHQ 9 assessment.

**Response to her grievances:**

1.  Donnie J Thomas (DJ) is a trained medical assistant. I have trained him since 2002. In my long career, I had not had a single adverse event or serious adverse event where he was involved. I have trained him not only to perform routine Medical Assistant Jobs, but he is also a Clinical Coordinator for my ongoing clinical research work (GCP certified). Ketamine infusion was administered for her widespread myofascial pain with allodynia with a sub-anesthetic analgesic dose for treating the central sensitization of pain.[1,2,3] Ketamine infusion is a validated treatment for treatment-resistant depression patients. DJ is trained to perform more than one job. Multitasking is required to work in a solo practitioner's office. DJ helps me in the procedure room. He positions patients, attaches them to the monitors per ASA guidelines, and moves the Fluoroscope per my instruction. At times DJ administers a small dose of sedation on my request. Ms. Fillhardt was administered Midazolam for anxiolysis and amnesia at the time of Ketamine infusion. The sedation helps abate the sympathomimetic effect of ketamine to some extent. DJ was not the only person present at the time of infusion, as other MAs were there, particularly her daughter, on the day of the first infusion. I have checked her multiple times during the infusion to monitor EKG tracing and the depth of her sedation. She received good care. She was covered appropriately with blankets. There was no trigger for reactivating PTSD.

2.  In September, there were three encounters. On 9/1/2021 patient underwent left C5 and C6 Transforaminal injection based on the clinical finding of a positive foraminal compression test with the presumption of disc herniation at C5 and C6 level causing left arm pain and suprascapular pain. The last cervical spine MRI was from 2020, which showed discogenic disease at the C4-5 level. 9/27/2021, a telephone encounter for a refill of medicine, and on 9/29/2021, repeat cervical transforaminal injection for long-term benefit. I don't recall the swelling at all. It was not life-threatening and without any residual problems. She is probably referring to swelling from IV fluid extravasation, which is not an allergic reaction. The patient was never administered Cyanocobalamin in my clinic.

3.  No, I don't recall calling any patient a VIP, although I consider all patients VIPs and treat them accordingly. Most of the time, her daughter Brittany Morris was present during transportation of her to and from the procedure room. She needed 5mg of midazolam for the procedure as she was extremely nervous. Without sedation, I could not have performed the procedure as she would not cooperate.

4.  Ms. Autumn Thomas is also a MA whom I have trained since 2013. Autumn Thomas occasionally helped us in the recovery unit by relieving Medical Assistants for lunch breaks when we were short-staffed during the COVID infection. Autumn Thomas is responsible for discharging patients, reviewing discharge instructions, and ensuring that patients are appropriately scheduled for post-procedure follow-up. She also helps me with

Page 2 of 6

NOT ORIGINAL

DOCUMENT

Item 9
Page 130
03/30/2026 04:22:14
PM

billing work. In the recovery area, she would typically watch those patients who are getting ready to be discharged. All patients in the recovery area are attached to the automated monitors. She is also responsible for following all my orders, such as lab work and imaging requests.

The patient was prescribed an appropriate dose of Savella, Lyrica, Topamax, Duloxetine, and Celebrex. She was initiated with Savella and titrated appropriately up to the therapeutic dose. However, I wonder if that helped, as she did not attend the last two follow-up appointments.

The allegations that I don't take care of my prescription are inaccurate. I am meticulous and ensure that my staff follows my instruction correctly. I verify and cross-verify that the prescriptions are correctly sent by checking the e-logs frequently. Autumn helps me ensure that the refills are sent in a timely fashion. I enter the prescription under the appropriate diagnosis, and then she transmits the Rx electronically, which I monitor directly.

5. No, I don't refill other physicians' prescriptions unless the patient specifically requests me to do that to save time and a visit. Most of these medications are like Topamax, Lyrica, duloxetine, and, sometimes, Gabapentin, as multiple specialists commonly prescribe these for painful conditions.

I have tried to provide excellent care to Ms. Fillhardt even though she did not comply with my treatment plan, as she missed multiple appointments. During each visit, I spent considerable time explaining the treatment plan and her disease process. I am sorry that she was not happy with my care.

A well-designed cohort study showed that patients in a primary clinic involved in the difficult encounter had more than five symptoms (RR= 1.9, 95% CI: 1.3-2.3) and had depression or anxiety disorder (RR = 2.8 CI: 1.3-4.2). These patients are less likely to trust physicians or be fully satisfied with the treatment.[4]

Finally, I have worked hard and diligently for over two decades as a solo practitioner and have ensured the highest level of care to the patients I served. All of my support staff are well-trained and follow my guidance exceptionally well. I have attached my resume for your review. I have also attached a chronological, brief narration of all the clinic visits of Ms. Fillhardt below.

Please do not hesitate to call me if you need further information.

Respectfully,

*PB Gupta MD*

Pragya B. Gupta, M.D., F.R.C.S., D.A.B.P.M.
Cell: ███████████
162 Barnwood Drive
Edgewood, KY 41017

Page 3 of 6

009

NOT ORIGINAL

DOCUMENT

PM

Item 9
Page 131
03/30/2026 04:22:14

85787

**References:**
1. Ketamine in Chronic Pain Management: An Evidence-Based Review. Hocking G, Cousins MJ. Anesth Analg 2003;97:1730-9.
2. Efficacy of Outpatient Ketamine Infusions in Refractory Chronic Pain Syndromes; A 5-year Retrospective Analysis. Patil S, Anitescu M. Pain Medicine 2012;13:263-269.
3. Consensus Guidelines on the Use of Intravenous Ketamine infusions for Chronic Pain From the American Society of Regional Anesthesia and Pain Medicine, The American Academy of Pain Medicine, and the American Society of Anesthesiologists. Cohen SP, Bhatia A, Buvendrun A, et al. Regional Anesthesia and Pain Medicine. Vol 43, Number 5, July 2018: 521-546.
4. A Cohort Study Assessing Difficult Patient Encounters in a Walk-In Primary Care Clinic, Predictors, and outcomes. Hinchey SA, Jackson JL. J Gen Intern Med 26(6):588-94.

**Chronological Events with brief narrative:**

Mrs. Fillhardt was referred to me by her daughter, Brittany Morris. Ms. Morris began working in my office as a Medical Assistant on August 20, 2020. Within a few months of employment, Ms. Morris asked for me to see her mother, Mrs. Wendy Fillhardt.

On January 25, 2021, Mrs. Fillhardt saw me for the first time. My notes outline my recommendations for her multiple diagnoses.

On February 25, 2021, Mrs. Fillhardt returned to see me. During this visit, Mrs. Fillhardt presented with new complaints not mentioned in her previous encounter. I created a care plan for those issues outlined in my records. I reviewed her completed lab values, which I ordered in her initial consultation, and recommended treatments accordingly. Mrs. Fillhardt had not completed some of the previously ordered tests and was again reminded to do so promptly.

On March 8, 2021, Mrs. Fillhardt returned to the clinic to review recently completed testing with me. As my notes indicate, I made the care plan according to the needs of her results.

On March 25, 2021, I performed a bilateral L3, L4 medial branch block, and L5 dorsal ramus block to block L4-5 and L5-S1 facet joints under fluoroscopy guidance on Mrs. Fillhardt. This procedure was performed based on the patient's complaint, examination, and MRI findings.

On April 14, 2021, Mrs. Fillhardt was initially scheduled for a repeat of the medial branch block. Upon arriving at the procedure, she required additional evaluation as she complained of widespread pain. After a thorough assessment and detailed discussion with the patient and her husband, the patient's care plan was changed. The patient consented, and the procedure was changed to a Ketamine infusion for her condition.

On May 18, 2021, Mrs. Fillhardt returned for a follow-up. Details of her plan of care are outlined in the note from this visit. Based on history, examination, and response to previous treatment, it was recommended that the patient undergo exercise therapy, which she participated in on May 25, 2021, June 2, 2021, and June 8, 2021.

NOT ORIGINAL
DOCUMENT

PM

Item 9
Page 132
03/30/2026 04:22:14

On June 15. 2021, Mrs. Fillhardt returned for a follow-up evaluation when she reported her 85787 inability to participate in ongoing exercise therapy. She also presented with nonspecific neurological changes, and I recommended a consultation with a neurologist for her piece of mind.

On July 13, 2021, Mrs. Fillhardt presented with various ongoing symptoms. The patient completed her intake forms in bold writing, acknowledging she did not follow up with the neurologist. Due to her mental state, a referral to a psychiatrist was also made. Additional labs were ordered further to explore the causation of the patient's complaints.

On August 24, 2021, Mrs. Fillhardt returned with complaints focused on her cervical spine. Based on the complaints and positive foraminal compression test, I requested the patient undergo a series of cervical transforaminal epidural injections.

On September 1, 2021, and September 29, 2021, Mrs. Fillhardt underwent a Left cervical 5 and 6 transforaminal injection under fluoroscopy guidance and sedation. Depending on the outcome and the duration of the effect of the medicine,   In Mrs. Fillhardt's third procedure was performed on November 24, 2021. It should also be noted that during this time in Mrs. Fillhardt's treatment, her daughter abruptly left her employment with my practice due to a domestic situation.

On December 21, 2021, Mrs. Fillhardt returned for a follow-up. The patient reported that cervical radicular pain had subsided.

After several months of absence from the clinic, Mrs. Fillhardt returned on March 14, 2022, with an appointment to see my midlevel provider. A urine drug screen was obtained from the patient on this date. Upon the midlevel provider entering the room, the patient and her husband refused to be seen by the provider and demanded to see me. She completed the visit when it was explained to her that I would not have time to see her and that the midlevel provider would see her and will give me feedback. The midlevel provider requested that the patient see me on the next visit, as outlined in the note.

On April 5, 2022, Mrs. Fillhardt returned to see me. During this visit, she explained she had clearance from her psychiatrist to undergo another ketamine infusion, as she benefited in the past. Further, I adjusted her medication per her symptoms.

On April 13, 2022, Mrs. Fillhardt underwent a ketamine infusion. As my notes indicate, I requested her to follow up with me in 30 days for evaluation.

Mrs. Fillhardt did not attend her scheduled follow-up appointments on  May 5, 2022, and May 26, 2022. This was not unusual for her to miss appointments. During her care, as in the past, she missed appointments on February 15, 2021, June 3, 2021, June 9, 2021, and October 27, 2021.

Unfortunately, the patient had an unpaid portion of her care. Our collection efforts were unsuccessful. After several unsuccessful attempts at collecting payments, per our policy, the

Page 5 of 6

011

NOT ORIGINAL

DOCUMENT

PM

Item 9
Page 133
03/30/2026 04:22:14

office was forced to turn her account over to a collection agency in October 2022. This might have made her upset but our collection policy is the same for all patients.

012

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 134
03/30/2026 04:22:14

85787

## CURRICULUM VITAE:

Pragya B. Gupta, M.D., F.R.C.S.(Edin), D.A.B.P.M.

Home Address: ███████████████████

**Office Address:**
162 Barnwood Dr, Edgewood, KY 41017. 859-331-4159

### Current Position:
**Director**
February 22, 2002 - Advanced Pain Treatment Center, 162 Barnwood Drive, Edgewood, KY 41017.
Tel: (859) 331 4159 www.aptcmd.com
Nov 2012- Otrimed Clinical Research, 162 Barnwood Drive, Edgewood, KY 41017.
Tel: (859) 7571359 www.otrimedresearchcenter.com

### Academic Appointment:
2001 July: Assistant Professor, Department of Anesthesiology and Pain Medicine, AHEC Faculty.
ID 10840536. Appointment until 2024.
University of Kentucky Medical Center, Lexington, KY 40536.

### Past Committee Position:
Member, Evidence Analysis Committee: Spine Intervention Society 2015 - 2017, July

### BOARD CERTIFICATION

**April 1, 2021- Dec 31, 2032: Diplomate of American Board of Pain Medicine** (first certified in 2001, ID# 08901)
**Jan 2021 – Dec 31, 2030: ABA Subspecialty Certification in Pain Medicine** (first certified in 2000 ), ABAID: 3581-7303.
**October 1, 1999:** Diplomate American Board of Anesthesiology **(Indefinite expiry, ABAID: 3581-7303).**
**1994:** Fellow of the Royal College of Surgeons of Edinburgh by exam (General surgery); United Kingdom.
**1979-1985:** Bachelor of Medicine and Bachelor of Surgery, Calcutta University, R.G. Kar Medical College & Hospital, 1 Khudiram Bose Sarani, Calcutta 700004, India.
**July 14, 1993:** ECFMG certification.

### Licensure:
- **Medical Board of California, # C152074, date issued 10/04/2017 – Expires: 7/31/2023**
- Kentucky Board of Medical Licensure # 34920, date issued 6/17/1999 – Expires: 03/01/2024
- Commonwealth of Massachusetts # 154671, date issued 12/10/1997 – Expires: 7/25/2024
- Medical Board of Ohio, # 35-082213, date issued 02/14/2003 – Expires: 01/01/2025
- General Medical Council, United Kingdom Registration # 4064804 1993
- Indian Medical Council registration #43916 - 1985.

NOT ORIGINAL DOCUMENT

Item 9
Page 135

03/30/2026 04:22:14 PM

85787

National Provider Identity Number (NPI) # 1740243609, Enumeration Date: 04/10/2006

DEA: ▮▮▮▮▮ Date of Issue: -08/18/2021, Date of Expiry: 09/30/2024

DEA: ▮▮▮▮▮ Date of Issue: 01/03/2023, Date of Expiry: 09/30/2025

ACLS Certified: Nov 30, 2022 – Nov 30-2024

## CLINICAL RESEARCH CERTIFICATION:

- **Nov 2022-Nov 2024: Certified Principal Investigator** (Initial Certification: 9/2016), Academy of Clinical Research Professionals – ACRP – active.
- **2016:** Fellow of the Academy of Physicians in Clinical Research- APCR.
- **24 Oct 2022- 24 Oct 2024. GCP CERTIFICATION - CITI** – Copernicus group IRB);
- **GCP Training: November 1, 2019:** Clinical Research Training for Physicians, sponsored by Encore Research Group (TransCelerate BioPharma, Inc).
- **FDA Clinical Investigator Training Course: Nov 13 – 15, 2018,** FDA Center for Drug Development and Research, 10903 New Hampshire Avenue, Silver Spring, MD 20993.

## EVIDENCE-BASED MEDICINE CERTIFICATION:
07/2015: Appraisal of Evidence in Studies of Diagnostic Tests and Strategies, Evidence-Based Medicine Part 1 & 2. Spine Intervention Society, Educational Program.

## MAT WAIVER CERTIFICATION:
Certification of completion American Academy of Addiction Psychiatry MAT waiver course, November 22, 2020. **DATA2000 approval for 275 patients.**

## Fluoroscopy Training and Certification:
- July 1, 2022: Certified California Fluoroscopy X-Ray Supervisor and Operator – Valid 7/31/2024. California Department of Public Health. Permit # RHC00206794
- March 23, 2022, Advanced Training Program on the Safe use of Fluoroscope. Certified by Fluorosafety. CME: 8 hours Category 1
- March 28, 2022: Establishing a Patient Safety Program in Fluoroscopy. Certified by FluoroSafety. CME: 2 hours, category 1.
- December 15, 2019: Basic Training on the Safe Use of Fluoroscopy: Course # E2019-3, CME 1 – 4 hours, FluoroSafety Certification.

## Past Employments:
July 1999 – Dec, 2000: Director Pain Control Center, Clark Regional Medical Center, Winchester, KY 40391

January 21, 2001 – February 21, 2002: Medical Director, Ohio Valley Chronic Pain Center, U.S. Highway 42W – S Warsaw, KY 41095

## Hospital Affiliations:
January 19, 2001 – ongoing) St. Elizabeth Medical Center, Medical Village Drive, Edgewood, KY 41017 (full admitting privileges)
January 1, 2019 - The Christ Hospital Network, Cincinnati, OH. Community affiliate Staff-Non Privileged.

PRAGYA B GUPTA, MD  ▮2▮

014

NOT ORIGINAL
DOCUMENT

PM

Item 9
Page 136
03/30/2026 04:22:14

85787

## RESIDENCY & FELLOWSHIP TRAINING IN THE USA:

- July 1994 – June 1995: Internship – **General Surgery, University of Illinois** – Metro Group of Hospital General Surgery Program. Illinois Masonic Medical Center, 836 W Wellington Avenue, Chicago, IL 60657-5193. Tel: 773-296-5347
- July 1995 – June 1998: Residency/ Senior Resident – Anesthesiology, **Tufts Medical Center,** 750 Washington Street, Boston, Box 298, MA 02111; 617-636-9303
- July 1998 – June 1999: Fellowship – Pain Medicine. **Tufts Medical Center,** 750 Washington Street, Box 298; Boston, MA 02111. Tel 617-636-9303

## POSTGRADUATE TRAINING IN THE UNITED KINGDOME

- Jan 1, 1990 – March 31, 1990; Clinical Clerkship, Dept of Accident and Emergency, Rotherham District General Hospital, Rotherham S60 2UD, UK
- April 1, 1990 – January 31, 1991: Senior House Officer, Dept. of Accident and Emergency, Rotherham District General Hospital, Moorgate Road, Rotherham S60 2UD
- February 1, 1991 – July 31, 1991: Senior House Officer, Dept. of Orthopedics, Rotherham District General Hospital, Moorgate Road, Rotherham, S60 2UD
- August 1, 1991 – July 31, 1992; Senior House Office, Dept. of General Surgery, Rotherham District General Hospital, Moorgate Road, Rotherham, S60 2UD
- September 1, 1992 – January 25, 1994; Senior House Officer, Department of General Surgery, Torbay General Hospital, Lawes Bridge, Torquay, TQ2 7AA

## Staff grade Position in General Surgery:

January 27, 1994 – June 15, 1994, Staff grade General Surgeon, Dunoon General Hospital, Dunoon, Scotland, Argyll, and Bute unit, Tigh Na Linne, Lochgilphead, Argyll PA31 8LE UK

## Post-Graduate Training and private practice in India (After graduating from Medical School):

- 08/16/1983 – 02/15/1984: Transitional Rotation in Medicine, Surgery, OB and Gyn, R.G. Kar Medical College and Hospital, Calcutta.
- 08/16/1984 – 02/15/1986: Senior House Officer, General Surgery, R.G. Kar Medical College & Hospital, 1, Khudiram Bose   Sarani, Calcutta, 700 004, India. 033-25557656
- 02/16/1986 – 10/30/1986: General Practice, EC 73 Sector 1, Salt Lake City, Calcutta, India.
- 11/01/1986 – 04/15/1987: General Surgery, Senior House Officer, S.S.K.M. Hospital and Institute of Postgraduate Medical Research, 244 A.J.C. Bose Road, Calcutta 700020, India
- 04/16/1987- 03/02/1988: General Practice, EC 73 Sector 1, Salt Lake City, Calcutta, India.
- 03/26/1988- 04/09/89: General Surgery Residency, Sher-I-Kashmir Institute, Medical Science, P.O. Box 27, Soura, Srinagar, 190011, India.
- 05/01/1989 – 10/30/1989: General Practice EC73, Sector 1, Salt Lake City Calcutta, India.
- 11/01/1989 – 12/31/1989: Preparatory leave for taking the Professional and Linguistic Assessment Exam (PLAB), United Kingdom.

## LIST of the Interventional Pain Procedures routinely performed in clinical practice:

- Balloon Kyphoplasty
- Diagnostic provocation, pressure-controlled Discogram
- Intradiscal therapies (PRP, Stem Cells implantation- implanted stem cells as a part of Clinical

PRAGYA B GUPTA, MD   3

015

NOT ORIGINAL
DOCUMENT
Item 9
Page 137
03/30/2026 04:22:14
PM
85787

trial)

- PRP treatment for Tendinitis, tendon tear, rupture, and I.A. injection for DJD under USG.
- Spinal Cord Stimulation trial and implant.
- Implantation of Intrathecal Drug Delivery Device.
- **Ultrasound-guided procedures** include Stellate Ganglion block, Serratus Anterior Plane block, Major joint injections, Interscalene blocks, paravertebral blocks, thoracic and cervical facet joint blocks, etc., Adductor canal block, Shoulder joint (suprascapular and axillary nerve) and Knee joint block (IPAC).
- Peripheral Nerve Stimulation under USG for painful neuropathic conditions.
- Radiofrequency Neurotomy of Cervical and Lumbar Z joints and Thoracic Z joints where possible.
- Fluoroscopy-guided diagnostic and therapeutic Cervical, Thoracic, and lumbar T.F. injections, medial branch blocks, joint injections, Caudal epidural Neuroplasty, LSPB, Pelvic Plexus blocks, Splanchnic nerve block, Celiac plexus block, Ganglion Impar block, etc.

## Pain Medicine Ultrasonography Training:

- August 17 – 18, 2013: World Academy of Pain Medicine Ultrasonography (previously AAPMU); Level 2, advanced ultrasound techniques in pain medicine, (16 category I CME), Phoenix, Arizona.
- March 9 – 10, 2013; World Academy of Pain Medicine Ultrasonography (previously AAPMU);
- Level 3, 16 hours CME-category I) Henderson, Nevada.
- February 9, 2013; World Academy of Pain Medicine Ultrasonography (previously AAPMU); Level 1, 8 hours CME-category I) Henderson, Nevada.
- October 2015; World Academy of Pain Medicine Ultrasonography (previously AAPMU); Level 2, 16 hours CME-category I, Chicago, IL.

## Medicine Assisted Treatment for Opioid use disorder waiver Courses

- October 5, 2008: Suboxone prescribing Certification course (SAMHSA accredited), Lexington, KY. CME-1: 8 Hours.
- October 15, 2017: Office-Based Treatment of Opioid Dependence, American Academy of Addiction Psychiatry Certification. 8 AMA PRA Category 1 Credit
- **November 22, 2020: 8-hour** online MAT Waiver Course, American Academy of Addiction Psychiatry. 8 hours of CME AMA-1
- Nov 2020: Psychiatric Comorbidities: Diagnosis and Treatment of Comorbid Psychiatric Disorders and Opioid Use disorders – Revised; 1.50 CME AMA Category 1.
- Nov 2020: Medication for Opioid Use Disorder; American Academy of Addiction Psychiatry; CME 1.5, AMA 1
- Nov 2020: Methadone and Buprenorphine Associated Drug-Drug interactions; American Academy of Addiction Psychiatry; CME 1, AMA Category 1.

## Publication:

Spontaneous Rupture of Spleen Secondary to Metastatic Carcinoma. PB Gupta & L Harvey, British Journal of Surgery. Vol 80, May 1993, 613
Book Review: Sickle Cell Pain by Samir Ballas, IASP Press Seattle. PBGupta, DBCarr; AcutePain (International Journal of Acute Pain Management). Volume 1 (5) Dec.1998.

PRAGYA B GUPTA, MD  4

DOCUMENT

PM

NOT ORIGINAL
Item 9
Page 136
03/30/2026 04:22:14

85787

## Research Interest:

Role of regenerative medicine in treating Degenerative disc and joint disease.
Peripheral neurostimulation for neuropathic pain
Spinal cord neuromodulation for chronic pain.

## MEMBERSHIP:

- Spine Intervention Society, Active since 2000
- American Academy of Pain Medicine
- North American Neuromodulation Society
- American Society of Regional Anesthesia
- Massachusetts Medical Society
- American Medical Association

## LIST OF PHASE II-IV CLINICAL TRIALS CONDUCTED AS A PRINCIPAL INVESTIGATOR:

### Opioid-Induced Constipation:
1. A safety and efficacy evaluation of BLI801 Laxative in Adults Experiencing Non-Idiopathic constipation.
2. A phase 3 randomized, double-blind, placebo-controlled, parallel-group study of NALDEMEDINE in the treatment of opioid-induced constipation in subjects with nonmalignant chronic pain receiving opioid therapy.
3. A phase 3 randomized, double-blind, double-dummy, placebo-controlled, active-controlled, parallel-group, multicenter trial of oxycodone/ naloxone controlled release tablet (OXN) to assess the analgesic efficacy (compared to placebo) and the management of opioid-induced constipation (compared to oxycodone controlled-release tablets (OXY) in opioid experienced subjects with uncontrolled moderate to severe chronic low back pain and a history of opioid-induced constipation who required around-the-clock opioid therapy.

### Sciatica Study:
4. A phase 2A, open, sequential, dose-escalation study of the pharmacokinetics, safety, and preliminary efficacy of MDT – 15 in subjects with lumbosacral radiculopathy.
5. A Prospective Multicenter Randomized Double-Blind Sham Controlled study to evaluate the efficacy and safety of Clonidine Micro pellets for the treatment of pain associated with lumbosacral radiculopathy in adults
6. A Multicenter, Randomized, Double-blind, Sham-controlled, Comparative Study of SI-6603(condoliase) in Subjects with Lumbar Disc Herniation (Phase 3).

### LOW BACK PAIN – Degenerative Disc Disease- (STEM CELL CLINICAL TRIALS):
7. A phase 3 prospective, multicenter, randomized, double-blind, placebo-controlled study to evaluate the efficacy and safety of a single injection of Rexlemastrocel-L alone or combined with hyaluronic acid in

PRAGYA B GUPTA, MD  5

017

NOT ORIGINAL
DOCUMENT

PM

Item 9
Page 139
03/30/2026 04:22:14

85787

subjects with chronic **discogenic lumbar back pain** through 12 months.

8. Phase I, first in the human, randomized, double-blind, vehicle and placebo-controlled, parallel-group, multi-center study in subjects with single-level, symptomatic lumbar intervertebral disc degeneration (>6 months) and unresponsive to conservative therapy for at least 3 months. The study will compare single intradiscal injections of high and low-dose IDCT with two control groups (saline, Sodium Hyaluronate).

9. A prospective, randomized, double-blinded, vehicle- and placebo-controlled, multicenter study to evaluate the safety and preliminary efficacy of IDCT in subjects with single-level, symptomatic lumbar intervertebral disc degeneration.

**LOW BACK PAIN – Degenerative Disc Disease / Non-Specific Low back pain**

10. A phase 3 randomized, double-blind, placebo and active-controlled multicenter, parallel-group study of the analgesic efficacy and safety of subcutaneous administration of Tanezumab in the adult subjects with chronic low back pain.
11. A phase 3 randomized, double-blind, double-dummy, placebo-controlled, active-controlled, parallel-group, multicenter trial of oxycodone/ naloxone controlled release tablet (OXN) to assess the analgesic efficacy (compared to placebo) and the management of opioid-induced constipation (compared to oxycodone controlled-release tablets (OXY) in opioid experienced subjects with uncontrolled moderate to severe chronic low back pain and a history of opioid-induced constipation who required around-the-clock opioid therapy.
12. A Phase III, Randomized, Double-Blind, Placebo-Controlled, Enriched-Enrollment Withdrawal, Multicenter Study to Evaluate the Efficacy and Safety of a Long-Acting Subcutaneous Injectable Depot of **Buprenorphine (CAM2038)** in Subjects with Moderate to Severe Chronic Low Back Pain Currently Treated with Daily Opioid.
13. A phase 3, Randomized, Double-blind, Placebo-controlled Study to Evaluate the Efficacy and Safety of Fasinumab in Patients with Moderate to Severe Chronic Low back pain and Osteoarthritis of Hip or Knee ( Study was put on hold in (2018 March).
**IMPLANTABLE SPINAL CORD STIMULATION TRIAL:**

14. Medtronic products surveillance registry version 6 (PSR-V6). The purpose of the PSR platform is to provide continuing evaluation and periodic reporting of the safety and effectiveness of market-released products for their intended use. Products surveillance is the systematic collection, analysis, and interpretation of performance data as well as its dissemination and application. Phase 4 study (Chronic Neuropathic pain).

**Post Traumatic Neuropathic Pain**
15. A phase 3 randomized double-blind placebo-controlled parallel-group study of the efficacy and safety of pregabalin (twice a day) in subjects with posttraumatic peripheral neuropathic pain.
16. SPRINT peripheral nerve stimulation for the treatment of Neuropathic post-Amputation Pain in a randomized, double-blinded, placebo-controlled, multicenter trial.

**Migraine Study:**
17. A phase IIb randomized, double-blind, placebo-controlled study of LY2951742 in patients with episodic migraine.
18. A phase 3, randomized, double-blind, and placebo-controlled study of LY2951742. Patient with episodic migraine.
19. A phase 3, randomized double-blind, parallel-group, multicenter placebo-controlled dose-ranging study to evaluate the efficacy and safety of AMG 334 in migraine prevention.

PRAGYA B GUPTA, MD   6

NOT ORIGINAL
DOCUMENT
Item 9
Page 140
03/30/2026 04:22:14
PM

20. A phase 3, multicenter, randomized, double-blind, placebo-controlled, parallel-group study to evaluate the efficacy, safety, and tolerability of multiple dosing regimens of oral **ATOGEPANT** for the prevention of migraine in patients with episodic migraine.

21. 15Q-MC-BOO4/2016-4215 Observational Study Protocol: Protocol 15Q-MC-B004: Preventive Treatment of migraine outcomes for Patients in real-world Healthcare systems (TRIUMPH). GPORWE-2016-4215.

**Diabetes Mellitus:**

22. A phase 3, randomized, 16 weeks, multiphase, double-blind, placebo-controlled dose-ranging study to evaluate the glycemic effect, safety, and tolerability of metformin delayed-release in subjects with type II diabetes mellitus

**Osteoarthritis Joint Pain- Degenerative Joint Disease**

23. A phase 3, randomized, 16 weeks, multi-phase, double-blind, placebo-controlled study to evaluate the efficacy, safety, and tolerability of Fulranumab as a monotherapy in subjects with signs and symptoms of osteoarthritis of the hip or knee. A phase 3 randomized, double-blind, placebo and active-controlled multicenter, parallel-group study of the analgesic efficacy and safety of subcutaneous administration of **Tanezumab** in the adult subjects with chronic low back pain.

24. A phase 3 randomized, double-blind, double-dummy, placebo-controlled, active-controlled, parallel-group, multicenter trial of oxycodone/ naloxone controlled release tablet (OXN) to assess the analgesic efficacy (compared to placebo) and the management of opioid-induced constipation (compared to oxycodone controlled-release tablets (OXY) in opioid experienced subjects with uncontrolled moderate to severe **chronic low back pain** and a history of opioid-induced constipation who required around-the-clock opioid therapy.

25. A phase 2, randomized, active, and placebo-controlled, dose-ranging study to evaluate the efficacy and safety of intra-articular Resiniferatoxin to treat moderate to server pain from knee osteoarthritis.

**Opioid Dependence**

26. Induction, Stabilization, adherence, and Retention Trial (START)- a randomized non-inferiority multicenter study to assess early treatment efficacy of OX219 (combination of **Buprenorphine** and Naloxone) and **Suboxone** and to explore switching between treatments. Phase 3 Study.

27. A randomized, double-blind, placebo-controlled pilot study to evaluate the safety and effectiveness of lucemyra in the treatment of opioid withdrawal during an opioid taper in subjects with chronic non-cancer pain.

28. A randomized, open-label, parallel-group study to evaluate the efficacy of the digital therapeutic OXD01 (MODIA™) in combination with sublingual buprenorphine/naloxone for the treatment of opioid use disorder

**Depression:**

29. ALK5461-208, A phase 3 multicenter study of the long-term safety and tolerability of ALKS 5461 for the adjunctive treatment of major depressive disorder in adults who have been an inadequate response to antidepressant therapy (the FORWARD-2 Study).

30. ALK5461-208, A phase 3 multicenter study of the long-term safety and tolerability of ALKS 5461 for the adjunctive treatment of major depressive disorder in adults who have been an inadequate response to antidepressant therapy (the FORWARD-3 Study).

31. The SPD 489-322 A phase 3, multicenter, randomized, double-blind, parallel-group, placebo-controlled, flexible-dose titration, efficacy, and safety study of SPD 489 in combination with an antidepressant in the treatment of adults with major depressive disorder with inadequate response to

PRAGYA B GUPTA, MD    7

019

NOT ORIGINAL
DOCUMENT

PM

Item 9
Page 141
03/30/2026 04:22:14

85787

prospective treatment with an antidepressant (Sub-Investigator).

32. The SPD489-322 A phase 3, open-label, multicenter, 12-month extension safety and tolerability study of SPD 489 in combination with an antidepressant in the treatment of adults with major depressive disorder with residual symptoms of inadequate response following treatment with an anti-depressant (S.I.).

33. A Phase II a double-blind, placebo-controlled multicenter study of Sirukumab as adjunctive treatment to a monoaminergic antidepressant in an adult with Major Depressive Disorder (SI).

34. A multicenter, randomized double-blind, parallel-group, placebo-controlled study evaluating the efficacy, safety, and pharmacokinetics of SAGE-547 injection in the treatment of adult female subjects with severe postpartum depression and adult female subjects with moderate postpartum depression. 547-PPD-202.

35. A multicenter, double-blind, placebo-controlled study evaluating the efficacy, safety, tolerability, and pharmacokinetics of Brexanolone in the treatment of adolescent female subjects with postpartum depression. Protocol Number: 547-PPD-304.

## MUSCLE SPASM:

36. Double-blind, randomized, placebo-controlled, multiple-dose parallel-group study of the efficacy and safety of multiple doses of Tolperisone administered in multiple doses three times daily in 400 male and female patients

## INTERSTITIAL CYSTITIS:

37. Multicenter, Randomized, Double-blind, Placebo-controlled, Crossover Study to Investigate the Effect of V117957 in Female subjects with Interstitial /cystitis Bladder Pain Syndrome.

## COMPLEX REGIONAL PAIN SYNDROME:

38. Randomized, double-blind, placebo-controlled trial investigating the efficacy and safety of intravenous neridronic acid in subjects with complex regional pain syndrome (CRPS).


## MALPRACTICE COVERAGE:

- Effective from 01/02/2023 to 01/02/2024 (Retro from 1/2/2002) Claim made coverage, $1M/ $ 3M. The Medical Protective Company, 5814 Reed Road, Fort Wayne, IN 46835, Tel: 800 463 3776 Fax: 913 789 4918, Policy Number: 671160.
  Agent: Barb Blankenship, CISR, Commercial Lines Account Manager, 1061 N. University Blvd., Middletown, OH 45044, PO Box 911, Middletown, OH 45044, 513-424-2481(O), 513-425-9601(F).

- Effective from 01/01/2001 to 01/01/2002, $1M/ $3M Occurrence Coverage
  OHIC Insurance Co, 155 East Broad Street, 13th Floor, Columbus, OH 43215, Tel: 614 221 7777, Fax: 614 461 1120, Policy Number: 01-9999-6125
  Agent: Inmon Insurance Corp, 7216 Shefford Ln, Louisville, KY 40242

- Effective from: 8/24/1999 to 8/24/2001/ $1M/$3M, Claim Made Coverage ; Doctors Insurance Reciprocal; Policy Number: KDPL 016498-2/00
  Agent: Coverage Option Associates; PO Box 436629; Louisville, KY 40253-6629

- Effective from: 10/01/1995 to 9/30/1999; Professional Liability, Modified Claims made; $2.5M/$5M RI Sound Enterprises Insurance Co, Ltd. (RISE); Life Span Risk Services, Inc, The CORO Building,

PRAGYA B GUPTA, MD  8

NOT ORIGINAL

DOCUMENT

Item 9
Page 142
03/30/2026 04:22:14

PM

Suite 170, 167 Point Street, Providence, RI 02903; Tel: 401 444 8273, Fax: 401 444 8963    85787
Lifespan Malpractice Plan: 1999 RISE Policy for Employed Physician-in-training. New England
Medica; Center, Inc; LC2-1998/99.

## REFERENCES:

Dr. Charles Roberts, M.D. Tel: (859) 3012663
Ortho Cincy, Interventional Pain Specialist
560 S Loop Road, Fort Mitchell, KY 41017

Dr. Maria Burton, MD
2697 Fiskburg Road
De Mossville, KY 41033
Tel: (859) 250-3080

Dr. Robert Edward Hurd, MD
3844 Victory Parkway
Cincinnati, OH 45207-1040
Tel: (513) 498-7845

PRAGYA B GUPTA, MD   9

021

DOCUMENT

PM

NOT ORIGINAL
Item 9
Page 143
03/30/2026 04:22:14

85787

KENTUCKY BOARD OF MEDICAL LICENSURE

# EXPERT REVIEW WORKSHEET
(Please type)

Case No.__15981_____  Patient Name__Wendy Fillhardt_____

Expert's Name__Jeffrey Berg, MD_____

1. **Brief description of symptom, dx and course of treatment:** _____

Wendi Fillhardt was a 45-year-old female when she presented to Advanced Pain Treatment Center on January 25, 2021. She complained of longstanding migraine headaches without aura. She had been receiving Topamax 300 milligrams QHS for her headaches over the last four years.

The patient also complained of cervical pain that referred to the right suprascapular area. In addition, she complained of bilateral tingling paresthesias and excessive cold sensations in her extremities.

Her past medical history was significant for a history of post-traumatic stress disorder beginning in childhood. She was receiving psychiatric treatment. A complete history and physical evaluation is included in the medical record. The physical exam findings of cervical tenderness were noted, "raising the possibility of facet joint arthropathy". An MRI of the cervical spine from 07/1/2020 was obtained and reviewed showing a central disc protrusion mildly compressing her thecal sac at C4-5.

The medical assessment from her initial visit was migraine headaches without aura, cervicalgia, cervical spondylosis, cervical disc displacement without myelopathy, and idiopathic peripheral neuropathy.

The initial treatment plan included continuing Topamax and starting Emgality injections for her migraine headaches. In addition, laboratory panels for thyroid function, vitamin B12, folate levels, c reactive protein, hepatitis panel, basic metabolic panel, sedimentation rate, and liver function tests were ordered, as well as x-rays of the cervical spine and an MRI of the brain. Opioid risk assessment and opioid consent agreements are included in the initial history and physical.

The patient was scheduled to return for "right C4-5 and C5-6 facet joint blocks to rule out facet joint arthropathy".

The patient returned on 2/25/21 with new complaints of severe lower back and bilateral leg pain. Her other problems were ongoing. A physical exam of the lumbar spine was

EXHIBIT # **3**

022

DOCUMENT

PM

NOT ORIGINAL
Item 9
Page 144
03/30/2026 04:22:14

85787

performed "raising the possibility of facet joint arthropathy." The assessments from that encounter were #1 Fibromyalgia #2 intractable migraine without aura #3 lumbosacral spondylosis without myelopathy #4 displacement of lumbar intervertebral disc without myelopathy #5 history of gastric bypass. The treatment plan for her fibromyalgia was to start Lyrica. For the lumbosacral spondylosis without myelopathy and for displacement of lumbar intervertebral disc without myelopathy, the patient was to have an MRI of the lumbar spine and return for facet joint blocks bilaterally at L4-5 and L5-S1 with mild sedation. For her history of gastric bypass, she was to complete previously ordered thyroid panel and to continue B12 injections.

Her next evaluation was on 3/8/21. Dr. Gupta describes ongoing cervical and lumbar symptoms as well as her migraine headaches. She also complained of insomnia. The patient had her MRI of the lumbar spine. The results were reviewed with the patient. However, the MRI results are not in the medical record. The MRI results were provided promptly on request. The results were as follows: disc desiccation, mild bilateral facet arthropathy at L4-5 and L5-S1 with mild bilateral neuro foraminal narrowing at L5-S1. The physical exam findings were unchanged. The treatment plan included starting Lunesta for sleep and follow up appointment for "bilateral L4-5 and L5-S1 facet joint blocks preferably under mild sedation."

On 3/25/21 the patient had L4-5 and L5-S1 bilateral medial branch blocks under fluoroscopic guidance with 5 mg of versed sedation and 500 ml of lactated ringers solution IV. The conscious sedation flow sheet shows only one set of vital signs recorded. The record also indicates that the medical assistant was Mr. Thomas. The record does not indicate who started the intravenous line or who administered the versed sedation. There was no RN present.

The patient's next follow up was on 4/15/21. There is no mention of the previous medial branch blocks or how the patient responded. The stated reason for the appointment was widespread myofascial pain and fibromyalgia. The patient was started on Savella (milnacipran). It was decided to proceed with ketamine 50 mg and versed 5mg infusion intravenously. The listed monitoring assistant was Mr. Thomas. The record shows 3 recorded vital signs over 30 minutes.

The patient returned on 5/18/21, again complaining of widespread myofascial pain. She described some relief with the ketamine infusion but stated her pain had reoccurred as before. The treatment plan was to continue her current medications with the addition of cyclobenzaprine for her lumbar spondylosis.

There were visits on 5/25/21, 6/2/21 and 6/8/21. The first visit involved checking mobility and general strength in upper body. "Finding an exercise selection that was obtainable" was the reason for the two other visits.

There is an evaluation on 6/15/21 for her widespread myofascial pain where the patient was continued on her current medications and no new treatments were performed.

NOT ORIGINAL
DOCUMENT

Item 9
Page 145

PM

03/30/2026 04:22:14

85787

However, the record states "Today patient exhibited some speech difficulty and complained of weakness in the right upper extremity and lower extremity".

On 7/13/21, "today patient complained of having an episode of attack of generalized numbness and fugue-like symptoms." The rest of her present illness was unchanged including continued speech difficulty and weakness. Additional labs were ordered for autoimmune disease. She was continued on her current medications. Dr. Gupta noted waiting for follow up with her psychiatrist and neurologist.

The patient was reevaluated on 8/24/21. Her history of present illness is the same as her previous visit, including continued speech difficulty and extremity weakness. The medical record mentions no history or exam findings of specific radicular arm pain, weakness, or focal numbness that would indicate the need for epidural injections. She was scheduled for left C5 and C6 transforaminal epidural injections. For cervical spondylosis she was started on Celebrex and duloxetine. The patient was to continue cyclobenzaprine, Emgality, Topamax, eszopiclone, pregabalin, and milnacipran. These are in addition to her other medications. Triamterene, hydrochlorothiazide, methylphenidate, Seroquel, and prazosin.

The patient returned on 9/1/22, 9/29/22 and 11/24/22. At all three of those visits the patient underwent left cervical C5 and C6 transforaminal epidural injections with 5mg of versed sedation and "500 ml of lactated ringers was administered prophylactically for the procedure". When the patient returned on 9/29/22 and 11/24/22 the second and third epidurals were performed without mention of the previous injection response. The patient record shows Mr. Thomas as the anesthesia monitor. In all of the procedures the duration of the sedation was stated to be greater than 30 minutes, yet there were no more than two recorded vital signs on any of the procedures. On the 11/24/22 procedure there is no anesthesia monitoring record at all.

The next evaluation was on 12/21/22. The history of present illness is identical to the last 6 encounters again without mention of the patient's response to the three transforaminal epidural injections. In addition, the patient is still noted to have speech difficulty and weakness. The patient was continued on all of her current medications.

On 3/14/22 the patient returned for reevaluation and the history of present illness and physical exam are again the same as the previous six visits. At the end of the office note it says "patient denies any radicular pain therefore at this time we will not schedule her for cervical transforaminal epidural injection." The patient was continued on her current medications.

The next follow up was on 4/05/22 where the patient stated that she had recently fallen. An ER visit found no acute injuries. The rest of history and physical exam were unchanged. The plan was to continue her current medications with the addition of lidocaine and diclofenac patches.

DOCUMENT

PM

NOT ORIGINAL
Item 9
Page 146
03/30/2026 04:22:14

85787

Her next and last evaluation was on 4-13-22  The reason for the appointment was for repeat ketamine infusion for her widespread pain  The ketamine infusion was done without problems as before.

2.  **Can you form an opinion?  Based on your background and experience and review of all information provided you, and assuming that the treatment as documented was provided, can you form an opinion as to whether the care rendered by the care provider, including diagnosis, treatment or record keeping, departed from or failed to conform to the minimal standards of acceptable and prevailing medical practice (in the medical community at large)?**

    __X___  Yes, I can form an opinion.

    _____  No, I cannot form an opinion.

    ___ _  I need more information (specify): _____

    _____

    _____

    _____

3.  **What is your opinion?  Please use the definitions below as "guidelines" to be used in defining standard of practice.  You are not limited to these guidelines in forming your opinion, but please state your own additional criteria if applicable.**

    a.  **Diagnosis.  Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable.**

        __X__    Below minimum standards

        _____    Within minimum standards

    b.  **Treatment.  Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction.**

        __X__    Below minimum standards

        _____    Within minimum standards

    c.  **Records.**

        **Maintenance of records which should contain, at a minimum, the**

025

NOT ORIGINAL
DOCUMENT

PM

Item 9
Page 147
03/30/2026 04:22:14

85787

following: (1) appropriate history and physical and/or mental examination for the patient's chief complaint relevant to the physician's specialty; (2) results of diagnostic tests (when indicated); (3) a working diagnosis; (4) notes on treatment(s) undertaken; (5) a record by date of all prescriptions for drugs, with names of medications, strengths, dosages, quantity, and number of refills; and (6) a record of billings.

_____ Below minimum standards

_X___ Within minimum standards

d. **Overall Opinion.** Based on the foregoing, what is your overall opinion?

_____ Clearly below minimum standards.

_____ Clearly within minimum standards

_X___ Borderline Case

e. **Gross Ignorance, Gross Negligence, Gross Incompetence.** If you found that this physician did not meet the minimum standards of care in treating a patient(s), did you also conclude that any of these departures from the minimum standards of care were so serious that you consider them to exhibit gross ignorance, gross negligence, and/or gross incompetence on the physician's part. If "yes," please identify each of these instances, classify it appropriately and explain your reasoning in reaching that conclusion(s). If "yes," please also indicate whether you found a pattern of gross ignorance, gross negligence and/or gross incompetence in this physician's practice as evidenced by the records reviewed and explain your conclusion(s).

_____

_____

_____

_____

_____

_____

4. **Other questions from the Medical Board (ignore if blank):** _____

_____

026

NOT ORIGINAL
DOCUMENT

PM

Item 9
Page 148
03/30/2026 04:22:14

85787

5. Explain your opinion. If you opined that practice was below minimum standard for any of the above reasons, state the correct minimal standard of practice (NOTE: It is not sufficient to say "I would have..., or I would have not...", you should be able to testify that "the minimal standard of practice in the medical community at large would be to...") Use extra sheets as necessary to explain your opinion and complete this report.

In the course of this review, the concerns with regard to Dr Gupta's diagnosis of Wendy Fillhardt are:

#1 Dr. Gupta performed three cervical transforaminal epidurals without documenting the specific history and physical findings indicating the need for these injections: numbness, weakness, or pain in the radicular distribution to be injected

#2 The cervical MRI showed; "C4-C5 small central disc protrusion mildly compressing the thecal sac. No spinal cord or nerve root compression."

With regard to the treatment of Wendy Fillhardt there are several issues of concern:

#1 The three transforaminal cervical epidurals performed were not indicated as described under the diagnosis. In addition, after each transforaminal epidural injection there is no mention of the patient's response to the previous epidural procedure. Only after three epidurals does Dr. Gupta describe the response to the three procedures.

#2 The epidurals and facet injections were performed under moderate sedation. The operating physician, Dr. Gupta, cannot also serve as the anesthesia monitor. It is standard of care that the anesthesia monitor must be at least an RN. In all of the procedures his trained assistant, DJ Thomas, served as anesthesia monitor. In addition, the sedation monitoring records are incomplete and one is missing.

#3 There is evidence in the medical record that Wendy Fillhardt was over-medicated In the fifteen months that the patient was under Dr. Gupta's care, the following medications were added to her medical regimen: pregabalin, cyclobenzaprine, milnacipran, eszopiclone, duloxetine, topiramate, celecoxib, galcanezumab, lidocaine patches, and diclofenac patches. These are in addition to the other medicines prescribed by her other providers: methylphenidate, quetiapine, prazosin, and triamterene-hydrochlorothiazide All of these medications, with exception of diclofenac patches, can have central nervous system side effects. These medications were added in response to new symptom complaints by Wendy Fillhardt. After starting these medications, on follow-ups Dr. Gupta does not address the patient response to these medications. On 6/15/2021 Dr. Gupta's interim history states "Today patient exhibited some speech difficulty and complained of weakness in right upper extremity and lower extremity." The medical

027

NOT ORIGINAL
DOCUMENT

PM

Item 9
Page 149
03/30/2026 04:22:14

85787

record does not show any new physical exam, just a repeat of the previous exams. Dr. Gupta does not comment on these serious new complaints and he continues her treatment plan. On 7/13/2021 the patient presented with new complaints of having an "attack of generalized numbness and fugue-like symptoms." The patient complained of intermittent incontinence, in addition to the previous complaints of speech difficulty, right upper and lower extremity weakness. Dr. Gupta notes, "patient awaiting to follow-up with neurologist and psychiatrist" Over the next eight months all of her complaints continued. There is no record of the neurologist findings. At the patient's last evaluation on 4/05/2022, she reported that she recently fell and that an ER visit found no acute processes.

The neurological complaints of Wendy Fillhardt, a 45-year-old woman, were serious and unexplained. She had MRIs of the brain, lumbar, and cervical spines as well as extensive laboratory examinations. Based on the list of medications and known drug interactions some of these serious symptoms were more likely than not related to over-medication.

The medical record was noted to contain a history and physical, opioid consent agreement, pain disability questionnaire, opioid risk assessment, KASPER reports, and a depression index. The medical records have a missing anesthesia monitoring form and several are incomplete, however the record meets minimal standards.

3/11/23
**Date of Review**

**Signature of Expert**

NOT ORIGINAL
DOCUMENT
PM
Item 9
Page 150
03/30/2026 04:22:14
85787

Pragya B. Gupta MD, FRCS, DABPM          April 4, 2023

Dear Mr. Marshall,

Thank you for allowing me to respond to the review, for which I am very grateful. The following is my response.

1. Cervical transforaminal injections were performed based on the patient's history of neck pain, suprascapular pain, and radicular arm pain in the distribution of C5 and C6. The foraminal compression test was positive. I scheduled the patient for a series of three transforaminal epidural injections. I normally examine each patient on the day of the procedure to verify the diagnosis. In my procedure note, I mentioned the indications of the procedure each time I did the procedure. Based on my clinical examination of a positive foraminal compression test on 8/24/21, I scheduled her for cervical transforaminal injections. MRI of the Cervical spine showed discogenic changes with a central bulge at C4-5 without cord or nerve compression. My clinical impression was radiculitis from disc-mediated inflammation. I scheduled her for a diagnostic and therapeutic cervical transforaminal injection. Since her symptoms were predominantly in the C5 and C6 dermatome, I chose to elect those two levels.

I performed three cervical transforaminal epidural injections on 9/01/2021 (pre-procedure VAS 5/10), 9/29/2021 (Pre-procedure VAS 8/10), and 11/24/2021 (Pre-procedure VAS 8/10). After one month of the injection patient's symptoms completely resolved, as documented in the chart (12/21/2022-under treatment section). Kennedy et al. showed that patients who received dexamethasone needed up to three injections to achieve adequate analgesia for up to 6 months.[1]

Transforaminal epidural steroid administration is a proven symptom-relief method for cervical and lumbar radicular pain. Cervical transforaminal epidural steroid injection should only be completed utilizing a nonparticulate corticosteroid such as dexamethasone to avoid spinal cord damage.[2]

In a cross-sectional survey, 40% of physicians reported allowing four ESIs at a given spinal segmental level per year. 314 physician members of the Spine Intervention Society participated in the survey in 2018.[3]

1. Kennedy D, Plastaras C, Casey E, et al. Comparative effectiveness of lumbar transforaminal epidural steroid injections with particulate versus nonparticulate corticosteroid for lumbar radicular pain due to intervertebral disc herniation a prospective randomized, double-blind trial; Pain Medicine 2014: 15: 548-555.
2. Schneider B, Varghis N, et al. Ideal corticosteroid choice for epidural steroid injections: A review of safety and efficacy. Curr Phys Med Rhabil Rep (2015) 3: 152-158.
3. Vydra D, McCormick Z, Clements N, et al. Current trends in steroid dose choice and frequency of administration of epidural steroid indications: A survey study. PM R 12 (2020) 49-54.

EXHIBIT # ___4___

029

NOT ORIGINAL

DOCUMENT

PM

Item 9
Page 152
03/30/2026 04:22:14

Pragya B. Gupta MD, FRCS, DABPM          April 4, 2023

I have prepared the conscious sedation flow sheet with the post-sedation evaluation 85787 REACT score for documentation. A normal vitals sign was documented in the flow sheet before the patient was discharged each time. I was present by the patient's side at all those sessions.

I have re-educated my staff members to fill out all the forms diligently. All staff members are ACLS certified. Please note that the patient was accompanied by her husband, a law enforcement officer, at each procedure visit. He waited in the recovery bay while we performed the procedure. During the first two times, Brittany Morris, her daughter, our MA, was with her and helped her with discharge instructions. The patient was fully awake and alert and walked out of the center without assistance.

3. Ms. Brittany Morris, our Medical Assistant, requested me to evaluate her mother, Ms. Wendy Fillhardt. Her problems included migraine, dizziness, h/o ataxia (please see my handwritten note in history), blurred vision, urinary incontinence, PTSD, etc. After my initial visit on 1/25/2021, my diagnosis included Migraine, Cervicalgia, Cervical spondylosis, cervical disc disease, and Idiopathic peripheral neuropathy (based on diminished vibration sensation and diminished sensation to pinprick and history of tingling paresthesia). There was no other neurologic deficit. I ordered labs that included CBC, BMP, LFT, ESR, CRP, TSH, and Vitamin B12 (h/o of gastric bypass surgery) were within normal limits except for low normal Vitamin B12. I also enrolled her in a Galcanezumab (Emgality) post-marketing study, allowing her to receive free Emgality injections for headaches, which she completed up to month 6 of the trial. Therefore, she was also followed by our research coordinator.

During the second visit on 2/25/2021, she complained of severe low back pain (8/10). Of note, the Roland Morris low back pain and disability score were 3 on 1/25/2021. I could not explain the sudden increase in low back pain. Because of widespread pain and allodynia at this visit, I diagnosed Fibromyalgia; however, the patient also had low back pain with stiffness and pain with axial loading, so I added a differential diagnosis of Lumbar spondylosis and Lumbar discogenic disease. I ordered an MRI of the lumbar spine. The neurologic examination was unchanged from my prior examination. I started Lyrica with a loading dose of 50mg PO t.i.d., which is FDA-approved for fibromyalgia and neuropathic pain.

On 03/08/2021 patient was seen for a follow-up. MRI of the lumbar spine dated 3/5/21 revealed L4-5 and L5-S1 facet arthropathy and disc desiccation. Clinical examination remained unchanged, including persistent low back pain. No new neurologic deficit. VAS was 7/10; PEG score was 8.3. PHQ 9 was 14, indicating moderate depression. The patient also complained of significant insomnia. I scheduled her a diagnostic lumbar facet block as a benefit of the doubt (history of back pain, stiffness with inactivity, and MRI finding of mild facet arthropathy). The diagnostic Lumbar facet joint block was performed on 3/25/2021. On this day, her daughter Brittany Morris was our recovery medical assistant. She discharged her mother and documented it as per our protocol. Her

Page 3 of 6

NOT ORIGINAL
DOCUMENT

PM

Item 9
Page 151
03/30/2026 04:22:14

Pragya B. Gupta MD, FRCS, DABPM          April 4, 2023

The decision to perform three cervical transforaminal injections was based on my clinical examination of the patient, my experience, and my knowledge. I examined the patient before every procedure in the procedure room. There is a record of pre-procedure VAS on each occasion. I canceled her second lumbar facet joint injection scheduled on 4/15/2021 to IV Ketamine injection since the examination revealed widespread allodynia to mild palpation. The patient did not benefit from the diagnostic facet joint block. I made this decision only after examining the patient before the procedure in the Pre-procedure recovery room. It is documented in the revised consent form.

Because I use dexamethasone for its safety profile, I scheduled her for three injections, as studies showed that most patients require three injections for pain relief. I did not schedule her for follow-up between scheduled procedures to prevent her extra expenses. I schedule follow-up after the procedure after the conclusion of the series of epidural injections. This patient had complete pain relief after the third injection. In the dictation note, the sides of the procedure, size and type of the needle, size of the RF cannula, type and amount of medications, and fluoroscopy time (since the middle of 2022, I have been recording Reference Air Kerma instead of fluoroscopy time) are recorded at every procedure.

2. I use sedation for anxiolysis and amnesia only. I titrate the medicine so that they are fully responsive and comfortable with minimal anxiety and can tolerate unpleasant sensations of the procedure. All patients are monitored as per ASA protocol. BP, HR, and Pulse oximetry are performed continuously in the procedure room. Patients are evaluated pre-procedure and post-procedure, and the vitals are recorded. We have followed the guidelines outlined in KBML (https://kbml.ky.gov/board/Documents/Board%20Opinion%20Office%20Based%20Surg ery.pdf) (revised 2018) regarding the requirement for the safe conduct of mild sedation. In this document requirement of a trained person is mentioned. All procedure personnel is ACLS trained and have been trained to assist me in the procedure room properly.

The procedure room has all the equipment for resuscitation, including an AED, laryngoscope (3 sizes Miller and McIntosh), suction machine, ambu-bag, and oxygen cylinder. All recovery bays are fully equipped with monitors for monitoring vitals as per ASA protocol. All equipment undergoes preventative maintenance. I can furnish a log of such if required.

The MA normally positions the fluoroscope and monitors the patient. I operate the fluoroscope and constantly communicate with the patient. I am a board-certified anesthesiologist and a pain specialist. I administer 0.5mg of Versed in the procedure room and titrate the medicine slowly while my assistant and I monitor the vitals. Most of the time, the completion of the procedure takes 30 - 35 minutes (for ESI or Facet joint block), which includes an examination of the patient pre and post-procedure in the room and recovery area. Ms. Fillhardt has a high threshold for sedatives because of her history of psychiatric medication use and alcohol abuse (ex); please see the psychiatry note. The assistant had to hold her hand throughout the procedure.

Page 2 of 6

NOT ORIGINAL
item 9
Page 153
03/30/2026 04:22:14

DOCUMENT

PM

Pragya B. Gupta MD, FRCS, DABPM          April 4, 2023

husband, a law enforcement officer, also accompanied her. I saw her briefly post- 85787 procedure.

The patient was scheduled for a repeat facet block on 4/15/2021 to rule out a placebo response. On the day of the procedure, I examined her and canceled the scheduled facet joint block (the consent form was signed for lumbar facet joint block – which was then changed to Ketamine infusion after obtaining the patient's consent). The cancellation was based on my clinical examination in the procedure room and her report of no pain relief. Please see the changed consent form from facet joint block to IV ketamine infusion.

In the follow-up visit on 5/18/2021, she reported short-term pain relief from the Ketamine infusion. However, the pain returned on the day of the follow-up. PHQ score was 7, indicating mild depression, down from 14, rated on 3/8/2021, which indicates that Ketamine helped her with depression as well. The patient's examination was unchanged. Based on ongoing fibromyalgia and back pain symptoms, I added Cyclobenzaprine 10mg PO three times daily and titrated Lyrica to 100 mg every 8 hours (VAS 7/10). There are many citations in the literature about the efficacy of Cyclobenzaprine in Fibromyalgia. The patient participated in our exercise therapy as a part of the multidisciplinary modality. She did sessions on 5/25/2021, 6/2/2021, and 6/8/2021. The patient did not like participating in exercise therapy and missed many scheduled exercise therapy sessions. On 6/15/21 patient had speech difficulty(stuttering) and complained of the upper extremity and lower extremity pain (the pain diagram was confusing). Examination revealed widespread tenderness and allodynia to deep palpation but not to light touch. She also complained of insomnia. On a detailed neurological examination, I could not localize any neuro deficit. Because of increasing myofascial pain, I added Savella, another FDA-approved drug for fibromyalgia, and Lunesta for sleep. Savella was titrated to 50mg PO twice daily (recommended dose is 100mg daily) and Lyrica to 100mg PO tid to be titrated up to 200mg PO t.i.d (recommended dose is 300 – 450 mg/day).

7/13/2021: Patient complained of generalized numbness, intermittent urinary incontinence, and other nonspecific complaints. She had all these symptoms before her first consult with me, including a history of ataxia. PHQ score was 12 reflecting ongoing depression. She felt depressed, had trouble concentrating, etc. At this visit, also I did not find any localizing neurological deficit. I refilled Topamax 200mg for headaches at her request, as she did not want to see her psychiatrist to save an extra visit. Her psychiatrist prescribed Topamax. I ordered Anti-SS-A/SSB and ANA, which were never done. ESR was normal. Based on the history of abnormal complaints, I reduced the dose of Lyrica to 100mg PO tid. All my treatment regimen is based on the following reference.
Ref:https://www.uptodate.com/contents/treatment-of-fibromyalgia-in-adults-not-responsive-to-initialtherapies.

8/24/2021 visit, the PHQ 9 score was 18. VAS 9/10, Pain diagram showed upper and lower extremities pain. ROS was positive for chills, night sweats, ankle swelling, and excessive thirst. My clinical examination was nonconclusive except for a positive cervical foraminal compression test on the left side. Because of the positive finding of

NOT ORIGINAL
DOCUMENT

PM

Item 9
Page 154

03/30/2026 04:22:14

Pragya B. Gupta MD, FRCS, DABPM        April 4, 2023

disc disease on the MRI of the cervical spine, I scheduled her for a Cervical TF injection. The patient was referred to a neurologist for neurologic evaluation.

The patient responded to a series of three cervical transforaminal injections. Her radicular pain subsided. On 3/14/2022, I continued the same regimen. Clinical examination remained unchanged. On 4/5/2022, the patient-reported history of falls. ED visit was unremarkable.

During the entire period when she was seeing me, she was also seeing her psychiatrist for GAD, ADHD, and PTSD. She was also seeing her PCP during this time intermittently. She failed psychotherapy administered by a psychiatrist. She chose not to participate in our behavioral therapy because she was seeing her psychiatrist. ED visit on 4/3/2022 was uneventful. A diagnosis of lumbar sprain was made. On 4/26/2022 patient was seen by an Internist, psychiatrist, and neurologist whose diagnosis included **Conversion disorder, somatoform disorder, etc.,** at St. Elizabeth Medical Center. I thought she had dissociative fugue-like symptoms reflection of her aberrant behavior. The patient did not attend her follow-up appointments on 5/5/2022 and 5/26/2022 with me. I have attached the dictations for your review.

The patient was an extremely difficult patient to manage. I spent anywhere from 1 – 2 hours with her each visit and could not document everything that transpired during the visit. I treated her with FDA-approved combination medicine for fibromyalgia as she failed all other treatments, but she did not respond. Insomnia is a known problem associated with fibromyalgia, which I treated with Lunesta. I can assure you that she did not experience any side effects from the medicine that I prescribed. The symptoms were manifestations of Somatization and **Conversion disorder** and not overmedication. None of the other consultants, such as the Internist, Neurologist, or Psychiatrist, suspected overmedication. A recent EEG awake and drowsy (5/5/2022) was reported as normal. MRI of the brain (2/9/21) was also normal.

Since I don't feel confident about deleting information from the EMR, all the dictations from the previous encounters are carried forward. After upgrading to their web-based EMR, I can't dictate directly to the EMR without using their proprietary dictation software, which is very expensive; therefore, I dictate in a notepad and transfer the text. I am looking for a better user-friendly EMR. Please note that Vitals, BMI, VAS ( PEG Score), PHQ 2 – PHQ – 9, COMM scored, and ROS are recorded at each visit and documented. KASPER is checked at every visit.

I have retrained all the staff members in filling out all the forms I have already prepared to take care of the patients. I have attached all the forms that I use for the practice of pain medicine.
1. Background questionnaire with pain diagram and details of ROS
2. Follow-up forms with pain diagram containing VAS, enjoyment of Life, and General activity scale and ROS.
3. PHQ 2 and PHQ 9

NOT ORIGINAL

DOCUMENT

PM

Item 9
Page 155

03/30/2026 04:22:14

Pragya B. Gupta MD, FRCS, DABPM          April 4, 2023

85787

4. PDQ
5. Roland Morris Back pain questionnaire
6. Columbia Suicidal Severity Rating Scale
7. Pre-Procedure instructions
8. Post-procedure instructions
9. Procedural form to document the outcome of the intervention.
10. Sedation Flow sheet with REAC score.
11. Informed Consent form for the procedures with the pre-sedation checklist.

I have always stayed current with the recent advances in Pain Medicine and stayed up to date per KMBL's guidance. I was a member of the Evidence Analysis Committee of the Spine Intervention Society from 2015 – 2018 and continue to participate in EBM meetings. I have attached the list of all the CMEs that have participated so far.

I actively participate in Pain Clinical research to bring innovative treatments to benefit my chronic pain patients. I am a certified Principal investigator by examination of the Association of Clinical Research Professionals, the largest US association of clinical research professionals, and a Fellow of the Academy of Physicians in Clinical Research. Our site in Kentucky received a certificate of appreciation from the largest clinical research organization Syneos in 2018. I have participated in 39 clinical trials since 2012. I have undergone an FDA audit successfully without any findings. Please see the list of clinical trials I have participated in my CV.

Finally, I am grateful to the Medical Board for allowing me to practice medicine in KY, which I have diligently done for the last 22 years. I am extremely sorry that the Medical Board had to utilize its resources to review my records and had to deal with patient complaints.

I want to continue my pain clinical research and practice in KY and would like to serve my community. I use UpToDate, Wolters Kluwer's web-based educational database for evidence-based medical practice, and Clinical Pharmacology, powered by Clinical Key, an Elsevier web-based database for drug indications, reactions, and interactions, to provide up-to-date and safe treatment to my patients. I wanted to share this information to reassure the KBML about my commitment to providing excellent and safe pain treatment. Therefore, I pray to the Medical Board to reconsider the decision of borderline status to a favorable status, please.

Respectfully submitted,

Pragya B. Gupta MD

Page 6 of 6

034

NOT ORIGINAL

DOCUMENT

Item 9
Page 180

03/30/2026 04:22:14

PM

85787



**U.S. FOOD & DRUG** ADMINISTRATION

December 13, 2017

Pragya B. Gupta. M.D.
162 Barnwood Drive
Edgewood, Kentucky 41017

Dear Dr. Gupta:

This letter describes the results of a Food and Drug Administration (FDA) inspection that concluded on November 22, 2017. An FDA investigator met with you to review the conduct of a clinical study entitled, *A Prospective, Multicenter, Randomized, Double-blind, Placebo-Controlled Study to Evaluate the Efficacy and Safety of a Single Injection of rexlemestrocel-L Alone or Combined with Hyaluronic Acid (HA) in Subjects with Chronic Discogenic Lumbar Back Pain Through 12 Months (MSB-DR003).* The FDA conducted this inspection under the Bioresearch Monitoring Program that includes inspections designed to review the conduct of research involving investigational products.

At the conclusion of the inspection, the FDA investigator had a close-out discussion with you and your staff which included several record-keeping items. According to the Establishment Inspection Report, the inspection revealed no significant deviations from applicable regulations.

We do not request a response to this letter. The FDA has several references available at http://www.fda.gov/ScienceResearch/SpecialTopics/RunningClinicalTrials/default.htm that offer information on human subject protection and the conduct of clinical research. If you have any questions about this letter or clinical studies of investigational products, you may contact:

  Christine Drabick
  Division of Inspections and Surveillance
  Office of Compliance and Biologics Quality
  Center for Biologics Evaluation and Research
  10903 New Hampshire Avenue, Building 71, Room 5126
  Silver Spring, Maryland 20993-0002
  Telephone (240) 402-8928

      Sincerely,

      Carrie M. Mampilly -S

      Carrie M. Mampilly
      Director, Division of Inspections and Surveillance
      Office of Compliance and Biologics Quality
      Center for Biologics Evaluation and Research

U.S. Food & Drug Administration
10903 New Hampshire Avenue, WO 71 RM 5128
Silver Spring, MD 20993
www.fda.gov

059

NOT ORIGINAL
DOCUMENT
PM
Item 9
Page 181
03/30/2026 04:22:14
85787



### Advanced Pain Treatment Center
INNOVATIVE HELP FOR MANAGING YOUR PAIN

Pragya B. Gupta, MD, FRCS (Edin), DABPM, FAPCR
www.aptcmd.com; www.atcumed.com

## Patient Registration

Referring Dr: _____ Referring Dr. Phone:_____

Referring Dr. Address:_____ City/ State:_____ Zip:_____

Primary Care Dr (if different than above):_____

## Patient Information

Name:_____ Date of Birth:_____ Age:___
    LAST       FIRST      MI

Social Security Number:_____ Sex: (Circle One) F  M     Marital Status: (Circle One) S M D W

Address:_____ City/ State: _____ Zip: _____

Home Phone: (___) ____-_____   Work Phone: (___) ____-_____        Cell Phone: (___) ____-_____

Employer/ School: _____ Occupation: _____

Emergency Contact: _____ Relation: _____ Phone: (___) ____-_____

## Injury Information

Is your injury due to: (Circle One) Work Related  Auto Accident  Other Accident  Gradual  Sports  Chronic

Date of Onset: _____ How did injury occur? _____

Area to be treated: _____

Are you off work due to injury? (Circle One) Yes    No    If YES, first date missed:_____

## Insurance Information

| Primary Insurance | Secondary Insurance |
|---|---|
| Insurance Name: _____ | Insurance Name:_____ |
| Address: _____ | Address:_____ |
| City/ State: _____ | City/ State: _____ |
| Phone: (_____) ____-_____ | Phone: (_____) ____-_____ |
| Policy No: _____ | Policy No: _____ |
| Subscriber Name: _____ | Subscriber Name: _____ |
| Date of Birth: _____ | Date of Birth: _____ |
| Subscriber Social Sec No: _____ | Subscriber Social Sec No: _____ |

060

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 182

03/30/2026 04:22:14

85787

## Worker's Compensation/ Automobile Insurance

Claim No: _____ Insurance Carrier: _____

Address: _____ City/ State: _____ Zip: _____

Phone: (____) _____-_____ Fax: (____) _____-_____ Contact Person: _____

Injury Occurred in: (Circle One)   Kentucky          Ohio          Indiana          Other

## Release of Information and Financial Responsibilities:

All personal and medical information given by the patient to the clinic will be strictly considered confidential. However, the undersigned authorizes the clinic to release information to the insurance providers, third party payers, clinic personnel, physicians, or any other medical staff for continuation of further treatment of the patient. The authorization includes the release of all relevant information, including but not limited to, medical documents, reports, psychological profile, etc. By signing this document, the patient confirms their understanding of the above-mentioned statement and agrees with it. The undersigned understands that insurance is a method of reimbursing a portion of the fees paid to the doctors and is not a substitute for full payment. It is the undersigned responsibility to pay a deductible amount, co-insurance, or any other balance not paid for by my insurance. Non-contact care, such as Chronic Care Management, Behavioral Health Collaboration, Tele visits and other care coordination charges will be billed when care team members meet billing criteria for such services. The undersigned agrees to participation in these programs and any financial responsibility for such programs. If this account is assigned to a collection agency or attorney for collections, the practice shall be entitled to reasonable attorney's fees and collection costs. I authorize the release of any information necessary to determine liability for payment and to obtain reimbursement on any claim. I request the payment of authorized benefits be made on my behalf. I assign the benefits payable to which I am entitled, including Medicare, private insurance, Medicaid, and any other health plans to the Advanced Pain Treatment Center. This assignment will be in effect until revoked by me in writing. A photocopy of this assignment is to be considered as valid as the original. I understand that I am financially responsible for all charges whether they are paid by my insurance.

## Cancellation/ No Show Policy

I understand that Advanced Pain Treatment Center, has a cancellation policy. I must give at least 24 hours' notice before canceling a new patient or follow up appointment and at least 48 hours before canceling a procedure appointment. I understand that if I do not give proper notice of cancellation, I will be subject to a fee of $50 for new patient and follow up appointments and $200 for procedure appointments. This fee covers administrative and operational costs. Any exceptions to this policy will be at the discretion of the administration. I understand this fee will not be reimbursed by insurance and is solely the responsibility of the patient.

_____          _____
Signature of Patient/ Guardian                              Date

061

NOT ORIGINAL
DOCUMENT
PM
03/30/2026 04:22:14

Item 9
Page 183

85787

# Advanced Pain Treatment Center
INNOVATIVE HELP FOR MANAGING YOUR PAIN

## BACKGROUND QUESTIONNAIRE

Name _____    Date: _____    DOB: _____    Sex : ☐ M ☐ F
    Last    First    MI

Primary Care Physician: _____ Telephone # _____

Address of PCP: ____ _____ ____ ____ REFERRED BY ☐ PCP    OR ☐ ____ ____

Please answer all questions very carefully and as completely as possible, as it would allow me to understand your problem and help me formulate a good treatment plan for you. Your response will be considered strictly confidential as per HIPPA laws. Please clearly circle or put check marks where indicated. Please fill out all pages (1 – 8). Thank you for your cooperation. For any additional information, please use *additional section* in page 8.

PRAGYA B. GUPTA, M.D., F.R.C.S., D.A.B.P.M.

**ARE YOU ALLERGIC TO ANY MEDICATION ☐ YES OR ☐ NO. IF YES PLEASE PROVIDE THE NAMES BELOW.**

| MEDICATION / ALLERGEN | REACTION | MEDICATION / ALLERGEN | REACTION |
|---|---|---|---|
| 1 | | 3 | |
| 2 | | 4 | |

## PAIN DIAGRAM:

1. Please shade in the location of your pain and put an X on the area that hurts the most and also for abnormal sensation mark as directed in the diagram below.

For Pins and needle mark XXXXX    For aching and cramping \\\\\\    For stabbing ZZZZZ
For Numbness mark    ++++++    For Burning mark    BBBBBBB    Other    OOOOO



% OF NECK PAIN:
--------

% OF ARM PAIN:
R    L

% OF THORACIC PAIN

% of BACK PAIN:

% of LEG PAIN:
R    L

% ABDOMEN/ PELVIC/GROIN AND OTHER PAIN:

⇐RIGHT

⇐LEFT

| MMPQ questionnaire: | | | |
|---|---|---|---|
| FOR THE MOST SIGNIFICANT SYMPTOM ONLY | | | |
| Quality of pain | None | Mild | Moderate | Severe |
| Throbbing | 0 | 1 | 2 | 3 |
| Shooting | 0 | 1 | 2 | 3 |
| Stabbing | 0 | 1 | 2 | 3 |
| Sharp | 0 | 1 | 2 | 3 |
| Cramping | 0 | 1 | 2 | 3 |
| Gnawing | 0 | 1 | 2 | 3 |
| Hot – Burning | 0 | 1 | 2 | 3 |
| Heavy | 0 | 1 | 2 | 3 |
| Tender | 0 | 1 | 2 | 3 |
| Splitting | 0 | 1 | 2 | 3 |
| Tiring/Exhausting | 0 | 1 | 2 | 3 |
| Sickening | 0 | 1 | 2 | 3 |
| Fearful | 0 | 1 | 2 | 3 |
| Punishing / Cruel | 0 | 1 | 2 | 3 |
| SCORE: | | | |

Page 1 of 8    Confidential    Patient's initial: _____ Date: __/__/__
Revised January 29, 2015    Voice: (859) 331 4159, (513) 4929317    Fax: (859) 3314163, (513) 4929325

062

DOCUMENT

PM

NOT ORIGINAL

**Advanced Pain Treatment Center**
INNOVATIVE HELP FOR MANAGING YOUR PAIN

Item 9
Page 184
03/30/2026 04:22:14

85787

2. What is the problem that you would like us to help you with (chief complain)?

_____

_____

_____

3. If you have more than one problem, please indicate first the most severe one followed by less severe ones :

_____     _____

_____     _____

4. **PAIN ASSESSMENTS (PEG):**

   I.    What number best describes your **pain on average** in the past week :

   | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |

   Does not interfere --mild----- ---- -I        I----------moderate-------I  I----severe------ pain as bad as you can imagine)

   II.   What number best describes how, during the past week, pain has interfered with your enjoyment of life?

   | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |

   Does not interfere mild----------------I      I----------moderate--------I    I------severe------ completely interferes

   III.  What number best describes how, during the past week, pain has interfered with your **general activity (such as ability to do your household work, activities of daily living, e.g., taking care of yourself etc.)**?

   | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |

   Does not interfere mild--------I       I--------moderate------I     I------severe---- completely interferes

   **PEG AVERAGE SCORE:**

5. **PHQ – 2**

| Over the past two weeks, how often have you been bothered by any of the following problems? | Not at all | Several days | More than half the days | Nearly every day |
|---|---|---|---|---|
| 1.  Little interest or pleasure in doing things | 0 | 1 | 2 | 3 |
| 2.  Feeling down, depressed or hopeless | 0 | 1 | 2 | 3 |

**Score:** _____    If the score is > 3 then have the patient fill out **PHQ – 9.**

6. HOW LONG HAVE YOU HAD THIS PAIN FOR (DURATION): _____

7. ONSET OF PROBLEM: ☐ SUDDEN    ☐ INSIDIOUS OR GRADUAL

8. FREQUENCY OF PAIN: ☐ CONSTANT ☐ INTERMITTENT

063

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 185

03/30/2026 04:22:14

85787

**Advanced Pain Treatment Center**
INNOVATIVE HELP FOR MANAGING YOUR PAIN

9. DIURNAL VARIATION: WHEN IS THE PAIN WORSE?
☐ MORNING   ☐ NOON   ☐ EVENING   ☐ ALL DAY

10. DOES THE PAIN WAKE YOU UP FROM SLEEP? ☐ YES   ☐ NO

11. CONTEXT:

DATE OF ONSET OF PAIN IF KNOWN: _____

What triggered or started pain? _____

If it is work related injury, please give date of injury: _____

If it is from MVA or AUTO accident: Date of Injury _____

12. Which of the following factors RELIEVES or WORSEN your pain?

| ONLY FOR BACK PAIN | RELIEVING FACTOR | WORSENING FACTOR | NO EFFECT |
|---|---|---|---|
| SPONTANEOUSLY | | | |
| STANDING | | | |
| SITTING | | | |
| WALKING | | | |
| LEANING OVER | | | |
| LEANING BACKWARD | | | |
| LYING | | | |
| RESTING | | | |
| RISING FROM CHAIR | | | |
| HEAT | | | |
| COLD | | | |
| ANXIETY | | | |
| MASSAGE | | | |
| PHYSICAL ACTIVITY | | | |
| ALCOHOLIC BEVERAGES | | | |
| COUGHING | | | |

| ONLY FOR NECK PAIN | RELIEVING FACTOR | WORSENING FACTOR | NO EFFECT |
|---|---|---|---|
| SPONTANEOUSLY | | | |
| ROTATION OF NECK TO LEFT | | | |
| ROTATION OF NECK TO RIGHT | | | |
| BENDING OF NECK TO RIGHT | | | |
| BENDING OF NECK TO LEFT | | | |
| BENDING OF NECK FORWARD | | | |
| BENDING OF NECK BACKWARD | | | |
| RAISING ARM OVER HEAD | | | |
| RESTING OR LYING ON LEFT SIDE | | | |
| RESTING OR LYING ON RIGHT SIDE | | | |
| | | | |

13. ACTIVITIES LIMITED BY YOUR PAIN (PLEASE ☒ APPROPRIATE RESPONSE):

| | SIGNIFICANT | MODERATE | MINIMAL | NO EFFECT |
|---|---|---|---|---|
| WALKING | | | | |
| SITTING | | | | |
| STANDING | | | | |
| BENDING | | | | |
| TWISTING | | | | |
| LYING | | | | |

14. WALKING ABILITIES:

| How many blocks can you walk? | More than 3 blocks | Up to 3 blocks | Less than 1 |
|---|---|---|---|
| Does the pain subside after resting completely? | No | Yes | |
| Is the pain worse while going upstairs? | Yes | No | |
| Is the pain worse while going down stairs? | Yes | No | |
| Does Leaning over reduces pain? | Yes | No | |

Page 3 of 8    Confidential    Patient's initial: _____ Date: __/__/__
Revised January 29, 2015    Voice: (859) 331 4159, (513) 4929317    Fax: (859) 3314163, (513) 4929325

064

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 186

03/30/2026 04:22:14

85787

## Advanced Pain Treatment Center
INNOVATIVE HELP FOR MANAGING YOUR PAIN

**15.** Do you have the following associated symptoms?

| Weakness | Arms/ hands | Legs/ feet | none |
|---|---|---|---|
| Numbness (loss of feeling) | Arms/ hands | Legs/feet | none |
| Tingling (falling asleep) | Arms/ hands | Legs/ feet | None |

**16. Bladder control (urine) (please check the appropriate box)**
☐No Problem          ☐Can't empty bladder     ☐Loss of Urine (accidents)

**17. Bowel Control; Please check the appropriate box.**
☐ No Problem          ☐Constipation          ☐Loss of control (accidents).

**18. What treatment have you had for the current problem? Circle appropriate answer and give the date of last treatment.**

Physical therapy          ☐Yes / ☐No    Helped / Did not help / Worsened pain, Date: _____

Chiropractic treatment    ☐Yes/ ☐No    Helped/ Did not help / Worsened pain: Date: _____

Nerve block / Epidural     ☐Yes/ ☐No     Helped/ Did not help / Worsened pain, Date: _____

Psychological Consultation and treatment;  Yes/ No. If yes please give details including the name of the treating Psychologist or Psychiatrist _____

**19. What diagnostic procedures have you had so far?**
1. _____ None
2. X- rays:      ☐Yes/ ☐No   If yes which body part and date?_____
3. MRI Scan    ☐ Yes/ ☐No, If yes which body part and date?_____
4. CT Scan     ☐Yes/☐ No, If yes which body part and date?_____
5. Myelogram:   ☐Yes/ ☐No. If yes which body part and date?_____
6. Discogram:   ☐Yes/ ☐No: Neck/ upper back/ lower back  and date?_____
7. EMG and NCS; ☐Yes / ☐No   If yes ? date and where was it done?_____
8. Bone Scan:    ☐Yes/ ☐No  Date? _____
9. DEXA  Scan:   ☐Yes/ ☐No  Date of your last scan_____

**20. Have you had SURGERY ON YOUR SPINE OR BACK?  If yes please give details.**

| WHAT SURGERY | DATE | SURGEON/ HOSPITAL/ CITY | Did it help? |
|---|---|---|---|
|  |  |  | Yes/ No |
|  |  |  | Yes/ No |
|  |  |  | Yes/ no |
|  |  |  | Yes/ No |

Page 4 of 8      Confidential      Patient's Initial: _____ Date: __/ __/ __
Revised January 29, 2015     Voice: (859) 331 4159, (513) 4929317   Fax: (859) 3314163, (513) 4929325

065

NOT ORIGINAL
DOCUMENT
PM

**Advanced Pain
Treatment Center**
INNOVATIVE HELP FOR MANAGING YOUR PAIN

Item 9
Page 187
03/30/2026 04:22:14

85787

**21.** List any surgery **OTHER THAN SPINE SURGERY:**

| WHAT SURGERY | DATE | SURGEON/ HOSPITAL/ CITY | Did it help? |
|---|---|---|---|
| | | | Yes/ No |
| | | | Yes/ No |
| | | | Yes/ No |
| | | | Yes/ No |
| | | | Yes/ No |

**22.** List of all Medication that you are taking including **pain medication**, over the counter medication and herbals.

| Medication & Dosage | Reason | How often | Prescriber's name |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Pain medication used in past: | | | |
| | | | |
| | | | |
| | | | |

**23.** __PAST Medical History:__

If none please check this box ☐

__Circle all conditions below that you currently have or had previously.__

__Heart:__ High Blood Pressure, Heart Attack, Abnormal Heart Rhythm (pace maker), Congestive Heart Failure, Myocarditis, Pericarditis, Heart valve disease (aortic/ mitral), Cardiac Effusion etc. _____

__Lungs:__ Chronic Bronchitis, Acute Bronchitis (recent date _____), Emphysema, Pleural Effusion, Bronchial asthma, Sarcoidosis, Fungal lung infection, Tuberculosis, Bronchiectesis, COPD, etc_____

__Gastro intestinal:__ Peptic ulcer disease, GERD (Hiatus hernia), Duodenal Ulcer, Irritable Bowel Syndrome, Crohn's Disease, Ulcerative colitis, GI bleeding, GI perforation, Gall bladder stone, Liver failure, Acute Pancreatitis, Chronic Pancreatitis, etc_____

__Endocrine system:__ Diabetes (Insulin dependent/ Non Insulin dependent), Hypo Thyroid, Hyper Thyroid, Hypo Adrenalism, Hyper adrenalism, Growth hormone problems, etc _____

__Kidney and Genitourinary System:__ Kidney stone, Kidney failure, Kidney infection (pyelonephritis), Nephropathy, etc
__Skin, & Breast::__ Dermatomyositis, Allergic skin diseases, dermatitis, Breast tumor (cancer/ benign).

__Infectious disease:__ HIV / AIDS, Hepatitis A/ B/ C, or any other recent infection such as Upper respiratory tract infection, Urinary tract infection, Skin infection etc _____

066

NOT ORIGINAL DOCUMENT

PM

**Advanced Pain Treatment Center**
INNOVATIVE HELP FOR MANAGING YOUR PAIN

Item 9
Page 188
03/30/2026 04:22:14

85787

**Musculoskeletal:** Osteo arthritis, Systemic Lupus Erythematosus (Lupus), Rheumatoid arthritis, Sclerosis, Polymyositis, Giant cell arteritis.
**Nervous system (including neuromuscular)** : Neuropathy, Stroke, Multiple Sclerosis, Porphyria, Bells palsy, Myasthenia gravis, Myotonia, Parkinson's disease, Migraine etc.

**Hematology and Oncology:** Anemia, Leukemia, Lymphoma, Cancer of (Breast, Spine, Liver, Pancreas, Bone etc).
**Any history of abnormal bleeding disorder?**    Yes/ No If yes please give details _____

**Psychiatry:** Depression, Anxiety, Schizophrenia, Family history of Suicide : Yes / No.

24. **Social History:**
   Marital Status (circle one answer)

   ☐ Single    ☐ Married    ☐divorced    ☐ Widowed ☐ Lives with spouse/ friend
   Perception of marriage: ☐Excellent    ☐ Good    ☐Average    ☐ poor    ☐ Intolerable
   Sexual Activities: (please circle one): ☐Capable, ☐ Increased discomfort, ☐Incapable, ☐Previously capable,☐ Do not practice.
   Family Support:    Do you have a supportive family    ☐Yes    ☐ No

**Drug abuse:**
   Recreational drug abuse: ☐Yes / No ☐ If yes what drug have you abused _____
   Alcohol: Do you drink alcoholic beverages: Yes/ No.
   Frequency of Drinking: ☐Never    ☐Rarely    ☐Socially    ☐Daily.
   Cigarettes smoking: ☐Yes, ☐No. If YES then how many packets per day _____, and for ___yrs.

   Ex-smoker: Yes/ No, if yes then ___ packets per day for _____ yrs., not smoking since: ___ .

   Family history of drug abuse: ☐Yes ☐Relationship. _____ ☐ what drug/s? _____

**Education:** Please check the highest level of education:
   • ☐ Grammar school    ☐High School ☐ GED ☐ College ☐Post – Graduate ☐ Vocational
   •
**Employment Status:** Employed ☐FT or ☐PT  Current Occupation: _____
   • Do you enjoy your work: ☐Yes or ☐No
   • Does your symptom interfere with your work? ☐Yes  or ☐No
   • Is the work setting is supportive of your condition? ☐Yes or☐ No
   • Unemployed: ☐Laid off, ☐Student, ☐Homemaker, ☐ Retired ☐ Disabled ( ☐Permanent ☐Temporary), if disabled, date made Disable: _____. Cause of Disability: _____
   • What TYPE of disability? : ☐Short term disability;  ☐  Long term disability; ☐ Social Security Before having pain, did you normally work (circle answer): ☐Yes or ☐No
   • Past Occupation: _____
   • Are you involved in litigation? ☐Yes / ☐No. If yes, is it ☐pending or☐ settled?
   • Type of litigation: ☐ Workers Compensation, ☐Motor Vehicle ☐Social Security.
   • Is there any possibility of retraining in case of inability to perform present job? ☐ Yes or ☐No,

Page 6 of 8    Confidential    Patient's initial: _____ Date: __/__/__
Revised January 29, 2015    Voice: (859) 331 4159, (513) 4929317  Fax: (859) 3314163, (513) 4929325

067

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:22:14

85787



**Advanced Pain Treatment Center**

INNOVATIVE HELP FOR MANAGING YOUR PAIN

Item 9
Page 189

- Do you foresee going back to work?    ☐YES   ☐NO

## 25. FAMILY HISTORY:

- ☐ I do not know the medical history of my biologic parents.
- Mother: age    . Healthy; ☐ Yes ☐No. If no, list the medical condition (major)_____
- If deceased cause of death    _____
- Father: age ___. Healthy; ☐Yes ☐No. If no, list the medical condition (major)_____
- If deceased cause of death _____
- <u>Please check the condition that is present in your family (please circle one):</u>
- Osteo-arthritis, Rheumatoid Arthritis, Cancer, Chronic back problems, Chronic fatigue syndrome, history of back surgery,   Diabetes, Fibromyalgia, Lupus, Multiple sclerosis, Muscle pain, Osteoporosis, Major, Depression, and Neuropathy . Any other history of chronic painful condition in your family?

**26. . Do you have any criminal conviction/ Felony charges/ or DUI  charges;    ☐Yes   ☐No**

**27. Review of System: (Very important)**   Do you have any of the following condition? Please circle yes or no for  each item

**General:**

| Recent weight loss of more than 10 pounds | | Yes | | No | | |
|---|---|---|---|---|---|---|
| Recent weight gain of more than 10 pounds | | Yes | | No | | |
| Fever | Yes | No | | | | |
| Chills | Yes | No | | | | |
| Night Sweats | Yes | No | | | | |
| Seen primary care physician in last year | | | Yes | No | | |

| HEENT: | | | Skin: | | |
|---|---|---|---|---|---|
| Abnormal hearing | Yes | No | Open sore | Yes | No |
| Hoarseness of voice | Yes | No | New Mole | Yes | No |
| Abnormal smell | Yes | No | Poor Healing | Yes | No |
| Double vision | Yes | No | Skin Infection | Yes | No |
| Glaucoma | Yes | No | | | |
| Sinus infection | Yes | No | Bone/Joints: | | |
| Respiratory: | | | Shoulder pain | Yes | No |
| Chronic cough | Yes | No | Wrist or hand pain: | Yes | No |
| Asthma/ wheezing | Yes | No | Hip pain | Yes | No |
| COPD/ Emphysema | Yes | No | Knee pain | Yes | No |
| Pneumonia | | Yes | No | Lupus | Yes | No |
| Recent respiratory infection | | Yes | No | Muscle weakness | Yes | No |

068

NOT ORIGINAL DOCUMENT PM

## Advanced Pain Treatment Center
INNOVATIVE HELP FOR MANAGING YOUR PAIN

Item 9
Page 190

03/30/2026 04:22:14

85787

| | | | | Fibromyalgia | Yes | | No |
|---|---|---|---|---|---|---|---|
| | | | | Dermatomyositis | Yes | | No |
| **Cardiovascular:** | | | | **Neurological:** | | | |
| Chest Pain | Yes | No | | Headache | | Yes | No |
| Shortness of Breath | Yes | No | | Tingling Numbness | | Yes | No |
| High Blood Pressure | Yes | No | | Burning Sensation | | Yes | No |
| Heart Disease | Yes | No | | Weakness | | Yes | No |
| Swelling of ankle/leg | Yes | No | | Tremors | | Yes | No |
| Abnormal heart rhythm | Yes | No | | Gait Disturbance | | Yes | No |
| History of Heart Attack | Yes | No | | Stroke | | Yes | No |
| Blood clot in legs or lungs | Yes | No | | Epilepsy/ Seizure | | Yes | No |
| Varicose Veins | Yes | No | | In coordination | | Yes | No |
| **Endocrine:** | | | | Involuntary Movements | | Yes | No |
| Excessive thirst | Yes | No | | Dizziness | | Yes | No |
| Heat or Cold Intolerance | Yes | No | | Spasticity | | Yes | No |
| Excessive Urination | Yes | No | | **Gastrointestinal:** | | | |
| Thyroid Problem | Yes | No | | GERD Reflux | | Yes | No |
| Diabetes | Yes | No | | Heartburn | | Yes | No |
| Osteoporosis | Yes | No | | Abdominal Pain | | Yes | No |
| Adrenal Gland problem | Yes | No | | Nausea | | Yes | No |
| **Genitourinary:** | | | | Vomiting | | Yes | No |
| Urinary Incontinence | Yes | No | | Diarrhea | | Yes | No |
| History of Jaundice | Yes | No | | Liver problem | | Yes | No |
| Pain with urination | Yes | No | | **Mental Health:** | | | |
| Blood in urine | Yes | No | | Depression | Yes | No | |
| Kidney failure | Yes | No | | Insomnia /Sleep disturbance | | Yes | No |
| Recurrent Urinary Infection | Yes | No | | Anxiety | | Yes | No |
| Dyspareunia | Yes | No | | Feeling of hopelessness | | Yes | No |
| **Hematological:** | | | | **Removal of Major Organ:** | | | |
| Bleeding disorders | Yes | No | | History of removal of Spleen: | | Yes | No |
| History of Lymph node swelling | Yes | No | | History of removal of Kidney: | | Yes | No |
| Anemia | Yes | No | | History of organ transplant: | | Yes | No |
| Easy Bruising | Yes | No | | Which organ & and When? | | | |
| Are you taking blood thinner? | Yes | No | | | | | |
| History of Blood Transfusion? | Yes | No | | | | | |

**Additional Notes:**

_____

_____

_____

**THANK YOU**

069

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 191
03/30/2026 04:22:14

85787

**Advanced Pain Treatment Center**
INNOVATIVE HELP FOR MANAGING YOUR PAIN

Pragya B. Gupta, MD, FRCS (Edin), DABPM, FAPCR

## The Roland   Morris Low Back Pain and Disability Questionnaire

Patient name: _____ File # _____ Date. _____

**Please read instructions:** when your back hurts. you may find it difficult to do some of the things you normally do.  Mark only the sentences that describe you today.

[ ]    I stay at home most of the time because of my back.

[ ]    I change position frequently to try to get my back comfortable.

[ ]    I walk more slowly than usual because of my back.

[ ]    Because of my back, I am not doing any jobs that I usually do around the house

[ ]    Because of my back. I use a handrail to get upstairs.

[ ]    Because of my back. I lie down to rest more often.

[ ]    Because of my back. I have to hold on to something to get out of an easy chair

[ ]    Because of my back. I try to get other people to do things for me

[ ]    I get dressed more slowly than usual because of my back.

[ ]    I only stand up for short periods of time because of my back.

[ ]    Because of my back. I try not to bend or kneel down.

[ ]    I find it difficult to get out of a chair because of my back.

[ ]    My back is painful almost all of the time.

[ ]    I find it difficult to turn over in bed because of my back.

[ ]    My appetite is not very good because of my back

[ ]    I have trouble putting on my sock (or stockings) because of the pain in my back.

[ ]    I can only walk short distances because of my back pain.

[ ]    I sleep less well because of my back.

[ ]    Because of my back pain. I get dressed with the help of someone else.

[ ]    I sit down for most of the day because of my back

[ ]    I avoid heavy jobs around the house because of my back.

[ ]    Because of back pain. I am more irritable and bad tempered with people than usual.

[ ]    Because of my back. I go upstairs more slowly than usual.

[ ]    I stay in bed most of the time because of my back.

| Score: _____ | Improvement: _____ %SCORE: _____ /24 |

NOT ORIGINAL
DOCUMENT
PM
03/30/2026 04:22:14

**Advanced Pain Treatment Center**

Item 9
Page 192

PRAGYA B GUPTA MD, FRCS, DABPM

85787

## PAIN DISABILITY QUESTIONNAIRE

Patient Name_____ Date _____ Score: ____ /150

**Instructions:** These questions ask your views about how your pain now affects how you function in everyday activities. Please answer every question and mark the ONE number on EACH scale that best describes how you feel.

1. Does your pain interfere with your normal work inside and outside the home?

**Work normally**                                **Unable to work at all**

0 —— 1 —— 2 —— 3 —— 4 —— 5 —— 6 —— 7 —— 8 —— 9 —— 10

2. Does your pain interfere with personal care (such as washing, dressing, etc.)?

**Take care of myself completely:**              **Need help with all my personal care**

0 —— 1 —— 2 —— 3 —— 4 —— 5 —— 6 —— 7 —— 8 —— 9 —— 10

3. Does your pain interfere with your traveling?

**Travel anywhere I like**                       **Only travel to see doctors**

0 —— 1 —— 2 —— 3 —— 4 —— 5 —— 6 —— 7 —— 8 —— 9 —— 10

4. Does your pain affect your ability to sit or stand?

**No problems**                                  **Can not sit/stand at all**

0 —— 1 —— 2 —— 3 —— 4 —— 5 —— 6 —— 7 —— 8 —— 9 —— 10

5. Does your pain affect your ability to lift overhead, grasp objects, or reach for things?

**No problems**                                  **Can not do at all**

0 —— 1 —— 2 —— 3 —— 4 —— 5 —— 6 —— 7 —— 8 —— 9 —— 10

6. Does your pain affect your ability to lift objects off the floor, bend, stoop, or squat?

**No problems**                                  **Can not do at all**

0 —— 1 —— 2 —— 3 —— 4 —— 5 —— 6 —— 7 —— 8 —— 9 —— 10

7. Does your pain affect your ability to walk or run?

**No problems**                                  **Can not walk/run at all**

0 —— 1 —— 2 —— 3 —— 4 —— 5 —— 6 —— 7 —— 8 —— 9 —— 10

8. Has your income declined since your pain began?

**No decline**                                   **Lost all income**

0 —— 1 —— 2 —— 3 —— 4 —— 5 —— 6 —— 7 —— 8 —— 9 —— 10

9. Do you have to take pain medication every day to control your pain?

**No medication needed**                         **On pain medication throughout the day**

0 —— 1 —— 2 —— 3 —— 4 —— 5 —— 6 —— 7 —— 8 —— 9 —— 10

10. Does your pain force you to see doctors much more often than before your pain began?

**Never see doctors**                            **See doctors weekly**

0 —— 1 —— 2 —— 3 —— 4 —— 5 —— 6 —— 7 —— 8 —— 9 —— 10

11. Does your pain interfere with your ability to see the people who are important to you as much as you would like? **No problem**                    **Never see them**

0 —— 1 —— 2 —— 3 —— 4 —— 5 —— 6 —— 7 —— 8 —— 9 —— 10

12. Does your pain interfere with recreational activities and hobbies that are important to you?

**No interference**                              **Total interference**

0 —— 1 —— 2 —— 3 —— 4 —— 5 —— 6 —— 7 —— 8 —— 9 —— 10

13. Do you need the help of your family and friends to complete everyday tasks (including both work outside the home and housework) because of your pain?

**Never need help**                              **Need help all the time**

0 —— 1 —— 2 —— 3 —— 4 —— 5 —— 6 —— 7 —— 8 —— 9 —— 10

14. Do you now feel more depressed, tense, or anxious than before your pain began?

**No depression/tension**                        **Severe depression/tension**

0 —— 1 —— 2 —— 3 —— 4 —— 5 —— 6 —— 7 —— 8 —— 9 —— 10

15 Are there emotional problems caused by your pain that interfere with your family, social and or work activities?

**No problems**                                  **Severe problems**

0 —— 1 —— 2 —— 3 —— 4 —— 5 —— 6 —— 7 —— 8 —— 9 —— 10

Examiner: Pragya B Gupta MD

071

ADVANCED PAIN TREATMENT CENTER
OPIOID TREATMENT AGREEMENT & CONSENT FORM

Pragya B. Gupta, MD, FRCS, DABPM

NAME: _____ DOB: _____ Date _____

The purpose of this form is to give you information about the medications you will be taking for pain management and to assure that you and your physician/health care provider comply with all state and federal regulations concerning the prescribing of controlled substances. A trial of opioid therapy can be considered for moderate to severe pain with the intent of reducing pain and increasing function. The success of treatment depends on mutual trust and honesty in the physician/patient relationship and full agreement and understanding of the risks and benefits of using opioids to treat pain.

I have consented and agreed to use opioids (morphine-like drugs) as part of my treatment for chronic pain. I was explained risks, benefits and alternative to the opioid treatment. I understand that these drugs have a high potential for abuse, addiction and are therefore closely controlled by the local, state, and federal government. Because my physician/ health care provider is prescribing such medication to help manage my pain, I agree to the following conditions:

1. I am responsible for my pain medications. I agree to take the medication only as prescribed.
   a. I understand that increasing my dose without the close supervision of my physician could lead to drug overdose causing severe sedation and respiratory depression and death.
   b. I understand that decreasing or stopping my medication without the close supervision of my physician can lead to withdrawal. Withdrawal symptoms can include yawning, sweating, watery eyes, runny nose, anxiety, tremors, aching muscles, hot and cold flashes, "goose flesh", abdominal cramps, and diarrhea. These symptoms can occur 24-48 hours after the last dose and can last up to 3 weeks.

2. I will not request or accept controlled substance medication from any other physician or individual while I am receiving such medication from my physician/health care provider at the Pain Center.

3. There are side effects with opioid therapy, which may include, but not exclusively, skin rash, constipation, sexual dysfunction, sleeping abnormalities, sweating, edema, sedation, or the possibility of impaired cognitive (mental status) and/or motor ability. Overuse of opioids can cause decreased respiration (breathing). I will be careful while operating machinery or driving vehicle while taking the opioids and if I feel impaired.

   It is my responsibility to notify my physician/health care provider for any side effects that continue or are severe (i.e., sedation, confusion). I am also responsible for notifying my pain physician immediately if I need to visit another physician or need to visit an emergency room due to pain, or if I become pregnant.

4. I understand that the opioid medication is strictly for my own use. The opioid should never be given or sold to others because it may endanger that person's health and is against the law.

5. I should inform my physician of all medications I am taking, including herbal remedies. Medications like Valium or Ativan; sedatives such as Soma, Xanax, Fiorinal; antihistamines like Benadryl, alcohol, and cough syrup containing alcohol, codeine, soma, appetite suppressants, stimulants can interact with opioids and produce serious side effects.

6. During the time that my dose is being adjusted, I will be expected to return to the clinic as instructed by my clinic physician.

7. I understand that opioid prescriptions will not be mailed. If I am unable to obtain my prescriptions monthly, I will be responsible for finding a local physician who can take over the writing of my prescriptions with consultations from my pain physician.

8. Any evidence of drug hoarding, acquisition of any opioid medication or adjunctive analgesia from other physicians (which includes emergency rooms), uncontrolled dose escalation or reduction, loss of prescriptions, or failure to follow the agreement may result in termination of the doctor/patient relationship

9. I will communicate fully with my physician to the best of my ability at the initial and all follow-up visits my pain level and functional activity along with any side effects of the medications. This information allows my physician to adjust your treatment plan accordingly.

10. You should not use any illicit substances, such as cocaine, marijuana, etc. while taking these medications. This may result in a change to your treatment plan, including safe discontinuation of your opioid medications when applicable or complete termination of the doctor/patient relationship.

10. The use of ALCOHOL together with opioid medications is contraindicated.

12. I am responsible for my opioid prescriptions. I understand that:
   a. Refill prescriptions can be written for a maximum of one-month supply and will be filled at the same pharmacy.
   b. It is my responsibility to schedule appointments for the next opioid refill before I leave the clinic or within 3 days of the last clinic visit.
   c. I am responsible for keeping my pain medications in a safe and secure place. I am expected to protect my medications from loss or theft. I am responsible for taking the medication in the dose prescribed and for keeping track of the amount remaining. If my medication is stolen, I will report this to my local police department and obtain a stolen item report. I will then report the stolen medication to my physician. If my

85787

NOT ORIGINAL          03/30/2026 04:22:14          DOCUMENT

ID#: 545

Case: 3:26-cv-00024-GFVT   Doc #: 1-2   Filed: 03/30/26   Page: 484 of 662 - Page

medications are lost, misplaced, or stolen my physician may choose not to replace the medications or to taper and discontinue the medications.

d. Refills will not be made as an "emergency", such as on Friday afternoon because I suddenly realize I will "run out tomorrow".

e. Prescriptions for pain medicine or any other prescriptions will be done only during an office visit or during regular office hours. No refills of any medications will be done during the evening or on weekends.

f. You must bring back all opioid medications and adjunctive medications prescribed by your physician in the original containers/bottles at every visit.

g. Prescriptions will not be written in advance due to vacations, meetings, or other commitments.

h. If an appointment for a prescription refill is *missed*, another appointment will be made as soon as possible.

i. No "walk-in" appointments for opioid refills will be granted.

13. While physical dependence is to be expected after long-term use of opioids, signs of addiction, abuse, or misuse shall prompt the need for substance dependence treatment as well as weaning and detoxification from the opioids.

a. Physical dependence results in biochemical changes such that abruptly stopping these drugs will cause a withdrawal response. It should be noted that physical dependence does not equal addiction.

b. Addiction is characterized by behavior that includes one or more of the following: impaired control over drug use, compulsive use, continued use despite harm, and cravings. This means the drug decreases one's quality of life. If the patient exhibits such behavior, the drug will be tapered and such a patient is not a candidate for an opioid trial. He/she will be referred to an addiction medicine specialist.

c. Tolerance means a state of adaptation in which exposure to the drug induces changes that result in a lessening of one or more of the drug's effects over time. The dose of the opioid may have to be titrated up or down to a dose that produces maximum function and a *realistic* decrease of the patient's pain.

14. If it appears to the physician/health care provider that there is no improvement in my daily function or quality of life from the controlled substance, my opioids may be discontinued. I will gradually taper my medication as prescribed by the physician.

15. If I have a history of alcohol or drug misuse/addiction, I must notify the physician of such history since the treatment with opioids for pain may increase the possibility of relapse. A history of addiction does not, in most instances, disqualify one for opioid treatment of pain, but starting or continuing a program for recovery is a necessity.

16. I will be seen on a regular basis and given prescriptions for enough medication to last from appointment to appointment, and sometimes two to three days extra if the prescription ends on a weekend or holiday. This extra medication is not to be used without the explicit permission of the prescribing physician unless an emergency requires your appointment to be deferred one or two days.

17. I agree and understand that my physician reserves the right to perform random or unannounced urine drug testing. If I decide not to provide a urine sample, I understand that my doctor may change my treatment plan, including safe discontinuation of my opioid medications when applicable or complete termination of the doctor/patient relationship. Urine drug testing is not forensic testing but is done for my benefit as a diagnostic tool and in accordance with certain legal and regulatory materials on the use of controlled substances to treat pain.

18. I agree to allow my physician/health care provider to contact any health care professional, family member, pharmacy, legal authority, or regulatory agency to obtain or provide information about your care or actions *if the physician feels it is necessary*. I understand that I will be referred to either a psychiatrist or psychologist for helping managing medication needs.

19. I agree to a family conference or a conference with a close friend or significant other *if the physician feels it is necessary*.

20. I understand that non-compliance with the above conditions may result in a re-evaluation of my treatment plan and discontinuation of opioid therapy. I may be gradually taken off these medications, or even discharged from the clinic.

21. I understand that I may be called in for a random pill count at any given time. If I fail to appear for my pill count, I understand that this may lead to discontinuation of opioid therapy. I may be gradually taken off these medications, or even discharged from the clinic.

I have read the above information, or it has been read to me and all my questions regarding the treatment of pain with opioids have been answered to my satisfaction. I hereby give my consent to participate in the opioid medication therapy & acknowledge receipt of this document.

Patient's Signature_____Date_____Provider's Signature: _____Date:_____

857787

APTC revised – Nov 2020

NOT ORIGINAL DOCUMENT
PM
03/30/2026 04:22:14

NOT ORIGINAL
DOCUMENT

PM

03/30/2026 04:22:14

Item 9
Page 195

85787

## Advanced Pain Treatment Center
INNOVATIVE HELP FOR MANAGING YOUR PAIN

Pragya B. Gupta M.D., F.R.C.S. (Edin), D.A.B.P.M.

Email obgupta@aptcmd.com
Website www.aptcmd.com

Name:_____ DOB:_____, Sex:_____ Date:

**PEG ASSESSMENTS:**

1. What number best describes <u>your pain on average in the past week with treatment (intervention or pain meds):</u>

   0   1   2   3   4   5   6   7   8   9   10

   Does not interfere --mild--------I    I------ moderate-------I   I --severe------ pain as bad as you can imagine

2. What number best describes how, during the past week, pain has interfered with your enjoyment of life?

   0   1   2   3   4   5   6   7   8   9   10

   Does not interfere mild---------I        I-----------moderate---------I     I--------severe------ completely interferes

3. What number best describes how, during the past week, pain has interfered with your <u>general activity (such as ability to do your household work, activities of daily living, e.g., taking care of yourself etc.)</u>?

   0   1   2   3   4   5   6   7   8   9   10

   Does not interfere mild----------I       I-----------moderate---------I     I-------severe------- completely interferes

<u>PEG AVERAGE SCORE:</u>

**PHQ – 2**

| Over the past two weeks, how often have you been bothered by any of the following problems? | Not at all | Several days | More than half the days | Nearly every day |
|---|---|---|---|---|
| 1. Little interest or pleasure in doing things | 0 | 1 | 2 | 3 |
| 2. Feeling down, depressed or hopeless | 0 | 1 | 2 | 3 |

Score: _____ If the score is > 3 then have the patient fill out PHQ – 9.



Please shade in the location of your pain and put an X on the area that hurts the most and also for abnormal sensation mark as directed in the diagram below.

For Pins and needle mark XXXXX
For aching and cramping \\\\\\
For stabbing ZZZZZ
For Numbness mark     ++++++
For Burning mark      BBBBBBB
Other     OOOOO

THANK YOU!

OVER FOR THE REVIEW OF SYSTEM QUESTIONNAIRE

074

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 196

03/30/2026 04:22:14

APTC – F/U ROS······PLEASE CIRCLE APPROPRIATE RESPONSE

NAME:_____ DOB:_____ DATE:_____

85787

☐  PLEASE CHECK IF NO CHANGE SINCE THE LAST VISIT:    General:

| | | | | | |
|---|---|---|---|---|---|
| RECENT WEIGHT LOSS OF MORE THAN 10 POUNDS | | YES | NO | | |
| RECENT WEIGHT GAIN OF MORE THAN 10 POUNDS | | YES | NO | | |
| FEVER | YES | NO | | | |
| CHILLS | YES | NO | | | |
| NIGHT SWEATS | YES | NO | | | |
| **RESPIRATORY:** | | | **SKIN:** | | |
| CHRONIC COUGH | YES | NO | OPEN SORE | YES | NO |
| ASTHMA / WHEEZING | YES | NO | NEW MOLE | YES | NO |
| COPD/ EMPHYSEMA | YES | NO | POOR HEALING | YES | NO |
| PNEUMONIA | YES | NO | SKIN INFECTION | YES | NO |
| RECENT RESPIRATORY INFECTION | YES | NO | **BONE/ JOINTS** | | |
| **CARDIOVASCULAR:** | | | SHOULDER PAIN | YES | NO |
| CHEST PAIN | YES | NO | WRIST OR HAND PAIN | YES | NO |
| SHORTNESS OF BREATH | YES | NO | HIP PAIN | YES | NO |
| HIGH BLOOD PRESSURE | YES | NO | KNEE PAIN | YES | NO |
| HEART DISEASE | YES | NO | LUPUS | YES | NO |
| SWELLING OF ANKLE/LEG | YES | NO | MUSCLE WEAKNESS | YES | NO |
| ABNORMAL HEART RHYTHM | YES | NO | FIBROMYALGIA | YES | NO |
| HISTORY OF HEART ATTACK | YES | NO | DERMATOMYOSITIS | YES | NO |
| BLOOD CLOT IN LEGS OR LUNGS | YES | NO | **NEUROLOGICAL:** | | |
| VARICOSE VEINS | YES | NO | HEADACHE | YES | NO |
| **ENDOCRINE:** | | | TINGLING NUMBNESS | YES | NO |
| EXCESSIVE THIRST | YES | NO | BURNING SENSATION | YES | NO |
| HEAT OR COLD INTOLERANCE | YES | NO | WEAKNESS | YES | NO |
| EXCESSIVE URINATION | YES | NO | TREMORS | YES | NO |
| THYROID PROBLEM | YES | NO | GAIT DISTURBANCE | YES | NO |
| DIABETES | YES | NO | STROKE | YES | NO |
| OSTEOPOROSIS | YES | NO | EPILEPSY/ SEIZURE | YES | NO |
| ADRENAL GLAND PROBLEM | YES | NO | IN-COORDINATION | YES | NO |
| **GASTROINTESTINAL:** | | | INVOLUNTARY MOVEMENTS | YES | NO |
| GERD-REFLUX | YES | NO | DIZZINESS | YES | NO |
| HEARTBURN | YES | NO | SPASTICITY | YES | NO |
| ABDOMINAL PAIN | YES | NO | **MENTAL HEALTH:** | | |
| NAUSEA & OR VOMITING | YES | NO | DEPRESSION | YES | NO |
| DIARRHEA | YES | NO | INSOMNIA /SLEEP DISTURBANCE | YES | NO |
| BOWEL INCONTINENCE | YES | NO | ANXIETY | YES | NO |
| **GENITOURINARY:** | | | FEELING OF HOPELESSNESS | YES | NO |
| RECENT URINARY TRACT INFECTION | | YES | NO | **ORGAN REMOVAL OR TRANSPLANT** | |
| BLADDER INCONTINENCE | | YES | NO | REMOVAL OF SPLEEN | YES | NO |
| KIDNEY FAILURE | YES | NO | REMOVAL OF KIDNEY | YES | NO |
| **HEMATOLOGY:** | | | ORGAN TRANSPLANT. | YES | NO |
| LYMPH NODE SWELLING | YES | NO | WHICH ORGAN & WHEN: | | |
| ANEMIA | YES | NO | | | |
| ARE YOU ON BLOOD THINNER? | YES | NO | | | |
| BLEEDING TENDENCY | YES | NO | | | |

Thanks

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 197
03/30/2026 04:22:14

85787

## Advanced Pain Treatment Center
### INNOVATIVE HELP FOR MANAGING YOUR PAIN

Pragya B. Gupta M.D., F.R.C.S. (Edin), D.A.B.P.M

Email pogupta@opicmd.com
Website www.opicmd.com

| Please answer the questions using the following scale: | NEVER | SELDOM | SOMETIMES | OFTEN | VERY OFTEN |
|---|---|---|---|---|---|
| Score | 0 | 1 | 2 | 3 | 4 |
| 8. In the past 30 days, how often have you had trouble controlling your anger (e.g., road rage, screaming, etc.)? | O | O | O | O | O |
| 9. In the past 30 days, how often have you needed to take pain medications belonging to someone else? | O | O | O | O | O |
| 10. In the past 30 days, how often have you been worried about how you're handling your medications? | O | O | O | O | O |
| 11. In the past 30 days, how often have others been worried about how you're handling your medications? | O | O | O | O | O |
| 12. In the past 30 days, how often have you had to make an emergency phone call or show up at the clinic without an appointment? | O | O | O | O | O |
| 13. In the past 30 days, how often have you gotten angry with people? | O | O | O | O | O |
| 14. In the past 30 days, how often have you had to take more of your medication than prescribed? | O | O | O | O | O |
| 15. In the past 30 days how often have you borrowed pain medication from someone else? | O | O | O | O | O |
| 16. In the past 30 days, how often have you used your pain medicine for symptoms other than for pain (e.g., to help you sleep, improve your mood, or relieve stress)? | O | O | O | O | O |
| 17. In the past 30 days how often have you had to visit the Emergency Room? | O | O | O | O | |

THANK YOU:                                    SCORE:

2  Edgewood Office
Phone 859.331.4159 • Fax 859.331.4163
162 Barnwood Dr. • Edgewood, KY 41017

Mason Office
Phone 513.492.9317 • Fax 513.492.9325
6406 Thornberry Ct. • Unit 220A • Mason, OH 4504C

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 198
03/30/2026 04:22:14

85787

## Advanced Pain Treatment Center
INNOVATIVE HELP FOR MANAGING YOUR PAIN

Pragyo B. Gupta M.D., F.R.C.S. (Edin), D.A.B.PM

Email obgupta@cofcmd.com
Website www.apicmd.com

Name: _____ DOB: _____ Sex: _____ Date: _____

*Please answer each question as honestly as possible. Keep in mind that we are only asking about the past 30 days. There are no right or wrong answers. If you are unsure about how to answer the question, please give the best answer you can. THIS IS NOT A LIE DETECTOR. This is confidential information and protected under HIPPA law.*

| Please answer the questions using the following scale: | NEVER | SELDOM | SOMETIMES | OFTEN | VERY OFTEN |
|---|---|---|---|---|---|
| Score | 0 | 1 | 2 | 3 | 4 |
| 1. In the past 30 days, how often have you had trouble with thinking clearly or had memory problems? | O | O | O | O | O |
| 2. In the past 30 days, how often do people complain that you are not completing necessary tasks? (i.e., doing things that need to be done, such as going to class, work or appointments) | O | O | O | O | O |
| 3. In the past 30 days, how often have you had to go to someone other than your prescribing physician to get sufficient pain relief from medications? (i.e., another doctor, the emergency room, friends, Street sources) | O | O | O | O | O |
| 4. In the past 30 days, how often have you taken your medications differently from how they are prescribed? | O | O | O | O | O |
| 5. In the past 30 days, how often have you seriously thought about hurting yourself? | O | O | O | O | O |
| 6. In the past 30 days, how much of your time was spent thinking about opioid medications (having enough, taking them, dosing schedule, etc.)? | O | O | O | O | O |
| 7. In the past 30 days, how often have you been in an argument? | O | O | O | O | O |

1 | Pain Management Center
Phone 859 331 4159 • Fax 859 331 4163
162 Barnwood Dr • Edgewood, KY 41017

Mason Office
Phone 513.492.9317 • Fax 513.492.9325
6406 Thornberry Ct. • Unit 220A • Mason, OH 45040

077

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:22:14

Pragya B. Gupta, M.D., F.R.C.S., D.A.B.C.I.

Item 9
Page 199

## PATIENT HEALTH QUESTIONNAIRE (PHQ-9)

NAME:_____    DATE:_____85787_____

Over the last 2 *weeks*, how often have you been bothered by any of the following problems?
*(use "✓" to indicate your answer)*

| | Not at all | Several days | More than half the days | Nearly every day |
|---|---|---|---|---|
| 1. Little interest or pleasure in doing things | 0 | 1 | 2 | 3 |
| 2. Feeling down, depressed, or hopeless | 0 | 1 | 2 | 3 |
| 3. Trouble falling or staying asleep, or sleeping too much | 0 | 1 | 2 | 3 |
| 4. Feeling tired or having little energy | 0 | 1 | 2 | 3 |
| 5. Poor appetite or overeating | 0 | 1 | 2 | 3 |
| 6. Feeling bad about yourself   or that you are a failure or have let yourself or your family down | 0 | 1 | 2 | 3 |
| 7. Trouble concentrating on things, such as reading the newspaper or watching television | 0 | 1 | 2 | 3 |
| 8. Moving or speaking so slowly that other people could have noticed. Or the opposite    being so figety or restless that you have been moving around a lot more than usual | 0 | 1 | 2 | 3 |
| 9. Thoughts that you would be better off dead, or of hurting yourself | 0 | 1 | 2 | 3 |

add columns         +         +

*(Healthcare professional: For interpretation of TOTAL, please refer to accompanying scoring card).*    TOTAL: _____

| | |
|---|---|
| 10. If you checked off *any problems*, how *difficult* have these problems made it for you to do your work, take care of things at home, or get along with other people? | Not difficult at all _____ <br> Somewhat difficult _____ <br> Very difficult _____ <br> Extremely difficult _____ |

078

NOT ORIGINAL
DOCUMENT

PM

Item 9
Page 200
03/30/2026 04:22:14



**Advanced Pain Treatment Center**

INNOVATIVE HELP FOR MANAGING YOUR PAIN

Pragya B. Gupta, MD, FRCS (Edin), DABPM, FAPCR
Jennifer Dehner, APRN     85787
www.aptcmd.com; www.atrimed.com

## PREPROCEDURE CHECKLIST

Appointment Date & Time _____

I Mr. / Ms. _____ have received the pre-procedure patient information sheet. I have read the instructions carefully and understand the content. If I should have any questions regarding this procedure I will call the clinic during the regular working hours. I understand that I will give 48 business hours' notice before canceling a scheduled appointment, $200.00 for procedure cancellation. I understand that this is to cover administration and operational cost. Exception to this will be at the discretion of the administration. I understand that these charges are not reimbursed by the insurance and that I will be responsible for those charges.

___No jewelry or dentures (the metal will interfere with the procedure).

___Bring a driver.

___Do not eat or drink six hours before the procedure. You may have clear fluid up to 2 hours prior to the procedure.

___Type I Diabetic patients: TAKE ½ of your INSULIN the morning of your procedure. Please bring the remainder of the insulin with you to the appointment. DO NOT TAKE DIABETES MEDICATION ON THE DAY OF PROCEDURE. TAKE THE MEDICATION THE NIGHT BEFORE AS USUAL. Please bring medication with you to the appointment.

___Type II Diabetic patients: DO NOT TAKE INSULIN the morning of your procedure. Please bring the insulin with you to the appointment. DO NOT TAKE DIABETES MEDICATION ON THE DAY OF PROCEDURE. Please bring medication with you to the appointment.

___No Ibuprofen, Naproxen, Aleve, and other anti-inflammatory medications 24 hours before the procedure. Baby Aspirin and Celebrex are OK to take before procedure.

___PLEASE TAKE YOUR BLOOD PRESSURE AND HEART MEDICINE WITH SIP OF WATER IN THE MORNING ON THE DAY OF PROCEDURE.

___No flu nasal mist within 7 days prior to the procedure and 3 weeks after the procedure. A flu shot is OK.

___Chance of pregnancy (women of child bearing age)? Yes / No

Comments: _____

___ Explained and understand the Cancellation and No-Show policy.

Any history of the following?

___HISTORY OF ANY KIND OF INFECTION IN LAST 2-3 WEEKS OR AT PRESENT If "yes" please inform MD as soon as possible.

___CONGESTIVE HEART FAILURE OR COPD

___Heart valve disease

___Multiple myeloma

079

NOT ORIGINAL

DOCUMENT

PM

Item 9
Page 201

03/30/2026 04:22:14

85787

_ History of any organ removal

_ Receiving Nephrotoxic drugs

_ Severe Hypothyroidism

__ Malignant Hyperthermia

A pain diary will be issued to you with a follow up appointment or procedure on the bottom. Please bring it with you to your next appointment.

_____        _____

Signature of Patient/Date              Signature of Witness /Date

080

NOT ORIGINAL
DOCUMENT
PM

### ADVANCED PAIN TREATMENT CENTER Edgewood (KY).
### Pragya B. Gupta, M.D., F.R.C.S., D.A.B.P.M.

Item 9
Page 202
03/30/2026 04:22:14

Name: _____ DOB: _____ Date:_____    85787

TO THE PATIENT: You have the right, as a patient, to be informed about your condition and the recommended surgical, medical, or diagnostic procedure to be used so that you may make the decision whether to undergo the procedure after knowing the risks and hazards involved. This disclosure is not meant to scare or alarm you: it is simply an effort to make you better informed so you may give or withhold your consent to the procedure.

Dr. Pragya B. Gupta has discussed with you, your condition and the recommended surgical, interventional, medical, or diagnostic procedure(s) to be preformed. This discussion was intended to ensure that you had the opportunity to receive the information necessary to make a reasoned and informed decision whether to consent to the procedure(s). This document is a written confirmation of that discussion and contains some of the more significant medical information discussed.

1. Based on this discussion, I understand that the following condition(s) may exist in my case

   _____

2. I understand that the procedure(s) proposed for treating or diagnosing my condition(s) is/are: Explain in lay terms:

   _____

3. I understand the necessity for the administration of sedation, or anesthesia when deemed appropriate.

4. **I have been informed of the following:**
   - Reasonably expected benefits of the proposed procedure, and the **available alternatives, some of which include: No treatment, or to continue medical management with the use of medications.**
   - **Probability of success** or failure and major problems of recuperation of proposed procedures.
   - **Epidural administration of steroids such as Kenalog (triamcinolone), Celestone (Betamethasone), and Dexamethasone etc. Hyaluronidase which is not steroid but an enzyme preparation, is off-label use, but supported by medical literatures and is known to be safe.**
   - Reasonably anticipated consequences if the procedure is not performed.
   - _____

5. I understand that all medical and surgical procedures involve risks to some degree. These risks may include the potential for infection (5% incidence of skin infection or wound infection), allergic reactions, bleeding, blood clots, brain damage, and even loss of bodily function or life. I have also been informed that the following additional risks and hazards may occur in connection with this Procedure: **Epidural abscess (0.2 to 1.2 per 10, 000), paralysis, permanent nerve damage (1 in 15,000), spinal cord damage, headache (1 in 100), immunosuppression, Hemo/Pneumothorax (collapse of lungs), increased pain, no pain relief, bowel or bladder dysfunction, sexual dysfunction, cerebrospinal fluid leakage. In case of the use of a catheter or spinal cord stimulator electrodes, there is a minor possibility of its shearing and being left behind in your body.**

6. I am aware that in the practice of medicine, other unexpected risks or complications not discussed may occur. I also understand that during proposed procedure(s), unforeseen conditions may be revealed requiring the performance of additional procedures, and I authorize such procedures to be preformed. I further acknowledge that no guarantees or promises have been made to me concerning the results of any procedures. I hereby voluntarily give my authorization and consent to Dr. Pragya B. Gupta, and his delegated associates to perform and/or assist in the proposed procedure described above.

7. I hereby authorize and consent to the taking of photographs or films during the procedure and their use for teaching and research purposes.

Confidential                    Page 1/2                    Revised Dec 2016

081

NOT ORIGINAL
DOCUMENT
PM
03/30/2026 04:22:14
85787

**ADVANCED PAIN TREATMENT CENTER Edgewood (KY).**
**Pragya B. Gupta, M.D., F.R.C.S., D.A.B.P.M.**

Item 9
Page 203

8. I hereby authorized and consent to the disposal of tissue necessarily removed as part of a procedure(s) for diagnostic and research purposes.

9. I have been given the opportunity to ask questions about my condition, alternative forms of treatment, risks of non-treatment, the procedures to be used and risks and hazards involved, and I believe that I have sufficient information to give this informed consent.

10. I have been informed about the use of X ray machine for precise needle placement during the pain interventional procedures. I have been made aware of the side effects of X ray although they are extremely rare.

11. I also understand that to visualize the structures precisely as well as to prevent intra-vascular injection of medication, injection of contrast (dye) material will be undertaken as part of diagnostic study. I understand that the dye study is an integral part of all interventional procedures. I understand that the risks include but not limited to hives, vomiting, blood pressure drop, and breathing difficulty or severe drug related reaction resulting in organ damage or death.

12. Only for female patients: **I am not pregnant.**
I certify that I have read and fully understand the contents of this form, that the disclosure referred to above were made to me, and that all blanks and statements requiring insertion or completion were filled in before I signed my name below.

_____     _____
Signature of patient/guardian    date         Signature of physician    date

_____     _____
Signature of witness         date         Signature of Spouse/ Family member Date

**TO BE COMPLETED BY RECOVERY STAFF OF THE CENTER:**

1. DIABETES YES / NO (NIDDM OR IDDM)
2. RENAL FAILURE YES/ NO.
3. MULTIPLE MYELOMA. YES/ NO
4. BRONCHIAL ASTHMA OR COPD  YES / NO
5. HEMOLYTIC ANEMIA:  YES/ NO
6. HYPOTHYROIDISM: YES/ NO
7. RECENT H/O MI OR CVA YES/ NO DATE: _____
8. H/O REMOVAL OF SPLEEN YES / NO
9. H/O ORGAN TRANSPLANT YES / NO _____
10. RECENT HISTORY OF INFECTION YES/ NO. _____
11. RECENT VACCINATION: YES / NO DATE:

12. BLOOD THINNER YES/ NO_____
    (COUMADIN/ ASA/ PLAVIX/_____)
13. IF YES, WHEN STOPPED _____
14. INR & PT, PTT DONE: YES/ NO
15. NPO SINCE WHAT TIME? _____
16. H/O Sickle cell disorder
17. HAVE YOU TAKEN YOUR HEART AND BP MEDICATION? YES / NO.

❑ Only applicable for the patient who had Thoracic Transforaminal injection:

Patient was informed NOT TO FLY within 72 hours after the thoracic transforaminal injection. Commercial planes depressurize the cabin to a relative altitude of 8000 ft which can complicate a possible subclinical pneumothorax (a benign condition) from the injection to a tension pneumothorax, a very severe condition leading to collapse of the lungs and possible death.

_____
Date and Initial of the Patient and the APTC staff

Confidential            Page 2/2            Revised Dec 2016

082

NOT ORIGINAL
DOCUMENT

PM

03/30/2026 04:22:14

Item 9
Page 204

## ADVANCED PAIN TREATMENT CENTER
Edgewood(KY)
### CONSCIOUS SEDATION FLOW SHEET

85787

Consent: Yes –No                                                    N PO Since: _____

Name: _____ DOB/ Age: _____    Sex M / F

Date of Procedure: _____    Operator: Dr. Gupta   Asst: _____

Diagnosis: _____ Allergy: _____

Procedure: _____ Time In _____    Time out _____

Vitals: BP _____, Pulse _____, Temp _____, RA Sat _____, Ht _____, Wt _____

**Sedation Order:**                                    IV Access Site: _____
- Start i.v. and administer 100cc/hr of lactated ringer except for diabetic patient whose blood sugar is <100mg/dl,  start 5% dextrose iv @ 100cc/hr
- Ancef 2gm i.v. or Cleocin 600mg iv 30 minutes before only Discogram/ SCS/ Caudel Epidural Neuroplasty.
- Midazolam 1 - 2mg prn q 5 - 10 minutes titrated to the effect (to be administered by MD/CRNA/PA/ARNP/RN

**Past Medical History:**
If yes describe in the note:

| | | |
|---|---|---|
| 1. History of structural airway problem  Y N | 5 Difficulty with mobility or arthritis  Y N | |
| 2. History of Breathing problem  Y N | 6 Hx of Panic attack or anxiety  Y N | |
| 3. History of Cardiac/ BP problem  Y N | 7 ETOH or Substance Abuse  Y N | |
| 4. History of Problem with anesthesia in past  Y N | 8. Lab value reviewed (PT, PTT, INR, Plat) Y  N (if on blood thinner) | |
| ®Nausea/ Vomiting  ®Difficulty awakening  ® Other _____ | | |

| Time→ Medicine↓ | 7.30 | 7:35 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| midaz | 3mg | 1mg | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

Codes: BP ·^^·; HR:·; Resp:•; Sedation Scale: 0 None, 1:Mild(Arouseble to voice), 2: Moderate 3. Severe(Arousable to sternal rub)

| Time→ | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 200 | | | | | | | | | | | | | | | | | | | | | | | |
| 180 | | | | | | | | | | | | | | | | | | | | | | | |
| 160 | | | | | | | | | | | | | | | | | | | | | | | |
| 140 | | | | | | | | | | | | | | | | | | | | | | | |
| 120 | ^↓ | | | | | | | | | | | | | | | | | | | | | | |
| 100 | | | | | | | | | | | | | | | | | | | | | | | |
| 80 | . | | | | | | | | | | | | | | | | | | | | | | |
| 60 | ^ | | | | | | | | | | | | | | | | | | | | | | |
| 40 | | | | | | | | | | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | | | | | | | | | | |
| Sed Level | | | | | | | | | | | | | | | | | | | | | | | |
| O₂ L/min | 3 | | | | | | | | | | | | | | | | | | | | | | |
| O₂ Sat | 96 | | | | | | | | | | | | | | | | | | | | | | |
| EKG | | | | | | | | | | | | | | | | | | | | | | | |

Page 1/2                                                                            Over

**Signature of the Nurse or MA discharging the patient.**          **Date & Time:**

083

NOT ORIGINAL
DOCUMENT
PM
03/30/2026 04:22:14

Item 9
Page 205

85787

## ADVANCED PAIN TREATMENT CENTER
### Edgewood, KY
### CONSCIOUS SEDATION FLOW SHEET

| Post Anesthesia / Sedation Score | Admission time | After 15/Discharge minutes |
|---|---|---|
| **Score:**<br>(R)espiration<br>0 Ventilation Essential<br>1 Spontaneous respiration < 10/min<br>2 Spontaneous respiration > 10/min | | |
| **Score:**<br>(E)nergy:<br>0: Does not move leg<br>1: Moves leg but can not sustain head lift<br>2: Sustains head lift, moves leg | | |
| **Score:**<br>(A)lertness:<br>0: Awakens only with vigorous stimulation<br>1: Awaken with gentle stimulation<br>2: Awake, seldom dozes. | | |
| **Score:**<br>(C)irculation Adult only<br>0: BP < 80 mm Hg, or weak radial pulse<br>1: BP 80mm Hg, and pre proc level<br>2: BP at pre procedure level | | |
| **Score:**<br>(T)emperature:<br>0: Oral temperature <35°C<br>1: Temperature 35 - 36°C<br>2: Temperature >36°C | | |
| **Total Score** | | |
| **REACT SCORE** | | |
| **Nurse's Signature:** | | |

Vitals Post Proc.: BP_____  Pulse_____  RA Sat _____

| Muscle Strength Grading:<br>   0:  No Contraction<br>   1.  Flicker or Trace of Contraction<br>   2.  Complete Range of Motion with "Gravity"<br>   3.  Complete Range of Motion against Gravity<br>   4.  Complete Range of Motion against Gravity, with some Resistance<br>   5.  Complete Range of Motion against Gravity, with full Resistance. | | | | |
|---|---|---|---|---|

| Has the patient voided urine?   Yes    No |
|---|
| Nurse's Note: |
| Future Procedure: |
| Patient received discharge instruction and understood the content of the instruction   ☐ Yes |

Signature of the Nurse or MA discharging the patient.          Date & Time:

084

NOT ORIGINAL
DOCUMENT

PM

## ADVANCED PAIN TREATMENT CENTER
TEL: 859-331-4159
: POST -PROCEDURE INSTRUCTIONS:

Item 9
Page 206
03/30/2026 04:22:14

Name: _____ DOB_____    Date 85787 _ _

1. Today you had _____.
2. The procedure was performed under sedation, and therefore **please refrains from operating heavy machinery, driving car, drinking alcohol, and making important decisions for a period of 24 hours.**
3. **Make sure that you have a competent adult who will accompany you home.**

4. If possible, in cases of elderly patients, it is a good idea, to have someone stay with the patient, during the initial 12 hours after the procedure.
5. At home if you feel any weakness in your legs, please make sure that during the first 12 hours someone helps you with ambulation, going to bathroom etc. Use cane or walker if necessary. Please know that without proper precaution you may fall because of the weakness of legs, which may make your pain condition worse.
6. After interlaminar epidural or Transforaminal epidural injection of steroid please avoid exposing yourself to any possible source of infection for about 2 to 3 weeks.
7. **IN THE FOLLOWING CONDITIONS PLEASE GO TO THE NEAREST HOSPITAL EMERGENCY ROOM (ER) AS SOON AS POSSIBLE & THEN HAVE THE ER PHYSICIAN CALL DR. GUPTA (859-468-2583)**
   - **Profound weakness of legs or arms or both.**
   - **Severe headache particularly worsening with sitting or standing up, with or without Nausea and Vomiting and with or without fever. Fever with headache and neck stiffness or rigidity.**
   - Fever and sweating. Fever during the first week with or without back pain following any procedure is important and should be notified to the physician. Any Fever following discography should be reported to the physician immediately.
   - Severe and progressively worsening back pain with radiation of severe pain to both legs and arms. Go to the nearest ER.
   - **Urinary retention or inability to pass urine following interventional pain procedure. Please go to the nearest ER.**
   - **Any loss of control of bowel or bladder. Please go to the nearest ER.**
   - **Any abnormal changes in consciousness. Please go to the nearest ER.**
   - In case of **Significant breathing trouble** following procedure on the Chest please go to the nearest ER to rule out Pneumothorax (collapse of lungs).
8. Try to rest during the first 12 hours after the procedure.
9. Please know that after some procedure pain may increase for first 24- 48 hours.
10. You may take pain medicine, anti-inflammatory such as Aleve, or Motrin for pain. Sometime local heat or ice application helps.
11. **Please fill out the PAIN DIARY and bring it with you on the first follow up appointment. This is mandatory. Please make sure that you have an appointment to see Dr. Gupta in 2 - 3 weeks following the procedure.**
12. Resume all your regular medications as prescribed by your physician. If you are on blood thinners such as coumadin, plavix you may restart in 6 hours after the procedure.
13. **IN CASE OF ANY OPERATION IN NEXT THREE MONTHS AFTER THE EPIDURAL INJECTION (TRANS FORAMINAL, CERVICAL or LUMBAR) PLEASE INFORM THE SURGEON OR ANESTHESIOLOGIST about it.**
14. **\*\*No Vaccination such as FLU shot or Pneumonia vaccine 1 week before procedure and 3 weeks after the procedure.**
15. In case of antibiotic induced diarrhea, abdominal pain, fever or if you feel unwell following procedure and you are significantly concerned you may contact Dr. Gupta as soon as possible **(859-468-2583)**.

I have read the above instructions and understood the content.

Revised 05/29/2018

_____    _____    _____    _____
Signature of the Patient.    Date          Signature of the Witness    Date

085

NOT ORIGINAL
DOCUMENT
PM
Item 9
Page 207
03/30/2026 04:22:14
85787



**Advanced Pain Treatment Center**
INNOVATIVE HELP FOR MANAGING YOUR PAIN

Pragya B. Gupta, MD, FRCS (Edin), DABPM, FAPCR
www.aptcmd.com, www.atrmed.com

## POST PROCEDURE PAIN DIARY

| Name: | Procedure: |
|---|---|
| Proc. Date: | Pre- Proc. Pain Level: _____ / 10 |

**Post Procedure Pain Level:**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 45min: No Pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10(Worst) |
| 60min: No Pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10(Worst) |
| 2nd Hr: No Pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10(Worst) |
| 24th Hr: No Pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10(Worst) |
| 2nd Day: No Pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10(Worst) |
| 3rd Day: No Pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10(Worst) |
| 4th Day: No Pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10(Worst) |
| 5th Day: No Pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10(Worst) |
| 6th Day: No Pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10(Worst) |
| 7th Day: No Pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10(Worst) |
| 10th Day: No Pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10(Worst) |
| 14th Day: No Pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10(Worst) |

**Four Activities Restored:**

What are four things in your life that you couldn't do, or had difficulty doing, because of your pain, and which ones have been restored after injection or treatment. These should be simple, realistic, daily life improvements that other people can see most of the time.

1. _____  NO/ A BIT/ A LOT/ COMPLETELY

2. _____  NO/ A BIT/ A LOT/ COMPLETELY

3. _____  NO/ A BIT/ A LOT/ COMPLETELY

4. _____  NO/ A BIT/ A LOT/ COMPLETELY

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:22:14



**Advanced Pain Treatment Center**
INNOVATIVE HELP FOR MANAGING YOUR PAIN

Item 9
Page 208

Pragya B. Gupta, MD, FRCS (Edin), DABPM, FAPCR
www.aptcmd.com  www.ptrimed.com

85787

## Post Procedure Pain Diary – Medial Branch Block

Procedure _____    Date of Proc. _____

Patient Name _____    Pre-Proc. Pain Level    _____/10

**Post Procedure Pain Score:** _____

**Check all activities that are limited by pain:**

___ Bending forward/backward              ___ Lifting              ___ Turning

___ Sitting              ___ Walking

**Post Procedure Pain Scores:**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **30min:** No pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | (Worst) |
| **60min:** No pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | (Worst) |
| **2nd Hr:** No pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | (Worst) |
| **3rd Hr:** No pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | (Worst) |
| **4th Hr:** No pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | (Worst) |
| **5th Hr:** No pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | (Worst) |
| **6th Hr:** No pain | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | (Worst) |

**Check all activities that you were able to do up to 6 hours after procedure:**

___ Bending forward/backward              ___ Lifting              ___ Turning

___ Sitting              ___ Walking

Comments: _____

_____

(859) 331-4159 - Phone
(859) 331-4163 - Fax

162 Barnwood Drive
Edgewood, KY 41017

087

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 209

03/30/2026 04:22:14

85787

# COLUMBIA-SUICIDE SEVERITY

# RATING SCALE

# (C-SSRS)

Baseline/Screening Version

Version 1/14/09

*Posner, K.; Brent, D.; Lucas, C.; Gould, M.; Stanley, B.; Brown, G.; Fisher, P.; Zelazny, J.; Burke, A.; Oquendo, M.; Mann, J.*

*Disclaimer:*

*This scale is intended to be used by individuals who have received training in its administration. The questions contained in the Columbia-Suicide Severity Rating Scale are suggested probes. Ultimately, the determination of the presence of suicidal ideation or behavior depends on the judgment of the individual administering the scale.*

*Definitions of behavioral suicidal events in this scale are based on those used in __The Columbia Suicide History Form__, developed by John Mann, MD and Maria Oquendo, MD, Conte Center for the Neuroscience of Mental Disorders (CCNMD), New York State Psychiatric Institute, 1051 Riverside Drive, New York, NY, 10032. (Oquendo M. A., Halberstam B. & Mann J. J., Risk factors for suicidal behavior: utility and limitations of research instruments. In M.B. First [Ed.] Standardized Evaluation in Clinical Practice, pp. 103 -130, 2003.)*

*For reprints of the C-SSRS contact Kelly Posner, Ph.D., New York State Psychiatric Institute, 1051 Riverside Drive, New York, New York, 10032; inquiries and training requirements contact posnerk@nyspi.columbia.edu*

© 2008 The Research Foundation for Mental Hygiene, Inc.

088

NOT ORIGINAL
DOCUMENT

PM

03/30/2026 04:22:14

Item 9
Page 210

## SUICIDAL IDEATION

| | Lifetime: Time He/She Felt Most Suicidal | | Past Months | |
|---|---|---|---|---|

*Ask questions 1 and 2. If both are negative, proceed to "Suicidal Behavior" section. If the answer to question 2 is "yes", ask questions 3, 4 and 5. If the answer to question 1 and/or 2 is "yes", complete "Intensity of Ideation" section below.*

**1. Wish to be Dead**
Subject endorses thoughts about a wish to be dead or not alive anymore, or wish to fall asleep and not wake up.
*Have you wished you were dead or wished you could go to sleep and not wake up?*

If yes, describe:

Lifetime: Yes ☐ No ☐    Past: Yes ☐ No ☐

**2. Non-Specific Active Suicidal Thoughts**
General non-specific thoughts of wanting to end one's life/commit suicide (e.g., "I've thought about killing myself") without thoughts of ways to kill oneself/associated methods, intent, or plan during the assessment period.
*Have you actually had any thoughts of killing yourself?*

If yes, describe:

Lifetime: Yes ☐ No ☐    Past: Yes ☐ No ☐

**3. Active Suicidal Ideation with Any Methods (Not Plan) without Intent to Act**
Subject endorses thoughts of suicide and has thought of at least one method during the assessment period. This is different than a specific plan with time, place or method details worked out (e.g. thought of method to kill self but not a specific plan). Includes person who would say, "I thought about taking an overdose but I never made a specific plan as to when, where or how I would actually do it...and I would never go through with it."
*Have you been thinking about how you might do this?*

If yes, describe:

Lifetime: Yes ☐ No ☐    Past: Yes ☐ No ☐

**4. Active Suicidal Ideation with Some Intent to Act, without Specific Plan**
Active suicidal thoughts of killing oneself and subject reports having some intent to act on such thoughts, as opposed to "I have the thoughts but I definitely will not do anything about them."
*Have you had these thoughts and had some intention of acting on them?*

If yes, describe:

Lifetime: Yes ☐ No ☐    Past: Yes ☐ No ☐

**5. Active Suicidal Ideation with Specific Plan and Intent**
Thoughts of killing oneself with details of plan fully or partially worked out and subject has some intent to carry it out.
*Have you started to work out or worked out the details of how to kill yourself? Do you intend to carry out this plan?*

If yes, describe:

Lifetime: Yes ☐ No ☐    Past: Yes ☐ No ☐

## INTENSITY OF IDEATION

*The following features should be rated with respect to the most severe type of ideation (i.e., 1-5 from above, with 1 being the least severe and 5 being the most severe). Ask about time he/she was feeling the most suicidal.*

Lifetime - Most Severe Ideation: _____  _____
Type # (1-5)    Description of Ideation

Past X Months - Most Severe Ideation: _____  _____
Type # (1-5)    Description of Ideation

| | Most Severe | Most Severe |
|---|---|---|

**Frequency**
*How many times have you had these thoughts?*
(1) Less than once a week   (2) Once a week   (3) 2-5 times in week   (4) Daily or almost daily   (5) Many times each day

**Duration**
*When you have the thoughts how long do they last?*
(1) Fleeting - few seconds or minutes          (4) 4-8 hours/most of day
(2) Less than 1 hour/some of the time          (5) More than 8 hours/persistent or continuous
(3) 1-4 hours/a lot of time

**Controllability**
*Could/can you stop thinking about killing yourself or wanting to die if you want to?*
(1) Easily able to control thoughts          (4) Can control thoughts with a lot of difficulty
(2) Can control thoughts with little difficulty          (5) Unable to control thoughts
(3) Can control thoughts with some difficulty          (0) Does not attempt to control thoughts

**Deterrents**
*Are there things - anyone or anything (e.g., family, religion, pain of death) - that stopped you from wanting to die or acting on thoughts of committing suicide?*
(1) Deterrents definitely stopped you from attempting suicide          (4) Deterrents most likely did not stop you
(2) Deterrents probably stopped you          (5) Deterrents definitely did not stop you
(3) Uncertain that deterrents stopped you          (0) Does not apply

**Reasons for Ideation**
*What sort of reasons did you have for thinking about wanting to die or killing yourself? Was it to end the pain or stop the way you were feeling (in other words you couldn't go on living with this pain or how you were feeling) or was it to get attention, revenge or a reaction from others? Or both?*
(1) Completely to get attention, revenge or a reaction from others          (4) Mostly to end or stop the pain (you couldn't go on living with the pain or how you were feeling)
(2) Mostly to get attention, revenge or a reaction from others
(3) Equally to get attention, revenge or a reaction from others and to end/stop the pain          (5) Completely to end or stop the pain (you couldn't go on living with the pain or how you were feeling)
(0) Does not apply

© 2008 Research Foundation for Mental Hygiene, Inc.          C-SSRS - Baseline/Screening (Version 1/14/09)          Page 1 of 2

089

NOT ORIGINAL DOCUMENT

03/30/2026 04:22:14 PM

85787

Item 9
Page 211

| SUICIDAL BEHAVIOR *(Check all that apply, so long as these are separate events; must ask about all types)* | Lifetime | | Past Years | |
|---|---|---|---|---|
| **Actual Attempt:** A potentially self-injurious act committed with at least some wish to die, *as a result of act.* Behavior was in part thought of as a method to kill oneself. Intent does not have to be 100%. If there is *any* intent/desire to die associated with the act, then it can be considered an actual suicide attempt. *There does not have to be any injury or harm,* just the potential for injury or harm. If person pulls trigger while gun is in mouth but gun is broken so no injury results, this is considered an attempt. Inferring Intent: Even if an individual denies intent/wish to die, it may be inferred clinically from the behavior or circumstances. For example, a highly lethal act that is clearly not an accident so no other intent but suicide can be inferred (e.g., gunshot to head, jumping from window of a high floor/story). Also, if someone denies intent to die, but they thought that what they did could be lethal, intent may be inferred. *Have you made a suicide attempt? Have you done anything to harm yourself? Have you done anything dangerous where you could have died?* *What did you do? Did you_____ as a way to end your life? Did you want to die (even a little) when you____? Were you trying to end your life when you _____? Or Did you think it was possible you could have died from_____?* *Or did you do it purely for other reasons / without ANY intention of killing yourself (like to relieve stress, feel better, get sympathy, or get something else to happen)?* (Self-Injurious Behavior without suicidal intent) If yes, describe: | Yes No ☐ ☐ Total # of Attempts ——— | | Yes No ☐ ☐ Total # of Attempts ——— | |
| Has subject engaged in Non-Suicidal Self-Injurious Behavior? | Yes ☐ | No ☐ | Yes ☐ | No ☐ |
| **Interrupted Attempt:** When the person is interrupted (by an outside circumstance) from starting the potentially self-injurious act *(if not for that, actual attempt would have occurred).* Overdose: Person has pills in hand but is stopped from ingesting. Once they ingest any pills, this becomes an attempt rather than an interrupted attempt. Shooting: Person has gun pointed toward self, gun is taken away by someone else, or is somehow prevented from pulling trigger. Once they pull the trigger, even if the gun fails to fire, it is an attempt. Jumping: Person is poised to jump, is grabbed and taken down from ledge. Hanging: Person has noose around neck but has not yet started to hang - is stopped from doing so *Has there been a time when you started to do something to end your life but someone or something stopped you before you actually did anything?* If yes, describe: | Yes No ☐ ☐ Total # of interrupted ——— | | Yes No ☐ ☐ Total # of interrupted ——— | |
| **Aborted Attempt:** When person begins to take steps toward making a suicide attempt, but stops themselves before they actually have engaged in any self-destructive behavior. Examples are similar to interrupted attempts, except that the individual stops him/herself, instead of being stopped by something else. *Has there been a time when you started to do something to try to end your life but you stopped yourself before you actually did anything?* If yes, describe. | Yes No ☐ ☐ Total # of aborted ——— | | Yes No ☐ ☐ Total # of aborted ——— | |
| **Preparatory Acts or Behavior:** Acts or preparation towards imminently making a suicide attempt. This can include anything beyond a verbalization or thought, such as assembling a specific method (e.g., buying pills, purchasing a gun) or preparing for one's death by suicide (e.g., giving things away, writing a suicide note). *Have you taken any steps towards making a suicide attempt or preparing to kill yourself (such as collecting pills, getting a gun, giving valuables away or writing a suicide note)?* If yes, describe: | Yes No ☐ ☐ | | Yes No ☐ ☐ | |
| **Suicidal Behavior:** Suicidal behavior was present during the assessment period? | Yes No ☐ ☐ | | Yes No ☐ ☐ | |

| *Answer for Actual Attempts Only* | Most Recent Attempt Date: | Most Lethal Attempt Date: | Initial/First Attempt Date: |
|---|---|---|---|
| **Actual Lethality/Medical Damage:** 0. No physical damage or very minor physical damage (e.g., surface scratches). 1. Minor physical damage (e.g., lethargic speech; first-degree burns; mild bleeding, sprains). 2. Moderate physical damage, medical attention needed (e.g., conscious but sleepy, somewhat responsive, second-degree burns, bleeding of major vessel). 3. Moderately severe physical damage, *medical* hospitalization and likely intensive care required (e.g., comatose with reflexes intact, third-degree burns less than 20% of body; extensive blood loss but can recover, major fractures). 4. Severe physical damage; *medical* hospitalization with intensive care required (e.g., comatose without reflexes; third-degree burns over 20% of body; extensive blood loss with unstable vital signs; major damage to a vital area). 5. Death | *Enter Code* ——— | *Enter Code* ——— | *Enter Code* ——— |
| **Potential Lethality: Only Answer if Actual Lethality=0** Likely lethality of actual attempt if no medical damage (the following examples, while having no actual medical damage, had potential for very serious lethality: put gun in mouth and pulled the trigger but gun fails to fire so no medical damage; laying on train tracks with oncoming train but pulled away before run over). 0 = Behavior not likely to result in injury 1 = Behavior likely to result in injury but not likely to cause death 2 = Behavior likely to result in death despite available medical care | *Enter Code* ——— | *Enter Code* ——— | *Enter Code* ——— |

© 2008 Research Foundation for Mental Hygiene, Inc.        C-SSRS—Baseline/Screening (Version 1/14/09)        Page 2 of 2

NOT ORIGINAL
DOCUMENT
PM

Advanced Pain
Treatment Center

Item 9
Page 212
03/30/2026 04:22:14

Pragya Gupta <pbgupta@aptcmd.com>

85787

## AWARD NOTIFICATION: Otrimed Corporation is a Recipient of the 2018 Syneos Health Site Appreciation Award

Site Appreciation Awards <siteappreciationawards@syneoshealth.com>          Fri, Oct 26, 2018 at 4:46 AM
To: "pbgupta@aptcmd.com" <pbgupta@aptcmd.com>, "hollydickens@otrimed.com" <hollydickens@otrimed.com>,
"dj.thomas@otrimed.com" <dj.thomas@otrimed.com>
Cc: "Brown, Andrew" <andrew.brown@syneoshealth.com>, "Galatioto, Jordan" <jordan.galatioto@syneoshealth.com>, "Unvericht-Hoennige, Ursula" <ursula.unvericht-hoennige@syneoshealth.com>, "Smith, Deborah" <deborah.smith@syneoshealth.com>

Dear Dr. Pragya Gupta and Team,

To recognize the value of clinical research sites as partners in the clinical research process, Syneos Health honors sites annually through our Site Appreciation Award program.

It is my great pleasure to inform you that Otrimed Corporation has been selected as a recipient of a 2018 Site Appreciation Award.

You were nominated by a Syneos Health clinical operations team members who made the following comments about your work:

- Efficient Study Start-up demonstrated by timely review of contracts and budgets, timely provision of essential documents and IRB/IEC submissions.

- Highly engaged investigator and site staff who are collaborative, responsive and demonstrate strong teamwork and communication.

### Award Presentation

As an award recipient you'll receive a plaque that you can display at your site. A member of the Syneos Health study team will be reaching out to you within the next few weeks to schedule a time to present the award to your site team. If you plan to promote this award with the media, please share your plans with us at danielle.deforge@syneoshealth.com.

Thank you for your contributions to improve the health and treatment options available to patients worldwide. We look forward to our continued collaboration.

Best regards,

091

NOT ORIGINAL
Item 9
Page 213
03/30/2026 04:22:14

DOCUMENT

PM

Alistair Macdonald
Chief Executive Officer

Syneos Health

85787

NOT ORIGINAL
Item 9
Page 214
03/30/2026 04:22:14

85787

## CURRICULUM VITAE:

**Pragya B. Gupta, M.D., F.R.C.S.(Edin), D.A.B.P.M.**

Home Address:

**Office Address:**
162 Barnwood Dr, Edgewood, KY 41017. 859-331-4159

**Current Position:**
**Director**
February 22, 2002 - Advanced Pain Treatment Center, 162 Barnwood Drive, Edgewood, KY 41017. Tel: (859) 331 4159 www.aptcmd.com
Nov 2012- Otrimed Clinical Research, 162 Barnwood Drive, Edgewood, KY 41017.
Tel: (859) 7571359  www.otrimedresearchcenter.com

**Academic Appointment:**
2001 July: Assistant Professor, Department of Anesthesiology and Pain Medicine, AHEC Faculty. ID 10840536. Appointment until 2024.
University of Kentucky Medical Center, Lexington, KY 40536.

**Past Committee Position:**
Member, Evidence Analysis Committee: Spine Intervention Society 2015 – 2017, July

## BOARD CERTIFICATION

**April 1, 2021- Dec 31, 2032: Diplomate of American Board of Pain Medicine** (first certified on April 13, 2001, ID# 08901)
**Jan 1, 2021 – Dec 31, 2030: ABA Subspecialty Certification in Pain Medicine** (first certified on Sept 9, 2000 ), ABAID: 3581-7303.
**October 1, 1999:** Diplomate American Board of Anesthesiology **(Indefinite expiry, ABAID: 3581-7303).**
**April 16, 1993:** Fellow of the Royal College of Surgeons of Edinburgh by exam (General surgery); Roll No: 20719, College Ref # 15099, The Royal College of Surgeons of Edinburgh, Nicolson Street, Edinburgh, EH8 9DW, United Kingdom.
**1979-1985:** Bachelor of Medicine and Bachelor of Surgery, Calcutta University, R.G. Kar Medical College & Hospital, 1 Khudiram Bose Sarani, Calcutta 700004, India.
**July 14, 1993:** ECFMG certification.

**Licensure:**
- Kentucky Board of Medical Licensure # 34920, date issued 6/17/1999 – Expires: 03/01/2024
- Medical Board of California, # C152074, date issued 10/04/2017 – Expires: 7/31/2025
- Commonwealth of Massachusetts # 154671, date issued 12/10/1997 – Expires: 7/25/2024
- Medical Board of Ohio, # 35-082213, date issued 02/14/2003 – Expires: 01/01/2025
- General Medical Council, United Kingdom Registration # 4064804 1993
- Indian Medical Council registration #43916 – 1985.

**National Provider Identity Number (NPI) #** 1740243609, Enumeration Date: 04/10/2006

PRAGYA B GUPTA, MD    1

DOCUMENT

PM

NOT ORIGINAL
Item 9
Page 215
03/30/2026 04:22:14

85787

MEDICARE: G97203, MEDICAID: 65936809 (KY), 6434920200(KY)

TAXONOMY: 208VP0014X – INTERVENTIONAL PAIN MEDICINE

DEA: ▮▮▮▮▮ Date of Issue: -08/18/2021, Date of Expiry: 09/30/2024

DEA: ▮▮▮▮▮ Date of Issue: 01/03/2023, Date of Expiry: 09/30/2025

ACLS Certified: Nov 30, 2022 – Nov 30-2024

## CLINICAL RESEARCH CERTIFICATION:

- Nov 2022-Nov 2024: **Certified Principal Investigator** (Initial Certification: 9/2016), Academy of Clinical Research Professionals – ACRP – active.
- 2016: Fellow of the Academy of Physicians in Clinical Research- APCR.
- 24 Oct 2022- 24 Oct 2024. GCP CERTIFICATION - CITI – Copernicus group IRB);
- GCP Training: November 1, 2019: Clinical Research Training for Physicians, sponsored by Encore Research Group (TransCelerate BioPharma, Inc).
- FDA Clinical Investigator Training Course: Nov 13 – 15, 2018, FDA Center for Drug Development and Research, 10903 New Hampshire Avenue, Silver Spring, MD 20993.

## EVIDENCE-BASED MEDICINE CERTIFICATION:
07/2015: Appraisal of Evidence in Studies of Diagnostic Tests and Strategies, Evidence-Based Medicine Part 1 & 2. Spine Intervention Society, Educational Program.

## MAT WAIVER CERTIFICATION:
Certification of completion American Academy of Addiction Psychiatry MAT waiver course, November 22, 2020. **DATA2000 approval for 275 patients.** New directive from DEA makes this certification non relevant.

## Fluoroscopy Training and Certification:
- July 1, 2022: Certified California Fluoroscopy X-Ray Supervisor and Operator – Valid 7/31/2024. California Department of Public Health. Permit # RHC00206794
- March 23, 2022, Advanced Training Program on the Safe use of Fluoroscope. Certified by Fluorosafety. CME: 8 hours Category 1
- March 28, 2022: Establishing a Patient Safety Program in Fluoroscopy. Certified by FluoroSafety. CME: 2 hours, category 1.
- December 15, 2019: Basic Training on the Safe Use of Fluoroscopy: Course # E2019-3, CME 1 – 4 hours, FluoroSafety Certification.

## Past Employments:
July 1999 – Dec, 2000: Director Pain Control Center, Clark Regional Medical Center, Winchester, KY 40391
January 21, 2001 – February 21, 2002: Medical Director, Ohio Valley Chronic Pain Center, U.S. Highway 42W -- S Warsaw, KY 41095

## Hospital Affiliations:
January 19, 2001 – ongoing) St. Elizabeth Medical Center, Medical Village Drive, Edgewood, KY 41017 (full admitting privileges)
January 1, 2019 - The Christ Hospital Network, Cincinnati, OH. Community affiliate Staff-Non Privileged.

## RESIDENCY & FELLOWSHIP TRAINING IN THE USA:

PRAGYA B GUPTA, MD  2

094

NOT ORIGINAL
Item 9
Page 216

DOCUMENT

PM

03/30/2026 04:22:14

85787

- July 1994 – June 1995: Internship - **General Surgery, University of Illinois** – Metro Group of Hospital General Surgery Program. Illinois Masonic Medical Center, 836 W Wellington Avenue, Chicago, IL 60657-5193. Tel: 773-296-5347, Program Director: Yosef H Pilch, MD
- July 1995 – June 1998: Residency/ Senior Resident – Anesthesiology, **Tufts Medical Center,** 750 Washington Street, Boston, Box 298, MA 02111; 617-636-9303. W Heinrich Wurm M.D. Program Director
- July 1998 – June 1999: Fellowship – Pain Medicine. **Tufts Medical Center,** 750 Washington Street, Box 298; Boston, MA 02111. Tel 617-636-9303. Program Director: W Heinrich Wurm, M.D.

## POSTGRADUATE TRAINING IN THE UNITED KINGDOME

- Jan 1, 1990 – March 31, 1990; Clinical Clerkship, Dept of Accident and Emergency, Rotherham District General Hospital, Rotherham S60 2UD, UK
- April 1, 1990 - January 31, 1991: Senior House Officer, Dept. of Accident and Emergency, Rotherham District General Hospital, Moorgate Road, Rotherham S60 2UD
- February 1, 1991 – July 31, 1991: Senior House Officer, Dept. of Orthopedics, Rotherham District General Hospital, Moorgate Road, Rotherham, S60 2UD
- August 1, 1991 – July 31, 1992; Senior House Office, Dept. of General Surgery, Rotherham District General Hospital, Moorgate Road, Rotherham, S60 2UD
- September 1, 1992 – January 25, 1994; Senior House Officer, Department of General Surgery, Torbay General Hospital, Lawes Bridge, Torquay, TQ2 7AA

### Staff grade Position in General Surgery:
**January 27, 1994 – June 15, 1994,** Staff grade General Surgeon, Dunoon General Hospital, Dunoon, Scotland, Argyll, and Bute unit, Tigh Na Linne, Lochgilphead, Argyll PA31 8LE UK

### Post-Graduate Training and private practice in India (After graduating from Medical School):
- 08/16/1983 – 02/15/1984: Transitional Rotation in Medicine, Surgery, OB and Gyn, R.G. Kar Medical College and Hospital, Calcutta.
- 08/16/1984 – 02/15/1986: Senior House Officer, General Surgery, R.G. Kar Medical College & Hospital, 1, Khudiram Bose Sarani, Calcutta, 700 004, India. 033-25557656
- 02/16/1986 – 10/30/1986: General Practice, EC 73 Sector 1, Salt Lake City, Calcutta, India.
- 11/01/1986 – 04/15/1987: General Surgery, Senior House Officer, S.S.K.M. Hospital and Institute of Postgraduate Medical Research, 244 A.J.C. Bose Road, Calcutta 700020, India
- 04/16/1987- 03/02/1988: General Practice, EC 73 Sector 1, Salt Lake City, Calcutta, India.
- 03/26/1988- 04/09/89: General Surgery Residency, Sher-I-Kashmir Institute, Medical Science, P.O. Box 27, Soura, Srinagar, 190011, India.
- 05/01/1989 – 10/30/1989: General Practice EC73, Sector 1, Salt Lake City Calcutta, India.
- 11/01/1989 – 12/31/1989: Preparatory leave for taking the Professional and Linguistic Assessment Exam (PLAB), United Kingdom.

### LIST of the Interventional Pain Procedures routinely performed in clinical practice:

- Balloon Kyphoplasty
- Diagnostic provocation, pressure-controlled Discogram
- Intradiscal therapies (PRP, Stem Cells implantation- implanted stem cells as a part of Clinical trial)
- PRP treatment for Tendinitis, tendon tear, rupture, and I.A. injection for DJD (USG).
- Spinal Cord Stimulation trial and implant.
- Implantation of Intrathecal Drug Delivery Device.
- **Ultrasound-guided procedures** include Stellate Ganglion block, Serratus Anterior Plane block, Major

PRAGYA B GUPTA, MD  **3**

095

NOT ORIGINAL
DOCUMENT
PM
03/28/2026 04:22:14
85787
Item 9
Page 217

joint injections, Interscalene blocks, paravertebral blocks, thoracic and cervical facet joint blocks, etc., Adductor canal block, Shoulder joint (suprascapular and axillary nerve) and Knee joint block (IPAC).

- Peripheral Nerve Stimulation under USG for painful neuropathic conditions.
- Radiofrequency Neurotomy of Cervical and Lumbar Z joints and Thoracic Z joints where possible.
- Fluoroscopy-guided diagnostic and therapeutic Cervical, Thoracic, and lumbar T.F. injections, medial branch blocks, joint injections, Caudal epidural Neuroplasty, LSPB, Pelvic Plexus blocks, Splanchnic nerve block, Celiac plexus block, Ganglion Impar block, etc.

## Pain Medicine Ultrasonography Training:

- August 17 – 18, 2013: World Academy of Pain Medicine Ultrasonography (previously AAPMU); Level 2, advanced ultrasound techniques in pain medicine, (16 category 1 CME), Phoenix, Arizona.
- March 9 - 10, 2013; World Academy of Pain Medicine Ultrasonography (previously AAPMU);
- Level 3, 16 hours CME-category 1) Henderson, Nevada.
- February 9, 2013; World Academy of Pain Medicine Ultrasonography (previously AAPMU); Level 1, 8 hours CME-category 1) Henderson, Nevada.
- October 2015; World Academy of Pain Medicine Ultrasonography (previously AAPMU); Level 2, 16 hours CME-category 1, Chicago, IL.

## Medicine Assisted Treatment for Opioid use disorder waiver Courses

- October 5, 2008: Suboxone prescribing Certification course (SAMHSA accredited), Lexington, KY. CME-1: 8 Hours.
- October 15, 2017: Office-Based Treatment of Opioid Dependence, American Academy of Addiction Psychiatry Certification. 8 AMA PRA Category 1 Credit
- **November 22, 2020: 8-hour** online MAT Waiver Course, American Academy of Addiction Psychiatry. 8 hours of CME AMA-1
- Nov 2020: Psychiatric Comorbidities: Diagnosis and Treatment of Comorbid Psychiatric Disorders and Opioid Use disorders – Revised; 1.50 CME AMA Category 1.
- Nov 2020: Medication for Opioid Use Disorder; American Academy of Addiction Psychiatry; CME 1.5, AMA 1
- Nov 2020: Methadone and Buprenorphine Associated Drug-Drug interactions; American Academy of Addiction Psychiatry; CME 1, AMA Category 1.
- Nov 11, 2022: American Academy of Addiction Psychiatry PCSS clinical roundtable: The neurobiology of Addiction. CME 1, Category 1.

## Publication:
Spontaneous Rupture of Spleen Secondary to Metastatic Carcinoma. PB Gupta & L Harvey, British Journal of Surgery. Vol 80, May 1993, 613
Book Review: Sickle Cell Pain by Samir Ballas, IASP Press Seattle. PBGupta, DBCarr; Acute Pain (International Journal of Acute Pain Management). Volume 1 (5) Dec.1998.

Pending Publication:
Chapter Title: Managing Outpatient Workplace Violence

## Research Interest:

Role of regenerative medicine in treating Degenerative disc and joint disease.

PRAGYA B GUPTA, MD  4

096

NOT ORIGINAL
Item 9
Page 218
03/30/2026 04:22:14

85787

Peripheral neurostimulation for neuropathic pain
Spinal cord neuromodulation for chronic pain.

**MEMBERSHIP:**

- Spine Intervention Society, Active since 2000
- American Academy of Pain Medicine
- North American Neuromodulation Society
- American Society of Regional Anesthesia
- Massachusetts Medical Society
- American Medical Association

## LIST OF PHASE II-IV CLINICAL TRIALS CONDUCTED AS A PRINCIPAL INVESTIGATOR:

**Opioid-Induced Constipation:**

1. A safety and efficacy evaluation of BLI801 Laxative in Adults Experiencing Non-Idiopathic constipation.
2. A phase 3 randomized, double-blind, placebo-controlled, parallel-group study of NALDEMEDINE in the treatment of opioid-induced constipation in subjects with nonmalignant chronic pain receiving opioid therapy.
3. A phase 3 randomized, double-blind, double-dummy, placebo-controlled, active-controlled, parallel-group, multicenter trial of oxycodone/ naloxone controlled release tablet (OXN) to assess the analgesic efficacy (compared to placebo) and the management of opioid-induced constipation (compared to oxycodone controlled-release tablets (OXY) in opioid experienced subjects with uncontrolled moderate to severe chronic low back pain and a history of opioid-induced constipation who required around-the-clock opioid therapy.

**Sciatica Study:**

4. A phase 2A, open, sequential, dose-escalation study of the pharmacokinetics, safety, and preliminary efficacy of MDT – 15 in subjects with lumbosacral radiculopathy.
5. A Prospective Multicenter Randomized Double-Blind Sham Controlled study to evaluate the efficacy and safety of Clonidine Micro pellets for the treatment of pain associated with lumbosacral radiculopathy in adults
6. A Multicenter, Randomized, Double-blind, Sham-controlled, Comparative Study of SI-6603(condoliase) in Subjects with Lumbar Disc Herniation (Phase 3).

**LOW BACK PAIN – Degenerative Disc Disease- (STEM CELL CLINICAL TRIALS):**

7. A phase 3 prospective, multicenter, randomized, double-blind, placebo-controlled study to evaluate the efficacy and safety of a single injection of **Rexlemastrocel-L** alone or combined with hyaluronic acid in subjects with chronic discogenic lumbar back pain through 12 months.

8. Phase I, first in the human, randomized, double-blind, vehicle and placebo-controlled, parallel-group, multi-center study in subjects with single-level, symptomatic lumbar intervertebral disc degeneration (>6 months) and unresponsive to conservative therapy for at least 3 months. The study will compare single intradiscal injections of high and low-dose IDCT with two control groups (saline, Sodium Hyaluronate).

9. A prospective, randomized, double-blinded, vehicle- and placebo-controlled, multicenter study to evaluate the safety and preliminary efficacy of IDCT in subjects with single-level, symptomatic lumbar intervertebral disc degeneration.

PRAGYA B GUPTA, MD    5

NOT ORIGINAL
Item 9
Page 219

DOCUMENT

PM

03/30/2026 04:22:14

**LOW BACK PAIN – Degenerative Disc Disease / Non-Specific Low back pain**

10. A phase 3 randomized, double-blind, placebo and active-controlled multicenter, parallel-group study of the analgesic efficacy and safety of subcutaneous administration of Tanezumab in the adult subjects with chronic low back pain.

11. A phase 3 randomized, double-blind, double-dummy, placebo-controlled, active-controlled, parallel-group, multicenter trial of oxycodone/ naloxone controlled release tablet (OXN) to assess the analgesic efficacy (compared to placebo) and the management of opioid-induced constipation (compared to oxycodone controlled-release tablets (OXY) in opioid experienced subjects with uncontrolled moderate to severe chronic low back pain and a history of opioid-induced constipation who required around-the-clock opioid therapy.

12. A Phase III, Randomized, Double-Blind, Placebo-Controlled, Enriched-Enrollment Withdrawal, Multicenter Study to Evaluate the Efficacy and Safety of a Long-Acting Subcutaneous Injectable Depot of Buprenorphine (CAM2038) in Subjects with Moderate to Severe Chronic Low Back Pain Currently Treated with Daily Opioid.

13. A phase 3, Randomized, Double-blind, Placebo-controlled Study to Evaluate the Efficacy and Safety of Fasinumab in Patients with Moderate to Severe Chronic Low back pain and Osteoarthritis of Hip or Knee ( Study was put on hold in (2018 March).

**IMPLANTABLE SPINAL CORD STIMULATION TRIAL:**

14. Medtronic products surveillance registry version 6 (PSR-V6). The purpose of the PSR platform is to provide continuing evaluation and periodic reporting of the safety and effectiveness of market-released products for their intended use. Products surveillance is the systematic collection, analysis, and interpretation of performance data as well as its dissemination and application. Phase 4 study (Chronic Neuropathic pain).

**Post Traumatic Neuropathic Pain**

15. A phase 3 randomized double-blind placebo-controlled parallel-group study of the efficacy and safety of pregabalin (twice a day) in subjects with posttraumatic peripheral neuropathic pain.

16. SPRINT peripheral nerve stimulation for the treatment of Neuropathic post-Amputation Pain in a randomized, double-blinded, placebo-controlled, multicenter trial.

**Migraine Study:**

17. A phase IIb randomized, double-blind, placebo-controlled study of LY2951742 in patients with episodic migraine.

18. A phase 3, randomized, double-blind, and placebo-controlled study of LY2951742. Patient with episodic migraine.

19. A phase 3, randomized double-blind, parallel-group, multicenter placebo-controlled dose-ranging study to evaluate the efficacy and safety of AMG 334 in migraine prevention.

20. A phase 3, multicenter, randomized, double-blind, placebo-controlled, parallel-group study to evaluate the efficacy, safety, and tolerability of multiple dosing regimens of oral ATOGEPANT for the prevention of migraine in patients with episodic migraine.

21. 15Q-MC-BOO4/2016-4215 Observational Study Protocol: Protocol 15Q-MC-B004: Preventive Treatment of migraine outcomes for Patients in real-world Healthcare systems (TRIUMPH). GPOR WE-2016-4215.

**Diabetes Mellitus:**

22. A phase 3, randomized, 16 weeks, multiphase, double-blind, placebo-controlled dose-ranging study to evaluate the glycemic effect, safety, and tolerability of metformin delayed-release in subjects with type II diabetes mellitus

**Osteoarthritis Joint Pain- Degenerative Joint Disease**

23. A phase 3, randomized, 16 weeks, multi-phase, double-blind, placebo-controlled study to evaluate the efficacy, safety, and tolerability of Fulranumab as a monotherapy in subjects with signs and symptoms of osteoarthritis of

PRAGYA B GUPTA, MD   6

NOT ORIGINAL
DOCUMENT
PM
Item 9
Page 220
03/30/2026 04:22:14

the hip or knee. A phase 3 randomized, double-blind, placebo and active-controlled multicenter, parallel-group study of the analgesic efficacy and safety of subcutaneous administration of **Tanezumab** in the adult subjects with chronic low back pain.

24. A phase 3 randomized, double-blind, double-dummy, placebo-controlled, active-controlled, parallel-group, multicenter trial of oxycodone/ naloxone controlled release tablet (OXN) to assess the analgesic efficacy (compared to placebo) and the management of opioid-induced constipation (compared to oxycodone controlled-release tablets (OXY) in opioid experienced subjects with uncontrolled moderate to severe chronic low back pain and a history of opioid-induced constipation who required around-the-clock opioid therapy.

25. A phase 2, randomized, active, and placebo-controlled, dose-ranging study to evaluate the efficacy and safety of intra-articular Resiniferatoxin to treat moderate to server pain from knee osteoarthritis.

**Opioid Dependence**

26. Induction, Stabilization, adherence, and Retention Trial (START)- a randomized non-inferiority multicenter study to assess early treatment efficacy of OX219 (combination of **Buprenorphine** and Naloxone) and **Suboxone** and to explore switching between treatments. Phase 3 Study.

27. A randomized, double-blind, placebo-controlled pilot study to evaluate the safety and effectiveness of lucemyra in the treatment of opioid withdrawal during an opioid taper in subjects with chronic non-cancer pain.

28. A randomized, open-label, parallel-group study to evaluate the efficacy of the digital therapeutic OXD01 (MODIA™) in combination with sublingual buprenorphine/naloxone for the treatment of opioid use disorder

**Depression:**

29. ALK5461-208, A phase 3 multicenter study of the long-term safety and tolerability of ALKS 5461 for the adjunctive treatment of major depressive disorder in adults who have been an inadequate response to antidepressant therapy (the FORWARD-2 Study).

30. ALK5461-208, A phase 3 multicenter study of the long-term safety and tolerability of ALKS 5461 for the adjunctive treatment of major depressive disorder in adults who have been an inadequate response to antidepressant therapy (the FORWARD-3 Study).

31. The SPD 489-322 A phase 3, multicenter, randomized, double-blind, parallel-group, placebo-controlled, flexible-dose titration, efficacy, and safety study of SPD 489 in combination with an antidepressant in the treatment of adults with major depressive disorder with inadequate response to prospective treatment with an antidepressant (Sub-Investigator).

32. The SPD489-322 A phase 3, open-label, multicenter, 12-month extension safety and tolerability study of SPD 489 in combination with an antidepressant in the treatment of adults with major depressive disorder with residual symptoms of inadequate response following treatment with an anti-depressant (S.I.).

33. A Phase II a double-blind, placebo-controlled multicenter study of Sirukumab as adjunctive treatment to a monoaminergic antidepressant in an adult with Major Depressive Disorder (SI).

34. A multicenter, randomized, double-blind, parallel-group, placebo-controlled study evaluating the efficacy, safety, and pharmacokinetics of SAGE-547 injection in treating adult female subjects with severe postpartum depression and adult female subjects with moderate postpartum depression. 547-PPD-202.

35. A multicenter, double-blind, placebo-controlled study evaluating the efficacy, safety, tolerability, and pharmacokinetics of Brexanolone in the treatment of adolescent female subjects with postpartum depression. Protocol Number: 547-PPD-304.

**MUSCLE SPASM:**

36. Double-blind, randomized, placebo-controlled, multiple-dose parallel-group study of the efficacy and safety of multiple doses of Tolperisone administered in multiple doses three times daily in 400 male and female patients

PRAGYA B GUPTA, MD    7

NOT ORIGINAL

DOCUMENT

PM

Item 9
Page 221
03/30/2026 04:22:14

85787

## INTERSTITIAL CYSTITIS:

37. Multicenter, Randomized, Double-blind, Placebo-controlled, Crossover Study to Investigate the Effect of VI17957 in Female subjects with Interstitial /cystitis Bladder Pain Syndrome.

## COMPLEX REGIONAL PAIN SYNDROME:

38. Randomized, double-blind, placebo-controlled trial investigating the efficacy and safety of intravenous neridronic acid in subjects with complex regional pain syndrome (CRPS).

## CANNABIS WITHDRAWAL SYNDROME:

39. A phase 2, multicenter, randomized, double-blind, multiple–dose, placebo-controlled clinical trial of titrating doses of nabilone with gabapentin for the mitigation of cannabis withdrawal symptoms.

## MALPRACTICE COVERAGE:

- Effective from 01/02/2023 to 01/02/2024 **(Retro from 1/2/2002)** Claim made coverage, $1M/ $ 3M.
  The Medical Protective Company, 5814 Reed Road, Fort Wayne, IN 46835, Tel: 800 463 3776 Fax: 913 789 4918, Policy Number: 671160.
  Agent: Barb Blankenship, CISR, Commercial Lines Account Manager, 1061 N. University Blvd., Middletown, OH 45044, PO Box 911, Middletown, OH 45044, 513-424-2481(O), 513-425-9601(F).

- Effective from 01/01/2001 to 01/01/2002, $1M/ $3M Occurrence Coverage
  OHIC Insurance Co, 155 East Broad Street, 13th Floor, Columbus, OH 43215, Tel: 614 221 7777, Fax: 614 461 1120, Policy Number: 01-9999-6125
  Agent: Inmon Insurance Corp, 7216 Shefford Ln, Louisville, KY 40242

- Effective from: 8/24/1999 to 8/24/2001/ $1M/$3M, Claim Made Coverage ; Doctors Insurance Reciprocal; Policy Number: KDPL 016498-2/00
  Agent: Coverage Option Associates; PO Box 436629; Louisville, KY 40253-6629

- Effective from: 10/01/1995 to 9/30/1999; Professional Liability, Modified Claims made; $2.5M/$5M
  RI Sound Enterprises Insurance Co, Ltd. (RISE); Life Span Risk Services, Inc, The CORO Building, Suite 170, 167 Point Street, Providence, RI 02903; Tel: 401 444 8273, Fax: 401 444 8963
  Lifespan Malpractice Plan: 1999 RISE **Policy for Employed Physician-in-training.** New England Medica; Center, Inc; LC2-1998/99.

## REFERENCES:

Dr. Zeeshan Tayeb, MD
3328 Westbourne Dr.
Cincinnati, OH 45248
Tel: 513-807-3564
█████████████

Dr. Robert Edward Hurd, MD
3844 Victory Parkway
Cincinnati, OH 45207-1040
Tel: (513) 498-7845
█████████████

PRAGYA B GUPTA, MD   8

DOCUMENT

PM

Dr. Maria Burton, MD
2697 Fiskburg Road
De Mossville, KY 41033
Tel: (859) 250-3080

Dr. Charles Roberts, M.D. Tel: (859) 3012663
Ortho Cincy, Interventional Pain Specialist
560 S Loop Road, Fort Mitchell, KY 41017

NOT ORIGINAL
Item 9
Page 222
03/30/2026 04:22:14

85787

PRAGYA B GUPTA, MD  9

101

NOT ORIGINAL
DOCUMENT

PM

Item 9
Page 323
Page 1 of 6
03/30/2026 04:22:14

85787

PRAGYA B. GUPTA, MD, FRCS, DABPM.

## LIST OF CME & EDUCATIONAL COURSES:

- 2003 11th Spine Intervention Society, Orlando FL, CME-1: 17 hours
- 2003 Annual Meeting American Academy of Pain Medicine, Orlando, FL CME-1: 42 hours
- 2004 12th Spine Intervention Society, Maui, Hawaii, CME-1, 17hours
- 2005 International intradiscal Therapy Society, San Diego, CA. CME-1: 15 hours
- 2006 14th Spine Intervention Society, Salt Lake City, UT. CME-1: 17hours
- 2006 Dec 7 -10, North American Neuromodulation Society, Las Vegas, NV. CME-1: 18 Hours
- 2007 July 18 -22, 15th Spine Intervention Society, Baltimore. CME-1: 18 hours
- 2008 July 23 - 26, 16th Spine Intervention Society, Las Vegas, NV. CME-1: 27 Hours
- 2009 July 23 - 25, 17th Spine Intervention Society, Toronto, Canada. CME-1: 25.4hours
- 2010 July 13 -17, 18th Spine Intervention Society, Grand Wailea, Maui, HI. CME-1: 23 hours
- 2011 March 24-27, American Academy of Pain Medicine, Washington, DC. CME-1: 16 hours
- 2011 August 10 -13, 19th Spine Intervention Society, Chicago. IL. CME-1: 18.75 hours.
- 2013 July 16 - 20, 21't Spine Intervention Society, New York City, NY. CME-1: 19 hours.
- 2013 Dec 8, North American Neuromodulation Society, Las Vegas, NV. CME-1: 4hours
- 2014 July 28 -Aug 3, 22nd Spine Intervention Society & Evidence-Based Medicine, Orlando, FL
  1. CME-1: 28 hours.
- 2015 July 28 -August 1, 23rd Spine Intervention Society &
  Evidence Based Medicine 11, Las Vegas, NV. CME-1: 27 hours.
- 2016 July 28 - 30, 24th Spine Intervention Society, New Orleans, LA, CME-1: 18.75 hours.
- 2017 July 19 - 22, 25th Spine Intervention Society, San Francisco, CA, CME-1: 18.75 hours.
- 2018 August 15 -18, 2018 26th Spine intervention Society, Chicago, CME 18.5 hours.
- 2019 August 14-17, 27th Spine Intervention Society Annual Scientific Conference, NYC, CME 19 hours Category 1.
- 2019 Nov 14 -16, 18th Annual Pain Medicine Meeting, ASRA, New Orleans, LA, CME: 23.75 AMA Cat 1 (13.75 hours claimed for MOCA 2.0 Part II CME).
- August 18 – 21, 2021: Spine Intervention Society Annual General Session, Washington, DC; 14 AMA PRA Category 1 Credits.

NOT ORIGINAL

DOCUMENT

PM

Item 9
Page 224
Page 2 of 6

03/30/2026 04:22:14

85787

**PRAGYA B. GUPTA, MD, FRCS, DABPM.**

- April 2, 2022: Diagnosis, Treatment, and Care of Alzheimer's Disease and Related Dementias. 3.5 AMA PRA Category 1; Massachusetts Medical Society.
- Nov 17 – 19, 2022 21st Annual Pain Medicine Meeting – ASRA, Orlando FL, 22.25 hours CME 1
- October 7, 2022: Duty to Report to the State Medical Board of Ohio, Certificate of Course Completion.

### Opioid and HB 1 MANDATED Courses:

- August 22, 2010: Responsible Opioid Prescribing: A physician' guide. University of Wisconsin School of Medicine. CME-1: 7.25 hours.
- June 10 – 12, 2012: International Conference on Opioid, Harvard Medical School, Boston, MA. CME-1, 16 hours.
- September 28, 2014: Scope of Pain; Safe and competent Opioid Prescribing Education. Category 1: 3 hours, Boston University.
- September 9, 10 2017, Opioid Prescribing and Addiction, 5 CME - AMA PRA Category 1. The University of Kentucky College of Medicine, Lexington, KY
- Sept 9, 2017: Heroin: An old Dog with new tricks CME 1, category.
- Sept 10, 2017: Substance Abuse Treatment as an integral part of the health care system: CME 1, Category1
- Treating women with opioid use disorders: A focus on Pregnant and parenting women, CME 1 Category 1
- Therapeutic uses of KASPER and Urine Drug Testing in clinical Practice, CME: 0.75, Category 1
- Responding to the prescription opioid and heroin crisis, An Epidemic of Addiction, CME: 1.25, category 1.
- August 7, 2018 Louisville, KY; Practioner's Diversion Awareness Conference; Organized by KMBL & DEA.
- April 15, 2019: Scope of Pain: Safer/ Competent Opioid Prescribing Education. Boston University School of Medicine. CME category 1 – 2.
- April 28, 2019: A patient-centered approach to opioid tapering, BU School of Medicine, 0.5 CME 1.
- 7/29/2019: Evidence-Based Guidance on Responsible Prescribing, Effective Management, Harm Reduction, CDC Opioid Prescribing Guidelines for Chronic Pain, Prescriber Education for Opioid. Analgesics, End-of-Life: Domains and Communication: **12.0 AMA, Category 1.**
- 11/22/2020: Harm Reduction and the opioid Syndemic. 0.5 AMA 1, CE central, UKMC
- 11/22/2020: Podcast 2: Creating a Pain Treatment Plan 0.5 AMA 1, CE Central UKMC
- 11/22/2020: Tips for Prescribing / Dispensing Controlled Substances within the Law, 0.5 AMA 1, CE Central UKMC
- 11/22/2020: Gabapentin: Possible Misuses Leads to Scheduling in Kentucky, 0.75 AMA 1, CE Central KY
- 11/22/2020: Substance Use Disorders in Your Medical Practice: Treatment and Referral Update: 1 AMA 1, CE Central UKMC
- 11/21/2020: Drug Conviction Data in KASPER: What is the prescriber to do? 1.50 AMA 1, CE Central UKMC.

NOT ORIGINAL
DOCUMENT
PM
Item 9
Page 225
Page 3 of 6
03/30/2026 04:22:14

PRAGYA B. GUPTA, MD, FRCS, DABPM.

- **11/23/2020: Clinical Considerations of Substance Abuse and Critical Components of Proper Prescribing Series-Session One. CME 1, Category 1 Kentucky Medical Association**
- 11/23/2020: **Clinical Considerations of Substance Abuse and Critical Components of Proper Prescribing Series-Session Two. CME 1, Category 1 Kentucky Medical Association**

## Advanced Cardiac Life Support Provider Course:

- October 1993: Advanced Trauma Life Support Course, Oxford University, Oxford, United Kingdom.
- 2002: St. Luke Hospital, Florence, KY CME: 2 hours
- 2002: Neonatal Resuscitation Program (NRP), The Christ Hospital, Cincinnati, OH.
- 2004: St. Luke Hospital, Ft. Thomas, KY CME: 2 hours
- 2006: St. Luke Hospital, Ft. Thomas, KY CME: 2 hours
- 2008: Christ Hospital, Cincinnati, OH, CME: 2 hours
- 2010: Christ Hospital, Cincinnati, OH, CME: 5 hours
- 2012: St. Elizabeth Medical Center, North Unit, Covington, KY. CME 5 hours
- 2014: Northern Kentucky Emergency Medical Service, KY 41075, CME: 2 hours
- 2015: University Hospital, OH 03258, Cincinnati OH 45219. CME 5 hours
- 2016: Northern Kentucky Emergency Medical Service, KY 41075, CME: 2 hours.
- 2018: United Medical Education CME: 4 Hours Cat 1.
- 2020: United Medical Education *ACLS Provider Recertification Credit CME: 4 Category 1.*
- 2022: United Medical Education *ACLS Provider Recertification Credit CME: 4 Category 1.*

## Office-based Treatment of Opioid use disorder (Buprenorphine / Suboxone) certification Courses:

- October 5, 2008: Suboxone prescribing Certification course (SAMHSA accredited), Lexington, KY. CME-1: 8 Hours.
- October 15, 2017: Office-Based Treatment of Opioid Dependence, American Academy of Addiction Psychiatry Certification. 8 AMA PRA Category 1 Credit
- **November 22, 2020: 8-hour** online MAT Waiver Course, American Academy of Addiction Psychiatry. 8 hours of CME AMA-1
- Nov 2020: Psychiatric Comorbidities: Diagnosis and Treatment of Comorbid Psychiatric Disorders and Opioid Use disorders – Revised; 1.50 CME AMA Category 1.
- Nov 2020: Medication for Opioid Use Disorder; American Academy of Addiction Psychiatry; CME 1.5, AMA 1
- Nov 2020: Methadone and Buprenorphine Associated Drug-Drug interactions; American Academy of Addiction Psychiatry; CME 1, AMA Category 1.
- Nov 11, 2022: American Academy of Addiction Psychiatry PCSS clinical roundtable: The neurobiology of Addiction. CME 1, Category 1.

104

NOT ORIGINAL
DOCUMENT

PM

Item 9
Page 226
Page 4 of 6

03/30/2026 04:22:14

85787

PRAGYA B. GUPTA, MD, FRCS, DABPM.

## Pain Medicine Ultrasonography Training:

- August 17 - 18, 2013: World Academy of Pain Medicine Ultrasonography (previously AAPMU); Level 2, advanced ultrasound techniques in pain medicine, (16 category 1 CME), Phoenix, Arizona.
- March 9 – 10, 2013; World Academy of Pain Medicine Ultrasonography (previously AAPMU);
- Level 3, 16 hours CME-category 1) Henderson, Nevada.
- February 9, 2013; World Academy of Pain Medicine Ultrasonography (previously AAPMU); Level 1, 8 hours CME-category 1) Henderson, Nevada.
- October 2015; World Academy of Pain Medicine Ultrasonography (previously AAPMU); Level 2, 16 hours CME-category 1, Chicago, IL.

## Risk Management Courses:

- October 2007: Risk management, Failure to diagnose, Medical Protective sponsored, Cincinnati, OH. CME-1: 8.5 hours
- April 21, 2010 & July 22, 2010: Risk Management course. Repairing difficult Patient Relationships. Medical Protective sponsored. CME -1, 8.5 hours, Cincinnati OH.
- October 23, 2014: Risk Management Course. Disclosure of Medical Errors, Medical Protective sponsored. CME 7.5 hours. Cincinnati, OH.
- Nov 5 2018; Risk Management Consult: Managing Disruptive Physician Behavior; CME 5 Category 1 AMA
- 2018: Risk Management Consult: Pain Management 2nd edition; CME 6 Category 1 AMA.
- 2019: 12/15/2019 Basic Training on the Safe Use of Fluoroscopy. Approved for 1.8 Category 1 Risk management CME credits.
- November 24, 2020; Risk Management Focus: Pain Management – Medical Risk Management. CME – 1 Category 1.
- November 24, 2020: Risk Management Focus: Electronic Medicine – Medical Risk Management CME – 5, Category 1.

## Sexual and Domestic Violence:

- Training and education in sexual and domestic violence compliance with Chapter 260, Sept 10, 2020, Commonwealth of Massachusetts department of health.

## Fluoroscopy Training and Certification:

- July 1, 2022: Certified California Fluoroscopy X-Ray Supervisor and Operator - Valid 7/31/2024. California Department of Public Health. Permit # RHC00206794
- March 23, 2022, Advanced Training Program on the Safe use of Fluoroscope. Certified by Fluorosafety. CME: 8 hours Category 1
- March 28, 2022: Establishing a Patient Safety Program in Fluoroscopy. Certified by FluoroSafety. CME: 2 hours, category 1.

NOT ORIGINAL DOCUMENT

PM

Item 9
Page 227
Page 5 of 6

03/30/2026 04:22:14

**PRAGYA B. GUPTA, MD, FRCS, DABPM.**

- December 15, 2019: Basic Training on the Safe Use of Fluoroscopy: Course # E2019-3, CME 1 – 4 hours, FluoroSafety Certification.

85787

-

## CLINICAL RESEARCH CERTIFICATION:

- **Nov 2022-Nov 2024: Certified Principal Investigator** (Initial Certification: 9/2016), Academy of Clinical Research Professionals – ACRP – active.
- **2016:** Fellow of the Academy of Physicians in Clinical Research- APCR.
- **24 Oct 2022- 24 Oct 2024. GCP CERTIFICATION - CITI** – Copernicus group IRB); 6 AMA Cat 1 credits (Albert Einstein College of Medicine Montefiore,
- **GCP Training: November 1, 2019:** Clinical Research Training for Physicians, sponsored by Encore Research Group (TransCelerate BioPharma, Inc).
- **FDA Clinical Investigator Training Course: Nov 13 – 15, 2018,** FDA Center for Drug Development and Research, 10903 New Hampshire Avenue, Silver Spring, MD 20993.

## EVIDENCE-BASED MEDICINE CERTIFICATION:

**07/2015:** Appraisal of Evidence in Studies of Diagnostic Tests and Strategies, Evidence-Based Medicine Part 1 & 2. Spine Intervention Society, Educational Program.

## MAT WAIVER CERTIFICATION:

Certification of completion American Academy of Addiction Psychiatry MAT waiver course, November 22, 2020. **DATA2000 approval for 275 patients.**

## HIV & AIDS updates KY State Mandated course:

- March 10, 2003: HIV/AIDS update 2001 -- Twenty years of HIV in the US marking a milestone. KY CHS course # 1103-1528-M Course Department of Pharmacy UKMC.
- August 12, 2012: HIV certification for Medical Providers at CE Central, Lexington, KY

## Hands-on Cadaver Spine Intervention Courses and Training:

- May 31, 2014: Cooled RF lesioning procedures for chronic pain management. Intervertebral disc Biacuplasty, cervical, thoracic, and lumbar Z joints, Sacro-iliac joint and peripheral denervation (genicular, obturator, and femoral articular branches). Barrow Neurological Institute, St. Joseph's Hospital and medical center, 350 W Thomas Road, Phoenix, Arizona 85013.
- April 26, 2014: PRP Autologous Stem Cell Therapy course. Use of BMAC/PRP for treatment of Soft tissue disease, Park City, Utah. Non-CME
- November 23, 2013: Spine Endoscopy Workshop (Endoscopic discectomy and endoscopic dorsal ramus neurectomy or rhizotomy), Richard Wolf Didactic instruction and hands on training.
- March 16, 2013: **Kyphon Balloon Kyphoplasty** Physician Training, Memphis TN
- February 13, 2013: Percutaneous Discectomy course, Elliquence, New York, NY

NOT ORIGINAL
Item 9
Page 9 of 8
03/30/2026 04:22:14

85787

DOCUMENT

PM

**PRAGYA B. GUPTA, MD, FRCS, DABPM.**

- June 2011: Intrathecal Drug Delivery device training, Medtronic, Chicago, IL
- April 30, 2011: Vertebral Augmentation Course/ **Kyphoplasty**, Stryker, Atlanta, GA.
- September 2008: SCS implantation techniques Advanced Bionics, NYU ALBERT Einstein Medical Center, NYC, NY
- March 24, 2007: SCS implant techniques, Advanced Bionics, Baltimore, MD
- January 2007: Vertebral Augmentation Course/ **Kyphoplasty**, Stryker, University of Cincinnati, OH.
- February 24 – 25, 2006 4th European Course on Minimally Invasive Spine Surgery, Monastier di Treviso, Park Hotel, Villafiorita, Italy.
- November 2001: Phase 5 Spine Intervention Society course (SIS), RF neurotomy and Intradiscal Electro Thermal Coagulation, Percutaneous disc decompression cadaver workshop, Austin, TX CME: 13 hours Category 1.
- October 2001: Spine Intervention Society (SIS) Discography workshop using Cadavers, CME 13 hours (Category 1). MERI, Memphis, TN.
- June 2001: Minimally Invasive Surgical Strategies, Cadaver workshop; IDET, Discography, and **Vertebroplasty** -- Wilmington, MA, 16 Hours Category 1 CME.
- March 2001: Phase 3, Cervical spine injection workshop using Cadaver; Chicago, IL Spine Intervention Society (SIS) CME – 1, 13 Hours.
- Sept 2000: Interactive Surgical Training Skills Lab (Cadaver course), Maricopa Integrated Health System, Wilmington, MA. CME: Category 1, 15 hours.
- August 2000: Advanced Lumbar and Thoracic workshop (Cadaver)- Spine Intervention Society (SIS); Memphis, TN. CME -1: 13 Hours.
- Dec 1999: Interventional Pain Management Technique (Cadaver Course), Dallas, TX.

107

# Pain Management Consultants, LLC

1169 Eastern Parkway, Suite 2211 Louisville, KY 40217
Phone (502) 635-2775   Fax (502) 371-0475

DOCUMENT
PM

NOT ORIGINAL
Item 9
Jeffrey W. Berg, M.D.
Melissa A. Hoehler, APRN
03/30/2026 04:22:14

85787

To whom it may concern:                                                                  April 26, 2023

Case #:  15981
Patient Name: Wendy Fillhardt

I have been asked to respond to Dr. Gupta's answers to my board consultative report regarding his care of Wendy Fillhardt.  The question asked to me by Mr. Jon Marshall was have any of my opinions changed after reviewing Dr.Gupta's responses?  I have reviewed Wendy Fillhardt's medical records again and my conclusions have changed for the following reasons.

Wendy Fillhardt had a total of five procedures where she was administered intravenous sedation with midazolam 5 mg.  This dosage is documented in the medical record and acknowledged by Dr. Gupta in his response to Wendy Fillhardt's grievance (answer number 3).  Dr. Gupta's patient encounters list the billing codes used for each visit.  In all instances where midazolam sedation was administered the billing was listed as moderate sedation.  Dr. Gupta has indicated in his response to my report that he was using mild sedation (answer 2).

Dr. Gupta states that Wendy Fillhardt's intravenous line infiltrated after one of her cervical epidurals in September 2021 without residual problems.  He also says he has educated his staff to properly fill out anesthesia monitoring forms.  I have previously stated that the guidelines for intravenous sedation require that a registered nurse be present as the anesthesia monitor to administer the sedation and, if necessary, start intravenous lines.  I have included in this report the latest guidelines for conscious sedation.

Most concerning to me is the recent information I have received regarding Donnie J. Thomas.  Wendy Fillhardt has stated that Mr. Thomas started at least one of her intravenous lines and had administered intravenous sedation to her.  Further review of Dr. Gupta's response (answer#1) to her grievance reveals by his own admission that he allows Mr. Thomas to administer intravenous midazolam.

My conclusion is Donnie J. Thomas is practicing medicine without a license.  This represents an immediate threat to the safety and health of the citizens of Kentucky.

Sincerely.

*Jeffrey W. Berg*

Jeffrey W. Berg M.D.

EXHIBIT # __5__



accredited by the
Joint Commission

108

NOT ORIGINAL
Item 9
Page 230
03/30/2026 04:22:14 PM
85787

DOCUMENT

An official website of the United States government
Here's how you know.

FULL TEXT LINKS

**ANESTHESIOLOGY**

Practice Guideline        Anesthesiology. 2018 Mar;128(3):437-479.
doi: 10.1097/ALN.0000000000002043.

# Practice Guidelines for Moderate Procedural Sedation and Analgesia 2018: A Report by the American Society of Anesthesiologists Task Force on Moderate Procedural Sedation and Analgesia, the American Association of Oral and Maxillofacial Surgeons, American College of Radiology, American Dental Association, American Society of Dentist Anesthesiologists, and Society of Interventional Radiology

*No authors listed*

PMID: 29334501   DOI: 10.1097/ALN 0000000000002043
Free article

*No abstract available*

## Comment in

The Newest Threat to Emergency Department Procedural Sedation.
Green SM, Roback MG, Krauss BS.
Ann Emerg Med 2018 Aug 72:2):115-119. doi 10.1016/j.annemergmed 2017 12.008 Epub 2018 Feb 8
PMID 29429580 No abstract available.

Questions about the Practice Management Guidelines for Moderate Sedation and Analgesia.
Cattano D.
Anesthesiology 2018 Oct;129(4):855 doi 10.1097/ALN.0000000000002405.
PMID: 30234594 No abstract available.

In Reply.
Apfelbaum JL, Connis RT.
Anesthesiology. 2018 Oct;129.4) 855-856. doi. 10.1097/ALN 0000000000002406
PMID: 30234595 No abstract available

## Related information

Cited in Books

## LinkOut - more resources

**Full Text Sources**

NOT ORIGINAL

4/14/23, 5:46 PM    Practice Guidelines Procedural Document

Item 9
Page 231

03/30/2026 04:22:14

85787

Ingenta plc
Ovid Technologies, Inc.
Silverchair Information Systems

Other Literature Sources
scite Smart Citations

Medical
ClinicalTrials.gov

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:22:14

85787

Item 9
Page 232

NCBI Bookshelf. A service of the National Library of Medicine, National Institutes of Health.

StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2023 Jan-.

## Procedural Sedation

Thomas Benzoni; Marco Cascella.

Author Information and Affiliations

Last Update: October 16, 2022.

### Continuing Education Activity

Procedural sedation permits the safe performance of procedures that a patient cannot tolerate in the fully conscious state. Through this activity, the practitioner will learn how to assess the airway by direct visual examination, tabulate risk factors by analysis of baseline risk, and will be able to properly choose a medication that we will get the patient safely through the proposed procedure.

**Objectives:**

- Outline the proper medication for procedural sedation based on specific patient risks.

- Describe the equipment, personnel, preparation, and technique in regards to procedural sedation.

- Review the potential complications and clinical significance of procedural sedation.

- Explain interprofessional team strategies for improving care coordination and communication to advance procedural sedation and improve outcomes.

Access free multiple choice questions on this topic.

### Introduction

Procedural sedation (PS), previously incorrectly referred to as 'conscious sedation,' refers to techniques, medications, and maneuvers performed to help a patient tolerate unpleasant or painful procedures, avoiding potential unwanted memories associated with such procedures.[1] Because the proper use of PS also aims to decrease the patient's perception of pain and is generally obtained through the administration of analgesics combined to a sedative, PS can also serve as procedural sedation analgesia (PSA). Furthermore, PS also increases the likelihood of a successful procedure while decreasing the time required to perform it. Additionally, PS increases safety for the patient and personnel attending the patient. These approaches include medications, psychological techniques, and or physical maneuvers to achieve the indented effect. According to the American College of Emergency Physicians (ACEP), PS is a *'technique of administering sedatives or dissociative agents with or without analgesics to induce a state that allows the patient to tolerate unpleasant procedures while maintaining cardiorespiratory function. PSA is intended to result in a depressed level of consciousness that allows the patient to maintain oxygenation and airway control independently.'*[2]

In various settings, the practice of PS (and PSA) has considerable variability, is practiced with varying degrees of skill, and has been the subject of controversy in the not-so-distant past. The practice of PSA, in fact, is not the exclusive preserve of anesthesia practitioners but is now routinely adopted by other specialists, such as emergency clinicians, critical care specialists,

NOT ORIGINAL
Item 9
Page 233
03/30/2026 04:22:14

85787

and several nurse specialists. On these bases, this chapter is intended to set out a standard method of practice and address some of the controversies along with providing additional outside resources for the learner's enrichment. The recommendations herein are not intended to be adopted en bloc but must be customized to the setting where they are used.[3] The matter has been by several scientific societies. In 2018, the American Society of Anesthesiologists (ASA) in conjunction with the American Association of Oral and Maxillofacial Surgeons (AAOMS), the American College of Radiology (ACR), the American Dental Association (ADA), the American Society of Dentist Anesthesiologists (ASDA), and the Society of Interventional Radiology (SIR) organized the task force on Moderate Procedural Sedation and Analgesia, releasing updated practice guidelines.[4] Furthermore, The American Society for Gastrointestinal Endoscopy (ASGE) published guidelines on the use of PSA for gastrointestinal endoscopic procedures. [5] However, there are differences between the proposed guidelines. For example, in contrast to the ASA recommendations, ASGE guidelines do not consider the capnography monitoring useful during PS.[6]

It is essential to understand that sedation, dissociation, and analgesia are separate concepts. Sedation is enabling the patient to lie very still; analgesia is pain relief by central or peripheral interventions, while dissociation is the production of a state of mind-body separation. As a consequence, PS is not general anesthesia or pain control alone, but it is explainable as a tailored approach to the patient, based on anxiety level and pain aimed at achieving optimal sedation and analgesia for performing noninvasive and minimally invasive procedures, conducted primarily in contexts outside of the operating theater such as emergency, dentistry, radiology, and gastrointestinal endoscopy.

Different evaluation methods have been developed for the degree of sedation, both in the operating theater and in environments outside the theater. The Ramsay scale indicates a straightforward approach described by Ramsey and colleagues in 1974. The tool indicates six categories from *patient awake but anxious, agitated, or restless*, to *patient awake but cooperative*, orientated, and tranquil, to *patient drowsy but responsive* to commands, *patient asleep* (brisk response to glabella tap or loud auditory stimulus), *patient asleep with sluggish response to a stimulus*, and finally *patients with no response to noxious stimuli*. Although this approach continues to be the most widely used scale for the assessment and monitoring of sedation, one major limitation is the non-precise distinction between intentional responses and unintentional ones. Recently, the Ramsey scale has undergone modifications to match the AAP and JCAHO guidelines better. After scoring eight characteristics, a score indicates anxiolysis (2 to 3), moderate sedation (4 to 5), deep sedation (6), and general anesthesia (7 to 8). Another widely used instrument is the Observer's Assessment of Alertness/Sedation (OAA/S) scale. It scores five categories: no response to shaking; response to mild prodding; response to name called loudly; lethargic response to name; and readily responds to name. This tool is an easy-to-use instrument, although it does not well discriminate among deep levels of sedation.[7]

Practically, the most commonly accepted terms for sedation depth are:

- Minimal: also called *anxiolysis;* the patient remains awake but relaxed, able to interact.

- Moderate: also called *conscious sedation*, the patient has depressed consciousness but will respond to verbal requests or react to touch. Breathing remains intact, and no support is needed.

DOCUMENT

PM

NOT ORIGINAL
Item 9
Page 234
03/30/2026 04:22:14

85787

- Deep: The patient cannot be easily aroused but will respond to repeated or painful stimuli. Breathing may be impaired and may need to be supported.

- Dissociative: a trance-like state wherein the patient remains awake but unaware of the pain and retains no memory of the event. They can follow commands, and airway reflexes remain intact.

It is generally accepted that, due to patients' varying sensitivities to medications as well as pre-existing co-morbidities, patients may slip into a deeper level than anticipated; the operator must prepare for this event.

## Anatomy and Physiology

Because the most severe complication is a respiratory failure from airway obstruction or hypoventilation, intimate knowledge of airway anatomy, its variations, and any history of airway anomalies is mandatory. The most commonly used airway anatomy assessment scale is the Mallampati score.[8] A careful assessment is mandatory for evaluating potential difficulties to ventilate. This assessment should include the presence of any anatomic features that may affect airway management, including dysmorphic or asymmetrical facial features, beard, significant malnutrition or cachexia with sunken cheeks and missing teeth, facial trauma (e.g., lacerations through the cheek or unstable bony injuries). Limited neck extension and mouth opening of less than 4 to 5 cm, which restricts access, requires checking. Finally, obesity can represent an obstacle to ventilation, even in the absence of the previously considered factors.

## Indications

PS and PSA are indicated any time the patient requires an intervention that will cause significant discomfort. The level of sedation needed depends on the amount of pain the patient is likely to experience, and the necessity of the patient remaining still during the procedure. For instance, an orthopedic procedure that requires joint reduction, and thus muscle relaxation will require deeper sedation than a less uncomfortable procedure. Decision-making also has to take into account the vital signs of stability of the patient. For example, a patient who cannot tolerate cessation of breathing or a drop in blood pressure may be better handled using a dissociative agent rather than moderate to deep sedation.

Additionally, a review of the patient's history for chronic diseases (e.g., cardiovascular or respiratory diseases) and their stability, drug history, and allergy are mandatory to assess the risk of harm during the proposed sedation and procedure. The most commonly used system for clinical assessment is the ASA Physical Status (Class) scoring:

- ASA Class 1. Normal healthy patient with no organic, physiologic, or psychiatric disturbance: excludes the very young and very old; healthy with acceptable exercise tolerance.

- ASA Class 2. Patients presenting with mild systemic disease: No functional limitations; has a well-controlled disease involving one body system; controlled hypertension or diabetes without systemic effects, cigarette smoking absent chronic obstructive pulmonary disease (COPD); mild obesity, pregnancy.

- ASA Class 3. Patients with severe systemic disease: Some level of functional limitation; has a controlled disease involving more than one body system or one major system; no

NOT ORIGINAL
DOCUMENT
PM
Item 9
Page 235
03/30/2026 04:22:14

85787

immediate danger of death; controlled congestive heart failure (CHF), stable angina, prior heart attack, poorly controlled hypertension, morbid obesity, chronic renal failure; a bronchospastic disease with intermittent symptoms.

- ASA Class 4. Patients with severe systemic disease that represents a constant threat to life: Has at least one severe disease not well controlled or at end-stage; possible risk of death; unstable angina, symptomatic COPD, symptomatic CHF, hepatorenal failure.

- ASA Class 5. Moribund patients not expected to survive without the operation: Not expected to survive over 24 hours without surgery; imminent risk of death; multiorgan failure, sepsis syndrome with hemodynamic instability, hypothermia, poorly controlled coagulopathy.

- ASA Class 6. A patient declared brain-dead whose organs are being harvested for donor purposes.

The addition of "E" to physical status denotes an emergency procedure. The definition of an emergency is as existing when a delay in treatment of the patient would lead to a significant increase in the threat to life or body part.

## Contraindications

In certain conditions and contexts, PSA is not appropriate.

- Operator skillset (training). If the person performing the sedation lacks the skillset to secure an unstable airway, from intubation to cricothyrotomy, PSA is not an option.

- Appropriate monitoring and resuscitation equipment are not available.

- Patient needs. If the patient requires any more than a brief painful procedure (e.g., surgery,) general anesthesia in an operating theater may be more appropriate.

- Patient conditions. Patients with a high ASA risk score may be safer with the services of a qualified anesthetist. In particular, PSA is contraindicated in patients with an ASA classification of unstable class II or class IV and above (unless requiring immediate intervention such as for ventricular tachycardia conversion).

- Patient allergies or hypersensitivity to medications used for PSA purposes

- High risk of aspiration (e.g., acute alcohol intoxication). Note: concerning fasting times before procedural sedation, it is possible to refer to guidelines used for general anesthesia that recommend the timing of 2 hours for clear fluids (these liquids must not include alcohol) and 6 hours for everything else. Infants may ingest breast milk for up to 4 hours before the procedure. Additional fasting time (8 or more hours) may be necessary in cases of patient intake of fried foods, fatty foods, or meat.[9]

## Equipment

Before starting a PSA, the operator should have available, open, or immediately at hand and checked for operational readiness:

- IV, running or functional saline lock

- Medications and equipment for cardiac resuscitation

114

NOT ORIGINAL
Item 9
Page 236
03/30/2026 04:22:14

85787

DOCUMENT

PM

- Oxygen administration equipment ranging from the nasal cannula to high-flow oxygen mask (nonrebreather)

- Suction device

- Airway equipment including bag valve mask, laryngeal mask airway, bougie, direct or video-assisted laryngoscopy with appropriate blades, appropriately sized oral airways, and endotracheal tubes, surgical and needle airways

- Reversal drugs if using drug-reversible agents such as opioids and benzodiazepines. Naloxone and flumazenil effectively terminate the effects of fentanyl (or of other opioids) and midazolam (or of other benzodiazepines), respectively. Of note, personnel should consider that flumazenil use can be associated with status epilepticus, mainly in patients with unidentified benzodiazepine abuse or affected by a seizure disorder.

- Monitoring equipment, usually including cardiac, blood pressure, pulse-oximetry monitors ($SaO_2$), respirations. $EtCO_2$ monitor is highly desirable

## Personnel

In the ideal situation, there are two operators. One person will perform the intended procedure, whereas the other person will be dedicated to sedation, patient monitoring, and team coordination. Nevertheless, there are many circumstances where having two operators is not possible, particularly for unplanned procedures. This situation is most common in a rural or resource-constrained setting. If the circumstance is the lone operator, this person must be prepared to abandon the procedure and rescue the patient.

Personnel involved in PSA must have the following training:

- Perform appropriate patient selection

- Acquire advanced airway-management skills (a mandatory prerequisite for performing these techniques)

- Understand and manage medications administered

- Perform patient's' monitoring

- Manages all potential complications

## Preparation

Meticulous preparation for PSA is mandatory and best practiced beforehand in a simulation environment.

Standard operative checklist procedures should be followed; the World Health Organization (WHO) template is useful.[10]

1. Verify identity, procedure, and consent.

2. Mark the site/side.

3. Check that needed medications are available. This may include reversal drugs (e.g., opioids/naloxone, benzodiazepines/flumazenil) and "agents/adjuncts" as some procedural medications lack reversal agents but have reversal *adjuncts* (e.g., propofol/bag-mask).

4/14/23, 5:44 PM

DOCUMENT

PM

NOT ORIGINAL
Item 9
Page 237

03/30/2026 04:22:14

85787

4. Check monitoring devices: EKG, SaO2, EtCO2 (preferred if available as it is more sensitive for hypoventilation than SaO2) and review potential errors from devices (e.g., SaO2 may drop during automated blood pressure cuff inflation by occlusion of arterial flow.) Review allergies.

5. Assess for airway difficulties/anomalies (e.g., Mallimpati score).

6. Patients with contact lenses should be removed (especially for nitrous oxide use).

7. Individually confirm team members' roles and preparation.

8. Display the necessary images.

At the conclusion of the procedure, as the patient recovers, confirm each team member's confirmation that their role shows stability before leaving the procedure room.

## Technique

### Medications

The ideal agent for PSA purposes should possess sedative, analgesic, and amnestic properties as well as a rapid onset and short duration of action to allow a safe and quick recovery and discharge. Although PSA is usually the result of combining a short-acting benzodiazepine such as midazolam (sedative, amnestic, and anxiolytic properties but not analgesic effects) with an opioid (e.g., fentanyl), several drugs are also options, alone or in combination.[11] The combination of fentanyl and midazolam is one of the most adopted procedures to carry out PSA, but other combinations (e.g., propofol and fentanyl or propofol and ketamine combination) are also adopted.

*Midazolam*

- Dose. IV: 2 to 2.5 mg initially, with further 1 mg doses repeated after 2 to 5 minutes, titrated to effect. In adults older than 60 and those chronically ill: starting dose 0.5 to 1 mg (and 1 mg over at least 30 seconds). A total dose of more than 5 mg is not usually necessary in a healthy young adult; less than 3.5 mg is the required dose in debilitated and older subjects. In patients 6 months to 5 years: IV initial dose of 0.05 to 0.1 mg/kg (total dose less than 6 mg); in children 6 to 12 years: IV initial dose of 0.025 to 0.05 mg/kg (total dose less than 10 mg); rectal greater than 6 months: 0.3 to 0.5 mg/kg; IM 1 to 15 years: 0.05 to 0.15 mg/kg.

- Onset time. IV: 2 to 3 minutes. Note: the onset of sedation may vary individually depending on the physical status and other factors such as the speed of administration, and dose.

- Duration. IV: the maximum effect occurs in about 5 to 10 minutes. The elimination half-life is 1.5 to 2.5 hours.

- Comments. Midazolam should be prepared as a 1 mg in 1 ml solution, especially in children less than 15 kg of body weight where midazolam solutions with concentrations higher than 1 mg/ml are not recommended. The antidot of midazolam is flumazenil, but care must be taken as this drug may have a shorter duration of action than the sedative agent, resulting in re-sedation. In the elderly, it is necessary to pay attention to the triggering of benzodiazepine-induced neurocognitive alterations.[12][13]

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:22:14

85787

Item 9
Page 238

*Fentanyl*

- Dose. (IV only) Adult and children: 1 to 1.5 mcg/kg initial dose and then titrated 1 mcg/kg every 3 minutes

- Onset time. IV: 1 to 2 minutes

- Duration: IV: 30 to 60 minutes

- Comments. Fentanyl is a synthetic opioid metabolized by the liver. It presents a rapid redistribution from the central nervous system

*Ketamine* [14]

- Dose. Adult and children IV: 1 to 3 mg/kg. IM: 5 to 10 mg/kg.

- Onset time. IV: 1 minute (Note: If the family is observing, prepare them for the sudden vacant stare Ketamine induction causes)

- Duration. IV: 5 to 15 minutes, IM: 15 to 30 minutes

- Comments. Adverse effects of ketamine include recovery agitation, transient airway complications such as laryngospasm, and emesis. Administration of a benzodiazepine (e.g., diazepam, lorazepam) at the time of the final dose of ketamine may blunt emergence phenomena (visual hallucinations, occasionally disturbing) and the potential sympathomimetic effects of the drug, especially in children. Avoid this agent in individuals who are predisposed to psychotic behavior.

*Etomidate* [15]

- Dose. (IV only) Adult and children over ten years old: 0.3 mg/kg. (Not studied in children under ten years old)

- Onset time. 1 to 2 minutes, IM: 3 to 4 minutes (Note: A third of patients may experience myoclonic jerks on induction; this may be important for orthopedic procedures and may be lessened by pretreatment with an opioid agent)

- Duration. 5 to 7 minutes; may be longer in the elderly and patients with decreased renal function.

- Comments. There is controversy about the suppression of the adrenal production of stress hormones; this has not been shown to be meaningful with single bolus use. Additionally, etomidate is a hypnotic only as it has essentially no analgesic properties.

*Propofol* [16]

- Dose. (IV only) Adult (healthy): 1 to 2 mg/kg. Adult (debilitated): 0.5 to 1 mg/kg. Children: 2 to 3 mg/kg. (Not studied in children under three years old). May be repeated at half doses several times as needed.

- Onset time: 15 to 30 seconds (circulatory time to the brain)

- Duration. 1 to 3 minutes; termination of action of this highly lipophilic drug is through redistribution/equilibration across other bodily tissues. Repeat doses prolong recovery.

NOT ORIGINAL

03/30/2026 04:22:14

85787

4/14/23, 5:44 PM

- Comments. Some literature contains a verbal confusion, stating Propofol caused hypoventilation has no reversal agent; the confusion results from conflating "agent" with "drug." Propofol's reversal agent for hypoventilation is a bag-mask. Additionally, orthostatic hypotension may occur; use IV isotonic fluids as a "reversal agent" and resume seated position cautiously. Be aware that this hypotensive effect, likely caused by peripheral vasodilation, may cause cardiac ischemia, further reducing cardiac output.[17] This condition can create a cycle of worsening cardiac ischemia, further decreasing cardiac output.

*Dexmedetomidine* [18]

- Dose. (IV only) Adult and children IV: 1 mcg/kg.

- Onset time. IV: 3 to 5 minute

- Duration. IV: 15 minutes

- Comments. Dexmedetomidine does not cause respiratory suppression. Research has recently called into question the effectiveness of dexmedetomidine as a sole sedative.[19]

*Methohexital* [20]

- Dose. Adult and Children: IV: 1 to 2 mg/kg. IM: 6 to 10 mg/kg. (Note: IM route is rarely used in adults)

- Onset. IV: 15 to 30 seconds, IM: 2 to 10 minutes

- Duration. IV: 4 to 7 minutes, IM: 6 to 15 minutes

- Comments. As a barbiturate, methohexital is contraindicated in patients with acute intermittent porphyria. Methohexital may cause suppression of respiration; bag-mask ventilatory support may be needed. Transient hypotension may occur from vasodilation; administer IV fluids, and/or sit up slowly.

*Nitrous oxide*

Nitrous oxide (N2O) is an analgesic/anxiolytic gas causing CNS depression and euphoria with little effect on the respiratory function. The onset of action is rapid, and recovery is fast. There is a wide margin of safety. Moreover, nausea and vomiting are uncommon, and reflex integrity is maintained. It is commonly used for PSA in dentistry, especially in the pediatric setting.[21] Gas delivery is with oxygen. Usually, the patient receives 100% oxygen at the beginning of the procedure, and then, oxygen is slowed, and N2O incrementally increased. A flow rate of 5 to 6 L/min is generally acceptable to most patients. Although the therapeutic levels will vary from patient to patient, the concentration of N2O should not routinely exceed 50%.[22] This approach is contraindicated in COPD, severe emotional disturbances or drug-related dependencies, the first trimester of pregnancy, treatment with bleomycin sulfate, recent tympanic membrane graft, and methylenetetrahydrofolate reductase deficiency.[23]

**Reversal agents**

*Naloxone*

- Dose. (IV only) Adults: 0.1 to 2.0 mg

118

NOT ORIGINAL

Item 9
Page 240

03/30/2026 04:22:14

85787

- Onset time. One minute

  - Duration: 15 to 30 minutes

  - Comments. Opiate reversal, very safe, but routine use NOT recommended

*Flumazenil*

  - Dose. (IV only). Adults: 0.2 mg per minute. Maximum: 1.0 mg every 20 minutes

  - Onset time. One minute

  - Duration. 45 minutes

  - Comments. Benzodiazepine reversal use is discouraged for potential benzodiazepine withdrawal or status epilepticus.

## Complications

A bedrock concept is using the right drug at the correct dose for the correct patient. This concept may mean using a more potent drug that has a shorter duration or a more straightforward intervention in the event of a complication. This counter-intuitive concept is built into modern sedation protocols. For example, using combinations of medications in a high dose with a long duration of action (e.g., fentanyl and lorazepam) may appear safer than using propofol for brief duration procedures. This idea represents a crucial error and demonstrates a misunderstanding of the realities of practice; avoidance of this error is especially incumbent on credentialing and training committees because the creation of artificial, non-evidence based restrictions can lead to workarounds that imperil patient safety. The reason is, if the person doing the procedure or performing the sedation gets into trouble with the sedation portion of the procedure, rescuing from hypopnea from propofol is several orders of magnitude easier and briefer duration than fentanyl/lorazepam.[24]

## Clinical Significance

Properly done, PSA is a humane approach to helping patients tolerate brief, painful procedures. Furthermore, it is vital that the procedure takes place in a safe environment with personnel prepared to rescue the patient from adverse effects of the sedation. Special attention is necessary for respiratory suppression, which is mitigated by monitoring, especially EtCO2, and having a low threshold to support respirations, particularly with bag valve mask ventilation. It is also essential that the respiratory support of the patient not be regarded as an adverse outcome but rather a necessary patient intervention. Because hypotension can also represent a complication, it is imperative to have an IV in place and be prepared to support blood pressure with IV fluids. It is also best practice to be cautious in moving the patient from recumbent to sitting position. Again, the operators must have experience in managing other potential complications such as vomiting.

## Enhancing Healthcare Team Outcomes

PS/PSA is one of the areas of medicine that exemplifies medicine as an interprofessional team sport. Ideally, there are two physicians available, one to perform the procedure and one to administer the sedation and monitor the patient. In resource-constrained settings and many emergency departments, a properly trained nurse can monitor the patient and can, under the supervision of a qualified physician, administer these medications. However, the operating

119

NOT ORIGINAL

Item 9
Page 241

03/30/2026 04:22:14

85787

physician must be ready to abandon the procedure and support the patient, paying particular attention to the airway. A nurse or another staff dedicated to the monitoring of the patient during the procedure is mandatory. Additionally, the nurse should ensure that all resuscitative equipment and antidotes are in the room before the procedure starts. Interprofessional team communication is crucial among all interprofessional team members for patient safety and positive outcomes. [Level 5]

## Nursing, Allied Health, and Interprofessional Team Interventions

Nurses function as integral team members during procedural sedation. They are tasked with patient assessment by nursing standards, controlling the room with the procedure will be performed, and ensuring the patient has adequate monitoring in place, including IV access. The nurse should also ensure that they seek out training opportunities to be adept at administering and monitoring these medications. Additionally, nurses have a professional obligation to ensure that their professional societies support the nurses' education and function as full team members to the top of their license. This support includes advocating for the elimination of non-evidence-based restrictions on nursing practice.

## Nursing, Allied Health, and Interprofessional Team Monitoring

Nurses must be cognizant of errors that can occur because of the interference of monitoring equipment. For instance, a blood pressure cuff inflating can create an artifactual decrease in oxygen saturation because of arterial compression. Additionally, the nurse must feel empowered to bring the attention of the physician and the rest of the team to adverse events, as observed.

## Review Questions

- Access free multiple choice questions on this topic.

- Comment on this article.

## References

1. Cascella M, Fusco R, Caliendo D, Granata V, Carbone D, Muzio MR, Laurelli G, Greggi S, Falcone F, Forte CA, Cuomo A. Anesthetic dreaming, anesthesia awareness and patient satisfaction after deep sedation with propofol target controlled infusion: A prospective cohort study of patients undergoing day case breast surgery. Oncotarget. 2017 Oct 03;8(45):79248-79256. [PMC free article: PMC5668036] [PubMed: 29108303]

2. Green SM, Roback MG, Krauss BS, Miner JR, Schneider S, Kivela PD, Nelson LS, Chumpitazi CE, Fisher JD, Gesek D, Jackson B, Kamat P, Kowalenko T, Lewis B, Papo M, Phillips D, Ruff S, Runde D, Tobin T, Vafaie N, Vargo J, Walser E, Yealy DM, O'Connor RE. Unscheduled Procedural Sedation: A Multidisciplinary Consensus Practice Guideline. Ann Emerg Med. 2019 May;73(5):e51-e65. [PubMed: 31029297]

3. Godwin SA, Burton JH, Gerardo CJ, Hatten BW, Mace SE, Silvers SM, Fesmire FM., American College of Emergency Physicians. Clinical policy: procedural sedation and analgesia in the emergency department. Ann Emerg Med. 2014 Feb;63(2):247-58.e18. [PubMed: 24438649]

4. Practice Guidelines for Moderate Procedural Sedation and Analgesia 2018: A Report by the American Society of Anesthesiologists Task Force on Moderate Procedural Sedation and Analgesia, the American Association of Oral and Maxillofacial Surgeons, American College

NOT ORIGINAL
DOCUMENT
PM
Item 9
Page 242
03/30/2026 04:22:14
85787

of Radiology, American Dental Association, American Society of Dentist Anesthesiologists, and Society of Interventional Radiology. Anesthesiology. 2018 Mar;128(3):437-479. [PubMed: 29334501]

5. ASGE Standards of Practice Committee. Early DS, Lightdale JR, Vargo JJ, Acosta RD, Chandrasekhara V, Chathadi KV, Evans JA, Fisher DA, Fonkalsrud L, Hwang JH, Khashab MA, Muthusamy VR, Pasha SF, Saltzman JR, Shergill AK, Cash BD, DeWitt JM. Guidelines for sedation and anesthesia in GI endoscopy. Gastrointest Endosc. 2018 Feb;87(2):327-337. [PubMed: 29306520]

6. Parida S, Kundra P, Mohan VK, Mishra SK. Standards of care for procedural sedation: Focus on differing perceptions among societies. Indian J Anaesth. 2018 Jul;62(7):493-496. [PMC free article: PMC6053889] [PubMed: 30078850]

7. van Haperen M, Preckel B, Eberl S. Indications, contraindications, and safety aspects of procedural sedation. Curr Opin Anaesthesiol. 2019 Dec;32(6):769-775. [PubMed: 31389805]

8. Long B, Koyfman A, Gottlieb M. Factors Predicting Difficult Endotracheal Intubation. Acad Emerg Med. 2019 Nov;26(11):1294-1296. [PubMed: 31251423]

9. Practice Guidelines for Preoperative Fasting and the Use of Pharmacologic Agents to Reduce the Risk of Pulmonary Aspiration: Application to Healthy Patients Undergoing Elective Procedures: An Updated Report by the American Society of Anesthesiologists Task Force on Preoperative Fasting and the Use of Pharmacologic Agents to Reduce the Risk of Pulmonary Aspiration. Anesthesiology. 2017 Mar;126(3):376-393. [PubMed: 28045707]

10. Ramsay G, Haynes AB, Lipsitz SR, Solsky I, Leitch J, Gawande AA, Kumar M. Reducing surgical mortality in Scotland by use of the WHO Surgical Safety Checklist. Br J Surg. 2019 Jul;106(8):1005-1011. [PubMed: 30993676]

11. Tobias JD, Leder M. Procedural sedation: A review of sedative agents, monitoring, and management of complications. Saudi J Anaesth. 2011 Oct;5(4):395-410. [PMC free article: PMC3227310] [PubMed: 22144928]

12. Cascella M. Anesthesia awareness. Can midazolam attenuate or prevent memory consolidation on intraoperative awakening during general anesthesia without increasing the risk of postoperative delirium? Korean J Anesthesiol. 2015 Apr;68(2):200-2. [PMC free article: PMC4384412] [PubMed: 25844143]

13. Cascella M, Muzio MR, Bimonte S, Cuomo A, Jakobsson JG. Postoperative delirium and postoperative cognitive dysfunction: updates in pathophysiology, potential translational approaches to clinical practice and further research perspectives. Minerva Anestesiol. 2018 Feb;84(2):246-260. [PubMed: 28984099]

14. Ghojazadeh M, Sanaie S, Paknezhad SP, Faghih SS, Soleimanpour H. Using Ketamine and Propofol for Procedural Sedation of Adults in the Emergency Department: A Systematic Review and Meta-Analysis. Adv Pharm Bull. 2019 Feb;9(1):5-11. [PMC free article: PMC6468222] [PubMed: 31011553]

15. Eberson CP, Hsu RY, Borenstein TR. Procedural sedation in the emergency department. J Am Acad Orthop Surg. 2015 Apr;23(4):233-42. [PubMed: 25715648]

16. Miller KA, Andolfatto G, Miner JR, Burton JH, Krauss BS. Clinical Practice Guideline for Emergency Department Procedural Sedation With Propofol: 2018 Update. Ann Emerg Med. 2019 May;73(5):470-480. [PubMed: 30732981]

17. Hannam JA, Mitchell SJ, Cumin D, Frampton C, Merry AF, Moore MR, Kruger CJ. Haemodynamic profiles of etomidate vs propofol for induction of anaesthesia: a randomised controlled trial in patients undergoing cardiac surgery. Br J Anaesth. 2019 Feb;122(2):198-205. [PubMed: 30686305]

18.

NOT ORIGINAL
Item 9
Page 243
03/30/2026 04:22:14

85787

Kaur M, Singh PM. Current role of dexmedetomidine in clinical anesthesia and intensive care. Anesth Essays Res. 2011 Jul-Dec;5(2):128-33. [PMC free article: PMC4173414] [PubMed: 25885374]

19. Shehabi Y, Howe BD, Bellomo R, Arabi YM, Bailey M, Bass FE, Bin Kadiman S, McArthur CJ. Murray L, Reade MC, Seppelt IM, Takala J, Wise MP, Webb SA., ANZICS Clinical Trials Group and the SPICE III Investigators. Early Sedation with Dexmedetomidine in Critically Ill Patients. N Engl J Med. 2019 Jun 27;380(26):2506-2517. [PubMed: 31112380]

20. Wood J, Ferguson C. Best evidence topic report. Procedural sedation for cardioversion. Emerg Med J. 2006 Dec;23(12):932-4. [PMC free article: PMC2564258] [PubMed: 17130605]

21. Paterson SA, Tahmassebi JF. Paediatric dentistry in the new millennium: 3. Use of inhalation sedation in paediatric dentistry. Dent Update. 2003 Sep;30(7):350-6, 358. [PubMed: 14558199]

22. Mohan R, Asir VD, Shanmugapriyan, Ebenezr V, Dakir A, Balakrishnan, Jacob J. Nitrousoxide as a conscious sedative in minor oral surgical procedure. J Pharm Bioallied Sci. 2015 Apr;7(Suppl 1):S248-50. [PMC free article: PMC4439684] [PubMed: 26015724]

23. Cascella M, Arcamone M, Morelli E, Viscardi D, Russo V, De Franciscis S, Belli A, Accardo R, Caliendo D, De Luca E, Di Caprio B, Di Sauro F, Giannoni G, Iermano C, Maciariello M, Marracino M, Cuomo A. Erratum to: Multidisciplinary approach and anesthetic management of a surgical cancer patient with methylene tetrahydrofolate reductase deficiency: a case report and review of the literature. J Med Case Rep. 2015 Sep 17;9:218. [PMC free article: PMC4574725] [PubMed: 26384007]

24. O'Connor RE, Sama A, Burton JH, Callaham ML, House HR, Jaquis WP, Tibbles PM, Bromley M, Green SM., American College of Emergency Physicians. Procedural sedation and analgesia in the emergency department: recommendations for physician credentialing, privileging, and practice. Ann Emerg Med. 2011 Oct;58(4):365-70. [PubMed: 21802778]

Copyright © 2023, StatPearls Publishing LLC.

This book is distributed under the terms of the Creative Commons Attribution-NonCommercial-NoDerivatives 4.0 International (CC BY-NC-ND 4.0) ( http://creativecommons.org/licenses/by-nc-nd/4.0/ ), which permits others to distribute the work, provided that the article is not altered or used commercially. You are not required to obtain permission to distribute this article, provided that you credit the author and journal.

Bookshelf ID: NBK551685   PMID: 31869149

NOT ORIGINAL
Item 9
Page 244
03/30/2026 04:22:14 PM
85787
DOCUMENT



An official website of the United States government
Here's how you know

FULL TEXT LINKS

**ANESTHESIOLOGY**

Practice Guideline    Anesthesiology. 2018 Mar;128(3):437-479.
doi: 10.1097/ALN.0000000000002043.

# Practice Guidelines for Moderate Procedural Sedation and Analgesia 2018: A Report by the American Society of Anesthesiologists Task Force on Moderate Procedural Sedation and Analgesia, the American Association of Oral and Maxillofacial Surgeons, American College of Radiology, American Dental Association, American Society of Dentist Anesthesiologists, and Society of Interventional Radiology

*No authors listed*

PMID: 29334501    DOI: 10.1097/ALN.0000000000002043
Free article

*No abstract available*

## Comment in

The Newest Threat to Emergency Department Procedural Sedation.
Green SM, Roback MG, Krauss BS.
Ann Emerg Med. 2018 Aug;72(2):115-119. doi: 10.1016/j.annemergmed.2017.12.009. Epub 2018 Feb 8
PMID: 29429580 No abstract available.

Questions about the Practice Management Guidelines for Moderate Sedation and Analgesia.
Cattano D.
Anesthesiology. 2018 Oct;129(4):855. doi: 10.1097/ALN.0000000000002425
PMID: 30234594 No abstract available.

In Reply.
Apfelbaum JL, Connis RT.
Anesthesiology. 2018 Oct;129(4):855-856. doi: 10.1097/ALN.0000000000002426
PMID: 30234595 No abstract available

## Related information

Cited in Books

## LinkOut - more resources

Full Text Sources

https://pubmed.ncbi.nlm.nih.gov/29334501/

1/2

123

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:22:14

Ingenta plc
Ovid Technologies, Inc.
Silverchair Information Systems

Other Literature Sources
scite Smart Citations

Medical
ClinicalTrials.gov

Item 9
Page 245

85787

https://pubmed.ncbi.nlm.nih.gov/29334501/

NOT ORIGINAL
Item 9
Page 246
03/30/2026 04:22:14

85787

NCBI Bookshelf. A service of the National Library of Medicine, National Institutes of Health.

StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2023 Jan-.

# Procedural Sedation

Thomas Benzoni; Marco Cascella.

Author Information and Affiliations

Last Update: October 16, 2022.

## Continuing Education Activity

Procedural sedation permits the safe performance of procedures that a patient cannot tolerate in the fully conscious state. Through this activity, the practitioner will learn how to assess the airway by direct visual examination, tabulate risk factors by analysis of baseline risk, and will be able to properly choose a medication that we will get the patient safely through the proposed procedure.

**Objectives:**

- Outline the proper medication for procedural sedation based on specific patient risks.

- Describe the equipment, personnel, preparation, and technique in regards to procedural sedation.

- Review the potential complications and clinical significance of procedural sedation.

- Explain interprofessional team strategies for improving care coordination and communication to advance procedural sedation and improve outcomes.

Access free multiple choice questions on this topic.

## Introduction

Procedural sedation (PS), previously incorrectly referred to as 'conscious sedation,' refers to techniques, medications, and maneuvers performed to help a patient tolerate unpleasant or painful procedures, avoiding potential unwanted memories associated with such procedures.[1] Because the proper use of PS also aims to decrease the patient's perception of pain and is generally obtained through the administration of analgesics combined to a sedative, PS can also serve as procedural sedation analgesia (PSA). Furthermore, PS also increases the likelihood of a successful procedure while decreasing the time required to perform it. Additionally, PS increases safety for the patient and personnel attending the patient. These approaches include medications, psychological techniques, and/or physical maneuvers to achieve the indented effect. According to the American College of Emergency Physicians (ACEP), PS is a '*technique of administering sedatives or dissociative agents with or without analgesics to induce a state that allows the patient to tolerate unpleasant procedures while maintaining cardiorespiratory function. PSA is intended to result in a depressed level of consciousness that allows the patient to maintain oxygenation and airway control independently.*'[2]

In various settings. the practice of PS (and PSA) has considerable variability, is practiced with varying degrees of skill, and has been the subject of controversy in the not-so-distant past. The practice of PSA, in fact, is not the exclusive preserve of anesthesia practitioners but is now routinely adopted by other specialists, such as emergency clinicians, critical care specialists,

NOT ORIGINAL

03/30/2026 04:22:14

85787

Item 9
Page 247

and several nurse specialists. On these bases, this chapter is intended to set out a standard method of practice and address some of the controversies along with providing additional outside resources for the learner's enrichment. The recommendations herein are not intended to be adopted en bloc but must be customized to the setting where they are used.[3] The matter has been by several scientific societies. In 2018, the American Society of Anesthesiologists (ASA) in conjunction with the American Association of Oral and Maxillofacial Surgeons (AAOMS), the American College of Radiology (ACR), the American Dental Association (ADA), the American Society of Dentist Anesthesiologists (ASDA), and the Society of Interventional Radiology (SIR) organized the task force on Moderate Procedural Sedation and Analgesia, releasing updated practice guidelines.[4] Furthermore, The American Society for Gastrointestinal Endoscopy (ASGE) published guidelines on the use of PSA for gastrointestinal endoscopic procedures. [5] However, there are differences between the proposed guidelines. For example, in contrast to the ASA recommendations, ASGE guidelines do not consider the capnography monitoring useful during PS.[6]

It is essential to understand that sedation, dissociation, and analgesia are separate concepts. Sedation is enabling the patient to lie very still; analgesia is pain relief by central or peripheral interventions, while dissociation is the production of a state of mind-body separation. As a consequence, PS is not general anesthesia or pain control alone, but it is explainable as a tailored approach to the patient, based on anxiety level and pain aimed at achieving optimal sedation and analgesia for performing noninvasive and minimally invasive procedures, conducted primarily in contexts outside of the operating theater such as emergency, dentistry, radiology, and gastrointestinal endoscopy.

Different evaluation methods have been developed for the degree of sedation, both in the operating theater and in environments outside the theater. The Ramsay scale indicates a straightforward approach described by Ramsey and colleagues in 1974. The tool indicates six categories from *patient awake but anxious, agitated, or restless*, to *patient awake but cooperative*, orientated, and tranquil, to *patient drowsy but responsive* to commands, *patient asleep* (brisk response to glabella tap or loud auditory stimulus), *patient asleep with sluggish response to a stimulus*, and finally *patients with no response to noxious stimuli*. Although this approach continues to be the most widely used scale for the assessment and monitoring of sedation, one major limitation is the non-precise distinction between intentional responses and unintentional ones. Recently, the Ramsey scale has undergone modifications to match the AAP and JCAHO guidelines better. After scoring eight characteristics, a score indicates anxiolysis (2 to 3), moderate sedation (4 to 5), deep sedation (6), and general anesthesia (7 to 8). Another widely used instrument is the Observer's Assessment of Alertness/Sedation (OAA/S) scale. It scores five categories: no response to shaking; response to mild prodding; response to name called loudly; lethargic response to name; and readily responds to name. This tool is an easy-to-use instrument, although it does not well discriminate among deep levels of sedation.[7]

Practically, the most commonly accepted terms for sedation depth are:

- Minimal: also called *anxiolysis; the* patient remains awake but relaxed, able to interact.

- Moderate: also called *conscious sedation*, the patient has depressed consciousness but will respond to verbal requests or react to touch. Breathing remains intact, and no support is needed.

DOCUMENT

PM

NOT ORIGINAL
Item 9
Page 248
03/30/2026 04:22:14

85787

- Deep: The patient cannot be easily aroused but will respond to repeated, painful stimuli. Breathing may be impaired and may need to be supported.

- Dissociative: a trance-like state wherein the patient remains awake but unaware of the pain and retains no memory of the event. They can follow commands, and airway reflexes remain intact.

It is generally accepted that, due to patients' varying sensitivities to medications as well as pre-existing co-morbidities, patients may slip into a deeper level than anticipated; the operator must prepare for this event.

## Anatomy and Physiology

Because the most severe complication is a respiratory failure from airway obstruction or hypoventilation, intimate knowledge of airway anatomy, its variations, and any history of airway anomalies is mandatory. The most commonly used airway anatomy assessment scale is the Mallampati score.[8] A careful assessment is mandatory for evaluating potential difficulties to ventilate. This assessment should include the presence of any anatomic features that may affect airway management, including dysmorphic or asymmetrical facial features, beard, significant malnutrition or cachexia with sunken cheeks and missing teeth, facial trauma (e.g., lacerations through the cheek or unstable bony injuries). Limited neck extension and mouth opening of less than 4 to 5 cm, which restricts access, requires checking. Finally, obesity can represent an obstacle to ventilation, even in the absence of the previously considered factors.

## Indications

PS and PSA are indicated any time the patient requires an intervention that will cause significant discomfort. The level of sedation needed depends on the amount of pain the patient is likely to experience, and the necessity of the patient remaining still during the procedure. For instance, an orthopedic procedure that requires joint reduction, and thus muscle relaxation will require deeper sedation than a less uncomfortable procedure. Decision-making also has to take into account the vital signs of stability of the patient. For example, a patient who cannot tolerate cessation of breathing or a drop in blood pressure may be better handled using a dissociative agent rather than moderate to deep sedation.

Additionally, a review of the patient's history for chronic diseases (e.g., cardiovascular or respiratory diseases) and their stability, drug history, and allergy are mandatory to assess the risk of harm during the proposed sedation and procedure. The most commonly used system for clinical assessment is the ASA Physical Status (Class) scoring:

- ASA Class 1. Normal healthy patient with no organic, physiologic, or psychiatric disturbance: excludes the very young and very old; healthy with acceptable exercise tolerance.

- ASA Class 2. Patients presenting with mild systemic disease: No functional limitations; has a well-controlled disease involving one body system; controlled hypertension or diabetes without systemic effects, cigarette smoking absent chronic obstructive pulmonary disease (COPD); mild obesity, pregnancy.

- ASA Class 3. Patients with severe systemic disease: Some level of functional limitation; has a controlled disease involving more than one body system or one major system; no

NOT ORIGINAL

Item 9
Page 249

03/30/2026 04:22:14

85787

DOCUMENT

PM

immediate danger of dea..., controlled congestive heart failure (CHF), st..e angina, prior heart attack, poorly controlled hypertension, morbid obesity, chronic renal failure; a bronchospastic disease with intermittent symptoms.

- ASA Class 4. Patients with severe systemic disease that represents a constant threat to life: Has at least one severe disease not well controlled or at end-stage; possible risk of death; unstable angina, symptomatic COPD, symptomatic CHF, hepatorenal failure.

- ASA Class 5. Moribund patients not expected to survive without the operation: Not expected to survive over 24 hours without surgery; imminent risk of death; multiorgan failure, sepsis syndrome with hemodynamic instability, hypothermia, poorly controlled coagulopathy.

- ASA Class 6. A patient declared brain-dead whose organs are being harvested for donor purposes.

The addition of "E" to physical status denotes an emergency procedure. The definition of an emergency is as existing when a delay in treatment of the patient would lead to a significant increase in the threat to life or body part.

## Contraindications

In certain conditions and contexts, PSA is not appropriate.

- Operator skillset (training). If the person performing the sedation lacks the skillset to secure an unstable airway, from intubation to cricothyrotomy, PSA is not an option.

- Appropriate monitoring and resuscitation equipment are not available.

- Patient needs. If the patient requires any more than a brief painful procedure (e.g., surgery,) general anesthesia in an operating theater may be more appropriate.

- Patient conditions. Patients with a high ASA risk score may be safer with the services of a qualified anesthetist. In particular, PSA is contraindicated in patients with an ASA classification of unstable class II or class IV and above (unless requiring immediate intervention such as for ventricular tachycardia conversion).

- Patient allergies or hypersensitivity to medications used for PSA purposes

- High risk of aspiration (e.g., acute alcohol intoxication). Note: concerning fasting times before procedural sedation, it is possible to refer to guidelines used for general anesthesia that recommend the timing of 2 hours for clear fluids (these liquids must not include alcohol) and 6 hours for everything else. Infants may ingest breast milk for up to 4 hours before the procedure. Additional fasting time (8 or more hours) may be necessary in cases of patient intake of fried foods, fatty foods, or meat.[9]

## Equipment

Before starting a PSA, the operator should have available, open, or immediately at hand and checked for operational readiness:

- IV, running or functional saline lock

- Medications and equipment for cardiac resuscitation

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 250

03/30/2026 04:22:14

85787

- Oxygen administration equipment ranging from the nasal cannula to high-flow oxygen mask (nonrebreather)

- Suction device

- Airway equipment including bag valve mask, laryngeal mask airway, bougie, direct or video-assisted laryngoscopy with appropriate blades, appropriately sized oral airways, and endotracheal tubes, surgical and needle airways

- Reversal drugs if using drug-reversible agents such as opioids and benzodiazepines. Naloxone and flumazenil effectively terminate the effects of fentanyl (or of other opioids) and midazolam (or of other benzodiazepines), respectively. Of note, personnel should consider that flumazenil use can be associated with status epilepticus, mainly in patients with unidentified benzodiazepine abuse or affected by a seizure disorder.

- Monitoring equipment, usually including cardiac, blood pressure, pulse-oximetry monitors (SaO2), respirations. EtCO2 monitor is highly desirable

## Personnel

In the ideal situation, there are two operators. One person will perform the intended procedure, whereas the other person will be dedicated to sedation, patient monitoring, and team coordination. Nevertheless, there are many circumstances where having two operators is not possible, particularly for unplanned procedures. This situation is most common in a rural or resource-constrained setting. If the circumstance is the lone operator, this person must be prepared to abandon the procedure and rescue the patient.

Personnel involved in PSA must have the following training:

- Perform appropriate patient selection

- Acquire advanced airway-management skills (a mandatory prerequisite for performing these techniques)

- Understand and manage medications administered

- Perform patient's' monitoring

- Manages all potential complications

## Preparation

Meticulous preparation for PSA is mandatory and best practiced beforehand in a simulation environment.

Standard operative checklist procedures should be followed; the World Health Organization (WHO) template is useful.[10]

1. Verify identity, procedure, and consent.

2. Mark the site/side.

3. Check that needed medications are available. This may include reversal drugs (e.g., opioids/naloxone, benzodiazepines/flumazenil) and "agents/adjuncts" as some procedural medications lack reversal agents but have reversal *adjuncts* (e.g., propofol/bag-mask).

NOT ORIGINAL

Item 9
Page 251

03/30/2026 04:22:14

85787

DOCUMENT

PM

4. Check monitoring devic... EKG, SaO2, EtCO2 (preferred if available ... is more sensitive for hypoventilation than SaO2) and review potential errors from devices (e.g., SaO2 may drop during automated blood pressure cuff inflation by occlusion of arterial flow.) Review allergies.

5. Assess for airway difficulties/anomalies (e.g., Mallimpati score).

6. Patients with contact lenses should be removed (especially for nitrous oxide use).

7. Individually confirm team members' roles and preparation.

8. Display the necessary images.

At the conclusion of the procedure, as the patient recovers, confirm each team member's confirmation that their role shows stability before leaving the procedure room.

## Technique

### Medications

The ideal agent for PSA purposes should possess sedative, analgesic, and amnestic properties as well as a rapid onset and short duration of action to allow a safe and quick recovery and discharge. Although PSA is usually the result of combining a short-acting benzodiazepine such as midazolam (sedative, amnestic, and anxiolytic properties but not analgesic effects) with an opioid (e.g., fentanyl), several drugs are also options, alone or in combination.[11] The combination of fentanyl and midazolam is one of the most adopted procedures to carry out PSA, but other combinations (e.g., propofol and fentanyl or propofol and ketamine combination) are also adopted.

### *Midazolam*

- Dose. IV: 2 to 2.5 mg initially, with further 1 mg doses repeated after 2 to 5 minutes, titrated to effect. In adults older than 60 and those chronically ill: starting dose 0.5 to 1 mg (and 1 mg over at least 30 seconds). A total dose of more than 5 mg is not usually necessary in a healthy young adult; less than 3.5 mg is the required dose in debilitated and older subjects. In patients 6 months to 5 years: IV initial dose of 0.05 to 0.1 mg/kg (total dose less than 6 mg); in children 6 to 12 years: IV initial dose of 0.025 to 0.05 mg/kg (total dose less than 10 mg); rectal greater than 6 months: 0.3 to 0.5 mg/kg; IM 1 to 15 years: 0.05 to 0.15 mg/kg.

- Onset time. IV: 2 to 3 minutes. Note: the onset of sedation may vary individually depending on the physical status and other factors such as the speed of administration, and dose.

- Duration. IV: the maximum effect occurs in about 5 to 10 minutes. The elimination half-life is 1.5 to 2.5 hours.

- Comments. Midazolam should be prepared as a 1 mg in 1 ml solution, especially in children less than 15 kg of body weight where midazolam solutions with concentrations higher than 1 mg/ml are not recommended. The antidot of midazolam is flumazenil, but care must be taken as this drug may have a shorter duration of action than the sedative agent, resulting in re-sedation. In the elderly, it is necessary to pay attention to the triggering of benzodiazepine-induced neurocognitive alterations.[12][13]

NOT ORIGINAL
DOCUMENT

PM

Item 9
Page 252

03/30/2026 04:22:14

85787

*Fentanyl*

- Dose. (IV only) Adult and children: 1 to 1.5 mcg/kg initial dose and then titrated 1 mcg/kg every 3 minutes

- Onset time. IV: 1 to 2 minutes

- Duration: IV: 30 to 60 minutes

- Comments. Fentanyl is a synthetic opioid metabolized by the liver. It presents a rapid redistribution from the central nervous system

*Ketamine* [14]

- Dose. Adult and children IV: 1 to 3 mg/kg. IM: 5 to 10 mg/kg.

- Onset time. IV: 1 minute (Note: If the family is observing, prepare them for the sudden vacant stare Ketamine induction causes)

- Duration. IV: 5 to 15 minutes. IM: 15 to 30 minutes

- Comments. Adverse effects of ketamine include recovery agitation, transient airway complications such as laryngospasm, and emesis. Administration of a benzodiazepine (e.g., diazepam, lorazepam) at the time of the final dose of ketamine may blunt emergence phenomena (visual hallucinations, occasionally disturbing) and the potential sympathomimetic effects of the drug, especially in children. Avoid this agent in individuals who are predisposed to psychotic behavior.

*Etomidate* [15]

- Dose. (IV only) Adult and children over ten years old: 0.3 mg/kg. (Not studied in children under ten years old)

- Onset time. 1 to 2 minutes, IM: 3 to 4 minutes (Note: A third of patients may experience myoclonic jerks on induction; this may be important for orthopedic procedures and may be lessened by pretreatment with an opioid agent)

- Duration. 5 to 7 minutes; may be longer in the elderly and patients with decreased renal function.

- Comments. There is controversy about the suppression of the adrenal production of stress hormones; this has not been shown to be meaningful with single bolus use. Additionally, etomidate is a hypnotic only as it has essentially no analgesic properties.

*Propofol* [16]

- Dose. (IV only) Adult (healthy): 1 to 2 mg/kg. Adult (debilitated): 0.5 to 1 mg/kg. Children: 2 to 3 mg/kg. (Not studied in children under three years old). May be repeated at half doses several times as needed.

- Onset time: 15 to 30 seconds (circulatory time to the brain)

- Duration. 1 to 3 minutes; termination of action of this highly lipophilic drug is through redistribution/equilibration across other bodily tissues. Repeat doses prolong recovery.

NOT ORIGINAL
Item 9
Page 253

03/30/2026 04:22:14

85787

- Comments. Some literature contains a verbal confusion, stating Propofol caused hypoventilation has no reversal agent; the confusion results from conflating "agent" with "drug." Propofol's reversal agent for hypoventilation is a bag-mask. Additionally, orthostatic hypotension may occur; use IV isotonic fluids as a "reversal agent" and resume seated position cautiously. Be aware that this hypotensive effect, likely caused by peripheral vasodilation, may cause cardiac ischemia, further reducing cardiac output.[17] This condition can create a cycle of worsening cardiac ischemia, further decreasing cardiac output.

### Dexmedetomidine [18]

- Dose. (IV only) Adult and children IV: 1 mcg/kg.
- Onset time. IV: 3 to 5 minute
- Duration. IV: 15 minutes
- Comments. Dexmedetomidine does not cause respiratory suppression. Research has recently called into question the effectiveness of dexmedetomidine as a sole sedative.[19]

### Methohexital [20]

- Dose. Adult and Children: IV: 1 to 2 mg/kg. IM: 6 to 10 mg/kg. (Note: IM route is rarely used in adults)
- Onset. IV: 15 to 30 seconds, IM: 2 to 10 minutes
- Duration. IV: 4 to 7 minutes, IM: 6 to 15 minutes
- Comments. As a barbiturate, methohexital is contraindicated in patients with acute intermittent porphyria. Methohexital may cause suppression of respiration; bag-mask ventilatory support may be needed. Transient hypotension may occur from vasodilation; administer IV fluids, and/or sit up slowly.

### Nitrous oxide

Nitrous oxide (N2O) is an analgesic/anxiolytic gas causing CNS depression and euphoria with little effect on the respiratory function. The onset of action is rapid, and recovery is fast. There is a wide margin of safety. Moreover, nausea and vomiting are uncommon, and reflex integrity is maintained. It is commonly used for PSA in dentistry, especially in the pediatric setting.[21] Gas delivery is with oxygen. Usually, the patient receives 100% oxygen at the beginning of the procedure, and then, oxygen is slowed, and N2O incrementally increased. A flow rate of 5 to 6 L/min is generally acceptable to most patients. Although the therapeutic levels will vary from patient to patient, the concentration of N2O should not routinely exceed 50%.[22] This approach is contraindicated in COPD, severe emotional disturbances or drug-related dependencies, the first trimester of pregnancy, treatment with bleomycin sulfate, recent tympanic membrane graft, and methylenetetrahydrofolate reductase deficiency.[23]

### Reversal agents

### Naloxone

- Dose. (IV only) Adults: 0.1 to 2.0 mg

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 254

03/30/2026 04:22:14

85787

- Onset time. One minute
- Duration: 15 to 30 minutes
- Comments. Opiate reversal, very safe, but routine use NOT recommended

*Flumazenil*

- Dose. (IV only). Adults: 0.2 mg per minute. Maximum: 1.0 mg every 20 minutes
- Onset time. One minute
- Duration. 45 minutes
- Comments. Benzodiazepine reversal use is discouraged for potential benzodiazepine withdrawal or status epilepticus.

## Complications

A bedrock concept is using the right drug at the correct dose for the correct patient. This concept may mean using a more potent drug that has a shorter duration or a more straightforward intervention in the event of a complication. This counter-intuitive concept is built into modern sedation protocols. For example, using combinations of medications in a high dose with a long duration of action (e.g., fentanyl and lorazepam) may appear safer than using propofol for brief duration procedures. This idea represents a crucial error and demonstrates a misunderstanding of the realities of practice; avoidance of this error is especially incumbent on credentialing and training committees because the creation of artificial, non-evidence based restrictions can lead to workarounds that imperil patient safety. The reason is, if the person doing the procedure or performing the sedation gets into trouble with the sedation portion of the procedure, rescuing from hypopnea from propofol is several orders of magnitude easier and briefer duration than fentanyl/lorazepam.[24]

## Clinical Significance

Properly done, PSA is a humane approach to helping patients tolerate brief. painful procedures. Furthermore, it is vital that the procedure takes place in a safe environment with personnel prepared to rescue the patient from adverse effects of the sedation. Special attention is necessary for respiratory suppression, which is mitigated by monitoring, especially EtCO2, and having a low threshold to support respirations, particularly with bag valve mask ventilation. It is also essential that the respiratory support of the patient not be regarded as an adverse outcome but rather a necessary patient intervention.Because hypotension can also represent a complication, it is imperative to have an IV in place and be prepared to support blood pressure with IV fluids. It is also best practice to be cautious in moving the patient from recumbent to sitting position. Again, the operators must have experience in managing other potential complications such as vomiting.

## Enhancing Healthcare Team Outcomes

PS/PSA is one of the areas of medicine that exemplifies medicine as an interprofessional team sport. Ideally, there are two physicians available, one to perform the procedure and one to administer the sedation and monitor the patient. In resource-constrained settings and many emergency departments, a properly trained nurse can monitor the patient and can, under the supervision of a qualified physician, administer these medications. However, the operating

NOT ORIGINAL
Item 9
Page 255
03/30/2026 04:22:14
85787

physician must be ready to ab... .ion the procedure and support the patient, pa, ..g particular attention to the airway. A nurse or another staff dedicated to the monitoring of the patient during the procedure is mandatory. Additionally, the nurse should ensure that all resuscitative equipment and antidotes are in the room before the procedure starts. Interprofessional team communication is crucial among all interprofessional team members for patient safety and positive outcomes. [Level 5]

## Nursing, Allied Health, and Interprofessional Team Interventions

Nurses function as integral team members during procedural sedation. They are tasked with patient assessment by nursing standards, controlling the room with the procedure will be performed, and ensuring the patient has adequate monitoring in place, including IV access. The nurse should also ensure that they seek out training opportunities to be adept at administering and monitoring these medications. Additionally, nurses have a professional obligation to ensure that their professional societies support the nurses' education and function as full team members to the top of their license. This support includes advocating for the elimination of non-evidence-based restrictions on nursing practice.

## Nursing, Allied Health, and Interprofessional Team Monitoring

Nurses must be cognizant of errors that can occur because of the interference of monitoring equipment. For instance, a blood pressure cuff inflating can create an artifactual decrease in oxygen saturation because of arterial compression. Additionally, the nurse must feel empowered to bring the attention of the physician and the rest of the team to adverse events, as observed.

## Review Questions

- Access free multiple choice questions on this topic.

- Comment on this article.

## References

1. Cascella M, Fusco R, Caliendo D, Granata V, Carbone D. Muzio MR, Laurelli G, Greggi S, Falcone F, Forte CA, Cuomo A. Anesthetic dreaming, anesthesia awareness and patient satisfaction after deep sedation with propofol target controlled infusion: A prospective cohort study of patients undergoing day case breast surgery. Oncotarget. 2017 Oct 03;8(45):79248-79256. [PMC free article: PMC5668036] [PubMed: 29108303]
2. Green SM, Roback MG, Krauss BS, Miner JR, Schneider S, Kivela PD, Nelson LS, Chumpitazi CE, Fisher JD, Gesek D, Jackson B, Kamat P, Kowalenko T, Lewis B, Papo M, Phillips D, Ruff S, Runde D, Tobin T, Vafaie N, Vargo J, Walser E, Yealy DM, O'Connor RE. Unscheduled Procedural Sedation: A Multidisciplinary Consensus Practice Guideline. Ann Emerg Med. 2019 May;73(5):e51-e65. [PubMed: 31029297]
3. Godwin SA, Burton JH, Gerardo CJ, Hatten BW, Mace SE, Silvers SM, Fesmire FM., American College of Emergency Physicians. Clinical policy: procedural sedation and analgesia in the emergency department. Ann Emerg Med. 2014 Feb;63(2):247-58.e18. [PubMed: 24438649]
4. Practice Guidelines for Moderate Procedural Sedation and Analgesia 2018: A Report by the American Society of Anesthesiologists Task Force on Moderate Procedural Sedation and Analgesia, the American Association of Oral and Maxillofacial Surgeons, American College

NOT ORIGINAL

Item 9
Page 256

03/30/2026 04:22:14

85787

DOCUMENT

PM

of Radiology, American Dental Association, American Society of Dentist Anesthesiologists, and Society of Interventional Radiology. Anesthesiology. 2018 Mar;128(3):437-479. [PubMed: 29334501]

5. ASGE Standards of Practice Committee. Early DS, Lightdale JR, Vargo JJ, Acosta RD, Chandrasekhara V, Chathadi KV, Evans JA, Fisher DA, Fonkalsrud L, Hwang JH, Khashab MA, Muthusamy VR, Pasha SF, Saltzman JR, Shergill AK, Cash BD, DeWitt JM. Guidelines for sedation and anesthesia in GI endoscopy. Gastrointest Endosc. 2018 Feb;87(2):327-337. [PubMed: 29306520]

6. Parida S, Kundra P, Mohan VK, Mishra SK. Standards of care for procedural sedation: Focus on differing perceptions among societies. Indian J Anaesth. 2018 Jul;62(7):493-496. [PMC free article: PMC6053889] [PubMed: 30078850]

7. van Haperen M, Preckel B, Eberl S. Indications, contraindications, and safety aspects of procedural sedation. Curr Opin Anaesthesiol. 2019 Dec;32(6):769-775. [PubMed: 31389805]

8. Long B, Koyfman A, Gottlieb M. Factors Predicting Difficult Endotracheal Intubation. Acad Emerg Med. 2019 Nov;26(11):1294-1296. [PubMed: 31251423]

9. Practice Guidelines for Preoperative Fasting and the Use of Pharmacologic Agents to Reduce the Risk of Pulmonary Aspiration: Application to Healthy Patients Undergoing Elective Procedures: An Updated Report by the American Society of Anesthesiologists Task Force on Preoperative Fasting and the Use of Pharmacologic Agents to Reduce the Risk of Pulmonary Aspiration. Anesthesiology. 2017 Mar;126(3):376-393. [PubMed: 28045707]

10. Ramsay G, Haynes AB, Lipsitz SR, Solsky I, Leitch J, Gawande AA, Kumar M. Reducing surgical mortality in Scotland by use of the WHO Surgical Safety Checklist. Br J Surg. 2019 Jul;106(8):1005-1011. [PubMed: 30993676]

11. Tobias JD, Leder M. Procedural sedation: A review of sedative agents, monitoring, and management of complications. Saudi J Anaesth. 2011 Oct;5(4):395-410. [PMC free article: PMC3227310] [PubMed: 22144928]

12. Cascella M. Anesthesia awareness. Can midazolam attenuate or prevent memory consolidation on intraoperative awakening during general anesthesia without increasing the risk of postoperative delirium? Korean J Anesthesiol. 2015 Apr;68(2):200-2. [PMC free article: PMC4384412] [PubMed: 25844143]

13. Cascella M, Muzio MR, Bimonte S, Cuomo A, Jakobsson JG. Postoperative delirium and postoperative cognitive dysfunction: updates in pathophysiology, potential translational approaches to clinical practice and further research perspectives. Minerva Anestesiol. 2018 Feb;84(2):246-260. [PubMed: 28984099]

14. Ghojazadeh M, Sanaie S, Paknezhad SP, Faghih SS, Soleimanpour H. Using Ketamine and Propofol for Procedural Sedation of Adults in the Emergency Department: A Systematic Review and Meta-Analysis. Adv Pharm Bull. 2019 Feb;9(1):5-11. [PMC free article: PMC6468222] [PubMed: 31011553]

15. Eberson CP, Hsu RY, Borenstein TR. Procedural sedation in the emergency department. J Am Acad Orthop Surg. 2015 Apr;23(4):233-42. [PubMed: 25715648]

16. Miller KA, Andolfatto G, Miner JR, Burton JH, Krauss BS. Clinical Practice Guideline for Emergency Department Procedural Sedation With Propofol: 2018 Update. Ann Emerg Med. 2019 May;73(5):470-480. [PubMed: 30732981]

17. Hannam JA, Mitchell SJ, Cumin D, Frampton C, Merry AF, Moore MR, Kruger CJ. Haemodynamic profiles of etomidate vs propofol for induction of anaesthesia: a randomised controlled trial in patients undergoing cardiac surgery. Br J Anaesth. 2019 Feb;122(2):198-205. [PubMed: 30686305]

18.

NOT ORIGINAL

03/30/2026 04:22:14

85787

Kaur M, Singh PM. Current f    of dexmedetomidine in clinical anesthesia a    ntensive care. Anesth Essays Res. 2011 Jul-Dec;5(2):128-33. [PMC free article: PMC4173414] [PubMed: 25885374]

19. Shehabi Y, Howe BD, Bellomo R, Arabi YM, Bailey M, Bass FE, Bin Kadiman S, McArthur CJ, Murray L, Reade MC, Seppelt IM, Takala J, Wise MP, Webb SA., ANZICS Clinical Trials Group and the SPICE III Investigators. Early Sedation with Dexmedetomidine in Critically Ill Patients. N Engl J Med. 2019 Jun 27;380(26):2506-2517. [PubMed: 31112380]

20. Wood J, Ferguson C. Best evidence topic report. Procedural sedation for cardioversion. Emerg Med J. 2006 Dec;23(12):932-4. [PMC free article: PMC2564258] [PubMed: 17130605]

21. Paterson SA, Tahmassebi JF. Paediatric dentistry in the new millennium: 3. Use of inhalation sedation in paediatric dentistry. Dent Update. 2003 Sep;30(7):350-6, 358. [PubMed: 14558199]

22. Mohan R, Asir VD, Shanmugapriyan, Ebenezr V, Dakir A, Balakrishnan, Jacob J. Nitrousoxide as a conscious sedative in minor oral surgical procedure. J Pharm Bioallied Sci. 2015 Apr;7(Suppl 1):S248-50. [PMC free article: PMC4439684] [PubMed: 26015724]

23. Cascella M, Arcamone M, Morelli E, Viscardi D, Russo V, De Franciscis S, Belli A, Accardo R, Caliendo D, De Luca E, Di Caprio B, Di Sauro F, Giannoni G, Iermano C, Maciariello M, Marracino M, Cuomo A. Erratum to: Multidisciplinary approach and anesthetic management of a surgical cancer patient with methylene tetrahydrofolate reductase deficiency: a case report and review of the literature. J Med Case Rep. 2015 Sep 17;9:218. [PMC free article: PMC4574725] [PubMed: 26384007]

24. O'Connor RE, Sama A, Burton JH, Callaham ML, House HR, Jaquis WP, Tibbles PM, Bromley M, Green SM., American College of Emergency Physicians. Procedural sedation and analgesia in the emergency department: recommendations for physician credentialing, privileging, and practice. Ann Emerg Med. 2011 Oct;58(4):365-70. [PubMed: 21802778]

Copyright © 2023, StatPearls Publishing LLC.

This book is distributed under the terms of the Creative Commons Attribution-NonCommercial-NoDerivatives 4.0 International (CC BY-NC-ND 4.0) ( http://creativecommons.org/licenses/by-nc-nd/4.0/ ), which permits others to distribute the work, provided that the article is not altered or used commercially. You are not required to obtain permission to distribute this article, provided that you credit the author and journal.

Bookshelf ID: NBK551685    PMID: 31869149

NOT ORIGINAL

DOCUMENT

PM

2023/05/09 08:34:36    1  /71

Item 9
Page 259

03/30/2026 04:22:14

85787

250 East Fifth Street, Suite 2000

Cincinnati

OH                45202

**FROM**

Name:  Bryan Hayes

Phone:  513.808.9921        Fax    513 808 9912

E-mail:  Bryan.Hayes@lewisbrisbois com

**TO**

15024297158@fax.lewisbrisbois.com

15024297158

Sent:  5/9/23        at    8 34 36 AM                    71    page(s) (including cover)

Subject:    Supplemental Response to Grievance Against Pragya Gupta, MD

Comments

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:22:14

85787

Item 9
Page 259



Bryan D. Hayes
Legal Assistant to Judd R. Uhl
Bryan.Hayes@lewisbrisbois.com
T: 513.808.9921  F: 513.808.9912
PLEASE NOTE WE HAVE MOVED:
250 East Fifth Street, Suite 2000, Cincinnati, OH 45202 | LewisBrisbois.com

Representing clients from coast to coast. View our nationwide locations.



**Bryan Hayes**
Paralegal/Secretary
Bryan.Hayes@lewisbrisbois.com

T: 513.808.9921  F: 513.808.9912

250 East Fifth Street, Suite 2000, Cincinnati, OH 45202 | LewisBrisbois.com

Representing clients from coast to coast. View our locations nationwide.

138

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:22:14

Item 9
Page 260



**LEWIS BRISBOIS**

LEWIS BRISBOIS BISGAARD & SMITH LLP

Judd R. Uhl
250 East Fifth Street, Suite 2000
Cincinnati, Ohio 45202
Judd.Uhl@lewisbrisbois.com
Direct: 513.808.9913

May 9, 2023

Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222

> Re:    Supplemental Response to Grievance Against Pragya Gupta, MD

To the Kentucky Board of Medical Licensure:

On behalf of Pragya Gupta, MD, the undersigned hereby submits this Supplemental Response to the Grievance filed by former patient, Wendy Fillhardt. Ms. Fillhardt's Grievance raised four specific issues that will each be addressed individually below:

I.    As this Board is undoubtedly aware, there is no statute or regulation in Kentucky which directly governs the practice of medical assistants. Rather, the delegation of tasks to unlicensed persons being supervised by a physician is a common law authority extended to physicians licensed in this State. This Board has indirect control over medical assistants by virtue of its control over licensed physicians who supervise and delegate tasks to them. While certification programs for medical assistants exist, certification or licensure is not a requirement in Kentucky. For purposes of this Supplemental Response, it must be noted that this Board has never issued an Opinion wherein a medical assistant was specifically precluded from serving as a qualified practitioner participating in a procedure involving moderate sedation/analgesia, nor has this Board defined what would constitute an "other qualified practitioner" as set forth in the published Board Opinion dated June 16, 2011, and updated March 15, 2018.

The Grievance submitted by Ms. Fillhardt expressed concern over Donald Jay Thomas' lack of medical certification and his participation in Ms. Fillhardt's care over the course of her treatment with Dr. Gupta. However, from the face of the Grievance, it is unequivocal that Dr. Gupta was directly supervising Mr. Thomas in every aspect of the tasks delegated to him by Dr. Gupta in accordance with the "Policies and Procedures for Sedation" at Advanced Pain and Treatment Center, effective December 2018. (*See* "Policies and Procedures for Sedation" attached hereto as Appendix A).

ARIZONA · CALIFORNIA · COLORADO · CONNECTICUT · DELAWARE · FLORIDA · GEORGIA · ILLINOIS · INDIANA · KANSAS · KENTUCKY · LOUISIANA
MARYLAND · MASSACHUSETTS · MINNESOTA · MISSISSIPPI · MISSOURI · NEVADA · NEW JERSEY · NEW MEXICO · NEW YORK · NORTH CAROLINA
OHIO · OREGON · PENNSYLVANIA · RHODE ISLAND · TENNESSEE · TEXAS · UTAH · VIRGINIA · WASHINGTON · WASHINGTON D.C. · WEST VIRGINIA
94656438 1

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:22:14

85787

Kentucky Board of Medical Licensure
May 8, 2023
Page 2

Moreover, Ms. Fillhardt executed six (6) separate informed consents to treatment, each of which explicitly include the following provisions:

> 6. I am aware that in the practice of medicine, other unexpected risks or complications not discussed may occur. I also understand that during proposed procedure(s), unforeseen conditions may be revealed requiring the performance of additional procedures, and I authorize such procedures to be performed. <u>I further acknowledge that no guarantees or promises have been made to me concerning the results of any procedures.</u> I hereby voluntarily give my authorization and consent to Dr. Pragya B. Gupta, and his delegated associates to perform and/or assist in the proposed procedure described above.

> 7. I hereby authorize and consent to the taking of photographs or films during the procedure and their use for teaching or research purposes.

(*See* Consents to Procedures attached hereto as Appendix B, emphasis in original).

In addition to executing the six consent forms allowing the participation of delegated associates, including Mr. Thomas, during the procedures, Ms. Fillhardt also consented to the procedures themselves to be used as instructional tools. (*See* Appendix B). Ms. Fillhardt was given the opportunity to ask questions about the procedures and certified that she read and fully understood the contents of the consent form and that the disclosures had in fact been made. (*Id.*). In accordance with the consent form executed by Ms. Fillhardt, Mr. Thomas participated in five (5) of the six procedures Dr. Gupta performed on Ms. Fillhardt, all of which utilized moderate sedation/analgesia. (*See* Conscious Sedation Flow Sheet attached hereto as Appendix C).

Ms. Fillhardt also consented to participate in an observational study conducted by Eli Lilly and Co. as part of the Preventive Treatment of Migraine: Outcomes for Patients in Real-World Healthcare Systems ("TRIUMPH"). (*See* Consent to Release Information and HIPAA Authorizations attached hereto as Appendix D). Ms. Fillhardt initially reviewed and executed her Consent to Release as part of this observational study, which did not constitute experimental treatment or alter the scope/plan of treatment for Ms. Fillhardt in any way, in an electronic format that Ms. Fillhardt examined for more than twenty (20) minutes on January 25, 2021, based upon the metadata/audit trail that was maintained as part of her enrollment in the study. (*See* Appendix D). Ms. Fillhardt subsequently executed a hard copy of a Consent and Release on November 24, 2021, which was also kept as part of Dr. Gupta's records. (*See* Appendix D). Accordingly, evidence exists supporting the conclusion that Ms. Fillhardt is the type of patient who reads documents prior to signing and there is no indication that she failed to read or was not afforded the opportunity to read the consents attached hereto as Appendix B. (*See* Appendix D).

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:22:14

85787

Item 9
Page 262

Kentucky Board of Medical Licensure
May 8, 2023
Page 3

As Dr. Gupta noted in his February 13, 2023 Response, Mr. Thomas has been with Dr. Gupta's practice since 2002 and Dr. Gupta has trained him for the past twenty (20) years. This long-standing history puts Dr. Gupta in a unique position to assess Mr. Thomas' abilities with respect to performing appropriately delegated patient care. Mr. Thomas' participation in Ms. Fillhardt's care was always directly supervised by Dr. Gupta and the inclusion of Mr. Thomas in these and similar procedures over the past twenty years has allowed Dr. Gupta to operate a safe and efficient practice in accordance with Kentucky law. Notably, Dr. Gupta cannot recall a single adverse event or serious adverse event where Mr. Thomas was involved in patient care. It is the teaching and research purposes Ms. Fillhardt and other similarly situated patients consented to which has allowed Mr. Thomas to participate in treatments/procedures to better assist Dr. Gupta and his patients.

As noted above, there is no statute or regulation that prohibits Dr. Gupta from training Mr. Thomas or including him in procedures, under direct supervision by Dr. Gupta, where the patient consents to his involvement and where moderate sedation/analgesia is used. Further, there is no pre-existing Opinion from this Board that provides a bright-line rule for the use/inclusion of medical assistants in this State in procedures involving moderate sedation/analgesia. Using Dr. Gupta as an example and punishing him for conduct that is not otherwise prohibited by law or the guidance of this Board would be unduly prejudicial and unconstitutional.

In the event that this Board would like to directly control the activities of medical assistants in Kentucky, proposing statutory legislation on this subject or issuing a prospective administrative regulation on this topic under KRS 311.565(1)(i) are more appropriate vehicles than retrospective punishment of Dr. Gupta when there has been no violation of Kentucky law or breach of the applicable standard of care. Similarly, if this Board would like to prohibit medical assistants from serving as a "qualified practitioner" in procedures where moderate sedation/analgesia is used, a clarifying Opinion on this topic would be more equitable than the issuance of a complaint or other punitive action under KRS 311.591(c) or (d).

II.    Ms. Fillhardt's next complaint pertains to the alleged injection of cyanocobalamin in Dr. Gupta's office. Specifically, Ms. Fillhardt claims that the second injection of the medication caused an allergic reaction, but she does not assert or describe any issue with the first injection of the medication. Notably, Dr. Gupta denies that cyanocobalamin was ever administered in his office; rather, the medication is simply listed as one of Ms. Fillhardt's medications.

III.   Ms. Fillhardt's assumption that her alleged designation as a "VIP" inferred that she would be given more anesthesia than other patients is inconsistent with the Conscious Sedation Flow Sheets and the acceptable norms of the practice of medicine. (*See* Appendix C). Further, Ms. Fillhardt's allegations that she "expected to be in a twilight type feeling while injections were being given" is unfounded and unsupported. Similarly, Ms. Fillhardt's contention that she "had issues coming out of anesthesia" is inconsistent with the nursing notes included in the Conscious Sedation Flow Sheets. (*See* Appendix C). To the extent that the document

LEWIS BRISBOIS BISGAARD & SMITH LLP
www.lewisbrisbois.com

94656438.1

141

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:22:14

85787

Item 9
Page 263

Kentucky Board of Medical Licensure
May 8, 2023
Page 4

has not been filled out, Dr. Gupta represented to this Board that all employees have been re-educated to fill out forms in their entirety.

In the event that Ms. Fillhardt had post-procedure issues, Dr. Gupta provided her with post-procedure instructions which included directions to report to a hospital or emergency room should certain complications arise. (See Post-Discharge Instructions attached hereto as Appendix E). At each procedure, Ms. Fillhardt was accompanied by her husband and/or her daughter, Brittany Morris, a medical assistant previously employed at Dr. Gupta's office. Ms. Fillhardt walked out of the office, without assistance, awake and alert after each procedure .

IV.    The last of Ms. Fillhardt's concerns in her Grievance pertain to Autumn Thomas' involvement in Ms. Fillhardt's prescriptions. With respect to the designation of Ms. Thomas as a medical assistant, Dr. Gupta relies on his response as set forth in Part (I) above.

Any involvement by Ms. Thomas in providing medication to Ms. Fillhardt would have been solely at the delegation by Dr. Gupta and under his direct supervision. This is not the situation where the Board previously issued an Opinion that prohibits medical assistants or nurses from prescribing or refilling medication consistent with a previously established protocol created by a physician. Rather, Dr. Gupta prescribed the medication for Ms. Fillhardt and Ms. Thomas did not participate in the unlicensed practice of medicine. Specifically, at no time did Ms. Thomas undertake any tasks which required the exercise of independent professional judgment or the making of clinical assessments, evaluations, or interpretations.

For these reasons, Dr. Gupta requests that this Board conclude that there is no evidence of any medical malpractice act by Dr. Gupta and that no further action is necessary pursuant to KRS 311.591(3)(a) or, in the alternative, that there is insufficient evidence of a violation to warrant the issuance of a complaint pursuant to KRS 311.591(3)(b). To the extent that this Board has already concluded that some type of action or complaint may be necessary consistent with KRS 311.591(3)(c) or (d), Dr. Gupta requests that this Board reconsider the same in light of the reasons provided herein, including the supportive documentation attached in the Appendices.

In addition to this letter serving as a direct reply to Ms. Fillhardt's allegations, Dr. Gupta also requests that Board Member Kristin A. Turner, counsel for Ms. Fillhardt in her civil suit, recuse herself from the Board's ultimate determination on the issuance of a complaint because her conflicting interest tarnishes the "independent" nature of the Board, despite the explicit language used in KRS 311.530(1) to create this Board, and Ms. Turner is "financially interested" in the regulation of Dr. Gupta's practice herein, contrary to the express provisions of KRS 311.530(3)(c). Any inquiry into the appropriateness of Dr. Gupta's practice under KRS 311.591 by Board Member Turner pertaining to the grievance filed by her client, who she represents in civil litigation pending against Dr. Gupta, would create an appearance of impropriety that KRS 311.591(5) attempts to prevent. Additionally, any final order issued against Dr. Gupta would be subject to judicial review under KRS 311.593 and KRS 311.555.

LEWIS BRISBOIS BISGAARD & SMITH LLP

www.lewisbrisbois.com

94656438 1

142

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 264

03/30/2026 04:22:14

85787

Kentucky Board of Medical Licensure
May 8, 2023
Page 5

Should this Board have any additional questions or concerns related to Dr. Gupta or his care of Ms. Fillhardt, please do not hesitate to contact me.

Very truly yours,

/s/ Judd R. Uhl

Judd R. Uhl of
LEWIS BRISBOIS BISGAARD & SMITH LLP

JRU

DOCUMENT

PM

Item 9
Page 265

NOT ORIGINAL

03/30/2026 04:22:14

85787

# Appendix A

144

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:22:14

85787

Page 266

## Advanced Pain Treatment Center

### Policies and Procedures for Sedation

**Objective:**

To provide widely applicable guidelines for
- The use of sedative and analgesic medications to maintain patient comfort during diagnostic and therapeutic procedures.
- Equipment necessary for adequate monitoring of patients by trained professional personnel.
- Documentation of the pre-procedure status of the patient
- The concurrent recording of the patient's response to the medications given, including fitness for discharge from medical supervision.

**Definitions:**

Sedation and Analgesia: Previously termed "conscious sedation" describes a state which allows patients to tolerate unpleasant procedures while maintaining cardio respiratory
function and the ability to respond purposefully to verbal command and/or tactile stimulation. Because sedation is a continuum, the intended goal to maintain consciousness and intact protective reflexes at all times may be affected by factors like drug responsiveness and variations in procedural intensity. Only mild or moderate sedation will be administered at Advanced Pain Treatment Center.

**Objective of Sedation and Analgesia include:**
- Relaxation, cooperation and comfort
- Diminished verbal communication and easy arousal from sleep
- Intact protective laryngeal and pharyngeal reflexes

**Personnel and Training:**

The practitioner is responsible for treating the patient and/or administering drugs during procedures requiring sedation. Still, all clinical personnel shall be knowledgeable in monitoring and sedation techniques.
- The minimum number of available personnel shall be two:
  1. The physician who performs the procedure
  2. The individual (R.N., N.P., P.A., R.T., or M.A.) is trained to assist in managing the patient receiving sedation and analgesia.
- The individual assigned to monitor the patient may administer sedation under direct supervision by a physician and observe the

Page 1 of 7

145

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:22:14

85787

Item 9
Page 267

patient and his/her response to the procedure and is capable of assisting with any supportive, emergency resuscitative measures. The individual monitoring the patient should have no other significant responsibilities except for the documentation and locking and unlocking using the button on the Siemens' X-ray machine when requested by the physician. The physician does all the adjustments of the Fluoroscope during the procedure. The X-ray machine is draped with a sterile drape.

- All personnel involved in sedation should be at least conversant with BLS. This includes recognition of airway obstruction, proper positioning of the head, clearing of the airway secretions, using oropharyngeal and nasal airways, and supplemental oxygen. ACLS certification would be of significant help.

**Equipment and Maintenance:**

The following list of equipment should be available at all locations where sedation is performed:

- A positive pressure oxygen delivery system (AMBU bag with reservoir), nasal prongs, and various size masks, including breathing masks as appropriate.
- A source of suction (portable or wall mounted) must be available
- A pulse oxymeter with variable pitch alarm set to 92%
- A device for measuring blood pressure (manual and automatic)
- ECG monitoring
- Flumazenil, a reversal agent for Midazolam, should be available.
- Naloxone should be available also.
- AED and necessary medicine as stated below.

**Patient Instructions and Care:**

- Informed consent should be obtained for the procedure and sedation.
        Discharge instructions (verbal and written) are given to each patient.

**Patient Assessment:**

- The patient's state of consciousness to be documented.
- Contraindications to sedation include but are not limited to pregnancy, a history of malignant hyperthermia, sleep apnea, hypothyroidism, and severe emphysema.
- A baseline health evaluation should be performed by a qualified physician no longer than 28 days before the procedure whenever possible and should include
    - Allergies and previous adverse drug reactions
    - current medications and last dose, h/o substance abuse
    - Current disease, disorders and abnormalities
    - Pertinent family history
    - Patient should be evaluated before the procedure by the physician.

Page 2 of 7

146

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:22:14

85787

Item 2.
Page 268

A physical examination reflecting
1. Height and weight
2. Vital signs, including baseline SaO2 whenever possible.

- Lab tests and EKG as indicated
- Dietary precautions (NPO status)
    1. Elective scheduled cases to fast six hours before but may take clear liquid up to two hours before their scheduled procedure. Clear liquids are water, soda, black tea, and coffee.
    2. In emergencies, avoid S/A or delay the procedure until risk of aspiration is reduced.

**Documentation and Monitoring Guidelines:**

- There will be written documentation of all aspects of care rendered to the patient
- Whenever drugs for S/A are administered, a trained individual should observe the patient.
- The individual assigned to monitor the patient may assist the practitioner with interruptible tasks of short duration once the patient's level of sedation is established, vital signs are stable and adequate monitoring is maintained.
- The level of sedation will be monitored.
- A functional IV access route will be established and maintained until discharge criteria are met.
- Vital signs, including HR, BP, RR, SaO2, and patients' responsiveness, will be monitored continuously and documented every five minutes during the procedure.
- Oxygenation should be assessed by observation of pulse oximetry every five minutes during the procedure.
- Adequacy of ventilation should be assessed by observation of spontaneous respiratory activity.
- IV drugs are administered slowly, considering the patient's age, weight, physical status, and the planned procedure. Dosage guidelines should be observed, which is 0.5mg of versed at a time. Individual dosing should be used, and a sufficient time interval must be allowed to elicit the patient's response following each dose. Only the physician decides the dosage and provides verbal orders for administering the medicine in case the physician himself is not administering the medicine.
- Administered medications are documented to include the route, site, time, drug, and dose using an appropriate flow sheet. The oxygen delivery is recorded in liters/ minutes when applicable.

147

- Local anesthetic drugs are monitored and recorded by the physician in the procedure note. The monitor must be familiar with dosage limits and able to recognize signs of local anesthetic toxicity, but it is the physician's responsibility to diagnose signs of toxicity ultimately.

## Quality Assessment:

Quality indicators may include some or all of the following events:

- Emergency use of reversal agents- NA
- Prolonged recovery
- Unplanned admission
- Unsuccessful sedation- procedure cancelled.
- Evidence of local anesthetic overdose (seizures, hypertension, conduction blockade)
- Vomiting and aspiration
- Cardiac arrest
- Arrhythmia requiring treatment.
- Hypoxia (oxygen saturation <92% or 5% points below baseline)
- Respiratory arrest

## Management Guidelines:

Oxygen saturation: As measured by pulse oximetry, the arterial oxygen saturation should be maintained within 5% points below baseline at all times. Patients with low baseline saturation require close monitoring and may not be a candidate for S/A. If SaO2 falls below 92% or 5% points below a baseline value, the individual monitoring the patient should immediately arouse the patient by verbal command, ask the patient to take several deep breaths, then determine and treat hypoventilation /or airway obstruction. If SaO2 fails to rise above 90%, the individual monitoring the patient should immediately notify the physician, consider insertion of a nasal or oral airway, perform a "jaw thrust maneuver," and, if spontaneous respirations are insufficient, administer 100% oxygen by positive pressure bag/mask device (AMBU bag). The physician should consider calling for assistance and/or reversal agents such as naloxone or flumazenil, depending on the drug administered.

## Drug Reaction:

Any physical manifestations (i.e., pruritus skin rash, dyspnea, significant hemodynamic changes) suggestive of an allergic reaction should be reported to the physician immediately. Appropriate action should then be implemented.

## Cardiovascular or Respiratory Arrest & Patient transfer policy:

The physician should initiate appropriate resuscitative measures immediately and follow ACLS protocol. 911 should be called immediately, and the patient should be transferred with the help of an EMT to St. Elizabeth Medical Center. The details need to be recorded. The physician should call the ER physician to appraise the situation.

Page 4 of 7

85787

NOT ORIGINAL
DOCUMENT
PM
03/30/2026 04:22:14

Item 9
Page 270

85787

**Post-Procedure Care:**

These criteria are solely based on recovery from sedation and analgesia. Additional information may be necessary depending on the procedure performed.

- Monitoring should continue following the completion of the procedure until the patient returns to his pre-procedural state. Vital signs (as defined above) should be monitored and recorded.
    1. Every 5-15 minutes for a minimum of 30 minutes following the last administered dose of intravenous sedative or analgesic drug
    2. Every 15 minutes until the patient returns to his/her pre-procedure state, provided the patient is stable. Oxygen saturation levels should be obtained if indicated.
    3. The patient must be observed for 30 minutes following the procedure. If antagonist drugs have been administered, a 2-hour observation period is recommended.

- Discharge criteria include:
    1. The patient is alert or appropriate to baseline. (Score of 9 on the REACT discharge scoring system)
    2. There is minimal nausea, dizziness, or pain
    3. The patient can sit unaided, if appropriate, to base line and procedure.
    4. The patient can walk with assistance, if appropriate to baseline and procedure
    5. There is a responsible adult accompanying the patient home.

**Discharge Plan:**

A discharge plan for outpatient procedures should include:
- Written instructions that explain potential or anticipated limitations or activities, behavior, and diet. Patients need verbal and written advice to refrain from operating heavy machinery, driving a car, drinking alcohol, or making important decisions for 24 hours.
- A 24-hour emergency contact telephone number should be provided to all patients
- Evaluation of pre-procedure medications to determine appropriate post-procedure scheduling. A competent adult shall accompany the patient home who received sedation electively.
- The patient or responsible adult verbalizes understanding of discharge instructions.
- Discharge orders have been obtained from a physician.

**Suggested Drugs and Dosages for Sedation and Analgesia in Adults:**

This list is not all-inclusive. We use only Midazolam in our center except when a kyphoplasty procedure is performed when Fentanyl may also be used after procuring it from the hospital if possible.

149

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:22:14

85787

Item 9
Page 271

Generally, no opioid is used during routine procedures.

- Midazolam (Versed)
  Under 60 yrs old: 0.5mg -2 mg over 5 minutes. Wait 2 more minutes to evaluate fully. If further titration is needed, give small increments. Wait 2 minutes after each increment to fully evaluate. A total dose of 0.05-0.1 mg/kg is usually sufficient. If narcotics or other CNS depressants are used, give 50% less.

  Over 60 yrs old, debilitated, or chronically ill patients: Titrate slowly; usual dose is no more than 0.5 mg IV. Wait 3-5 minutes to fully evaluate. If further titration is necessary, give no more than 0.5 mg every 2-3 minutes. Total dose of 0.05/kg is usually sufficient. If CNS depressants are used, give 50% less midazolam.

- Diphenhydramine (Benadryl) 10-50 mg IV
- Hydroxizine (Vistaril) 25-100 mg IM or PO. Lower doses to 50% if combined with narcotic.
- Flumazenil 0.4-1.0 mg IV for complete antagonism

Other drugs needed for emergencies:
  Epinephrine
  Atropine
  Levophed
  Glycopyrrolate
  ASA tablets
  Labetalol
  Glucose tablets
  Esmolol
  Nitroglycerine tablets
  Dexamethasone
  Metoprolol
  Phenergan
  Zofran
  Reglan
  Ketorolac
  Lidocaine
  Ropivacaine
  Diphenhydramine

*Patients requiring reversal of benzodiazepines need extended monitoring in the recovery phase (minimum 2 hours recommended).*

Anesthetic Agents: Safe dose by weight (and for a 70 kg adult)
- Lidocaine plain 4-5 mg/kg (300-350mg)

Page 6 of 7

NOT ORIGINAL
DOCUMENT

PM

03/30/2026 04:22:14

85787

Item: 9
Page 272

- Lidocaine with epinephrine 7 mg/kg (500 mg)
- Bupivicaine plain 2.5 mg/kg (175 mg)
- Bupivicaine with epinephrine 3 mg/kg (225 mg)
- Ropivacaine 3mg/kg
- Benzocaine 20% (hurricane spray) used metered spray

Not used at this center (2018).

**ASA Physical Status Classification:**

Class I: No systemic disease
Class II: Mild or well controlled systemic disease, no functional limitations. Class III:
Severe Systemic disease, definite functional limitations
Class IV: Severe systemic disease, constant threat to life, incapacitating
Class V: Moribund, not expected to survive for 24 hours, irrespective of intervention.

**Sedation Scale:**

0 None
1 Mild (occasionally drowsy; easy to arouse)
2 Moderate (frequently drowsy; easy to arouse)
3 Severe (somnolent; difficult to arouse)

Oxygen cylinder Airway Cart:
ETT sizes 6, 6.5, 7, 7.5, and 8 cuffed
Guedel airway 7, 8, and 9 Nasal
airway (rubber) 20-3 Nasal cannula
for 02
Laryngoscope (short handle and normal handle) McIntosh 3,
3.5, and 4 blades
Miller 2, 3, and 4 blades

**References:**
- Kentucky Medical Board opinion regarding Office based surgery – 2018.
- Practice Guidelines for Moderate Procedural Sedation and Analgesia 2018. A report by ASA Taskforce on moderate Procedural sedation and analgesia.
- A hospital policy regarding sedation and analgesia by non-anesthesiologist during elective diagnostic and therapeutic procedures. New York Society of Anesthesiology Sphere. 1997, Vol 49, #4, pp 26-32.
- American Society of Anesthesiologists. Guidelines for sedation and analgesia by Non-Anesthesiologists. Anesthesiology, Anesthesiology 1996; 84:459-71.
- Commonwealth of Massachusetts, Board of Registration in Medicine, Policy 94-004. Patient care assessment guidelines for IV conscious sedation. May 11, 1994.
- Holzman RS, Cullen DJ, Eichhorn JH, Philip JH: Guidelines for sedation by non-anesthesiologist during and therapeutic procedures. J Clin Anesth 6:265-276, 1994.

Created by Pragya B. Gupta, MD. January 14, 2001, Revised December, 2018.

Page 7 of 7

151

NOT ORIGINAL
DOCUMENT

PM

Item 9
Page 273

03/30/2026 04:22:14

85787

# Appendix B

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 286

03/30/2026 04:22:14

85787

# Appendix C

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 297

03/30/2026 04:22:14

85787

# Appendix D

NOT ORIGINAL
DOCUMENT

PM

03/30/2026 04:22:14

Item 8
Page 298

IRB APPROVED
AS MODIFIED
Oct 20, 2021

85787

## CONSENT TO RELEASE INFORMATION AND HIPAA AUTHORIZATION

**TITLE:**        preventive TReatment of mIgraine: oUtcoMes for Patients in real-world Healthcare systems (TRIUMPH)

**PROTOCOL NO.:**    I5Q-MC-B004/2016-4215
IRB Protocol # 20193217

**SPONSOR:**       Eli Lilly and Company

**INVESTIGATOR:**    Pragya B. Gupta, MD
162 Barnwood Drive
Edgewood, Kentucky 41017
United States

**STUDY RELATED
PHONE NUMBER(S):**    859-757-1359
859-468-2583 (24 hours)

IRB Version 2.0
I5Q-MC-B004 (TRIUMPH)
Study-specific Consent to Release Information Form _US_v2.0
Confidential
Country ICF USA_MainV3.0(USA)v1.0(18Sep2021)

177

NOT ORIGINAL
DOCUMENT

PM

Item 9
Page 299

IRB APPROVED 30/2026 04:22:14
AS MODIFIED
Oct 20, 2021
85787

## Introduction

You are invited to take part in an *observational* research study. To help you decide, you should understand the study and what it will involve for you. This process is called 'informed consent'. Please take the time to read the following information carefully and feel free to share and discuss it with others. Please ask your doctor if there is anything that is not clear or if you would like more information. If you decide that you want to take part, you will be asked to sign the attached consent form. You will be given a copy of the signed and dated Informed Consent Form and HIPAA Authorization to keep, and the original will stay at your doctor's office.

## What is the purpose of the study?

The purpose of this study is to collect information about treatment patterns, effects, and outcomes in patients with migraine who are switching or initiating a pharmacologic treatment for migraine prevention.

Eli Lilly and Company, and its representatives ("sponsor"), are sponsoring this study and are paying the health care provider and/or study doctor for their work in this study.

## Why have you been invited?

You have been asked to participate in this study because you have been diagnosed with migraine and your doctor has prescribed you a new migraine preventive medication.

## How many people will take part in this study?

We anticipate that approximately 5300 patients will participate in this study. The study will be conducted at approximately 285 study centers in multiple countries worldwide. We anticipate the study will run until 2025.

## What treatment will you receive?

This is an observational study. Your treatment and medical care will not change because you are participating in this study. Your health care provider will continue to make all decisions regarding your proper treatment and care.

## What will happen if you take part in this study?

Your participation in the study will be either a single- day assessment or it will last up to 2 years. This depends on which preventive migraine medication you are prescribed as part of your routine care.

This study consists of 2 stages. Depending on your eligibility, you will be enrolled in stage 1 and stage 2 on the same day.

Page 2 of 12

IRB Version 2.0
ISG-MC-B004 (TRIUMPH)
Study-specific Consent to Release Information Form _US_v2.0
Confidential
Country ICF USA_MainV3.0(USA)v1.0(16Sep2021)

178

IRB APPROVED
AS MODIFIED
Oct 20, 2021

**Stage 1:** Information about your medical history will be collected, some of which may come from review of your medical records, and you will be asked to complete 3 questionnaires providing information about the migraine therapy outcome and your perception of your specific disease burden.

The following information will be collected from your medical records:

- Demographic information such as gender, age/year of birth , Ethnicity/Race
- Height and weight
- Your medical history and comorbidities (i.e., other disease that you have)
- Your migraine history, migraine treatment history, and your current disease state; this includes:

    o Your preventive and acute treatment use and rationale for changes
    o The number of migraine headache days, headache hours, severity, and symptoms

You will also be asked to complete some questionnaires. Each of them will take approximately 1 – 5 minutes to complete.

- **Migraine Treatment Optimization Questionnaire (mTOQ):** six questions measuring the efficacy of your current acute treatment
- **Migraine Disability Assessment (MIDAS):** five questions to quantify your headache-related disability over a 3-month period
- **Patient Global Impression of Severity Scale (PGI-S):** a single question that rates the severity of your migraine from 1 ("normal, not at all ill") to 7 ("extremely ill")

**Stage 2:** Your health care provider will decide if you also meet the eligibility requirements to participate in the follow up part of the study which is expected to run for 2 years

During stage 2 your routine care will continue but you will also be asked to:

- keep an electronic patient headache diary. Your health care provider will encourage you to complete your diary each time you experience a headache within 48 hours of onset. You will enter this information using your personal electronic device or a web portal. You will be given detailed instructions on how to use the device or the web portal.
- Complete the questionnaires listed above; and
- answer some additional questionnaires. It is anticipated that the total time to complete these questionnaires at each visit will be approximately 20 minutes.

IRB Version 2.0
I5Q-MC-9004 (TRIUMPH)
Study-specific Consent to Release Information Form _US_v2 0
Confidential
Country ICF USA_MainV3.0(USA)v1.0(16Sep2021)

85787

NOT ORIGINAL
03/30/2026 04:22:14 PM
DOCUMENT 179

NOT ORIGINAL
DOCUMENT

PM

IRB APPROVED
AS MODIFIED
Oct 20, 2021

You should complete these questionnaires at specific intervals during the 2-year follow up phase (completion due every 3 months or less often). Depending on your preference, you will receive phone or email reminders to support you with entering the information needed. You may answer the questionnaires by using a personal device. You will read more about these reminders and how we keep your privacy later in this form. The questionnaires are:

- o **Headache Impact Test-6 (HIT-6):** 6 questions measuring the way you feel and what you cannot do because of headaches.
- o **Migraine-Specific Quality of Life Questionnaire version 2.1 (MSQ v2.1):** measuring your physical and emotional limitations because of migraine
- o **Patient Satisfaction with Medication Questionnaire-Modified (PSMQ-M):** measuring your level of satisfaction with your migraine medication
- o **Migraine Interictal Burden Scale (MIBS-4):** measures your burden related to headache in the time between attacks
- o **Work Productivity and Activity Impairment Questionnaire (WPAI):** measures the impact on your work productivity and regular activities related to your migraine
- o **Health Care Resource Utilization and Employment Status (HCRU):** 4 questions asking your use of health care facilities or services; you will be asked to complete this questionnaire monthly

**What are your responsibilities if you take part in this study?**
- You will attend your usual doctor's appointments with your doctor and continue to take your regular medication as prescribed by your doctor.
- You will be given the option to attend the study specific baseline visit and the follow up visits at your doctor's office, by phone or by web.
- If you are involved in any other clinical study you should inform your study doctor.
- You will have to follow the instructions the doctors give you in order to keep your headache diary and to complete the questionnaires at given timepoints.

**Will you have to pay to take part in the study?**
You do not have to pay to take part in this study. The treatments/procedures in this study are considered normal care in the monitoring and/or treatment of your disease. You or your health care insurance provider should pay the cost of any treatment for your disease that you would receive whether you were in this study or not.

**Will you be paid to take part in the study?**
You will not receive any payment or other benefits for providing this information from your medical records.

Page 4 of 12

IRB Version 2.0
ISQ-MC-8004 (TRIUMPH)
Study-specific Consent to Release Information Form _US_v2.0
Confidential
Country ICF USA_MainV3.0(USA)v1 0(16Sep2021)

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:22:14

85787

Item 9
Page 302

IRB APPROVED
AS MODIFIED
Oct 20, 2021

However, you will be paid $25 for your time to complete the Patient Reported Outcome (PRO) questionnaires at the following visits or time points:

- Baseline (Month 0)
- Month 3
- Month 6
- Month 12
- Month 18
- Month 24

Based on the total number of times that you complete the PRO questionnaires throughout the study, you will be paid up to a maximum amount of $150 for your time. Apart from that, you will not be paid to take part in this study.

**Do you have to take part in the study?**
Your participation in this study is voluntary. If you choose not to participate, your option is to continue to receive routine care from your doctor without being in the study.

**What are the possible risks of taking part in this study?**
Since the study is observational it will not change how your treatment/disease is managed by your doctor. There are no physical risks of taking part in this study. While completing the questionnaires, there is the potential that some of the questions might be upsetting or distressing to you or may cause emotional or mental discomfort. Should you become upset while answering any of the questionnaires, please tell your study doctor.

There is a low risk of loss of confidentiality of your personal information; however, steps have been taken to help ensure this will not happen. You will read more about the protection of your information later in this form.

**What if new information becomes available?**
New information about your treatment or your disease may become available during this study. If this happens, your doctor will tell you about the new information, and he/she will talk to you about whether you want to remain in the study. If you decide to withdraw from the study, the medical care you receive will not be impacted.

**What are the possible benefits of taking part in this study?**
There are no direct benefits for your participation in this study. However, the information collected in this study may lead to an improved understanding of your illness. The findings from this study may provide healthcare providers with important information for treating migraine in the future.

Page 5 of 12

IRB Version 2.0
ISO-MC-0004 (TRIUMPH)
Study-specific Consent to Release Information Form _US_v2.0
Confidential
Country ICF USA_MainV3.0(USA)v1.0(16Sep2021)

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:22:14

Item 9
Page 303

IRB APPROVED
AS MODIFIED
Oct 20, 2021

**What will happen if you are injured as a result of taking part in this study?**
In case you become injured or ill during the study, your doctor/or your healthcare team will provide medical treatment to you as you would normally receive even if you were not participating in the study. As this is an observational study and there are no experimental procedures or treatment as part of this study, the study sponsor will not provide any payment for your medical treatment in cases of injury or illness while participating in the study. Neither the study clinic nor the study Sponsor will provide other types of financial compensation. You and/or your health insurance company will be responsible for the cost of the medical care for your illness or injury. If you become ill or physically injured during this study, please contact your doctor right away. You do not give up any of your legal rights by signing this consent form.

**What if you have a question or problem?**
If you have any questions about this study complaints, concerns, or think this research has hurt you, you can call the study doctor at the contact information listed on page 1 of this form.

If you have any questions about your rights as a research subject, questions about the study, or any concerns or complaints about the research that you do not want to discuss with your doctor or research team, you may contact the Institutional Review Board ("IRB").An IRB is a group of people who perform independent review of research studies. You may talk to them at (888)-303-2224 or (800) 562-4789, irb@cgirb.com if:

- You have questions, concerns, or complaints that are not being answered by the research team.
- You are not getting answers from the research team.
- You cannot reach the research team.
- You want to talk to someone else about the research.
- You have questions about your rights as a research subject.

**What will happen if you don't want to carry on with the study?**
You can stop taking part in the study at any time without giving any reason by telling your doctor. This will not affect your medical care or your relationship with your doctor. There will not be any penalty or loss of benefits to you if you decide not to take part or if you leave the study early. Your doctor or Sponsor may also decide to withdraw you from the study at any time, for any of the following reasons:

- Lost to follow-up (i.e., discontinuation by patient without notice or action)
- Violation of eligibility criteria (i.e., if you do not begin taking you preventive migraine treatment within 66 days of your doctor's prescription)
- You do not follow the instructions for participation

Page 8 of 12

IRB Version 2.0
ISQ-MC-8004 (TRIUMPH)
Study-specific Consent to Release Information Form _US_v2.0
Confidential
Country ICF USA_MainV3.0(USA)v1.0(16Sep2021)

IRB APPROVED
AS MODIFIED
Oct 20, 2021

The study may be stopped at any time, prior to being completed. Your doctor will inform you if the study is stopped for any reason. Your normal care will not be affected.

**How will my contact information be used for the purposes of this study?**
In order to remind you to complete the questionnaires, you will be asked to provide your personal contact information (telephone number and/ or email address) and to agree to have your personal contact information shared with the call center. The representatives of the call center will have no affiliation with the study team members. This means that your personal contact details will be stored separately from the study database, and the call center representatives will never be in contact with the study team to share this information.

Information that identifies you, such as your email address, will be obtained for completion of the questionniares. By signing this consent form, you agree that information about you may be used and disclosed as follows: when completing your questionnaires on an electronic device, you will receive an automated email from the system which will collect your answers to the questionnaires. The contact email information provided will be blinded to all users in the system after submission in the system and will not be visible to any users; only a unique patient ID provided for your log in will be visible to other users.  You will receive an email notification confirmation when your information has been captured by the system.

If you decide to complete the questionniares on your mobile device, a member of the study team will complete the enrollment process by entering your: email address, phone number (optional), language preference and timezone into the questionnaire platform. You will then receive an email asking you to enter a password. Once the enrollment process is complete, the questionnaires will be available to you. Your contact information will be stored completely separate from the study database.

Your contact information will also be used to deliver payments to you for completion of the patient reported outcome questionnaires. The payments will be made by a third party vendor who only has access to your contact information and what payment you are owed—they receive no information on your study results.

Finally, we wish to ask if you are willing to share your contact information so we might follow up with you about your interest to participate in future research projects by the sponsor of the present study. You may decline to share your contact information for this purpose.

**Will taking part in this study be kept confidential and how will your personal information be used?**
As part of the conduct of this research study, it will be necessary to share medical information about you with persons other than the study health care provider. This

IRB Version 2.0
I5O-MC-8004 (TRIUMPH)
Study-specific Consent to Release Information Form _US_v2.0
Confidential
Country ICF USA_MainV3.0(USA)v1.0(16Sep2021)

85787

NOT ORIGINAL

03/30/2026 04:22:14

PM

183 DOCUMENT

NOT ORIGINAL DOCUMENT
03/30/2026 04:22:14 PM

Item 9
Page 305

IRB APPROVED
AS MODIFIED
Oct 20, 2021

Consent to Release Information explains how your personal health information will be used and to whom it will be given ("disclosed") for this research study.

It also describes your privacy rights, according to a federal government rule that has been issued to protect the privacy rights of patients. This rule was issued under a law called the Health Insurance Portability and Accountability Act of 1996 (HIPAA). This rule is designed to protect the confidentiality of your personal health information.

Your personal health information is information about you that could be used to find out who you are. For this research study, this includes information in your existing medical records (paper or via electronic media) including health information, such as medical condition and medical history, your lifestyle, and your demografhics (age, gender, race/ethnicity, if allowed by local regulations) needed for this study and new information created or collected during the study. This study will also collect information about your race and/or ethnicity. Your race and/or ethnicity are considered sensitive personal information under data protection law. If you agree to give this information, your race and/ or ethnicity will be collected and entered into the same database where the other data about you will be entered, stored, and protected during this study.

By signing the Consent to Release Information for this study, you give permission ("authorization") for the uses and disclosures of your personal health information that are described in this Consent to Release Information. If you do not want to allow these uses, you should not participate in this study.

If you agree to participate in the research study, your personal health information will be used and disclosed in the following ways:

- The study health care provider and staff will use your medical records including health information (paper or via electronic media) and information created or collected during the study to conduct the study.
- The study health care provider and staff will send your study-related health information ("study data") to the sponsor of the study and its representatives ("the sponsor"). Because the sponsor conducts business related to clinical research in many countries around the world, this may involve sending your study data outside of this country.
- The study data sent by the study health care provider to the sponsor does not include your name, address, or other information that directly identifies you. Instead, the study health care provider assigns a code number to the study data. Some study data sent to the sponsor may contain information that could be used (perhaps in combination with other information) to identify you (for example, date of birth). If you have questions about the specific health information that will be transferred, you should ask the study health care provider.

Page 6 of 12

IRB Version 2.0
I5O-MC-8004 (TRIUMPH)
Study-specific Consent to Release Information Form _US_v2.0
Confidential
Country ICF USA_MainV3.0(USA)v1.0(16Sep2021)

184

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:22:14

Item 9
Page 306

IRB APPROVED
AS MODIFIED
Oct 20, 2021

- The sponsor will use the study data for research purposes to support the scientific objectives of the study described in the consent document, to assess the safety or efficacy of any drug or treatment included in the study, to better understand the disease(s) included in the study, or to improve the design of future studies.
- Your study data, either alone or combined with data from other studies, may be shared with regulatory authorities in this country and other countries including the United States and also with health care providers at other institutions participating in the study and the ethics review board overseeing this study.
- Study data that does not identify you may be published in medical journals or shared with others as part of scientific discussions.
- Your original medical records and health information (paper or via electronic media), which may contain information that directly identifies you, may be reviewed by the sponsor, the Institutional Review Board (IRB) overseeing this study, and regulatory authorities (such as the FDA) in this country and/or other countries including the United States. The purpose of these reviews is to assure the quality of the study conduct and the study data, or for other uses authorized by law.
- The sponsor works with business partners in drug development. The sponsor may share your study data with these business partners, but only if the business partners need the information as a part of this work with the sponsor, and only if the business partners sign a contract that requires them to protect your study data in the same way as the sponsor.

Your personal health information may no longer be protected under the HIPAA privacy rule once it is disclosed by your study health care provider to these other parties.

**Your rights under data protection law:**
You have the right to see and correct your personal health information related to the research study, ask for it to be deleted, to have it transferred in a common electronic format for as long as this information is held by the study health care provider or research institution. However, if and to the extent your request may inhibit the further conducting of the study your request may not be (fully) complied with according to applicable law. You will be informed accordingly in such cases.

If you do not withdraw this Authorization, it will remain in effect.

If the research site is located in California, Delaware, Indiana, Washington, or Wisconsin this authorization will expire on 31Dec2070.

Your authorization for the uses and disclosures described in this Consent to Release Information does not have an expiration date unless listed in one of the states above. You do not have to sign this form. If you do not sign this form, you cannot take part in this research study.

IRB Version 2.0
I5O-MC-8004 (TRIUMPH)
Study-specific Consent to Release Information Form _US_v2.0
Confidential
Country ICF USA_MainV3.0(USA)v1.0(16Sep2021)

185

IRB APPROVED
AS MODIFIED
Oct 20, 2021

You may withdraw your permission to use and disclose your health information at any time. You can do this by sending written notice to the study doctor. If you withdraw your permission, you will not be able to continue being in the research study.

Information that has already been gathered may still be used and given to others. If you withdraw your permission, no new health information will be gathered unless you have a side effect related to the study.

If you withdraw from the study but do not withdraw your Authorization, new health information may be collected until this study ends.

Your decision to withdraw your Authorization or not to participate will not involve any penalty or loss of access to treatment or other benefits to which you are entitled.

**Information from your family doctor:**
Your doctor may tell your family doctor about you taking part in the study and ask them for medical information about you.

**What will happen to the results of this study?**
The overall results of the study may be published. A description of this clinical study will be available on the ENcEPP Registry <www.encepp.eu>. This Web site will not include information that can identify you. At most, the Web site will include a summary of the results. You can search this Web site at any time.

**Who has reviewed the study?**
All research studies are reviewed by an independent group of people, called an Institutional Review Board to protect your safety, rights, well-being and dignity. This study has been reviewed and has been given approval by WCG Institutional Review Board.

**Thank you for reading this and considering if you will take part in this study.**

IRB Version 2.0
ISO-MC-5004 (TRIUMPH)
Study-specific Consent to Release Information Form _U3_v2.0
Confidential
Country ICF USA_MainV3.0(USA)v1.0(16Sep2021)

85787

PM

186 DOCUMENT

03/30/2026 04:22:14

NOT ORIGINAL

ID#: 637

Case: 3:26-cv-00024-GFVT    Doc #: 1-2    Filed: 03/30/26    Page: 576 of 662 - Page

IRB APPROVED
AS MODIFIED
Oct 20, 2021

## Statement of Consent to Release Information

### Signature Page

To become a part of this study and to authorize use and disclosure of your personal health information, you must sign and date this page.

By signing this page, you are confirming the following:

- You have read all of the information in this Consent to Release Information, and you have had time to think about it.
- All of your questions have been answered to your satisfaction.
- You are volunteering to be part of this research study, and you understand that you may freely choose to stop being a part of this study at any time.
- You understand the need to collect your personal contact information for the study purposes described in the information sheet, and will provide your:

  ☑ Email address
  ☑ Phone number

- You allow the study health care provider and the sponsor to use and disclose your personal health information as described in this document.
- You have received a copy of this Consent to Release Information form to keep for yourself.
- I agree that my family doctor

  Dr. Gupta
  ...........................................................................................................
  **Name**

will be informed of my participation in the clinical study and that personal health information of me may be obtained. To this extent, I release the study doctor/family doctor from his professional obligation to secrecy.

  ☑ Yes          ☐ No

- I agree that I may also be contacted at a later date(s) for my permission in connection with this or any related sub study.

  ☑ Yes          ☐ No

IRB Version 2.0
ISQ-MC-6004 (TRIUMPH)
Study-specific Consent to Release Information Form _US_v2.0
Confidential
Country ICF USA_MainV3.0(USA)v1.0(16Sep2021)

85787

NOT ORIGINAL

03/30/2026 04:22:14

DOCUMENT 187

PM

ID#: 638

Case: 3:26-cv-00024-GFVT    Doc #: 1-2    Filed: 03/30/26    Page: 577 of 662 - Page

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:22:14

IRB APPROVED
AS MODIFIED
Oct 20, 2021

85787

_____
Signature of Study Participant

_2 24/NOV/2021_
Date (dd-mmm-yyyy)
(Study Participant must personally date)

_Wendy Filhardt_
Study Participant Name (Print or Type)

_WmF_
Study Participant Initials

_____
Name of Individual Conducting Consent
Discussion (Print or Type)

_____
Signature of Individual Conducting Consent
Discussion

_24. NW-2021_
Date (dd-mmm-yyyy)
(Individual Conducting Consent
Discussion must personally date)

IRB Version 2.0
I5Q-MC-B004 (TRIUMPH)
Study-specific Consent to Release Information Form _US_v2.0
Confidential
Country ICF USA_MainV3.0(USA)v1.0(16Sep2021)

188

NOT ORIGINAL
DOCUMENT

PM

03/30/2026 04:22:14

85787

Item 9
Page 310

# Eli Lilly - I5Q-MC-B004

*Main*

## CONSENT TO RELEASE INFORMATION AND HIPAA AUTHORIZATION

TITLE: Preventive Treatment of Migraine: Outcomes for Patients in real-world Healthcare Systems (TRIUMPH)

PROTOCOL NO.:I5Q-MC-B004/2016-4215

IRB Protocol # 20193217

SPONSOR:Eli Lilly and Company

INVESTIGATOR: Pragya B. Gupta, MD
162 Barnwood Drive
Edgewood, Kentucky 41017
United States

STUDY RELATED PHONE NUMBER(S):

859-757-1359
859-468-2583 (24 hours)

Preventive Treatment of Migraine: Outcomes for Patients in real-world Healthcare Systems (TRIUMPH)

## Introduction

You are invited to take part in *an observational* research study. To help you decide, you should understand the study and what it will involve for you. This process is called 'informed consent'. Please take the time to read the following information carefully and feel free to share and discuss it with others. Please ask your doctor if there is anything that is not clear or if you would like more information. If you decide that you want to take part, you will be asked to sign the attached consent form. You will be given a copy of the signed and dated Informed Consent Form and HIPAA Authorization to keep, and the original will stay at your doctor's office.

## What is the purpose of the study?

The purpose of this study is to collect information about treatment patterns, effects, and outcomes in patients with migraine who are switching or initiating a pharmacologic treatment for migraine prevention.

Main 2.0, 2020-12-16                                                          1 of 14
IRB Version 2.0 I5Q-MC-B004 (TRIUMPH)    Document ID: eac6b064-17e0-4563-a497-5220be0d3785
Study-specific Consent to Release Information                         CERTIFIED COPY
Form _US_v2.0 Confidential

189

NOT ORIGINAL DOCUMENT
Item 9
Page 311
03/30/2026 04:22:14 PM
85787

Eli Lily and Company , and its representatives ("sponsor"), are sponsoring this study and are paying the health care provider and/or study doctor for their work in this study.

## Why have you been invited?

You have been asked to participate in this study because you have been diagnosed with migraine and your doctor has prescribed you a new migraine preventive medication.

## How many people will take part in this study?

We anticipate that approximately 6000 patients will participate in this study. The study will be conducted at approximately 285 study centers in multiple countries worldwide. We anticipate the study will run until 2025.

## What treatment will you receive?

This is an observational study. Your treatment and medical care will not change because you are participating in this study. Your health care provider will continue to make all decisions regarding your proper treatment and care.

## What will happen if you take part in this study?

Your participation in the study will be either a single- day assessment or it will last 2 years. This depends on which preventive migraine medication you are prescribed as part of your routine care.

This study consists of 2 stages. Depending on your eligibility, you will be enrolled in stage 1 and stage 2 on the same day.

Stage 1: Information about your medical history will be collected, some of which may come from review of your medical records, and you will be asked to complete 3 questionnaires providing information about the migraine therapy outcome and your perception of your specific disease burden.

The following information will be collected from your medical records:

- Demographic information such as gender, age/year of birth , Ethnicity/Race
- Height and weight
- Your medical history and comorbidities
- Your migraine history, migraine treatment history, and your current disease state; this includes:

    - Your preventive and acute treatment use and rationale for changes
    - The number of migraine headache days, headache hours, severity, and symptoms

You will also be asked to complete some questionnaires. Each of them will take approximately 1 – 5 minutes to complete.

- **Migraine Treatment Optimization Questionnaire (mTOQ):** six questions measuring the efficacy of your current acute treatment
- **Migraine Disability Assessment (MIDAS):** five questions to quantify your headache-related disability over a 3-month period

Main 2.0, 2020-12-18
IRB Version 2.0 I5Q-MC-B004 (TRIUMPH)
Study-specific Consent to Release Information
Form _US_v2.0  Confidential
Document ID: 60c8b054-17a0-45f5-a497-6220ba0d3765
2 of 14
CERTIFIED COPY

NOT ORIGINAL
DOCUMENT

PM

03/30/2026 04:22:14

Item 9
Page 312

85787

- Patient Global Impression of Severity Scale (PGI-S): a single question that rates the severity of your migraine from 1 ("normal, not at all ill") to 7 ("extremely ill")

Stage 2: Your health care provider will decide if you also meet the eligibility requirements to participate in the follow up part of the study which is expected to run for 2 years

During stage 2 your routine care will continue but you will also be asked to:

- keep an electronic patient headache diary. Your health care provider will encourage you to complete your diary each time you experience a headache within 48 hours of onset. You will enter this information using your personal electronic device or a web portal. You will be given detailed instructions on how to use the device or the web portal.
- answer some additional questionnaires each of which will take approximately 1 to 5 minutes of your time. You should complete these questionnaires at specific intervals during the 2-year follow up phase (completion due every 3 months or less often). Depending on your preference, you will receive phone or email reminders to support you with entering the information needed. You may answer the questionnaires by using a personal device. You will read more about these reminders and how we keep your privacy later in this form. The questionnaires are:
    - Headache Impact Test-6 (Hit-6): 6 questions measuring the way you feel and what you cannot do because of headaches.
    - Migraine-Specific Quality of Life Questionnaire version 2.1 (MSQ v2.1): measuring your physical and emotional limitations because of migraine
    - Patient Satisfaction with Medication Questionnaire-Modified (PSMQ-M): measuring your level of satisfaction with your migraine medication
    - Migraine Interictal Burden Scale (MIBS-4): measures your burden related to headache in the time between attacks
    - Patient Health Questionnaire-8 (PHQ-8): 8 questions to detect depressive symptoms
    - 7-Item Generalized Anxiety Disorder Scale (GAD-7): 7 questions to detect and measure the severity of anxiety symptoms
    - Work Productivity and Activity Impairment Questionnaire (WPAI): measures the impact on your work productivity and regular activities related to your migraine
    - Health Care Resource Utilization and Employment Status (HCRU): 4 questions asking your use of health care facilities or services; you will be asked to complete this questionnaire monthly
    - Medication Adherence Reporting Scale (MARS-5): measures the degree you follow your migraine preventive treatment therapy
    - Allodynia Symptom Checklist (ASC12): A 12 item checklist measuring how often you experience increased pain or an unpleasant sensation on the skin during a headache

# What are your responsibilities if you take part in this study?

- You will attend your usual doctor's appointments with your doctor and continue to take your regular medication as prescribed by your doctor.
- You will be given the option to attend the study specific baseline visit and the follow up visits at your doctor's office, by phone or by web.
- If you are involved in any other clinical study you should inform your study doctor.
- You will have to follow the instructions the doctors give you in order to keep your headache diary and to complete the questionnaires at given timepoints.

# Will you have to pay to take part in the study?

Main 2.0, 2020-12-16
IRB Version 2.0 ISO-MC-B004 (TRIUMPH)
Study-specific Consent to Release Information
Form _US_ v2.0  Confidential

3 of 14
Document ID. eac8b054-17a0-46f5-a497-5220be0d3765
CERTIFIED COPY

191

NOT ORIGINAL
DOCUMENT

PM

03/30/2026 04:22:14

Item 9
Page 313

85787

You do not have to pay to take part in this study. The treatments/procedures in this study are considered normal care in the monitoring and/or treatment of your disease. You or your health care insurance provider should pay the cost of any treatment for your disease that you would receive whether you were in this study or not.

## Will you be paid to take part in the study?

You will not receive any payment or other benefits for providing this information from your medical records.

However, you will be paid $25 for your time to complete the Patient Reported Outcome (PRO) questionnaires at the following visits or time points:

- Baseline (Month 0)
- Month 3
- Month 6
- Month 12
- Month 18
- Month 24

Based on the total number of times that you complete the PRO questionnaires throughout the study, you will be paid up to a maximum amount of $150 for your time. Apart from that, you will not be paid to take part in this study.

In addition to payment from the sponsor, you will be compensated $20.00 for each completed visit at Month 0, Month 3, Month 6, Month 12, Month 18, and Month 24. You will be paid at the end of your participation in the study. If you do not finish the study, you will only be paid for the visits completed.

## Do you have to take part in the study?

Your participation in this study is voluntary. If you choose not to participate, your option is to continue to receive routine care from your doctor without being in the study.

## What are the possible risks of taking part in this study?

Since the study is observational it will not change how your treatment/disease is managed by your doctor. There are no physical risks of taking part in this study. While completing the questionnaires, there is potential that some of the questions might be upsetting or distressing to you or may cause emotional or mental discomfort. Should you become upset while answering any of the questionnaires, please tell your study doctor.

There is a low risk of loss of confidentiality of your personal information; however, steps have been taken to help ensure this will not happen. You will read more about the protection of your information later in this form.

## What if new information becomes available?

New information about your treatment or your disease may become available during this study. If this

Main 2.0, 2020-12-16
IRB Version 2.0 ISO-MC-B004 (TRIUMPH)
Study-specific Consent to Release Information
Form_US_v2.0 Confidential

4 of 14
Document ID: eac5b054-17a0-45f6-a497-5220be0d3785
CERTIFIED COPY

192

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 314

03/30/2026 04:22:14

85787

happens, your doctor will tell you about the new information, and he/she will talk to you about whether you want to remain in the study. If you decide to withdraw from the study, the medical care you receive will not be impacted.

## What are the possible benefits of taking part in this study?

There are no direct benefits for your participation in this study. However, the information collected in this study may lead to an improved understanding of your illness. The findings from this study may provide healthcare providers with important information for treating migraine in the future.

## What will happen if you are injured as a result of taking part in this study?

In case you become injured or ill during the study, your doctor/or your healthcare team will provide medical treatment to you as you would normally receive even if you were not participating in the study. As this is a non-interventional study and there are no experimental procedures or treatment as part of this study, the study sponsor will not provide any payment for your medical treatment in cases of injury or illness while participating in the study. Neither the study clinic nor the study Sponsor will provide other types of financial compensation. You and/or your health insurance company will be responsible for the cost of the medical care for your illness or injury. If you become ill or physically injured during this study, please contact your doctor right away. You do not give up any of your legal rights by signing this consent form.

## What if you have a question or problem?

If you have any questions about this study complaints, concerns, or think this research has hurt you, you can call the study doctor at the contact information listed on page 1 of this form.

If you have any questions about your rights as a research subject, questions about the study, or any concerns or complaints about the research that you do not want to discuss with your doctor or research team, you may contact the Institutional Review Board ("IRB"). An IRB is a group of people who perform independent review of research studies. You may talk to them at (888)-303-2224 or (800) 562-4789, irb@wcgirb.com if:

- You have questions, concerns, or complaints that are not being answered by the research team.
- You are not getting answers from the research team.
- You cannot reach the research team.
- You want to talk to someone else about the research.
- You have questions about your rights as a research subject.

## What will happen if you don't want to carry on with the study?

You can stop taking part in the study at any time without giving any reason by telling your doctor. This will not affect your medical care or your relationship with your doctor. There will not be any penalty or loss of benefits to you if you decide not to take part or if you leave the study early. Your doctor or Sponsor may also decide to withdraw you from the study at any time, for any of the following reasons:

Main 2.0, 2020-12-16
IRB Version 2.0 I5Q-MC-B004 (TRIUMPH)
Study-specific Consent to Release Information
Form _US_v2.0  Confidential

Document ID: eac6b054-17a0-4515-a497-5220be0d3785

5 of 14
CERTIFIED COPY

193

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:22:14

Item 9
Page 315

85787

- Lost to follow-up (i.e., discontinuation by patient without notice or action)
- Violation of eligibility criteria (i.e., if you do not begin taking you preventative migraine treating within 56 days of your doctor's prescription)
- You do not follow the instructions for participation

The study may be stopped at any time, prior to being completed. Your doctor will inform you if the study is stopped for any reason. Your normal care will not be affected.

## How will my contact information be used for the purposes of this study?

In order to remind you to complete the questionnaires, you will be asked to provide your personal contact information (telephone number and/ or email address) and to agree to have your personal contact information shared with the the call center. The representatives of the call center will have no affiliation with the study team members. This means that your personal contact details will be stored separately from the study database, and the call center representatives will never be in contact with the study team to share this information.

Information that identifies you, such as your email address, will be obtained for completion of the questionnaires. By signing this consent form, you agree that information about you may be used and disclosed as follows: when completing your questionnaires on an electronic device, you will receive an automated email from the system which will collect your answers to the questionnaires. The contact email information provided will be blinded to all users in the system after submission in the system and will not be visible to any users; only a unique patient ID provided for your log in will be visible to other users. You will receive an email notification confirmation when your information has been captured by the system.

If you decide to complete the questionnaires on your mobile device, a member of the study team will complete the enrollment process by entering your: email address, phone number (optional), language preference and timezone into the questionnaire platform. You will then receive an email asking you to enter a password. Once the enrollment process is complete, the questionnaires will be available to you. Your contact information will be stored completely separate from the study database.

Your contact information will also be used to deliver payments to you for completion of the patient reported outcome questionnaires. The payments will be made by a third party vendor who only has access to your contact information and what payment you are owed—they receive no information on your study results.

Finally, we wish to ask if you are willing to share your contact information so we might follow up with you about your interest to participate in future research projects by the sponsor of the present study. You may decline to share your contact information.

## Will taking part in this study be kept confidential and how

Main 2.0, 2020-12-16
IRB Version 2.0 I5Q-MC-B004 (TRIUMPH)
Study-specific Consent to Release Information
Form  US  v2.0  Confidential

6 of 14
Document ID: eac6b034-17e0-45f5-a497-6220be0d3785
CERTIFIED COPY

194

NOT ORIGINAL
DOCUMENT

PM

03/30/2026 04:22:14

Item 9
Page 316

85787

## will your personal information be used?

As part of the conduct of this research study, it will be necessary to share medical information about you with persons other than the study health care provider. This Consent to Release Information explains how your personal health information will be used and to whom it will be given ("disclosed") for this research study.

It also describes your privacy rights, according to a federal government rule that has been issued to protect the privacy rights of patients. This rule was issued under a law called the Health Insurance Portability and Accountability Act of 1996 (HIPAA). This rule is designed to protect the confidentiality of your personal health information.

Your personal health information is information about you that could be used to find out who you are. For this research study, this includes information in your existing medical records (paper or via electronic media) including health information, such as medical condition and medical history, your lifestyle, and your demographics (age, gender, race/ ethnicity, if allowed by local regulations) needed for this study and new information created or collected during the study. This study will also collect information about your race and/or ethnicity. Your race and/or ethnicity are considered sensitive personal information under data protection law. If you agree to give this information, your race and/ or ethnicity will be collected and entered into the same database where the other data about you will be entered, stored, and protected during this study.

By signing the Consent to Release Information for this study, you give permission ("authorization") for the uses and disclosures of your personal health information that are described in this Consent to Release Information. If you do not want to allow these uses, you should not participate in this study.

If you agree to participate in the research study, your personal health information will be used and disclosed in the following ways:

- The study health care provider and staff will use your medical records including health information (paper or via electronic media) and information created or collected during the study to conduct the study.
- The study health care provider and staff will send your study-related health information ("study data") to the sponsor of the study and its representatives ("the sponsor"). Because the sponsor conducts business related to clinical research in many countries around the world, this may involve sending your study data outside of this country.
- The study data sent by the study health care provider to the sponsor does not include your name, address, or other information that directly identifies you. Instead, the study health care provider assigns a code number to the study data. Some study data sent to the sponsor may contain information that could be used (perhaps in combination with other information) to identify you (for example, date of birth). If you have questions about the specific health information that will be transferred, you should ask the study health care provider.
- The sponsor will use the study data for research purposes to support the scientific objectives of the study described in the consent document, to assess the safety or efficacy of any drug or treatment included in the study, to better understand the disease(s) included in the study, or to improve the design of future studies.
- Your study data, either alone or combined with data from other studies, may be shared with regulatory authorities in this country and other countries including the United States and also with health care providers at other institutions participating in the study and the ethics review board overseeing this study.
- Study data that does not identify you may be published in medical journals or shared with others as part of scientific discussions.
- Your original medical records and health information (paper or via electronic media), which may contain information that directly identifies you, may be reviewed by the sponsor, the Institutional

Main 2.0, 2020-12-16
IRB Version 2.0 I5Q-MC-B004 (TRIUMPH)
Study-specific Consent to Release Information
Form _U9_v2.0 Confidential

7 of 14
Document ID eac6b064-17a0-45f5-a497-5220be0d3785
CERTIFIED COPY

195

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:22:14

85787

Item 9
Page 317

Review Board (IRB) overseeing this study, and regulatory authorities (such as the FDA) in this country and/or other countries including the United States. The purpose of these reviews is to assure the quality of the study conduct and the study data, or for other uses authorized by law.

- The sponsor works with business partners in drug development. The sponsor may share your study data with these business partners, but only if the business partners need the information as a part of this work with the sponsor, and only if the business partners sign a contract that requires them to protect your study data in the same way as the sponsor.

Your personal health information may no longer be protected under the HIPAA privacy rule once it is disclosed by your study health care provider to these other parties.

## Your rights under data protection law:

You have the right to see and correct your personal health information related to the research study, ask for it to be deleted, to have it transferred in a common electronic format for as long as this information is held by the study health care provider or research institution. However, if and to the extent your request may inhibit the further conducting of the study your request may not be (fully) complied with according to applicable law. You will be informed accordingly in such cases.

- If you do not withdraw this Authorization, it will remain in effect.
- If the research site is located in California, Delaware, Indiana, Washington, or Wisconsin this authorization will expire on 31Dec2070.

Your authorization for the uses and disclosures described in this Consent to Release Information does not have an expiration date unless listed in one of the states above.

You do not have to sign this form. If you do not sign this form, you cannot take part in this research study.

You may withdraw your permission to use and disclose your health information at any time. You can do this by sending written notice to the study doctor. If you withdraw your permission, you will not be able to continue being in the research study.

Information that has already been gathered may still be used and given to others. If you withdraw your permission, no new health information will be gathered unless you have a side effect related to the study.

If you withdraw from the study but do not withdraw your Authorization, new health information may be collected until this study ends.

Your decision to withdraw your Authorization or not to participate will not involve any penalty or loss of access to treatment or other benefits to which you are entitled.

## Information from your family doctor:

Your doctor may tell your family doctor about you taking part in the study and ask them for medical information about you.

## What will happen to the results of this study?

The overall results of the study may be published. A description of this clinical study will be available on

Main 2.0, 2020-12-16
IRB Version 2.0 I5Q-MC-B004 (TRIUMPH)
Study-specific Consent to Release Information
Form _US_v2.0 Confidential

Document ID: eab6b064-17a0-45f5-a497-6220ba0d3786

6 of 14

CERTIFIED COPY

196

NOT ORIGINAL
DOCUMENT

PM

03/30/2026 04:22:14

the ENcEPP Registry (www.encepp.eu). This Web site will not include information that can identify you. At most, the Web site will include a summary of the results. You can search this Web site at any time.    85787

## Who has reviewed the study?

All research studies are reviewed by an independent group of people, called an Institutional Review Board to protect your safety, rights, well-being and dignity. This study has been reviewed and has been given approval by WCG Institutional Review Board.

Thank you for reading this and considering if you will take part in this study.

Main 2.0, 2020-12-16
IRB Version 2.0 I5Q-MC-B004 (TRIUMPH)          Document ID: eac6b054-17a0-45f5-a497-5220be0d3765
Study-specific Consent to Release Information                          CERTIFIED COPY
Form  US  v2.0  Confidential                                          9 of 14

# Signatures

### Patient                                                                 Required

*Statement of Consent to Release Information*

#### Signature Page

To become a part of this study and to authorize use and disclosure of your personal health information, you must sign and date this page.

By signing this page, you are confirming the following:

- You have read all of the information in this Consent to Release Information, and you have had time to think about it.
- All of your questions have been answered to your satisfaction.
- You are volunteering to be part of this research study, and you understand that you may freely choose to stop being a part of this study at any time.
- You understand the need to collect your personal contact information for the study purposes described in the information sheet, and will provide your:

☒

#### Email Address

☒

#### Phone Number

- You allow the study health care provider and the sponsor to use and disclose your personal health information as described in this document.
- You have received a copy of this Consent to Release Information form to keep for yourself.
- I agree that my family doctor

#### Name

| Wendy Silhardt |

will be informed of my participation in the clinical study and that personal health information of me may be obtained. To this extent, I release the study doctor/family doctor from his professional obligation to secrecy.

- ● Yes
- ○ No

- I agree that I may also be contacted at a later date(s) for my permission in connection with this or any related sub study.

- ● Yes
- ○ No

Study Participant Initials | Wmf |

Main 2.0, 2020-12-16
IRB Version 2.0 ISO-MC-8004 (TRIUMPH)
Study-specific Consent to Release Information
Form _US_v2.0 Confidential

Document ID. eac6b054-17a0-45f5-a497-6220bc0d3785

10 of 14
CERTIFIED COPY

NOT ORIGINAL DOCUMENT
03/30/2026 04:22:14 PM
85787

198

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:22:14

85787

Item 9
Page 320

wendy morris filhardt

2021-01-25

Date

Main 2.0, 2020-12-16
IRB Version 2.0 I5Q-MC-B004 (TRIUMPH)
Study-specific Consent to Release Information
Form _US_v2.0  Confidential

Document ID: eac6b054-17a0-45f5-a497-5220be0d3785

11 of 14
CERTIFIED COPY

199

NOT ORIGINAL

DOCUMENT

03/30/2026 04:22:14

PM

Item 9
Page 321

Individual Conducting Consent

Required 85787

Individual Conducting Consent Discussion must personally date 01/25/2021

Holly Dickens

2021-01-25

Date

Main 2.0, 2020-12-16
IRB Version 2.0 ISQ-MC-B004 (TRIUMPH)
Study-specific Consent to Release Information
Form US v2.0 Confidential

Document ID: eac6b054-17a0-45f5-a497-8220be0d3785

12 of 14
CERTIFIED COPY

200

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 322

03/30/2026 04:22:14

85787

## Audit Trail

*Document Label* Main

| | |
|---|---|
| Document Version Number | 2.0 |
| Document Version Date | 2020-12-16 |
| Document ID | eac6b054-17a0-4515-e497-5220be0d5783 |

| Timestamp | Action | Description |
|---|---|---|
| 2021-01-25 21:26:12 UTC | Signature | Signature Individual Conducting Consent, Study Investigator countersigned the document. (User: baily.dickens@cetirad.com) |
| 2021-01-25 20:12:16 UTC | Signed Document | Signed document 2.0 |
| 2021-01-25 20:12:06 UTC | Signature | Patient signed the document. |
| 2021-01-25 20:10:29 UTC | Understood | Who has reviewed the study? |
| 2021-01-25 20:10:20 UTC | Viewed | Who has reviewed the study? |
| 2021-01-25 20:10:19 UTC | Understood | What will happen to the results of this study? |
| 2021-01-25 20:10:18 UTC | Viewed | What will happen to the results of this study? |
| 2021-01-25 20:10:09 UTC | Understood | Information from your family doctor. |
| 2021-01-25 20:09:59 UTC | Viewed | Information from your family doctor. |
| 2021-01-25 20:09:59 UTC | Understood | Your rights under data protection law. |
| 2021-01-25 20:09:53 UTC | Viewed | Your rights under data protection law. |
| 2021-01-25 20:09:53 UTC | Understood | Will taking part in this study be kept confidential and how will your personal information be used? |
| 2021-01-25 20:09:45 UTC | Viewed | Will taking part in this study be kept confidential and how will your personal information be used? |
| 2021-01-25 20:09:44 UTC | Understood | How will my contact information be used for the purposes of this study? |
| 2021-01-25 20:09:34 UTC | Viewed | How will my contact information be used for the purposes of this study? |
| 2021-01-25 20:09:34 UTC | Understood | What will happen if you don't want to carry on with the study? |
| 2021-01-25 20:09:25 UTC | Viewed | What will happen if you don't want to carry on with the study? |
| 2021-01-25 20:09:24 UTC | Understood | What if you have a question or problem? |
| 2021-01-25 20:09:09 UTC | Viewed | What if you have a question or problem? |
| 2021-01-25 20:09:09 UTC | Understood | What will happen if you are injured as a result of taking part in this study? |
| 2021-01-25 20:09:02 UTC | Viewed | What will happen if you are injured as a result of taking part in this study? |
| 2021-01-25 20:09:02 UTC | Understood | What are the possible benefits of taking part in this study? |
| 2021-01-25 20:08:52 UTC | Viewed | What are the possible benefits of taking part in this study? |
| 2021-01-25 20:08:52 UTC | Understood | What if new information becomes available? |
| 2021-01-25 20:08:43 UTC | Viewed | What if new information becomes available? |
| 2021-01-25 20:08:43 UTC | Understood | What are the possible risks of taking part in this study? |
| 2021-01-25 20:08:34 UTC | Viewed | What are the possible risks of taking part in this study? |

Main 2.0, 2020-12-16
IRB Version 2.0 I5Q-MC-B004 (TRIUMPH)
Study-specific Consent to Release Information
Form _US_v2.0  Confidential

13 of 14
Document ID: eac6b054-17a0-4515-e497-5220be0d3766
CERTIFIED COPY

201

 

| | | |
|---|---|---|
| 2021-01-25 20:08:33 UTC | Understood | Do you have to take part in the study? |
| 2021-01-25 20:08:22 UTC | Viewed | Do you have to take part in the study? |
| 2021-01-25 20:08:22 UTC | Understood | Will you be paid to take part in the study? |
| 2021-01-25 20:07:59 UTC | Viewed | Will you be paid to take part in the study? |
| 2021-01-25 20:07:57 UTC | Understood | Will you have to pay to take part in the study? |
| 2021-01-25 20:07:45 UTC | Viewed | Will you have to pay to take part in the study? |
| 2021-01-25 20:07:44 UTC | Understood | What are your responsibilities if you take part in this study? |
| 2021-01-25 20:07:30 UTC | Viewed | What are your responsibilities if you take part in this study? |
| 2021-01-25 20:07:30 UTC | Understood | What will happen if you take part in this study? |
| 2021-01-25 20:06:46 UTC | Viewed | What will happen if you take part in this study? |
| 2021-01-25 20:06:46 UTC | Understood | What treatment will you receive? |
| 2021-01-25 20:06:33 UTC | Viewed | What treatment will you receive? |
| 2021-01-25 20:06:37 UTC | Understood | How many people will take part in this study? |
| 2021-01-25 20:06:29 UTC | Viewed | How many people will take part in this study? |
| 2021-01-25 20:06:27 UTC | Understood | Why have you been invited? |
| 2021-01-25 20:06:13 UTC | Viewed | Why have you been invited? |
| 2021-01-25 20:06:17 UTC | Understood | What is the purpose of this study? |
| 2021-01-25 20:06:06 UTC | Viewed | What is the purpose of the study? |
| 2021-01-25 20:06:05 UTC | Understood | Introduction |
| 2021-01-25 20:05:51 UTC | Viewed | Introduction |
| 2021-01-25 20:05:50 UTC | Understood | CONSENT TO RELEASE INFORMATION AND HIPAA AUTHORIZATION |
| 2021-01-25 20:05:35 UTC | Viewed | CONSENT TO RELEASE INFORMATION AND HIPAA AUTHORIZATION |
| 2021-01-25 20:05:25 UTC | Begin Consent | Viewed Getting Started and accepted policy |

Digitally signed using
SecureConsent, Certified on
2021-01-25 21:25:59 UTC

Main 2.0, 2020-12-16
IRB Version 2.0 I5Q-MC-B004 (TRIUMPH)
Study-specific Consent to Release Information
Form_US_v2.0 Confidential

Document ID: eac6b064-17a0-45f5-a497-5220be0d3785

14 of 14
CERTIFIED COPY

NOT ORIGINAL

85787

03/30/2026 04:22:14
PM

DOCUMENT
202

DOCUMENT

PM

NOT ORIGINAL

Item 9
Page 324

03/30/2026 04:22:14

85787

# Appendix E

DOCUMENT

PM

NOT ORIGINAL
Item 9
Page 329
03/30/2026 04:24:04

## STATUTORY OPTIONS CHECKLIST

I.   ***POSTPONE DECISION:*** If you believe additional information is necessary to85787 make an informed decision, you may find additional investigation is necessary and order:
     a. the investigator to conduct additional specified investigation;
     b. additional review by a specified consultant; and/or;
     c. the licensee to appear before the Panel at a later meeting.

**DIVERSION:** For low-level standard-of-care violations, you may consider diversion as an alternative. If you choose this option, you would keep the investigation open a reasonable period of time (12-18 months) to see whether the problem can be corrected without resorting to formal and reportable action. The doctor would be required to enter into an Interim Agreed Order, requiring appropriate remedial CME, followed by one or two favorable consultant review(s) to ensure the problem has been corrected. If so, the investigation can then be closed without formal action. If not, you have all other options available to you.

II.  ***MAKE FINDINGS(S):*** If you believe sufficient information is available to make an informed decision, the statute provides that you shall make a finding that:
     a. There is no evidence of a violation of the Medical Practice Act and no further action is necessary;
     b. There is insufficient evidence of a violation to warrant the issuance of a Complaint, but there is evidence of a practice or activity that requires modification and the Panel may issue a Letter of Concern;
     c. The grievance discloses an instance of misconduct that does not warrant the issuance of a Complaint. In these instances, the Panel may admonish the physician for his misconduct; or
     d. The grievance discloses one (1) or more violations of the provisions of the Medical Practice Act that warrant the issuance of a Complaint. It would be helpful if you specify the act(s) of conduct that should be included in the Complaint.

III. ***PRE-COMPLAINT RESOLUTION:*** In many instances, the Panel feels that a particular resolution of the case would be satisfactory. If so, please let the General Counsel or Assistant General Counsel know if that resolution should be offered before filing a Complaint.

IV.  ***EMERGENCY ORDER OF SUSPENSION/RESTRICTION:*** The Panel may vote to enter an Emergency Order of Suspension or Restriction if it finds probable cause to believe:
     a. that the licensee has violated a condition of an Order of Probation, Agreed Order or regular Order; or,
     b. that the licensee's practice constitutes a danger to the health, welfare and safety of patients or the general public.

     Suspension should be imposed if a restriction/limitation would not be sufficient.



NOT ORIGINAL
DOCUMENT
PM
03/30/2026 04:24:04
85787



PRE PROCEDURE L POST
PROCEDURE HOLDING
BAY



NOT ORIGINAL
03/30/2026 04:24:04
85787

NOT ORIGINAL

03/30/2026 04:24:04 PM

85787

DOCUMENT



NOT ORIGINAL

213

NOT ORIGINAL DOCUMENT
03/30/2026 04:24:04 PM

**COVIDIEN** Nellcor EASYCAP II 6

Nellcor™

Adult Colorimetric CO₂ Detector

≥15 kg

Case: 3:26-cv-00024-GFVT    Doc #: 1-2    Filed: 03/30/26    Page: 600 of 662 - Page ID#: 661

274



NOT ORIGINAL
03/30/2026 04:24:04
85787

NOT ORIGINAL

03/30/2026 04:24:04

85787





NOT ORIGINAL DOCUMENT
03/30/2026 03:34:04 PM
85787

NOT ORIGINAL

DOCUMENT

03/30/2026 04:24:04

PM

85787



NOT ORIGINAL

03/30/2026 04:24:04

85787

DOCUMENT

PM



NOT ORIGINAL DOCUMENT
03/30/2026 04:24:04 PM
85787

NOT ORIGINAL DOCUMENT
03/30/2026 04:24:04 PM
85787



NOT ORIGINAL

DOCUMENT

03/30/2026 04:24:04

PM

This meeting of Panel B was called to order at 9:33 a.m. by Dale E. Toney, M.D., 85787 Chairman.

## Approval of Minutes

Following a review of the Minutes from the March 16, 2023, Panel B meeting, a motion was made by Dr. Joshi that they be approved. Seconded by Ms. Wiard, the motion carried.

## Disciplinary Cases - Final Actions

The Board's Assistant General Counsel, Ms. King, informed the Panel that the case for final action involving Arthur W. Loesevitz, M.D., would require the Panel to deliberate as a judicial or quasi-judicial body regarding an individual adjudication and, thus, it would be appropriate to go into Executive Session pursuant to KRS 61.810(1)(c) and (j). Dr. Koenig moved to enter into executive session for the reasons stated by counsel and pursuant to the specific statutory provisions of KRS 61.810(1)(j). Seconded by Mr. Foster, the motion carried. Ms. Diakov and the public exited the room.

After deliberation, the Panel returned to open session and the Board's assistant general counsel, Nicole King, informed the public that while in executive session pursuant to KRS 61.810(1)(c) and (j), the Panel deliberated as a judicial or quasi-judicial body on the individual adjudication of the case of Arthur W. Loesevitz, M.D. The Panel then took up the following matter:

## Arthur W. Loesevitz, M.D. #38648

The Panel is asked to finally resolve this case following receipt of the hearing officer's finding of fact, conclusions of law, and recommended order. Panel members reviewed a memorandum from Ms. Leanne Diakov, Board General Counsel, Findings of Fact, Conclusions of Law, and Recommended Order, 4/14/2023, and Complaint, 2/17/2023.

Action: After discussion, Dr. Koenig moved to accept and adopt the hearing officer's findings of fact, conclusions of law and recommended order, and issue a Final Order of Revocation. Seconded by Ms. Wiard, the motion carried. Terms and conditions were provided to counsel.

## Disciplinary Cases – Requests for Modification

## Steven A. Conrotto, M.D. #28990

Dr. Conrotto comes before the Panel to request termination of the Agreed Order, 2/14/2020. Panel members reviewed a memorandum from Ms. Leanne Diakov, Board General Counsel, letter from Dr. Conrotto, 1/06/2023, Agreed Order, 2/14/2020, statements of continuing education credit related to HB 1, letter from Vanderbilt regarding

223

NOT ORIGINAL

DOCUMENT

03/30/2026 04:24:04

PM

"Proper Prescribing of Controlled Prescription Drugs" course, 6/12/2020, first board consultant review, 10/20/2021, second board consultant review, 11/10/2022, compliance inspection reports, 8/19/2020, 3/01/2021, 9/14/2021, 3/28/2022, and 9/20/2022.

Action: After review, Dr. Koenig moved to defer for further investigation. She also moved to open an investigation on the PA. Seconded by Ms. Wiard, the motions carried.

### Applications for Renewal (None)

Board counsel informed the Panel that discussion and deliberation of the remaining items on the agenda would be appropriate for executive session pursuant to KRS 61.810(1)(c), (j) and (k), KRS 61.878(1)(a) and (h) and KRS 311.619 because the Panel would be required to discuss individual licensee involvement with the Kentucky Physicians Health Foundation, under Agenda Item 7, and matters under Agenda Items 6, 8, 9 and 10 may result in litigation being filed on behalf of the Board. Counsel noted that the deliberations would require the panel members to review and discuss information compiled in the course of the Board's work to detect and investigate statutory and regulatory violations (the premature release of which may harm the Board's ability to carry out its administrative adjudication or prospective law enforcement functions, if an investigation remains open and final action is not taken in this meeting); to determine whether to initiate litigation on behalf of the Board against individual licensees; and/or review and discuss confidential records and information required to be conducted in privacy according to federal and state law. Dr. Koenig moved to enter into executive session for the reasons stated by counsel. Seconded by Ms. Wiard, the motion carried.

\*\*\* \*\*\* \*\*\*

Following discussion, it was moved by Mr. Foster and seconded by Dr. Joshi that the Panel return to open session. In open session, counsel explained to the public that while in executive session, the Panel reviewed and discussed individual licensee involvement with the Kentucky Physicians Health Foundation; reviewed and discussed information compiled in the course of the Board's work to detect and investigate statutory and regulatory violations (the premature release of which may harm the Board's ability to carry out its administrative adjudication or prospective law enforcement functions if the investigation were to remain open and final action not be taken in this meeting); deliberated whether to initiate litigation against licensees on behalf of the Board; and discussed confidential records and information required to be conducted in privacy according to federal and state law, pursuant to the specific statutory provisions of KRS 61.810(1)(c), (j), and (k) and KRS 61.878(1)(a) and (h) and KRS 311.619. The Panel then took up the following matters:

### Non-Compliance Cases

### Samuel L. Rice, M.D. #18974

224

NOT ORIGINAL

DOCUMENT

03/30/2026 04:24:04

PM

Dr. Rice is currently under an Amended Agreed Order filed of record, 4/06/2016. Panel members reviewed an investigative report from Mr. Kevin Payne, Board Investigator, case #1333 Amended Agreed Order, 4/16/2016, first consultant review, physician's response to consultant review, first consultant final review, second consultant review, 3/18/2021, physician's response to second consultant review, second consultant final review, third consultant review, 11/14/2022, third consultant review worksheets, physician's response to third consultant review, third consultant final review, final report from Lifeguard, and certificate from Texas A&M medical documentation course. Dr. Rice was present and spoke to the Panel. Panel members felt that the issues raised were not such that they could be corrected by remedial education and monitoring, as Dr. Rice had exhausted all possible remedial education and coaching options in recent years.

> Action: After review, a motion was made by Dr. Koenig to issue a Complaint and Emergency Order of Restriction. She then moved to first allow Dr. Rice the opportunity to fully resolve the investigation without the issuance of the Complaint and Emergency Order of Restriction and resulting litigation by entering into a Second Amended Agreed Order.  Seconded by Dr. Joshi, the motions carried.  Terms and conditions were provided to the General Counsel. Dr. Thornbury recused himself from deliberations and voting.

## Kentucky Physicians Health Foundation

### David O. Griffith, M.D. #41908

Dr. Griffith comes before the Panel to request termination of his Letter of Agreement entered 3/24/2022. Panel members reviewed a memorandum from Ms. Leanne Diakov, Board General Counsel, letter from Dr. Griffith, Letter of Agreement, 3/24/2022, Order of Release, New Mexico Medical Board Case No. 2021-029, 12/13/2022, letter to Dr. Griffith from Frank Rios, Texas Medical Board, 12/21/2022, letter from Tina Simpson, M.D., KPHF, 1/09/2023, and compliance inspection reports, 1/09/2023.

> Action:  After review, Dr. Koenig made a motion to grant Dr. Griffith's request to terminate his letter of agreement. Seconded by Mr. Foster, the motion carried.

### John M. Farmer, Jr., M.D. #52891

Dr. Farmer comes before the Panel to request termination of his Letter of Agreement entered 2/19/2020. Panel members reviewed a memorandum from Ms. Leanne Diakov, Board General Counsel, letter from Dr. Farmer, 1/13/2023, Letter of Agreement, 2/19/2020, Verified First Amended Complaint, Case No. 20-CI-6143 (Jefferson Circuit Court), 1/13/2021, letter from Tina Simpson, M.D., KPH,1/20/2023, and compliance inspection reports, 7/102020, 7/12/2021, & 1/09/2023.

> Action:  After review, Dr. Koenig made a motion to grant Dr. Farmer's request to terminate his letter of agreement. Seconded by Mr. Foster, the motion carried.

225

NOT ORIGINAL

DOCUMENT

03/30/2026 04:24:04

PM

85787

### Old Cases

#### Puneet Bhatia, M.D. #45480

This is an old case involving a grievance against Dr. Bhatia concerning poor standard of care. Panel members reviewed an investigative report from Mr. Stephen Manley, Board Investigator, original panel memo & exhibits, 1/19/2023, and consultant review.

Action: Following discussion, Ms. Wiard moved to send Dr. Bhatia a Letter of Concern. Seconded by Dr. Koenig, the motion carried.

#### Robert Lewe, M.D. #31245

Dr. Lewe is currently under an Interim Agreed Order of Diversion, 1/24/2022. Panel members reviewed an investigative report from Mr. Stephen Manley, Board Investigator, original panel memo & exhibits, 1/20/2022, Interim Agreed Order (Diversion), CPEP Assessment Report, and CPEP Educational Intervention Program.

Action: After review, a motion was made by Dr. Koenig to issue a Complaint and Emergency Order of Suspension. She then moved to first allow Dr. Lewe the opportunity to fully resolve the investigation without the issuance of the Complaint and Emergency Order of Suspension and resulting litigation by entering into an Agreed Order.  Seconded by Dr. Joshi, the motions carried. Terms and conditions were provided to the General Counsel.

#### Daniel J. Pearson, M.D. #50448

This is an old case presenting information from Dr. Pearson's impairment evaluation as ordered by the Panel on 3/22/2023. This matter is being presented to the Panel for any action deemed necessary. Panel members reviewed a memorandum from Ms. Nicole King, Assistant General Counsel, original panel memo, 2/15/2023, Order to Submit to Evaluation, 3/22/2023, letter from Tina Simpson, M.D., KPHF, 5/01/2023, and KPHF Diagnostic Contract, 5/09/2023.

Action: After review Dr. Koenig moved to ask that Dr. Pearson enter into a Letter of Agreement. Seconded by Mr. Foster, the motion carried.

### New Cases – Investigated (Comprehensive)

#### Shelebra K. Bartley, P.A.-C #PA1141

226

NOT ORIGINAL

DOCUMENT

03/30/2026 04:24:04

PM

85787

This is a new case involving a grievance against PA Bartley concerning improper prescribing. Panel members reviewed an investigative report from Mr. Billy Madden, Board Investigator, OIG report, statement from Dr. Fleming, statement from Dr. Kirkpatrick, Dr. Kirkpatrick's supervising physician approval letter, 12/16/2021, PA Bartley's response, consultant report, rebuttal to review, and physician assistant profile. Ms. Bartley was present and spoke to the Panel. Panel members felt that the issues raised in the investigation and in Ms. Bartley's presentation to the Panel were not such that they could be corrected by remedial education and monitoring and that she should not practice in any setting or specialty separate from a supervising physician should she continue to practice as a physician assistant.

Action: After review, a motion was made by Ms. Wiard to issue a Complaint and Emergency Order of Suspension. She then moved to first allow Ms. Bartley the opportunity to fully resolve the investigation without the issuance of the Complaint and Emergency Order of Suspension and resulting litigation by entering into an Agreed Order and to open an investigation on Dr. Cassandra M. Kirkpatrick, the supervising physician. Seconded by Dr. Koenig, the motions carried. Terms and conditions were provided to the General Counsel.

### David P. Easley, M.D. #22832

This is a new case involving a grievance against Dr. Easley alleging poor standard of care. Panel members reviewed an investigative report from Mr. John Lewis, Board Investigator, grievance, physician's response, and consultant review.

Action: Following review, Dr. Koenig made a motion to further investigate this case. Seconded by Ms. Wiard, the motion carried.

### Pragya B. Gupta, M.D. #34920

This is a new case involving a grievance against Dr. Gupta alleging poor standard of care. Panel members reviewed an investigative report from Mr. Jon Marshall, Board Investigator, grievance, physician's response, consultant review, physician's response to the consultant review, and consultant's final review. Dr. Gupta was present with Counsel and spoke to the Panel. Strong consideration was given to Dr. Gupta's representations that he had effectively closed his solo practice, having transferred all of his patients and ceased performing procedures in Kentucky in anticipation of his move to California; although Dr. Gupta desires to maintain a Kentucky license, Panel members felt that the issues raised in the investigation were not such that they could be corrected by remedial education and monitoring and that he should not practice in an independent setting in Kentucky.

227

NOT ORIGINAL

DOCUMENT

03/30/2026 04:24:04

PM

Action: After review, a motion was made by Dr. Koenig to issue a Complaint and Emergency Order of Suspension. She then moved to first allow Dr. Gupta the opportunity to fully resolve the investigation without the issuance of the Complaint and Emergency Order of Suspension and resulting litigation by entering into an Agreed Order. Seconded by Dr. Joshi, the motions carried. Terms and conditions were provided to the General Counsel.

### Elizabeth Whitney Hunter, M.D. #51398

This is a new case involving a grievance against Dr. Hunter concerning prescribing. Panel members reviewed an investigative report from Mr. Jon Marshall, Board Investigator, grievance, physician's response, consultant's review, physician's response to consultant's review, and consultant's final review.

Action: Following discussion, Mr. Foster moved to send Dr. Hunter a Letter of Concern. Seconded by Dr. Koenig, the motion carried.

### Edward P. Isaacs, D.O. #02356

This is a new case involving a grievance against Dr. Isaacs concerning substance abuse. Panel members reviewed an investigative report from Mr. Jon Marshall, Board Investigator, KPHF letter, and letter from Dr. Isaacs.

Action: After review Dr. Joshi moved to ask that Dr. Isaacs enter into a Letter of Agreement. Seconded by Dr. Koenig, the motion carried.

### Kenny J. Manion, M.D. #24806

This is a new case involving a grievance against Dr. Manion concerning court/legal action. Panel members reviewed an investigative report from Mr. Stephen Manley, Board Investigator, report of federal court action, plea agreement, letter from Mr. David Broderick, physician's response, and another letter from Mr. David Broderick and sentencing documents.

Action: Upon review, Dr. Koenig made a motion that the incident disclosed an instance of misconduct that does not warrant the issuance of a Complaint under the circumstances but that a Letter of Admonishment should be directed to Dr. Manion. Seconded by Mr. Foster, the motion carried. Dr. Thornbury recused himself from deliberations and voting.

### Elizabeth Ann Ruchhoft, M.D. #46295

228

NOT ORIGINAL

DOCUMENT

03/30/2026 04:24:04

PM

This is a new case involving a grievance against Dr. Ruchhoft alleging poor standard of care. Panel members reviewed an investigative report from Mr. Jon Marshall, Board Investigator, grievance, physician response, and consultant review.

Action: After discussion, Dr. Koenig moved that there was no evidence of a violation of the Medical Practice Act and no further action was necessary. Seconded by Mr. Foster, the motion carried.

### Mollie Cartwright, M.D. #24670

This is a new case involving a grievance against Dr. Cartwright alleging poor standard of care. Panel members reviewed an investigative report from Mr. John Lewis, Board Investigator, grievance, physician response, and consultant review.

Action: After discussion, Dr. Koenig moved that there was no evidence of a violation of the Medical Practice Act and no further action was necessary. Seconded by Mr. Foster, the motion carried.

### Charles E. Hardin, M.D. #22756

This is a new case involving a grievance against Dr. Hardin alleging poor standard of care. Panel members reviewed an investigative report from Mr. Billy Madden, Board Investigator, grievance, response from ARH, and physician response.

Action: After discussion, Dr. Koenig moved that there was no evidence of a violation of the Medical Practice Act and no further action was necessary. Seconded by Mr. Foster, the motion carried.

## New Cases -- Not Investigated (Preliminary)

### Seema Capoor, M.D. 34791

The Panel is asked to determine whether an investigation should be initiated regarding a grievance filed against Dr. Capoor alleging poor standard of care. Panel members reviewed the grievance and the response from the physician.

Action: After discussion, Dr. Koenig moved that there was no evidence of a violation of the Medical Practice Act and no further action was necessary. Seconded by Dr. Joshi, the motion carried.

### Jeffrey A. Carrico, M.D. #28163

229

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:24:04

The Panel is asked to determine whether an investigation should be initiated regarding a grievance filed against Dr. Carrico alleging poor standard of care. Panel members reviewed the grievance and the response from the physician.

Action: After discussion, Dr. Koenig moved that there was no evidence of a violation of the Medical.Practice Act and no further action was necessary. Seconded by Dr. Joshi, the motion carried.

### Daniel Culy, M.D. #52075

The Panel is asked to determine whether an investigation should be initiated regarding a grievance filed against Dr. Culy alleging poor standard of care. Panel members reviewed the grievance and the response from the physician.

Action: After discussion, Dr. Koenig moved that there was no evidence of a violation of the Medical Practice Act and no further action was necessary. Seconded by Dr. Joshi, the motion carried.

### April Lynn Hall-Slone, D.O. #02936

The Panel is asked to determine whether an investigation should be initiated regarding a grievance filed against Dr. Hall-Slone alleging poor standard of care. Panel members reviewed the grievance and the response from the physician.

Action: After discussion, Dr. Koenig moved that there was no evidence of a violation of the Medical Practice Act and no further action was necessary. Seconded by Dr. Joshi, the motion carried.

### Ashley A. Hammerbeck, M.D. #45564

The Panel is asked to determine whether an investigation should be initiated regarding a grievance filed against Dr. Hammerbeck alleging unethical/unprofessional conduct. Panel members reviewed the grievance and the response from the physician.

230

NOT ORIGINAL DOCUMENT

03/30/2026 04:24:04 PM

Action: After discussion, Dr. Koenig moved that there was no evidence of a 85787 violation of the Medical Practice Act and no further action was necessary. Seconded by Dr. Joshi, the motion carried.

### Keith A. Hewitt, M.D. #26868

The Panel is asked to determine whether an investigation should be initiated regarding a grievance filed against Dr. Hewitt alleging poor standard of care. Panel members reviewed the grievance and the response from the physician.

Action: After discussion, Dr. Koenig moved that there was no evidence of a violation of the Medical Practice Act and no further action was necessary. Seconded by Dr. Joshi, the motion carried.

### Travis A. Hunt, M.D. #40091

The Panel is asked to determine whether an investigation should be initiated regarding a grievance filed against Dr. Hunt alleging poor standard of care. Panel members reviewed the grievance and the response from the physician.

Action: After discussion, Dr. Koenig moved that there was no evidence of a violation of the Medical Practice Act and no further action was necessary. Seconded by Dr. Joshi, the motion carried.

### Troy T. Pope, M.D. #45722

The Panel is asked to determine whether an investigation should be initiated regarding a grievance filed against Dr. Pope alleging poor standard of care. Panel members reviewed the grievance and the response from the physician.

Action: After discussion, Dr. Koenig moved that there was no evidence of a violation of the Medical Practice Act and no further action was necessary. Seconded by Dr. Joshi, the motion carried.

### Vijay M. Raghavan, M.D. #33876

The Panel is asked to determine whether an investigation should be initiated regarding a grievance filed against Dr. Raghavan alleging poor standard of care. Panel members reviewed the grievance and the response from the physician.

231

NOT ORIGINAL

DOCUMENT

03/30/2026 04:24:04

PM

Action: After discussion, Dr. Koenig moved that there was no evidence of a 85787 violation of the Medical Practice Act and no further action was necessary. Seconded by Dr. Joshi, the motion carried.

## Eric F. Smith, D.O. #02967

The Panel is asked to determine whether an investigation should be initiated regarding a grievance filed against Dr. Smith alleging unethical/unprofessional conduct. Panel members reviewed the grievance and the response from the physician.

Action: After discussion, Dr. Koenig moved that there was no evidence of a violation of the Medical Practice Act and no further action was necessary. Seconded by Dr. Joshi, the motion carried.

## Joel Warren, M.D. #44338

The Panel is asked to determine whether an investigation should be initiated regarding a grievance filed against Dr. Warren alleging poor standard of care. Panel members reviewed the grievance and the response from the physician.

Action: After discussion, Dr. Koenig moved that there was no evidence of a violation of the Medical Practice Act and no further action was necessary. Seconded by Dr. Joshi, the motion carried.

## Actions by Other States (None)

## Malpractice Settlements / Judgments (None)

## Other Items (None)

## Date of Next Meeting

The next Panel B meeting is scheduled for July 20, 2023.

## Adjournment

There being no further business open for discussion, a motion was made by Mr. Foster that the meeting be adjourned at 12:53 pm. Seconded by Dr. Joshi, the motion carried.

232

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:24:04

85787

## KENTUCKY BOARD OF MEDICAL LICENSURE

**Andy Beshear**
GOVERNOR

Hurstbourne Office Park
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222

www.kbml.ky.gov
(502) 429-7150

May 19, 2023

<u>Certified Mail</u>

Pragya B. Gupta, M.D.
License No. 34920
162 Barnwood Drive
Edgewood, KY 41017

Re:  **Agreed Order**

Dear Dr. Gupta:

At its May 18th meeting, the Board's Inquiry Panel B considered a grievance alleging poor standard of care. In addition to the grievance filed by Wendy Fillhardt, dated January 6, 2023, the Panel considered a Panel Memorandum prepared by Jon Marshall, KBML Medical Investigator, dated May 1, 2023; your response to the grievance, dated February 12, 2023; the Board Consultant's Report, dated March 21, 2023; your response to the Consultant's Report, dated April 4, 2023; and the Board Consultant's Final Report, dated April 26, 2023.

Having considered the above information and being sufficiently advised, the Panel chose to issue a Complaint and Emergency Order of Suspension.  However, the Panel chose to first grant you an opportunity to resolve this matter by entering into the enclosed Agreed Order, in lieu of a Complaint and Emergency Order of Suspension.

Please review the enclosed and, if you choose to accept the Agreed Order, return the executed document to our offices **on or before June 2, 2023**.  If you decline to enter into the Agreed Order by the designated date, the Board will proceed with the issuance of a Complaint and Emergency Order of Suspension.

Please be aware that a licensee cannot supervise a Physician Assistant while subject to an Agreed Order.  If you choose to enter into this Agreed Order and you are currently registered as a supervising physician for a Physician Assistant, please contact the Board's Physician Assistant coordinator, Teresa



TEAM
KENTUCKY™
An Equal Opportunity Employer M/F/D

234

NOT ORIGINAL

03/30/2026 04:24:04

85787

Kleinhenz, at (502) 429-7932 to coordinate continuity of supervision by another licensee.

   If you have any questions or need additional assistance, please do not hesitate to call me at (502) 429-7944.

Sincerely,

Nicole A. King
Assistant General Counsel

Enc.
cc: Judd R. Uhl, Esq.

2

235

NOT ORIGINAL

DOCUMENT

03/30/2026 04:24:04

PM

85787

COMMONWEALTH OF KENTUCKY
BOARD OF MEDICAL LICENSURE
CASE NO. 2106

IN RE: THE LICENSE TO PRACTICE MEDICINE IN THE COMMONWEALTH OF KENTUCKY HELD BY PRAGYA B. GUPTA, M.D., LICENSE NO. 34920, 162 BARNWOOD DRIVE, EDGEWOOD, KENTUCKY 41017

## AGREED ORDER

Come now the Kentucky Board of Medical Licensure (hereafter "the Board"), acting by and through its Inquiry Panel B, and Pragya B. Gupta, M.D. (hereafter "the licensee"), and, based upon their mutual desire to fully and finally resolve the pending investigation without an evidentiary hearing, hereby ENTER INTO the following **AGREED ORDER**:

## STIPULATIONS OF FACT

The parties stipulate the following facts, which serve as the factual bases for this Agreed Order:

1. At all relevant times, Pragya B. Gupta, M.D., was licensed by the Board to practice medicine within the Commonwealth of Kentucky.

2. The licensee's medical specialty is Interventional Pain Management.

3. In January 2023, the Board received a complaint from one of the licensee's patients alleging violations of the standard medical practice and standard of care and causing her trauma. Specifically, the grievant detailed the following issues:

   - Donald Jay Thomas "DJ" was introduced to me as the office manager. However, throughout my time under the licensee's care he was an active participant in my care. I was very uncomfortable with Mr. Thomas being in my treatment room while I was wearing a gown and not fully clothed given that he has no medical certification. On multiple occasions, he was the individual who administered the anesthesia[.] He would ask Dr. Gupta how much to administer and then measure out and give the doses by iv. [...]

   - In September 2021, I was given my first injection of cyanocobalamin [.] I was supposed to have a second injection 30 days from the first as I understand the protocol to be. At the second injection date, Dr. Gupta took

236

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:24:04

one look at me and was immediately concerned. I had let DJ and others in the office know that I did not feel right, and I had swelling. Dr. Gupta immediately knew that this was an allergic reaction. I instead was given a different injection.

- I was told during my injection procedures that I was a "VIP" patient and that I would receive good stuff. I took this to mean that I was given more anesthesia than other patients. I expected to be in a twilight type feeling while injections were being given. However, I was completely knocked out and I do not believe that was appropriate for this type of injection. On one occasion, I had issues coming out of the anesthesia in the office.

- Autumn Thomas is the wife of DJ Thomas and the clerk/billing assistant at the office. To my understanding she has had no medical training or certification, but she conducted medical functions such as taking vitals. She was also the individual that would handle sending proscriptions [sic] to the pharmacy. However, I do not believe that proper protocols were followed in proscribing [sic] as I had two different issues that I believe are very important to mention.

    a. I was proscribed [sic] Savella. Dr. Gupta had advised that this medication was one that needed to be stepped up to a higher dosage. I was only advised to take one a day and was supposed to receive a lower milligram capsule for so many days then pickup a higher milligram. The proscription [sic] was incorrectly placed by Autumn, my dosage stated two pills per day and I was started on a 25 mg which I was supposed to start on 12.5. At one point, the system as you can see in my medical records had me proscribed [sic] a 25 MG and a 50 mg to both take twice a day. I never took these together or in the incorrectly proscribed [sic] manner. However, I did have side effects from taking the 25 mg to begin [...] This causes me to have concerns that he does not fill out his own prescription orders or at the least he doesn't pay attention to what he signs.

    b. On several occasions, proscriptions [sic] from other doctors were ordered to be refilled by Dr. Gupta's office. My understanding from what I was told was that this was Autumn incorrectly refilling medications. My other doctors [...] were very concerned when this occurred. [...]

4. On or about February 12, 2023, the licensee responded to the grievant's complaint.

He discussed her history, diagnoses and treatment. He also included his chronology

of her care and his *curriculum vitae*. Specifically, he stated, in part:

2

237

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:24:04

- Donnie J Thomas (DJ) is a trained medical assistant. I have trained him since 2002. In my long career, I had not had a single adverse event or serious adverse event where he was involved. I have trained him not only to perform routine Medical Assistant Jobs, but he is also a Clinical Coordinator for my ongoing clinical research work (GCP certified). [...] DJ is trained to perform more than one job. Multitasking is required to work in a solo practitioner's office. DJ helps me in the procedure room. He positions patients, attaches them to the monitors per ASA guidelines, and moves the Fluoroscope per my instruction. At times DJ administers a small dose of sedation on my request. [...] DJ was not the only person present at the time of infusion, as other MAs were there, particularly her daughter, on the day of the first infusion. I have checked her multiple times during the infusion to monitor EKG tracing and the depth of her sedation. She received good care. She was covered appropriately with blankets. There was no trigger for reactivating PTSD.

- In September, there were three encounters. [...] I don't recall the swelling at all. It was not life-threatening and without any residual problems. She is probably referring to swelling from IV fluid extravasation, which is not an allergic reaction. The patient was never administered Cyanocobalamin in my clinic.

- No, I don't recall calling any patient a VIP, although I consider all patients VIPs and treat them accordingly. Most of the time, her daughter Brittany Morris was present during transportation of her to and from the procedure room. She needed 5mg of midazolam for the procedure as she was extremely nervous. Without sedation, I could not have performed the procedure as she would not cooperate.

- Ms. Autumn Thomas is also a MA whom I have trained since 2013. Autumn Thomas occasionally helped us in the recovery unit by relieving Medical Assistants for lunch breaks when we were short-staffed during the COVID infection. Autumn Thomas is responsible for discharging patients, reviewing discharge instructions, and ensuring that patients are appropriately scheduled for post-procedure follow-up. She also helps me with billing work. In the recovery area, she would typically watch those patients who are getting ready to be discharged. All patients in the recovery area are attached to the automated monitors. She is also responsible for following all my orders, such as lab work and imaging requests.

  [...]

- The allegations that I don't take care of my prescription are inaccurate. I am meticulous and ensure that my staff follows my instruction correctly. I verify and cross-verify that the prescriptions are correctly sent by checking the logs frequently. Autumn helps me ensure that the refills are sent in a timely fashion. I enter the prescription under the appropriate diagnosis, and then she transmits the Rx electronically, which I monitor directly.

3

238

NOT ORIGINAL
DOCUMENT
PM
03/30/2026 04:24:04

- No, I don't refill other physicians' prescriptions unless the patient specifically requests me to do that to save time and a visit. [...]    85787

5. On or about March 21, 2023, a Board consultant completed a review of the grievant's medical records and found that the licensee's diagnosis and treatment were below the minimum standards of acceptable and prevailing medical practice.

The Board consultant's specific diagnostic concerns were that:

- Dr. Gupta performed three cervical transforaminal epidurals without documenting the specific history and findings indicating the need for these injections [...]

- The cervical MRI showed "C4-C5 small central disc protrusion mildly compressing the thecal sac. No spinal cord or nerve root compression."

The Board consultant's specific treatment concerns were that:

- The three transforaminal cervical epidurals performed were not indicated as described under the diagnosis. In addition, after each transforaminal epidural injection there is no mention of the patient's response to the previous epidural procedure. Only after three epidurals does Dr. Gupta describe the response to the three procedures.

- The epidurals and facet injection's were performed under moderate sedation. The operating physician, Dr. Gupta cannot also serve as the anesthesia monitor. It is standard of care that the anesthesia monitor must be at least an RN. In all of the procedures his trained assistant, DJ Thomas, served as anesthesia monitor. In addition, the sedation monitoring records are incomplete and one is missing.

- There is evidence in the medical record that the grievant was over-medicated. [...] After starting these medications, on follow-ups Dr. Gupta does not address the partial response to these medications. On 6/15/2021 Dr. Gupta's interim history states "Today patient exhibited some speech difficulty and complained of weakness in right upper extremity and lower extremity." The medical record does not show any new physical exam, just a repeat of the previous exams. Dr. Gupta does not comment on these serious new complaints and he continues her treatment plan. On 7/13/2021 the patient presented with new complaints of having an "an attack of generalized numbness and fatigue-like symptoms." The patient complained of intermittent incontinence, in addition to the previous complaints [...] Over the next eight months all of her complaints continued.

- [...] Based on the list of medications and known drug interactions some of these serious symptoms, were more likely than not related to over-medication.

4

239

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:24:04

85787

6. On or about April 4, 2023, the licensee responded to the Board consultant's report and included a detailed explanation of his treatment and reasoning for the care he provided to the grievant. He also included significant references to literature and his clinic's policies and procedures. Specifically, he explained:

- The decision to perform three cervical transforaminal injections was based on my clinical examination of the patient, my experience, and my knowledge. I examined the patient before every procedure in the procedure room. There is a record of pre-procedure VAS on each occasion. […] This patient had complete pain relief after the third injection.

- I use sedation for anxiolysis and amnesia only. I titrate the medicine so that they are fully responsive and comfortable with minimal anxiety and can tolerate unpleasant sensations of the procedure. All patients are monitored as per ASA protocol. BP, HR, and Pulse oximetry are performed continuously in the procedure room. Patients are evaluated pre-procedure and post-procedure, and the vitals are recorded. We have followed the guidelines outlined in KBML (https://kbml.ky.gov/board/Documents/ Board%20Opinion%20Office%20Based%20Surgery.pdf) (revised 2018) regarding the requirement for the safe conduct of mild sedation. In this document[,] requirement of a trained person is mentioned. All procedure personnel is ACLS trained and have been trained to assist me in the procedure room properly.

- The procedure room has all the equipment for resuscitation, including an AED, laryngoscope (3 sizes Miller and McIntosh), suction machine, ambu-bag, and oxygen cylinder. All recovery bays are fully equipped with monitors for monitoring vitals as per ASA protocol. All equipment undergoes preventative maintenance. […]

- The MA normally positions the fluoroscope and monitors the patient. I operate the fluoroscope and constantly communicate with the patient. I am a board-certified anesthesiologist and a pain specialist. I administer 0.5mg of Versed in the procedure room and titrate the medicine slowly while my assistant and I monitor the vitals. Most of the time, the completion of the procedure takes 30 - 35 minutes (for ESI or Facet joint block), which includes an examination of the patient pre and post-procedure in the room and recovery area.

  […]

- The patient was an extremely difficult patient to manage. I spent anywhere from 1 – 2 hours with her each visit and could not document everything that transpired during the visit. I treated her with FDA-approved combination medicine for fibromyalgia as she failed all other treatments, but she did not

5

240

NOT ORIGINAL
DOCUMENT

PM

03/30/2026 04:24:04

respond. Insomnia is a known problem associated with fibromyalgia, which I treated with Lunesta. I can assure you that she did not experience any side effects from the medicine that I prescribed. [...]

7. On or about April 26, 2023, after considering the licensee's response to his report and again reviewing the records, the Board consultant changed his conclusions as follows:

- [The grievant] had a total of five procedures where she was administered intravenous sedation with midazolam 5 mg. This dosage is documented in the medical record and acknowledged by Dr. Gupta in his response to the grievance (answer number 3). Dr. Gupta's patient encounters list the billing codes used for each visit. In all instances where midazolam sedation was administered the billing was listed as moderate sedation. Dr. Gupta has indicated in his response to my report that he was using mild sedation (answer 2).

- Dr. Gupta states that [the grievant's] intravenous line infiltrated after one of her cervical epidurals in September 2021 without residual problems. He also says he has educated his staff to properly fill out anesthesia monitoring forms. I have previously stated that the guidelines for intravenous sedation require that a registered nurse be present as the anesthesia monitor to administer the sedation and, if necessary, start intravenous lines. I have included in this report the latest guidelines for conscious sedation.

- Most concerning to me is the recent information I have received regarding Donnie J. Thomas. The grievant has stated that Mr. Thomas started at least one of her intravenous lines and had administered intravenous sedation to her. Further review of Dr. Gupta's response (answer#1) to her grievance reveals by his own admission that he allows Mr. Thomas to administer intravenous midazolam.

  My conclusion is Donnie J. Thomas is practicing medicine without a license. This represents an immediate threat to the safety and health of the citizens of Kentucky.

8. The licensee, with counsel, was present at the Panel meeting on May 18, 2023. Leading up to the meeting, he provided more literature to the Panel and provided pictures of his facility to the Panel during the meeting. At the Panel meeting, he explained that he trains all his staff. He considers Mr. Thomas a Medical Assistant because of that training and because he assists him with procedures, including

6

241

NOT ORIGINAL

pushing medications. The licensee conceded that Mr. Thomas has no certification. However, Mr. Thomas has worked with the licensee on and off for twenty years, most recently starting in 2016. During the meeting, the licensee stated that he has twelve staff members, including one Nurse Practitioner, two receptionists, two clinical coordinators, one dietitian, one exercise therapist, one discharge employee and two temporary workers for additional help. Two people are in the procedure room, but none are a Physician Assistant, Registered Nurse or certified Medical Assistant. It is during post-op that a certified Medical Assistant sees patients. He informed the Board that he has plans to move to California and had been offered a job there in October. He has transferred all his patients to another physician, and May 18, 2023 was his last day – he would perform no further procedures in Kentucky.

9. The licensee agreed to enter into this Agreed Order, in lieu of the issuance of a Complaint and Emergency Order of Suspension.

## STIPULATED CONCLUSIONS OF LAW

The parties stipulate the following Conclusions of Law, which serve as the legal bases for this Agreed Order:

1. The licensee's medical license is subject to regulation and discipline by the Board.

2. Based upon the Stipulations of Fact, the licensee engaged in conduct which violates the provisions of KRS 311.595(9) [as illustrated by KRS 311.597(4)]. Accordingly, there are legal grounds for the parties to enter into this Agreed Order.

3. Pursuant to KRS 311.591(6) and 201 KAR 9:082, the parties may fully and finally resolve this matter without an evidentiary hearing by entering into an informal resolution such as this Agreed Order.

7

242

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:24:04

## AGREED ORDER

85787

Based upon the foregoing Stipulations of Fact and Stipulated Conclusions of Law, and, based upon their mutual desire to resolve the pending matter without an evidentiary hearing, the parties hereby ENTER INTO the following **AGREED ORDER:**

1. The license to practice medicine within the Commonwealth of Kentucky held by Pragya B. Gupta, M.D., is RESTRICTED/LIMITED FOR AN INDEFINITE PERIOD OF TIME, effective immediately upon the filing of this Agreed Order.

2. During the effective period of this Agreed Order, the licensee's medical license SHALL BE SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:

   a. The licensee SHALL NOT perform any act which would constitute the practice of medicine, as that term is defined or contemplated by KRS 311.840, et seq., in the Commonwealth of Kentucky, unless and until the Panel or its Chair has approved, in writing, the practice location at which he will practice as a physician. The decision whether to approve a particular practice location lies in the sole discretion of the Panel or its Chair. In determining whether to approve a practice location, the Panel or its Chair will particularly consider whether there will be appropriate oversight by a person(s) or entity that is not the licensee. In approving such practice location, the Panel or its Chair may include specific conditions/restrictions to ensure patient safety;

   b. Pursuant to KRS 311.565(1)(v), the licensee SHALL REIMBURSE the Board's costs of $2,625.00 within six (6) months from entry of this Agreed Order; and

   c. The licensee SHALL NOT violate any provision of KRS 311.595 and/or 311.597.

3. The licensee expressly agrees that if he should violate any term or condition of this Agreed Order, the licensee's practice will constitute an immediate danger to the public health, safety, or welfare, as provided in KRS 311.592 and 13B.125. The parties further agree that if the Board should receive information that the licensee has violated any term or condition of this Agreed Order, the Panel Chair is authorized by law to enter an Emergency Order of Suspension or Restriction

8

243

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:24:04

immediately upon a finding of probable cause that a violation has occurred, after an *ex parte* presentation of the relevant facts by the Board's General Counsel or Assistant General Counsel. If the Panel Chair should issue such an Emergency Order, the parties agree and stipulate that a violation of any term or condition of this Agreed Order would render the licensee's practice an immediate danger to the health, welfare and safety of patients and the general public, pursuant to KRS 311.592 and 13B.125; accordingly, the only relevant question for any emergency hearing conducted pursuant to KRS 13B.125 would be whether the licensee violated a term or condition of this Agreed Order.

4. The licensee understands and agrees that any violation of the terms of this Agreed Order would provide a legal basis for additional disciplinary action, pursuant to KRS 311.595(13), and may provide a legal basis for criminal prosecution.

SO AGREED on this _____ day of May, 2023.

FOR THE LICENSEE:

_____
PRAGYA B. GUPTA, M.D.

_____
JUDD R. UHL
COUNSEL FOR THE LICENSEE

FOR THE BOARD:

_____
DALE E. TONEY, M.D.
CHAIR, INQUIRY PANEL B

_____
NICOLE A. KING
Assistant General Counsel
Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
(502) 429-7150

9

244

NOT ORIGINAL DOCUMENT

FILED OF RECORD
03/30/2026 04:24:04 PM

JUN - 1 2023

85787

K.B.M.L.

COMMONWEALTH OF KENTUCKY
BOARD OF MEDICAL LICENSURE
CASE NO. 2106

IN RE: THE LICENSE TO PRACTICE MEDICINE IN THE COMMONWEALTH OF KENTUCKY HELD BY PRAGYA B. GUPTA, M.D., LICENSE NO. 34920, 162 BARNWOOD DRIVE, EDGEWOOD, KENTUCKY 41017

### AGREED ORDER

Come now the Kentucky Board of Medical Licensure (hereafter "the Board"), acting by and through its Inquiry Panel B, and Pragya B. Gupta, M.D. (hereafter "the licensee"), and, based upon their mutual desire to fully and finally resolve the pending investigation without an evidentiary hearing, hereby ENTER INTO the following **AGREED ORDER**:

### STIPULATIONS OF FACT

The parties stipulate the following facts, which serve as the factual bases for this Agreed Order:

1. At all relevant times, Pragya B. Gupta, M.D., was licensed by the Board to practice medicine within the Commonwealth of Kentucky.

2. The licensee's medical specialty is Interventional Pain Management.

3. In January 2023, the Board received a complaint from one of the licensee's patients alleging violations of the standard medical practice and standard of care and causing her trauma. Specifically, the grievant detailed the following issues:

   - Donald Jay Thomas "DJ" was introduced to me as the office manager. However, throughout my time under the licensee's care he was an active participant in my care. I was very uncomfortable with Mr. Thomas being in my treatment room while I was wearing a gown and not fully clothed given that he has no medical certification. On multiple occasions, he was the individual who administered the anesthesia[.] He would ask Dr. Gupta how much to administer and then measure out and give the doses by iv. [...]

   - In September 2021, I was given my first injection of cyanocobalamin [.] I was supposed to have a second injection 30 days from the first as I understand the protocol to be. At the second injection date, Dr. Gupta took

245

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:24:04

one look at me and was immediately concerned. I had let DJ and others in the office know that I did not feel right, and I had swelling. Dr. Gupta immediately knew that this was an allergic reaction. I instead was given a different injection.

- I was told during my injection procedures that I was a "VIP" patient and that I would receive good stuff. I took this to mean that I was given more anesthesia than other patients. I expected to be in a twilight type feeling while injections were being given. However, I was completely knocked out and I do not believe that was appropriate for this type of injection. On one occasion, I had issues coming out of the anesthesia in the office.

- Autumn Thomas is the wife of DJ Thomas and the clerk/billing assistant at the office. To my understanding she has had no medical training or certification, but she conducted medical functions such as taking vitals. She was also the individual that would handle sending proscriptions [*sic*] to the pharmacy. However, I do not believe that proper protocols were followed in proscribing [*sic*] as I had two different issues that I believe are very important to mention.

    a. I was proscribed [*sic*] Savella. Dr. Gupta had advised that this medication was one that needed to be stepped up to a higher dosage. I was only advised to take one a day and was supposed to receive a lower milligram capsule for so many days then pickup a higher milligram. The proscription [*sic*] was incorrectly placed by Autumn, my dosage stated two pills per day and I was started on a 25 mg which I was supposed to start on 12.5. At one point, the system as you can see in my medical records had me proscribed [*sic*] a 25 MG and a 50 mg to both take twice a day. I never took these together or in the incorrectly proscribed [*sic*] manner. However, I did have side effects from taking the 25 mg to begin [...] This causes me to have concerns that he does not fill out his own prescription orders or at the least he doesn't pay attention to what he signs.

    b. On several occasions, proscriptions [*sic*] from other doctors were ordered to be refilled by Dr. Gupta's office. My understanding from what I was told was that this was Autumn incorrectly refilling medications. My other doctors [...] were very concerned when this occurred. [...]

4. On or about February 12, 2023, the licensee responded to the grievant's complaint.

He discussed her history, diagnoses and treatment. He also included his chronology

of her care and his *curriculum vitae*. Specifically, he stated, in part:

2

246

NOT ORIGINAL

DOCUMENT

03/30/2026 04:24:04

PM

- Donnie J Thomas (DJ) is a trained medical assistant. I have trained him since 2002. In my long career, I had not had a single adverse event or serious adverse event where he was involved. I have trained him not only to perform routine Medical Assistant Jobs, but he is also a Clinical Coordinator for my ongoing clinical research work (GCP certified). [...] DJ is trained to perform more than one job. Multitasking is required to work in a solo practitioner's office. DJ helps me in the procedure room. He positions patients, attaches them to the monitors per ASA guidelines, and moves the Fluoroscope per my instruction. At times DJ administers a small dose of sedation on my request. [...] DJ was not the only person present at the time of infusion, as other MAs were there, particularly her daughter, on the day of the first infusion. I have checked her multiple times during the infusion to monitor EKG tracing and the depth of her sedation. She received good care. She was covered appropriately with blankets. There was no trigger for reactivating PTSD.

- In September, there were three encounters. [...] I don't recall the swelling at all. It was not life-threatening and without any residual problems. She is probably referring to swelling from IV fluid extravasation, which is not an allergic reaction. The patient was never administered Cyanocobalamin in my clinic.

- No, I don't recall calling any patient a VIP, although I consider all patients VIPs and treat them accordingly. Most of the time, her daughter Brittany Morris was present during transportation of her to and from the procedure room. She needed 5mg of midazolam for the procedure as she was extremely nervous. Without sedation, I could not have performed the procedure as she would not cooperate.

- Ms. Autumn Thomas is also a MA whom I have trained since 2013. Autumn Thomas occasionally helped us in the recovery unit by relieving Medical Assistants for lunch breaks when we were short-staffed during the COVID infection. Autumn Thomas is responsible for discharging patients, reviewing discharge instructions, and ensuring that patients are appropriately scheduled for post-procedure follow-up. She also helps me with billing work. In the recovery area, she would typically watch those patients who are getting ready to be discharged. All patients in the recovery area are attached to the automated monitors. She is also responsible for following all my orders, such as lab work and imaging requests.

  [...]

- The allegations that I don't take care of my prescription are inaccurate. I am meticulous and ensure that my staff follows my instruction correctly. I verify and cross-verify that the prescriptions are correctly sent by checking the logs frequently. Autumn helps me ensure that the refills are sent in a timely fashion. I enter the prescription under the appropriate diagnosis, and then she transmits the Rx electronically, which I monitor directly.

3

247

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:24:04

- No, I don't refill other physicians' prescriptions unless the patient specifically requests me to do that to save time and a visit. [...]

5. On or about March 21, 2023, a Board consultant completed a review of the grievant's medical records and found that the licensee's diagnosis and treatment were below the minimum standards of acceptable and prevailing medical practice. The Board consultant's specific diagnostic concerns were that:

- Dr. Gupta performed three cervical transforaminal epidurals without documenting the specific history and findings indicating the need for these injections [...]

- The cervical MRI showed "C4-C5 small central disc protrusion mildly compressing the thecal sac. No spinal cord or nerve root compression."

The Board consultant's specific treatment concerns were that:

- The three transforaminal cervical epidurals performed were not indicated as described under the diagnosis. In addition, after each transforaminal epidural injection there is no mention of the patient's response to the previous epidural procedure. Only after three epidurals does Dr. Gupta describe the response to the three procedures.

- The epidurals and facet injection's were performed under moderate sedation. The operating physician, Dr. Gupta cannot also serve as the anesthesia monitor. It is standard of care that the anesthesia monitor must be at least an RN. In all of the procedures his trained assistant, DJ Thomas, served as anesthesia monitor. In addition, the sedation monitoring records are incomplete and one is missing.

- There is evidence in the medical record that the grievant was over-medicated. [...] After starting these medications, on follow-ups Dr. Gupta does not address the partial response to these medications. On 6/15/2021 Dr. Gupta's interim history states "Today patient exhibited some speech difficulty and complained of weakness in right upper extremity and lower extremity." The medical record does not show any new physical exam, just a repeat of the previous exams. Dr. Gupta does not comment on these serious new complaints and he continues her treatment plan. On 7/13/2021 the patient presented with new complaints of having an "an attack of generalized numbness and fatigue-like symptoms." The patient complained of intermittent incontinence, in addition to the previous complaints [...] Over the next eight months all of her complaints continued.

- [...] Based on the list of medications and known drug interactions some of these serious symptoms, were more likely than not related to over-medication.

4

248

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:24:04

6. On or about April 4, 2023, the licensee responded to the Board consultant's report and included a detailed explanation of his treatment and reasoning for the care he provided to the grievant. He also included significant references to literature and his clinic's policies and procedures. Specifically, he explained:

- The decision to perform three cervical transforaminal injections was based on my clinical examination of the patient, my experience, and my knowledge. I examined the patient before every procedure in the procedure room. There is a record of pre-procedure VAS on each occasion. [...] This patient had complete pain relief after the third injection.

- I use sedation for anxiolysis and amnesia only. I titrate the medicine so that they are fully responsive and comfortable with minimal anxiety and can tolerate unpleasant sensations of the procedure. All patients are monitored as per ASA protocol. BP, HR, and Pulse oximetry are performed continuously in the procedure room. Patients are evaluated pre-procedure and post-procedure, and the vitals are recorded. We have followed the guidelines outlined in KBML (https://kbml.ky.gov/board/Documents/Board%20Opinion%20Office%20Based%20Surgery.pdf) (revised 2018) regarding the requirement for the safe conduct of mild sedation. In this document[,] requirement of a trained person is mentioned. All procedure personnel is ACLS trained and have been trained to assist me in the procedure room properly.

- The procedure room has all the equipment for resuscitation, including an AED, laryngoscope (3 sizes Miller and McIntosh), suction machine, ambu-bag, and oxygen cylinder. All recovery bays are fully equipped with monitors for monitoring vitals as per ASA protocol. All equipment undergoes preventative maintenance. [...]

- The MA normally positions the fluoroscope and monitors the patient. I operate the fluoroscope and constantly communicate with the patient. I am a board-certified anesthesiologist and a pain specialist. I administer 0.5mg of Versed in the procedure room and titrate the medicine slowly while my assistant and I monitor the vitals. Most of the time, the completion of the procedure takes 30 - 35 minutes (for ESI or Facet joint block), which includes an examination of the patient pre and post-procedure in the room and recovery area.

   [...]

- The patient was an extremely difficult patient to manage. I spent anywhere from 1 – 2 hours with her each visit and could not document everything that transpired during the visit. I treated her with FDA-approved combination medicine for fibromyalgia as she failed all other treatments, but she did not

5

249

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:24:04

respond. Insomnia is a known problem associated with fibromyalgia, which I treated with Lunesta. I can assure you that she did not experience any side effects from the medicine that I prescribed. [...]

7. On or about April 26, 2023, after considering the licensee's response to his report and again reviewing the records, the Board consultant changed his conclusions as follows:

- [The grievant] had a total of five procedures where she was administered intravenous sedation with midazolam 5 mg. This dosage is documented in the medical record and acknowledged by Dr. Gupta in his response to the grievance (answer number 3). Dr. Gupta's patient encounters list the billing codes used for each visit. In all instances where midazolam sedation was administered the billing was listed as moderate sedation. Dr. Gupta has indicated in his response to my report that he was using mild sedation (answer 2).

- Dr. Gupta states that [the grievant's] intravenous line infiltrated after one of her cervical epidurals in September 2021 without residual problems. He also says he has educated his staff to properly fill out anesthesia monitoring forms. I have previously stated that the guidelines for intravenous sedation require that a registered nurse be present as the anesthesia monitor to administer the sedation and, if necessary, start intravenous lines. I have included in this report the latest guidelines for conscious sedation.

- Most concerning to me is the recent information I have received regarding Donnie J. Thomas. The grievant has stated that Mr. Thomas started at least one of her intravenous lines and had administered intravenous sedation to her. Further review of Dr. Gupta's response (answer#1) to her grievance reveals by his own admission that he allows Mr. Thomas to administer intravenous midazolam.

  My conclusion is Donnie J. Thomas is practicing medicine without a license. This represents an immediate threat to the safety and health of the citizens of Kentucky.

8. The licensee, with counsel, was present at the Panel meeting on May 18, 2023. Leading up to the meeting, he provided more literature to the Panel and provided pictures of his facility to the Panel during the meeting. At the Panel meeting, he explained that he trains all his staff. He considers Mr. Thomas a Medical Assistant because of that training and because he assists him with procedures, including

6

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:24:04

pushing medications. The licensee conceded that Mr. Thomas has no certification. However, Mr. Thomas has worked with the licensee on and off for twenty years, most recently starting in 2016. During the meeting, the licensee stated that he has twelve staff members, including one Nurse Practitioner, two receptionists, two clinical coordinators, one dietitian, one exercise therapist, one discharge employee and two temporary workers for additional help. Two people are in the procedure room, but none are a Physician Assistant, Registered Nurse or certified Medical Assistant. It is during post-op that a certified Medical Assistant sees patients. He informed the Board that he has plans to move to California and had been offered a job there in October. He has transferred all his patients to another physician, and May 18, 2023 was his last day – he would perform no further procedures in Kentucky.

9. The licensee agreed to enter into this Agreed Order, in lieu of the issuance of a Complaint and Emergency Order of Suspension.

## STIPULATED CONCLUSIONS OF LAW

The parties stipulate the following Conclusions of Law, which serve as the legal bases for this Agreed Order:

1. The licensee's medical license is subject to regulation and discipline by the Board.

2. Based upon the Stipulations of Fact, the licensee engaged in conduct which violates the provisions of KRS 311.595(9) [as illustrated by KRS 311.597(4)]. Accordingly, there are legal grounds for the parties to enter into this Agreed Order.

3. Pursuant to KRS 311.591(6) and 201 KAR 9:082, the parties may fully and finally resolve this matter without an evidentiary hearing by entering into an informal resolution such as this Agreed Order.

7

251

NOT ORIGINAL

DOCUMENT

03/30/2026 04:24:04

PM

85787

## AGREED ORDER

Based upon the foregoing Stipulations of Fact and Stipulated Conclusions of Law, and, based upon their mutual desire to resolve the pending matter without an evidentiary hearing, the parties hereby ENTER INTO the following **AGREED ORDER:**

1. The license to practice medicine within the Commonwealth of Kentucky held by Pragya B. Gupta, M.D., is RESTRICTED/LIMITED FOR AN INDEFINITE PERIOD OF TIME, effective immediately upon the filing of this Agreed Order.

2. During the effective period of this Agreed Order, the licensee's medical license SHALL BE SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:

   a. The licensee SHALL NOT perform any act which would constitute the practice of medicine, as that term is defined or contemplated by KRS 311.840, et seq., in the Commonwealth of Kentucky, unless and until the Panel or its Chair has approved, in writing, the practice location at which he will practice as a physician. The decision whether to approve a particular practice location lies in the sole discretion of the Panel or its Chair. In determining whether to approve a practice location, the Panel or its Chair will particularly consider whether there will be appropriate oversight by a person(s) or entity that is not the licensee. In approving such practice location, the Panel or its Chair may include specific conditions/restrictions to ensure patient safety;

   b. Pursuant to KRS 311.565(1)(v), the licensee SHALL REIMBURSE the Board's costs of $2,625.00 within six (6) months from entry of this Agreed Order; and

   c. The licensee SHALL NOT violate any provision of KRS 311.595 and/or 311.597.

3. The licensee expressly agrees that if he should violate any term or condition of this Agreed Order, the licensee's practice will constitute an immediate danger to the public health, safety, or welfare, as provided in KRS 311.592 and 13B.125. The parties further agree that if the Board should receive information that the licensee has violated any term or condition of this Agreed Order, the Panel Chair is authorized by law to enter an Emergency Order of Suspension or Restriction

8

252

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:24:04

immediately upon a finding of probable cause that a violation has occurred, after an *ex parte* presentation of the relevant facts by the Board's General Counsel or Assistant General Counsel. If the Panel Chair should issue such an Emergency Order, the parties agree and stipulate that a violation of any term or condition of this Agreed Order would render the licensee's practice an immediate danger to the health, welfare and safety of patients and the general public, pursuant to KRS 311.592 and 13B.125; accordingly, the only relevant question for any emergency hearing conducted pursuant to KRS 13B.125 would be whether the licensee violated a term or condition of this Agreed Order.

4. The licensee understands and agrees that any violation of the terms of this Agreed Order would provide a legal basis for additional disciplinary action, pursuant to KRS 311.595(13), and may provide a legal basis for criminal prosecution.

SO AGREED on this _27th_ day of May, 2023.

FOR THE LICENSEE:

_____
PRAGYA B. GUPTA, M.D.

_____
JUDD R. UHL
COUNSEL FOR THE LICENSEE

FOR THE BOARD:

_____
DALE E. TONEY, M.D.
CHAIR, INQUIRY PANEL B

_____
NICOLE A. KING
Assistant General Counsel
Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
(502) 429-7150

9

NOT ORIGINAL
DOCUMENT

PM

03/30/2026 04:24:04

**King, Nicole A (KBML)**

| | |
|---|---|
| From: | Toney, Dale E. ████████████████ |
| Sent: | Thursday, July 6, 2023 6:44 PM |
| To: | King, Nicole A (KBML) |
| Subject: | RE: Dr. Pragya Gupta |

85787

---

**This Message Originated from Outside the Organization**

This Message is From an External Sender.

Report Suspicious

I should be able to call you tomorrow.   Dale

Dale Toney MD
Associate Professor and Chief
Division of General Internal Medicine and Women's Health
Director, Executive Health Program
University of Kentucky College of Medicine
859 323-0303

**From:** King, Nicole A (KBML) <nicolea.king@ky.gov>
**Sent:** Thursday, July 6, 2023 4:24 PM
**To:** Toney, Dale E. ████████████████
**Subject:** Dr. Pragya Gupta

CAUTION: External Sender

Dr. Toney,

I received the attached letter from Dr. Pragya Gupta's counsel, addressed to you. I am also attaching the Investigative Memo (without the exhibits) from Jon Marshall, the Meeting Minutes, and the Agreed Order to assist in your review. Once you have had had a chance to look this over, please call me at your convenience. My direct line is (502)429-7944 and my cell is ██████████

Thanks!
Nicole

*Nicole A. King*
**Assistant General Counsel**
**Kentucky Board of Medical Licensure**
**310 Whittington Parkway, Suite 1B**
**Louisville, KY 40222**
nicolea.king@ky.gov
**Tel. (502) 429-7150**
**Fax (502) 429-7118**

*This message contains information which is confidential. It is for the exclusive use of the intended recipient(s). If you are not the intended recipient(s) please note that any form of distribution, copying, forwarding or use of this communication or the information in it or attached to it is strictly prohibited and may be unlawful. If you have received this communication in error, please return it to the sender and then delete the email and destroy any copies of it.

**If this is a message to which a reply is required, please note that your reply is neither expected nor will be reviewed outside of this agency's regular business hours (Monday-Friday, 8:00 a.m. – 4:30 p.m., excluding holidays).

1

254

NOT ORIGINAL

DOCUMENT

PM

**L. Chad Elder**
celder@eldergood.com
June 30, 2023



**Elder & Good, PLLC**
**Attorneys at Law**

**Brian R. Good**
bgood@eldergood.com    04:24:04

85787

Dale E. Toney, M.D.
Chair, Panel B
310 Whittington Parkway
Kentucky Board of Medical Licensure
Louisville, KY 40222

Re: *Pragya Gupta, M.D. - Request for Worksite Approval*

Dear Dr. Toney,

On behalf of Dr. Gupta, we are requesting approval for Dr. Gupta to practice with Dr. Laxmaiah Manchikanti's Pain Management Centers of America. Dr. Manchikanti's attached letter details the expectations for Dr. Gupta's integration into his practice. Dr. Gupta would be practicing in the Paducah and Hopkinsville locations. Pursuant to the Agreed Order entered by the Board on June 1, 2023, we request the Panel Chair's approval of this request without the necessity of any further limitations or conditions.

When Dr. Gupta met with the Board in May 2023, he had closed his practice in Kentucky to move to California with his family. Unfortunately, as a result of the Agreed Order, that opportunity was withdrawn. In order to have such an opportunity in the future, Dr. Gupta recognizes that he must resolve this matter in Kentucky by resuming the practice of medicine and assuring the Board of his skill, professionalism and competency. He appreciates the opportunity Dr. Manchikanti has offered him to demonstrate his ability and willingness to meet the Board's expectations.

As the focus of the Agreed Order centered on one patient, Dr. Manchikanti has offered to provide the Board with broader quarterly reviews of Dr. Gupta's "patient encounters, compliance with interventional pain practices and standards, policies and procedures of PMCOA and ASC, technical skills, personal interactions, and overall medical judgment." As a past Board member, Dr. Manchikanti understands the Board's desire to ensure Dr. Gupta's continued safe practice. His practice provides an excellent setting for Dr. Gupta to demonstrate his abilities and regain the Board's confidence.

Dr. Gupta has taken the additional step to demonstrate his commitment to a professional, skilled, and ethical practice by voluntarily enrolling in the *CPEP ProBE* program. He will be attending the seminar July 13-15, 2023.

Based upon the information provided, we respectfully request the Panel Chair's approval of Dr. Gupta's request to practice in the Paducah and Hopkinsville settings of the Pain Management Centers of America. Dr. Gupta looks forward to being an asset to patients in the Commonwealth.

Sincerely,

L. Chad Elder

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:24:04

# Pain Management Centers of America

1101 Professional Blvd Ste 100, Evansville IN 47714 Tel.: (812) 477-7246; Fax: (812) 477-7240
67 Lakeview Dr., Paducah, KY 42001 Tel.: (270) 554-8373; Fax: (270) 554-8987

---

June 29, 2023

Dale E. Toney, M.D.
Chair, Panel B
310 Whittington Parkway
Kentucky Board of Medical Licensure
Louisville, KY 40222
*Via Email*

Re:    Pragya Gupta, M.D. practice opportunity

Dear Dr. Toney,

I am writing to describe a practice opportunity that Dr. Gupta could have with my practice, Pain Management Centers of America, if you approve his request. I have reviewed Dr. Gupta's Agreed Order entered into with the Board and have met with Dr. Gupta. As a past KBML board member, I understand the implications an Agreed Order has on a practitioner's opportunities. Dr. Gupta appears amenable to following the requirements of our practice which will concurrently demonstrate compliance with addressing the Board's concerns.

Dr. Gupta certainly has the training, experience, and qualifications to provide quality care and our practice will provide him with an opportunity to demonstrate his abilities.

Briefly, our practice has offices in Kentucky, Tennessee, Illinois, Indiana and Mississippi.

I began my practice in Paducah, Kentucky after completion of a fellowship in anesthesiology and critical care medicine in 1980. I worked extensively in advancing the evolution and development of interventional pain management as a specialty. Personally, I have over 40 years of experience. The present practice represents the 2019 merger of the longstanding practices of Pain Management Centers of Paducah, Kentucky and Illinois, and my Co-Director's, Dr. Mahendra Sanapati, Advanced Pain Care Clinics of Indiana.

Our Paducah procedure suites and surgery centers are equipped with qualified personnel with 12 RNs, 4 Radiological Technicians, and other staff. The surgery center is approved by Medicare, all insurers and AAAHC. We also employ in Paducah and Hopkinsville locations with 4 APRNs -- apart from myself, we have 3 other physicians practicing.

As to Dr. Gupta's opportunity, my plan would be to gradually integrate him into our practice. This will provide him with an opportunity to become knowledgeable of our practice processes, procedures, and expectations. Initially, Dr. Gupta will shadow me in the clinic and surgery center in Paducah, Kentucky. After familiarizing himself with our processes, I will then observe his patient encounters in the clinic and procedures in the surgery center. When my expectations are met, Dr. Gupta will then transition to having his own schedule of clinic patients in the Paducah and Hopkinsville offices. He will also be scheduled time

256

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:24:04

85787

in the Paducah surgery center for procedures. I will note that sometimes I am present in the Hopkinsville office and there is an APRN onsite in addition to the physician and other qualified staff. Of course, I would be available for consultation with Dr. Gupta as needed.

In speaking with Dr. Gupta, I appreciate his candor and willingness to regain the Board's confidence. As part of his practice with us, I am willing to provide the Board with periodic – quarterly perhaps, - reviews of Dr. Gupta's practice, to include review of his patient encounters, compliance with interventional pain practices and standards, and policies and procedures of PMCOA and ASC, technical skills, personal interactions, and overall medical judgment.

I hope this will assist Dr. Gupta in his efforts to satisfy the Agreed Order and move forward in the profession.

I am attaching a copy of my *Curriculum Vitae* and biography for your consideration. If you have further questions about our practice and the opportunity for Dr. Gupta, please feel free to contact me. I look forward to assisting Dr. Gupta and being of assistance to the Board in working through this matter with Dr. Gupta.

Sincerely,

**Laxmaiah Manchikanti, MD**
Chairman of the Board and Chief Executive Officer, ASIPP and SIPMS
Director, Pain Management Centers of America
Ambulatory Surgery Center and Pain Care Surgery Center
Clinical Professor
Anesthesiology and Perioperative Medicine
University of Louisville, Kentucky
Professor of Anesthesiology-Research
Department of Anesthesiology, School of Medicine
LSU Health Sciences Center
Shreveport, LA
2831 Lone Oak Road
Paducah, KY 42003
Phone: 270-554-8373 ext. 4101
Fax: 270-554-8987
E-mail: drm@asipp.org
https://www.linkedin.com/in/laxmaiahmanchikanti
https://www.linkedin.com/company/american-society-of-interventional-pain-pain-physicians

To view some of Dr. Manchikanti's publications go to:
https://pubmed.ncbi.nlm.nih.gov/?term=Manchikanti+L%5BAuthor%5D&sort=date

"The most entrenched conflict of interest in medicine is a disinclination to reverse a previous opinion."
*Yudkin JS et al. Lancet 2011*

"There is no limit to what a man or woman can do, or where he or she can go if he or she doesn't mind who gets the credit." *Ronald Reagan*-modified

257

DOCUMENT

PM

NOT ORIGINAL

03/30/2026 04:24:04

# CURRICULUM VITAE
# LAXMAIAH MANCHIKANTI, M.D.

| | | |
|---|---|---|
| **SPECIALTY:** | Interventional Pain Management (-09) | 85787 |

**PRACTICE:**
- Co-Founder and Director, Pain Management Centers of America
- Medical Director, Pain Management Centers of Paducah and Marion, Ambulatory Surgery Center and Pain Care Surgery Center

**ACADEMIC APPOINTMENTS:**
- Clinical Professor of Anesthesiology and Perioperative Medicine, University of Louisville, KY, since 2012
- Professor of Anesthesiology-Research, School of Medicine, LSU Health Sciences Center, Shreveport, LA, since 2020
- Professor of Anesthesiology-Research, School of Medicine, LSU Health Sciences Center, New Orleans, LA, 7/2017-7/2021
- Associate Clinical Professor of Anesthesiology and Perioperative Medicine, University of Louisville, KY, 2006-2012
- Assistant Clinical Professor of Anesthesiology and Perioperative Medicine, University of Louisville, KY, 2002-2006

**ADDRESS:**
- 67 Lakeview Dr., Paducah, KY 42001
  Telephone: (270) 554-8373, Fax: (270) 554-8987
- 108 Airway Drive, Marion, IL 62959
  Telephone: (618) 997-7820, Fax: (618) 997-6721
- E-mail ▮▮▮▮▮▮▮

**BOARD CERTIFICATIONS:**

**Subspecialty Certifications**
1. Subspecialty Certification, Pain Medicine, American Board of Anesthesiology, Initial 1993 – Re-certification – 2003, 2011, 2014, 12/31/2023
2. Diplomate of American Board of Interventional Pain Physicians, Initial 2006 – Re-certification – 2015, 2025
3. Diplomate of American Board of Pain Medicine Certification, 1993
4. Fellow of Interventional Pain Practice The World Institute of Pain, 2002

**Specialty Certifications (Anesthesiology)**
1. American Board of Anesthesiology, Diplomate, Certification, 1980
2. American College of Anesthesiologists, Fellow, Certification, 1979
3. Osmania University, Diplomate, Certification, 1976

**Medical Degree**
1. Gandhi Medical College, Osmania University, Hyderabad, AP. Degree awarded, 1973

**Other Certifications**
1. Competency Certification Examination in Coding, Compliance, and Practice Management (CCCPM), 1/2006
2. Competency Certification Examination in Controlled Substance Management (CCCSM), 1/2006
3. Federal Licensing Examination, Oklahoma State Board of Medical Examiners, 1977
4. Educational Council for Foreign Medical Graduates, 1975
5. Certified Basic Life Support Provider, American Heart Association, 2/2022
6. Certified Advanced Cardiovascular Life Support Provider, American Heart Association, 2/2022
7. Competency Certification Examination in Regenerative Medicine in Interventional Pain Management, 3/2017

258

NOT ORIGINAL
DOCUMENT
PM
03/30/2026 04:24:04
85787

**TRAINING & EXPERIENCE:**

| | | |
|---|---|---|
| Professional Training | 1. | Fellowship: |
| | | Department of Anesthesiology and Critical Care Medicine, University of Pittsburgh School of Medicine. Pittsburgh, Pennsylvania, (1979-1980) |
| | 2. | Residency: |
| | a. | Department of Anesthesiology, Allegheny General Hospital, Pittsburgh, Pennsylvania, (1978-1979) |
| | b. | Department of Anesthesiology, Youngstown Hospital Association (North Eastern Ohio Universities College of Medicine), Youngstown, Ohio (1977-1978) |
| | c. | Department of Anesthesiology: Gandhi Hospital, Secunderabad, A.P., (1974-1976) |
| | 3. | Internship: |
| | a. | Internal Medicine: Gandhi Hospital: Secunderabad, A.P. (1973-1974) |
| | b. | Flexible - Gandhi Hospital: Secunderabad, A. P. (1972-1973) |

Medical Education — Gandhi Medical College (Osmania University) Hyderabad, A.P., (1966-1972)

**PREMEDICAL EDUCATION** — Dharmavant Hindi Higher Secondary School (Junior College) Hyderabad, A.P. Graduated 1966.

**LICENSURES** — Active: Kentucky, Illinois, Indiana, Tennessee, Mississippi
Inactive: Alabama, Georgia, Louisiana, Michigan, Missouri, North Carolina, Oklahoma, Pennsylvania, South Carolina, Texas, Virginia, West Virginia

**AWARDS:**

Falco Excellence Award, American Society of Interventional Pain Physicians – 2023

Trailblazer Award, World Institute of Pain, 2019

Giants in Pain Management Award, American Society of Interventional Pain Physicians – 2017

1st Dr. P. Prithviraj Memorial Oration and Award, International Conference on Recent Advances in Pain 2017
Distinguished Alumni Award, Gandhi Medical College Global Association, 2016

Becker's Healthcare Leadership Award, Becker's Hospital Review

Interventional Pain management Visionary Award, National Spine & Pain Centers- 2015

Lifetime Achievement Award, American Society of Interventional Pain Physicians - 2011

Distinguished Physician, American Society of Interventional Pain Physicians - 2007

Distinguished Service Award, Osmania, Gandhi and Kakatiya Medical Alumni Association of America, 2006

House of Representatives Presented in honor of Dr. Laxmaiah Manchikanti, MD by Congressman Ed Whitfield, 109th Congress First Session, 2005-2006

World of Appreciation Award, American Society of Interventional Pain Physicians – 2004

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:24:04

85787

## HOSPITAL STAFF PRIVILEGES

1. Lourdes Hospital, Paducah, Kentucky, July 1980-present
2. Western Baptist Hospital, Paducah, Kentucky, February 1985-present
3. Heartland Regional Medical Center, Marion, Illinois, April 2001 – present
4. Harrisburg Medical Center, Harrisburg, Illinois, July 1988 – 1991
5. Massac Memorial Hospital, Metropolis, Illinois, December 1986 - December 1987
6. Director, Department of Anesthesiology, Lourdes Hospital, Paducah, Kentucky, 1985 & 1992

## PROFESSIONAL MEMBERSHIPS

1. American Society of Interventional Pain Physicians
2. Kentucky Society of Interventional Pain Physicians
3. Illinois Society of Interventional Pain Physicians
4. American Medical Association
5. Kentucky Medical Association
6. International Anesthesia Research Society
7. International Association for the Study of Pain

## EDITORIAL POSITIONS

Reviewer for Peer Review Journals:

Spine
Pain Physician
IPM Reports
BMC Health Services Research
BMC Musculoskeletal Disorders
International Journal of Clinical Practice
Archives of Pediatrics & Adolescent Medicine Review
Journal of Clinical Anesthesia
Future Neurology
Health Policy
Spine Journal
The Journal of Musculoskeletal Medicine
Journal of General Internal Medicine
Addiction Research & Theory
Pain Medicine
Acta Anaesthesiologica Scandinavica
JAMA
International Journal of Medical Sciences
Fundamental & Clinical Pharmacology
Expert Opinion on Pharmacotherapy
Pain
PM&R
Journal of Clinical Medicine
PLoS ONE
Journal of Hospital Administration
Annals of Internal Medicine

Revised 06/2023

3

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:24:04

## OTHER POSITIONS

**Current:**

1. Chairman of the Board and CEO– American Society of Interventional Pain Physicians
2. Chairman of the Board and CEO– Society of Interventional Pain Management Surgery Centers
3. Member of Kentucky Carrier Advisory Committee

**Past:**

1. Licensure Board – Member of the Kentucky Board of Medical Licensure: 2002-2007
2. Medicare Coverage Advisory Committee Member: 2005 – 2007
3. Board of Regents – Murray State University: 2007-2010
4. President, American Society of Interventional Pain Physicians: 1998-2004
5. President, Society of Interventional Pain Management Surgery Centers: 2006 – 2007
6. American Medical Association – Member of House of Delegates
7. Member of the Carrier Advisory Committee of the National Government Services
8. Member of Kentucky All Schedule Prescription Electronic Reporting (KASPER) Task Force

## PUBLICATIONS

**Peer Reviewed Journals**

1. Manchikanti L, Knezevic NN, Knezevic E, Pasupuleti R, Kaye AD, Sanapati MR, Hirsch JA. Efficacy of percutaneous adhesiolysis in managing low back and lower extremity pain: A systematic review and meta-analysis of randomized controlled trials. *Pain Ther* published May 25, 2023.

2. Manchikanti L. Book review: Atlas of Interventional Pain Management Procedures: A Stepwise Approach with Procedures Videos. *Pain Physician* 2023; 26:E253-E254.

3. Manchikanti L, Sanapati MR, Hirsch JA. Comment RE Dhruva et al. Long-term outcomes in use of opioids, nonpharmacologic pain interventions, and total costs of spinal cord stimulators compared with conventional medical therapy for chronic pain. *JAMA Neurol* 2023; 80(1):18-29; online comment posted January 11, 2023.

4. Manchikanti L. Letter to Editor: Re: Ambrosio et al. The systematic review of interventional minimally invasive treatments for chronic low back pain caused by lumbar facet joint syndrome provided inaccurate information. *Global Spine J* 2023 Mar 22:21925682231165961. Online ahead of print.

5. Manchikanti L, Sanapati M, Hirsch J. Re: Hara et al. Spinal cord burst stimulation vs placebo stimulation for patients with chronic radicular pain after lumbar spine surgery. *JAMA* 2023; 329:846.

6. Manchikanti L, Kaye AD, Latchaw RE, Sanapati MR, Pampati V, Gharibo CG, Albers SL, Hirsch JA. Impact of COVID-19 pandemic on utilization patterns of facet joint interventions in managing spinal pain in Medicare population. *Pain Ther* 2023; 12:505-527.

7. Manchikanti L, Knezevic NN, Knezevic E, Abdi S, Sanapati MR, Soin A, Wargo BW, Navani A, Atluri S, Gharibo CG, Simopoulos TT, Kosanovic R, Abd-Elsayed A, Kaye AD, Hirsch JA. A systematic review and meta-analysis of the effectiveness of radiofrequency neurotomy in managing chronic neck pain. *Pain Ther* 2023; 12:19-66.

8. Manchikanti L, Pampati V, Knezevic NN, Kaye AD, Abdi S, Sanapati MR, Abd-Elsayed A, Kosanovic R, Soin A, Beall DP, Shah S, Hirsch JA. The influence of COVID-19 on utilization of epidural procedures in managing chronic spinal pain in the Medicare population. *Spine (Phila Pa 1976)* 2022; published ahead of print.

NOT ORIGINAL
DOCUMENT

**Lun, Jill  (KBML)**                                                    03/30/2026 04:24:04
PM

| | |
|---|---|
| **From:** | Lun, Jill  (KBML) |
| **Sent:** | Tuesday, August 8, 2023 6:04 PM |
| **To:** | Toney, Dale E. |
| **Subject:** | Re: Pragya Gupta, M.D. |

85787

Thank you!!

Get Outlook for iOS

---

**From:** Toney, Dale E. ████████████████
**Sent:** Tuesday, August 8, 2023 4:20:59 PM
**To:** Lun, Jill (KBML) <Jill.Lun@ky.gov>
**Subject:** RE: Pragya Gupta, M.D.

This Message Originated from Outside the Organization
This Message Is From an External Sender:

Report Suspicious

Jill,

I apologize for the delay. I couldn't get the attachment downloaded yesterday but was able to do so today.

I approve and you may use my signature stamp.

Thanks.

Dale Toney MD
Associate Professor and Chief
Division of General Internal Medicine and Women's Health
Director, Executive Health Program
University of Kentucky College of Medicine
859 323-0303

**From:** Lun, Jill (KBML) <Jill.Lun@ky.gov>
**Sent:** Monday, August 7, 2023 1:20 PM
**To:** Toney, Dale E. ████████████████
**Subject:** Pragya Gupta, M.D.

CAUTION: External Sender

Dr. Toney,

Please review the attached Amended Agreed Order.  If you approve, may I use your signature stamp?  Also, if you have any questions, you may call Nicole King at 502/429-7944.

Thanks,

1

262

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:24:04

85787

*Jill Lun, Legal Assistant*
*Kentucky Board of Medical Licensure*
*310 Whittington Parkway, Suite 1B*
*Louisville, Kentucky 40222*
*502/429-7942*
*Fax: 502/429-7118*

*This message contains information which is confidential. It is for the exclusive use of the intended recipient(s). If you are not the intended recipient(s) please note that any form of distribution, copying, forwarding or use of this communication or the information in it or attached to it is strictly prohibited and may be unlawful. If you have received this communication in error, please return it to the sender and then delete the email and destroy any copies of it.

**If this is a message to which a reply is required, please note that your reply is neither expected nor will be reviewed outside of this agency's regular business hours (Monday-Friday, 8:00 a.m. – 4:30 p.m., excluding holidays).

263

NOT ORIGINAL
DOCUMENT

PM

FILED OF RECORD

*03/30/2026 04:24:04*

AUG - 8 2023

85787

K.B.M.L.

COMMONWEALTH OF KENTUCKY
BOARD OF MEDICAL LICENSURE
CASE NO. 2106

IN RE: THE LICENSE TO PRACTICE MEDICINE IN THE COMMONWEALTH OF
KENTUCKY HELD BY PRAGYA B. GUPTA, M.D., LICENSE NO. 34920, 162
BARNWOOD DRIVE, EDGEWOOD, KENTUCKY 41017

## AMENDED AGREED ORDER

Come now the Kentucky Board of Medical Licensure (hereafter "the Board"), acting

by and through the Chair of its Inquiry Panel B, and Pragya B. Gupta, M.D. (hereafter "the

licensee"), and, based upon their mutual desire to fully and finally resolve the pending

investigation without an evidentiary hearing, hereby ENTER INTO the following

**AMENDED AGREED ORDER:**

### STIPULATIONS OF FACT

The parties stipulate the following facts, which serve as the factual bases for this

Amended Agreed Order:

1. At all relevant times, Pragya B. Gupta, M.D., was licensed by the Board to practice

   medicine within the Commonwealth of Kentucky.

2. The licensee's medical specialty is Interventional Pain Management.

3. In January 2023, the Board received a complaint from one of the licensee's patients

   alleging violations of the standard medical practice and standard of care and

   causing her trauma. Specifically, the grievant detailed the following issues:

   - Donald Jay Thomas "DJ" was introduced to me as the office manager.
     However, throughout my time under the licensee's care he was an active
     participant in my care. I was very uncomfortable with Mr. Thomas being in
     my treatment room while I was wearing a gown and not fully clothed given
     that he has no medical certification. On multiple occasions, he was the
     individual who administered the anesthesia[.] He would ask Dr. Gupta how
     much to administer and then measure out and give the doses by iv. [...]

264

NOT ORIGINAL DOCUMENT

03/30/2026 04:24:04 PM

- In September 2021, I was given my first injection of cyanocobalamin [.] I was supposed to have a second injection 30 days from the first as I understand the protocol to be. At the second injection date, Dr. Gupta took one look at me and was immediately concerned. I had let DJ and others in the office know that I did not feel right, and I had swelling. Dr. Gupta immediately knew that this was an allergic reaction. I instead was given a different injection.

- I was told during my injection procedures that I was a "VIP" patient and that I would receive good stuff. I took this to mean that I was given more anesthesia than other patients. I expected to be in a twilight type feeling while injections were being given. However, I was completely knocked out and I do not believe that was appropriate for this type of injection. On one occasion, I had issues coming out of the anesthesia in the office.

- Autumn Thomas is the wife of DJ Thomas and the clerk/billing assistant at the office. To my understanding she has had no medical training or certification, but she conducted medical functions such as taking vitals. She was also the individual that would handle sending proscriptions [*sic*] to the pharmacy. However, I do not believe that proper protocols were followed in proscribing [*sic*] as I had two different issues that I believe are very important to mention.

  a. I was proscribed [*sic*] Savella. Dr. Gupta had advised that this medication was one that needed to be stepped up to a higher dosage. I was only advised to take one a day and was supposed to receive a lower milligram capsule for so many days then pickup a higher milligram. The proscription [*sic*] was incorrectly placed by Autumn, my dosage stated two pills per day and I was started on a 25 mg which I was supposed to start on 12.5. At one point, the system as you can see in my medical records had me proscribed [*sic*] a 25 MG and a 50 mg to both take twice a day. I never took these together or in the incorrectly proscribed [*sic*] manner. However, I did have side effects from taking the 25 mg to begin [...] This causes me to have concerns that he does not fill out his own prescription orders or at the least he doesn't pay attention to what he signs.

  b. On several occasions, proscriptions [*sic*] from other doctors were ordered to be refilled by Dr. Gupta's office. My understanding from what I was told was that this was Autumn incorrectly refilling medications. My other doctors [...] were very concerned when this occurred. [...]

2

265

NOT ORIGINAL

DOCUMENT

03/30/2026 04:24:04

PM

4. On or about February 12, 2023, the licensee responded to the grievant's complaint. 5787

He discussed her history, diagnoses, and treatment. He also included his chronology

of her care and his *curriculum vitae*. Specifically, he stated, in part:

- Donnie J Thomas (DJ) is a trained medical assistant. I have trained him since 2002. In my long career, I had not had a single adverse event or serious adverse event where he was involved. I have trained him not only to perform routine Medical Assistant Jobs, but he is also a Clinical Coordinator for my ongoing clinical research work (GCP certified). [...] DJ is trained to perform more than one job. Multitasking is required to work in a solo practitioner's office. DJ helps me in the procedure room. He positions patients, attaches them to the monitors per ASA guidelines, and moves the Fluoroscope per my instruction. At times DJ administers a small dose of sedation on my request. [...] DJ was not the only person present at the time of infusion, as other MAs were there, particularly her daughter, on the day of the first infusion. I have checked her multiple times during the infusion to monitor EKG tracing and the depth of her sedation. She received good care. She was covered appropriately with blankets. There was no trigger for reactivating PTSD.

- In September, there were three encounters. [...] I don't recall the swelling at all. It was not life-threatening and without any residual problems. She is probably referring to swelling from IV fluid extravasation, which is not an allergic reaction. The patient was never administered Cyanocobalamin in my clinic.

- No, I don't recall calling any patient a VIP, although I consider all patients VIPs and treat them accordingly. Most of the time, her daughter Brittany Morris was present during transportation of her to and from the procedure room. She needed 5mg of midazolam for the procedure as she was extremely nervous. Without sedation, I could not have performed the procedure as she would not cooperate.

- Ms. Autumn Thomas is also a MA whom I have trained since 2013. Autumn Thomas occasionally helped us in the recovery unit by relieving Medical Assistants for lunch breaks when we were short-staffed during the COVID infection. Autumn Thomas is responsible for discharging patients, reviewing discharge instructions, and ensuring that patients are appropriately scheduled for post-procedure follow-up. She also helps me with billing work. In the recovery area, she would typically watch those patients who are getting ready to be discharged. All patients in the recovery area are attached to the automated monitors. She is also responsible for following all my orders, such as lab work and imaging requests.

  [...]

3

266

NOT ORIGINAL

DOCUMENT

03/30/2026 04:24:04

PM

- The allegations that I don't take care of my prescription are inaccurate. I am meticulous and ensure that my staff follows my instruction correctly. I verify and cross-verify that the prescriptions are correctly sent by checking the logs frequently. Autumn helps me ensure that the refills are sent in a timely fashion. I enter the prescription under the appropriate diagnosis, and then she transmits the Rx electronically, which I monitor directly.

- No, 1 don't refill other physicians' prescriptions unless the patient specifically requests me to do that to save time and a visit. [...]

5. On or about March 21, 2023, a Board consultant completed a review of the grievant's medical records and found that the licensee's diagnosis and treatment were below the minimum standards of acceptable and prevailing medical practice.

The Board consultant's specific diagnostic concerns were that:

- Dr. Gupta performed three cervical transforaminal epidurals without documenting the specific history and findings indicating the need for these injections [...]

- The cervical MRI showed "C4-C5 small central disc protrusion mildly compressing the thecal sac. No spinal cord or nerve root compression."

The Board consultant's specific treatment concerns were that:

- The three transforaminal cervical epidurals performed were not indicated as described under the diagnosis. In addition, after each transforaminal epidural injection there is no mention of the patient's response to the previous epidural procedure. Only after three epidurals does Dr. Gupta describe the response to the three procedures.

- The epidurals and facet injection's were performed under moderate sedation. The operating physician, Dr. Gupta cannot also serve as the anesthesia monitor. It is standard of care that the anesthesia monitor must be at least an RN. In all of the procedures his trained assistant, DJ Thomas, served as anesthesia monitor. In addition, the sedation monitoring records are incomplete and one is missing.

- There is evidence in the medical record that the grievant was over-medicated. [...] After starting these medications, on follow-ups Dr. Gupta does not address the partial response to these medications. On 6/15/2021 Dr. Gupta's interim history states "Today patient exhibited some speech difficulty and complained of weakness in right upper extremity and lower extremity." The medical record does not show any new physical exam, just a repeat of the previous exams. Dr. Gupta does not comment on these serious new complaints and he continues her treatment plan. On 7/13/2021 the patient presented with new complaints of having an "an attack of

4

267

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:24:04

generalized numbness and fatigue-like symptoms." The patient complained 85787
of intermittent incontinence, in addition to the previous complaints [...]
Over the next eight months all of her complaints continued.

- [...] Based on the list of medications and known drug interactions some of
these serious symptoms, were more likely than not related to over-
medication.

6. On or about April 4, 2023, the licensee responded to the Board consultant's report

and included a detailed explanation of his treatment and reasoning for the care he

provided to the grievant. He also included significant references to literature and

his clinic's policies and procedures. Specifically, he explained:

- The decision to perform three cervical transforaminal injections was based
on my clinical examination of the patient, my experience, and my
knowledge. I examined the patient before every procedure in the procedure
room. There is a record of pre-procedure VAS on each occasion. [...] This
patient had complete pain relief after the third injection.

- I use sedation for anxiolysis and amnesia only. I titrate the medicine so that
they are fully responsive and comfortable with minimal anxiety and can
tolerate unpleasant sensations of the procedure. All patients are monitored
as per ASA protocol. BP, HR, and Pulse oximetry are performed
continuously in the procedure room. Patients are evaluated pre-procedure
and post-procedure, and the vitals are recorded. We have followed the
guidelines outlined in KBML (https://kbml.ky.gov/board/Documents/
Board%20Opinion%20Office%20Based%20Surgery.pdf) (revised 2018)
regarding the requirement for the safe conduct of mild sedation. In this
document[,] requirement of a trained person is mentioned. All procedure
personnel is ACLS trained and have been trained to assist me in the
procedure room properly.

- The procedure room has all the equipment for resuscitation, including an
AED, laryngoscope (3 sizes Miller and McIntosh), suction machine, ambu-
bag, and oxygen cylinder. All recovery bays are fully equipped with
monitors for monitoring vitals as per ASA protocol. All equipment
undergoes preventative maintenance. [...]

- The MA normally positions the fluoroscope and monitors the patient. I
operate the fluoroscope and constantly communicate with the patient. I am
a board-certified anesthesiologist and a pain specialist. I administer 0.5mg
of Versed in the procedure room and titrate the medicine slowly while my
assistant and I monitor the vitals. Most of the time, the completion of the
procedure takes 30 - 35 minutes (for ESI or Facet joint block), which

5

268

NOT ORIGINAL

DOCUMENT

PM

03/30/2026 04:24:04

includes an examination of the patient pre and post-procedure in the room 787 and recovery area.

[...]

- The patient was an extremely difficult patient to manage. I spent anywhere from 1 – 2 hours with her each visit and could not document everything that transpired during the visit. I treated her with FDA-approved combination medicine for fibromyalgia as she failed all other treatments, but she did not respond. Insomnia is a known problem associated with fibromyalgia, which I treated with Lunesta. I can assure you that she did not experience any side effects from the medicine that I prescribed. [...]

7. On or about April 26, 2023, after considering the licensee's response to his report and again reviewing the records, the Board consultant changed his conclusions as follows:

- [The grievant] had a total of five procedures where she was administered intravenous sedation with midazolam 5 mg. This dosage is documented in the medical record and acknowledged by Dr. Gupta in his response to the grievance (answer number 3). Dr. Gupta's patient encounters list the billing codes used for each visit. In all instances where midazolam sedation was administered the billing was listed as moderate sedation. Dr. Gupta has indicated in his response to my report that he was using mild sedation (answer 2).

- Dr. Gupta states that [the grievant's] intravenous line infiltrated after one of her cervical epidurals in September 2021 without residual problems. He also says he has educated his staff to properly fill out anesthesia monitoring forms. I have previously stated that the guidelines for intravenous sedation require that a registered nurse be present as the anesthesia monitor to administer the sedation and, if necessary, start intravenous lines. I have included in this report the latest guidelines for conscious sedation.

- Most concerning to me is the recent information I have received regarding Donnie J. Thomas. The grievant has stated that Mr. Thomas started at least one of her intravenous lines and had administered intravenous sedation to her. Further review of Dr. Gupta's response (answer#1) to her grievance reveals by his own admission that he allows Mr. Thomas to administer intravenous midazolam.

  My conclusion is Donnie J. Thomas is practicing medicine without a license. This represents an immediate threat to the safety and health of the citizens of Kentucky.

6

269

NOT ORIGINAL
DOCUMENT
03/30/2026 04:24:04
PM

8. The licensee, with counsel, was present at the Panel meeting on May 18, 2023. Leading up to the meeting, he provided more literature to the Panel and provided pictures of his facility to the Panel during the meeting. At the Panel meeting, he explained that he trains all his staff. He considers Mr. Thomas a Medical Assistant because of that training and because he assists him with procedures, including pushing medications. The licensee conceded that Mr. Thomas has no certification. However, Mr. Thomas has worked with the licensee on and off for twenty years, most recently starting in 2016. During the meeting, the licensee stated that he has twelve staff members, including one Nurse Practitioner, two receptionists, two clinical coordinators, one dietitian, one exercise therapist, one discharge employee and two temporary workers for additional help. Two people are in the procedure room, but none are a Physician Assistant, Registered Nurse or certified Medical Assistant. It is during post-op that a certified Medical Assistant sees patients. He informed the Board that he has plans to move to California and had been offered a job there in October. He has transferred all his patients to another physician, and May 18, 2023 was his last day -- he would perform no further procedures in Kentucky.

9. The Panel gave strong consideration to the licensee's representations that he had effectively closed his solo practice, having transferred all of his patients and ceased performing procedures in Kentucky in anticipation of his move to California. Although the licensee desired to maintain a Kentucky license, Panel members felt that the issues raised in the investigation were not such that they could be corrected by remedial education and monitoring and that he should not practice in an independent setting in Kentucky. The Panel and the licensee agreed to enter into an

7

270

NOT ORIGINAL DOCUMENT

03/30/2026 04:24:04 PM

Agreed Order, in lieu of the issuance of a Complaint and Emergency Order of Restriction.

10. The Agreed Order, filed of record on June 1, 2023, required that the licensee's medical license SHALL BE SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:

   a. The licensee SHALL NOT perform any act which would constitute the practice of medicine, as that term is defined or contemplated by KRS 311.840, et seq., in the Commonwealth of Kentucky, unless and until the Panel or its Chair has approved, in writing, the practice location at which he will practice as a physician. The decision whether to approve a particular practice location lies in the sole discretion of the Panel or its Chair. In determining whether to approve a practice location, the Panel or its Chair will particularly consider whether there will be appropriate oversight by a person(s) or entity that is not the licensee. In approving such practice location, the Panel or its Chair may include specific conditions/restrictions to ensure patient safety;

   b. Pursuant to KRS 311.565(1)(v), the licensee SHALL REIMBURSE the Board's costs of $2,625.00 within six (6) months from entry of this Amended Agreed Order; and

   c. The licensee SHALL NOT violate any provision of KRS 311.595 and/or 311.597.

11. On or about June 12, 2023, the licensee reimbursed the Board for costs in the amount of $2,625.00.

12. On or about June 30, 2023, the licensee, through his counsel, advised the Board that his opportunity in California was withdrawn. Therefore, he requested approval to practice in Kentucky with Dr. Laxmaiah Manchikanti at Pain Management Centers of America, P.S.C. If approved, the licensee stated that he would be practicing in the Paducah and Hopkinsville locations.

13. Attached to the licensee's request was a letter from Dr. Laxmaiah Manchikanti explaining:

8

271

NOT ORIGINAL

DOCUMENT

03/30/2026 04:24:04

PM

[M]y plan would be to gradually integrate [Dr. Gupta] into our practice 787 This will provide him with an opportunity to become knowledgeable of our practice processes, procedures, and expectations. Initially, Dr. Gupta will shadow me in the clinic and surgery center in Paducah, Kentucky. After familiarizing himself with our processes, I will then observe his patient encounters in the clinic and procedures in the surgery center. When my expectations are met, Dr. Gupta will then transition to having his own schedule of clinic patients in the Paducah and Hopkinsville offices. He will also be scheduled time in the Paducah surgery center for procedures. I will note that sometimes I am present in the Hopkinsville office and there is an APRN onsite in addition to the physician and other qualified staff. Of course, I would be available for consultation with Dr. Gupta as needed.

14. The Panel and the licensee now enter into this Amended Agreed Order to approve the licensee's location to practice medicine under Dr. Laxmaiah Manchikanti at Pain Management Centers of America, P.S.C. in the Paducah and Hopkinsville locations pursuant to the terms and conditions of this Amended Agreed Order.

## STIPULATED CONCLUSIONS OF LAW

The parties stipulate the following Conclusions of Law, which serve as the legal bases for this Amended Agreed Order:

1. The licensee's medical license is subject to regulation and discipline by the Board.

2. Based upon the Stipulations of Fact, the licensee engaged in conduct which violates the provisions of KRS 311.595(9) [as illustrated by KRS 311.597(4)]. Accordingly, there are legal grounds for the parties to enter into this Amended Agreed Order.

3. Pursuant to KRS 311.591(6) and 201 KAR 9:082, the parties may fully and finally resolve this matter without an evidentiary hearing by entering into an informal resolution such as this Amended Agreed Order.

9

272

NOT ORIGINAL

DOCUMENT

03/30/2026 04:24:04

PM

## AMENDED AGREED ORDER

85787

Based upon the foregoing Stipulations of Fact and Stipulated Conclusions of Law, and, based upon their mutual desire to resolve the pending matter without an evidentiary hearing, the parties hereby ENTER INTO the following **AMENDED AGREED ORDER:**

1. The license to practice medicine within the Commonwealth of Kentucky held by Pragya B. Gupta, M.D., is RESTRICTED/LIMITED FOR AN INDEFINITE PERIOD OF TIME, effective immediately upon the filing of this Amended Agreed Order.

2. During the effective period of this Amended Agreed Order, the licensee's medical license SHALL BE SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:

   a. The licensee SHALL NOT perform any act which would constitute the practice of medicine, as that term is defined or contemplated by KRS 311.840, et seq., in the Commonwealth of Kentucky, unless and until the Panel or its Chair has approved, in writing, the practice location at which he will practice as a physician. The decision whether to approve a particular practice location lies in the sole discretion of the Panel or its Chair. In determining whether to approve a practice location, the Panel or its Chair will particularly consider whether there will be appropriate oversight by a person(s) or entity that is not the licensee;

      i. Once approved, the licensee SHALL NOT change practice locations without first obtaining written approval by the Panel or its Chair for such change. The parties agree that the Panel or its Chair may require additional conditions and/or restrictions as a condition of it granting approval for a new practice location;

      ii. The licensee is approved to practice medicine at the following locations of Pain Management Centers of America, P.S.C.:

         1. **Pain Management Center | Paducah, KY**
            **67 Lakeview Drive**
            **Paducah, Kentucky 42001**

         2. **Pain Management of America Surgery Center**
            **2831 Lone Oak Road**
            **Paducah, Kentucky 42003**

10

NOT ORIGINAL

DOCUMENT

03/30/2026 04:24:04

PM

3. **Pain Management Center | Hopkinsville, KY**      85787
   112 Keeton Drive
   Hopkinsville, Kentucky 42240

   b. The licensee understands that his practice of medicine at Pain Management Centers of America, P.S.C. may be subject to review by the Board at is discretion including but not limited to requesting reviews from Dr. Manchikanti relevant to whether the licensee's practice of medicine meets acceptable and prevailing medical practices in the Commonwealth of Kentucky; and

   c. The licensee SHALL NOT violate any provision of KRS 311.595 and/or 311.597.

3. As an express condition for the entry of this Amended Agreed Order, each party understands and agrees that the Board will never consider any petition for termination or modification the terms of the agreement in any way that would allow the licensee to practice in an independent setting in the Commonwealth of Kentucky. Any communication by the licensee and/or his agents to the Board attempting to revive this matter or modify or terminate the terms set forth in this Amended Agreed Order will be returned without being provided or forwarded to any Board member.

4. The licensee expressly agrees that if he should violate any term or condition of this Amended Agreed Order, the licensee's practice will constitute an immediate danger to the public health, safety, or welfare, as provided in KRS 311.592 and 13B.125. The parties further agree that if the Board should receive information that the licensee has violated any term or condition of this Amended Agreed Order, the Panel Chair is authorized by law to enter an Emergency Order of Suspension or Restriction immediately upon a finding of probable cause that a violation has occurred, after an *ex parte* presentation of the relevant facts by the Board's General Counsel or Assistant General Counsel. If the Panel Chair should issue such an

11

274

NOT ORIGINAL

DOCUMENT

03/30/2026 04:24:04

PM

Emergency Order, the parties agree and stipulate that a violation of any term 95787
condition of this Amended Agreed Order would render the licensee's practice an
immediate danger to the health, welfare and safety of patients and the general
public, pursuant to KRS 311.592 and 13B.125; accordingly, the only relevant
question for any emergency hearing conducted pursuant to KRS 13B.125 would be
whether the licensee violated a term or condition of this Amended Agreed Order.

5.  The licensee understands and agrees that any violation of the terms of this Amended
    Agreed Order would provide a legal basis for additional disciplinary action,
    pursuant to KRS 311.595(13), and may provide a legal basis for criminal
    prosecution.

    SO AGREED on this  7ᵗʰ  day of _____ Aug _____, 2023.

FOR THE LICENSEE:

_____
PRAGYA B. GUPTA, M.D.


_____
L. CHAD ELDER
COUNSEL FOR THE LICENSEE

FOR THE BOARD:

_____
DALE E. TONEY, M.D.
CHAIR, INQUIRY PANEL B

_____
NICOLE A. KING
Assistant General Counsel
Kentucky Board of Medical Licensure
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
(502) 429-7150

12

275

NOT ORIGINAL
DOCUMENT
PM
03/30/2026 04:25:03

NO. 24-CI-01033

FRANKLIN CIRCUIT COURT
DIVISION TWO (2)
HON. THOMAS D. WINGATE

**FILED**
**NOV 07 2024**
FRANKLIN CIRCUIT COURT
KEM MARSHALL, CLERK

PRAGYA B. GUPTA, M.D.

PETITIONER

v.

KENTUCKY BOARD OF MEDICAL LICENSURE, et al.

RESPONDENTS

### Index to Documents – Kentucky Board of Medical Licensure
### v. Pragya B. Gupta, M.D.
### Agency Case No. 2106
### Volume 1 of 1

### Personal information in the documents listed below have been redacted.

|    |    |    | Pages |
|----|----|----|-------|
| 1. | Memorandum to Panel B from Jon Marshall, Medical Investigator, with Exhibits 1-5 attached | 05/01/23 | 001 - 221 |
|    | Exhibit 1 – Grievance | | 004 - 006 |
|    | Exhibit 2 – Dr. Gupta's response to grievance | | 007 - 021 |
|    | Exhibit 3 – Board consultant's report | | 022 - 028 |
|    | Exhibit 4 – Dr. Gupta's response to consultant's report | | 029 - 107 |
|    | **(Sealed pages 035 – 058 – Medical Records)** | | |
|    | Exhibit 5 – Board consultant's final report | | 108 - 136 |
|    | Handout – Supplemental Response to Grievance | | 137 - 207 |
|    | **(Sealed pages 153 – 164 – Medical Records)** | | |
|    | **(Sealed pages 166 – 175 – Medical Records)** | | |
|    | **(Sealed pages 204 – 207 – Medical Records)** | | |
|    | Statutory Options Checklist | | 208 |
|    | Photographs provided at Panel meeting | | 209 - 221 |
| 2. | Minutes – Panel B | 05/18/23 | 222 - 232 |
| 3. | CD – Presentation of Dr. Gupta to Panel B | 05/18/23 | 233 |
| 4. | Letter to Praya B. Gupta, M.D. w/proposed Agreed Order | 05/19/23 | 234 - 244 |
| 5. | Agreed Order | 06/01/23 | 245 - 253 |
| 6. | Email chain between Nicole A. King and Dale Toney, M.D. with Attachment | 07/06/23 | 254 - 261 |
| 7. | Email chain between Jill Lun and Dale Toney, M.D. | 08/07/23-08/08/23 | 262 – 263 |

NOT ORIGINAL DOCUMENT

8.    Amended Agreed Order                                        08/08/23        264-275

I hereby certify that these are the true and correct copies of the above-named documents in the case of Pragya B. Gupta, M.D., Case No. 2106.

Dated this _7th_ day of November, 2024.

TYRA JOHNSON, RECORDS CUSTODIAN
KENTUCKY BOARD OF MEDICAL
      LICENSURE
310 Whittington Parkway, Suite 1B
Louisville, Kentucky 40222
502/429-7150

cc:    Lisa English Hinkle, Esq.
       Ed Monarch, Esq.
       Valerie Michael, Esq.
       Katy Harvey, Esq.

NOT ORIGINAL
DOCUMENT
03/30/2026 04:25:03
PM
85787

NO. 24-CI-01033                          FRANKLIN CIRCUIT COURT
                                             DIVISION TWO (2)
                                         HON. THOMAS D. WINGATE


PRAGYA B. GUPTA, M.D.                              PETITIONER


V.


KENTUCKY BOARD OF MEDICAL LICENSURE, et al.  RESPONDENTS

**<u>Index to Documents – Kentucky Board of Medical Licensure</u>**
**<u>v. Pragya B. Gupta, M.D.</u>**
**<u>Agency Case No. 2106</u>**
**<u>Volume 1 of 1</u>**